D. Maimon Kirschenbaum
JOSEPH & KIRSCHENBAUM LLP
32 Broadway, Suite 601
New York, NY 10004
(212) 688-5640
(212) 688-2548 (fax)

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------x

**JOSEPH PASQUARELLO,**

        **Plaintiff,**

        **v.**

**CROTHALL HEALTHCARE, INC. and**
**MICHAEL ROCHE,**

        **Defendants.**

-----------------------------------------------------x

           **COMPLAINT**

           **DEMAND FOR JURY TRIAL**

Plaintiff Joseph Pasquarello alleges as follows:

## INTRODUCTION

1.     Plaintiff Joseph Pasquarello knows fire safety. He is a retired firefighter and former fire marshal. He is a fire safety expert and investigator, and holds numerous certificates in the area of fire safety and emergency responsiveness. He is also a 9/11 first responder, whose quick thinking saved lives in the moments before the Twin Towers collapsed. It would be difficult to find a person more qualified than Plaintiff Pasquarello to manage the fire safety department of a large hospital system like Mount Sinai Hospital.

2.     But, Defendants Crothall Healthcare, Inc. and Michael Roche, Senior Director of Engineering, pushed 55-year-old Pasquarello out of his job leading the Fire Safety department after he complained of egregious and intentional age discrimination.

3.     Rather than keep a veteran fire safety expert at the helm of Mount Sinai Hospital, Defendants Crothall Healthcare, Inc. and Michael Roche are replaced Pasquarello with a man half his age and with no fire safety training.

## JURISDICTION AND VENUE

4.     Plaintiff Joseph Pasquarello brings this action against Defendants alleging discrimination and retaliation claims brought under the Age Discrimination in Employment Act of 1967 ("ADEA"); New York Equal Pay Act, NYLL § 194 ("NY EPA"); New York City Human Rights Law, ("NYCHRL"), and the New York Administrative Code §§ 8-107(1), et al. ("NYSHRL").

5.     This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because this case is brought under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq*. This Court has supplemental jurisdiction over the New York state and city law claims, as they are so related to the claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

6.     Venue is proper in this District because Defendants conduct business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## THE PARTIES

7.     Defendant Crothall Healthcare, Inc. ("Crothall" or the "Company") is a private corporation incorporated in Delaware, with offices nationwide, including an office located at 126 East 56th Street, New York, New York. Crothall provides management services to healthcare

organizations nationwide,  including Mount Sinai Hospital in New York City, and is a subsidiary of Compass Group, a multinational corporation.

8.      Defendant Michael Roche ("Defendant Roche") is the Senior Director of Engineering at Crothall and Plaintiff's direct supervisor. Defendant Roche is in his 30s.

9.      Crothall and Defendant Roche, collectively are referred to herein as the "Defendants."

10.     Plaintiff Joseph Pasquarello ("Plaintiff Pasquarello" or "Plaintiff") is a New York resident who worked for Defendants from October of 2019 through September 2021 as Assistant Director of Fire Safety for the Mount Sinai Hospital system.  Plaintiff is 55-years-old.

## BACKGROUND FACTS

11.     Plaintiff Pasquarello came to Crothall with over 20 years of experience in fire safety. He has served as a fire marshal, a firefighter, a first responder at Ground Zero on 9/11, a fire safety expert and investigator, a police officer and a U.S. Marine. He holds numerous certificates for his extensive training in fire safety and emergency responsiveness.

12.     Among other services, Defendant Crothall provides facilities management services to healthcare and educational organizations. One of Defendant Crothall's clients is Mount Sinai Hospital ("Mount Sinai" or the "Hospital") in New York City.

13.     Mount Sinai is one of the largest healthcare systems in the country. The largest Mount Sinai campus, which comprises approximately 15 buildings, is the main campus located in New York City.

14.     In 2019, Defendant Crothall was seeking to staff its Fire Safety department for the main campus of Mount Sinai Hospital.

15.     Defendant Crothall recruited Plaintiff by contacting him via LinkedIn for an open Fire Safety Manager position. Although he interviewed for a Manager role, Plaintiff was ultimately offered the role of Assistant Director based on his obvious over-qualification for a Manager level position.

16.     Mount Sinai played a key role in Plaintiff's hiring to the extent that Patricia Lamb, Chief of Ancillary & Support Services and Senior Vice President of Mount Sinai Health System, made the job offer to Plaintiff. She made the offer contingent on the final approval of Crothall's Systems Director of Fire Safety for Mount Sinai Health System, Bob Shaffer.

17.     Bob Shaffer, a fellow retired firefighter, easily approved Plaintiff's candidacy based on Plaintiff's obvious qualifications for the job.

18.     Defendant Roche also interviewed Plaintiff, but he was not the ultimate decision-maker in granting Plaintiff a job offer.

19.     Although Plaintiff's title was Assistant Director, until his retaliatory demotion, Plaintiff Pasquarello functioned as the the the de facto Director of the Fire Safety department from the inception of his tenure.

20.     He reported directly to Senior Director of Engineering Defendant Roche and had no Director above him.

<u>**Age Discrimination**</u>

21.     The Fire Safety department is part of Crothall's Facilities Engineering division that provides facilities management services to Mount Sinai Hospital. The Engineering division is managed by Defendant Roche.  Plaintiff was one of only two employees over 50 that reports

directly to Defendant Roche.[1] All other employees managed by Defendant Roche are in their 20s and 30s.

22.     When Plaintiff took over the Fire Safety department from Matthew Bond, a man in his 30s, the department was in disarray. As a result of Mr. Bond's performance deficiencies, he was demoted to Fire Safety Manager and became Plaintiff's direct report.

23.     As Assistant Director of Fire Safety, Plaintiff immediately began addressing and fixing shortfalls in the department, including, for example, completing outstanding work orders, fire marshal performance and training, staff deficiencies, fire safety policies and protocol.

24.     From the beginning of his employment with Defendants, Plaintiff Pasquarello endured significantly harsher and more negative treatment from Defendant Roche compared to his younger colleagues. Defendant Roche consistently denied Plaintiff access to equipment, training and staff needed for his department. Defendant Roche held Plaintiff responsible for the work and mistakes of his younger colleagues, and held Plaintiff to a different standard of performance than his younger counterparts.

25.     When Plaintiff joined Crothall in October of 2019, Defendant Roche was supposed to schedule Plaintiff for the standard Crothall training. Upon information and belief, Plaintiff's younger colleagues are routinely scheduled for that training promptly after their hire date. Plaintiff requested the training numerous times, and each time Defendant Roche said he would "let [Plaintiff] know." Ultimately, Defendant Roche never gave Plaintiff access to the Crothall training, but instead criticized Plaintiff when he did not know specific information or processes he was supposed to have learned at that very training.

---

[1] Wayne Thomas, who is in his 70s, is an Assistant Director of Engineering in a separate building and is preparing for retirement.

26. Defendant Roche also denied Plaintiff and his department the necessary equipment needed to do his job and fulfill the needs of the Fire Safety department.

27. For example, when he began his job, Plaintiff requested a laptop computer in order to perform his duties, and a large monitor for the fire marshals' office. Defendant Roche informed Plaintiff that only one computer was permitted for each department and that he should therefore take Mr. Bond's computer, if he needed one. Plaintiff did not take his direct report's computer, which would have further prevented Mr. Bond from performing his essential duties. As the head of Fire Safety for Mount Sinai Hospital, Plaintiff is on-call 24 hours a day. He did not want to risk the safety of the hospital's buildings by not having a laptop that allows him to log into the hospital's system at all times. Thus, Plaintiff purchased his own computer so his work would not be impeded.

28. Defendant Roche told Plaintiff to draft a proposal to justify the fire marshals' monitor. To date, Defendant Roche has not approved this essential piece of equipment.

29. Plaintiff also requested a large monitor in or around May of 2020, during a time of civil unrest in this country, in order to monitor local events and protect the safety of the hospital buildings. Defendant Roche denied this request. Even after the civil unrest had subsided, Plaintiff still needed the extra monitor to properly and efficiently address his tasks. Defendant Roche again refused to approve the reasonable request for basic equipment.

30. By contrast, Defendant Roche regularly approved new furniture and television screens for the younger Directors and Assistant Directors he supervises, regardless of whether their jobs require such equipment. Rather than using this equipment for work, the younger employees' television screens are generally tuned to sports games and the stock market. New office furniture is purchased for younger Crothall employees regardless of any specific need.

31.     Defendant Roche did not deny essential equipment to the younger Assistant Directors and Directors that report to him.

32.     Defendant Roche also denied Plaintiff essential staff for his department.

33.     When Plaintiff became Assistant Director of Fire Safety, he supervised two Managers, Mr. Bond, who had been demoted to Manager from Assistant Director of Fire Safety for performance reasons, and Joe Jerrain, a man in his 50s. Plaintiff also was responsible for managing approximately 18 fire marshals.

34.     In his Manager role, Mr. Bond handled the paperwork related to the Fire Safety department, while Mr. Jerrain managed the immediate needs of the 18 fire marshals supervised by Plaintiff.

35.     When Plaintiff began in his role, Defendant Roche actively worked with Plaintiff to put Mr. Jerrain, the older manager, on a performance plan. Defendant Roche had wanted to terminate Mr. Jerrain, but Plaintiff recommended Mr. Jerrain for transfer to provide him with an opportunity to succeed. Ultimately, Mr. Jerrain was transferred to a smaller hospital in Queens within the Mount Sinai system serviced by Crothall in or about February of 2020 where he has been successful.

36.     When Plaintiff approached Defendant Roche about finding a replacement for this critical Manager role, Defendant Roche responded that Plaintiff would only get the necessary staff after Plaintiff met the vague benchmark of "getting the department to 100 percent."

37.     Aside from causing an overload of work for Plaintiff, who was left to do his own work and the job of his direct report, this also put the hospital's Fire Safety department in a

vulnerable position. It took nearly a year before Plaintiff was finally permitted to hire a Fire Safety Manager to replace Mr. Jerrain.[2]

38.     Defendant Roche approached the performance deficiencies of Mr. Bond, Plaintiff's younger direct report, very differently than his handling of Mr. Jerrain.  Although, Mr. Bond was also not meeting performance expectations, Defendant Roche refused to support putting Mr. Bond on a performance plan. Mr. Bond was falling short on urgent impact interim life safety measures ("ILSM ") among other things. Despite Plaintiff's concern for the effect on safety that these deficiencies could cause Mount Sinai Hospital, Defendant Roche refused to permit coaching or writing up of Mr. Bond.

39.     Mr. Bond's deficiencies could not be ignored, however, and in January of 2021, a woman named Omelfi Garcia transferred to Plaintiff's department to replace Mr. Bond as Fire Safety Manager. Rather than losing his job or even being written up for performance concerns, the young Mr. Bond was transferred by Defendant Roche to a newly created role – Engineering Manager.

40.     In or about January of 2021, when Ms. Garcia joined Fire Safety, and Mr. Bond transferred out, she requested an office chair to replace the small temporary chair she had been using. Defendant Roche refused to approve the obviously reasonable request by Plaintiff's direct report. By contrast, when new employees were hired in the departments managed by younger employees, their offices were renovated and equipped with brand new furniture, regardless of whether such furniture is essential to their work.

41.     In addition, Ms. Garcia was expected to train her replacement for her previous role, and train Mr. Bond in aspects of his new role, while also fulfilling her responsibilities for Fire

---

[2] In or about December of 2020, Plaintiff was able to hire Ron Kanterman as Fire Safety Manager.

Safety. Ms. Garcia ultimately left Crothall just a few months after joining Plaintiff's team because of the utter lack of support and the mistreatment directed toward Fire Safety as a result of Defendant Roche's discriminatory animus toward Plaintiff.

42.     On or about January 26, 2021, Plaintiff prevented the spread of a large fire in the hospital. His skill and bravery saved the hospital, but also landed him in the emergency room. He received accolades from all his colleagues at Crothall and Mount Sinai, including Patricia Lamb.

43.     In fact, Plaintiff had submitted to Defendant Roche revised fire safety response procedures several times prior to the January 2021 fire.  Each time, Defendant Roche had prevented Plaintiff's suggestions from circulating up the chain of command for feedback and adoption. Time and again, Defendant Roche refused to move Plaintiff's submissions forward in an effort to prevent other people at Crothall and Mount Sinai Hospital from recognizing Plaintiff's abilities. This failure to circulate and adopt the fire safety plan put Plaintiff and other employees in danger when the fire broke out in January of 2021.

44.     When Plaintiff drafted his report about the fire incident, he wanted to include in his report suggested best practices for improving the hospital's emergency response protocols moving forward.

45.     Defendant Roche prevented Plaintiff from including these recommendations in his report on the fire, which continues to prevent the hospital from being maximally protected.

46.     In or about February of 2021, Patricia Lizarazo of Crothall's Human Resources department met with Plaintiff to inform him he had been nominated as Manager of the Month. Ms. Lizarazo then asked Plaintiff how things were going in his department. At that point, Plaintiff reported to Ms. Lizarazo that Defendant Roche treated him differently and held him to a different

standard than his younger counterparts. He also reported not getting essential equipment and staff for his department.

47.     At that time, Crothall did not investigate or act on Plaintiff's complaint of age discrimination.

48.     On February 22, 2021, Plaintiff met with Bob Shaffer, Defendant Roche, Ron Kanterman and Chris Hariegel, Crothall's Vice President of Operations Engineering, to address staffing needs in the Fire Safety department that Defendant Roche refused to address. In that meeting Mr. Hariegel agreed with Plaintiff's proposal for the hiring of a new Impairment Coordinator ("IC"), which would allow Plaintiff to better address the needs of his department. "Impairments" occur when various utilities in the hospital are temporarily and intentionally shut down in order to conduct testing or maintenance. This work includes coordinating with other departments to ensure the safety of the building during each shutdown. The Fire Safety department manages over 100 of these impairments every month. If Plaintiff managed every impairment on his own, he would not be able to do any of his work as the head of Fire Safety.

49.     Therefore, the same day that Mr. Hariegel approved the hiring of an IC, Plaintiff presented Defendant Roche with a job description for the new position. Despite Mr. Hariegel's clear approval, Defenant Roche refused to allow the hiring of an IC to proceed. Later, as described below, Defendant Roche would refer to Plaintiff as the Impairment Coordinator, holding Plaintiff responsible for his own work and the work of yet another lower-level role.

50.     None of the other younger Assistant Directors or Directors reporting to Defendant Roche is expected to perform the jobs of their direct reports in addition to their own jobs. None of the younger Assistant Directors or Directors are required to have a perfect department while short-staffed before being granted the necessary headcount to do their jobs properly.

51.     Both Ms. Garcia and Ron Kanterman resigned from their roles in Fire Safety less than a year after joining the department as a direct result of Defendant's Roche's policies and practices that consistently overloaded their department and deprived them of the tools and staff needed to protect Mount Sinai Hospital. Ms. Garcia stayed for only three months and Mr. Kanterman stayed for just seven months as a result of the blatant discriminatory treatment.

52.     Defendant Roche further humiliated Plaintiff by making Plaintiff's vacation time contingent on him getting approval for it from his direct reports in an effort to demean him and undermine his authority.

53.     Upon information and belief, the younger Directors and Assistant Directors reporting to Defendant Roche do not need to have their earned vacation time approved by their direct reports.

54.     Defendant Roche cultivated a work environment where Plaintiff's colleagues, all of whom are significantly younger than Plaintiff, were empowered to dump their work on Plaintiff, openly mistreat him, and question his authority as a fire safety expert.

55.     For example, as part of Mr. Bond's new role as Engineering Manager, Defendant Roche assigned Mr. Bond to review the Fire Safety department's logs and paperwork. Rather than reviewing it to support Fire Safety, which remained woefully understaffed, Mr. Bond reviewed the books for mistakes and deficiencies. Ironically, the mistakes and deficiencies he is finding are the ones he created during his ill-fated tenure as Assistant Director of Fire Safety and then as Fire Safety Manager. Nevertheless, Defendant Roche held Plaintiff responsible for these deficiencies found in the paperwork.

56.     In or about May of 2021, Mr. Bond sent Plaintiff an email criticizing Fire Safety for its history not having buildings offline in time for the inspections in the past. Ironically, these

incidents occurred when Mr. Bond served as the Manager of Fire Safety and was responsible for getting buildings offline for inspections. When Mr. Kanterman took over that role, Fire Safety stopped having problems getting the buildings offline on time. Regardless of this fact, Defendant Roche allowed and encouraged this mischaracterization of facts in order to implicate the one older employee on his team.

57.    Plaintiff was regularly blamed in this way for the failures of younger employees in a clear attempt by Defendant Roche to push Plaintiff out of his job.

58.    As a result of being consistently short-staffed and delegated work from other departments, Plaintiff regularly worked 12 to 15 hour days. At the same time, Plaintiff's younger colleagues had time to watch ballgames on their large screen televisions, congregate in each other's offices, and leave the office for bike rides midday. Defendant Roche is well-aware of these circumstances because he was generally congregating with these younger employees and taking extended lunch breaks with them. Defendant Roche permited the younger employees to deflect work onto Plaintiff, who was already overloaded and short-staffed in his department.

59.    Defendant Roche also refused to acknowledge Plaintiff's accomplishments and tried to prevent others from recognizing Plaintiff's abilities. Defendant Roche repeatedly instructed Plaintiff not to communicate with Mr. Hariegel, Ms. Lamb, or anyone else at Mount Sinai to prevent Plaintiff from building relationships with people at the Company or at Mount Sinai.

60.    On May 7, 2021, Plaintiff discovered that Defendant Roche had not only prevented others from recognizing Plaintiff's skill, but he also was denigrating Plaintiff in front of other Crothall employees, including Mr. Shaffer.

61.    On May 10, 2021, Plaintiff questioned Defendant Roche about disparaging comments he made to Mr. Shaffer.

62.    In response, and without any basis at all in Plaintiff's actual work performance and accomplishments as the head of Fire Safety, Defendant Roche told Plaintiff that the Fire Safety department was not where he wanted it to be. Even while acknowledging that Plaintiff got everything done that was asked of him, Defendant Roche said he did not see Plaintiff lasting in the department more than six months. Defendant Roche then told Plaintiff to start looking for a new job. Plaintiff, who had been obviously excelling in his work was in shock.

63.    Defendant Roche did not at any time during that conversation or prior express what his goals were for the Fire Safety department. He also did not commend Plaintiff on any of the many concrete and measureable improvements Plaintiff had made to the department.

64.    On May 25, 2021, Plaintiff and Defendant Roche met again to follow-up on the disturbing comments Defendant Roche had made on May 10, 2021. During this meeting, Defendant Roche again criticized Plaintiff unjustifiably and ignored all the tangible improvements that Plaintiff achieved in his department.

65.    Defendant Roche never once commended Plaintiff for addressing the over 500 open and long-overdue work orders Plaintiff inherited from Mr. Bond's tenure. In just a year and a half, Plaintiff fixed and closed nearly all of the 500 open work orders – some of which were 60 days to several years overdue.

66.    Defendant Roche refused to acknowledge Plaintiff for improving both the training and performance of the team of fire marshals he directed. The fire marshals had been poorly trained and underperforming on Mr. Bond's watch.

67.     Defendant Roche never commended Plaintiff for his heroic actions on January 26, 2021, when Plaintiff's swift and skilled actions saved Mount Sinai Hospital from a dangerous fire and landed Plaintiff in the emergency room. Plaintiff received accolades from Ms. Lamb and others at Mount Sinai and Crothall, but Defendant Roche remained silent.

68.     Defendant Roche also did not acknowledge that Plaintiff drafted and updated all processes and procedures for the Fire Safety department that have since led to more awareness and preparedness. Plaintiff also addressed unique Covid-19-related safety concerns during his tenure and processed over 800 impairments in 2021 alone without the help of an Impairment Coordinator.

69.     Further, Plaintiff had been handling an influx of additional work orders and vendor management responsibilities resulting from the Hospital's Joint Commission inspections. The Joint Commission audit is an inspection that occurs once every several years. It requires an enormous amount of time and preparation and the hospital's eligibility for Medicare and Medicaid funding is dependent on the hospital meeting the Joint Commission's standards. Defendant Roche never acknowledged the time-consuming nature of these responsibilities or how well Plaintiff managed them without the benefit of a fully-staffed department.

70.     Plaintiff pointed out to Defendant Roche that he was treated differently than his younger counterparts and also held to a different standard in terms of work performance. In response, Defendant Roche made clear to Plaintiff that his days in Fire Safety were numbered.

71.     Following Plaintiff's complaint of age discrimination, Defendant Roche intensified his discriminatory treatment of Plaintiff.

72.     In response to Defendant Roche's effort to disparage, harass and push him out, Plaintiff sent an email to Defendant Crothall's human resources department on May 26, 2021, complaining of harassmsent, hostile work environment, and age discrimination. Plaintiff reiterated

that he was denied training, support and equipment while his younger colleagues received equipment for leisure use, sufficient personnel to address the needs of their departments and the authority to dump their duties on Plaintiff. Further, Plaintiff reported that Defendant Roche was clearly attempting to humiliate and push Plaintiff out of his job.

73.     Although Defendant Crothall acknowledged receipt of Plaintiff's complaint of age discrimination, it did not provide Plaintiff with any details that it was investigating his allegations.

74.     On June 9, 2021, Plaintiff met with Ms. Lizarazo from HR to discuss his complaint. Ms. Lizarazo informed Plaintiff that "appropriate actions were taken" but stated that the results of the Company's investigation were confidential. Thus, Plaintiff received no resolution to his allegations, no positive change in his circumstances and no protection from retaliation. Ms. Lizarazo then declared the case closed.

75.     However, the case was far from closed. On the day following the closure of the Plaintiff's complaint, Defendant Roche presented Plaintiff with a retaliatory and unfounded progressive counselling and put him on a bogus 90-day performance improvement plan ("PIP"). This was Plaintiff's first PIP in his decades long career in Fire Safety.

76.     Defendant Roche included in the progressive counselling incidents that were the result of his younger colleagues not fulfilling their duties and an incident that he and Plaintiff resolved six months prior. That incident only became the subject of a write-up after Plaintiff complained of age discrimination.

77.     Further, the action items on the PIP were primarily tasks that were already being successfully performed by Plaintiff in addition to being requirements that were not placed on Plaintiff's younger predecessor, Mr. Bond.

78.     For example, Defendant Roche listed timely completion of preventative maintenance as the first action item on the PIP. Plaintiff's Fire Safety department was the only department working under Defendant Roche with 100 percent closed preventive measures every month on his clock. All other departments led by Plaintiff's younger counterparts consistently had open preventive measures.

79.     Defendant Roche also sought to penalize Plaintiff for not attaining certain Certificates of Fitness from the Fire Department, including an F89 certificate and various ancillary certificates required for fire marshals. When Plaintiff started at Crothall, he had the F89 certification, which makes the ancillary certifications redundant and unnecessary.[3] However, his certification expired during the Covid-19 pandemic when all testing and ceritifications were halted. Defendant Roche had previously communicated that Plaintiff should attain all certificates by October of 2021. He never expressed any urgency or priority regarding the F89 certification. Further, Defendant Roche never required these certifications of Plaintiff's younger predecessor. Mr. Bond never attained the F89 certification and was never written up for that failure while he served as Assistant Director of Fire Safety.

80.     Further, Defendant Roche did not need Plaintiff to have the F89 certification to perform his role in Fire Safety. Fire Safety needs at least one fire marshal within the department to possess the F89 certification so they are eligible to sign off on fire safety plans. Plaintiff has since learned that Defendant Roche intended to use Plaintiff as the person with such certification to avoid using a fire marshal who he would be contractually obligated to pay the higher union rate. Further, Defendant knew for months that Plaintiff's certification expired during the height of the

---

[3] Defendant Roche is not familiar with fire safety qualifications and thus did not understand that the F89 certificate encompasses all ancillary certificates of fitness and makes the attainment of the ancillary certifications redundant.

Covid-19 pandemic and never told him to renew it. Only after Plaintiff complained of age discrimination did Defendant Roche decide it was an issue worthy of a write-up.

81.     The PIP also included unrealistic deadlines for paperwork that were never communicated to Plaintiff or required of his younger predecessor or counterparts.

82.     In further retaliation for Plaintiff's complaint of age discrimination, Defendant Roche removed Plaintiff's authority to hire his own Managers.

83.     When presenting Plaintiff with the utterly unjustifiable PIP, Defendant Roche announced that he had hired a new Director of Fire Safety who would become Plaintiff's direct supervisor. Defendant Roche essentially stripped Plaintiff of the role he had fulfilled in an exemplary way for the past year and a half.

84.     Rather than allow for the hiring of desperately needed Managers under Plaintiff, Defendant Roche chose to punitively hire a Director above Plaintiff, constructively demoting Plaintiff to a Manager level.

85.     The Director position was never posted, and Plaintiff, who has acted as the de facto Director for a year and a half, had no opportunity to apply for the position.

86.     Defendant Roche's handpicked replacement for Plaintiff's job is a man in his 30s with no fire safety education. The new Director studied environmental health and safety, and his training in fire safety is limited to what he learned while working in his previous role as a Manager at a smaller hospital served by Defendant Crothall. The new Director also has no experience managing staff, though he would have to take over Plaintiff's functions as the supervisor of 18 fire marshals in addition to two Fire Safety Managers.

87.     Rather than giving Plaintiff the Director title he deserved, and filling the needed Manager positions, Defendant Roche chose to humiliate Plaintiff by stripping him of his authority

and forcing him to report to a man half his age and without the critical skills and experience needed to lead Fire Safety.

88.     Plaintiff immediately reported the retaliatory and harassing PIP to HR, Mr. Hariegel and Mr. Shaffer. Plaintiff described in an email how the PIP was harassing, based on false and misleading statements, mischaracterized events, and intended to hold Plaintiff to a different standard than his younger colleagues.

89.     The PIP also did not follow Defendant Crothall's own protocol for progressive counselling.

90.     Plaintiff reported Defendant Roche's clear efforts to push out the one "older" employee on his team in retaliation for Plaintiff's complaint.

91.     On June 15, 2021 Defendant Crothall's HR department sent an email acknowledging receipt of Plaintiff's complaint of age discrimination, hostile work environment and retaliation. The communication provided no further information regarding a plan to investigate or follow up with Plaintiff.

92.     In or about June of 2021, the fire department was scheduled to do a test on the water valves of Mount Sinai Hospital's Hess Building. Mr. Bond, as Engineering Manager, and Ryan Nowicki, as Director of Engineering, were responsible for managing this type of project, while Crothall's engineers and vendors generally conduct the test. Plaintiff's role had always been to make sure the responsible parties conducted the tests, did it on time and corrected any problems that were found. However, as a result of the environment cultivated by Defendant Roche, Mr. Nowicki ordered Plaintiff to manage and physically observe the test that should have been handled by Mr. Bond. Defendant Roche supported Mr. Nowicki's improper delegation of work to Plaintiff despite his already overwhelming work load.

93.    The following day, overwhelmed by the extreme stress caused by Defendant Roche's discrimination and Defendant Crothall's failure to protect him from retaliation, Plaintiff was admitted to the emergency room with severe chest pain and required several days of medical leave to recover.

94.    On June 23, 2021, Plaintiff returned to work and was introduced to his new boss, Bernie Nunez. Mr. Nunez was previously a Manager at a smaller hospital. Crothall promoted him at least two levels when he became Director of Fire Safety. Mr. Nunez asked Plaintiff to choose which of the Fire Safety roles previously filled by Plaintiff's direct reports Plaintiff prefered to fulfill now that Mr. Nunez would be taking over as Director of Fire Safety.

95.    Further, Plaintiff asked Mr. Nunez to allow Plaintiff to meet with the fire marshals and be the first to inform them of the change in command. Mr. Nunez denied Plaintiff's request and introduced himself to the team of fire marshals. This not only caused stress and shock among the fire marshals, it revealed the intentional nature of this humiliating staffing change directed by Defendant Roche.

96.    Clearly, Defendant Roche intended this change in Fire Safety management to humiliate Plaintiff and drive him out of his job.

97.    Defendant Roche's demotion of Plaintiff had no basis in the belief that Plaintiff was unable to do his job. In fact there is no question that Defendant Roche believed Plaintiff had the skills, qualifications and ability to run the Fire Safety department on his own.

98.    For example, Defendant Roche went on vacation July 5, 2021 through July 9, 2021. At the same time, Defendant Roche allowed the new Director not to show up for work at Mt. Sinai hospital while he trained in his replacement at his prior hospital.

99.     In the meantime, Defendant Roche left Plaintiff to run the Fire Safety department as he usually did and also fulfil the vast number of tasks that should be handled by a full staff of Fire Safety Managers reporting to Plaintiff. At that time, Plaintiff was performing the work of the Director of Fire Safety and two Fire Safety Managers.

100.     Plaintiff requested a list of priorities from Defendant Roche in order to manage the immense workload according to Defendant Roche's preferences. Defendant Roche refused to communicate any priorities. Defendant Roche was intentionally setting Plaintiff up for failure and pushing him out of his job.

101.     Mr. Nunez, the new Director designated to supervise Plaintiff, also left no guidance at the time for how Plaintiff should address the work of an entire department alone.

102.      Defendant Roche clearly knew Plaintiff had the skills and knowledge to set these priorities in his absence, otherwise he would not leave Mount Sinai's Fire Safety department unstaffed and vulnerable.

103.     In addition to single-handedly running Fire Safety, doing the work of three or more people, including managing payroll for the fire marshalls – a task for which he has no training – Plaintiff was also preparing the hospital for the Joint Commission audit.

104.     The Joint Commission audit is an assessment of the hospital in many key areas, including Fire Safety, in order for the hospital to maintain its eligibility to receive Medicare and Medicaid funding.

105.     On July 12, 2021, the Joint Commission began its review of the hospital. Although Plaintiff was responsible for preparing the hospital facilities for this critical inspection, Defendant Roche assigned Plaintiff to attend an arbitration on the first day of the Joint Commission review and excluded him from participating on the second day.

106.     Prior to Plaintiff's complaint of discrimination, the plan had always been for Plaintiff to accompany Mount Sinai leadership on the walk through the hospital with the Joint Commission team. After Plaintiff's complaints of discrimination, Defendant Roche actively prevented Plaintiff from participating in the Joint Commission review.

107.     Nevertheless, at the conclusion of the Joint Commission audit, Plaintiff was informed that the Joint Commission commended his paperwork and diligence throughout the hospital as some of the best they had ever seen in a Joint Commission review. Both Bob Shaffer and Mr. Bond reported to Plaintiff that the Joint Commission auditors said that this review was the best they had ever seen.

108.     Defendant Roche did not acknowledge this or mention it to Plaintiff.

109.     On Friday, July 16, 2021, following the Joint Commission review, Plaintiff again complained to Mr. Hariegel about Defendant Roche's discrimination and retaliatory PIP. He questioned Mr. Hariegel about why he was on a PIP when he was clearly excelling in his work. Plaintiff also questioned why a younger, less experienced employee had been placed above him, essentially demoting Plaintiff to a Manager level.

110.     Mr. Hariegel acknowledged that Mr. Nunez had less experience than Plaintiff. Mr. Hariegel stated that nobody had claimed that Plaintiff was not doing his job, but that Plaintiff was on a PIP for concerns with his paperwork, and Mr. Nunez was good at "paperwork." This bizarre response belied the high marks Plaintiff's paperwork received in the most important paperwork audit for the hospital in three years.

111.     Clearly, when Defendant Roche handpicked Plaintiff's replacement as Director of Fire Safety, Mr. Nunez' younger age was his strongest qualification.

112.    Plaintiff asked Mr. Hariegel, if documentation had been a real issue in his department all along, why had Defendant Roche only raised the issue recently in a PIP rather than speaking to Plaintiff about it or issuing a preliminary write-up. Mr. Hariegel acknowledged Mr. Roche's deficiency as a good leader saying, "Experience cannot be taught."

113.    Plaintiff complained to Mr. Hariegel that he was treated differently than the younger Directors and Assistant Directors supervised by Defendant Roche. For example, Plaintiff stated that he could not even get Defendant Roche to approve the basic equipment he needed to optimally perform his job.

114.    Mr. Hariegel stated that Plaintiff should use the Fire Safety budget for these basic items. Mr. Hariegel also revealed to Plaintiff that the younger Assistant Directors and Directors supervised by Defendant Roche had unfettered access to use their departments' budgets for basic supplies. They are empowered to use those budgets according to their own discretion. Defendant Roche conveniently never informed Plaintiff at any point during his employment that he had a budget for supplies for his department. Instead, any time Plaintiff required basic supplies, Plaintiff had to submit proposals to Defendant Roche. Often, Defendant Roche denied Plaintiff's requests. The one time Plaintiff had attempted to purchase face masks and gloves for his fire marshals on his own, Defendant Roche screamed at him saying that the money was "not [Plaintiff's] budget to use." Clearly, this was blatantly false and yet another effort by Defendant Roche to impede Plaintiff's performance and humiliate him.

115.    On Monday, July 19, 2021, Defendant Roche immediately retaliated against Plaintiff for complaining to Mr. Hariegel about Defendant Roche's unlawful behavior.

116.    After briefly thanking Plaintiff for his hard work on the Joint Commission report, Defendant Roche issued Plaintiff another bogus write-up in an obvious attempt to build a paper

trail to support Plaintiff's imminent termination. The write-up criticized Plaintiff for having one single preventative measure that was closed on June 30, 2021 instead of by June 25, 2021, as required by Defendant Roche's PIP. This critique was baseless for several reasons. First, the preventative measure should have remained open because it was for a facilities test scheduled for March of 2022. Because Mr. Bond improperly closed the work order on June 30, 2021 instead of correcting the date, it looked like a preventive measure that closed a few days after Defendant Roche's arbitrary deadline. Further, the preventive measure showed that Mr. Bond signed off on the preventive measure without checking whether the preventive measure – scheduled for March 2022 – had actually been completed. Further, this particular preventive measure closed while Plaintiff was on a planned vacation. Therefore, Defendant Roche himself would have been the person instructing Mr. Bond to improperly close the open preventative measure. In reality, Plaintiff's department addressed at least 100 preventive maintenance work orders for the month of June, and all of them closed by the end of the month. This was in addition to the hundreds of life safety work orders generated that month in preparation for the Joint Commission audit.

117.    Defendant Roche also wrote up Plaintiff for not having all interim life safety measures ("ILSM") closed within 24 hours during the month of June. He described an ILSM that came to Plaintiff's email on June 23, 2021 at 8:01 a.m. He states that it was closed the morning of June 24, 2021 without listing an exact time. Defendant Roche essentially wrote up Plaintiff for an ILSM that was addressed just minutes after the 24-hour deadline.

118.    There is no doubt that Defendant Roche issued this second write-up in direct retaliation for Plaintiff's complaint the previous business day of continued age discrimination and retaliation.

119.     The bogus PIP from Defendant Roche expired on September 8, 2021. Leading up to that date, Defendant Roche, in his final efforts to push Plaintiff out of the Company, criticized Plaintiff again for issues that were either mischaracterized or wholly out of his control. Defendant Roche also made demands on Plaintiff that were impossible to fulfill. For example, while Plaintiff took courses and tested for the F89 certification listed in the PIP, Defendant Roche also instructed Plaintiff to fulfill his daily responsibilities at the office.

120.     Defendant Roche sent Plaintiff emails, clearly building a paper trail of false allegations against Plaintiff. He made it clear to Plaintiff that Plaintiff would soon be out of a job.

121.     The increasingly hostile accusations caused enormous stress to Plaintiff, and, after consulting with his health care providers and being treated for high blood pressure, Plaintiff resigned from his employment from Crothall on or about September 21, 2021.

122.     Every day since the beginning of Plaintiff's employment, Defendant Roche discriminated against him based on his age. Following Plaintiff's official complaints of discrimination, Defendant Roche immediately retaliated and ultimately pushed Plaintiff out of his job. Plaintiff suffered enormous emotional distress that caused lasting physical symptoms.

**Equal Pay Claims**

123.     Plaintiff was also not compensated as well as his younger counterparts.

124.     Plaintiff earned $112,500 when he began as Assistant Director of Fire Safety. Upon information and belief, Mr. Bond, who is at least 20 years younger than Plaintiff, earned more than Plaintiff when performing the same job, despite having fewer credentials and deficient performance.

125.     When Plaintiff supervised Mr. Bond in his role as Fire Safety Manager, Mr. Bond was earning $110,000.

126.     Upon information and belief, Mr. Bond earned significantly more than $112,500 when he served as Assistant Director of Fire Safety.

127.     Further, Plaintiff's replacement, Mr. Nunez, was hired as a Director but will be fulfilling all the same responsibilities that Plaintiff had as Assistant Director. Upon information and belief, there is no difference between the job that Plaintiff performed since being hired and the Director role now given to Mr. Nunez. For example, Mr. Nunez is now responsible for, among other duties, hiring Fire Safety Managers, ensuring that preventive measures and ILSMs are timely addressed, negotiating the fire marshal's contract with their union and attending meetings with the hospital's various committees for fire safety, emergency management, and lab safety.

128.     Upon information and belief, as Director, Mr. Nunez is compensated at a rate higher than Plaintiff, despite performing the same or substantially similar job functions as Plaintiff did in his Assistant Director role.

129.     Further, the younger Directors and Assistant Directors  supervised by Defendant Roche all earned at least $5,000 more than Plaintiff desite having fewer years of experience and less qualifications. Plaintiff's younger counterparts primarily address maintenance issues for Mount Sinai. Their work is generally less urgent than Plaintiff's work and often deals with cosmetic rather than critical life safety issues. Further, at least 2/3 of the Joint Safety Commission audit concerns the Fire Safety department, as opposed to the areas managed by his younger counterparts.

130.     Nevertheless, Crothall pays the younger Directors and Assistant Directors more than they paid Plaintiff.

131.     As a result of Defendants' illegal and intentional actions, Plaintiff has suffered and continues to suffer lost income and serious emotional distress.

## FIRST CLAIM FOR RELIEF
### Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*) ("ADEA") – Age Discrimination

132.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

133.         Defendants have intentionally discriminated against Plaintiff on the basis of his age by treating Plaintiff less well than his younger colleagues and by holding Plaintiff to different and more stringent performance standards than his younger counterparts.

134.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary.

135.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

136.     As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to lost wages and damages for emotional distress, physical injuries, and medical treatment, and such other legal and equitable relief as this Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*) ("ADEA") – Retaliation

137.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

138.     In violation of the ADEA, Defendants retaliated against Plaintiff for complaining about age discrimination.

139.    Defendants' retaliation was sufficiently severe so as to affect the terms of Plaintiff's employment.

140.    Defendants' conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.

141.    As a direct and proximate consequence of Defendants' retaliation against Plaintiff, he has suffered, and continues to suffer, substantial monetary and non-monetary damages, including, but not limited to, emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, humiliation and anguish.

142.    As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to: damages for lost wages, emotional distress, punitive damages, post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as the Court deems just and proper.

### THIRD CLAIM FOR  RELIEF
**New York State Human Rights Law ("NYSHRL") – N.Y. Exec. Law §§ 290 *et seq.*
Age Discrimination**

143.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

144.    In violation of NYSHRL, Defendants intentionally discriminated against Plaintiff on the basis of his age.

145.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary.

146.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to

emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

147.     As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to lost wages and damages for emotional distress, physical injuries, and medical treatment, and such other legal and equitable relief as this Court deems just and proper.

### FOURTH CLAIM FOR RELIEF
### NYSHRL – N.Y. Exec. Law §§ 290 *et seq.* – Retaliation

148.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

149.     In violation of the NYSHRL, Defendants retaliated against Plaintiff for complaining about discrimination.

150.     Defendants' retaliation was sufficiently severe so as to affect the terms of Plaintiff's employment.

151.     Defendants' conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.

152.     As a direct and proximate consequence of Defendants' retaliation against Plaintiff, he has suffered, and continues to suffer, substantial monetary and non-monetary damages, including, but not limited to, emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, humiliation and anguish.

153.     As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to: damages for lost wages, emotional distress, punitive damages, post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as the Court deems just and proper.

## FIFTH CLAIM FOR RELIEF
### New York City Human Rights Law ("NYCHRL")
### N.Y. Admin. L. §§8-101 et seq. – Age Discrimination

154.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

155.     A copy of this Complaint will be delivered to the New York City Corporation Counsel.

156.     In violation of the NYCHRL, Defendants discriminated against Plaintiff on the basis of his age.

157.     As a direct and proximate result of Defendants' discrimination against Plaintiff, he has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary.

158.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

159.     Defendants' conduct was malicious, intended to injure and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.

160.     As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to lost wages, damages for emotional distress, physical injuries, and medical treatment; punitive damages; attorneys' fees and costs; and such other legal and equitable relief as this Court deems just and proper.

## SIXTH CLAIM FOR RELIEF
### NYCHRL Violations, N.Y. Admin. Code §§ 8-107(7) – Retaliation

161.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

162.        In violation of NYCHRL, Defendants retaliated against Plaintiff for complaining about discrimination.

163.        As a direct and proximate consequence of Defendants' retaliation against Plaintiff, Plaintiff suffered, and continues to suffer, substantial monetary damages, including, but not limited to, a loss of income and employment benefits.

164.        As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to backpay, lost employment benefits, as well as front pay, liquidated damages, post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

## SEVENTH CLAIM FOR RELIEF
### New York Equal Pay Act ("NY EPA"),
### N.Y. Lab. Law §§ 194, 198.

165.        Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

166.        Defendants have discriminated against Plaintiff within the meaning of the New York Equal Pay Act, N.Y. Lab. Law § 194, by providing him with lower pay than similarly situated younger colleagues on the basis of his age even though Plaintiff performed similar duties requiring the same skill, effort, and responsibility as his younger counterpart(s).

167.        The differential in pay between employees was not due to seniority, merit, quantity or the quality of production, or a factor other than age.

168.        Defendants caused, attempted to cause, contributed to or caused the continuation of wage discrimination based on age, in violation of the New York EPA.

169.        The foregoing conduct constitutes a willful violation of the New York EPA within the meaning of N.Y. Lab. Law 198(1-a).

170.        Plaintiff seeks all legal and equitable remedies available for violations of the New York EPA, including unpaid compensation, liquidated damages, attorneys' fees and costs, pre- and post-judgment interest, and such other legal and equitable relief as this Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

A.        An award of damages, according to proof, including, back pay, front pay, compensatory damages, emotional distress damages, liquidated damages, and punitive damages, to be paid by Defendant;

B.        Penalties available under applicable laws;

C.        Costs of action incurred herein, including expert fees;

D.        Attorneys' fees;

E.        Pre-judgment and post-judgment interest, as provided by law; and

F.        Such other and further legal and equitable relief as this Court deems necessary, just and proper.

Dated:  New York, New York
        October 25, 2021

Respectfully submitted,

JOSEPH & KIRSCHENBAUM LLP

By:  /s/ Leah Seliger
     D. Maimon Kirschenbaum
     Leah Seliger
     32 Broadway, 6th Floor
     New York, NY 10004
     Tel: (212) 688-5640
     Fax: (212) 688-2548

*Attorneys for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which he has a right to jury trial.