# EXHIBIT A

1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   ---------------------------------------X
    JOSEPH PASQUARELLO,
4
                    Plaintiff,              Case No.
5                                           21-cv-08732(JMF)
            -against-
6
    CROTHALL HEALTHCARE, INC. and
7   MICHAEL ROCHE,

8                   Defendants.
    ---------------------------------------X
9

10      VIDEOTAPED DEPOSITION OF JOSEPH PASQUARELLO

11                  Taken Remotely

12              Friday, July 15, 2022

13

14

15

16

17

18

19

20

21

22

23   Reported by

24   JEFFREY BENZ, CRR, RMR

25   JOB NO. 213687

Page 2

```
1
2
3
4                   July 15, 2022
5                   10:00 a.m.
6
7
8
9        Videotaped Deposition of JOSEPH PASQUARELLO,
10   taken remotely, before Jeffrey Benz, a Certified
11   Realtime Reporter, Registered Merit Reporter and
12   Notary Public of the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2   A P P E A R A N C E S:
3
4        JOSEPH & KIRSCHENBAUM LLP
5        Attorneys for Plaintiff
6             32 Broadway
7             New York, New York 10004
8        BY:   LEAH SELIGER, ESQ.
9
10   LITTLER MENDELSON P.C.
11        Attorneys for Defendants
12             900 Third Avenue
13             New York, New York 10022
14        BY:   SHAWN CLARK, ESQ.
15             ZACK SHARPE, IV, ESQ.
16
17
18
19
20
21   ALSO PRESENT:
22        MATTHEW PEREZ, Videographer
23
24
25
```

Page 4

```
1                   Pasquarello
2        THE VIDEOGRAPHER:  Good morning.  My
3   name is Matthew Perez.  I am a legal
4   videographer in association with TSG
5   Reporting Inc.  Because this is a remote
6   deposition, I will not be in the same room
7   with the witness.  Instead, I will record
8   this videotape deposition remotely.  The
9   reporter, Jeff Benz, also will not be in
10   the same room and will swear in the witness
11   remotely.
12        Do all parties stipulate to the
13   validity of this video recording and remote
14   swearing and that it will be admissible in
15   the courtroom as if it had been taken
16   following Rule 30 of the Federal Rules of
17   Civil Procedures and the state rules where
18   this case is pending?
19        MR. CLARK:  Yes, defendants' counsel
20   so stipulates for defendants.
21        MS. SELIGER:  Yes, plaintiff's counsel
22   so stipulates for plaintiff.
23        THE VIDEOGRAPHER:  Thank you.
24        This is the start of Media labeled
25   Number 1 of the video-recorded deposition
```

Page 5

```
1                   Pasquarello
2   of Joseph Pasquarello in the matter of
3   Joseph Pasquarello versus Crothall
4   Healthcare Inc. and Michael Roche, in the
5   United States District Court, Southern
6   District of New York, Case Number
7   21-cv-08732.  This deposition is being held
8   via Zoom on July 15, 2022, at approximately
9   10:00 a.m.
10        My name is Matthew Perez.  I am the
11   legal video specialist from TSG Reporting
12   Inc., headquartered at 228 East
13   45th Street, Suite 810, New York, New York.
14   The court reporter is Jeff Benz, in
15   association with TSG Reporting.
16        Counsel, please introduce yourselves.
17        MR. CLARK:  Good morning.  Shaun
18   Clark, for defendants Crothall Health and
19   Mike Roche.
20        MS. SELIGER:  Leah Seliger, with
21   Joseph & Kirschenbaum, for plaintiff,
22   Joseph Pasquarello.
23        MR. SHARPE:  And Zack Sharpe, also for
24   defendant.
25        THE VIDEOGRAPHER:  Thank you.  Will
```

Pasquarello

```
 1              the court reporter please swear in the
 2              witness.
 3    JOSEPH PASQUARELLO,
 4              called as a witness, having been first
 5              duly sworn by Jeffrey Benz, a Notary
 6              Public within and for the State of New
 7              York, was examined and testified as
 8              follows:
 9    EXAMINATION BY MR. CLARK:
10         Q.   Okay.  Good morning, Mr. Pasquarello.
11    I believe we've met before, but let me
12    reintroduce myself.  My name is Shaun Clark,
13    and, as you know, I am counsel for Crothall
14    Health and Mike Roche in a lawsuit brought by
15    you.
16              I'm going to be asking you a series of
17    questions today about your allegations in this
18    lawsuit.  You understand that?
19         A.   Yes.
20         Q.   You've been deposed before, right?
21         A.   Yes.
22         Q.   How many times?
23         A.   I don't know exactly, but a half a
24    dozen is a safe bet.
```

Pasquarello

```
 1         Q.   When was the last time you were
 2    deposed?
 3         A.   I would say approximately -- other
 4    than in -- in court, about five years ago.  I
 5    was a witness to the termination of some
 6    employees about two to three years ago.  I don't
 7    know if that's an actual deposition.
 8         Q.   Yeah.  When you say you were "a
 9    witness to termination of some employees," what
10    do you mean by that?
11         A.   A couple of the fire marshals that
12    were disciplined and ultimately terminated, I
13    presented the case to human resources, and they
14    questioned me on it.
15         Q.   Were you sworn under oath in that
16    questioning with human resources?
17         A.   Yes.
18         Q.   In the half dozen or so depositions
19    that you've had, were you a party in any
20    lawsuit?
21         A.   Yes.
22         Q.   All right.  Of the half dozen
23    depositions that you had, how many of those were
24    for a lawsuit in which you were a party?
```

Pasquarello

```
 1         A.   One.
 2         Q.   And what was the name of that case?
 3         A.   It was a tenant below me versus me and
 4    the insurance company.  I don't recall the exact
 5    name of the tenant.
 6         Q.   Do you know what the nature of the
 7    claims were?  I'm sorry.  Go ahead.
 8         A.   I own -- I own a rental property, and
 9    there was a leak in the wall that caused damage
10    to the apartment below.  And they sued,
11    obviously, myself and the insurance company, and
12    it was ultimately settled with the insurance
13    company.
14         Q.   Have you been a party to any other
15    lawsuits, other than that landlord-tenant action
16    that you just told me about?
17         A.   There was one over -- I believe it was
18    over ten years ago that involved the -- an
19    allegation of harassment when I was a Boy Scout
20    leader.
21         Q.   And you were a party in that action?
22         A.   I was.
23         Q.   As a plaintiff or a defendant?
24         A.   Defendant.
```

Pasquarello

```
 1         Q.   The allegation of harassment, was it
 2    against you?
 3         A.   It was -- yes, me and the Boy Scouts
 4    of America.
 5         Q.   And what specifically was the
 6    allegations against you?
 7         A.   It was harassment.  We had an argument
 8    at camp.
 9         Q.   How did that case resolve?
10         A.   The defendants -- well, I am the
11    defendant.  The plaintiff never brought it after
12    depositions.
13         Q.   So the plaintiff stopped pursuing his
14    or her claims?
15         A.   Yes.
16         Q.   Do you know what the plaintiff's name
17    was in that case?
18         A.   Rothenberg, I believe.
19         Q.   Can you spell that for me?
20         A.   It would be a total guess.  I would
21    probably butcher it.
22         Q.   Give me your best guess, if you can.
23    I won't hold you to it.
24         A.   R-O-T-H-E-N-B-E-R-G, maybe.
```

Pasquarello

1
2    Q.   Okay.  Any other lawsuits in which you
3    were a party that you haven't already told me
4    about?
5    A.   No, that's it.
6    Q.   Okay.  So I know you've been deposed
7    before.  I know you've been a party to a lawsuit
8    before.  But I still want to go over some ground
9    rules for today's deposition, which may sound
10   familiar to you and they may not.  I think it
11   would be helpful to go over it and make all of
12   our lives easier today.
13   A.   Okay.
14   Q.   So to start, you've been placed under
15   oath by the court reporter.  You understand
16   that?
17   A.   Yes.
18   Q.   And do you understand that's the same
19   oath that you would take if you were testifying
20   before a judge or a jury in court?
21   A.   Yes.
22   Q.   That oath requires you to answer my
23   questions fully, truthfully, and accurately.  Do
24   you understand that?
25   A.   Yes.

Pasquarello

1
2    Q.   You are doing well so far, but today
3    I'm going to ask that you give me verbal answers
4    to my questions.  You'll see the court reporter
5    is here with us and taking down every word that
6    we say here, but he cannot take down gestures or
7    nods or waves or any kind of nonverbal answer.
8    So in response to my question, please give a
9    verbal answer.  Do you understand that?
10   A.   Understood.
11   Q.   And, again, you're doing well on this
12   today.  I'm sure at some point one of us or both
13   of us will mess this up but we should talk one
14   at a time so that the court reporter can take
15   down the full question, then the full answer.
16        So I will do my best to pause after my
17   question to let you answer and pause before
18   beginning my next question, and I'll ask that
19   you allow me to finish my question before
20   starting your answer.  Can we agree to that?
21   A.   Yes.
22   Q.   If at any point you do not understand
23   a question or you did not hear a question, will
24   you ask me to rephrase it or restate it?
25   A.   Yes.

Pasquarello

1
2    Q.   If you do not ask me to rephrase or
3    restate it, I'll assume you understood my
4    question, and I'll expect that you'll give me a
5    verbal answer.  Do you understand that?
6    A.   Yes.
7    Q.   Okay.  This is not a marathon.  If at
8    any time today you need a break, please just let
9    me know.  If there is a question pending, I'll
10   ask that you answer that question, or maybe a
11   series of a few questions so we can wrap that
12   up, and then I'll be happy to give you whatever
13   break you need to use the restroom, get water,
14   or whatever you need to do.  Do you understand
15   that?
16   A.   Yes.
17   Q.   Okay.  This is a remote deposition.
18   We're not in the same room today.  So where are
19   you right now?
20   A.   I have a high ranch, so I'm on the
21   first level of my home.
22   Q.   Is anybody else there in the room with
23   you?
24   A.   No.  My wife was here, but she went
25   outside in the yard.

Pasquarello

1
2    Q.   And what kind of device are you using
3    to appear for today's virtual deposition?
4    A.   My laptop computer.
5    Q.   Other than the Zoom window for this
6    deposition, do you have any other windows or
7    applications open on your computer?
8    A.   Just the email that I linked into the
9    Zoom link.
10   Q.   Okay.  I'm going to ask you to close
11   that email and any email program you might have
12   open in the background.
13   A.   They should all be closed.
14   Q.   Okay.  Do you have any notes,
15   notebooks, or printouts in front of you on your
16   desk?
17   A.   No.
18   Q.   Any other devices with you in the
19   room, other than the laptop computer that you're
20   currently appearing on?
21   A.   I have my cell phone on -- on silent.
22   If you want, I can put it in another room.
23   Q.   It's fine for you to leave it there.
24   I'm going to leave mine here just in case of
25   emergency.  But it is important, since you are

Page 14

Pasquarello

1
2    testifying under oath, that you not communicate
3    with anybody during your testimony.  Do you
4    understand that?
5        A.   I do.
6        Q.   Are you aware of any reason that might
7    impair or prevent you from testifying truthfully
8    and accurately today?
9        A.   No.
10       Q.   Do you suffer from any condition,
11   either mental or physical, that might impair
12   your ability to answer my questions?
13       A.   No.
14       Q.   Do you suffer from any condition,
15   either mental or physical, that might impair
16   your ability to hear my questions?
17       A.   No.
18       Q.   Have you taken any medications,
19   prescription or otherwise, in the last 24 hours
20   that would inhibit your ability to testify
21   today?
22       A.   No.
23       Q.   Were there any medications that you
24   were supposed to take in the last 24 hours that
25   you did not take?

Page 15

Pasquarello

1
2        A.   No.
3        Q.   Did you prepare for today's
4    deposition?
5        A.   A little bit, yes.
6        Q.   What did you do to prepare for today's
7    deposition?
8        A.   I reviewed the -- the allegations in
9    the PIP, my answers to Crothall and
10   Ms. Lizarazo, and then I spoke with my attorney.
11       Q.   Okay.  You said you reviewed the
12   allegations in the PIP.  Is that a specific
13   document you're referring to?
14       A.   Yes.
15       Q.   What is that document you're referring
16   to that has the allegations in the PIP?
17       A.   It -- it was the write-up that
18   Mr. Roche gave me about my performance.
19       Q.   Is that the June 1 performance
20   improvement plan?
21       A.   I'm not going to recall exact dates.
22   I will try, but I believe it was that date, yes.
23       Q.   And then you said you reviewed your
24   answers to Crothall.  Is that a specific
25   document?

Page 16

Pasquarello

1
2        A.   There were letters that I sent in
3    response to the PIP and my formal complaints of
4    age discrimination before the PIP.
5        Q.   How many letters in total did you
6    review in preparation for today's deposition?
7        A.   Three.
8        Q.   Okay.  Can you describe each of those
9    letters for me?
10       A.   First one was a letter to Patty
11   Lizarazo, she was the HR representative for our
12   team, when I made the complaint of age
13   discrimination.  Then I received -- right after
14   making that complaint, the next day I was
15   written up for missing items that -- which I'm
16   sure we're going to get into, and then a PIP
17   followed.  I answered each of the points in that
18   PIP in another letter.
19            After that was taken care of, I don't
20   remember the exact date, I wrote another letter
21   following up on -- on that.  And then I was
22   given the second write-up after that letter.
23       Q.   That second letter you referred to, to
24   whom was that addressed?
25       A.   I don't recall exactly.  It was

Page 17

Pasquarello

1
2    probably Chris Hariegal, Bob Shaffer, and Patty
3    Lizarazo.  There might have been a third one.
4    I'm -- I'm not sure who I addressed them to.  I
5    guess I should have studied it a little more.
6            THE COURT REPORTER:  I didn't -- I
7        guess I should what, Mr. Pasquarello?  I
8        didn't hear.
9        A.   I didn't read the headings as much as
10   I read the body.
11       Q.   Did you review any other documents,
12   other than the documents we've already talked
13   about, in preparation for today's deposition?
14       A.   No.
15       Q.   Other than speaking with your
16   attorney, did you speak with anybody else about
17   today's deposition?
18       A.   No.
19       Q.   When did you speak with your attorney
20   about today's deposition?
21            Strike that.  Let me ask that
22   differently.
23            When you -- when I asked if you did
24   anything to prepare for today's deposition, you
25   said you met with your attorney; is that right?

Pasquarello

1
2    A.   Via phone call.
3    Q.   Okay.  When was that call?
4         MS. SELIGER:  Objection.
5         You can answer.
6    A.   It was the day before yesterday, I
7    believe, as the prep.  But I'm -- I'm in touch
8    with my attorney, and whenever I have a
9    question, I'll call her, so it's a regular
10   basis.
11   Q.   The call you had approximately the day
12   before yesterday, who was on the phone?  Without
13   telling me what was said, I just want to know
14   who was on the phone.
15   A.   Myself and Leah.
16   Q.   And for how long did you and
17   Ms. Seliger speak the day before yesterday in
18   preparation for today's deposition?
19   A.   I think it was about a half an hour.
20   Q.   The documents we talked about a moment
21   ago, the three letters and the performance
22   improvement plan, did those documents, when you
23   reviewed them, refresh your recollection about
24   events that occurred or allegations that you've
25   made in this lawsuit?

Pasquarello

1
2         MS. SELIGER:  Objection.
3    A.   Yeah.
4         MS. SELIGER:  You can answer.
5         Counsel, can I just --
6    A.   Yeah, I'm sorry.  I said yes as you
7    objected, so I thought it was on the record.
8    But, yes.
9         MS. SELIGER:  Can I just let the --
10        the deponent know that I'm going to be
11        saying objections.  Unless I instruct you
12        not to answer, you still answer.  And I
13        understand we were speaking at the same
14        time but --
15        THE WITNESS:  Thank you.
16   Q.   I don't recall if I asked you this
17   before, so I'm sorry if I have, but did you
18   discuss the fact that you were appearing for
19   today's deposition with anyone, other than your
20   lawyer and your wife?
21   A.   Well, my wife knew I was going to be
22   deposed today, but I didn't discuss the
23   deposition, though.
24   Q.   Okay.  Did you discuss the deposition
25   with anyone, other than your lawyer?

Pasquarello

1
2    A.   No, just my lawyer.
3    Q.   Since you separated from your
4    employment with Crothall in 2021, have you
5    spoken with any of your former colleagues at
6    Crothall?
7    A.   I have.
8    Q.   Who have you spoken with?
9    A.   I spoke with Ron Kanterman a couple of
10   times.  I've spoken with Omelfi Garcia a couple
11   of times.  I have had other employees apply for
12   positions at my new position, so I've spoken to
13   them a couple of times.
14        There's a couple of marshals that have
15   called me from time to time to say hello and how
16   am I.  So to give names, Strudy Yulfo applied
17   for a position with me.  Terry Calendar applied
18   for a position with me.
19        One of the -- I'm sorry.  I'm drawing
20   a blank on another young man who I hired and
21   tries to keep in touch from time to time.  I --
22   it will probably come to me before the end of
23   this.  I'm just drawing a blank on his name.
24   Q.   If at some point it comes to you, feel
25   free to interject that.

Pasquarello

1
2    A.   I will.
3    Q.   How many times have you spoken with
4    Mr. Kanterman since separating from your
5    employment with Crothall?
6    A.   Maybe a half a dozen, again, would be
7    a safe bet.  I don't know exactly how many.
8    Q.   Have you discussed this case with
9    Mr. Kanterman?
10   A.   Only once when I asked if he would
11   talk to my lawyer.
12   Q.   When was that?
13   A.   Almost a year ago.
14   Q.   And what did you say about this case
15   during that discussion with Mr. Kanterman when
16   you asked him to speak with your lawyer?
17   A.   If my lawyer would -- if he would
18   allow her to give him a call and just please
19   tell the truth as what happened at Crothall.
20   Q.   Did you tell him anything about the
21   allegations that you're making in this lawsuit?
22   A.   I -- I may have told him it was age
23   discrimination, but not -- no further details.
24   I didn't go into details with it, because I
25   figured, let it be fresh, Leah's questions to

Page 22

Pasquarello

1    him and his answers to her without my influence.
2        Q.    Is that the only conversation you had
3    with Mr. Kanterman about this case?
4        A.    That I -- yes, I believe that was the
5    only one about the case.
6        Q.    How many times have you spoken with
7    Omelfi Garcia since you separated from your
8    employment with Crothall?
9        A.    Maybe two or three times.
10       Q.    Have you spoken with Ms. Garcia about
11   this case?
12       A.    One conversation about the case when
13   she called me and said that Mike Roche had
14   called her and what was going on.  So I told
15   her, you know, what was going on.  And I says,
16   Listen, if they call you as a witness or -- call
17   you as a witness, just be truthful, and tell
18   what you know.
19       Q.    What did you tell Ms. Garcia about
20   what was going on?
21       A.    Just that I brought a suit against
22   Crothall and Michael for age discrimination.
23       Q.    Did you tell her anything else about
24   this case in that conversation?
25

Page 23

Pasquarello

1        A.    No.  Omelfi is not the type that wants
2    to be involved in anything, so I just gave her
3    the -- the fact and that was it.  It was a very
4    short conversation.
5        Q.    Did you ask her to be a witness in
6    this lawsuit?
7        A.    I asked her if she was to be a
8    witness, no matter which side called her, just
9    please tell the truth.  I didn't specifically
10   ask her to be mine, but I know that the truth
11   was on my side, so I did tell Leah she would be
12   a good witness for us.  And if she was called by
13   you, that would be fine, too.
14       Q.    Did you ask Ms. Garcia to speak with
15   your lawyer at any point since you separated
16   from your employment with Crothall?
17       A.    I asked if she would be willing to
18   take the phone call, yes.
19       Q.    What was her response?
20       A.    Yes.
21       Q.    Do you know if your lawyer and
22   Ms. Garcia connected?
23       A.    I know they connected via email.  I
24   don't remember if they spoke.  Sorry, Leah,
25

Page 24

Pasquarello

1    maybe -- but I don't recall them speaking.
2        Q.    Have you spoken about this case with
3    any of the other individuals, the marshals and
4    other individuals with whom you've had contact
5    since separating from your employment with
6    Crothall?
7        A.    No.
8        Q.    Have you ever been convicted of a
9    crime?
10       A.    No.
11       Q.    Have you ever been arrested?
12       A.    No.
13       Q.    Other than with respect to your
14   allegations in this case, have you ever filed a
15   complaint of discrimination with the EEOC, the
16   New York State Division of Human Rights, or the
17   New York City Commission on Human Rights?
18       A.    No.
19       Q.    Have you ever sought unemployment
20   insurance?
21       A.    No.  I was a victim of insurance fraud
22   at one point.  Michael told me that he --
23   they -- a filing that I had filed for
24   unemployment but it was fraudulent, and that
25

Page 25

Pasquarello

1    caused me to have to freeze my -- like, what do
2    they call them?  My credit rating services.  So
3    I did that in response to identity fraud or
4    theft.
5        But to answer your question, no, I
6    never filed for unemployment.
7        Q.    Since separating from your employment
8    with Crothall, have you had any period of
9    unemployment between that day and today?
10       A.    No, I didn't -- I had a job offer
11   written when I left Crothall, and I went on
12   vacation for a week.  But other than that, I
13   wasn't unemployed.  I went from one position to
14   another.
15       Q.    How old are you?
16       A.    Fifty-six.
17       Q.    And what year were you born?
18       A.    1965.
19       Q.    Are you currently employed?
20       A.    Yes.
21       Q.    By whom?
22       A.    Columbia University in the City of
23   New York.
24       Q.    When did you begin that position?
25

Pasquarello

1
2      A.   I believe it was last -- it was
3  October.
4      Q.   Do you happen to know the exact date
5  on which you started in October of 2021?
6      A.   Might have been -- no.  It was, like,
7  after the -- it was probably the second week of
8  October because my daughter was married the
9  first week and that was the week I took off, and
10 then I started work.  So it was some time the
11 second week of October, so I don't remember the
12 exact date.
13     Q.   What's your current position at
14 Columbia University?
15     A.   I was recently promoted to full
16 director of the department.
17     Q.   When were you promoted?
18     A.   The promotion date is the 14th.  I --
19 I started my duties last Monday.
20     Q.   You say "the promotion date is the
21 14th."  You're referring to July 14th,
22 yesterday?
23     A.   No.  So I guess it's a month.  They --
24 they backdated the promotion because there was
25 some -- they -- I'll make it clear for you.  I

Pasquarello

1
2  wasn't there a year.  I'm only there six to
3  eight months.  They -- they offered me the
4  position.  HR has a rule that if you're not
5  there for a full year, you can't be promoted.
6           The -- the vice president and the
7  assistant vice president and the vice president
8  in HR all wrote letters for a waiver.  That went
9  through the process.  They approved the waiver.
10 They gave me the position of full director
11 after, you know, being vouched for by the senior
12 leadership of the department.
13          And so what they did was they
14 backdated my promotion to when that process
15 started, which would have been last month on the
16 14th.  So it would have been June 14, but I
17 actually started -- you know, they gave me my
18 new office and -- and started to meet my new
19 staff, get familiar with the new buildings and
20 everything last week.
21     Q.   What was your title when you started
22 at Columbia University in October?
23     A.   I was the manager of the
24 Manhattanville campus, manager of fire safety
25 for Manhattanville campus.

Pasquarello

1
2      Q.   Between October 2021 and June 14,
3  2022, did your title change?
4      A.   Say it again?  I'm sorry.
5      Q.   Sure.
6           Between October and June 14 of 2022,
7  did your title change from manager of the
8  Manhattanville campus?
9      A.   Yes, it did.
10     Q.   Okay.
11     A.   It changed to director of --
12 university-wide.  I'm also the -- I was also
13 just told I have all their real estate holdings,
14 too, I'm responsible for.  So that -- that's
15 another thing we're going to start working on
16 next week, because that totals now well over a
17 hundred additional buildings that I would be
18 responsible for.
19     Q.   Let me make sure I understand your
20 testimony about your titles.  When is the first
21 time your title changed after you began your
22 employment in October of 2021?
23     A.   My title changed last Monday to full
24 director.  I didn't know at the time -- well,
25 they told me that day that they backdated my

Pasquarello

1
2  title to the 14th of last month.
3      Q.   So you're in your second title at
4  Columbia University; is that right?
5      A.   I am.
6      Q.   Okay.  What was your starting salary
7  when you were in the manager title?
8      A.   A hundred thousand.
9      Q.   And have you received increases for
10 that starting salary?
11     A.   I have, and that was also one of the
12 things that was being discussed and negotiated.
13 Because going along with that year before you
14 could be promoted, they wouldn't increase my
15 salary more than 50 percent.  So that -- that's
16 what they gave me, a 50 percent increase.
17     Q.   So when was the first time you got an
18 increase from your salary of a hundred thousand
19 at Columbia University?
20     A.   June 14.
21     Q.   And what was your salary increased to?
22     A.   150,000.
23     Q.   Is that your current salary as of
24 today?
25     A.   Yes.

Pasquarello

1    Q.   What are your job duties in your
2  current position?
3    A.   My job duties are to manage the staff
4  of our fire safety offices and my managers in
5  the fire safety department.  I manage a man -- I
6  supervise a manager of fire systems and his crew
7  now falls under me, so I have all my own
8  mechanics that are in-house for -- for the alarm
9  systems and the suppression systems.
10         I also do the vendor management.  I
11  take care of any negotiations for payrolls, you
12  know, their -- their salary increases, and
13  things like that.  Typical, you know, director
14  management position.
15    Q.   Any other duties in that role as
16  director that you haven't already told me about?
17    A.   If you say subject matter expert,
18  that -- that's also my -- one of the primary
19  parts of the role is to be the subject matter
20  expert, whenever anything was going on that
21  would involve fire safety or life safety
22  throughout the -- the institution.
23    Q.   Okay.  And any other duties in
24  addition to what you've already told me?

Pasquarello

1    A.   I'm sure I do a lot more than I'm
2  saying, but off the top of my head, those are
3  the ones that I'm coming up with that are, I
4  guess, the most prevalent.
5    Q.   Have you held any other employment,
6  other than Columbia University, since you
7  separated from your employment with Crothall?
8    A.   No.
9    Q.   Have you had any other sources of
10  income, other than your salary from Columbia
11  University, since June of 2021?
12         I'm sorry.  Strike that.  Let me ask
13  that question -- I got the date wrong.  Let me
14  ask that question better.
15         Have you had any other sources of
16  income since your separation from Crothall in
17  September 2021?
18    A.   It -- your date wouldn't make a
19  difference.  I do have other sources of income.
20    Q.   Okay.  What are those sources of
21  income?
22    A.   I have my pension from the New York
23  City Fire Department, and I have rental
24  properties.

Pasquarello

1    Q.   Any other sources of income?
2    A.   I hold other licenses, but I don't
3  pursue work with them, so, no, that's my only
4  steady source of income.
5    Q.   Have you on occasion served as an
6  expert witness in litigation?
7    A.   Yes.
8    Q.   When is the last time you did that?
9    A.   That was probably the -- the last
10  deposition you mentioned, what did I say, it was
11  about five years ago, maybe, and -- and
12  that's -- that's just an estimate.
13    Q.   Since 2021, have you derived any
14  income from serving as an expert?
15    A.   No, that's what I re -- that's what I
16  was referring to when I said I hold other
17  licenses, but I don't pursue anything, so, no.
18  There -- there's still cases that could pop up,
19  you know how it is, you know better than me, the
20  statute of limitations, but nothing has come up
21  since, no.
22    Q.   Where did you work immediately prior
23  to working for Crothall?
24    A.   Memorial -- Memorial Sloan Kettering.

Pasquarello

1    Q.   And what was your last position there
2  at Memorial Sloan Kettering?
3    A.   I was a manager of fire safety but
4  my -- they had split fire safety into two
5  positions there.  I managed operations and the
6  staff, and there was a colleague that managed
7  the systems, which would be the fire alarms,
8  fire suppression.
9    Q.   For how long did you work at Memorial
10  Sloan Kettering?
11    A.   I think it was about a year.
12    Q.   Were you the manager of fire safety
13  for that entire approximately one year?
14    A.   Yes.
15    Q.   Why did you leave?
16    A.   Crothall recruited me.
17    Q.   How much were you making at Memorial
18  Sloan Kettering when you left your employment
19  there?
20    A.   It was 112-.  Say between 100- and
21  115-.  I don't remember the exact salary.  It
22  was very comparable pay with Crothall.  I -- I
23  didn't lose money by going there.  I didn't
24  really gain much.  So I don't remember the exact

Page 34

Pasquarello

1  numbers.
2      Q.   Was Crothall a better opportunity than
3  the Memorial Sloan Kettering job you had?
4      A.   Well, Crothall recruited me.  The
5  first phone calls were revolving around going
6  there to be a manager, and that was a question
7  mark for me, to be honest with you.  I didn't
8  know if I was going to leave, you know, the
9  prestige of Memorial Sloan Kettering for -- for
10  Mount Sinai and Crothall.  Although, you know,
11  Mount Sinai is a very prestigious hospital as
12  well, just not in the same league as Sloan
13  Kettering, in my opinion.
14          But with that said, during my
15  interview process and after meeting with
16  Ms. Lamb, Patricia Lamb, I was offered an
17  assistant director position so it -- yeah, it
18  was -- I took the position more for -- for title
19  and career advancement in the future than I did
20  for any type of immediate financial gains at the
21  present.
22      Q.   When was your first day of employment
23  with Crothall?
24      A.   I -- it -- I don't remember.  I think

Page 35

Pasquarello

1  it was the month of October also, but that --
2  that's -- at this point it's a guess.
3      Q.   Do you recall the year in which you
4  started at Crothall?
5      A.   It was '19.
6      Q.   So approximately October of 2019 is
7  when you started there?
8      A.   Yeah, I believe so.
9      Q.   And what was your title when you
10  commenced your employment with Crothall?
11      A.   Assistant director of fire safety.
12      Q.   Who was your supervisor while you were
13  at Crothall?
14      A.   Michael Roche.
15      Q.   Was he your supervisor for the entire
16  period of your employment there?
17      A.   Yes.
18      Q.   What was his title?
19      A.   Senior director of engineering.
20      Q.   Did you have any other supervisors
21  during your employment, other than Mr. Roche?
22      A.   It came to -- known that, no, I
23  didn't, but I had thought Bob Shaffer was also
24  some sort of management to my role, but it

Page 36

Pasquarello

1  turned out he wasn't.  Those were his words,
2  that he wasn't.  I believe he was.
3      Q.   What was Mr. Shaffer's title?
4      A.   I believe he's a director of systems,
5  operations, or something like that.  He -- he
6  audits and works behind the scenes and it is
7  company-wide is my understanding.
8      Q.   Why did you think that Mr. Shaffer was
9  your supervisor?
10      A.   He has that air about him, as if he's
11  everybody's boss.  He's -- that's just the way
12  he is.  I'm not saying good or bad.  That's just
13  Bob.
14      Q.   And how did you learn that, in fact,
15  he wasn't your supervisor?
16      A.   When I came to him with my allegation
17  of this unfair treatment by Michael and age
18  discrimination, he says, Well, he's your boss,
19  work it out with him.  And that's when I said to
20  him, I said, I thought you were our boss.  And
21  he's, like, No, no, no.  And I was, like, All
22  right.  You live and learn.
23      Q.   When did that conversation take place?
24      A.   It was early in 2021, so I would say

Page 37

Pasquarello

1  that was right around -- between January and
2  February.  I don't exactly when but I
3  would say around January, February.  Maybe even
4  December, give -- give or take.  It was within
5  the beginning of the year, if you will.
6      Q.   Was that an in-person conversation or
7  by phone or email, or something else?
8      A.   That one might have been by phone.
9      Q.   Was anybody else on the phone with you
10  during that conversation?
11      A.   No.  It would have just been me and
12  Bob.
13      Q.   Did you call him, or did he call you?
14      A.   I called him, I believe.
15      Q.   During your employment at Crothall did
16  you supervise any employees?
17      A.   Yes.
18      Q.   How many employees did you supervise
19  during your entire period of employment?
20      A.   The marshal staff it fluctuated but up
21  to 18 or 20, I believe.  And then there was the
22  managers, whenever we had managers, so it was
23  either one or two at a time.  So I would say
24  roughly 20 employees I managed.  And then, if

Pasquarello

1  you consider managing vendors, I -- I also
2  managed, you know, nonemployees, but they did
3  work for us.
4     Q.   Can you give me the names of the
5  individuals who served in the manager role who
6  reported to you?
7     A.   It started -- I had two managers,
8  Joseph Jerrain and Matt Bond.  Joe Jerrain was
9  transferred out within two to three months of me
10 starting, maybe four months of me starting, and
11 then it was just Matt Bond.  Then about a year
12 after Joe Jerrain left, Ronald Kanterman came
13 in.  I managed him.
14     And then as soon as Ron came, about a
15 month later Matt left, and Omelfi Garcia came to
16 the department.  She there -- she was only there
17 about a total of three months, but in that
18 entire time you could say she was under my
19 management, but she was being pushed in so many
20 different directions it was -- it was very
21 difficult for her.  But she -- she was in my
22 department for her last three months at
23 Crothall.
24     Q.   Were there any other managers that

Pasquarello

1  reported to you, other than Jerrain, Bond,
2  Kanterman, and Garcia?
3     A.   No.
4     Q.   How did you learn about the job at
5  Crothall?
6     A.   They called me.  I forget the woman's
7  name but it -- it was one of the Crothall
8  recruiters that reached out to me on LinkedIn,
9  and then we had a conversation on the phone.
10     The -- the -- I believe the -- the
11 LinkedIn reach out was something like, Would you
12 be interested in a position?  And -- sure.  I
13 mean, you know, never want to limit your
14 opportunities so I took the call.
15     Q.   Did you ultimately submit a resume or
16 an application for a position at Crothall?
17     A.   I'm -- I'm sure I did.
18     Q.   Do you recall to whom you submitted
19 that resume or application?
20     A.   I think it was web based.
21     Q.   Were you interviewed for a position at
22 Crothall?
23     A.   Many interviews, yeah.
24     Q.   Who interviewed you?

Pasquarello

1     A.   I had the -- the first series of
2  interviews were over the phone with the
3  recruiter.  Then I had a phone interview with
4  Michael and someone else, I don't recall who was
5  with him -- actually I don't remember if I even
6  ever got the name but it was him and someone
7  else talking to me.
8     Then at that point I was asked to come
9  in and have a face-to-face interview.  I did
10 that with Michael.  From that point I was asked
11 to come back and meet with Pat Lamb, from the
12 hospital.  She -- she's the client, if you will.
13 I interviewed with Pat.  That was the point
14 where the position changed from manager to
15 assistant director.
16     And Pat asked me to interview one last
17 time with Bob Shaffer, and that's where the
18 impression that Bob Shaffer was, you know, a
19 boss, if you will, is when he and Pat Lamb had
20 the final say as to if I was being hired or not,
21 so that's why I assumed Bob was the boss.
22     Q.   You referred to a Michael in your
23 answer, a phone meeting with Michael and a
24 face-to-face meeting with Michael.  Is that

Pasquarello

1  Mike --
2     A.   Roche.
3     Q.   -- Roche?
4     A.   I'm sorry I interrupted.  Yes, that
5  was Mike Roche.
6     Q.   You were ultimately offered a position
7  at Crothall, right?
8     A.   Yes.
9     Q.   Who offered you that position?
10     A.   I believe that position offered was
11 from Pat Lamb and Bob Shaffer.
12     Q.   How -- strike that.
13     In what manner did Bob and Pat make
14 you that offer?
15     A.   Pat said, Everything looks good.  I
16 would like to have you aboard but I need you to
17 talk with Bob first and get his opinion.  Bob
18 actually came to my home to interview me, and it
19 was very -- I wouldn't say it was a formal
20 interview at all.  We sat down, had a cup of
21 coffee, spoke a little bit.
22     He said, Pat told me to come meet you.
23 You never lied to her so here I am meeting you.
24 You've got my full endorsement.  Welcome aboard.

Pasquarello

1
2 Make sure you get parking as part of your
3 package.  That was our exact conversation.
4 Coffee, we spoke a little bit about the fire
5 department, and he left.
6     Q.  Did Mr. Shaffer offer you a position
7 in that conversation at your house?
8     A.  At that point I knew that I -- yes, I
9 knew I was getting the position at that point.
10 He said, Welcome aboard.  And he would talk to
11 Pat.
12     Q.  Prior to that conversation with
13 Mr. Shaffer, had anybody else offered you the
14 position at Crothall?
15     A.  No, the official offer -- I guess the
16 official offer came from the very first person I
17 spoke to, which was that recruiter, and then
18 everything was done through her at that point.
19     So that -- that's, like I said, Bob,
20 you know, flippantly or -- or, you know, looking
21 out for me, if you will, said, Make sure you get
22 parking.  So that was -- all part of the
23 negotiation was done through the recruiter.  I
24 never really spoke to anybody other than -- than
25 that.

Pasquarello

1
2     So, you know, salary was discussed
3 with her.  Parking was discussed with her.  And
4 that's really it.  I mean, the package is the
5 package, and I don't accept the benefits from
6 anybody, so.
7     Q.  Were you satisfied with the
8 compensation package that you were offered from
9 Crothall?
10     A.  Yeah, as I said earlier, it was
11 more -- the title with me being in to the
12 positions in my career more than the salary.
13 I -- I didn't get hurt, one way or the other,
14 with the salary.  It was fine so that wasn't --
15 it wasn't my main consideration to taking the
16 job.  Parking --
17     Q.  You -- I'm sorry I interrupted.  What
18 was that?
19     A.  Is that -- you work in Manhattan, I
20 don't know where you are, but, you know, parking
21 is a nice perk.  That -- that had a -- that was
22 significant perk to -- to the position.
23     Q.  Can you describe for me your
24 responsibilities as the assistant director for
25 fire safety for Crothall?

Pasquarello

1
2     A.  Well, it -- you know, to describe
3 the -- the responsibilities, it's the same as
4 the director job.  There's no difference.  So in
5 essence I ran the department.  I was in charge
6 of managers.  I was never fully staffed, so I
7 was always picking up the slack of either the no
8 manager or not a very good manager.
9     So I was always doing all the
10 operations stuff.  I was overseeing all the
11 vendors.  I was overseeing aspects while I was
12 the subject matter expert, so I was handling all
13 those questions.  I was dealing with
14 negotiations for the union.
15     I was dealing with all the additional
16 work that was coming about through COVID.  We
17 were expanding the hospital.  They had hundreds
18 of beds at one point that all needed to be code
19 compliant and ILSMs reviewed.  They put up a
20 tents hospital like a MASH unit in the park
21 across the street.  They -- they put me in
22 charge of working with Samaritan's Purse to make
23 sure that they were compliant and not breaking
24 any city rules.
25     The -- the duties were that listed on

Pasquarello

1
2 the job announcement and then some, based a lot
3 on the pandemic and -- and the other situations
4 that were occurring at the time of my employment
5 there.
6     Q.  Let's do it this way.  Let's -- I'm
7 going to show you an exhibit.  I'm going to ask
8 my colleague to put it in the chat function of
9 the screen.  I'm also going to put it up on my
10 screen.  But because it's a multi-page document,
11 I can only show you a piece a time at -- on
12 the screen.  But let me put it up on the screen.
13     MR. CLARK:  We're going to mark this
14     as Exhibit 1, and for the record, it is
15     a -- two, four, six, seven-page document
16     bearing Bates stamp CH 1663 through 1669,
17     and it's entitled Job Description Fire
18     Safety Assistant Director.
19     (Seven-page document bearing Bates
20     stamp CH 1663 through 1669, entitled Job
21     Description Fire Safety Assistant Director,
22     was marked Pasquarello Exhibit 1 for
23     identification, as of this date.)
24     Q.  Okay.  So, Mr. Pasquarello, you should
25 be able to see this in two ways.  One in the

Pasquarello

1
2  chat you should be able to download the document
3  directly and scroll and read through it as ever
4  you would like.
5        I also have it up on my screen.
6  Although because the screens are limited, you
7  can only see the top half at the moment.  But
8  let me pause for a moment and say, can you see
9  my screen, at least the top portion of the first
10 page of this exhibit?
11       A.  I do see your screen.
12       Q.  Okay.
13       A.  I did click on Exhibit 1.  Click to
14 open.  There we go.  I no longer see your
15 screen.  Now I just see my document that you are
16 referring to.
17       Q.  Okay.  Well, my questions will be
18 about this document, so let me ask you to take a
19 moment and look at the document -- either if you
20 want me to do it on the screen, I could scroll
21 through it, or you can do it in the PDF you've
22 downloaded, take a look at the document, and my
23 question will be, do you recognize this
24 document?
25       A.  I do.

Pasquarello

1
2        Q.  Okay.  Have you had an opportunity to
3  look at the document?
4        A.  I -- I see it in front of me.  I -- I
5  don't read that fast.  But I guess I can go
6  through it with you, if -- if you want to do
7  that.  It's how many pages?  Seven pages?
8        Q.  Let's go through it a piece at a time.
9  So if you go to the very last page -- and I'll
10 scroll there on my screen as well, in case you
11 are following along there.  But the very last
12 page, which is 1669 in the bottom right corner.
13       A.  Okay.
14       Q.  At the bottom of that page you'll see
15 three lines that say associate name, signature,
16 date.  You see where I'm looking?
17       A.  Yes.
18       Q.  Is that your handwriting and your
19 signature on those three lines?
20       A.  Yes.
21       Q.  Okay.  Did you sign this document on
22 November 2, 2020?
23       A.  I have no reason to doubt that, yes.
24       Q.  Was that your first day of employment,
25 November 2, 2020?

Pasquarello

1
2        A.  I -- that I don't -- no, I think I
3  started in October.  I -- like I said, I could
4  be mistaken but I started -- I believe I started
5  this position in October.
6        Q.  And at the bottom of that same page
7  you'll see it says initials in the bottom right
8  corner?
9        A.  Yes.
10       Q.  And it actually says initials on every
11 page of the document.  Are those your initials?
12       A.  They are.
13       Q.  Okay.  Let's go back up to the first
14 page for a moment.  I want to focus on the
15 section that says Summary.  If you could read
16 that to yourself.  My question is going to be,
17 is that an accurate summary of the role you had
18 for Crothall?
19       A.  On the first page?
20       Q.  The first page under the heading
21 Summary, there's a three-line paragraph.
22       A.  Oh.
23           (Witness reviewing document.)
24       A.  Yes, okay.  I believe that's how I
25 answered, but I -- I agree with that statement.

Pasquarello

1
2        Q.  So the summary is an accurate summary
3  of the job you had when you worked at Crothall?
4        A.  It's an accurate statement of what I
5  signed.  The job I did at Crothall was a lot
6  more expansive than this summary statement.
7        Q.  Okay.  So let's take a look, then, in
8  the section that follows, which is entitled
9  Essential Duties and Responsibilities?
10       A.  Okay.
11       Q.  I'm scrolling there on my screen, and
12 you can either follow along on my screen or in
13 your separate PDF.  But do you see where I'm
14 looking in the section that begins Essential
15 Duties and Responsibilities?
16       A.  So I'm -- I'm going to see if this is
17 easier.  I'm going to minimize my screen.  Now I
18 don't see your screen anymore, so let me see if
19 I click this, if you come back.  There you are.
20 So let me minimize this, take this away, move
21 the chat out of the way.
22           All right.  It's -- now I think it's
23 better if I follow along with you, so.
24       Q.  Okay.  You can see my screen?
25       A.  I do see your screen.

Pasquarello

1
2    Q.   Okay.  So I'm looking under Essential
3  Duties and Responsibilities, and I want to walk
4  through these bullets so that I better
5  understand what these means.  So let's start
6  with the first bullet there, it says:  Oversee
7  programs for fire alarm and fire suppression
8  testing and life safety PMs.
9        Do you see that?
10   A.   Yes, I do.
11   Q.   Let me start with the acronym there,
12 what does PM stand for?
13   A.   Preventive maintenance.
14   Q.   What did this essential duty actually
15 entail, the essential duty that's listed in the
16 first bullet here?
17   A.   Okay.  So the way I read that I
18 oversee that program.  Everything that says
19 oversee is usually delegated to a manager or the
20 staff, and -- and my job is to ensure it's
21 done -- it's done.  So it -- you know, it did
22 get overwhelming at times being short staffed.
23        But with that said, fire alarm and
24 suppression system testing and life safety PMs,
25 so obviously every building has a fire alarm

Pasquarello

1
2  system and suppression systems, right?  They
3  have to be tested based on code.  Certain tests
4  are done monthly.  Certain tests are done
5  semiannual.  Certain tests are done quarterly.
6        A lot of it is -- a lot of testing is
7  done by vendors, more so than the PMs.  The PMs
8  are mostly done by in-house.  A PM could result
9  in bringing in a vendor, but not necessarily.
10 So the first one is talking about overseeing the
11 program of testing frequencies and making sure
12 that we stay within the -- the -- the NFPA
13 standards of frequencies.  So that -- that's
14 what that bullet is talking about.
15       The second bullet --
16   Q.   Well, hang on.  We're not at the
17 second bullet yet.
18   A.   -- goes exactly with the first bullet.
19   Q.   Okay.  We will get to the second
20 bullet in a second.  I want to stay on the first
21 bullet if we can.
22   A.   Okay.
23   Q.   Was there a process at Crothall for
24 entering and tracking PMs or preventative
25 maintenance?

Pasquarello

1
2    A.   The system -- yes, they have a system
3  called TeamDocs or TeamOps.  This was I believe
4  in the TeamDocs one.  It's been a while since
5  I'm out but I believe it was the TeamDocs
6  program, and it reminds you of when these things
7  are due and done.  PMs, though, are -- they're
8  the in-house stuff, but, yes, there -- there is
9  a program that keeps track of those.
10   Q.   Whose responsibility was it to enter
11 the PM information into TeamOps or TeamDocs for
12 preventative maintenance?
13   A.   That's a clerical duty, and I didn't
14 believe that was the duties of -- of the -- the
15 head of the department, so that was delegated to
16 one of the managers.  And Matt was the -- the
17 computer guy, so he was more of the -- he was
18 the admin manager, if you will, so it was his
19 duties to ensure that TeamDocs and TeamOps were
20 updated properly.
21   Q.   As Matt's supervisor were you able to
22 track the status of open and completed PMs?
23   A.   I did.
24   Q.   How often did you do that?
25   A.   Weekly, monthly, it -- it depended on

Pasquarello

1
2  the PMs, and it depended on what I was seeing on
3  the screen.  So if something wasn't being done,
4  this screen would let you know that, and then I
5  would have a talk with him and see what's going
6  on.
7        But our PMs were always closed out on
8  time, so I didn't have an issue with PMs.  And
9  then the alarms and testing, there -- there was
10 stuff in the background that -- considering I
11 never got the full training on the system, I
12 wasn't seeing in real time, if you will.
13       So sometimes things would be -- I'll
14 call them green and red, because that's the way
15 the system produces your -- if everything is
16 green, everything is good.  If something is red,
17 there's something missing.  If I'm looking at it
18 and it's all green, I'm assuming that it's good.
19       I later came to understand -- and this
20 was only because of the Joint Commission and
21 their desire to say I was missing stuff was
22 showing that there was stuff in the back of
23 those programs that weren't being updated.
24       And -- and I'm sure we're going to get
25 to it, but that's -- that was the problem and --

Pasquarello

1  and where I felt I'm being held to a different
2  standard.  The one who found the stuff that was
3  missing in the back of the program was Matt.
4  They didn't fix it.  They just told me it was
5  not there, and it was up to me to fix all that.
6        And it would have been fixed if I had
7  known about it from the get-go.  But, you know,
8  there's an old saying, you don't know what you
9  don't know.  And if you didn't tell me about it,
10  how was I supposed to know about it?  And
11  that -- that's part of the problems that -- that
12  led to my feeling of unfair discrimination
13  and -- and discrimination.
14        But that -- that's what that program
15  is.  So I oversaw what he was doing, but it was
16  easy to hide the fact that there was things
17  missing in it until -- until we were going
18  through Joint Commission and you seen that it
19  was missing.
20    Q.    What was the name of that program that
21  that had the --
22    A.    Like I say, I believe it was --
23    Q.    -- greens and tracked --
24    A.    Like I say, I believe it was -- or

Pasquarello

1  TeamOps.  It -- it's one or the other, it's
2  TeamDoc or TeamOp.  I don't deal with that
3  program anymore, so I -- I don't remember
4  exactly which one it -- it was.  I believe it
5  was doc, because these look like documents.
6    Q.    Did you ever receive training on
7  TeamDoc?
8    A.    The training I received was through
9  Matt, so, again, I didn't know what I didn't
10  know so I only know what he was showing me.
11  The -- the company did offer remote type of
12  trainings, log in and, you know, spend some time
13  in the classroom with somebody from, I don't
14  know where he's located, but -- I did do a
15  couple of those.
16        But, again, it was -- it -- depending
17  on the class we did.  So the classes that I did
18  take with him were basically the same stuff Matt
19  was showing me, so I didn't get any training on
20  this -- the behind-the-curtain parts of the
21  program.
22        For example, I didn't even know that
23  the -- the inventories were kept in there until
24  they were telling me that the inventories were

Pasquarello

1  wrong.  That was news to me because the
2  inventories were based off all the PMs.  So if
3  you said that they were wrong, all along, that's
4  going back years.  And some of them, in fact,
5  went back years.  I was fixing inventories that
6  went back to 2016, '17, when it was all Matt and
7  nobody else.  But that's -- this is part of the
8  problem that was going on then.
9    Q.    When you received training on TeamDocs
10  from Matt and from the company, did you ask
11  questions?
12        MS. SELIGER:  Objection.
13        MR. CLARK:  What's the objection?
14        MS. SELIGER:  Compound question.
15        MR. CLARK:  I don't think it's a
16  compound question.
17    Q.    Mr. Pasquarello, you can answer.
18    A.    I did.  I said of course I asked
19  questions.  So each -- each thing that I -- I
20  learned, I know.  If I -- if it wasn't a class I
21  took, I didn't know it.  So example is, getting
22  the inventories out of the background, that
23  would never show red.  It wouldn't show
24  anything.  So it's not something that brings

Pasquarello

1  your attention to it.
2        It only became an issue when we were
3  going through the Joint Commission reviews,
4  because inventory was part of the reviews.  So
5  all the paper inventories that I was using,
6  which was coming from the vendors who were doing
7  the PMs, we were discovering that those
8  inventories and the inventories in the system
9  weren't identical.
10        Some of them were easy enough to fix.
11  And when I say "easy enough to fix," we throw
12  away the old ones and put in the new ones.  Not
13  really threw it away, we just archived them and
14  put on an updated one.  Some of them were
15  extremely difficulty to fix, and those were the
16  ones where Omelfi and myself were there
17  sometimes to 10, 11:00, 9:00, 8:00 in the
18  evening trying to make heads or tails out of it.
19        Dampers come to mind.  I was on the
20  phone with that company brand weekends, nights.
21  It -- it took a very long time to fix those, and
22  that's because the system was never updated
23  since 2016.
24        You know, it's funny to me that Matt

Pasquarello

1  and Mike were able to find that 2016 problem
2  during -- you know, after Matt left the
3  department.  You know, it was pretty amazing to
4  me that that all of a sudden was an issue, when
5  he was the manager in training that put it all
6  in, he was the manager that updated and kept it,
7  and it never came to my attention until he left
8  the department.
9      Q.   You were Matt's supervisor; is that
10 right?
11     A.   I was.
12     Q.   Did you work with TeamDocs in your
13 employment at Memorial Sloan Kettering?
14     A.   No.
15     Q.   You referred to "inventories" in your
16 answer earlier.  Did you work with inventories
17 in your role at Memorial Sloan Kettering?
18     A.   Yes.
19     Q.   Did you also work with preventative
20 maintenance issues in your role at Memorial
21 Sloan Kettering?
22     A.   Some of them, yes.  Like I said, we
23 were separated into operations and systems, so
24 most PMs are done in systems but there are some

Pasquarello

1  PMs that are done on -- on the operation side,
2  like fire extinguishers are a good example.  So,
3  yeah, I did have some PMs but not as many as I
4  had here.
5      Q.   How did you learn that there was an
6  issue with the PMs at Crothall?
7          MS. SELIGER:  Objection.
8      A.   I didn't believe there was an issue
9  with the PMs at Crothall.  There was an issue
10 with -- with some of the documentation coming
11 off of the testing.  My PMs were always closed
12 on time.
13         (Cross talking.)
14         THE COURT REPORTER:  I'm sorry.  I
15 didn't hear the last few words of that.  My
16 PMs were always?  Just repeat what you said
17 the first time, if you can.  Did you say --
18         THE WITNESS:  Closed on time.
19         THE COURT REPORTER:  Okay.  Thank you.
20         THE WITNESS:  Yes.
21     Q.   How did you learn there was an issue
22 with documentation?
23         MS. SELIGER:  Objection.
24     A.   I learned there was an issue with

Pasquarello

1  documentation when we started reviewing all the
2  documents for the Joint Commission survey.  Then
3  all of a sudden, Matt Bond, Mike Roche, and
4  Bobby Denver started coming to me daily, several
5  times a day, This is missing.  That's missing.
6  This is missing.  And it's, like, Are you
7  kidding me?
8          I mean, this is the stuff that
9  literally 90 percent of Matt's job was to make
10 sure it was all in there.  Like I said, the
11 screen would never tell you that they weren't in
12 there.  You would have to go into those actual
13 spots of TeamDoc, if it is, in fact, TeamDoc,
14 not Ops, to find it, and that was the stuff I
15 was never taught.
16         And to say that I asked questions
17 about it, not that particular thing I didn't ask
18 questions about because, again, like I said, you
19 don't know what you don't know.  I do know,
20 though, that we were working off of inventories.
21 I had inventories on everything, so I was able
22 to correct the majority of it fairly okay -- or
23 quickly, I should say, not okay.
24         There was some that were so bad

Pasquarello

1  because they involved five-year testings and
2  six-year testing, two-year testing, the first
3  year, five-year testing the years after.  So
4  those are things that took up an exorbitant
5  amount of time.  And, again, they pointed them
6  out.  They never offered any help to do it.
7          I believe it was purely being held to
8  a separate standard, and the one that left the
9  information out is the one telling me that the
10 information was left out.  So it was, you know,
11 quite disheartening, to say the least.
12     Q.   When did you begin reviewing
13 documentation in preparation for the Joint
14 Commission audit?
15     A.   I don't remember the exact month but I
16 do remember that I was so busy at that point
17 doing everything else that the team took it
18 over.  The team would be Matt, Bobby, and
19 Michael.  So they -- they were the ones that
20 were doing the document review, if you will.
21         I was working more at that point with
22 the vendors, trying to get all these additional
23 work that's being discovered addressed.
24     Q.   At any point during your employment at

Pasquarello

1                Pasquarello
2  Crothall did you review documentation either in
3  preparation for the Joint Commission edit or for
4  some -- strike that.  Let me re-ask that.
5         At any point during your employment at
6  Crothall did you review documentation either in
7  preparation for the Joint Commission audit or
8  for some other purpose?
9      A.  Yes.  I -- as I said earlier, I
10 reviewed documentation at the minimum on a
11 monthly basis, if not more.  While I was there,
12 we went through several audits through Bob
13 Shaffer and Crothall, and we passed them.  So
14 I'm passing audits by the company, only to find
15 out later on that the audit you're giving us
16 during the year shows that I'm good, and you're
17 giving us our bonus in -- in recognition of the
18 fact that my work is good.
19        And now, work is missing, in the zero
20 hour leading up to Joint Commission?  Why didn't
21 you pick that up last year when you audited me
22 on the normal audit?  I mean, we're talking
23 about some of these inventories, like I said,
24 from 2015, 2016, 2017, you didn't pick that up
25 then.  Now you pick it up now and -- and you're

Pasquarello

1  telling me to fix it.  I wasn't even there.  I
2  didn't even know what you were talking about.
3         So I had to research all this
4  information, had to work with the vendors to get
5  all their past documents that were archived, and
6  bring us back up to speed.  The only stuff that
7  was -- and I won't say it was easy because
8  nothing was really easy to do, was the stuff
9  that I was more hands-on with the vendor, which
10 would have been the fire alarm system.
11        That one was the easiest to bring up
12 to speed, because Piro's signal was there.  They
13 have people stationed at the hospital.  So
14 whenever there was questions with that or
15 documents I needed with that, I had a direct
16 line to get that.
17        But, again, we're audited by Bob
18 Shaffer twice a year.  We passed all our
19 internal audits.  Now the Joint Commission audit
20 comes around, and you're telling me there was
21 stuff missing or needed that wasn't told months
22 earlier when we -- when we went through our --
23 our company-wide audits.
24        So, you know, again, it -- it

Pasquarello

1  suspended belief that this stuff was actually
2  that much of a problem and -- and more so a
3  gotcha to try and get rid of me because, I don't
4  know, maybe I was too much of a threat to
5  Michael, and he certainly didn't like anybody
6  older and more experienced in his department.
7      Q.  Was there actually documentation that
8  was missing?
9      A.  Nothing was missing.  Some of it was
10 inaccurate.
11     Q.  Why didn't you pick up on the
12 inaccuracies in the documentation before you
13 were notified about them?
14     A.  Because they weren't obvious.  They --
15 they were in the background of a program that I
16 was never given the proper training on.  If I
17 had gone to school like everybody else who came
18 before me, that went to the Crothall Learning
19 Center and learned all this, probably wouldn't
20 have been an issue.
21        But I was also depending on the fact
22 that I passed my previous audits to believe that
23 my work was up to date.  So, I mean, you're
24 telling me I passed an audit.  You're not giving

Pasquarello

1  me training to find the stuff in the back of the
2  system, which is, you know, not obvious to
3  anybody who doesn't work that system.  Yeah, I
4  mean, it was a setup.
5      Q.  Who found the inaccuracies?
6      A.  Matt Bond.  And he was the one who was
7  supposed to be keeping up with -- with the
8  system.  So it --
9      Q.  You told me that you didn't have
10 access --
11     A.  Well, I do have a question that was
12 never answered.  Because if I passed the audit
13 under Bob Shaffer and then they're finding
14 inaccuracies during the -- the clique of Mike,
15 Bobby, and -- and Matt, was that -- I mean, at
16 this point, knowing how unfair I was treated, I
17 have no idea if they even took out or changed
18 and put old inventories in there.  There's no
19 way for me to know that.
20        All I know is I passed my earlier
21 audit, and now all of a sudden I'm not passing
22 an audit.  And it's not that stuff is missing.
23 It's that stuff is out of date.  I don't know
24 where did the -- where did this -- that stuff

Pasquarello

1  come from or go, but I do know that that was
2  Matt's job for over five years.  He was and is
3  the expert on this system.
4       When he left fire safety, it was to
5  manage this system.  So I had to rely on who
6  they also thought was the expert in the system
7  of TeamDocs within the whole team.
8       Q.   Are you done with your answer?
9       A.   I believe so, yeah.
10       Q.   You told me you didn't get the
11  training that some others received.  Did you
12  ever ask for that training?
13       A.   Constantly.
14       Q.   Who did you ask?
15       A.   Michael Roche.
16       Q.   How many times?
17       A.   A dozen would be an understatement.
18       Q.   And what was his response when you
19  asked for that training?
20       A.   You don't ask enough questions.
21       Q.   Do you think you asked enough
22  questions?
23       A.   I asked more than enough questions.  I
24  can't ask a question that I don't know the

Pasquarello

1  information for.  So if you're keeping something
2  from me, how do I ask questions about it?  So,
3  yes, I asked enough questions.
4       Q.   Did you ask anybody other than Mike
5  Roche for the training you needed to be able to
6  do your job?
7       A.   I had voiced my concern to Bob
8  Shaffer.
9       Q.   How many times?
10       A.   That's when Bob said he would come in
11  and help me, you know, learn some of the other
12  stuff in the background, but that never
13  materialized.
14       Q.   How many times did you ask Mr. Shaffer
15  for access to the training you needed to do your
16  job?
17       A.   I -- I don't recall an exact number.
18  I would guessing.
19       Q.   Was it more than once?
20       A.   I would say a couple of times at the
21  most, yeah.
22       Q.   Was it more than five times?
23       I'm sorry?
24       A.   I -- I was relying more on my direct

Pasquarello

1  supervisor to give me the training I needed.
2       Q.   Well, you told me earlier that at some
3  point you thought Mr. Shaffer was your direct
4  supervisor, right?
5       A.   No.  I thought Mr. Shaffer was
6  Michael's supervisor.  I never said I thought he
7  was my direct supervisor.
8       Q.   Let's go back to your job description
9  which should still be up on your screen, and I
10  want to go to the third bullet under Essential
11  Duties and Responsibilities, which says:  Carry
12  out and supervise the implementation of ILSMs in
13  response to system deficiencies and
14  construction.
15       Do you see that?
16       A.   Yes, I do.
17       Q.   What is an ILSM?
18       A.   Interim life safety measure.
19       Q.   And what role or duties did you have
20  with respect to ILSMs?
21       A.   My role and duty at that point was to
22  teach the staff how to properly do them.  The
23  staff was woefully undertrained before I got
24  there, and they didn't know how to do them.  So

Pasquarello

1  unfortunately I had to do a lot of them myself
2  and make each of them a training opportunity for
3  the staff.
4       So I would bring the staff, including
5  the managers, and showed them how to do proper
6  interim life safety measures.  There is a
7  checklist.  The form is actually a checklist, so
8  it's not -- finding the actual measure is not
9  difficult.  The difficult part is recognizing
10  the deficiency in order to implement the proper
11  measure.  And -- and that was the majority of
12  what I was doing with those.
13       So I put in hundreds of them,
14  especially during COVID, like I previously
15  explained, with all the additional beds and
16  tents and everything else that were going up.
17  But then all the regular deficiencies that would
18  come about due to regular construction, because
19  the hospital was always under construction.  I
20  had to teach the staff how to properly do those.
21       Q.   Do ISLMs need to be documented?
22       A.   They are documented, yes.
23       Q.   Are they documented in one of the two
24  systems we discussed before, TeamOps or

                          Pasquarello

1    TeamDocs?

2        A.   No, they would be documented with
3    the -- well, there's different ILSMs, so you're
4    confusing the urgent impact ILSMs with regular
5    ILSMs.  If I am putting words in your mouth,
6    stop me.  But these ILSMs are systems
7    deficiencies due to -- and it says in
8    construction, so they're in a separate file.
9    That's not that file that we're talking about
10   all along here.
11       Q.   Do the urgent ILSMs need to be
12   documented in either TeamOps or TeamDocs?
13       A.   They're -- they're part of the TeamOps
14   program.  And what they are is -- an urgent ILSM
15   or urgent impact ILSM, it's -- it's a little bit
16   of a misleading statement, urgent impact ILSM.
17   But what they are is, during a PM or during
18   something else, a testing, services, or just
19   your daily rounds, you discover something,
20   right?  Let's make it easy, you discover a hinge
21   broken on a -- door, right?  That you put a --
22   a work order in for.
23            Now, if it's a fire door, right?  That
24   generates -- it goes into the system

                          Pasquarello

1    differently.  So it's a fire door, we have to do
2    that because it's -- it maintains
3    compartmentation of the hospital.  That's what
4    keeps smoke and fire from spreading.  So it's a
5    very important thing, right?
6             So an urgent impact ILSM will get
7    automatically generated through the system.
8    The -- the ILSM that's asked for in that case
9    is -- I use this one because it's a very simple
10   ILSM, and that is to inform the staff that
11   there's a problem with the door and make sure if
12   the fire alarm goes off, that door stays closed.
13   That -- that's a sufficient ILSM or urgent
14   impact ILSM for that type of a deficiency found.
15            Then the work order gets assigned to
16   either the in-house carpenter shop or the -- or
17   a vendor if it needs things that in-house can't
18   do.  So that's what that is.  They're two
19   different things.
20            An ILSM in response to construction or
21   deficiencies are what we do when we have to.
22   And urgent impact ILSMs are generated through
23   the system when a work order to repair something
24   is deemed a life safety asset, item, however you

                          Pasquarello

1    want to say it, and that will require us to
2    review it to see what, if anything, needs to be
3    done in the area or for the staff and whatnot.
4        Q.   Whose responsibility was it to monitor
5    the work orders for the ISLMs that were
6    submitted through the system?
7        A.   Again, that's a clerical
8    responsibility.  So monitoring the -- the work
9    was still part of the manager, in this case it
10   was Matt Bond's responsibility for the TeamOps
11   and TeamDocs program.  So his job daily was to
12   monitor TeamOps and TeamDocs for anything going
13   on, and those urgent impacts would come to him
14   first.
15            If there was something missing or
16   something that required more expertise that
17   maybe he wasn't familiar with, then I would come
18   in and -- and go and reevaluate the area.  So my
19   job was more to make sure the measures he was
20   putting in were correct, not so much to do it.
21            And, again, I -- I began training him
22   on this pretty much as soon as I got there.  And
23   I believe when I left, they were pretty
24   competent in -- in doing the evaluations of

                          Pasquarello

1    these areas or deficiencies.
2        Q.   As Mr. Bond's supervisor, were you
3    able to track the status of his open work
4    orders?
5        A.   Yes.
6        Q.   How often did you track the status of
7    his open work orders?
8        A.   Weekly to monthly, depending on the
9    type of work orders.  We would have -- well,
10   actually, daily, we went over our work orders
11   daily.  You know, you -- you mentioned the work
12   orders.  You got to understand when I got there,
13   work orders were very, very -- were very, very
14   behind, if you will.
15            There was hundreds -- I believe there
16   was over 500 of them that were well over 60 days
17   old.  Some of them were over a year or two old.
18   So we were having daily meetings on catching up
19   all the old ILSM -- not ILSMs, all the old work
20   orders to get those off the books, if you will,
21   and get everything repaired and up to code.
22            And that was -- so it was a daily
23   thing for months.  Actually for almost the
24   entire time I was there.  When I left, there was

Pasquarello

1  only four work orders that were over 60 days
2  old.  When I got there, there was 500 of them
3  but that 500 is a misleading number because my
4  younger counterparts Matt and before him,
5  another guy, Mr. Matthews, I forget his first
6  name, but he was the director.  Matt was his
7  boss -- Matt was his manager, rather.
8      They took groups of work orders and
9  put them into a different work order to make it
10  look like the numbers went down, when, in fact,
11  the number -- the work never went down, just the
12  appearance of the work went down.  So it took --
13  it took me well over the first year I was there
14  to get rid of all those overdue work orders.
15      So, yeah, work orders was a daily
16  thing that we worked on in the department to get
17  those under control.  And it -- it's something
18  actually I'm quite proud of to say when I left
19  there, we had none of those open work orders
20  anymore.  We were able to get rid of all of
21  them.
22      Q.   If there were work orders that were
23  outstanding for more than 60 days, did you
24  remind Mr. Bond that they were still open and

Pasquarello

1  they needed to be addressed?
2      A.   Well, any of them that were made since
3  I got there that went over 60 days I knew why
4  they were open over 60 days.  So there are
5  reasons that a work order would stay open that
6  long, especially during the COVID pandemic and
7  the supply chain issues that we're basically
8  still experiencing.
9      So if -- if a part was needed and they
10  couldn't get the right part, that work order may
11  very well stay open for more than 60 days.  So
12  ever since I took the helm, if you will, my work
13  orders didn't go over 60 days.  I was on top of
14  the work orders that were coming in since I got
15  there.
16      On a daily basis I was addressing the
17  over 500 work orders that weren't addressed in
18  the year or two before I got there.  So
19  that's -- I didn't have to ask them why a work
20  order when I got there was over 60 days old.  I
21  would know the answer to that.  It was the work
22  orders that were over 60 days old and sometimes
23  over a year or so old that we were working on
24  daily that -- that needed my attention.

Pasquarello

1      And I would bring Matt into my
2  office -- not bring him into my office.  I had a
3  very open door policy.  I mean, he was right
4  next door.  We talked about this every day,
5  the -- the work orders.  The stuff that was a
6  problem was what we were discussing previously,
7  the behind-the-scenes stuff in the computer that
8  I never seen and was able to get access to it,
9  because I didn't know to ask for that back
10  there, you know, and is it the same inventories
11  we are currently working with.
12      It's not like I wasn't working with
13  inventories.  It's that the inventories I was
14  working with were different than the inventories
15  in -- I have proper inventories, it just wasn't
16  in the system.
17      Q.   Was there a requirement that work
18  orders be closed as of the 25th of each month?
19      A.   That was -- that was only for me.
20  That was Michael's way of putting extra pressure
21  on me.  No, there was nothing written that said
22  work orders had to be closed by the 25th of the
23  month.  That was in his PIP, and it was
24  completely unfounded considering my shop always

Pasquarello

1  went a hundred percent complete.
2      And we're not talking about a regular
3  work order.  You're talking about PMs, so I'll
4  correct your misuse of work orders to PMs.  It's
5  a PM work order that he wanted closed within
6  25 days in the month.  So those were always
7  closed.  The one he wrote me up for wasn't even
8  supposed to be closed.  That one wasn't due
9  until March and October.  So they falsified that
10  record blatantly.
11      Q.   Go back to your job description which
12  you should still see on your screen?
13      A.   I do.
14      Q.   And I want to go down to the section
15  that talks about Supervisory -- I apologize, it
16  looks like it's a double-sided document, and
17  there were some blank pages in this production.
18      A.   Yeah, I figured that.  Not a worry.
19      Q.   The section that says Supervisory
20  Functions and has a number of bullets below it.
21  Do you see that on your screen?
22      A.   I do.
23      Q.   Take a look at the one, two, three,
24  four, five, sixth bullet down.  It says:

Pasquarello

1   Orients new employees and provides on-the-job
2   training to assigned personnel.
3
4           Do you see that?
5       A.   Yes.
6       Q.   Is that a task you performed?
7       A.   That's a task not only did I perform,
8   I completely wrote the system.  When I got
9   there, the -- the employees weren't getting any
10  of the training that they were supposed to have.
11  They -- they were woefully lacking in their job
12  knowledge.  I put together check sheets.  I put
13  together a training packet for them which
14  described each parts of their job.  I rewrote
15  all the policy and procedures into -- into an
16  updated format and into more concise reading for
17  the staff.  And I did train that staff.
18          So the staff when I started there,
19  like I said, didn't know how to do a proper
20  ILSM.  They didn't even know how to do a proper
21  lamp test.  I went through everything with them.
22  So, yes, that was something not only did I --
23  was part of my responsibility, it was something
24  I'm very proud of.
25          The fire safety department when I left

Pasquarello

1   was a professional well-run department.  When I
2   got there, they -- they really couldn't even
3   pull themselves [inaudible].
4       THE COURT REPORTER:  They really
5   couldn't what?
6       A.   -- talk to them, they will admit that,
7   because I got thanks every day for showing them
8   that, the right way to do it.
9       Q.   Did you feel that you had sufficient
10  training to be able to orient new employees and
11  provide on-the-job training to them?
12      A.   Yeah, because we were talking about
13  fire safety director work.  We're not talking
14  about -- I'm not teaching them how to do TeamOps
15  or TeamDocs.  I'm teaching them how to do their
16  job with fire safety.  I -- yes, I have -- I
17  have very good experience in fire safety.
18      Q.   Let's go down to the next section of
19  the job description, which is entitled
20  Qualifications, and we're on page 1667.  See
21  that section entitled Qualifications?
22      A.   Yes.
23      Q.   The fourth bullet says:  Ability to
24  multitasks and establish priorities.
25

Pasquarello

1           Do you see that?
2       A.   Yes.
3       Q.   Do you agree that it was a necessary
4   qualification to be able to multitask in your
5   position as assistant director?
6       A.   Yes.  And I agree -- I also will state
7   that I did that very well.
8       Q.   The next bullet says:  Ability to
9   maintain organization in a changing environment.
10          Do you see that?
11      A.   I do.
12      Q.   Do you agree that that was a necessary
13  qualification for your position as assistant
14  director?
15      A.   Again, I agree with that, and I
16  believe I did that very well.
17      Q.   Scroll further down on the same page,
18  there's a heading entitled Education/Experience.
19  Do you see that on your screen?
20      A.   I do.
21      Q.   And then there is a number of bullets
22  that are prefaced with:  Strongly preferred
23  certifications include.
24          Do you see where I'm looking?

Pasquarello

1       A.   I do.
2       Q.   Do you know what the OSHA 10-hour
3   certification is?
4       A.   Yes, I do.
5       Q.   What is it?
6       A.   OSHA training is on-site safety.
7   There's two -- OSHA gives two types of training.
8   They'll give it in office buildings which are
9   general OSHA and then they also give
10  construction training.  So they're not even
11  telling you which training they want you to take
12  with that OSHA 10.  Did they want you to take
13  the basic general or do they want you to take
14  the -- the construction?
15          But either way, OSHA construction, how
16  to walk a ladder, how to have three points of
17  contact, it's all these different modules that
18  add up to 10 hours.  So that's what OSHA is.  If
19  you're going on the general side, it's how to
20  make sure there's no tripping hazard with
21  carpets and -- and things like that.  So that's
22  OSHA, Occupational Safety Health Administration,
23  I believe it is.  Could be a little off on the
24  acronym, but I believe that's the acronym for

Pasquarello

1  OSHA.

2  OSHA.

3      Q.   Did you ever ask anybody what that

4  OSHA 10 hour referred to?

5      A.   I knew what it referred to.  Why did I

6  have to ask?  I don't understand the question.

7      Q.   Did you tell me in your answer

8  previously that it could refer to one of two

9  different types of training?

10     A.   Oh.  Well, I know both of them, so I

11 wasn't concerned about that.  I knew I had the

12 qualifications for the job.  So, you know, if

13 they -- they wanted to question me on my OSHA

14 experience, they could have.  You know, they --

15 well, they had me teach the OSHA training to the

16 men, or to the staff, I had some females too.

17 So they -- they knew I was well versed in OSHA.

18     Q.   Did you have the OSHA 10-hour

19 certification?

20     A.   I don't have the OSHA 10-hour

21 certification, no.

22     Q.   What is F85 fire safety director with

23 active shooter and medical emergency

24 preparedness?

25     A.   That's a very old -- now it's called

Pasquarello

1  the F89, and that's your fire safety director

2  certification.  F85 has been phased out.

3      Q.   Did you have either the F85 or the F89

4  during your employment with Crothall?

5      A.   When I got to Crothall, I had my Z89,

6  which meant I took the course and I passed the

7  examination.  I needed to take an on-site exam.

8  And then the pandemic hit, and I never did the

9  on-site exam there.  And in that interim, my Z89

10 had expired, and then I renewed it when Michael

11 put it on the PIP to get it.

12     So I -- I came there with the Z89,

13 which is what everybody has.  You don't come to

14 a building within with an F89 because the F

15 stands for -- well, you don't get the F

16 designation until you on-site in a specific

17 building that you're working.  So I did go there

18 with the 89.  The 89 supercedes all the other

19 ones under there.  So when I got there, I had

20 the certification that covered all the others

21 that you see there.  Well --

22     Q.   How long --

23     A.   -- this is --

24     Q.   I'm sorry?

Pasquarello

1      A.   As far as the FDNY certifications, the

2  Z89 or the F89 would cover all the -- the -- the

3  lower level ones, the 12, 13, 95, and 7.  But,

4  nevertheless, I did go there with it.  It

5  expired while I was there.  And then when he

6  made an issue out of it, I re-got all of them.

7  I got every one of them and then some.

8      But, you know, we could go into why I

9  disagreed it was a necessity.  Because, one, the

10 fire department was closed down for the majority

11 of the -- the first year or so I was there due

12 to the pandemic, and then we went into Joint

13 Commission right away.

14     So just to tell me to leave and take a

15 day to go down and do four or five examinations,

16 which is to leave the hospital four, five, six

17 times, was a little -- you know, I -- to this

18 day still say it was unnecessary.  But it was a

19 simple thing.  He wanted me to do it, I did it,

20 and it satisfied that part of his PIP.

21     It -- it, you know -- it wasn't even

22 anything I had to study for.  I just went and

23 took the test, and I got, you know, high grades

24 on all of them anyhow.  So I'm competent at --

Pasquarello

1  at my job in the fire department certifications.

2      And, again, Matt Bond was there for

3  years, younger, part of the clique, never

4  received his F89.  He was there for over five,

5  six years when I got there.  So, again, I was

6  held to a different standard than my

7  counterparts.

8      And Bernie Nunez, who superseded me,

9  didn't have half the other certifications either

10 that I carried, and certainly doesn't have my

11 experience.

12     Q.   How long did the Z89 certification

13 last?

14     A.   It lasts a year.

15     Q.   And when did you get your Z89

16 certification last before starting at Crothall?

17     A.   Well, if I started in October, I

18 probably got it maybe the November, December,

19 before that.  I would have to check records, but

20 that's a good guess, give or take, because it

21 expired fairly quickly after I got there.

22     And something I -- I had spoken to

23 Michael about several times, he wanted to use my

24 certification numbers on fire safety plans, and

Pasquarello
1   I did refuse that.  That -- that's illegal, and
2   you don't do it.  But he didn't want to hear it,
3   and he routinely put manager's certification
4   numbers on the fire safety plans.
5           And that was something that definitely
6   should not be done, and it's a practice that I
7   voiced my opinion to everybody about.  And
8   "everybody" that being Shaffer and Hariegal.  So
9   you don't use a manager's certificate of
10  fitnesses if they're not the one performing the
11  job.
12          So I also didn't believe that the
13  certifications that you're asking a manager to
14  hold are necessary for the manager.  It's
15  necessary for the staff, not the manager, unless
16  you're looking to use those certifications in
17  way that they're not designed to be used.
18      Q.  I'm sure that was an answer to a
19  question.  I don't think most of that was an
20  answer to my question.  Let me move on, though.
21          Did you refer in your earlier answer
22  to Matt Bond as being one of your counterparts?
23  Did I hear you correctly?
24      A.  Well, when he was the assistant

Pasquarello
1   director, yes.  But he was my subordinate when
2   there I was, but he wasn't assistant director of
3   the department before I got there.
4       Q.  And did he maintain that title as
5   assistant director after you started your
6   employment?
7       A.  No.
8       Q.  What did his title change to?
9       A.  I don't know when it changed but he
10  was manager as far as I know.
11      Q.  Was that a demotion from assistant
12  director?
13      A.  I would assume, yes.
14      Q.  Do you know who demoted him?
15      A.  No.
16      Q.  Did that demotion or that position
17  change occur before you got to Crothall?
18      A.  Yes.
19          MR. CLARK:  We have been going a
20      while.  I think now is a good time for a
21      break so everybody can get water and use
22      the facilities.  Does that work for you,
23      Mr. Pasquarello?
24          THE WITNESS:  That's fine.

Pasquarello
1           MR. CLARK:  Okay.  Let's --
2           THE VIDEOGRAPHER:  The time is
3       11:29 a.m., and we are going off the
4       record.
5           (Recess from 11:29 to 11:40.)
6           THE VIDEOGRAPHER:  The time is
7       11:40 a.m., and we are back on the record.
8       Q.  Mr. Pasquarello, welcome back from
9   break.  While he were on that ten-minute break,
10  did you review any documents?
11      A.  No.
12      Q.  Did you speak with anybody about this
13  deposition?
14      A.  I spoke with Leah for a second.
15      Q.  Did you speak with anybody else?
16      A.  No.
17      Q.  You're familiar with the term
18  "impairment" as is used in the fire safety
19  department at Crothall?
20      A.  Yes.
21      Q.  What does that term mean?
22      A.  An impairment of a system means that
23  there's some part of the system that's either
24  bypassed or not functioning properly.  It's --

Pasquarello
1   what's another word for impaired?  Not working
2   at the moment.  It doesn't necessarily mean it's
3   broken.  We could have bypassed it ourselves.
4   But that's an impairment.
5       Q.  When an impairment occurs on one of
6   the fire systems, are there steps that the fire
7   safety department must take?
8       A.  Yes.
9       Q.  What are those steps?
10      A.  Well, it depends on the impairment.
11  So an ILSM would be a step we would take.
12  Again, depending on the impairment, certain
13  notifications would have to be made.  So
14  notifications, inspection of the area, and an
15  ILSM, if needed.
16      Q.  Who needed to be notified of an
17  impairment?
18      A.  Well, it would depend on the
19  impairment we're talking about.  Some
20  impairments don't need any outside
21  notifications.  Some impairments needs the fire
22  department to have notifications.  Those are the
23  ones that are required by code.
24      Q.  Are there any other external parties

Pasquarello

1   that need to be notified of any type of
2   impairment, other than the FDNY?
3       A.   Not by the fire code, but as a
4   practice, some insurance companies ask to be
5   notified of certain types of impairments.
6       Q.   Do you know if Crothall's or Mount
7   Sinai's insurance carrier asks to be notified of
8   impairments?
9       A.   Yes, they have -- at the time I was
10  there they have FM Global, and FM Global asked
11  to be notified of impairments.
12      Q.   When did you first learn that FM
13  Global wanted to be notified of impairments?
14      A.   I used -- well, I used -- FM Global
15  was also the insurer of my previous employer, so
16  I knew FM Global's requirements for
17  notifications.
18      Q.   So is it accurate that as of the time
19  you started at Crothall, you were aware that FM
20  Global required notification for certain
21  impairments?
22      A.   Yes.
23      Q.   We talked earlier about Mr. Bond, who
24  you supervised during your employment.  Do you

Pasquarello

1   know how old Mr. Bond is?
2       A.   I believe he turned 30 while I was
3   there.
4       Q.   During the time that you supervised
5   Mr. Bond, how was his performance?
6       A.   He needed -- he needed work.
7   Satisfactory in some areas.  Very poor in
8   others.
9       Q.   In what areas was he very poor?
10      A.   His time management skills were
11  lacking.  Really, he didn't focus well on -- on
12  more than one task at a time.  Obviously he was
13  missing documentation.  He was very good at
14  hiding that fact, but he was missing it.  It
15  was -- I would say his -- his biggest problem
16  was time management and commitment to the -- to
17  the task at hand.
18      Q.   Were there other areas of his
19  performance that he needed improvement in?
20      A.   His leadership abilities, I tried
21  talking to him about how to handle staff.  He --
22  he often would get in a situation where they
23  were very dismissive and condescending of him,
24  and I would try to help him develop the -- the

Pasquarello

1   persona of a boss, if you will, or of a leader.
2       And I told him the best way to do that
3   is to be as competent in your position as
4   possible, and never ask your staff to do what
5   you can and don't know how.  I said that will go
6   a long way to helping you.  But he needed -- he
7   still needs help -- well, he needs to mature in
8   his role as a leader.
9       Q.   Are there any other areas of
10  Mr. Bond's performance that were deficient?
11      A.   Leadership.  As -- as I'm being
12  questioned, nothing else is coming to my head.
13  But if I think of something, I'll mention it,
14  but as of now that's what I think.
15      Q.   Did you take steps during your
16  employment or your management of Mr. Bond to
17  address his deficiencies with him?
18      A.   Yes.  I would have one-on-one meetings
19  with him.  I -- I would send him emails.  I
20  would try and give him tools to help him stay on
21  track.  I -- I -- I remember giving him certain
22  sheets that were broken down by the hour,
23  unlike, you know, set aside, you know, X amount
24  of hours whatever you need a day to go through

Pasquarello

1   your emails, do that once or twice a day during
2   the beginning and the end.  Don't worry so much
3   in the middle.
4       Take time every day to -- to go over
5   the -- the TeamDocs stuff, the -- the TeamOps
6   stuff, what needs follow-up.  You know, flag
7   things that needed follow-up.  I worked with
8   Matt a lot to try and bring him along in his --
9   in his time management and multitasking skills.
10      Q.   Did you ever formally or informally
11  discipline him?
12      A.   Informally, yeah, I would tell him,
13  Matt, you have to get better at this, you know.
14  You're a reflection of me.  We have to get this
15  department to the next level.  I -- you know, I
16  need your help.  I need the help of my
17  management team to do that.
18      And formally I went to Mike several
19  times to try and bring Matt to the next -- after
20  coaching didn't work, after talks like that
21  didn't work, emails, aids, then I asked if I
22  could put Matt on a PIP.  And Mike didn't
23  endorse the -- the PIP that I presented to him
24  to -- to put Matt on.

Pasquarello

1          Q.   You said in your answer that you told
2   Mr. Bond that he was a reflection on you.  What
3   did you mean by that?
4          A.   Well, he worked for me.  It was my
5   department, fire safety was my department, I
6   take that very personal and serious.  And I
7   don't like leading what's not a professional
8   well-run machine.  And I did -- you know, Matt
9   needed some work to -- to get to my
10  expectations.  It just -- he -- he didn't
11  display or exhibit the desire to do that.
12         I can't guess as to why he didn't, but
13  there was -- he -- he didn't have that
14  motivation and drive to get himself to the next
15  level, in my opinion.
16         MR. CLARK:  Okay.  Zack, let's mark
17     Exhibit 2.  I'll ask Zack to put it in the
18     chat, and, again, I'll put it up on my
19     screen.  Exhibit 2 is a series of emails
20     bearing Bates number CH 1233 through
21     CH 1236.
22         Q.   And, again, Mr. Pasquarello, like last
23  time, it will be available to you as a PDF in
24  the chat, and I am going to put it up on my

Pasquarello

1   screen as well.  Take a look at it, and let me
2   know if it's something you recognize once you've
3   reviewed it.
4          (Series of emails bearing Bates stamp
5      CH 1233 through CH 1236 was marked
6      Pasquarello Exhibit 2 for identification,
7      as of this date.)
8          Q.   And please let me know, if you're
9   looking on my screen, if you'd like me to scroll
10  through the document since you could only see a
11  piece of it.
12         A.   I thought I was looking on my screen
13  but I guess it's yours.
14         Q.   So I'm happy to scroll through the
15  document if that's easy for you, and you can
16  just tell me when to move.  Or if you want to
17  download it out of the chat and move at your
18  convenience, you could do that as well.
19         A.   Are you moving it right now, or is it
20  just moving?
21         Q.   That's me.  I'm moving it up and down.
22         A.   I thought maybe I had a delay going.
23  Let me see if I can get it back up.  All right.
24  I got it.  It's a little easy for me to first

Pasquarello

1   review this way, and then get back to you and go
2   through it with you.
3          (Witness reviewing document.)
4          A.   Okay.  I reviewed -- I read through
5   them.
6          Q.   Okay.  Are these emails that you
7   received during your employment at Crothall?
8          A.   Well, I -- well, sent and received,
9   yes.
10         Q.   I notice you have a mountsinai.org
11  email address on these emails.  Why is that?
12         A.   Because the -- the contract was Mount
13  Sinai.
14         Q.   And were you the assistant director of
15  fire safety for Mount Sinai Hospital?
16         A.   Well, in essence, yes, but I worked
17  for Crothall Healthcare.
18         Q.   All right.  I want to focus on parts
19  of this email, and I'll scroll to them on my
20  screen or you can scroll to them in the PDF if
21  you have that separate open.  But let's start
22  with the April 22, 2020 email that Mike Roche
23  sent to you at the bottom of the first page of
24  the exhibit.

Pasquarello

1          A.   Okay.
2          Q.   You with me?
3          A.   Yes.
4          Q.   In the last sentence on that page, he
5   writes:  You have now been here for over six
6   months, the department should be running much
7   more smoothly than it is.
8          Do you see that?
9          A.   Yes.
10         Q.   Do you agree with that sentiment that
11  the department as of April 22, 2020 should have
12  been running more smoothly?
13         A.   In certain aspects, yes.  In certain
14  aspects, no.
15         Q.   In what aspects do you believe the
16  department should have been running more
17  smoothly?
18         A.   At that time I was still training the
19  staff on how to properly do their jobs.  At that
20  time I was still -- well, as the email before
21  showed, I was still trying to help Matt develop
22  time management and prioritizing skills.
23         We were running without a direct --
24  well, without a manager for the staff, so

```
                    Pasquarello
1
2    although -- that work was on my shoulders.  I
3    know in this he also says -- I was going to do
4    Jerrain's jobs but there were some parts of
5    Jerrain's that were at -- what would the right
6    word be?
7              Like paperwork, administrative.  So I
8    thought it was best to have Matt just
9    concentrate on administrative stuff, and I would
10   concentrate on the others.  So that -- I
11   disagreed with, you know, some of this letter,
12   or this email.
13             You know, so we -- we were a ship that
14   was being corrected.  Was it a hundred percent
15   corrected at that point, absolutely not, but it
16   was well on its way.  So, you know, later on I
17   had asked when was your expectations done.
18   Because it -- with six months in, you know, I
19   was down a manager and we were in the beginning
20   of a major pandemic.  So it's -- you know, I --
21   I took his next sentence to -- to mean, you
22   know, we still had work to do but we're getting
23   there.
24        Q.   By "his next sentence," you're
25   referring to the statement where he says:  I am
```

```
1                   Pasquarello
2    not happy with where we are and it needs to be
3    improved?
4              Strike that.  Let me read it -- let me
5    read it more correctly.
6              By "the next sentence" are you
7    referring to:  I am not happy with where we are
8    and it needs to improve?
9         A.   No.  I would go to the next -- next
10   page.
11        Q.   Okay.  Let me -- let me stop at the
12   sentence I just read for a moment.  Were you
13   happy with where the department was as of
14   April 22, 2020?
15        A.   No, I wasn't.
16        Q.   In the paragraph that's preceding the
17   paragraph we were just looking at, the last two
18   lines, Mr. Roche writes to you:  Matt's failures
19   are a reflection of the department's failures,
20   not his alone.  Anything he does not accomplish
21   reflects poorly on you.
22             Do you see that?
23        A.   Absolutely.  I just said that to you a
24   moment ago.
25        Q.   And did you --
```

```
1                   Pasquarello
2         A.   I --
3         Q.   Sorry.  Go ahead.
4         A.   No, no.  Go ahead.
5         Q.   Did you understand that as of
6    April 22, 2020, that Mr. Roche would hold you
7    accountable for Mr. Bond's failures?
8         A.   He was holding me accountable for
9    Mr. Bond's failures before this email.  So, yes,
10   I knew I was being held accountable for
11   Mr. Roche -- Mr. Bond's failures.
12        Q.   On the next page of the document, let
13   me scroll down a bit on my screen so you can see
14   it, or you can follow along on the separate PDF
15   you might have downloaded.  I'm looking
16   beginning on the second line, at the top of the
17   second page.  It says:  The AD's role is to
18   accomplish all tasks under the department, not
19   just recognize what needs to be done.  If it's
20   not moving, you need to roll your sleeves up and
21   get it done however necessary.
22             Do you see that?
23        A.   Yes, I do.
24        Q.   Does "AD" in that sentence refer to
25   assistant director?
```

```
1                   Pasquarello
2         A.   Yes.
3         Q.   That -- that's you, right?
4         A.   Yes.
5         Q.   Did you understand as of the date of
6    this email that Mr. Roche expected you to pick
7    up the slack of your subordinates if they were
8    falling behind?
9         A.   Yes.  I -- I completely understood
10   that, and I had a conversation with him after
11   this email regarding exactly what he was saying,
12   that I -- it's probably best if I answer your
13   questions, more than me just going on right now.
14        Q.   Are you done with your answer?
15        A.   For -- for what you asked, yes.
16        Q.   Do you believe that you rolled your
17   sleeves up and got the necessary tasks done
18   following your receipt of this email?
19        A.   Absolutely.
20        Q.   You responded to this April 22 email,
21   right?
22             Strike that.  Let me ask it
23   differently.
24             The -- the email at the top of the
25   first page of this exhibit is an email from you
```

Pasquarello

1   to Mr. Roche on April 25, 2020; is that right?
2      A.   Yes.
3      Q.   In the first paragraph of that email,
4   again, at the top of Exhibit 2, you wrote,
5   referring to Mr. Bond:  I'm not putting him on
6   and don't want this considered a development
7   plan at this time.
8      Do you see that?
9      A.   I do.
10     Q.   Why didn't you want to put Mr. Bond on
11  a development plan?
12     A.   Well, I was only there a couple of
13  months, so at that point I wanted to mentor him
14  more than discipline him, if you will.  And I
15  felt if we made a formal thing, it would be
16  first steps in discipline.  And I wasn't there
17  long enough at that point to want to do that to
18  a -- to Matt.  I thought he had the -- the
19  potential, if you will, to learn.  So that --
20  that's where that came from.
21     But I did put him on a plan, and, you
22  know, as we progressed more and more into it and
23  I seen that my efforts to develop him and my
24  need to continue rolling up my sleeves to do

Pasquarello

1   subordinate's work was getting inordinate, and
2   the fact that Michael wouldn't allow me to hire
3   the help that the department needed got me to
4   the next level where I wanted it to be formal.
5      Q.   In the next paragraph of the email
6   we're looking at on Exhibit 2, you write:  I'm
7   going to be more firm on documenting and/or
8   write-ups for missed deadlines.
9      Do you see that?
10     A.   Yes.
11     Q.   Why did you write that?
12     A.   Not sure what was going through my
13  mind at that moment, but just that I'm feeling
14  if the way that -- I don't know why I wrote
15  that.  It's more that I would be more hands-on
16  on missed deadlines.  And -- and I don't believe
17  I was talking strictly about Matt on this.  I
18  believe that was more in general for the
19  department.
20     Because if you see the next line, I
21  believe keeping a manager between me and the
22  marshals makes it a -- clear that a call from me
23  is an escalation within the chain of command.
24     I needed somebody -- I feel as -- as

Pasquarello

1   a -- a department head, you need that chain of
2   command.  So if you're -- if you're not getting
3   it done -- and this goes back to my statements
4   about trying to help Matt become a leader, when
5   you get a call from me, we're already past that,
6   and it would result in -- in documentation or a
7   write-up.  So that -- that's where that was
8   coming from.
9      Q.   Did you believe it was important for
10  Mr. Bond and other members of the fire safety
11  department to meet deadlines?
12     A.   Of course.
13     Q.   Why?
14     A.   Because when you miss deadlines, the
15  work just keeps piling up on you.  You know, so
16  you're -- if something has to be taken care of
17  this month and you don't get it done, and then
18  next month I got twice the work to do.  So, I
19  mean, just from a practical standpoint, you
20  should meet your deadlines.
21     You know, even if the deadline is a
22  self-imposed deadline, you should give
23  yourself -- and this is what I was trying to
24  teach Matt with the 30-, 60-, 90-day plan.  Even

Pasquarello

1   if you give yourself a deadline, it might be
2   before -- well, it should always be before the
3   actual deadline from the system, but that will
4   keep you ahead of the game.  And that...
5      Q.   In your opinion, was it important to
6   document the instances when Matt or somebody
7   else that you managed missed their deadlines?
8      A.   We started doing email after that, so
9   you could see one of the lower emails where I
10  would start sending out what was needed before
11  the end of the month to -- to -- as an attempt
12  to keep everybody on track and documenting.
13     Q.   And why do you think it was important
14  to document where the department was in terms of
15  its deadlines?
16     A.   Not -- if you could rephrase that,
17  that would be better.
18     Q.   Sure.
19     You referred to -- let's scroll down
20  there to an email lower down in this chain,
21  where you sent -- on April 22, 2020, you sent an
22  email to a number of folks, saying:  All below
23  is what's incomplete as of this morning in
24  maintenance connection.

Pasquarello

1
2      You see where I'm looking?
3      A.   Yes, that's what I was referring to.
4      Q.   Why did you send this email?
5      A.   To be more hands-on, roll up my
6  sleeves and have the -- the staff know where we
7  were.  So I started giving them mid-month and
8  end-of-month reminders of where we need to be.
9  So that -- that was a -- a tool for me to use to
10 document that we see where we are, let the team
11 see where we are, and get things done.
12     Q.   In the second sentence of the email
13 we're looking at from you, you write:  If unable
14 to complete by the 15th, a written explanation
15 as to the delay with a proposed date of
16 completion needs to be provided.
17          Do you see that?
18     A.   Yes.
19     Q.   Why did you need an explanation and a
20 proposed date?
21     A.   To keep people on track.  To let
22 the -- let me know why you couldn't get it done
23 by the 15th.  What happened.  What was going on.
24     Q.   Do you believe it's important for a
25 manager to keep his or her subordinates on

Pasquarello

1
2  track?
3      A.   I do.  That's why I provided this tool
4  to keep them on track.
5      Q.   Did Mr. Bond miss any deadlines after
6  your last email in this chain on April 25, 2020?
7          MS. SELIGER:  Objection.
8      A.   I -- I would -- listen, everybody
9  misses deadlines from time to time.  So I would
10 say, yes, he has missed deadlines.  Were they,
11 you know, blatant deadlines on certain things
12 like the PMs, or -- or something like that?  I
13 don't believe so, because I know my PMs were
14 closed on time consistently.
15          You know, but were deadlines missed?
16 I'm sure deadlines were missed.  I mean, I don't
17 know anybody who never misses a deadline.  You
18 know, it was a very fluent time in the hospital.
19 You know, we were working during the most
20 unprecedented time in healthcare.
21          So was a deadline missed because
22 something else took priority?  I'm pretty sure
23 it did.  Could I give you an example?  Probably
24 not off the top of my head.  But I would say
25 it's a safe bet we missed a deadline or two.

Pasquarello

1
2      Q.   Did you document any missed deadlines
3  that Mr. Bond had after April 25, 2020?
4      A.   I don't recall.
5      Q.   At some point was Mr. Bond placed on a
6  performance improvement plan?
7      A.   No.  I brought it to Mike for his
8  endorsement and review, and -- and he didn't
9  want to review it or endorse it.
10     Q.   Was it necessary for Mike Roche to
11 review and sign off on a performance improvement
12 plan for your subordinate?
13     A.   Well, I only did one other, and he was
14 fully involved with that one, so I assume that
15 was what he wanted, yes.  So if he agreed with
16 it or supported it, he would have been involved.
17     Q.   Who was the other person that you
18 placed on a performance improvement plan?
19     A.   Joe Jerrain.
20     Q.   When you discussed the idea of placing
21 Mr. Bond on a performance improvement plan with
22 Mr. Roche, did you ask him if you could put one
23 in place regardless of whether he agreed with it
24 or not?
25     A.   I didn't ask that, but I -- I knew I

Pasquarello

1
2  could.  I told him I felt uncomfortable due to
3  their personal relationship to put him on a
4  performance plan.  I believed then and I believe
5  now that their -- that the relationship between
6  the younger employees was a tight one, and then
7  all that would have did was accelerate the
8  inevitable way Mike was trying to force me out.
9      Q.   Did you discuss with anybody in human
10 resources your idea to put Mr. Bond on a
11 performance improvement plan?
12     A.   I'm sure that must have been part of
13 my conversations with Patty Lizarazo, but I
14 don't recall exactly how much detail I went
15 into, but I know I've mentioned it.
16     Q.   When did you and Ms. Lizarazo discuss
17 putting Mr. Bond on a performance improvement
18 plan?
19     A.   I don't remember if it was our first
20 or second meeting.
21     Q.   Was that first or second meeting while
22 you were still supervising Mr. Bond?
23     A.   Yes.  Well, I wouldn't put him on a
24 plan if he wasn't my subordinate anymore.
25     Q.   And what did Ms. Lizarazo say in

Pasquarello

1
2 response to your proposal to put Mr. Bond on a
3 performance improvement plan?
4     A.   It wasn't that she said anything.  She
5 was just listening and taking notes.  She didn't
6 advise me either way.
7     Q.   Did you ask her whether you could put
8 Mr. Bond on a performance improvement plan
9 without the support of Mr. Roche?
10     A.   No.  I told her that I was
11 uncomfortable putting him on a plan because of
12 Mr. Roche's relationship with the younger
13 members of the team.
14     Q.   And what did she say in response to
15 that?
16     A.   She didn't.  She just took it as a no.
17     Q.   Did you discuss your idea to put
18 Mr. Bond on a performance improvement plan with
19 anybody else at Crothall or Mount Sinai?
20     A.   Bob Shaffer.
21     Q.   And when did you have that discussion
22 with Bob Shaffer?
23     A.   All around the same time.  I don't
24 recall exactly when it was.
25     Q.   What did you say to Mr. Shaffer about

Pasquarello

1
2 putting Mr. Bond on a performance improvement
3 plan?
4     A.   That I wrote a plan and I gave it to
5 Mike, and he wouldn't endorse it.
6     Q.   And what did Mr. Shaffer say in
7 response?
8     A.   That kid should have been fired years
9 ago.
10     Q.   As the assistant director in fire
11 safety, did you have the power to hire and fire
12 folks who reported to you?
13     A.   Well, I -- I did the interview
14 process, so yes, I made the recommendations to
15 hire, and then I also made recommendations to
16 fire.  I don't know if it was necessarily my
17 power to do so.  I believed it more as my
18 recommendations to do so.  I believe HR has the
19 power to hire and fire.
20     Q.   Did you make the recommendation to
21 fire Mr. Bond to anybody at Crothall or Mount
22 Sinai?
23     A.   Did I?  No.  That was Bob's statement,
24 not mine.
25     Q.   Did you agree with that statement?

Pasquarello

1
2     A.   I agreed with it, but it wasn't my
3 decision to make.
4     Q.   Was it your recommendation to make?
5     A.   No, because it goes back to the same
6 thing.  I wouldn't have recommended firing
7 somebody until I exhausted every aspect of
8 trying to train them and coach them.  Matt still
9 had steps that could have been taken to train
10 and coach him.  Instead of doing that, Mike just
11 transferred him out of one department and
12 actually created a position for him in another.
13 The -- the protection was astonishing.
14     Q.   Other than Roche, Lizarazo, and
15 Shaffer, did you speak with anybody else about
16 your plan or proposal to put Mr. Bond on a
17 performance improvement plan?
18     A.   Not that I recall, no.
19     Q.   The position that Mr. Bond transferred
20 to out of the fire safety department, what
21 position was that?
22     A.   It was a hybrid position.  Like I
23 said, it was developed just to get him to move
24 out of the department.  So he was taking over
25 work control, which is the -- the part of the

Pasquarello

1
2 hospital or part of the system that puts out the
3 work orders.  So his job now was to make -- to
4 give everybody their work orders and to track
5 that system.
6          That was a significant demotion from
7 fire safety manager, if you will, so they were
8 adding into that more computer-based work with
9 the TeamOps and TeamDocs for the other
10 department.
11          So it -- it wasn't a clearly defined
12 role to any of us.  I don't know what kind of
13 job description, if any, they gave him for the
14 new role.
15          But I do know who he replaced, and
16 work control would have been considered a -- a
17 demotion from fire safety manager.  And to keep
18 the title manager and I guess his salary, they
19 added that extra responsibility of keeping
20 TeamDocs and TeamOps for the whole department of
21 engineering.
22          So I -- I don't know exactly more than
23 those two roles that he did, but it was all
24 administrative based on work orders and the
25 TeamOp, TeamDoc system.

Pasquarello

1  Q.   And in your mind, that transfer from
2  fire safety to that new role was a demotion?
3  A.   It was not in my mind.  In everybody's
4  mind, yeah, it was a demotion.
5  Q.   So is it accurate that Mr. Bond has
6  been twice demoted, that you're aware of, once
7  from assistant director to fire safety manager
8  and once from fire safety manager to that new
9  position?
10  A.   No, I believe that new position in
11  Matt's view, or even in anybody else's view, was
12  to shield him from the shortcomings that were
13  coming up with the TeamDoc review, that was his
14  shortcomings that were -- were put to me.  So it
15  was a way to shield him, not demote him.
16  And -- and it was just a place to put
17  him until they ultimately were able to get rid
18  of me.  That's my belief why they did it.
19  Because that position itself certainly didn't
20  require the -- somebody with Matt's background
21  up and to that point.
22  Q.   You told me earlier that you worked
23  with Mike Roche to place Mr. Jerrain on a
24  performance improvement plan; is that right?

Pasquarello

1  A.   Yes.
2  Q.   Why was Mr. Jerrain placed on a
3  performance improvement plan?
4  A.   Joe was -- I believe Joe was having a
5  hard time transitioning from his previous role
6  to -- to management and new technologies and the
7  stuff that comes with that, and -- and he needed
8  time to grow in the position and -- and learn it
9  in not such a -- a busy atmosphere, and
10  certainly not in a -- such a dynamically
11  changing atmosphere as was going on in -- in the
12  beginning and midst of the COVID pandemic.
13  So at -- at one point after constant
14  coaching and we put Joe on the plan, which,
15  again, was completely endorsed and helped --
16  Michael helped me write it.  He had Omelfi
17  Garcia, who was his office manager at the time,
18  help me draft it.  Me and Michael sat down
19  together to -- to finalize it, and then put Joe
20  on it.
21  At some point Michael wanted to fire
22  Joseph, and I was adamant that he did not
23  deserve it.  He was hired.  He never lied on his
24  resume.  He never lied about his background.  He

Pasquarello

1  needed to be trained.  He was a good,
2  hardworking man that needed -- that could get to
3  the next step.  He just couldn't do it there.
4  And I had asked through Michael and
5  then Bob if there was another place to put him,
6  and it turned out that they were able to
7  transfer him to a -- in a meeting with Bob,
8  Chris Hariegal, and Michael, he was offered a
9  transfer to a -- a one-building hospital to
10  Queens -- Mount Sinai Queens, and he's doing
11  very well.  He -- Joe would call me in the
12  beginning almost daily, then it went to weekly,
13  then it went to monthly, and then it tapered
14  off.
15  So I was helping him in his new role
16  on -- on a continuing basis.  He -- he would
17  call me for questions.  How do I do this?  How
18  do I do that?  What's the right way to do this?
19  How do I implement that?  So I continued
20  coaching him even after he left my department,
21  and -- and I'm happy to say Joe's -- reputation
22  wide is supposedly doing very well.
23  Q.   Was Mr. Jerrain's transfer to the
24  other location a demotion, in your mind?

Pasquarello

1  A.   No, I don't see it as a demotion for
2  him.  He -- he kept his salary.  He kept his
3  title.  He just went to a smaller hospital.  It
4  was -- it was a lateral move to -- an analogy, I
5  don't know, what's an analogy?
6  I mean, you're a professional ball
7  player and -- and you're having trouble
8  developing, so they put you in the minors for a
9  couple of months and see if they could develop
10  you and bring you back up to the majors.  Maybe
11  I would look at it like that.
12  I certainly wouldn't think Joe was
13  being cast aside, at least I hope he wasn't,
14  because my intent was to -- to advocate for him
15  not to be.  It was just the way to get him in a
16  smaller atmosphere where he could get his feet
17  under him.  He didn't have to deal with the
18  staff.  He didn't have to deal with the unions.
19  He didn't have to deal with all that other
20  stuff.  He could concentrate on learning fire
21  safety from a more granular aspect.
22  So, no, it wasn't a demotion.  It was
23  just a -- a move to a smaller place that's easy
24  to learn.

Pasquarello

1
2     Q.   Switch gears for a second.  I'm going
3  to flip back to Exhibit 1, and I'm going to show
4  it to you on my screen.  You can look at it.
5  And if you've downloaded it, you can look at it
6  in the separate PDF as well.  Whatever is easier
7  for you.
8     A.   Downloaded it, because I think it just
9  pops up on the thing here.
10    Q.   Well, if you could see -- I mean,
11 sorry, I didn't actually share my screen.  Let
12 me share my screen.  If you could see my screen,
13 let me know if you can.  I'm going to focus on
14 just one bullet, so maybe it's easier to look at
15 it that way.  Can you see my screen?
16    A.   Yes, I see your screen.
17    Q.   So I'm looking at Exhibit 1, page
18 CH 1665, this is the job description we looked
19 at earlier, and I want to focus on the third
20 bullet down that begins:  Oversees and manages
21 programs to respond and clear FDNY and ECB
22 violations.
23         Do you see that?
24    A.   Yes.
25    Q.   What is ECB?

Pasquarello

1
2     A.   I believe it's environmental control
3  board.
4     Q.   Can you explain to me what this duty
5  entailed.
6     A.   Yeah, that would be -- I'll go more
7  with the FDNY because ECB violations would go
8  more to environmental health and safety, so I
9  would work through them to clear those
10 violations.
11         But a fire department violation, let's
12 say they came in and there was -- well, they
13 responded to an alarm.  They responded to more
14 than one in a month and they were both
15 unfounded, we would get a summons from the fire
16 department, and we would have to explain to them
17 what the -- was.
18         So you write a letter.  You send it to
19 legal, and then legal brings it to -- I don't
20 know if they ever really go to court with them,
21 but let's say they went to court with them.  So
22 we would provide the answer that they need to
23 answer the summons.
24    Q.   Were you ever required to show up in
25 court or at an administrative agency to address

Pasquarello

1
2  a summons or a violation?
3     A.   No.  That would have been legal.  That
4  was never my position.
5     Q.   During your employment with Crothall
6  did anybody ever ask you to submit a response or
7  documentation to help address a summons or a
8  violation from either the FDNY or the ECB or any
9  other city agency?
10    A.   Yeah, it was a normal part of -- of
11 the department's responsibilities, but the
12 weird -- well -- yeah, weird I guess is a good
13 way to say it.  Not all of them come directly to
14 me.  So sometimes they would come through
15 Crothall.  Sometimes they would come to a
16 different part of the hospital and they were
17 rerouted to me.  So I would voluntarily tell you
18 that sometimes the responses came after a
19 deadline, but that's only because the summons
20 itself came to me after a deadline.  It's not
21 something you know is coming, so it's something
22 that shows up.
23         When they would directly hand it to my
24 staff or myself, they were, you know, responded
25 within a day or two because it's easy enough to

Pasquarello

1
2  do.  It's almost a cut-and-paste response.  All
3  you're doing is clarifying what the issue was.
4         But if it didn't come directly through
5  fire safety and it came through other means,
6  it -- it's hard to know if anything was -- was
7  delayed or missed because it might have never
8  got to us.
9     Q.   Did you respond to all of the
10 summonses and violations that came to your
11 attention?
12    A.   All the ones that came to my
13 attention, yes.  They either came directly to me
14 or they came through Matt.  Matt -- Matt filled
15 out a lot of them.  I -- he didn't have a
16 problem with those per se.  They would come in,
17 like I said, it's a form letter, you just add in
18 the different response, and you sent it back to
19 legal.
20         So that was something that came, and
21 as soon as -- like I said before, it's easy to
22 handle something as soon as it comes than to
23 procrastinate with it because then it either
24 gets lost in the shuffle or it piles up.
25         So the way I handle them, if they came

Pasquarello

1   to my desk, I signed it and sent it back --
2   well, not signed it.  I put the accompanying
3   document with it.  It's usually a letter and
4   then a certificate of correction, which is just
5   a -- a notarized thing that the -- the expediter
6   would use.  And they would actually notarize it
7   for you.  You just sent it back with the packet.
8           MR. CLARK:  So let's mark as Exhibit 3
9       a nine-page document bearing Bates stamp
10      number CH 1223 through CH 1231.  I'm going
11      to ask Zack to put it in the chat for you,
12      and I'm going to share my screen.
13      Q.   It is a multi-page document, so,
14   Mr. Pasquarello, if you're using my screen
15   version, if you want me to scroll through, I'm
16   happy to do it, just please ask me.
17           (Emails and attachments bearing Bates
18      stamp CH 1223 through CH 1231 was marked
19      Pasquarello Exhibit 3 for identification,
20      as of this date.)
21      A.   Okay.  I'll check it first, and I'll
22   jump back.
23      Q.   Okay.  So take a look at the document,
24   and let me know when you're done.  And my

Pasquarello

1   question is going to be, do you recognize this
2   series of emails?
3           (Witness reviewing document.)
4       A.   Obviously, there's more than that one.
5           So I think I might be able to talk to
6   this.  I went through it.  I'm not sure I know
7   what your question is.
8       Q.   Well, my first question is, do you
9   recognize the series of emails and attachments
10   that are shown in Exhibit 3?
11      A.   I don't remember -- I don't recall all
12   the attachments or emails, but this one that
13   we're looking at obviously came directly to me
14   and I see it.
15      Q.   Okay.  So the one we're looking at on
16   the top of the first page of Exhibit 3, page
17   CH 1223, is an email from Mike Roche to you on
18   September 25, 2020.  You're looking at the same
19   email I'm looking at?
20      A.   I am.
21      Q.   Okay.  And it says:  Joe, the attached
22   violation was sent to you on the -- on
23   June 10th.  The hearing was September 11, '20
24   and no one showed up so we got a $4800 fine.

Pasquarello

1   Please let me know if you took any steps to
2   prevent this.
3           Do you see that?
4       A.   Yes.
5       Q.   Let me scroll to the next page of the
6   document, which is an email that was attached to
7   that previous email, and it's an email from
8   Mr. Roche to you with a series of attachments
9   that says Number 4 in the body of the email.  Do
10   you see that?
11      A.   Yeah, that one I don't recall but,
12   okay.
13      Q.   Do you see in the bolded line that
14   says Attachments at the top of this page 2 of
15   the exhibit, 1224 Bates stamp, that there are
16   two, three summonses -- sorry, four summonses
17   listed in the attachments?
18      A.   Yes.
19      Q.   Do you recall receiving this email on
20   June 10, 2020 from Mr. Roche?
21      A.   I don't recall it but I'm not saying I
22   didn't receive it.
23      Q.   All right.  If you scroll down further
24   in the exhibit, you'll see a notice from the

Pasquarello

1   City of New York OATH Hearings Division dated
2   June 10th.  Do you see that?
3       A.   I see that.
4       Q.   Okay.  That's page 1226.  And then
5   there is an NYC serve violation copy, which
6   looks to be a summons from the Department of
7   Environmental Protection.  Do you see that?
8       A.   I do.
9       Q.   Do you recall receiving the notice
10   from OATH and the citation from the Department
11   of Environmental Protection?
12      A.   I don't, but I can tell you if I did
13   receive these, I would have forwarded them to
14   environmental health and safety.  This isn't one
15   of my summonses.  This is for asbestos control.
16   This has nothing to do with fire safety.
17      Q.   So going back to the first page of the
18   exhibit, the email from Mr. Roche to you on
19   September 25, 2020, Mr. Roche asks you:  Please
20   let me know if you took any steps to prevent
21   this.
22           Do you see that?
23      A.   Yes.
24      Q.   Did you respond to this email?

Pasquarello

1        Pasquarello
2        A.   I don't recall.  I'm sure I answered
3   him because I don't think he would have let me
4   not answer him.  But based on what I'm looking
5   at here, it wasn't one of our summonses so I
6   would have told him I forwarded it to EH and S
7   if that's what I received.
8        Q.   Do you have a specific recollection of
9   telling Mr. Roche that this was not one of your
10  summonses?
11       A.   I don't.  I don't.  And I don't ever
12  remember this becoming an issue up to this
13  second.  But to say no one showed up, I'm hoping
14  that's not implying I was supposed to go
15  somewhere, because that would be misleading.  I
16  never show up for the summonses.  We don't go to
17  court.  That wasn't our job.  And, again, this
18  is an environmental summons, not a fire alarm
19  summons, so it would have went to EH and S.
20       Q.   When you received the email that's
21  depicted on the second page of the exhibit on
22  June 10, 2020, do you recall if you responded
23  and said, This summons doesn't relate to fire
24  safety?
25            MS. SELIGER:  Objection.

1        Pasquarello
2        A.   I -- I can't believe I didn't.  I
3   don't see my response here.  So, you know, I
4   can't say, Oh, absolutely.  But there's no way I
5   would have got an email from my boss saying
6   what's going on here and not have answered it.
7   So, yes, I'm sure I answered him, and I'm sure
8   when I read the summons, I said, This is not our
9   summons, Mike.  This goes to EH and S.
10       Q.   Do you have a specific recollection of
11  sending an email to that effect to Mr. Roche?
12       A.   I don't have a specific recollection
13  of one email for one summons, where we receive
14  hundreds of them, almost two years ago.  I mean,
15  I'm sorry, I don't.
16       Q.   Would you be surprised if there wasn't
17  a response from you to the June 10, 2020 email?
18       A.   I would be extremely surprised I
19  didn't answer my boss who was asking me a
20  specific question.  And I would be more
21  surprised Mike didn't jump on it if that was the
22  case.  So I believe I answered him.  I must have
23  answered him.
24       Q.   Do you know if Mount Sinai was
25  required to pay the $4800 fine that's referenced

1        Pasquarello
2   in the September 25, 2020 email on the first
3   page of this exhibit?
4        A.   Again, that's a misleading gotcha type
5   of sentence.  They would have been able -- they
6   would have been required to pay the fine if
7   somebody was there or not.  You're not going to
8   get away with an asbestos inspector not being -- not
9   allowing an asbestos inspector to inspect and
10  not pay a fine.  Would it have been reduced?  I
11  have no idea.  But the fine is the fine.
12            So to turn around and say, No one
13  showed up and we got a fine, Mike, you got the
14  fine when you got the summons.  So don't try and
15  spin this as if, Oh, you didn't send an answer,
16  because I'm sure I sent the answer and it was
17  probably not the answer he wanted, that it was a
18  $4800 fine attached to it.  That's -- the fine
19  is when you got that summons.  If -- if there
20  was a reason you got the summons, which I'm sure
21  there was, they don't usually just hand them
22  out, you would have paid the fine.
23            So, you know, yes, I -- it's a
24  misleading statement, the way it's worded there.
25  No one showed up and we got a fine.  You got the

1        Pasquarello
2   fine when you got the summons.  Nobody showing
3   up is legal.  Why didn't legal come to us
4   before -- between June and September and say,
5   Hey, I need an answer for this, and -- you know,
6   double-check?  So I'm being held to a standard
7   from a department when I'm providing an answer,
8   and the answer to this particular summons is,
9   it's not my department's summons.  It's EH and
10  S.  It's an ECB summons.
11            So I'm not -- I can't keep talking to
12  what another department would have did.  That,
13  again, is ultimately under Michael Roche, so it
14  wasn't me that dropped the ball on this one.  It
15  was him.
16       Q.   In the job description bullet that we
17  looked at a moment ago, do you have any
18  understanding of why it refers to managing
19  programs to respond to ECB violations?
20       A.   If an ECB violation came through that
21  had a fire safety component to it, it would come
22  to me, so, yes, I would be responsible to
23  answering one that has a fire safety component
24  to it.  Short of that, it wouldn't be mine.
25  There are multiple departments in the hospital

Pasquarello

1  to handle multiple things.  EH and S would
2  handle anything to do with those type of
3  situations, asbestos, party rentals.  I mean,
4  that wouldn't be me.
5        Maybe the party rental would come to
6  me -- because I notice one of those was that.
7  If it was blocking something, maybe it was
8  blocking an egress path and -- and the guy gave
9  us a summons for that.  And I would answer the
10 summons basically if it was, in fact, blocking
11 the egress path, yes, it was blocking the egress
12 path and here is the company that installed it.
13 And they would subrogate, you know, the -- the
14 fine that way.
15        But, otherwise, you know, you're not
16 answering these summonses to -- to get these
17 fines dismissed necessarily.  Most of the times
18 they're -- you know, you hope to get something
19 reduced, or you're answering it so that, you
20 know, attorneys could subrogate the losses back
21 to multiple parties.
22        It's never -- I shouldn't say never
23 but it's very rare summonses are just dismissed,
24 because, you know, he gave you the summons for a
25

Pasquarello

1  reason.  What's the answer to the reason.  The
2  answer to this one is, it has nothing to do with
3  fire safety so I would have sent it back.
4     Q.   In your experience addressing the
5  summonses that do relate to fire safety, could
6  you argue that a fine be reduced or directed to
7  another party at the hearing?
8     A.   Well, again, I wouldn't be the one
9  going to the hearing.  I would provide that
10 information in the letter that we would send
11 with the certificate of correction if it indeed
12 was something I needed to correct, but usually
13 they are to the expediter, whether that is an
14 attorney or an expediter, I don't really know.
15 I've never face to face met these people.  It's
16 always through emails.
17        But, yeah, like -- so I could give you
18 an example of -- fire department showed up for
19 an unwarranted alarm today.  Contractor was
20 doing work, didn't tell anybody about it, and
21 they set off the smoke detector through dust or
22 overspray, for example, right?  A week later
23 another alarm comes in, so now you got two
24 within the timeframe, the fire department is
25

Pasquarello

1  going to give you a summons, right?
2        I can argue that the second summons
3  was the result of, say, a pull station, and the
4  fire department inputs it and we get a
5  violation.  Well, you can't give me a violation
6  for a pull station.  So I'll turn around and
7  say, A pull station should be a 1092, a
8  malicious false alarm, and therefore you can't
9  hold the hospital responsible for a -- for a
10 criminal act by somebody, you know -- persons
11 known or -- you know, persons unknown committed.
12       So that would be a way I can argue
13 that, Well, they did show up twice.  The judge
14 might turn around and say, All right, the pull
15 station we're going to have to let this one go.
16 They are not going to pay it.
17       But it was two detections from
18 contractor error or lack of notification to take
19 a point off.  You're going to pay that fine.
20 But I can turn around and say to the attorneys,
21 Well, this contractor didn't notify fire safety
22 and they got overspray in the smoke detector
23 from painting, because this actually happened,
24 some of the tanks in the -- in the Annenberg

Pasquarello

1  machine room.
2        And then a week later, the same
3  contractor turned around and did it in a
4  different part of the hospital, the fire
5  department showed up two times, and we got a
6  summons for it.  Yeah, subrogate that summons
7  back to this company.  And if you take my
8  recommendation, don't use this company no more
9  because they're not notifying us when they're
10 doing work, and it's costing us money.  Because
11 each time they did that I had to change the
12 smoke heads.  We -- we had to put in work
13 because the overspray wasn't good, so we had to
14 have Piro fix it.
15        So these things happen, and, you know,
16 that's how I would subrogate or advise who you
17 can subrogate to.  But losing a summons
18 altogether or having it dismissed outright, very
19 rare that happens because, you know, things
20 happen.  It's a very large metropolitan hospital
21 with a lot of things going on at once, you're
22 going to get summonses, you know.  But to say no
23 one showed up, that -- that's not a shame on me.
24 I'm not the person who is supposed to show up.

Pasquarello

1
2      Q.   Did you tell Mr. Roche that you were
3  not the person who was supposed to show up for
4  the hearing on September 11, 2020?
5      A.   I'm sure I did, and I know for a fact
6  he knows that.
7           MR. CLARK:  Let's mark the next
8       exhibit, Exhibit 4.  Zack, if you could
9       drop it in the chat, and I'll share my
10      screen as well.  Exhibit 4 is a multi-page
11      email bearing Bates stamp number CH 1247
12      through CH 1249.
13          (Multi-page email bearing Bates stamp
14      CH 1247 through CH 1249 was marked
15      Pasquarello Exhibit 4 for identification,
16      as of this date.)
17     Q.   Mr. Pasquarello, I'm sharing my screen
18  which has a piece of Exhibit 4 on it.  And you
19  should be able to get access to the entirety of
20  Exhibit 4 by downloading it through the chat.
21  So take a look at Exhibit 4.  Let me know if you
22  need me to scroll through it.  And my question
23  will be, once you've had a chance to review it,
24  whether you recognize this series of emails.
25          (Witness reviewing document.)

Pasquarello

1      A.   I looked at it.
2      Q.   Okay.  Do you recognize this series of
3  emails that are shown on Exhibit 4?
4      A.   I'm -- I believe these emails are in
5  relationship to delayed closes on doors that
6  lead to the -- the waste rooms down in the --
7  the service corridor level.  I don't see any
8  further information on here, but that's my
9  recollection of where we installed delayed
10  closers.
11     Q.   The --
12     A.   So if not this email, then I'm not
13  familiar with it, but I believe delayed closers
14  were for the terminal chute rooms is what
15  they're called, and that's where the -- the
16  trash comes down into the -- the large hoppers
17  and then gets removed from the hospital.
18     Q.   The emails that are shown in
19  Exhibit 4, are these emails that you either sent
20  or received in -- well, they're spread out
21  amongst the dates so let me ask that
22  differently.
23          The emails that are shown in
24  Exhibit 4, are these emails that you either sent

Pasquarello

1  or received during your employment?
2      A.   Yeah, I mean, I wouldn't say somebody
3  false -- you know, you can't do that.  So, yeah,
4  I would agree that these are emails that came
5  and went through.
6      Q.   Okay.  So let's start from the bottom,
7  the first email in this chain, which begins on
8  the bottom of page 1248 Bates stamp number and
9  continues on to 1249.
10     A.   Uh-huh.
11     Q.   Before I ask about -- strike that.
12          In this first email that we're looking
13  at, the one that begins:  Good afternoon.
14  Attached is the catalog.
15     A.   Right.
16     Q.   Mr. Bond asks Rick Cotter about a
17  delayed door closure.  Do you see that?
18     A.   I do.
19     Q.   Okay.  What is a delayed door closer?
20     A.   You know what a door check is?
21     Q.   I don't.
22     A.   All right.  You know doors that
23  self-close, there's a big mechanism on the top
24  of a door that has an arm, so the door will open

Pasquarello

1  and the arm brings it back closed.  All right?
2  So the delayed door closer would open, it would
3  hesitate a moment, and then start to close.
4           So that's -- it's a door closer.  It's
5  like any other door check.  It just has a
6  mechanism where there's a delay.  Could be up to
7  30 seconds.  It's not, you know, a prolonged
8  delay but it's a delay --
9      Q.   Who is Rick Cotter?  Do you know that
10  person?
11     A.   Yeah, I do.  Rick Cotter is their
12  Joint Commission consultant.
13     Q.   Is he a Mount Sinai employee?
14     A.   No.
15     Q.   Is he an outside consultant?
16     A.   Yes.
17     Q.   So Mr. Cotter responds to Mr. Bond on
18  November 26, 2019, and he says:  Hi, Matt.  If
19  it is simply a delayed closure, which it looks
20  like, then go forth and install.
21          Do you see that?
22     A.   I do.
23     Q.   And then if we scroll up more,
24  Mr. Bond forwarded this email to Michael Roche,

Pasquarello

1                      Pasquarello
2  with a copy to you, Robert Denver, and Douglas
3  Rome.  Do you see that?
4      A.   I do.
5      Q.   Who is Robert Denver?
6      A.   He is another assistant director in
7  the department.
8      Q.   Does he also report -- strike that.
9      Did he also report to Mr. Roche as of
10 November 2019?
11     A.   Yes.  The -- the three people on this
12 are all Mr. Roche's direct reports, and they're
13 all part of what we call "the clique."
14     Q.   What was Douglas Rome's title?
15     A.   He was another assistant director.
16     Q.   He is --
17     A.   So Bob and Doug split -- split the --
18 the basic -- how do I put it?  There's the fire
19 life safety or the life safety components of the
20 hospital that are under my purview, and then
21 there's the rest of the maintenance in the
22 hospital that's under Bobby and Doug's purview,
23 and they would split it into two areas.  I don't
24 recall exactly how they split it, if they split
25 it into healthcare and non-healthcare, but they

1                      Pasquarello
2  split the hospital between the two of them.
3      So I would be responsible to fix fire
4  doors or rated doors.  They would be
5  responsible, say, to fix all other types of
6  doors.  That's just an example.
7      Q.   Does the fact that --
8      Sorry.  Go ahead.
9      A.   No.  I didn't really have anything to
10 add.
11     Q.   Does the fact that Mr. Bond commenced
12 this email chain suggest to you that the project
13 he was talking about was a fire safety project?
14     A.   I'm familiar with this project, yes.
15 It wasn't so much a fire safety project, but it
16 was a fire door.  It was a rated door on the
17 chute rooms.  So there was a lot of discussions
18 about these, not just this email.  I -- I
19 remember this, so we can talk about it.  You ask
20 a question, I'll answer you.
21     Q.   Okay.  So if we scroll up further in
22 the email chain, Mr. Roche responds to
23 Mr. Bond's email, and he writes:  Great.  Please
24 proceed with the install.
25      Do you see that?

1                      Pasquarello
2      A.   I do.
3      Q.   Okay.  And that's November 26, 2019,
4  right?
5      A.   Okay.
6      Q.   You see that?
7      A.   If that's what it is, yeah, I see it.
8  November 26, 2019.  So I was there a couple of
9  weeks.
10     Q.   Okay.  If we keep scrolling up, the
11 next email in this chain is February 10, 2020
12 from Robert Denver.  You see it?
13     A.   Yes.
14     Q.   And Mr. Bond, you, Mr. Rome, and
15 Mr. Roche are all in the "to" and "cc" lines.
16 Do you see that?
17     A.   I do.
18     Q.   And Mr. Denver is asking you and
19 Mr. Bond, who are in the "to" line:  Guys, was
20 this complete?
21      You see that?
22     A.   I do.
23     Q.   As of February 10, 2020 was the
24 installation of these delayed door closers
25 complete?

1                      Pasquarello
2      A.   I don't believe so, because there was
3  issues with that.
4      Q.   What were the issues?
5      A.   If they were legal enough to do.  I
6  was still researching at that point if we can
7  put a delayed closure on those types of doors.
8  So when this came to my attention, I said, Slow
9  down.  You can't just put a delayed closer on a
10 door that's meant to keep fire in a terminal
11 chute room.  So let's find out if we can even do
12 this before we do it.  So there was a delay
13 because of that, it needed more research.
14     Q.   Who did that research?
15     A.   I was doing that research.  I was
16 talking on the phone with Rick Cotter about it.
17 And I was talking with the alarm company,
18 talking about putting the doors on -- on magnets
19 instead.  And they then -- that would have been
20 the right way to do it or the -- the safest way
21 to do it, if you will.
22      But I was told in these meetings,
23 because we used to have meetings sitting in a
24 room with the four of five of us, actually more
25 than that, and the doors -- these would come up

Pasquarello

1   quite often, What are we doing with it?
2
3           And they're, like, No, the hospital
4   don't want that open because, you know, they
5   could smell -- it was the service corridor.  So
6   they removed the magnets, and they wanted these
7   delayed closers.
8           And then there was an issue with, they
9   would break them because they would prop open
10  the doors, the environmental health and safety.
11  And because of the cost associated, I -- I was
12  making suggestions that we should first verify
13  who in environmental safety is breaking the
14  existing closers and wedging the doors open and
15  take appropriate measures there, before putting
16  a closer that's going to not really serve the
17  purpose that they want anyway.
18          So this whole project was nothing but
19  a waste of money for the hospital, that Michael
20  and Bob Denver and Douglas Rome pushed through,
21  in my case -- in my opinion, erroneously.  But
22  they -- we installed it, we had it installed --
23  ultimately installed before the Joint
24  Commission, and they would break almost
25  instantly.  But that's -- that's the background

Pasquarello

1   on these delayed door closers.
2       Q.   You told me earlier that you had to
3   conduct some research to know whether these
4   delayed door closers were proper or legal.  When
5   did you begin that research?
6       A.   When I became aware of it.  If it was
7   February, I don't know exactly when.  But I do
8   know that you can't put a delay closer on those
9   type of doors.  And like I said, they pushed
10  through this project against my -- against my
11  advice.
12      Q.   So the first several emails in this
13  chain are all from November 26, 2019.  Is that
14  when you began the research?
15      A.   Could you scroll back up?  Because
16  I --
17      Q.   Sure.
18      A.   -- I don't believe I started it
19  that -- that quickly.  Because you're seeing I'm
20  not on that first email.  So when -- when do I
21  even start getting involved in this?  It was
22  late November.  Through Bobby:  Please see Rick
23  Cotter's response below.  And then I started
24  voicing my concern about it.
25

Pasquarello

1           And like I said, we would have
2   meetings on the Cotter report they called it,
3   and my attitude or my professional opinion is,
4   you don't put those kind of closers on these
5   kind of doors.  Mike overrode my opinion, and
6   ultimately we put the closers on.
7       Q.   So Mr. Roche told you and Mr. Bond to
8   proceed with the install as of November 26,
9   2019; is that right?
10      A.   Yes.
11      Q.   Why did it -- strike that.
12          Why as of February 10 had the install
13  not already happened if on November 26 your
14  supervisor had told you to proceed with the
15  install?
16      A.   Because I went to my supervisor after
17  that meeting, and I said, Michael, we can't put
18  these type of closers on those doors.  They're
19  not code compliant.  They -- they need to close
20  to contain the fire if one was to happen in a
21  chute, in the terminal chute room.  And he, as
22  he often did, disregarded the advice of the
23  subject matter expert and went ahead and
24  insisted on it being installed.
25

Pasquarello

1           Bobby then -- this email that you're
2   looking at from February, I don't know if he
3   knew I had the conversation with Mike or not at
4   that point.  But I do know I had the
5   conversation with him, and I do know that the
6   delayed closer was not a code compliant device
7   for terminal chute rooms.
8           So it -- that I know, and that I know
9   I spoke to him about, because I'm very familiar
10  with this.  Because ultimately, I did it under
11  protest, those were my words to Michael.  I
12  said, Michael, I'll have Brand install them, but
13  it's under protest, they're not right.  They
14  should be tied into the fire alarm if you want
15  these doors to stay open.
16          And he's, like, Just do it.  This is
17  what the hospital wants.  So we did it.  And
18  they broke within weeks of being installed
19  because, you know, it didn't alleviate the
20  problem of having the doors propped open for the
21  environmental services team to retrieve and
22  place new bins.  They would take out the full
23  bins and put in the new -- you know, empty bins.
24          So they were still wedging the doors

Pasquarello

1   open, and instead of breaking, you know, a
2   reasonably priced device, now they were breaking
3   a very expensive device.  But either way it
4   didn't solve the problem.  And I told him
5   straight out that it wasn't the right way to do
6   it.  The magnet was the right way to do it.
7       Q.   Did you say the hospital requested
8   these door closers?
9       A.   I think Michael told me the hospital
10  requested it.  I don't have -- I don't know if
11  that to be the truth or not.
12      Q.   Let's take a look at the first email
13  in this chain.  Mr. Bond says:  The hospital is
14  looking to mitigate the constant destruction of
15  terminal chute room doors.  Do you see any
16  issues with installing such closers to the chute
17  room doors?
18           Do you see that?
19      A.   I do.
20      Q.   The hospital is Crothall's client,
21  right?
22      A.   Yes.
23      Q.   And where Mr. Bond asked, Do you see
24  any issues with installing such closers to the
25

Pasquarello

1   chute room doors --
2       A.   Right.
3       Q.   -- he asked that of Mr. Cotter, and
4   Mr. Cotter says:  No issue.
5           Right?
6       A.   That's what Cotter said, yes.
7       Q.   Anywhere in this email chain did you
8   express your objection or issues with installing
9   these delayed door closers?
10      A.   If it's -- I don't know if this is the
11  entire chain, but I know I verbally said it to
12  all of them.  It was part of a meeting where I
13  was, like, You got to be kidding me, you are
14  going to put delayed closers on fire doors.
15      Q.   I don't think you answered my
16  question.  Anywhere in this email chain did you
17  express your objection --
18      A.   I said not in this email --
19      Q.   -- or any issues with --
20      A.   No, I -- I said not in this email
21  chain, I don't see an answer to that.  I don't
22  know if this is the entire email chain, though,
23  either.  I do know that this may or may not be
24  the entire email chain for this -- this
25

Pasquarello

1   discussion, because this was a very detailed and
2   long process.
3       Q.   In response to Mr. Denver's email
4   saying, Guys, was this complete, you wrote on
5   February 10, 2020:  I'll check and let you know
6   ASAP.
7           Do you see that?
8       A.   I do.
9       Q.   Do you know why you didn't know as of
10  February 10, 2020 whether the job was complete?
11      A.   No.  I -- you know, I would have to
12  walk and see every door if that was the case.
13  So I -- I'll let you know.  I know at that point
14  they must have -- I don't know if I knew at that
15  point if they were doing it or not.  I do know I
16  was still voicing concern even after they were
17  installed.  I don't remember exactly when they
18  were installed.
19      Q.   And the very first email in the
20  exhibit, which is the most recent email,
21  Mr. Roche writes just to you:  Joe, this was
22  requested in November of last year.  Please
23  ensure it is completed by October 16, '20.  Let
24  me know ahead of that date if there will be any
25

Pasquarello

1   issue getting this completed.
2           You see that?
3       A.   I do.
4       Q.   Was the install of the delayed door
5   closers completed by October 16?
6       A.   I don't know.
7       Q.   Do you recall if you let Mr. Roche
8   know that the project would be delayed for any
9   reason?
10          MS. SELIGER:  Objection.
11      A.   I don't know.  As far as I know, it
12  could have been installed.  I don't remember.  I
13  know that ultimately these closers were put on
14  against my -- you know, against my objections
15  they were done.  So they were done.  Were they
16  done by October 16?  I would be guessing.  I
17  don't remember when they were exactly finalized.
18      Q.   Is the reason that closers weren't
19  installed between November and February because
20  you had objections to them?
21          MS. SELIGER:  Objection.
22      A.   I don't know that either.  I know my
23  objection was overruled by Michael, so I
24  wouldn't -- I don't know that answer.
25

Page 150

Pasquarello

1
2     Q.   When in time was your objection
3  overruled by Michael?
4     A.   He had in his head he was going to do
5  it all along.  There was no convincing him
6  otherwise.  He -- like I said, he didn't take --
7  he did not take my advice on this.
8     Q.   As of November 2019 was it clear to
9  you that your objection had been overruled?
10      MS. SELIGER:  Objection.
11     A.   I don't remember the day I felt my
12  objection was overruled.
13     Q.   Between November 2019 and February
14  2020 did you ever check with Mr. Bond to
15  determine whether the project had been
16  completed?
17     A.   I don't recall.
18     Q.   Do you recall if you documented his
19  failure to meet any deadlines on this project?
20     A.   No, I don't recall.  Because this --
21  it -- I don't recall if there was any delays.  I
22  do know that the doors were compliant and that
23  the -- the closers they were asking for had
24  nothing to do with the safety and compliance of
25  the doors.  The doors were working fine.  They

Page 151

Pasquarello

1
2  just wanted these other install -- devices
3  installed.
4      So, you know, part of my argument was,
5  There's no rush on this.  The doors are working.
6  Let's -- let's make sure we're not putting the
7  hospital under risk, make sure that these are
8  right.  And if they really want them to stay
9  open, the right way to do it is to put them on a
10  magnet and have that magnet tied into the fire
11  alarm.  That -- that's the right way to have
12  done that project.
13      We ultimately -- like I said, I was
14  overruled by my boss.  He wanted it, and they
15  went through -- I believe Brand was the company
16  that installed it.  So I remember who installed
17  them.  I don't remember when.  And I do remember
18  that the same problem started happening, they
19  were wedging the doors open.  The arms were
20  bending.  The arms were breaking, and they had
21  to be replaced again.  And they wound up getting
22  replaced with the old ones that didn't delay,
23  because it didn't solve of the problem.
24      But that's -- you know, sometimes to
25  be a subject matter expert you have to tell the

Page 152

Pasquarello

1
2  client, That's not the right way to do it.  And
3  Michael didn't seem to do that at this --
4  especially with this -- this project.
5     Q.   Did you receive written performance
6  reviews while you were employed at Crothall?
7     A.   I'm sure -- yeah, I'm sure I did.
8     Q.   How often did you receive those -- I'm
9  sorry.  Go ahead.
10     A.   One or two of them, to be honest with
11  you.
12     Q.   Were they on some regular cadence?
13     A.   Yearly, yeah, so I -- like I said, I
14  wasn't there a full two years so I don't think I
15  received a second one.  And I don't remember if
16  I received one, like, two or three months into
17  my employment.  I -- I don't recall.  But I know
18  I received one of them.
19      MR. CLARK:  Okay.  Let's mark as
20  Exhibit 5 a one-page document.  At the top
21  the title says Year End Process.  And it
22  bears Bates stamp number, bear with me a
23  moment, CH 1677.  Again, I'll ask my
24  colleague to drop it in the chat, and I
25  will share my screen with Exhibit 5.

Page 153

Pasquarello

1
2      (Year End Process bearing Bates stamp
3  CH 1677 was marked Pasquarello Exhibit 5
4  for identification, as of this date.)
5     Q.   Okay.  Mr. Pasquarello, hopefully you
6  can see my screen.  If you want to read it
7  there, I'm happy to scroll for you.  Or you can
8  read it by downloading the document in the chat.
9  Take a look at this document, and let me know
10  when you're done.  My question will be, do you
11  recognize it?
12      (Witness reviewing document.)
13     A.   Okay.
14     Q.   Is this document, Exhibit 5, one of
15  the written performance reviews that you
16  received while you were employed at Crothall?
17     A.   Yes.
18     Q.   If you look at the bottom of the page,
19  you'll see two signatures.  Is that your
20  signature above the line that says Associate
21  Signature?
22     A.   Yes.
23     Q.   And whose signature is above the line
24  that says Manager Signature?
25     A.   That's Mike Roche's.

Pasquarello

1         Q.   All right.  And did you receive this
2   document on or around October 29, 2020?
3         A.   Yes.  This is the -- the one that I
4   was referring to.  I don't remember getting more
5   than one but I do remember this one.
6
7         Q.   Did Mr. Roche present this document to
8   you?
9         A.   Yes.
10         Q.   And how did he do that?
11         A.   Informally quick in his office, just
12   one -- maybe the whole thing took five minutes,
13   if that.
14         Q.   Did he say anything to you when he
15   presented the document to you?
16         A.   No.  Like I said, it really went very
17   quickly.
18         Q.   Did you say anything to him after you
19   received the document?
20         A.   I -- I did point out a couple of
21   things about systems and -- and stuff that, you
22   know, was more different departments that needed
23   that understanding.  But it -- that was all I
24   really said when it came to this.  I didn't -- I
25   didn't agree fully with the -- the assessment.

Pasquarello

1   But, you know, if that was his assessment with
2   me at the time, that was it.
3
4         Q.   You said you pointed out a couple
5   things.  What specifically did you point out to
6   Mr. Roche in this meeting where he presented
7   this document to you?
8         A.   Well, when he said, He has a lot to
9   learn about fire protection systems and needed
10   to fully understand in the coming year, this was
11   one of the arguments that I would have with
12   Michael over -- over the different roles between
13   what fire safety should be responsible for and
14   what other departments and engineering, namely
15   plumbing, should be responsible for.
16         So I told him that I have an
17   understanding of fire protection systems.  It's
18   not my place to know what every valve in the
19   system is.  It's not my place to know the
20   shut-down sequence and drain-down sequence of
21   this -- these systems.  He had a different
22   understanding of that, and that was one of
23   our -- one of the things I felt he was holding
24   me to a different standard for.
25         This is not the job of a fire safety

Pasquarello

1   manager or director.  This is the job of the
2   plumbing systems.  Or you hire an outside vendor
3   with the proper licensing, master fire
4   suppression license, to do this.  This isn't --
5   he wasn't referring to knowing the difference
6   between zone valves and colors and stuff that
7   fire safety personnel know about suppression
8   systems.
9         He was going into the weeds, as he
10   puts it in another part of this, I need to get
11   more into the weeds on things.  No, you don't
12   act outside your title.  That's -- I'm a big
13   believer in that.  You don't act to be an expert
14   in a field that requires its own certifications
15   and licenses.  This is one of the things that
16   Bob Shaffer used to supposedly stand up for me
17   and fire safety regarding.
18         So that's -- that's what this is
19   referring to, and that was the objection I
20   raised.  But, again, the whole thing took about
21   five minutes.  He wasn't really hearing it.  I
22   understood that.  And that -- that was my yearly
23   review.  You know, the joke was at the end, he
24   goes, Don't worry about it, you're still getting

Pasquarello

1   your bonus.  So that was how he ended that
2   conversation.
3         Q.   Was there anything else that you
4   pointed out to Mr. Roche during this five-minute
5   meeting with him where you received this
6   document that you haven't already told me?
7         A.   I don't recall if there was anything
8   else.
9         Q.   Did you say that Mr. Roche said you
10   were getting a bonus following this year end
11   process?
12         A.   Yeah.  The bonuses are based on your
13   review and the internal audit, that I was
14   talking about earlier, so we passed them.  He
15   said, Don't worry about it, you are getting your
16   bonus.  So he made it like this was -- you know,
17   it was no big deal.
18         Q.   Did you read this document before you
19   signed it?
20         A.   I didn't study it, but -- yeah, I
21   didn't just sign it either.
22         Q.   So was that a yes, you did read the
23   document before you signed it?
24         A.   I did.  Like I said, I didn't

1                  Pasquarello
2  completely agree with it.  I mentioned a couple
3  of things.  If you scroll back up, I think there
4  was a point earlier I didn't agree with.  You
5  know -- well, I did mention it.  Joe needs to
6  get more into the weeds on some issues.
7            He's mainly talking about issues with
8  the systems, and -- and I disagreed with that.
9  I said, Michael, systems require their own
10 expertise.  I says, If you were looking for a
11 fire suppression engineer to run your
12 department, that's what you should have hired.
13 You hired an -- you know, somebody who is well
14 versed in fire safety, not suppression systems
15 on the granular engineering level.  And so these
16 were the things that I disagreed with.
17           Time management, I -- I disagreed with
18 that, too.  I -- I'm doing the job of two to
19 three people.  I mean, I'm managing the time
20 best I was able to under the circumstances.  So,
21 you know, again, I didn't completely agree with
22 this.  And his answer to that is, Well, you got
23 to put something in box 2.  So, you know,
24 don't -- and, again, he ended it with, Don't
25 worry about it, you're still getting your bonus.

1                  Pasquarello
2           So I was like, Okay, you know, and
3  I'll see you later.  That was -- that was the
4  end of it.  Like I said, it was about five
5  minutes.  It was very informal, quick, Hey, Joe,
6  do me a favor, come to my office and sign your
7  review.  The whole thing was like five minutes.
8       Q.   Let's look at box 2, and start at that
9  sentence you were just referencing that begins,
10 Time management.  It says:  Time management
11 needs to be improved.  PMs continue to be closed
12 the last day of the month.  ILSM reviews are not
13 completed on time.  And PCRA requests take
14 longer than they should.
15           Do you see that?
16      A.   I do.
17      Q.   What's a PCRA request?
18      A.   It -- I'm drawing a blank right now,
19 and I don't know why.  But it -- the PCRA, is
20 what we call it, is -- it's the construction
21 review of the -- of the project.  I -- I don't
22 remember the exact acronym.  I'm sorry.
23      Q.   Regardless of whether you agree with
24 this assessment of your performance, did you
25 understand that as of October 2020, Mr. Roche

1                  Pasquarello
2  thought you needed to improve your time
3  management?
4       A.   I did.  But the way you're reading
5  this is, PMs to be closed last day of the month,
6  right -- or continue to be closed, that doesn't
7  mean the PM wasn't completed.  The paperwork was
8  done at the end of the month.  So, you know,
9  Mike is implying in here that the work itself
10 wasn't done until the end of the month.  No, the
11 work was all done by the 15th of the month.  It
12 just didn't get input until the end of the
13 month.
14           Again, who was doing my inputting was
15 my manager that was doing the -- the -- the
16 paperwork in the department, so Matt was doing
17 it on the last day of the month.  Did I
18 particularly want to penalize him for that as
19 long as our month was closed?  No.  Because the
20 work was done.  All the PMs were completed on
21 time, the way they were supposed to be, and we
22 finished the month with all the paperwork in
23 there.
24           So, yeah, I understood Mike's point,
25 and, listen, everybody can always improve on

1                  Pasquarello
2  something.  But this is implying that the work
3  wasn't done when the work was done.
4           ILSM reviews not completed on time.
5  ILSM reviews weren't done the way I was doing
6  them before I got there, and that was something
7  we might not have discussed in this particular
8  meeting, but it was something that was discussed
9  and I think goes back to, Joe has improved the
10 fire marshals in terms of training and
11 development and whatnot.  I got them to do it
12 much more efficiently, and therefore it took a
13 little longer.
14           But no project ever kicked off without
15 their ILSMs, and nothing was ever done without
16 PCRA reviews.  And I'm just sorry, like, for
17 some reason I got this brain freeze on the exact
18 acronym.  So that's how I answer that.  That was
19 all, you know -- I understand his point, he had
20 to put something there, but the work was always
21 completed.
22           And the ILSMs that I did were much
23 more thorough than before I got there, and maybe
24 that was a perceived delay but it certainly
25 wasn't delayed.  It lent to -- to better,

Pasquarello

1
2      more -- more thorough interim life safety
3      measures, in my opinion.
4          Q.   Mr. Pasquarello, you gave me a very
5      long answer, so I just want to make sure I
6      understand the -- the answer that you gave that
7      actually addressed my question.
8              Is it correct that you understood as
9      of October 2020 that Mr. Roche expected you to
10     improve your time management?  Yes or no?
11         A.   I would say, I -- yes.
12         Q.   Did --
13         A.   I --
14         Q.   Go ahead.
15         A.   No, I think he put this in here to
16     start his paper trail on me.  So he's saying I
17     needed to improve my time management.  I just
18     gave you a long answer as to why I think that is
19     an unfounded statement.  But, yeah, I understand
20     he put that in there to begin his paper trail so
21     that -- that's my answer.
22         Q.   So do you think --
23         A.   Does he really believe my time
24     management skills were false or -- or lacking?
25     I don't know.  I completely turned the ship

Pasquarello

1
2      around, so, you know, where was my management
3      lagging?  He's never given any specifics on --
4      you know, I'm answering what took longer for
5      reviews, not that they were not done on time.
6      They just took longer.
7              So to say they're not completed on
8      time, what's on time?  They were all completed
9      before the -- the project kicked off.  That's --
10     that's the timeframe.  You would never start a
11     project before an ILSM was reviewed and -- and
12     implemented.  So it's a misleading statement
13     that he put in there, so that at this point
14     you'd have something to point to.  That -- it's
15     a false statement.  I understand he believed it,
16     or wrote it -- not believed it, wrote it.  It's
17     just not accurate.  That's my answer.
18         Q.   So is it your testimony that as of
19     October 29, 2020 you believe Mr. Roche was
20     amassing a paper trail to either discipline or
21     terminate your employment?
22         A.   I do.
23              MS. SELIGER:  Objection.
24         A.   I do believe that.
25              THE COURT REPORTER:  Counsel?

Pasquarello

1
2          MR. CLARK:  Yes.
3          THE COURT REPORTER:  Can I get a break
4      sometime in the next ten or fifteen minutes
5      when you get to a good point?
6          MR. CLARK:  I was just about to offer
7      one.  I have two more questions on this
8      document and then I think we'll take a
9      break, and off the record we can talk about
10     what we want to do for lunch and how much
11     time everybody needs.
12         Q.   Okay.  Mr. Pasquarello, did you
13     understand that as of October 29, 2020,
14     Mr. Roche expected you to close PMs before the
15     last day of the month?
16         A.   Yes.  I'm going to add, though, the
17     PMs themselves were closed.  The -- the
18     paperwork was completed by the last day of the
19     month.
20         Q.   So did you understand that he was
21     asking you to complete the paperwork by the last
22     day of the month?
23         A.   Yeah, what I'm saying is, he -- he is
24     saying in there:  PMs continue to be closed the
25     last day of the month.

Pasquarello

1
2              The PM themselves -- I'm explaining,
3      the PMs themselves, the preventive maintenance
4      that was done, were all completed before the
5      last day of the month.  It was on the last day
6      of the month that usually Matt and I'm -- you
7      know, I'm giving him the credit that is due him,
8      he did input and update the computer, but it was
9      on the last day of the month.
10             So, yeah, I understand Mike wanted it.
11     It's just not that clear.  The work was always
12     done well before the end of the month.  It --
13     unless something was due at the end of the
14     month.  I mean, there's always an exception to
15     that.  But the fact that he is saying they were
16     closed on the last day of the month, no, the
17     computer was updated on the last day of the
18     month.  The PMs were closed prior to the
19     computer being updated.  So it's a little
20     misleading.
21             The PMs were closed on time during the
22     month, and at the end of the month they were
23     upload into -- or the computer itself was
24     updated, so that's -- that's the answer to that.
25         Q.   As a result of receiving this year end

Pasquarello

1  process did you tell Mr. Bond that you needed to
2  close PMs in the computer before the last day of
3  the month?
4      A.   I don't recall.  Like I said a minute
5  ago, I felt we had so much going on that as long
6  as we went every month compliant, which we did,
7  I, as his manager, was okay with that one aspect
8  of it.  I wasn't going to make a -- an arbitrary
9  deadline when the real deadline was the end of
10 the month.  You know, why put more pressure on
11 Matt the way Matt -- Mike is putting on me to
12 get it in on the 25th of the month when nobody
13 is asking for that other than him.
14          The system is not asking for that.
15 Bob Shaffer wasn't asking for that.  As long as
16 the work was done before that.  And I insisted
17 that the work was done before that.  This way if
18 there was a problem with the work, we could
19 address it before the end of the month.  So I
20 had my deadline on the work, but the actual
21 updating of the computer, I did -- no, I didn't
22 have a problem with it being at the end of the
23 month.  You know, in the priority sense, that --
24 that was low on my priority list.

Pasquarello

1      Q.   Your supervisor was asking that it be
2  inputted into the computer before the end of the
3  month, right?
4      MS. SELIGER:  Objection.
5      A.   He was only asking that of me.  He
6  didn't ask that of any of his other ADs or
7  managers.  It was only for me.
8      MR. CLARK:  Okay.  Off the record.
9      THE VIDEOGRAPHER:  The time is
10 1:19 p.m., and we are going off the record.
11         (Luncheon recess at 1:19.)

Pasquarello

1          A F T E R N O O N   S E S S I O N
2          (2:01)
3  JOSEPH PASQUARELLO
4          resumed, having been previously duly
5          sworn by a Notary Public, was
6          examined and testified further
7          as follows:
8          THE VIDEOGRAPHER:  The time is
9          2:01 p.m., and we are back on the record.
10 CONTINUED EXAMINATION BY MR. CLARK:
11     Q.   Mr. Pasquarello, welcome back from the
12 break.  Did you review any documents during the
13 break?
14     A.   No.
15     Q.   Did you speak with anybody, other than
16 your lawyer, during the break?
17     A.   No.  Well, not about the case.
18     Q.   Okay.
19     A.   I had lunch with -- with Joanie.
20     Q.   Did you speak with anybody other than
21 your lawyer and your wife during the break?
22     A.   That was it.
23     Q.   Okay.  We are not going to waive
24 either privilege.

Pasquarello

1      MR. CLARK:  Okay.  Let's mark the next
2  exhibit, I think we're up to 6.  So, again,
3  I'll ask Zack to put it in the chat.  I'll
4  put it up on my screen.  Exhibit 6 is a
5  three-page document bearing Bates stamp
6  number CH 1277 through 1279.  It's a series
7  of emails.
8      Q.   Let me put it up on the screen.  And,
9  Mr. Pasquarello, if you can see it or if you can
10 download it from the chat, my question is going
11 to be, do you recognize these emails?
12         (Series of emails bearing Bates stamp
13         CH 1277 through 1279 was marked Pasquarello
14         Exhibit 6 for identification, as of this
15         date.)
16     A.   I -- yeah, I -- I didn't read it yet,
17 but I see the stamps.
18     Q.   Okay.  Read the document, and let me
19 know after you've reviewed it if you recognize
20 them.
21         (Witness reviewing document.)
22     A.   Okay.  I read it.
23     Q.   Okay.  Are these documents that you
24 either sent or received on December 21, 2020?

Pasquarello

1
2    A.   Yes, I recognize them.
3    Q.   Let me scroll down to the first
4  document -- or, sorry, the first email in the
5  series of three emails, which is from Monique
6  Bembry-Reid.
7    A.   Uh-huh.
8    Q.   You see that?
9    A.   I do.
10   Q.   Who is Monique?
11   A.   Monique worked in the -- the
12 department we spoke about earlier, work control,
13 and that was the department that Matt ultimately
14 went over to take over.  So Monique was one of
15 the workers in work control.
16   Q.   All right.  And she writes in her
17 December 21, 2020 email, which you are a
18 recipient on:  Good morning all.  Please see the
19 open percentages of PMs due for completion for
20 Thursday, December 31, 2020.
21      You see that?
22   A.   I do.
23   Q.   And there's a list that follows with
24 percentages open and closed.  What is this list?
25   A.   This is an update list that work

Pasquarello

1
2  control would send out during the month to -- to
3  let the department heads -- like all those other
4  names you see there are, you know, other heads
5  of different departments and letting them know
6  how their PMs are looking, you know, so far that
7  month.
8    Q.   Which PMs on this list relate to fire
9  safety?
10   A.   The one that says Life Safety.
11   Q.   The second from the bottom, Life
12 Safety, 52 percent open, 48 percent closed?
13   A.   Yes.
14   Q.   Are there any other PMs on the list
15 that have some relation to life -- strike that.
16      Are there any other PMs on the list
17 that have some relation to the fire safety
18 department?
19   A.   It's not necessarily each month that
20 there would be, but like a high risk one might
21 fall under our category, but it would show in my
22 shop if it did.  So when I pull up my shop, it
23 would pull whatever is related to us in -- in
24 the list.
25      So the numbers you look at are -- are

Pasquarello

1
2  fairly accurate for that month.  So 52 percent
3  of mine are open, 48 percent closed at this
4  point.  So the high risk ones in this month
5  weren't but sometimes they are.  Sometimes they
6  aren't.
7    Q.   As of December 31 --
8    A.   Actually, let me -- let me back up.
9  It wouldn't be.  Like, if it jumped to my shop,
10 it would come out a high risk and into my shop,
11 that's what I meant to say.  So it could start
12 in one and then, you know, come over to me.  And
13 same thing, it could start with me and then go
14 over to somebody else.
15   Q.   Are any of the PMs in the
16 non-high-risk category, fire safety?
17   A.   Actually -- actually, Shaun, I'm
18 sorry, I have to correct myself again.
19   Q.   Sure.
20   A.   PMs are preventive maintenance.  Those
21 don't jump back and forth.  Work orders, we get
22 similar emails like this for work orders.  Those
23 could bounce between shops based on who -- you
24 know, who would ultimately own it.  In this --
25 in the PM one, no, this is it.  The numbers you

Pasquarello

1
2  see are the numbers they are.  So, no, mine is
3  life safety, those are my -- that's my shop.
4  Sorry about that confusion.
5    Q.   No problem.
6       As of December 31, 2020, which is the
7  date that this email asks the PMs to be
8  completed, do you know how many of the
9  52 percent that were open ten days earlier were
10 closed by your department?
11   A.   I would say all of them.  I don't
12 remember ever going past due on PMs.
13   Q.   Let's scroll up here.  I scrolled up
14 to the second email in the chain, which is the
15 bottom email on the first page of this
16 Exhibit 6, which is an email from Michael Roche
17 to you on December 21, 2020.  And he writes:
18 Less than 50 percent closed and past your
19 deadline of the 15th.  What actions will be
20 taken?
21      Do you see that?
22   A.   I do.
23   Q.   As of December 21, 2020 were you aware
24 of a deadline of the 15th for closing out these
25 PMs?

Pasquarello

1
2    A.   No.  Well, what Mike is referring to
3  there is what I referred to earlier in my -- in
4  this deposition, is I set a standard of the 15th
5  for my department for certain PMs, not all of
6  them, certain ones.  Because I, you know, said
7  earlier also, that some won't get closed till
8  the end of the month depending on where they
9  were the month before.
10        The 15th deadline stands for my fire
11 extinguishers.  I set a deadline of the 15th
12 because if we had any issues with an
13 extinguisher, I can have it either replaced or
14 serviced before the 30th or 31st of the month,
15 and then we would go on to the next month with
16 no problem with the extinguisher.
17        So, again, this is Mike's chain of
18 emails to hold me to a different standard than
19 the rest of the department.  So this illustrates
20 how he wants to take the 15th that I set for my
21 team and say, What actions will you take?
22        The -- I do answer him in the next
23 email, but the 15th is only a deadline for my
24 extinguishers, and it's because I don't want to
25 go the following month -- because before I got

Pasquarello

1
2  there extinguishers and doors were the two
3  biggest problem areas in the department, and it
4  took a while to get them all under control.  And
5  at this point you'll see in the next email that
6  we're trying a new system so that they can be
7  electronically tracked and have more accuracy.
8        So that's -- again, his email to me is
9  nothing more than micromanaging to get on the
10 record that I'm somehow missing the deadline
11 that I'm not missing.  And -- and that's what I
12 see here.  I do answer him, because, you know
13 respect for the boss, you know.
14     Q.   Do you know if Mr. Roche sent similar
15 emails to other department heads or managers
16 that had less than 50 percent closure as of
17 December 21?
18     A.   I would only be speculating by saying
19 he doesn't, but I know I -- I do know I was held
20 to a different standard than everybody else in
21 that email chain.  So I'm comfortable telling
22 you, no, he never sent emails like this to
23 anybody else, but that's my word against his
24 word.
25     Q.   Are there any --

Pasquarello

1
2     A.   Unless he sent -- unless he sent it.
3  I'm sure we asked for exculpatory evidence and,
4  you know, more direct evidence from him.  So if
5  he sent these emails to somebody else, produce
6  them.  Otherwise I can't answer that question.
7  I don't know.  But I know I was treated
8  differently than everybody else.
9     Q.   Did you ever ask any of your
10 colleagues who were directors or assistant
11 directors whether they received an email like
12 this?
13     A.   Well, the other assistant directors
14 were Bobby, Doug, Matt at one point, or a
15 manager, so that was the clique.  He -- those
16 were the people he wanted around him.  So for me
17 to ask them that question would have been
18 fruitless.  You know, they weren't going to turn
19 around and say, Oh, yeah, he sends that to me
20 all the time.  Well, I know he didn't send that
21 to them.  I was -- I was being held to a
22 different standard than they were.
23     Q.   But you don't know that for a fact.
24 You're speculating he didn't sent that --
25     A.   No, I do know that.  That's why I made

Pasquarello

1
2  a complaint.  That's why we're sitting here
3  today.  I believe it's a fact that he held me to
4  a different standard.  I guess it's up to the
5  courts to decide if I'm right or wrong.  I
6  believe that with all my heart.  I wouldn't be
7  sitting here for all these hours today.
8     Q.   I understand --
9     A.   I know he treated me differently, and
10 it was all because of my age.  That's why we're
11 sitting here today.
12     Q.   I understand that you have a belief --
13     A.   If he sent these to other people -- if
14 he sent these to other people, show it to me,
15 I'll shut up.  But I don't think he sent these
16 to other people.
17     Q.   Again, we're not at trial.  We are at
18 deposition.  So let me ask the question about
19 your basis of knowledge, and we can deal with
20 exhibits at trial if we ever get there.
21        But do you have any -- are there any
22 documents that you have or any factual
23 understanding that you have to know whether
24 Mr. Roche sent a similar email to any other
25 directors or assistant directors at Crothall?

Pasquarello
1
2          MS. SELIGER:  Objection.
3     A.   I have no direct knowledge.
4     Q.   You referred to a "Bobby, Doug, and
5  Matt."  Who are those people?
6     A.   Bob Denver, Doug Rome, and Matt Bond.
7     Q.   As of December 21, 2020, Matt Bond was
8  your subordinate, right?
9     A.   I was talking before I got there.  I
10 don't believe Matt received this type of
11 scrutiny before I got there either.
12    Q.   Okay.  Do you know a person named
13 Jeannie Lai, L-A-I?
14    A.   Yeah.  She was finance.
15    Q.   Who was her direct supervisor?
16         MS. SELIGER:  Objection.
17    A.   I'm not sure --
18         MR. CLARK:  What's the objection?
19         MS. SELIGER:  Foundation.
20    Q.   Do you know who her supervisor is?
21    A.   I don't know Jeannie's supervisor.  I
22 would think Mike because -- without any direct
23 knowledge otherwise, but I don't know that for a
24 fact.  I know she's not engineering.  She's
25 finance, so I don't know who managed the finance

Pasquarello
1
2  department.
3     Q.   Do you know how old Ms. Lai is?
4     A.   No.
5     Q.   Is she over 40 or under 40 in your
6  estimation?
7          MS. SELIGER:  Objection.
8     A.   I honestly don't know.
9     Q.   Do you know a guy named John Barton?
10    A.   You're asking me to answer on a
11 woman's age question.  I don't know.  Sorry.
12    Q.   Do you know a guy named John Barton?
13    A.   I do know John Barton.
14    Q.   What was his position at Crothall?
15    A.   John Barton was equal to Michael.  He
16 was a senior director.
17    Q.   Do you know who he reported to?
18    A.   As far as I know, Chris Hariegal.
19    Q.   How old was Mr. Barton, if you know?
20    A.   Barton -- I would say Barton is in his
21 50s.  I don't know it for a fact, but he looks
22 like he's around that age.
23    Q.   What about him suggests to you that
24 he's in his 50s?
25    A.   His appearance, his knowledge, his

Pasquarello
1
2  demeanor.  I would say he's a mature gentleman.
3     Q.   What color is his hair?
4     A.   Salt -- I don't know.  I think he was
5  more blond and gray than -- than dark and gray,
6  but I'm -- it's been a while since I've seen
7  John.
8     Q.   The last time you saw Mr. Barton was
9  he balding?
10    A.   Yeah, John might be balding, sure.
11 Might have my hairline.  Maybe a little less.
12    Q.   You know someone named Ricardo
13 Cantana, C-A-N -- I'm butchering that name,
14 Ricardo Canata, C-A-N-A-T-A?
15    A.   No.
16    Q.   We talked earlier about Robert Denver?
17    A.   Yeah.
18    Q.   What was his title?
19    A.   Assistant director at the time I was
20 there.
21    Q.   And he reported to Mike Roche, right?
22    A.   Yes.
23    Q.   How old is Mr. Denver, if you know?
24    A.   Late 20s, early 30s.  I don't know
25 their exact ages.  I know he's late 20s, early

Pasquarello
1
2  30s.
3     Q.   We talked earlier about Douglas Rome.
4  He reported to Mr. Roche as well, right?
5     A.   Yes.
6     Q.   Do you know how old Mr. Rome is?
7     A.   I do know, when I was there, Doug
8  turned 27, because I remember them talking how
9  he's now off his parent's insurance.  And I
10 believe Bobby is around the same age as Doug,
11 give or take a year or two.
12    Q.   Do you know someone named Ryan
13 Nowicki?
14    A.   Yes.
15    Q.   Who does he report to?
16    A.   Ryan is the director of engineering.
17 He also falls under Mike's umbrella.
18    Q.   And how old was Mr. Nowicki, if you
19 know?
20    A.   I don't know.  I would say Ryan is in
21 his 30s.
22    Q.   Going back to Exhibit 6, which should
23 still be on your screen here, you write in
24 response to Mr. Roche's December 21, 2020 email
25 to you -- on that same day, you write:  Matt

Pasquarello

1    gave out the extinguisher sheets late that
2    month.
3
4           Do you see that?
5    A.   I do.
6    Q.   What does that mean?
7    A.   Remember, I was telling you before
8    about inventories?  So we were working off the
9    paper inventories.  Those paper inventories is
10   how we check our things, whether it be us
11   checking -- "us" I mean the fire safety
12   department directly checking, which would have
13   been fire extinguishers, or the vendors checking
14   devices and whatnot.  So every month we would
15   hand out a paper copy of the fire extinguisher
16   list or inventory, if you will, and that's what
17   the marshals used to go around and do their fire
18   extinguisher inspections.
19   Q.   How does the extinguisher sheets
20   relate to the PM closure rates that are shown
21   below in this email?
22   A.   It's a significant portion of the PMs,
23   because there's extinguishers in every
24   building -- so you know what, that -- that's
25   actually a pretty good question.  I don't know

Pasquarello

1    how much of the percentage was actually the
2    extinguishers.  It could have been 50 percent of
3    our work was extinguishers or more.  I'm not
4    sure how it broke down by device.
5
6           But extinguishers were one of the most
7    significant items we checked every month.  There
8    was well over a thousand of them that we checked
9    monthly.  So it's a campus-wide program,
10   obviously there's extinguishers in every
11   building, every area.  So that could have --
12   that could definitely account for that
13   percentage.
14          So in other words, it wouldn't be fire
15   extinguisher 1 percent of it.  Fire
16   extinguishers could be a large percentage of it,
17   based on the way it's broken down in the
18   computer, and I have no -- I don't know how that
19   would be broken down.
20   Q.   When did you become aware that Matt
21   Bond gave out the extinguisher sheets late for
22   the month of December 2020?
23   A.   I don't -- I don't recall when I knew
24   for a -- you know, that they were out late that
25   month.  I do know we were starting a new program

Pasquarello

1    that month so I didn't -- I didn't take it to be
2    a disciplinary action that it was out a little
3    late.  As you can see, I was giving an extension
4    to -- to everybody, because we were rolling out
5    this -- or we were going to try and roll out
6    this new program.
7    Q.   So this email that you sent to
8    Mr. Roche is December 21, 2020, and you write in
9    it:  The new deadline this month was given as
10   the 22nd.
11          The following day, right?
12   A.   Yes, so based on what you just pointed
13   out to me, and I appreciate that, thank you, I
14   must have told -- or known about it earlier in
15   the month because it looks like I gave a ten --
16   almost a ten-day extension.  So it looks like
17   from the, you know, 15th to the 22nd means he
18   handed it out, what, like 15 -- on maybe the --
19   the 8th, the 9th, so I extended -- I added that
20   to the deadline.  So when I became aware of it
21   would have been 15 days earlier than the 22nd.
22   Q.   As of the December 22 deadline you
23   imposed what percentage of PMs were closed for
24   the month of December 2020?

Pasquarello

1
2    A.   I don't recall.
3    Q.   Do you recall if you followed up with
4    Mike Roche on the next day to report a new
5    number to him?
6    A.   I don't recall.
7    Q.   At some point during your employment
8    at Crothall did you have regular one-on-one
9    meetings with Mr. Roche?
10   A.   I have, yes.
11   Q.   When those meetings start?
12   A.   Immediately.
13   Q.   When you say "immediately," do you
14   mean immediately at the beginning of your
15   employment?
16   A.   Yes.
17   Q.   And how often did those meetings take
18   place?
19   A.   Every week.  I mean, there was a
20   couple of weeks that were missed, but, you know,
21   somebody not in, somebody on vacation, something
22   happening that, you know, we said, Oh, we're not
23   going to have it today.  But for the most part
24   they were weekly one-on-one meetings.
25   Q.   Whose idea was it to have those weekly

Pasquarello

1 one-on-one meetings?
2     A.   Michael had his one-on-one meetings
3 with -- it was -- from what I could see
4 everybody, so he -- all his subordinates would
5 meet with him, so that would be me, Doug, Bobby,
6 those were the only ones that I have witnessed
7 Mike having one-on-ones with.
8     Q.   When you had the one-on-one meetings
9 with Mr. Roche, did anybody else attend besides
10 you and him?
11    A.   Yeah.  There was a lot of times our
12 one-on-ones were department one-on-ones, if you
13 will, so one-on-one is kind of a bad way to put
14 it, when it was -- so almost all the one-on-ones
15 when Matt was working with me or for me, Matt
16 was involved.  There were -- there were very few
17 that it was just me.  Our one-on-ones were
18 department one-on-ones, if you will, and I had a
19 manager in my department.
20         So they started, it was Joe Jerrain
21 and Matt and myself.  Then Joe left and it was
22 just me and Matt for a long time.  And then it
23 got to the point where it was just me but I
24 can't tell you when that happened.  I honestly
25

Pasquarello

1 don't remember.  But for the most part they were
2 department type of one-on-ones.
3     Q.   Did those meetings take place in
4 person?
5     A.   I'm sorry.  You broke up.
6     Q.   I'm sorry.  Did those meetings take
7 place in person?
8     A.   Yes, they did.
9     Q.   Where?
10    A.   Mike's office.  Almost exclusively in
11 Mike's office.
12    Q.   What was the --
13    A.   -- are not in Mike's office.
14    Q.   Sorry.  I stepped on your answer
15 there.  Are you done?
16    A.   Yeah.  I'm sorry.  I just added.
17    Q.   What was the purpose of the meetings?
18    A.   More catch-up, what's going on, like
19 what did we accomplish the week before, what is
20 to be expected for the week later?  You know,
21 where it -- it was -- they were never really
22 formal-formal, until it got formal.  And, you
23 know, I have my thoughts on that, too, but we
24 won't go there.  Like you said, this is just
25

Pasquarello

1 answer your question.
2         They were very informal in the
3 beginning, what's going on, this is what we are
4 looking for next week, this is what you did this
5 week.  They -- they weren't, you know, these big
6 structured things.  They -- they were pretty
7 relaxed for -- for the most part.
8     Q.   During these meetings, did you provide
9 Mike Roche with an update of your work, what you
10 were working on?
11    A.   Yes.
12    Q.   And did he provide you with his
13 expectations of what he wanted or expected of
14 you for the coming week or month?
15    A.   Yes.  I mean, it wasn't every month
16 there was expectations that, you know -- but,
17 mostly, yeah, we did that.
18    MR. CLARK:  All right.  Let's mark
19    Exhibit 7, which is a one-page document
20    entitled Associate Counseling Report
21    bearing Bates number CH 1691.
22    And, Mr. Pasquarello, we're going to
23 give it to you in two ways, once on the screen
24 and I am happy to scroll through it for you, and
25

Pasquarello

1 once in the chat where you can download it.
2 Take a look at it however you would like.  Let
3 me know if you need me to scroll.  And my
4 question for you is going to be, do you
5 recognize this document?
6     A.   I do.
7         (Associate Counseling Report bearing
8     Bates stamp CH 1691 was marked Pasquarello
9     Exhibit 7 for identification, as of this
10    date.)
11    Q.   Okay.  Have you had a chance to review
12 Exhibit 7?
13    A.   This is your screen I'm looking at?
14 We can stay with your screen.  I know this
15 document.
16    Q.   Sure.
17    A.   This is his write-up.
18    Q.   Do you want me to scroll through it so
19 you have a chance to read it?
20    A.   It -- it's not that big.  I'll -- I'll
21 go to your questions.  If I need more time, I'll
22 let you know.
23    Q.   Okay.  When is the first time you saw
24 this document?
25

Page 190

Pasquarello

1      A.   When he gave it to me.

2      Q.   When was that, do you remember?

3      A.   Some reason I'm thinking it was the

4 10th of that month but I -- I don't have it in

5 front of me. If you scroll down to the bottom,

6 yeah, it was the 10th of the month.

7      Q.   And you're looking at the date next to

8 the Signature of Manager?

9      A.   Yes.

10      Q.   Is that Mr. Roche's signature?

11      A.   That is.

12      Q.   Did Mr. Roche present this document to

13 you in person?

14      A.   Yes.

15      Q.   Was anyone else present when he

16 presented it to you?

17      A.   Mario Persaud I believe is how he

18 pronounces his last name.

19      Q.   And is that the person who is listed

20 as witness in the blue ink on the left of the

21 bottom of the page?

22      A.   Yes.

23      Q.   And it says next to that and slightly

24 above: Associate refused to sign.

---

Pasquarello

1      Do you see that?

2      A.   Yes.

3      Q.   Did you refuse to sign this document?

4      A.   Yes, I did.

5      Q.   Why?

6      A.   Because it's got no merit. That

7 document is completely without merit.

8      Q.   Scroll up for a moment. Under the

9 heading Detailed Account of Incident Resulting

10 in Conference. You see the section I'm looking

11 at in the middle?

12      A.   I do.

13      Q.   The first numbered paragraph there

14 says that you were informed of an impairment to

15 the 1184 fire pump. You notified the FDNY but

16 you did not notify the insurance provider. You

17 see that?

18      A.   I do see that.

19      Q.   Is that an accurate statement?

20      A.   No, not at all.

21      Q.   What's inaccurate about that?

22      A.   The entire statement. You want to go

23 one by one?

24      Q.   Let me ask a follow-up then. Did you

---

Pasquarello

1 notify the insurance provider about the

2 impairment to the 1184 fire pump?

3      MS. SELIGER: Objection to form.

4      A.   I personally made no notifications.

5      Q.   I'm sorry. Can you give me that

6 answer again? I missed it.

7      A.   I personally made no notifications.

8 So that's the first inaccuracy there. Well,

9 it's the first one I mentioned. The whole thing

10 is inaccurate.

11      Q.   So it says: He notified FDNY but did

12 not notify our insurance provider.

13      Is it your testimony that you also

14 didn't notify the FDNY?

15      A.   It's my testimony that I did not

16 notify anyone. That's -- that's a -- it's false

17 and misleading. This is fabricated. I wasn't

18 informed on the 6th that they were doing that

19 work. They went to the fire marshal office and

20 asked to do a repair job based on a thing I was

21 informed about a week or so earlier, which was

22 the 1184 pump's annual maintenance and testing.

23      The pump failed, and then on the 6th

24 they went to the marshal's office and told them

---

Pasquarello

1 that they were going to work on the pump. And

2 they didn't follow normal procedures by

3 informing me of that.

4      The staff, the fire marshal staff,

5 notified the FDNY that the pump was going out of

6 service for repairs. That's by code, they did

7 exactly what they were supposed to do.

8      Then he says: As a result the

9 insurance provider added a deficiency which was

10 previously removed.

11      That's not true. I don't know if the

12 insurance company added anything. But I do know

13 that the insurance company was on site May 6

14 doing a separate -- completely separate

15 unrelated site walk-through. Ronald Kanterman,

16 my manager, was walking them through the site,

17 showing them valves, showing them the

18 suppression systems.

19      There was a couple of findings that

20 came out of that, that walk-through. One of the

21 findings was, Oh, they were working on the pump.

22 How come you guys didn't notify us? When Ron

23 told me that, I says, You know what? It's ten

24 by code. But Ron was also familiar with the

Pasquarello

1      fact that we would notify the insurance company,
2      and we took immediate actions to rectify that
3      portion of the oversight.
4           However, I don't know if we ever
5      received anything for it, because the man wasn't
6      that upset about it.  He said, For a test like
7      this, it's good if you do notify us.  So it was
8      a small repair.  It wasn't a major impairment
9      that, you know, sometimes rises to that level.
10          But I found out about it that day.  I
11     instructed Ron to take measures to ensure that
12     never happens again, and we did do that.  So
13     between myself giving directions and Ron
14     following my -- you know, my orders, if you want
15     to call them orders, we took care of the
16     situation.
17          So were we informed on May 6 that they
18     were going to do -- that there was a planned
19     site visit?  Yeah, I know that the insurance
20     company was coming on the 6th.  That's why I had
21     my manager ready to walk with them.  Was I
22     informed that the 1184 pump was going to be off
23     that day?  No.  They went directly to the fire
24     marshal's office to do a repair of a test that

Pasquarello

1      happened a little earlier in the month, or the
2      month earlier.
3           And then the insurance provider
4      noticed it.  I immediately gave that information
5      to Michael on the 6th when it happened.  It
6      was -- there was no delay in notifying him.  So
7      that's what happened on May 6th in relationships
8      to the pump.
9           Another thing that came out of that
10     is, the insurance company asked us to make sure
11     that all the valves were painted the proper
12     colors.  And I had asked for that earlier.  They
13     said it wasn't necessary.  Now the insurance
14     company said it was necessary.  So I finally got
15     the okay to do it, and we hired Olympic Torch to
16     do that portion of the finding.
17          So they had two findings that I was
18     aware of, the valves needed to be painted, and
19     they noticed that the work was -- the repair was
20     going on on the pump, and they didn't know about
21     the repair.  That -- that was the two things
22     that happened on May 6th.
23     Q.   So, Mr. Pasquarello, you gave a very
24     long answer to my question so let's break it

Pasquarello

1      down a bit if we can so I understand exactly
2      what you're testifying to.  Is it your testimony
3      that you were not aware of the impairment to the
4      1184 fire pump on May 6th?
5      A.   That's what I'm saying.  They didn't
6      inform me.  They went straight to the fire
7      marshal's office and asked for the pump to come
8      offline for the repair.
9      Q.   Oh.
10     A.   They didn't submit the proper
11     paperwork that day.  That's in-house.  That's
12     John Barton's team, and they felt that they're
13     in-house, they -- they don't have to follow the
14     same rules as everyone else.  And that was one
15     of the things that I always fought against, and
16     that Bob Shaffer when he states he defends me,
17     was defending me on.  You have to follow the
18     same procedures as everybody else every single
19     time you touch that pump.  Why?  We would have
20     avoided this situation altogether if they had
21     done that.
22          But they didn't, and this is what
23     happened.  But instead of Mike holding those
24     responsible, he held my -- me responsible

Pasquarello

1      instead of the plumbing shop.
2      Q.   Mr. Pasquarello, again, you gave me a
3      very long answer to a very short question.
4      We'll have to break down, and we'll -- we'll be
5      here all day, which I'm happy to do.
6           Did -- were the fire marshals required
7      to notify you of impairments to fire pumps?
8      A.   Well, at this point I had a manager up
9      there, so, no, they could have went to their
10     manager and they did.
11     Q.   Were the fire marshals required to
12     notify somebody about an impairment to a fire
13     pump?
14     A.   They -- yes.  They made the
15     notification to the manager, and then they made
16     the notification to the -- the fire department
17     as per code.  Did I get notified?  After the
18     fact, yes.  Joe, they're doing the pump today.
19     They came down to the office.  That's how I got
20     that notification.  What I'm saying is, I didn't
21     get the written notification as customary.  And
22     a lot of times in-house plumbing does that.
23     Q.   Whose job is it to notify the
24     insurance provider of an impairment to a fire

Pasquarello

1  pump?
2      A.  It would have been the staff.  The
3  staff makes the notifications.  So that was
4  the -- the fire marshal who filled out the
5  permit to let them go and -- and take the pump
6  offline.
7
8      Q.  What's that fire marshal's name?
9      A.  Well, I don't know.  I had 18.  I don't
10  know who was working that day.
11      Q.  Well, did you ask who was notified
12  about the impairment to the fire pump after you
13  got this notification from Mr. Roche?
14      A.  I did.  I took it up with my manager.
15  He handled that.  But, yes, we -- I don't
16  remember who the marshal that made the
17  notifications were, but I do remember that I
18  instructed Ron on the -- what was going on, and
19  then we -- we set new measures in place so that
20  this would never happen again.
21      We sent out a bulletin to all members
22  of the department highlighting the fact that the
23  insurance provider must be notified, and we
24  changed the form of -- the shutdown request form
25  to include a check box that makes us remember

Pasquarello

1  right there on the spot notify insurance
2  provider.
3
4      So when I became aware of it, I didn't
5  discipline anyone on the spot, if that's what
6  you're asking.  I took it as a learning
7  opportunity and it -- and an opportunity to
8  improve the process of the department, and I did
9  that.
10      There was never anybody in any kind of
11  danger.  An insurance notification is not the
12  same as notifying the fire department.  It's not
13  code required.  It's a courtesy that the
14  insurance company asks for from their clients.
15  That's all that was, so I didn't see the need
16  to -- to write somebody up for that.  I found
17  the need to improve the process so it didn't
18  happen again, and that's what I did.
19      Q.  Does the policy with FM Global require
20  notification for impairments?
21      A.  I never seen a written policy from FM
22  Global, nor was I ever given one.  I know --
23      Q.  So --
24      A.  -- in practice that it's -- that they
25  do want to get notified.  Nobody at Crothall,

Pasquarello

1  nobody at Mount Sinai, ever gave me anything
2  from the insurance company stating what they
3  required or expected.
4      Q.  So when you refer to it as "a
5  courtesy," you don't know whether it is also a
6  contractual obligation; is that right?
7      A.  No, you're -- that's correct, I don't
8  know if it's contractual.  I didn't see their
9  contract.
10      Q.  Did you ever ask for it?
11      A.  No, not that I recall.
12      Q.  You said earlier that the statement,
13  As a result the insurance provider added a
14  deficiency which was previously removed, was an
15  inaccurate statement; is that right?
16      A.  I -- I don't know if that's accurate.
17  I don't know if they added any deficiency to our
18  report based on that.  I did not see a report
19  from them that shows they added a deficiency for
20  it.  That was Mike's words that they did it, and
21  that it was previously removed.
22      So I asked Mike, Well, who was
23  responsible for the last one?  And he wouldn't
24  answer me.

Pasquarello

1      Q.  Why is that relevant, who was
2  responsible for the last deficiency?
3      A.  Because I want to know if my hunch
4  that I'm being held to a different standard is
5  true or not.  You're -- you're writing me up for
6  something that I told you about the day it
7  happened.  You're lying saying that you didn't
8  know about it for, you know, 10 days, 12 days
9  later, which is not the truth.  You knew about
10  it the day it happened.  And then you're saying
11  that we received a deficiency, and that this
12  deficiency was previously removed.
13      Well, who was held accountable the
14  first time we had this deficiency, and please
15  show me that you're writing me up for something
16  that is actually happened.  So I asked, very
17  nicely, Can I see the deficiency that I'm being
18  written up for?  And he wouldn't do it.  He --
19  he didn't show me anything.
20      Q.  Does Mr. Roche say anywhere in this
21  Associate Counseling Report when he learned of
22  the impairment to the fire pump?
23      A.  He's saying -- I take it as he's
24  saying he learned about it on the 18th.

Pasquarello

```
 1                  Pasquarello
 2        Q.   Because it says:  On May 18th we
 3   received a report from our insurance provider?
 4        A.   Yes.
 5        Q.   Okay.  Let's take a look at the second
 6   numbered paragraph.  Paragraph number 2 says
 7   that:  No work orders were created by fire
 8   safety to track repairs and life safety
 9   deficiencies following an annual fire door
10   inspection.
11             Do you see that?
12        A.   I do.
13        Q.   Is that accurate?
14        A.   It's a long answer to say -- it's not
15   a yes-or-no answer.
16        Q.   Well, is it accurate?  Yes or no?  And
17   then I'll let you explain.
18        A.   Let me read it a second.
19             (Witness reviewing document.)
20        A.   I -- it's accurate that that I didn't
21   make the customary work orders for this
22   particular projects, yes.
23        Q.   Why didn't you make the customary work
24   orders for this particular project?
25        A.   Okay.  Remember when I said when I
```

Pasquarello

```
 1   took over this department there was over 500
 2   work orders that were over 60 days, several of
 3   them were a couple of years old?  The majority
 4   of that were for doors.  So the door issue was
 5   the major issue that the -- the hospital and the
 6   fire safety department was facing when I came
 7   aboard.
 8             To say there was 500 door issues is
 9   completely inaccurate.  What Matt Bond and Mark
10   Matthews, my predecessor, did was they grouped
11   work orders and put them into a new work order
12   to make it look their number of work orders went
13   down.  When, in fact, they didn't go down.  They
14   actually went up, because they put these work
15   orders into another work order, and then that
16   work order said refer to these work orders.  All
17   right.  So it took me from the time I started
18   almost to this point to chip away at those 500
19   overdue work orders or 500 plus, which were the
20   majority doors.
21             Now, we get this door job comes up,
22   and we have to track it.  I knew that the
23   Crothall system was not working with the doors,
24   and the -- the vendor that was performing this
```

Pasquarello

```
 1   worked differently than the vendor that they had
 2   previous.  So I set up a spreadsheet.  I worked
 3   off of that spreadsheet, and I insisted that the
 4   company bring two sets of people, inspectors and
 5   mechanics at the same time, because they were
 6   going to work on a rotating basis, ten-day
 7   rotations.
 8             I says, I need you to identify and fix
 9   what you can as you find them.  So during that
10   rotation, that's what they did, and I tracked it
11   on the spreadsheet.  Make a long story short,
12   but at the end of this project all doors were
13   addressed and fixed, which was something that
14   wasn't done for years before I got there.
15             When they called me and asked me, Why
16   didn't you follow the proper way, I says,
17   Because it didn't work in this particular
18   situation.  I was able to accomplish the goal of
19   keeping the hospital safe, getting all the doors
20   done, and we put out a blanket ILSM to cover
21   everything, and we trained over 4,000 people,
22   which is all documented, on the need to close
23   doors when there's an -- a fire alarm in the
24   building.
```

Pasquarello

```
 1             Now, we took all that and Bob called
 2   me, and then they had me sit with -- so Mike is
 3   saying he didn't find out about this until a
 4   review.  Completely bogus.  He knew about this
 5   every step of the way.  Because I told him I
 6   would be more than happy to sit with Joint
 7   Commission and explain my process to them.
 8   Because Rick Cotter, the gentleman we spoke to
 9   earlier, said that, All Joint Commission wants
10   to know is if you had a process and followed the
11   process.  I had a process and I followed my
12   process.
13             The only one who explained to me the
14   reason that my process wasn't the preferred
15   method was Bob Shaffer, well after the point.
16   Bob explained to me that Crothall sells their
17   services to the hospitals based on their
18   process.  So if you turned around and showed the
19   flaw in their process, that would keep them from
20   getting future contracts possibly with the
21   hospital.  So never go against the process
22   regardless of what happens.
23             I felt my job as the fire safety
24   person was to ensure the safety and compliance
```

Pasquarello

1
2 of the hospital, not to worry so much about work
3 order work -- work order work.  The work was
4 identified, the work was corrected, all within
5 that week, all within that timeframe.  Whatever
6 was not done and corrected during those windows,
7 during those rotations, work orders were made.
8        Those were usually things that
9 required parts or required labor that was
10 specialized, like, maybe electronic door closers
11 or something.  So those were the only ones that
12 weren't addressed at the moment, or within that
13 rotation, and those were the ones that were --
14 work orders were completed.
15        So I was willing to talk about it
16 then.  I'm willing to talk about it now.  And I
17 will talk about my process to anybody who asks.
18 I had a process that worked and took care of
19 deficiencies that were open for years.  You're
20 using this as a way to write me up all because
21 you don't want somebody with more experience and
22 older than you working for you.  That's my
23 belief, and that's how I did this.  It had
24 nothing to do with work orders not being
25 completed.

Pasquarello

1
2        The -- so, yes, did I work work
3 orders?  Only for the ones that were
4 outstanding, and I only did that because the
5 amount of work required to not only clear up
6 this year's but all the past year or two needed
7 to be done the way I did it.  I believe that was
8 the best way to do it, and I still believe it's
9 the best way to do it.
10    Q.   That very long answer you gave me, did
11 you ever write that up and submit it to
12 Mr. Roche?
13    A.   Yes, I did.
14    Q.   When?
15    A.   When he wrote me up.
16    Q.   So at some point --
17    A.   That went to Mr. Roche and went to
18 Patty Lizarazo.  It went to everybody.  I don't
19 know how anybody could read my answers to this
20 write-up and have found no merit to my answers.
21 But obviously, they did, or else we wouldn't be
22 sitting here.
23    Q.   So is it your testimony that --
24    A.   -- investigation, I don't know.
25    Q.   Is it your testimony that after

Pasquarello

1
2 June 10, 2021, you submitted a response to the
3 items that are listed in this Associate
4 Counseling Report?
5    A.   Yes.  And the PIP that followed it.
6    Q.   Okay.  I'm right now just referring to
7 the Associate Counseling Report.  So is there a
8 document that lists your disagreement with this
9 Associate Counseling Report?
10    A.   Yes.  I don't know if you have it but
11 I know we submitted it.
12 RQ    MR. CLARK:  I don't think we have it,
13       so let me call on the record for
14       production of that document.
15       MS. SELIGER:  Shaun, you guys produced
16       that to us, and it was also part of our
17       production.  Those are the letters that --
18       I believe -- Joe, you can correct me if I'm
19       wrong, but I believe those are the letters
20       that Mr. Pasquarello wrote, they were
21       variously addressed to HR or Bob Shaffer.
22       They were --
23       THE WITNESS:  Chris Hariegal.
24       MS. SELIGER:  Chris Hariegal.  So not
25       only did you produce those letters to us

Pasquarello

1
2 but I believe they were part of our
3 production as well.
4 RQ    MR. CLARK:  Okay.  Thank you for that
5       representation.  I'm looking at a few of
6       them which predate this.  I'll go back and
7       look for the production.  And if we don't
8       have it, I will follow up in writing with
9       a follow-up request for it.
10       MS. SELIGER:  Sure.
11    Q.   When you received, Mr. Pasquarello,
12 this document that you refused to sign, why
13 didn't you make any notation in the section that
14 says:  Associate's response to this discussion?
15    A.   Because I wanted to gather my bullets
16 properly and not act in the moment.
17    Q.   How long after June 10, 2021 did you
18 submit your written disagreement with this
19 Associate Counseling Report?
20    A.   If -- if -- if we had the document,
21 the date would be on it.  But it was -- it was
22 less than a week, I believe.
23    Q.   And to whom did you submit that
24 disagreement?
25    A.   I know HR.  Chris Hariegal.  I went up

1                    Pasquarello
2  the chain of command.
3       Q.    Anybody else besides HR and Chris
4  Hariegal that you submitted your --
5       A.    I believe Bob --
6       Q.    -- written disagreement with?
7       A.    I think Bob might have been on it.  I
8  don't remember the heading that I submitted it
9  to, but I believe it was HR, Chris, Bob.
10      Q.    The detailed account of incident
11 resulting in conference refers to a performance
12 improvement plan that will accompany this
13 document and will be presented to the associate
14 when reviewing this form.
15           Did you receive a performance
16 improvement plan?
17      A.    Yes.
18           MR. CLARK:  Okay.  Let's mark that
19 Exhibit 8.
20           Let me take this down and put that up.
21           Okay.  We are marking as Exhibit 8 a
22 two-page document bearing Bates stamp
23 number CH 1693 -- well, I guess it's a
24 three-page document, CH 1693 through
25 CH 1695.

1                    Pasquarello
2       I have it up on my screen,
3  Mr. Pasquarello, but let me see if I can
4  flip it so it's actually readable.  But
5  Zack will also put it in the chat for you
6  if you want to download it there.
7           (June 1, 2021 performance improvement
8  plan bearing Bates stamp CH 1693 through CH
9  1695 was marked Pasquarello Exhibit 8 for
10 identification, as of this date.)
11          MR. CLARK:  There we go.  Okay.  So
12 take a look at this document either on my
13 screen and I'm happy to scroll for you or
14 through the chat, and let me know when
15 you're done.
16          THE WITNESS:  Shaun, would it be all
17 right if we took a bathroom break real
18 quick?
19          MR. CLARK:  Of course.  Of course.
20 Off the record.
21          THE VIDEOGRAPHER:  The time is
22 2:48 p.m., and we are going off the record.
23          (Recess from 2:48 to 2:59.)
24          THE VIDEOGRAPHER:  The time is
25 2:59 p.m., and we are back on the record.

1                    Pasquarello
2       Q.    Okay.  Mr. Pasquarello, welcome back.
3  On the break did you review any documents?
4       A.    No.
5       Q.    Did you speak with anybody?
6       A.    Just Leah.
7       Q.    Okay.  Just before the break we had
8  marked Exhibit 8, which is the June 1, 2021
9  performance improvement plan.  Let me put it
10 back on up the screen.  I think it's also
11 available in the chat if you want to look at it
12 that way and download it.  But take a look at
13 this document -- it's really a two-page document
14 with a blank page in the middle.  Take a look at
15 this two- or three-page document, and let me
16 know when you're done.
17      A.    I'm familiar with this document.
18 We -- you could ask questions.  Sure.
19      Q.    Okay.  Is this a document you've seen
20 before?
21      A.    Yes.
22      Q.    Did you receive this performance
23 improvement plan on or about June 10, 2021 when
24 you received the counseling we looked at in
25 Exhibit 7?

1                    Pasquarello
2       A.    I -- yes.
3       Q.    And scrolling to the bottom of the
4  first page there, the signature above Manager
5  Signature, is that Mr. Roche's signature?
6       A.    Yes.
7       Q.    And you declined to sign this
8  performance improvement plan; is that right?
9       A.    Yes.
10      Q.    On the second page of the plan, third
11 page of the exhibit, there is a table with four
12 columns, Performance Improvement, Task To Be
13 Completed By, Measurement, and Follow-up Notes.
14 Do you see that?
15      A.    Yes.
16      Q.    Putting aside whether you agreed with
17 the need for this performance improvement plan
18 or the tasks that were listed, did you
19 understand that as of your receipt of this
20 document that Mr. Roche expected you to complete
21 the tasks under performance improvement?
22      A.    Yes.
23      Q.    And did you understand that those
24 tasks would be measured against or gauged by the
25 items that are listed under the heading

```
                    Pasquarello
 1
 2   Measurement?
 3        A.   Yes.
 4        Q.   Okay.  Stop sharing this for a moment.
 5        Let's mark the next exhibit, which is
 6   Exhibit 9.  It's a one-page document Associate
 7   Counseling Report dated July 19, 2021, Bates
 8   stamp number CH 1697.
 9        (Associate Counseling Report dated
10        July 19, 2021, bearing Bates stamp CH 1697
11        was marked Pasquarello Exhibit 9 for
12        identification, as of this date.)
13        Q.   Again, Mr. Pasquarello, I will put it
14   on my screen.  Zack has already, he's fast, put
15   it in the chat for you.  Feel free to look at it
16   either way.  Okay.  Take a look at Exhibit 9,
17   and let me know when you're done.
18        A.   I'm just checking to see if my
19   computer was working properly, because it wasn't
20   popping up.
21        Okay.  Again, I'm familiar with this
22   document.
23        Q.   Is this a document that was presented
24   to you on or about July 19, 2021?
25        A.   Yes.
```

```
                    Pasquarello
 1
 2        Q.   The signature at the bottom of the
 3   page, Signature of Manager, is that Mike Roche's
 4   signature?
 5        A.   Yes.
 6        Q.   And did you decline to sign this
 7   document?
 8        A.   Yes.
 9        Q.   Was that because you disagreed with
10   its contents?
11        A.   Yes.
12        Q.   Let's take a look at the section in
13   the middle that is headlined Detailed Account of
14   Incident Resulting in Conference.
15        There are two numbered paragraphs
16   below that heading.  Do you see that?
17        A.   Yes.
18        Q.   In the first numbered paragraph, it
19   says that:  As of June 28, 2021, Work Order
20   Number 503212 remains issued and open after the
21   25th of June.
22        Do you see that, the last sentence of
23   Number 1?
24        A.   I do.
25        Q.   Is that an accurate statement?
```

```
                    Pasquarello
 1
 2        A.   No.
 3        Q.   What is inaccurate about that last
 4   sentence of paragraph Number 1?
 5        A.   Everything about that statement is
 6   also false.  There was a PM that was still left
 7   open because it was supposed to be left open.
 8   That PM was supposed to have its date changed.
 9   It was for a dry pump test in the Hess building.
10   That test was performed.  It's an annual test.
11   The last ones were performed in March and
12   October, so neither test was due.  That test was
13   supposed to -- all that was supposed to happen
14   with that work order, it was -- the date was
15   supposed to be changed.
16        Mike Roche and Matt Bond falsified
17   that document by closing it out, attesting that
18   work was completed that was never completed, and
19   closed it while I wasn't even in the office on
20   the 30th of the month or close to the 30th of
21   the month.
22        That is a complete fabrication.  The
23   work order that's associated with that was
24   fabricated as closed when it shouldn't have been
25   closed.  I -- it was my intention then and it's
```

```
                    Pasquarello
 1
 2   my intention now that that's a criminal act that
 3   they falsified a document.  I brought that to
 4   everybody's attention.  That's also in my
 5   answer.  And that -- that's just completely
 6   unfounded and false.  And as I wrote, somebody
 7   should be held accountable for falsifying
 8   records.  That's on Number 1.
 9        Q.   I understand your contention that you
10   think the record was not --
11        A.   It's not a contention.  It's a fact.
12   If you look at the document, you can see --
13        Q.   I'm in the middle of a question, so I
14   just remind you of the earlier instruction
15   because I think we're getting a bit away from
16   it.  Please allow me to finish my question, and
17   I'll allow you to finish your answer.  At times
18   we will mistakenly step on each other, that's
19   okay, it happens, but please don't purposely
20   step on the question.
21        So the question is, as of June 28,
22   regardless of what you think of the merit of
23   that work order, was it open?
24        A.   Yes, it was open and it was supposed
25   to be open.
```

Pasquarello

1
2     Q.   So the statement, As of June 28, 2021,
3  Work Order 503212 remains issued and opened, is
4  an accurate statement, right?
5     A.   Yes.
6     Q.   Okay.  The second numbered paragraph
7  refers to ISLMs that were not closed out by the
8  Wednesday deadline.
9          You see that?
10    A.   Yes.
11    Q.   Is it accurate that those ISLMs were
12  not closed by the Wednesday deadline?
13    A.   That's accurate.  There's more to the
14  answer but, yes, that's accurate.
15    Q.   Did you submit a written response to
16  this Associate Counseling Report, as you were
17  permitted to do, in that middle section:
18  Associate response to this discussion?
19    A.   I did submit a written report, yes.
20    Q.   When did you make that submission?
21    A.   Again, within a day or two of
22  receiving it.
23    Q.   So within a day or two of July 19,
24  2021?
25    A.   Yes.

Pasquarello

1
2     Q.   To whom did you make that written
3  submission?
4     A.   It would have been the same people,
5  HR, Chris, and Bob.  I believe those were the
6  three.
7     Q.   Did you save a copy of that written
8  submission?
9     A.   I'm sure somewhere in my records I
10  have a copy of it, yes.
11    Q.   Have you turned over a copy of that
12  written submission to your attorney?
13    A.   Yes.  And I received it back from my
14  attorney, so it's numbered.  It's a part of this
15  packet of stuff that had all the numbers on it.
16 RQ      MR. CLARK:  Okay.  So to the extent
17        it hasn't been produced, I'll call for it.
18        We will check our records if we have it,
19        and I won't need to follow up on it.
20        MS. SELIGER:  Again, that is one of
21        the letters that we both included in our
22        production and received in your production,
23        but we can all make sure that it's there
24        and follow up.
25        MR. CLARK:  Okay.  Thank you.

Pasquarello

1
2     Q.   Let me take down Exhibit 9.
3          Earlier we looked at Exhibit 8, which
4  was a performance improvement plan that was
5  issued to you.  How long was that performance
6  improvement plan for?
7     A.   I believe 90 days.  30, 60, 90, or
8  something like that, or 90 day.
9     Q.   So from early June 2021 to early
10  September 2021?
11    A.   Yes.  What was the date on the last
12  exhibit you showed?
13    Q.   Let me put it back up for you.  Are
14  you talking about Exhibit 8 or Exhibit 9?  Are
15  you talking about the performance improvement
16  plan --
17    A.   So 9 was based off of that plan
18  ending, so it's -- that's when it ended.
19    Q.   Okay.  Well, let's do -- before we get
20  there, let's -- one more.  Let's deal with this
21  one first.  So Exhibit 10 is a one-page document
22  bearing Bates number CH 1745.  Again, Zack will
23  put it in the chat for you to download.  I will
24  put it on my screen for you to look at.  Take a
25  look at the document, and let me know if it's a

Pasquarello

1
2  document you've seen before.
3          (One-page document bearing Bates stamp
4          CH 1745 was marked Pasquarello Exhibit 10
5          for identification, as of this date.)
6     A.   I never seen this document.
7     Q.   In connection with this lawsuit did
8  you review documents that were produced by
9  defendants to your lawyer?
10    A.   Yes, I -- I did review --
11    Q.   Do you recall if this is one of the
12  documents you reviewed?
13    A.   I'm opening it up again, see if this
14  is the one that -- I don't recall seeing this
15  one, even as some of the documents that my
16  attorney gave me to look at.  I don't recall
17  this document.
18    Q.   Did you meet with Mike Roche and Pat
19  Lizarazo on August 24, 2021 in Mike Roche's
20  office?
21        MS. SELIGER:  Objection.
22        MR. CLARK:  What's the objection?
23        Sorry, Mr. Pasquarello, hang on.  Let
24  me make sure I can correct my question if
25  it's bad.

Pasquarello

1
2      What's the objection?
3      MS. SELIGER:  Foundation.
4      Q.   Okay.  I don't understand that
5  objection.  Let me re-ask the question so we
6  have a clean record.
7          Did you meet with Mike Roche and
8  Patricia Lizarazo in Mike Roche's office on
9  August 24, 2021?
10     A.   I don't remember the date but there
11 was a meeting with Mike and Patricia.  I don't
12 recall the date.
13     Q.   Do you recall if it was in August of
14 2021?
15     A.   I honestly don't remember the date.
16     Q.   According to the first sentence of
17 this document, it says:  There were three fire
18 drills performed which have not been uploaded
19 into TeamDoc as of 8/24/21.
20         Do you see that?
21     A.   I do see that.
22     Q.   Is that accurate?
23     A.   I -- I don't recall.  I -- I don't
24 remember this document.  I don't remember the
25 conversation.

Pasquarello

1
2      Q.   At the end of the document there's a
3  sentence that begins, Patty asked.  It says:
4  Patty asked Joe how he thought he was doing
5  meeting the requirements of the plan.  Joe chose
6  not to respond and asked me how I thought he was
7  doing.
8          You see that?
9      A.   I do see that.
10     Q.   Do you recall whether Ms. Lizarazo
11 asked you how you thought you were doing under
12 the performance improvement plan?
13     A.   No, I don't recall that.
14     Q.   How did you think you were doing
15 meeting the requirements of the performance
16 improvement plan?
17     A.   I thought I met all the performance --
18 all the requirements.  The last one that I said
19 required a longer answer requires a much longer
20 answer, but I -- I met all the criteria Mike put
21 out in that performance improvement plan.
22     Q.   In the last sentence it says:  I
23 stated that I felt there have been some issue
24 including the previous counseling in June, but
25 that there was some progress on some of the

Pasquarello

1
2  items.
3          Do I take it from your testimony that
4  you disagree with that statement made by, I
5  believe, Mike Roche?
6      A.   Yes, I disagree with that.
7      Q.   All right.  Now let's get to
8  Exhibit 11, which we started talking about for a
9  second.  We'll mark as Exhibit 11 a two-page
10 document bearing Bates number CH 1250 to 1251.
11         Let me scroll to the top here.
12 Mr. Pasquarello, take a look at what we have
13 marked as Exhibit 11, and let me know when
14 you've finished.
15         (Memo to Joseph Pasquarello from
16     Michael Roche dated September 20, 2021, re
17     completion of performance improvement plan
18     bearing Bates stamp CH 1250 to 1251, was
19     marked Pasquarello Exhibit 11 for
20     identification, as of this date.)
21     A.   Never seen this.
22     Q.   Okay.  Let me better identify it for
23 the record so we know what we're looking at.
24 Exhibit 11 is a two-page document.  I've given
25 the Bates number.  It is a memo to Joseph

Pasquarello

1
2  Pasquarello from Michael Roche dated
3  September 20, 2021, re completion of performance
4  improvement plan.
5          Mr. Pasquarello, you told me you've
6  never seen this before?
7      A.   I was never given this.  I believe
8  this is one of the items that my attorney showed
9  me that I was never -- that I never seen before.
10     Q.   Okay.
11     A.   That she -- never seen before she gave
12 it to me or showed it to me.
13     Q.   The second sentence at the beginning
14 of the memo, it says:  This memo will document
15 the completion of that plan and specify any
16 areas within the plan that continue to need
17 improvement as well as acknowledge any realized
18 improvement.
19         You see that?
20     A.   I see it, but --
21     Q.   Is it accurate that as of
22 September 20, 2021, you were no longer on a
23 performance improvement plan?
24     A.   Sir, I never seen this document, so I
25 can't testify or comment on anything in it.

Page 226

Pasquarello

1
2      Q.   So let me take down the document,
3  because I'm not asking you to comment on the
4  document specifically.  My question is, is it
5  accurate that as of that date, September 20,
6  2021, you were no longer on a performance
7  improvement plan?
8      A.   I don't know that.  I was never told I
9  was off the plan.
10      Q.   Were you ever told that the plan was
11  extended?
12      A.   No.  I was just written up a second
13  time.
14      Q.   So when you --
15      A.   So that -- sorry.
16      Q.   Go ahead.
17      A.   That would indicate to me I was still
18  on something.  I mean, he wrote me up again for
19  parts of the plan that he said weren't met.  I
20  disagree with that, but, you know, nevertheless,
21  that is my understanding.  So, no, I don't know
22  if I was still on the plan or not.
23      Q.   Did you ever ask when the end date of
24  the performance improvement plan was?
25      A.   No, at that point I was -- my

Page 227

Pasquarello

1  inquiries were going through HR.  That's when --
2
3  no.
4      Q.   Let's turn back to Exhibit 8 for a
5  moment.  Let me put it back up on my screen so
6  we can look at the plan together.  If you can
7  see, I'm scrolling up to the top here.  Can you
8  see Exhibit 8 on my screen?
9      A.   I see it.
10      Q.   The performance improvement plan is
11  dated June 1, 2021, right?
12      A.   Yes.
13      Q.   And then in the third paragraph of the
14  first page it begins:  Over the next 90 days.
15          Do you see that?
16      A.   I do.
17      Q.   Was it your understanding when you
18  received this, that this performance improvement
19  plan would begin in early June and end in early
20  September?
21      A.   That was my understanding, yes.
22      Q.   Okay.  When was your last day at
23  Crothall?
24      A.   I don't recall.  I think it was
25  September something, but I don't recall.

Page 228

Pasquarello

1
2      Q.   Let's put up Exhibit 12.  Exhibit 12
3  is a one-page document bearing Bates number
4  CH 1637, dated September 21, 2021, to Mike Roche
5  and Bernie Nunez from Joseph Pasquarello,
6  subject Letter of Resignation.
7          (One-page document dated September 21,
8      2021 to Mike Roche and Bernie Nunez from
9      Joseph Pasquarello, subject Letter of
10      Resignation, bearing Bates stamp CH 1637,
11      was marked Exhibit 12 for identification,
12      as of this date.)
13      Q.   Mr. Pasquarello, I've put up on my
14  screen Exhibit 12.  Take a look at it, and let
15  me know when you're done.
16      A.   Okay.  I'm good.
17      Q.   Okay.  Is this a document you created?
18      A.   Yes.
19      Q.   And is that your signature at the
20  bottom, above your name?
21      A.   Yes, it is.
22      Q.   The document says:  Please accept this
23  letter as formal notification that I am
24  resigning from my position as assistant
25  director/fire safety with Crothall Healthcare

Page 229

Pasquarello

1  effective immediately.
2          You see that?
3      A.   Yes.
4      Q.   Does that mean that your last day of
5  employment with Crothall was September 21, 2021?
6      A.   Yes.
7      Q.   Why did you resign your position?
8      A.   I seen the writing on the wall.  I
9  knew they were -- they constructively demoted
10  me.  They were treating me with different
11  standards.  They -- they were -- I was getting
12  physically sick working there at that point, and
13  I couldn't do it anymore so I left.
14          I had -- to that point my record is
15  impeccable.  I wasn't going to [inaudible] that
16  with unfounded accusations mar up until that
17  point 30, 40 years of good work.
18      Q.   You allege in this lawsuit that you
19  were subject to discrimination on the basis of
20  your age?
21      A.   Yes.
22      Q.   Who do you believe discriminated
23  against you?
24      A.   Michael Roche.

Pasquarello

1
2     Q.   Anyone else?
3     A.   Michael was my boss, or my supervisor,
4 so nobody else mattered.  But he -- he fostered
5 an atmosphere of where it was free to -- to
6 treat differently people older than them.
7     Q.   Putting aside in your terms whether
8 anybody else mattered, do you believe anybody
9 else discriminated against you based on your
10 age?
11    A.   I wouldn't know.  He -- he's the only
12 one that matters.  He -- he was the boss.  He
13 was the -- the head of the department.
14    Q.   You don't know if anybody else
15 discriminated against you?
16    A.   Mike controlled my career.  Nobody
17 else did.  So how anybody else thought or acted
18 towards me wouldn't prompt me to bring action.
19    Q.   What specific actions did Mike Roche
20 take that you believe were discriminatory based
21 on your age?
22    A.   I believe when you looked at the other
23 members of the immediate team that had
24 day-to-day daily activities with Mike, I was the
25 only person remotely -- nowhere near their age,

Pasquarello

1
2 20, 30 years older than most of them.  I was
3 treated differently.  I was denied basic
4 equipment for my department.  I was denied basic
5 equipment for myself.
6         I was held to different deadlines than
7 everybody else.  My work orders are double,
8 triple, if not more than everybody else, and
9 he's holding those to example on -- on work not
10 being done that goes back to that Exhibit 9 or
11 10, where all those interim life safety measures
12 that -- there was completely misleading
13 information on that.  Those -- there was 40, 50
14 of them made in a three-day period.  If you're
15 going to do it accurately and keep the hospital
16 safe, you can't close 40, 50 things out in
17 24 hours.  You're not doing a fair job to the
18 device and to the people.  So he held me to
19 different standards.
20         He -- he often dismissed my experience
21 and -- and wisdom for unexperienced younger
22 people's opinions, which were based in nothing.
23 The doors were an example, the door hinges for
24 that point.  There -- there's dozens of reasons.
25 I'm not the type that would bring a suit unless

Pasquarello

1 I really believed it was discrimination based
2 on -- on my difference with them and that was my
3 age.
4
5     Q.   You said there are dozens of reasons.
6 I want to make sure that I hear them all --
7     A.   I probably just gave you half a dozen.
8 I don't know.  You know, but the -- lack of
9 equipment, the fact that I had a budget that he
10 never told me I had, I only found out about it
11 when complaining to -- to Chris Hariegal.  He
12 thought that was good to keep the budget -- the
13 discretionary budget from me.  Again, you don't
14 know what you don't know.  So did I ask that I'm
15 going to you for equipment that I had the means
16 to purchase on my own all along, and I don't
17 find out about that until I make formal
18 complaints?
19         It's discriminatory, and it was
20 discriminatory based on my age.  He did not want
21 somebody with more experience shining in that
22 department.  And it became even more so apparent
23 after I extinguished the fire in the mechanical
24 room in Annenberg.  All of a sudden now I was
25 known by Ms. Lamb and Dr. Rich, and that really

Pasquarello

1
2 sent them over the edge.
3         And the hostility ramped up at that
4 point to the point where I was hospitalized
5 twice for chest pains.  I was getting irritable
6 bowel syndrome.  It was a toxic place to work,
7 and it was all because of his pettiness that he
8 didn't want anybody with experience or age
9 working for him.  It was -- it was a terrible
10 place.
11    Q.   Have you told me all of the ways in
12 which you believe Mr. Roche discriminated
13 against you based on your age?
14    A.   You know, whenever you finish a
15 conversation, no matter what it is, an hour
16 later you say, Oh, I should have said that.  So,
17 no, I'll leave it open ended that there was
18 probably more things he did, but right now, in
19 this face to face with you, that's what's coming
20 to the immediate mind.
21    Q.   Well, this is your --
22         THE VIDEOGRAPHER:  There's some
23 feedback.
24         MR. CLARK:  Matt, can you tell where
25 it's coming from so we could isolate a mic?

Page 234

```
                    Pasquarello
1
2         THE VIDEOGRAPHER:  I think it's from
3    Joseph, but I'll monitor it and let you
4    know.
5         Q.  Mr. Pasquarello, this is your
6    deposition testimony, so I want to make sure I
7    give you the opportunity to tell me all of the
8    ways or actions that Mr. Roche took to
9    discriminate against you.  So as you sit here
10   today, can you remember any other actions that
11   he did to discriminate against you based on your
12   age?
13        A.  I know there's not a transcript so I
14   would ask for a read back of what I've already
15   said because I don't want to just keep repeating
16   myself.  Is that possible in this type of
17   format?  I don't know.
18        Q.  Jeff could certainly read back your
19   answer.  Before we do that, is there anything
20   else that's come to mind that you don't think
21   you've already said?
22        A.  I -- I -- I would just reserve my
23   right to amend it if, when I read the
24   transcript, I missed something or misspoke
25   something.  And I know that that's customary,
```

Page 235

```
                    Pasquarello
1    so.
2
3         Q.  Well, it's not, and here is -- here is
4    why.  If you -- if you have further testimony
5    that you give later, we'll have to call you back
6    to ask you about it.  So I want to make sure we
7    cover that now.
8         MR. CLARK:  So let's do this.  Jeff,
9    can you read back his long answer about the
10   ways in which he thought he was
11   discriminated against, and make sure that
12   Mr. Pasquarello doesn't have anything to
13   add right now?
14        THE COURT REPORTER:  Yes, I can do
15   that.
16        MS. SELIGER:  Objection.
17        THE COURT REPORTER:  I'm sorry,
18   Ms. Seliger, did you just say objection?
19        MS. SELIGER:  I did.
20        THE COURT REPORTER:  Okay.
21        MS. SELIGER:  Shaun, if you're asking
22   Mr. Pasquarello to make a legal conclusion,
23   he cannot obviously.  He can recall what he
24   can recall, but, you know, you have his
25   complaint.
```

Page 236

```
                    Pasquarello
1
2         MR. CLARK:  This is not a legal
3    conclusion.  I'm definitely not asking you
4    to tell me what the law is here.
5    Mr. Pasquarello, so we're clear, I'm asking
6    you to tell me what actions happened that
7    you believe were discriminatory based on
8    your age.
9         So let's have Jeff read that answer
10   back.  And if there's something you have to
11   add, you can do that after he's able to do
12   that for you.
13        (The record was read back.)
14        MR. CLARK:  Thank you, Jeff.
15        Q.  Mr. Pasquarello, are there any other
16   actions that you believe Mr. Roche took that
17   were discriminatory based on your age that you
18   haven't already told me?
19        MS. SELIGER:  Objection.
20        THE WITNESS:  Thank you, Jeff, for
21   that.
22        A.  And, Shaun, no, I think that covered
23   it.
24        MS. SELIGER:  Shaun, I think it's --
25   it's unrealistic to expect someone to
```

Page 237

```
                    Pasquarello
1
2    recall hundreds of details or what -- I
3    mean, I'm not saying hundreds.  But if --
4    if there's something that comes up, you
5    will be free to question plaintiff about
6    it.
7         MR. CLARK:  Sure.  I will take your
8    speaking objection under advisement and say
9    that this is Mr. Pasquarello's time to
10   testify about what happened to him, and it
11   should be realistic that he could testify
12   about something that happened last year.
13   So my speaking response to your speaking
14   objection, I think we can continue now.
15        Q.  Mr. Pasquarello, what equipment were
16   you denied by Mr. Roche because of your age?
17        A.  I asked for the laptop so that I can
18   do some work at home.  Especially during the
19   pandemic we needed to work at home a lot.  I was
20   denied a laptop.  I was told that only one per
21   department.  I don't believe that to be the
22   case.  I can't see a company as big as Compass
23   and Crothall only -- saying only one for
24   department.
25        I asked for monitors to be linked to
```

Pasquarello

1  computers in the fire safety office so that we
2  could better track and improve the processes and
3  procedures and work orders and shutdowns, and
4  all that other stuff that the marshals have to
5  do day-to-day.  He wouldn't give me the --
6  the -- regardless of how many times I asked for
7  it and how many formal proposals we put in for
8  it, it was never approved.
9          We asked -- as a department, or as
10 myself I asked for the television set, not only
11 to be used to monitor the news during the unrest
12 that was going on at the city at the time but to
13 also link to the computers so that we can work
14 upstairs remotely, and I can update this --
15 their -- the marshal's office systems as needed.
16 Those were all turned down to me.
17         So basic equipment that other
18 departments would get with the younger managers
19 gleefully and with no problem was given.  Every
20 time I asked for something regardless what it
21 was, it wasn't given.  The TV is a good example.
22 They wanted theirs for pleasure.  I wanted mine
23 for work.  They got them for pleasure.  I didn't
24 get it for work.  That -- that was a clear

Pasquarello

1  discriminatory act.
2          Threatening me with the -- with, I'm
3  an at-will employee whenever I would ask for
4  something was another way he's holding me
5  differently.  I never heard him say that to
6  anybody other than me.
7      Q.   My question was, what equipment were
8  you denied based on your age?  Have you told me
9  all of the equipment you were denied based on
10 your age?
11     A.   That I can recall right now, yes.
12     Q.   How many laptops did the other
13 departments who reported to Mike Roche have?
14     A.   I don't think that's relevant because
15 they didn't have subordinates the way I did.  So
16 Bobby had -- he was an assistant director in the
17 department, him and Bob -- him and Doug.  Each
18 assistant directors had their own computers but
19 they didn't have managers that worked under them
20 the way I did.  I had two managers that worked
21 under me.
22         So you are giving one computer to a
23 three-management team, where you are giving one
24 computer to a one-management team.  So there --

Pasquarello

1  there's the difference.  It's not an
2  apples-to-apple comparison.
3      Q.   I appreciate you're thinking my
4  question is not relevant.
5      A.   Sir --
6      Q.   Let me ask it this way.
7      A.   -- that it wasn't apples to apples.
8      Q.   Let me ask it this way.  How many
9  people reported to Ryan Nowicki?
10     A.   I don't know that.
11     Q.   If I told you based on the 2021 org
12 chart that one, two, three, four, five, six
13 people reported to him, would that surprise you?
14     A.   No.  Ryan is a director of
15 engineering.  That wouldn't surprise me.
16     Q.   How many laptops did his department
17 have?
18     A.   I have no idea.
19     Q.   How many people reported to Jeannie
20 Lai?
21     A.   None that -- well, one that I know of.
22     Q.   What's that person's name?
23     A.   I think Shelby reported to her.
24         Am I correct?  I don't know.

Pasquarello

1      Q.   Are you familiar with somebody named
2  Peter Cabrera?
3      A.   Yes, I know Peter.  Peter reported to
4  her?  Okay.  I didn't know that.
5      Q.   Are you familiar with someone named
6  Steven -- I'll spell the last name if I could
7  read it, N-A-F-A-S-H?
8      A.   Nafash?  Yes, I know the name.
9          But they -- they don't -- they're not
10 life safety the way I am.  They don't have the
11 need for that computer at home the way I did.
12 We're dealing with the safety of the hospital.
13 He's holding a computer away from the man who is
14 responsible for the fire and life safety of the
15 hospital, so you're going to compare that to the
16 lady who is doing payroll and doesn't take that
17 home with her?  I don't see the comparison.
18         I'm not saying your question is not
19 relevant.  I'm saying I don't see how you're
20 making that comparison between the director of
21 fire and life safety needing to be able to log
22 into the system at -- at any time day and night
23 to somebody who is taking care of payroll, or
24 somebody who is ordering pencils.  It's two

Pasquarello

1
2  different things.
3           I needed the computer and because he
4  wouldn't give it to me, I went out and I bought
5  my own and I uploaded or downloaded their system
6  so I can do it.  I did that because of my work
7  ethic and my desire to keep people safe.  I
8  didn't do it because -- any other reason that it
9  was the right thing to do for me, for my
10 conscience.  His conscience has to believe he
11 didn't give me the right equipment to do the
12 job.
13      Q.   I have no idea what question you just
14 answered.  I don't think there was a question
15 pending.  Do you think I am -- strike that.
16           You told me earlier that you were
17 denied equipment and other departments were not.
18 What department is a fair comparison, in your
19 mind, for determining who should have gotten
20 equipment and who shouldn't have?
21      A.   The departments that handle emergency
22 should have it.  Which other departments handle
23 emergencies?  Would be the -- maybe the leader
24 of plumbing, the leader of electric, leader of
25 HVAC.  I believe those directors should have a

Pasquarello

1
2  laptop along with maybe their managers, because
3  we are dealing with the safety of -- of the
4  hospital and equipment.
5           I don't think people who are not on
6  call 24/7 the way -- I'm actually on call 24/7
7  when I work there.  That -- that was part of my
8  job.  I was on call 24/7.  So if I'm on call
9  24/7, I believe that the -- the -- the
10 organization had an obligation to give me the
11 equipment I needed to perform my job if I'm
12 expected to answer calls at all hours of the day
13 and night, weekends, and holidays.
14           So, no, I don't think you're making
15 fair comparisons.  I think we're just trying to
16 say nobody else had it.  Well, I don't think
17 they -- they had the need that I had.  That --
18 that's what I'm saying.  And I think that need
19 is based on Michael not wanting to give it to
20 me.
21      Q.   Who led plumbing?
22      A.   Well, it would fall under the umbrella
23 of the plant, but I -- the manager was a Joseph
24 Ecklof.
25      Q.   Joseph -- I'm sorry, tell me the last

Pasquarello

1
2  name?
3      A.   Ecklof, ran plumbing.
4      Q.   How many laptops did the plumbing
5  group have?
6      A.   I have no idea, but I also don't know
7  if Joseph is on call 24/7 like I did.  So like I
8  said, I'm prefacing -- I'm answering your
9  question with whoever was on call 24/7 should
10 have had a laptop computer.  I don't know who
11 else that was besides me, but I'm only concerned
12 really about me and my department.
13      Q.   As you sit here today, can you think
14 of anybody else who reported to Mike Roche who
15 was on call 24/7 like you were?
16      A.   In an emergency capacity, no.
17      Q.   You told me that Mike Roche held you
18 to deadlines in a way he didn't hold others who
19 reported to him to those deadlines; is that
20 right?
21      A.   Yes.
22      Q.   The deadlines that you had, were they
23 for the same type of projects as the deadlines
24 that other departments that reported to Mike
25 Roche had?

Pasquarello

1
2      A.   Rephrase that, please?
3      Q.   Sure.
4           What kind of deadlines did Mike Roche
5  hold you to?
6      A.   Well, like the fact on the PIP, he
7  wanted my PMs done by the 24th, when company
8  policy is by the end of the month.  There --
9  there's a different standard for me than
10 everybody else.  It's not that I was ever late
11 or missed deadlines.  You know?  He just didn't
12 like the fact that mine were being closed in the
13 books on the end of the month instead of mid
14 month.  Different standard.
15           Understand, though, that a lot of work
16 is not in my control, and that's another way he
17 was able to -- to manipulate the books.  In
18 other words, if there was a -- a life safety
19 deficiency that involved exit lights being out,
20 that comes to me as a life safety deficiency,
21 that goes on my books.  I don't go and fix that
22 light.  None of my people go and fix that light.
23 His electrician goes and fixed that light.
24           Mike would allow the electricians and
25 the plumbers to de-prioritize my work and

Pasquarello

1  prioritize their work, which was more routine
2  than emergency on a normal basis.  And that
3  would force a lot of times me arguing in the
4  morning meeting to get something done so that,
5  1, we don't miss deadline, and, 2, that the
6  hospital was safe.  You're going to allow them
7  to fix a toilet bowl over a standpipe valve.
8      And when I say, Mike, you got to do
9  the standpipe valve first, he would blow it off.
10 You know, why?  Because I was being held to the
11 different standard, but he's able to manipulate
12 the other company -- the other departments to
13 make it harder for me to meet the standards he's
14 self-inflicting on me.
15     Q.  Is it fair to say that your deadlines,
16 generally, are more important because you're
17 involved in life safety issues?
18     A.  I believe that, yes.
19     Q.  Do you know whether Mike Roche held
20 anybody else to a standard of submitting PMs by
21 the 24th of the month?
22     A.  Not to my knowledge.  No.
23     Q.  Did you tell me earlier that you had
24 more work orders than every other department
25

Pasquarello

1  head who reported to Mike Roche?
2      A.  No, I didn't say I had more work
3  orders.  My work orders are different.  My work
4  orders generate those additional interim life
5  safety measures.  Nobody else's work orders
6  generate those.  So for every one work order I
7  have, it's in essence two jobs I have to do,
8  where everybody else just has the one job.  And,
9  again, the work that's attached to those work
10 orders I'm not doing.  I have to then get the
11 other departments to do that work for me --
12     Q.  So in other words, it wouldn't be --
13     A.  Well, I'm not -- without the backing
14 of Michael, which I didn't have, it was very
15 difficult to meet his deadline sometimes,
16 because he allowed the -- the -- the
17 discrimination to go beyond him and not
18 prioritize my work, which is priority work.
19     Q.  Are you saying that it wouldn't be
20 fair to compare the number of work orders that
21 fire safety had with the number of work orders
22 that any other department that reported to Mike
23 Roche had?
24     A.  No, I don't think I would say it
25

Pasquarello

1  wasn't fair.  I'm just saying mine are
2  different.  And I don't do the work.  I have to
3  have others do the work for us.
4      Q.  Was there any other department that
5  reported to Mike Roche that had work orders of
6  the nature that fire safety had?
7      A.  Of the nature?  No.
8      Q.  I think you told me earlier that Mike
9  Roche dismissed your experience and wisdom.  Did
10 I hear you correctly?
11     A.  Yes.
12     Q.  Can you tell me how he dismissed your
13 experience and wisdom?
14     A.  Well, the only example I gave you was
15 the door checks.  You want to put delayed door
16 checks on terminal chute rooms, it is not a good
17 idea.  It wasn't really to code, although it
18 wasn't specifically prohibited by code.  It
19 just -- you don't use those type of door hinges.
20     All my marshals were supposed to have
21 elevator keys to put the elevators in
22 independent mode.  Michael said that they didn't
23 have a need for them.  I sent him the -- the
24 passage in the fire life safety director's
25

Pasquarello

1  handbook that says that's part of their basic
2  equipment and job function.
3      Douglas Rome told him, No, they don't
4  really need it.  And Mike went with somebody who
5  has no fire safety experience, just -- he
6  thought it was good to keep a key away from
7  members.  That did become an issue during the
8  fire actually when the elevator got stuck and
9  they had no means to independently operate it.
10     So I brought that up, and he's, like,
11 keep it out of the report.  He didn't want any
12 negative things in my after-action report.  So
13 we wrote two different reports for that
14 after-action, one with the suggestions and one
15 that he submitted.
16     The -- the fact that fire safety it's
17 not our understanding to know the systems like
18 he wrote down in the thing in the -- in the
19 weeds, as he put it.  That's the plumbers or a
20 licensed master fire suppression plumber would
21 know this -- the drain down -- shutdown
22 sequences, all the different valves.  That's not
23 something a standard fire safety director would
24 know.  And when I told him that, he dismissed
25

Pasquarello

1   it.
2          So these -- these are just some
3   examples of how he would dismiss my -- my
4   experience with, Oh, no, we don't do it like
5   that here.  Well, that's the way the industry
6   does it.  Why don't you do it like that here?
7      Q.   As you sit here today, can you think
8   of any other examples of times when Mr. Roche
9   dismissed your experience and wisdom?
10     A.   Again, I'll -- it's the same answer I
11  had before.  We'll hang up and I'll think of
12  something.  So I think I gave enough examples
13  right now for this record.
14     Q.   So as you sit here today you cannot
15  think of any other examples, other than those
16  that you've already provided, when Mr. Roche
17  dismissed your experience and wisdom?
18     A.   Sir, what I'm saying is, if I think of
19  anything else, I'll tell my attorney and I'm
20  happy to sit here and be questioned by you
21  again.
22     Q.   I just want to know if you can think
23  of any right now or not, so that's yes or no.
24  As you sit here, can you think of any other

Pasquarello

1   examples?
2      A.   No, I can't think of anymore right
3   now.
4      Q.   Why do you believe -- strike that.
5          What's your basis for believing that
6   Mr. Roche dismissed your experience and wisdom
7   based on your age?
8      A.   The -- it's -- it's the only factor
9   that made me different than the rest of his
10  team.  They never doubted my experience.  I
11  mean, I've asked that to him.  I asked it to
12  Bob.  I asked it to Hariegal.  They all
13  acknowledged that none of them have nearly my
14  experience in fire safety.  That -- that, you
15  know, they all said that verbally and in other
16  statements.  But yet Mike would dismiss the
17  guidance I'm trying to give him.  As the subject
18  matter expert, you should never do that, and the
19  only thing different for me was my age.
20     Q.   Were your positions also different?
21     A.   What do you mean?
22     Q.   Did you have different positions than
23  the folks who were not dismissed by Mr. Roche?
24     A.   I'm sorry.  I'm not -- I'm not

Pasquarello

1   following you.
2      Q.   You told me in your answer before that
3   the only thing that was different between you
4   and the others who were not dismissed was your
5   age; is that right?
6      A.   Yes.
7      Q.   Were your positions also different?
8   Did you hold -- strike -- let me strike that
9   earlier comment so I could ask -- the earlier
10  question so I could ask it better.
11         Did you hold a different position than
12  the folks who were not dismissed in the same
13  manner?
14     A.   No.  We held the same positions in
15  different departments.
16     Q.   Did you have different tenure with
17  Crothall than the folks who were not dismissed?
18     A.   My tenure with Crothall was different,
19  but my years in the business were longer.  I'm
20  not -- I would consider myself the subject
21  matter expert in fire safety.  Why you would ask
22  the guy who sends the painter out what to do
23  about elevators doesn't make sense to me.
24     Q.   Who was with Crothall longer, you or

Pasquarello

1   Mike Roche?
2      A.   Mike Roche.
3      Q.   Who was with Crothall longer, you or
4   Doug Rome?
5      A.   I can help you out.  I was the -- the
6   junior guy with Crothall to all those people
7   you're about to name.
8      Q.   Was there anybody more junior than you
9   who reported to Mike Roche?
10     A.   I would say Ron Kanterman when he came
11  aboard in -- in my department.  And then I would
12  say Mario when he came aboard.  So anybody who
13  came in after me was junior to me.  Those are
14  the two that I can think of at this point.
15     Q.   Mr. Kanterman reported to you, right?
16     A.   Yes, he did.
17     Q.   And you reported to Mike Roche?
18     A.   Yes.
19     Q.   Okay.  And Mario Persaud was an
20  administrative person; is that right?
21     A.   Yes.
22     Q.   Okay.  Other than those two, were
23  there anybody -- was there anybody who reported
24  to Mike Roche who was less tenured than you were

Pasquarello

1     at Crothall?
2          A.   I don't -- I don't know that.
3          Q.   Did Mike Roche ever make any
4     derogatory comments to you about your age?
5          A.   After the fire there was a comment,
6     you know, What do you think, you're still a kid?
7     You can't be doing stuff like that.  There --
8     innuendos, you know, I would have to put my
9     glasses on every time we looked at something,
10    like stupid innuendos but, yes, there were.
11         Q.   What innuendos were made by Mike Roche
12    that were disparaging or discriminatory based on
13    your age?
14         A.   We're responding to something, I'm
15    there, Oh, we better take the elevator.  Don't
16    let the old guy walk the stairs, things like
17    that.  I mean, he might -- I don't know if he
18    thought it was a joke or what, but it was very
19    offensive.
20         Q.   Any other innuendos that as you sit
21    here today you can remember, other than, Can't
22    be doing that stuff like that, and, Don't make
23    the old guy walk the stairs?
24         A.   No, I don't recall anything right now,

Pasquarello

1     like I said.
2          Q.   When he said that you should not walk
3     the stairs, was anybody else present?
4          A.   Yeah.  We were walking as a group.
5          Q.   Who else was there?
6          A.   The group usually consisted of Doug,
7     Bobby, Matt, maybe Chris, this one guy Chris
8     Pantoja, he -- he reported to Bobby.  That's
9     usually the rounds people.
10         Q.   You said "usually" twice.  I'm curious
11    who was actually there when that comment was
12    made.  Was Doug, Bobby, Matt, and Chris, in
13    fact, there when Mike Roche made this comment
14    about walking the stairs?
15         A.   I wasn't alone with Mike Roche.  And
16    those are the people that usually accompany our
17    rounds, so that -- that's who would have been
18    there.
19         Q.   Do you have a specific --
20         A.   I know it wasn't just Mike and I.
21         Q.   Do you have a specific recollection of
22    Doug being there?
23         A.   Like I said, no.
24         Q.   Do you have a specific recollection of

Pasquarello

1     Bobby being there?
2          A.   I only have a specific recollection
3     that it was done during rounds, and those are
4     the people who normally do rounds together.
5          Q.   Do you have a specific recollection of
6     Matt being there when the statement about not
7     walking the stairs was made?
8          A.   No.  But Matt was always with me, so,
9     yeah, Matt was there.
10         Q.   Do you have a specific recollection
11    that Matt was, in fact, there when this
12    statement was made?
13         A.   I'll answer it again.  Matt was always
14    with me when we do rounds, so I would say he was
15    there.  The -- am I closing my eyes and
16    picturing Matt next to me, no.
17         Q.   And we're referring to Matt Bond; is
18    that right?
19         A.   Yes.
20         Q.   Do you have a specific recollection of
21    Chris being there when the statement was made?
22         A.   Again, no specific recollection
23    exactly.  I just know it happened during rounds,
24    and those are the guys we do rounds with.

Pasquarello

1          Q.   Where were you in the hospital when
2     Mr. Roche made the statement?
3          A.   We were walking the tunnel coming up
4     out of the morning meeting.  We were going into
5     the Annenberg building.  And when we got into
6     the Annenberg building, Let's take the
7     elevators.  The old guy can't take the stairs.
8          Q.   When was that comment made, the date?
9          A.   I don't know.
10         Q.   Can you approximate for me when it was
11    made?
12         A.   It was made when the tents were
13    erected.  So whenever they were putting those
14    beds down in the -- in the lobby areas for
15    COVID, that's when that comment was made.  I
16    remember the beds being erected and the --
17    medical, gas, plumbing being installed.
18         Q.   Was that sometime at the start of the
19    pandemic in early 2020?
20         A.   It would have been, yeah.
21         Q.   Did you respond to Mike Roche's
22    statement about taking the elevator, not the
23    stairs?
24         A.   I believe my answer back was, Don't

Pasquarello

1  let the old guy kid you.
2
3      Q.  Kid you, K-I-D?
4      A.  Yeah.  Like I could take stairs, don't
5  worry about it.  Like that -- that was the --
6  the give back.
7      Q.  Did you think Mike was joking?
8      A.  As time went on I realized he wasn't
9  joking.
10     Q.  At the time he made the statement did
11 you think he was joking?
12     A.  At the time he made the statement, I
13 was naive to his -- who Mike really was.  So,
14 no, I didn't -- I just took it as a stupid
15 comment from an immature person.
16     Q.  Did you ever complain to HR about that
17 statement?
18     A.  That specific statement, no.
19     Q.  Did you complain to anybody about that
20 statement?
21     A.  I complained to HR about the -- the
22 different treatment.
23     Q.  We'll get to your HR complaint in a
24 second.  I'm curious if you ever complained to
25 HR or anybody else about the statement that you

Pasquarello

1  just testified about?
2
3      A.  No.  Nobody ever asked me about
4  disparaging statements.  You're the first one
5  that ever asked me that question.  That incident
6  popped to my head.
7      Q.  I understand that nobody ever asked
8  you about it.  Did you ever tell anybody about
9  it?
10     A.  No.  No.  There was people who
11 witnessed it, but, no, I didn't bring it to
12 anybody else's attention.
13     Q.  When is the first time that you
14 complained to HR about what you believed was
15 discriminatory behavior by Mr. Roche?
16     A.  When Patty Lizarazo came to my office,
17 I think in February, to tell me I was nominated
18 for manager of the month.
19     Q.  Is that February of 2021?
20     A.  Yeah, I believe so.
21     Q.  Prior to February of 2021, had you
22 made any complaints to Patty or anybody in HR
23 about discriminatory conduct?
24     A.  Bob Shaffer was, like, my confidante
25 at that time.  So all along, yeah, Bob -- I

Pasquarello

1  would complain to Bob, and that's the admission
2  when Bob said, I stand up for you.  I defend the
3  department.  Those -- those comment were based
4  on our conversations and my complaints about the
5  way Mike acted and treated the fire safety and
6  myself differently.
7      So Bob Shaffer was aware well before I
8  made that complaint to Patty Lizarazo.
9
10     MR. CLARK:  Jeff, can you go back to
11        my question and just read it back to me.  I
12        forgot what I had asked.
13     THE COURT REPORTER:  Sure.
14        (The record was read back.)
15     Q.  Okay.  Let me go back to that
16 question, Mr. Pasquarello.  Because I know you
17 told me about Bob, but I want to focus on HR for
18 a moment.  Prior to February 2021 did you
19 complain to anybody in HR about discriminatory
20 conduct?
21     A.  I don't believe so, no.
22     Q.  Okay.  You told me in your answer to
23 the previous question that you complained to Bob
24 Shaffer.  When is the first time you complained
25 to Bob Shaffer about discriminatory conduct?

Pasquarello

1      A.  I don't know exact so I would say
2  mid-2020 would be fair.
3      Q.  Are there any documents, either notes
4  or emails or text messages, that show that you
5  complained to Mr. Shaffer in mid-2020 about
6  discriminatory conduct?
7      A.  No, these are conversations that I had
8  with Bob.
9      Q.  Were they in person or by the -- or by
10 phone?
11     A.  By the phone.  A lot of times I would
12 call Bob on -- on the phone on the way home.
13     Q.  What specifically did you tell Bob in
14 2020 about the discrimination you thought you
15 were suffering from?
16     A.  Well, it was more in the terms of the
17 dismissal of things.  That, you know, Bob, I --
18 this guy is just not listening to experience.
19 He's not listening to my -- you know, my years
20 of experience, and things like that, and he's
21 not understanding what the role of fire safety
22 is versus the role of facilities and
23 engineering.  So we would discuss that.
24     And Bob was in agreement with me on

Page 262

Pasquarello

1      every point.  I would talk to him about, you
2      know, this clique is out of control.  He goes,
3      Listen, everybody knows about the clique.  Just
4      stay away from them.  Let them do what they are
5      going to do.  All right.  So it's not like it
6      was a secret that they had this -- you know, 20,
7      30 somethings that were just doing their own
8      thing.  I don't know how else to put it.  I'm
9      kind of at a loss for words on what this is.
10        Q.   Did you say anything else to Bob
11     Shaffer in 2020, or at any point before February
12     2021, about age discrimination that you thought
13     you were suffering?
14        A.   When he called me up for the -- the
15     doors, I told him this is -- so -- and I made it
16     clear that I felt at that point, this is what --
17     Mike is trying to force me out based on my age.
18     And he said, Don't you worry about it.  That's
19     not going to happen.  You're not going nowhere.
20     That was the conversation that I had with Bob.
21     That probably would have been around February
22     '21, or -- or give or take, whenever that door
23     issue came to his attention.
24        Q.   The door issue you're referring to, is
25

Page 263

Pasquarello

1      that the door issue that we looked at in --
2         A.   With just the doors, yeah, I had that
3      conversation with Bob, I -- maybe it wasn't
4      February.  Maybe it was after that.  Maybe it
5      was June.  I know it's -- one of these exhibits
6      mentions when I had that conversation.
7         Q.   Exhibit 4 was the email entitled
8      Delayed Door Closer.  Is that --
9         A.   No.
10        Q.   -- the door issue you're referring to?
11        A.   No, I'm talking about the work orders
12     for the door.  Bob called me up, and that's what
13     prompted everything.  That -- that's the first
14     letter that I wrote.  I don't remember the exact
15     date I had that conversation with him, but
16     that's when I said, This is how he's starting
17     his -- his documentation now.
18             I don't -- might not have -- might not
19     have presented that exhibit.  You're saying you
20     didn't have it.  But I know Leah said that we
21     got it from you, the numbered copy.  So, you
22     know, maybe we'll get that exact date in another
23     point.
24        Q.   I will show it to you in a moment.
25

Page 264

Pasquarello

1      Let's go back there.  We'll get back there in a
2      second.
3             MR. CLARK:  You know what?  Let's --
4      let's go off the record for ten minutes so
5      I can grab this document electronically,
6      put it up, and we'll identify that date on
7      the record.
8             THE VIDEOGRAPHER:  The time is
9      4:00 p.m.  We're going off the record.
10            (Recess from 4:00 to 4:11.)
11            THE VIDEOGRAPHER:  The time is
12     4:11 p.m.  We are back on the record.
13            MR. CLARK:  Jeff, can you read me back
14     the last question and answer so I know
15     where we left off.
16            THE COURT REPORTER:  Sure.
17            (The record was read back.)
18            MR. CLARK:  Let's mark as Exhibit 13 a
19     four-page document dated May 26, 2021,
20     bearing Bates number CH 928 through CH 931.
21     Let me put it on the screen.  And if I'm
22     adept enough, I'm going to put it in the
23     chat, because I didn't send it to Zack.
24            Actually, let's hold off on doing
25

Page 265

Pasquarello

1      that.
2             (Four-page document dated May 26,
3      2021, bearing Bates stamp CH 928 through CH
4      931 was marked Exhibit 13 for
5      identification, as of this date.)
6         Q.   So, Mr. Pasquarello, hopefully you can
7      see my screen.  You're seeing at least the top
8      portion of what we are marking as Exhibit 13,
9      which is, again, a four-page document.  I'm
10     happy to scroll through the document if you want
11     to read the whole thing, but I really just want
12     to ask about the first sentence there that
13     begins, On May 7.  But let me know if you want
14     to read the whole document before I ask you
15     about that one sentence.
16        A.   No, I -- if we go beyond that, like
17     you said, I will download it and read it.  But
18     that -- that's my original letter to Pat, yes.
19     I believe -- I don't know if it's the original
20     one but I think it is.
21        Q.   Okay.  And --
22        A.   Well -- yeah, follow-up to -- okay.
23     Yes.
24        Q.   All right.  So earlier you were
25

                      Pasquarello
1
2    talking about a conversation you had with Bob
3    Shaffer during which you complained about
4    discrimination, and I think you said that
5    conversation related to the door inspection; am
6    I right so far?
7        A.   Yes.
8        Q.   Okay.  So the top of this Exhibit 13
9    says, underneath the subject line:  On May 7,
10   2021, I received a call from Bob Shaffer
11   regarding the way the 2021 annual fire door
12   inspection was conducted, namely how work orders
13   were utilized.
14            Let me stop there.  Is this a document
15   you wrote?
16       A.   Yes.
17       Q.   Does the first sentence there that you
18   wrote suggest to you that the discussion you had
19   with Mr. Shaffer about age discrimination was on
20   May 7, 2021?
21       A.   No.  I recall -- looking at this, I'm
22   recalling a little bit better.  So we had that
23   conversation, Bob and I, on the 7th.  On the
24   10th I had another conversation with Mike.  It
25   would have been shortly after the 10th that I

1                     Pasquarello
2    had this conversation with Bob regarding how I
3    believed Mike was starting to put together a way
4    to get rid of me based on my age.
5             So it was in -- it was, like, around
6    that time but I would say it was after the 10th.
7    I don't know the exact date.
8        Q.   After the 10th of May 2021?
9        A.   Yes.  After I had that conversation
10   with Mike.
11       Q.   Okay.  Other than Mr. Shaffer and
12   Ms. Lizarazo, did you complain to anybody else
13   at Crothall or at Mount Sinai about the age
14   discrimination that you believed you were
15   suffering?
16       A.   One more time with Chris Hariegal, the
17   day he was -- the day the Joint Commission
18   ended.  Again, I don't remember the exact date,
19   but I asked him to come to my office, and we had
20   a brief conversation and I voiced my concern to
21   him in that conversation.
22       Q.   Do you recall around when that was?
23   Understanding you don't recall the exact date.
24       A.   That's also in one of those letters,
25   so the exact date is there.  I just don't have

1                     Pasquarello
2    anything in front of me.
3        Q.   Do you recall if the Joint Commission
4    audit was sometime in the summer of 2021?
5        A.   It was.  It was -- I just don't
6    remember if it was June, July.  I -- I don't
7    recall.  Maybe -- I don't recall the date.  I'm
8    sorry.
9        Q.   That's fine.
10            So other than Mr. Shaffer,
11   Ms. Lizarazo, and Mr. Hariegal, did you complain
12   to anybody else about age discrimination?
13       A.   No.  I'm assuming Lizarazo is HR, so
14   it would have went to other people, but those
15   were the -- my contacts, if you will.  My chain
16   of command is what I thought I was at.
17       Q.   Did you speak with anybody else in HR,
18   other than Ms. Lizarazo?
19       A.   Not -- no, I don't recall speaking to
20   anybody else.
21       Q.   Do you allege in this lawsuit that you
22   were paid less than other directors and
23   assistant directors because of your age?
24       A.   Yes.
25       Q.   What directors or assistant directors

1                     Pasquarello
2    do you believe -- strike that.
3             Which assistant directors and
4    directors do you believe earned more than you?
5        A.   Bobby Denver, Doug Rome, I believe
6    made more money than me.  I believe when Matt
7    was in my position, he -- he -- it was earlier
8    than I was in that position, so the cost of
9    living increases he was making more money than
10   me.
11       Q.   Are there any other directors or
12   assistant directors who you believe earned more
13   money than you?
14       A.   I -- I don't know.
15       Q.   Do you have any understanding of how
16   Crothall calculates starting salary?
17            Let me ask that better.  Do you have
18   any understanding of what factors go into salary
19   determinations at Crothall?
20       A.   I believe -- I believe in the ad it
21   would say -- what's the word -- just got
22   tongue-tied, it's a long day -- commensurate,
23   whatever, to experience.  So there's a range,
24   and -- and if -- your experience put you at the
25   higher end or the lower end of the range is what

Pasquarello

1  my understanding would have been.
2      Q.   Do you know whether Crothall takes
3  into account tenure with the company when
4  determining how much to pay people?
5      A.   I -- I don't know that.  You know, I
6  don't know their inner workings.  I do know that
7  I have more experience than my younger
8  counterparts, and I was making less money than
9  they were.
10     Q.   Did Mr. Denver or Mr. Rome perform any
11 fire safety functions?
12     A.   No.  I -- you know what?  Let me back
13 up.  Not that it's a fire safety function.  Doug
14 Rome, part of his duties had the elevator
15 mechanics report to him, and one of the elevator
16 tasks was a monthly test of the -- the intercom
17 system and whatnot.  That -- that's tied to the
18 fire system.
19     So, yes, Doug in -- you know,
20 indirectly, his monthly elevator checks, one
21 portion of that check came back to me.  So he
22 would give me a report every month on, you
23 know -- a portion of his report would come back
24 to me each month.

Pasquarello

1      Q.   Have you ever seen or reviewed
2  Mr. Denver's or Mr. Rome's resume?
3      A.   No.
4      Q.   Are you connected on LinkedIn with
5  either Mr. Denver or Mr. Rome?
6      A.   I think -- yeah, I think I'm connected
7  with Bob Denver.
8      Q.   Do you assert in this lawsuit that you
9  were subjected to retaliation for complaining of
10 discrimination?
11     A.   Yes.
12     Q.   Who do you believe retaliated against
13 you?
14     A.   Michael Roche.
15     Q.   What specific actions do you believe
16 Michael Roche took to retaliate against you?
17     A.   My write-ups.  Write-ups came right
18 after I made complaints.  Literally days after a
19 complaint he wrote me up each time.
20     Q.   Were there any other actions that
21 Mr. Roche took that you believe were retaliatory
22 in nature?
23     A.   Sorry.  I believe the -- the main
24 retaliatory act were the write-ups.  The -- the

Pasquarello

1  different deadlines that he set for me over
2  other departments were retaliatory in nature,
3  yes.
4      Q.   Anything else that you think was
5  retaliatory in nature other than the write-ups
6  and the different deadlines?
7      A.   This was something that was ongoing so
8  I would put it more with the deadlines.
9  Whenever I would ask for vacation, I was the
10 only one who had to get my own coverage.  I
11 would have to get my subordinate to sign off
12 each time I asked for some time off, so my
13 earned time off was contingent on my subordinate
14 covering and not my manager providing coverage.
15 So I thought that was a -- another example of
16 being held to a different standard.
17     Was it necessarily retaliatory to my
18 complaints, that -- that was something I
19 probably should have added to the complaint --
20 well, I believe I did add it to the complaint.
21 I'm sorry.  It is in there.  It's a long day at
22 this point, I'm trying to keep dates and stuff
23 straight in my head.  But, yes, that's all I'm
24 recalling at this moment.

Pasquarello

1      Q.   Okay.  So the write-ups, the different
2  deadlines, the vacation issue, anything else
3  that you think was retaliatory in nature that
4  Mr. Roche did?
5      A.   The accusation that I was parking in
6  a -- in a private spot for more money.  I had
7  parking as part of my sign-on agreement, if you
8  will, offer letter.  He tried to -- he implied
9  that he would take that away a couple of times,
10 I believe that was a little retaliatory in
11 nature.
12     Q.   Anything else?
13     A.   No, that's all.  I can't think of
14 anything right now.
15     MR. CLARK:  Let's mark Exhibit 14.
16 It's not Bates stamped because it's the
17 complaint.  So, Zack, I've renumbered my
18 version so mine says 14.  I think the
19 version you have probably still says 13.
20 If you could renumber it and then pop it in
21 the chat.  I'll throw it up on the screen.
22     MR. Pasquarello, you may know, it's a
23 32-page document so putting it on the
24 screen is not going to be all that helpful.

Pasquarello

1
2  But I'm happy to scroll through it if you
3  want, have you download it.  I'm going to
4  be asking you specific questions about
5  individual paragraphs.  So however you want
6  to review it is fine with me.  Just let me
7  know when you are ready to -- to go.  My
8  first question will be, have you seen this
9  before?
10          (Complaint was marked Exhibit 14 for
11  identification, as of this date.)
12      A.   That one I can answer with no problem.
13 So, yes, I've seen it.  I would say because it
14 is such a long document, why don't we go to the
15 areas you want to discuss.  And if I need to
16 review something, I -- you know, I'm not shy,
17 I'll speak up.  And we'll do that.
18      Q.   Good.  Okay.  And that will give Zack
19 time to rename it because I just threw that on
20 him on the record.
21          When was the first time you saw a copy
22 of this complaint?
23      A.   I don't remember the date.
24      Q.   If you look at the very top line, that
25 blue, it says, Filed October 25, 2021.  Do you

Pasquarello

1
2  think you reviewed a copy of the complaint in
3  some form before October 25, 2021?
4      A.   I would assume yes.  I don't think
5  Leah would have filed it without talking to me
6  or showing it to me, so, yes, I'm sure I did.
7      Q.   At the time you first reviewed it, was
8  everything in the complaint accurate?
9      A.   I don't recall if I made notes on the
10 first draft.  There -- yeah, I believe we went
11 back and forth with some notes.  I'm not saying
12 I might not have missed something, but it --
13 it's -- it was reviewed and -- for accuracy.
14 But I do know there's a possibility I probably
15 missed something, but --
16      Q.   Well, let me ask it this way.  As of
17 the date it was filed, which is October 25,
18 2021, you think everything in it was accurate?
19      A.   No, I believe that -- I don't know if
20 it's this document or another document that I
21 had seen with the interrogatories that has one
22 discrepancy in it.  Other than that, I believe
23 everything is accurate.
24      Q.   As you sit here today, can you recall
25 what the discrepancy was?

Pasquarello

1
2      A.   Just names of the older individuals or
3  the younger individuals in the -- in the
4  department.  I believe John Barton and Ron
5  Codier might have been inadvertently added as
6  with the younger names, and maybe Wayne Thomas,
7  there might have been three names that shouldn't
8  have been added.  Those are guys from the plant,
9  not the day-to-day operations with the rest of
10 the team.
11      Q.   We talked about John Barton earlier.
12          The second name you gave me was Ron --
13 tell me the last name again?
14      A.   Ron Codier.  He reports to John
15 Barton.  He is the chief of the plant.
16      Q.   And approximately how old is he?
17      A.   Again, around 50s, give or take.
18      Q.   And then you mentioned Wayne Thomas.
19 What was his position?
20      A.   Wayne Thomas is also a plant
21 individual, and he works one building.  He just
22 works the Hess building.  So the plant guys are
23 really John Barton's guys.  On paper I don't
24 know who they report to, but in reality they're
25 John Barton's people and they run the plant.  So

Pasquarello

1
2  if you think of it as a ship, if you will,
3  they're the engine room, and the rest of us that
4  we have been talking about all this time is the
5  rest of the crew.
6      Q.   Approximately how old is Mr. Thomas?
7      A.   Wayne -- I believe Wayne is getting
8  ready for retirement, so I would say he's
9  probably in his 60s, if not older.
10      Q.   Okay.
11      A.   I think Wayne is the oldest -- oldest
12 member of -- that we're discussing, or that came
13 up in this.
14      Q.   As of the time you separated from your
15 employment in September '21 was Wayne Thomas
16 still employed by Crothall?
17      A.   I believe so.  Wayne, like I said,
18 just works the -- the Hess building.  I don't
19 know if he -- he did not come to morning
20 meetings or anything so you never really seen
21 him.  So I don't know if when I left, he was
22 still there.  I didn't hear otherwise but I
23 can't answer that with firsthand knowledge.
24      Q.   All right.  So let's turn back to the
25 complaint, which we have marked as Exhibit 14.

Page 278

```
                    Pasquarello
1
2    I'm going to start at paragraph 18, which says:
3    Defendant Roche also interviewed plaintiff but
4    he was not the ultimate decision maker in
5    granting plaintiff a job offer.
6             You see that?
7        A.   Yes.
8        Q.   How do you know that Mr. Roche was not
9    the ultimate decision maker in granting you a
10   job offer?
11       A.   That I had to go above his level in
12   interviews, and that the job offer was
13   ultimately decided by Pat Lamb and then Bob
14   Shaffer, with his endorsement.  So Pat Lamb was
15   the decision maker with Bob Shaffer's
16   endorsement.
17       Q.   Did anybody ever tell you that
18   Mr. Roche was not the ultimate decision maker?
19       A.   No.  Nobody told me he was either, no.
20   So I was off -- I was -- indicate -- the
21   indication came from Pat and Bob that I got the
22   job.  Nothing ever came from Michael.
23       Q.   Who does Pat Lamb work for?
24       A.   Mount Sinai Hospital.  She is the
25   client, if you will.
```

Page 279

```
                    Pasquarello
1
2        Q.   Let's look at paragraph 21.  It says:
3    The fire safety department is part of Crothall's
4    facilities engineering division that provides
5    facilities management services to Mount Sinai
6    Hospital.  The engineering division is managed
7    by Defendant Roche.  Plaintiff was one of only
8    two employees over 50 that reports directly to
9    Defendant Roche.  All other employees managed by
10   Defendant Roche are in their 20s and 30s.
11            You see that?
12       A.   I do.
13       Q.   Who are the two individuals who are
14   over 50 that report to -- directly to Defendant
15   Roche?
16       A.   On paper I believe that it was Ron and
17   Wayne, but in reality, I know Ron and Wayne go
18   through the other senior director which was John
19   Barton.
20       Q.   But the two that are referred to here
21   you think are Ron and Wayne?
22       A.   Yes.  Well, Ron Codier, not Ron
23   Kanterman, yes.
24       Q.   Okay.  And I should -- I should note
25   there's a Footnote 1 here so let's look for
```

Page 280

```
                    Pasquarello
1
2    completion because it does reference Mr. Thomas.
3    Footnote 1 to this paragraph says:  Wayne
4    Thomas, who is in his 70s, is an assistant
5    director of engineering in a separate building
6    and is preparing for retirement.
7        A.   Yeah.  I probably didn't catch that.
8    I would have probably said in his late 60s.  But
9    let's not let Wayne know we have him older than
10   he is.  I don't know.  But, yeah, so Wayne and
11   Ron Codier, who I was referencing when -- when
12   Leah asked me that question.
13       Q.   Do you think it was important to
14   distinguish Mr. Thomas as being in a separate
15   building?
16       A.   I do, because on paper I believe Wayne
17   is listed as one of Mike's direct reports, but
18   you never see Wayne.  Wayne is, like, almost
19   autonomous.  He runs the Hess building, and
20   that -- that's what he does.  And he has been
21   there a very long time.  I don't know if he
22   predated the contract or not.
23       Q.   As a fire safety assistant director,
24   you worked in multiple buildings at Mount Sinai,
25   right?
```

Page 281

```
                    Pasquarello
1
2        A.   I worked at, yes, all the buildings.
3        Q.   Do you think it was relevant to note
4    in this footnote that Mr. Thomas was, quote,
5    preparing for retirement?
6        A.   I -- I have no opinion on that.  I
7    don't know.
8        Q.   Do you have any idea why that's
9    written here in this complaint?
10       A.   No.
11       Q.   You think people in their 70s should
12   retire?
13       A.   I would hope people in their 70s can
14   enjoy the rest of their life without having to
15   work, but I would never make a claim like that.
16   You work until you don't want to work no more.
17       Q.   Let's look at paragraph 24.  It says:
18   From the beginning of his employment with
19   defendants, Plaintiff Pasquarello endured
20   significantly harsher and more negative
21   treatment from Defendant Roche compared to his
22   younger colleagues.
23            Let me stop there for a second.  Who
24   is being referred to here as "younger
25   colleagues?
```

Page 282

Pasquarello

2    A.   Denver, Rome, Bond, Ecklof.
3    Q.   What was the fourth name?  Denver,
4  Rome, Bond, and who was the fourth?
5    A.   Joe Ecklof.  He came up earlier.  He
6  is the plumbing manager.
7    Q.   Anybody else that falls within this
8  category of younger colleagues as referred to in
9  paragraph 24 of the complaint?
10   A.   Well, Ryan Nowicki but Ryan is above
11  me so I wouldn't say a colleague.  He's -- I
12  didn't report to him but he -- he was a level
13  above.
14   Q.   Okay.  Anybody else in this definition
15  of "younger colleagues" in paragraph 24?
16   A.   No.  The rest of the younger people
17  were below the level of directors and managers.
18  They were -- or they were managers but a lower
19  level.  So I would stay with the ones I
20  mentioned.
21   Q.   Okay.  Let's go to 25:  When plaintiff
22  joined Crothall in October of 2019 -- excuse
23  me -- Defendant Roche was supposed to do
24  schedule plaintiff for the standard Crothall
25  training.  Upon information and belief,

Page 283

Pasquarello

1  plaintiff's younger colleagues are routinely
2  scheduled for that training promptly after their
3  hire date.
4
5      Let me stop there.  Are the "younger
6  colleagues" that are being referred to here in
7  paragraph 25, are those the same younger
8  counterparts that are referred to in paragraph
9  24?
10   A.   Yes.
11   Q.   How do you know that those folks are
12  scheduled for their training promptly after
13  their hire date?
14   A.   The -- they all mentioned that they
15  went right after they were hired.  They went
16  to -- they went away for -- I don't remember if
17  it was a full week or several days, to a
18  facility and was basically immersed in
19  Crothall's methods.  They all received that when
20  they came aboard.
21   Q.   Where was that facility that they went
22  to for the training?
23   A.   I -- I don't remember.  I think there
24  was more than one place they could have sent
25  you, but I -- I don't remember where they are.

Page 284

Pasquarello

2    Q.   Do you know if it was in Charlotte,
3  North Carolina?
4    A.   I -- I honestly don't remember.  I
5  mean, everything is honest, but I don't
6  remember.  I remember them talking about it.
7  They said how fun a time it was, you know.
8  Because it's work in the day and then hanging
9  out at night.  So even that seemed like it was a
10  young oriented experience, but I -- so they
11  discussed the time that they went, and that was
12  when they were hired.
13   Q.   How long after their hire, if you
14  know, did they go to that training?
15   A.   They indicated it was initial
16  training.  It was when they first came aboard.
17  You know, Oh, you're going to -- you know, it
18  was like one of those, Oh, you're going to go.
19  It's great.  You get away for a while.  You
20  know, okay.  But I never went.  They never gave
21  it to me.
22   Q.   Did any of the fire safety directors
23  or assistant directors go to that training?
24   A.   Anyone before me, I don't know.  I
25  don't know.  And, you know, I'm not even

Page 285

Pasquarello

2  familiar if it's only assistant directors and
3  above or managers and above, but I know it was
4  at least assistant directors.  And I didn't go.
5  I believe Matt went when he -- but he started as
6  a manager in training, so he was with the
7  company longer when he went, but he --
8  nevertheless he went.  Is my understanding he
9  went.
10   Q.   Jump to paragraph 28:  Defendant Roche
11  told plaintiff to draft a proposal to justify
12  the fire marshal's monitor.  To date, Defendant
13  Roche has not approved this essential piece of
14  equipment.
15      Is that an accurate statement?
16   A.   Yes.
17   Q.   Did -- did you provide a proposal to
18  justify the fire marshal's monitor?
19   A.   Yes.  I provided several -- it started
20  off informally as emails back and forth, and him
21  asking me, What's the cost of this?  What would
22  you do with that?  So -- and then it became a
23  more formal draft.  And then when Ron came
24  aboard, he had experience in doing proposals
25  like that, and I had asked him to put together a

Pasquarello

1  proposal.
2          So there were several from me, and
3  then I handed that off to Ron because it was
4  more his day-to-day operations that was going to
5  take over the need for that board, and he also
6  provided several drafts to a written proposal.
7      Q.   It says here:  To date, Defendant
8  Roche has not approved this essential piece of
9  equipment.
10          As of the date of this complaint, did
11  he deny the essential piece of equipment?
12     A.   We were ask -- I was asking for it for
13  over a year, and it never came.  So, in essence,
14  it was not approved.  Is there a written denial?
15  No.
16     Q.   Is there any verbal denial?
17          Let me rephrase that.  Did he ever
18  tell you, Mr. Roche -- let me rephrase that,
19  too.
20          Did Mr. Roche ever tell you that he
21  was denying your request for a monitor?
22     A.   He would make statements like, he
23  doesn't see the need for it and how would it
24  improve.  And then I would explain to him how it

Pasquarello

1  would improve and what the need was, and then he
2  wouldn't say anything again.  So there was never
3  follow-up after we answered -- or I answered his
4  questions.
5      Q.   Yeah, I don't think you answered my
6  question.  Did Mr. Roche ever tell you that he
7  was denying your request for a monitor?
8      A.   No.  He just never provided it, or
9  approved it.  He didn't formally deny it but he
10  never approved.
11     Q.   Let's look at paragraph 29.  It says:
12  Plaintiff also requested a large monitor in or
13  around May of 2020 during a time of civil unrest
14  in this country in order to monitor local events
15  and protect the safety of the hospital
16  buildings.  Defendant Roche denied this request.
17          Let me stop there.  Why did you need a
18  large monitor to monitor civil unrest in the
19  country?
20     A.   I wouldn't call it a large monitor.
21  That's basically I was asking for a -- a TV in
22  the office that we could have, also, hooked up
23  to my computer.  So when I had meetings with
24  vendors and stuff, I could use it as a large

Pasquarello

1  monitor to the computer to bring, you know --
2  make it easier to -- to go over proposals and --
3  and inventories, and things like that.  So that
4  was the one need I had for it.
5          And then the other need was to monitor
6  the news and what was going on.  I mean, as you
7  remember, there was a lot of going on.  There
8  was a protest in and around the hospital, and it
9  would have been good to pick up the 24/7 news
10  cycles that were going on, so that's why I asked
11  for that.
12     Q.   The --
13     A.   So it was to the monitor the -- the
14  events that were happening outside, and then to
15  use -- to better present -- to make our meetings
16  with vendors easier to -- to view shared
17  documents instead of getting up and coming
18  around my desk and looking at my screen, or me
19  trying to turn the screen enough for them to see
20  it.  That was my reasoning I asked for that
21  television and monitor combination.
22     Q.   Does Mount Sinai Hospital have a
23  security staff?
24     A.   They do.

Pasquarello

1      Q.   Were you a member of that security
2  staff?
3      A.   I was a member of the emergency team
4  in the hospital.  So, in essence, yes, I was a
5  part of the -- the hospital's overall -- overall
6  safety team, which would have been public
7  safety, fire safety, and emergency management.
8  So my answer was, yes, I am part of that team.
9      Q.   Is there any reason you couldn't
10  monitor civil unrest in the country from your
11  phone or your computer?
12     A.   Yeah, I believe trying to do it from
13  the computer would have meant I had to have the
14  computer on a streaming network, and how was I
15  going to do my work if my computer was streaming
16  events?  So I didn't think the computer would
17  work.
18          I did install on my phone citizens
19  app, the broadcastify app, so I did download
20  several apps that would have allowed me to get
21  notifications from -- from different resources
22  outside of the -- outside of the hospital.
23     Q.   Did you get notifications on your
24  phone from any of the 24-hour news sources, CNN,

```
                 Pasquarello
1
2  Fox, MSNBC, New York Times, any of those?
3       A.   Just the Apple News cycle, you know,
4  that -- that's already pre-installed in the
5  phone, I got it from there.
6            But this -- this comes back to the
7  different treatment.  I'm asking for that
8  television with specific departmental and
9  operational needs, and it's denied.  Every other
10 assistant director or manager that we've been
11 talking about so far today all have television
12 sets in their office, and none of them had an
13 operational need for them.  They were just for
14 pleasure, and there was never a problem with
15 that.  So, again, that illustrated the different
16 standards for me and others.
17      Q.   Did Mr. Roche ever tell you how those
18 other departments got their televisions?
19      A.   No, he didn't tell me anything.  He
20 approved it.  And then when I asked what was
21 going on, like months later, he said, Denine --
22 Jeannie turned it down, denied it.  I said, What
23 do you mean, Jeannie denied it?  You're --
24 you're the assistant director.  He shrugged his
25 shoulders and said, She's tough.
```

```
                 Pasquarello
1
2            There were several meetings afterwards
3  where he's like, Oh, if you get this done, maybe
4  I'll get you your TV.  I was, like, Mike, I
5  don't have a need for a TV.  It's not like I'm
6  sitting down watching a ball game.  I needed it
7  during a specific time for a specific task.  I
8  still need the computer monitor, though.  And
9  those were how conversations were met.
10           So I do know that the television was
11 already in the office.  We were able to secure
12 TVs from other parts of the hospital that were
13 recycling them, you know, old ones coming out of
14 a patient room, et cetera.  So the TVs were
15 already there.  What needed to be installed and
16 which was installed in all the other offices is
17 the cable to run the television.  That's what we
18 needed done, not the TVs.  The TVs or monitors
19 were provided.  They were free.  I needed the
20 cable to come to my office.
21           And I know all the other offices --
22 because I was there when they installed the
23 cable in Jeannie's office.  I was there when
24 they installed the cable in Bobby Denver's new
25 office.  And I was there when they installed the
```

```
                 Pasquarello
1
2  cable in Doug Rome's new office.  So after my
3  request, three brand-new cable lines were run in
4  different manager's offices for television sets
5  that were for pleasure.  That was after my
6  request and proposal submittals.  So I don't
7  know how you justify that.
8       Q.   The Jeannie you referred to in your
9  answer as having denied the request, is that
10 Jeannie Lai?
11      A.   Uh-huh.  Yes.
12      Q.   Is that a yes?
13      A.   I was drinking.  Yeah, I was drinking.
14 It's a yes.
15      Q.   And Ms. Lai was in charge of finances
16 for the department; is that right?
17      A.   Yes.
18      Q.   Do you think Ms. Lai denied you a TV
19 because of your age?
20      A.   I don't think it was Ms. Lai.  I think
21 Mike just blamed it on her.  Why would she have
22 a say in that?  That was Mike's decision, not
23 hers.  But then later on I came to find out, it
24 wasn't Mike's decision.  I had a discretionary
25 budget according to Chris Hariegal after I spoke
```

```
                 Pasquarello
1
2  to him, and I could have ordered it on my own
3  all along.  Information that was kept from me,
4  again, different treatment than the other
5  managers who had access to their discretionary
6  budgets.  So the -- you know, all this does is
7  show the -- the blatant different treatment I
8  received than my younger counterparts.
9       Q.   You think Mr. Roche was lying to you
10 when he told you that Jeannie Lai denied your
11 request for a TV?
12      A.   Yeah, I do.  And if not, it was his
13 place to override her decision.  So it wasn't
14 Jeannie's decision to make, so why would he say
15 it was her decision?
16      Q.   Let's take a look at paragraph 33,
17 which says, When -- I keep getting a -- a
18 beeping.  Just to confirm, Mr. Pasquarello, are
19 you chatting with anybody on your computer?
20      MS. SELIGER:  No, Shaun, I'm so sorry.
21      That is -- that is my computer, and I
22      cannot figure out how to silence the
23      notifications without silencing us.  If
24      anyone has instructions, I will gladly take
25      them.
```

Pasquarello

1          MR. CLARK:  I wish I did.  So long as
2     I know that it's you and that
3     Mr. Pasquarello is not talking to somebody
4     about his testimony, I'm fine.  I can live
5     with the little beeps.
6          MS. SELIGER:  I'm getting beeps every
7     time I get an email, and I really would
8     like to shut it down.
9          MR. CLARK:  Okay.
10    Q.   Paragraph 33, says:  When plaintiff
11 became assistant director of fire safety, he
12 supervised two managers, Mr. Bond, who had been
13 demoted to manager from assistant director of
14 fire safety for performance reasons, and Joe
15 Jerrain, a man in his 50s.
16         Let me stop there for a second.  Who
17 demoted Mr. Bond?
18    A.   That was before I got there.  I don't
19 know.
20    Q.   Let's go to paragraph 38.  It says:
21 Defendant Roche approached the performance
22 deficiencies of Mr. Bond, plaintiff's younger
23 direct report, very differently than his handing
24 of Mr. Jerrain.  Although Mr. Bond was also not

Pasquarello

1  meeting performance expectations, Defendant
2  Roche refused to support putting Mr. Bond on a
3  performance improvement plan.
4          Let me stop there.  Is that an
5     accurate statement?
6     A.   Yes.
7     Q.   What specifically did Mr. Roche say
8  that suggested to you he was not supportive of
9  putting Mr. Bond on a performance improvement
10 plan?
11    A.   Well, like I said earlier, when it
12 came to putting Mr. Jerrain on a plan, Michael
13 had me sit with Omelfi Garcia to draft the first
14 draft.  Then he had me sit with him to go over
15 the draft and make adjustments.  They were his
16 adjustments.  He had full input on that.  And it
17 was encouraged that I did it.
18         When it came to Mr. Bond, who, quite
19 frankly, had a lot of the same deficiencies that
20 Mr. Jerrain had, I drafted the -- and mind you,
21 I did a lot of coaching and emails and whatnot
22 back and forth before I wanted to move to
23 written performance improvement plans.
24         But when I did draft Mr. Bond's

Pasquarello

1  performance improvement plan based off of the
2  way I was given the help to draft Mr. Jerrain's,
3  Michael wouldn't even review it, and he didn't
4  want to endorse it.  He said, I had to own it.
5  And I told him, I am, like, Mike, this guy is
6  with you -- you go to two-, three-hour lunches
7  with him, which is one of the biggest reasons
8  he's falling short on his performance.  He's
9  always out with you, extended lunches, leaving
10 early.  I said, This is all under your
11 leadership.  I says, I need you to endorse this,
12 or else how am I going to put him on it?  And
13 just refused to endorse it.
14    Q.   What do you mean when you say "he
15 refused to endorse it"?
16    A.   He refused to endorse it.  He told me,
17 If you're going to put him on it, you have to
18 own it.  I says, How do I own it when half the
19 reason he's falling behind is because you're
20 taking him out to two-, three-hour lunch
21 periods?  Or -- or you're sitting down in
22 Bobby's office, you know, watching the stock
23 market or the -- a sports event.
24         I says, He's falling behind because of

Pasquarello

1  your influence in letting him hang out with you
2  doing this.  And I can't write him up for that
3  without putting you in it, so I need you to
4  either endorse this or go that route.  And he's,
5  like, Do what you got to do.  Yeah, he knew I
6  wasn't going to do it without his endorsement.
7     Q.   I think you said earlier that
8  Mr. Roche declined to review the draft
9  performance plan?  Did I hear you correctly?
10    A.   He did.  He didn't want to look at the
11 one I wrote for Mike -- for -- I emailed it to
12 him, so I think he had to see it.  But when I
13 wanted to sit down with him and review it, he
14 didn't want to do it.
15         MR. CLARK:  Let me pull down the
16    complaint for a moment, and, Zack, let's
17    put up the exhibit we marked as 16.  We'll
18    keep it as 16, even though we're skipping
19    15.
20         (Two emails, with Bates stamp numbers
21    CH 1496 through CH 1502, were marked
22    Exhibit 17 for identification, as of this
23    date.)
24         MR. SHARPE:  I had already changed to

Pasquarello

1   17, so I've got to renumber it --
2      MR. CLARK:  Oh, leave it at 17,
3   because I already changed it to 17, too.
4      MR. SHARPE:  Okay.
5      MR. CLARK:  Sorry, guys.  Bear with
6   us.  It's in the chat now.  I'm going to
7   put it up on my screen.  This is a document
8   we're going to mark as Exhibit 17 -- I
9   realize we are skipping over a few numbers.
10  It is a three-page document bearing Bates
11  numbers -- well, they didn't make it on
12  here.  We will supplement the Bates
13  numbers -- actually, Zack, do you have the
14  Bates-numbered version?
15     MR. SHARPE:  Sorry, I was on mute.
16  Yeah, the version I have has the Bates
17  numbers.
18     MR. CLARK:  All right.  Let me use
19  that one.  These are all problems we did
20  not have when we didn't do remote
21  depositions.
22     Okay.  Let's try this again.  This is
23  Exhibit 17.  It is a seven-page document,
24  because this one has the attachments, and

Pasquarello

1   it bears Bates stamp number CH 1496 through
2   CH 1502.
3      Q.  Mr. Pasquarello, do you recognize the
4   two emails that appear on the first two pages of
5   this Exhibit 17?
6      A.  I don't -- not -- I'm trying to look
7   at it here.  All right.  I just brought it up.
8      I think I can answer with -- if you
9   want to go through this a little bit.
10     Q.  My only question right now is, do you
11  recognize the two emails, the one from Mr. Roche
12  to you at the top of the page sent on
13  October 19, 2020 and the one that predates it
14  from you to Mr. Roche, October 17, 2020?
15     A.  Yes.
16     Q.  All right.  In his email to you --
17  well, strike that.
18     Let me start here.  In your email to
19  Mr. Roche on October 17, 2020, you attach a copy
20  of a draft performance improvement plan for Matt
21  Bond; is that right?
22     A.  Yes.
23     Q.  And then you suggest some draft
24  language that you will send to Mr. Bond in a --

Pasquarello

1   I guess a cover email; is that right?
2      A.  I don't know if it would have been a
3   cover email or just the first step of -- of it,
4   yes.  It -- yeah.  Yeah.  Cover email I guess is
5   more accurate.
6      Q.  And then at the end of that same email
7   you say:  Please see attached plan before I give
8   it to Matt.  If you have suggestions, comments,
9   or questions, please let me know.  Thank you.
10     That comment is directed to Mr. Roche,
11  right?
12     A.  Yes.
13     Q.  So you were asking him to review the
14  draft performance improvement plan that you had
15  put together for Matt Bond?
16     A.  I did.
17     Q.  Okay.  And then he responded to you on
18  the 19th, right?
19     A.  Yes.
20     Q.  He says:  The email looks fine.  My
21  only comment is on the development plan.
22     Does that suggest to you that he read
23  the development plan?
24     A.  Yes.  I -- I'm talking about when I

Pasquarello

1   came and spoke to him in person with it.
2   Because if you continue reading:  Do not use my
3   name saying that I recommend it.  It is not
4   under my recommendation.
5      Well, he's falling behind because he's
6   out with you for two-, three-hour lunches
7   sometimes, actually more times than should be
8   acceptable, and you don't want to recommend it.
9   You know, and you want me to take your name out
10  of it as if I didn't even discuss it with you.
11     So at that point I went in and spoke
12  to him.  I was like -- and then I said what I
13  said to you.  I am, like, Mike, you -- I can't
14  give this to him without your endorsement when I
15  believe you're part of the reason he's falling
16  behind on some of his tasks.  And he -- you
17  know, at that meeting he's, like, You have to
18  own it.
19     I was, like, well, you know, what am I
20  owning?  I -- it seemed like the fix was in.  So
21  I -- that -- that's how I interpret everything
22  we just read there in that first paragraph.
23     Q.  Did Mr. Roche ever tell you not to
24  give Matt Bond the performance improvement plan?

Pasquarello

1                    Pasquarello

2    A.  He said right there:  It is not under

3  my recommendation.  So if my boss isn't

4  recommending me put somebody he's clearly biased

5  to in a good way on a plan, I didn't think it

6  was prudent to do at that point.

7    Q.  Take a look at the last sentence

8  before the Thanks salutation, it says:  Whether

9  or not you give this development plan to Matt

10  needs to be your decision as his manager and

11  presented as such.

12        Do you see that?

13    A.  Yes.

14    Q.  What did you understand that to mean

15  when you received this email?

16    A.  I believe that to be Mike's CYA, cover

17  his ass.

18    Q.  Were you --

19    A.  I'm not going to recommend it but you

20  do what you think.  If you're not recommending

21  it, what are you telling me?  It's not under my

22  recommendation.  I don't -- I'm not going to go

23  against your recommendation.

24    Q.  At some point earlier in your

25  testimony you told me that eventually Matt Bond

Pasquarello

1                    Pasquarello

2  was transferred into another position which was

3  somewhat like a demotion.  Do you remember that

4  testimony?

5    A.  Yes.

6    Q.  Who -- who transferred Matt into that

7  position that was somewhat like a demotion?

8      MS. SELIGER:  Objection.

9    A.  Well --

10      THE WITNESS:  I'm sorry, Leah, you

11  said?

12      MS. SELIGER:  I just said objection.

13      THE WITNESS:  Oh.

14    A.  Like I said, I seen it, like, as a

15  demotion, because the position was held by a

16  lower leveled person than the manager of fire

17  safety when he moved there.  But it was a newly

18  drafted position or a newly created position

19  just for Matt.

20      So, again, I believe that was Mike's

21  way of shielding Matt from the deficiencies we

22  were -- that were about to -- and they weren't,

23  like, major or a lot of deficiencies, but it was

24  enough for him to want to start this

25  constructive firing of me, if you will.  So he

Pasquarello

1                    Pasquarello

2  moved Matt out of the department.

3      And then, the -- so, yeah, he made a

4  position to shield Matt from any deficiencies

5  that were about to be discovered in fire safety

6  that were deficiencies in the -- in the area of

7  fire safety that Matt was responsible for.

8    Q.  I think you answered my question in

9  that pretty long answer, but my question was

10  just who, so let me confirm.  Is it true that

11  Mike Roche transferred Matt Bond from fire

12  safety manager to the new position?

13      MS. SELIGER:  Objection.

14    A.  Yeah, I wouldn't know if it was his

15  decision or somebody else's.  I -- I don't know

16  that for a fact.  I have no firsthand knowledge

17  on who moved the personnel around.

18    Q.  Was it your decision?

19    A.  It wasn't my decision, no.

20    Q.  Flip back to the complaint, which I

21  think we've marked as Exhibit 14.  I flipped

22  back on my screen.  You could feel free to flip

23  back on the PDF if you have it open on your

24  computer.

25      Let's look at paragraph 43.  It says:

Pasquarello

1                    Pasquarello

2  In fact, plaintiff had submitted to Defendant

3  Roche revised fire safety response procedures

4  several times prior to the 2021 -- excuse me,

5  the January 2021 fire.  Each time Defendant

6  Roche had prevented plaintiff's suggestions from

7  circulating up the chain of command for feedback

8  and adoption.

9      I'll stop there.  There's more in the

10  paragraph.  What revisions did you make to fire

11  safety response procedures prior to January

12  2021?

13    A.  Well, prior to January 2021, during my

14  initial retraining of the staff, I set clear

15  positions for the -- for the marshals to take

16  during fire alarm activations.  So before I got

17  there, there was nobody -- they didn't have

18  clear directions from the previous leadership as

19  to who was going to respond where during an

20  alarm.

21      So I set up early, during the

22  beginning of every shift, we identified who was

23  going to be person to go to the fire alarm

24  panel, who was going to be the person to go to

25  the area of alarm activation, who was going to

Pasquarello

1  be person to go outside and meet the fire
2  department and escort them into the building and
3  then take them to the area where the activation
4  is occurring.
5         So those were never put in place.
6  That's something I was able to do
7  departmental-wise right away.  I didn't need
8  feedback really from anybody else.  I identified
9  the problem and I corrected it.
10        Institution-wide, there was a problem
11  with the institution.  Public safety wasn't
12  stopping people from coming in.  Like, during an
13  alarm activation public safety should limit
14  access to the building to only first responders.
15  They weren't doing that.  They still don't do
16  that.  They're supposed to put -- take over the
17  elevator.  We don't have enough personnel to do
18  it all the time, so part of their job should be
19  elevator operations.
20        All the trades should send at least
21  one person to the fire alarm panel to provide
22  their area of expertise.  So in other words, if
23  there's an electrical fire, we should have
24  somebody from the electrical department that
25

Pasquarello

1  would know how to isolate that equipment or that
2  circuit so that we can safely control the fire.
3  If there's a plumbing leak, gas, or something,
4  somebody from plumbing should be there to know
5  where the proper valves would be in the proper
6  shutoffs for the area.
7         So I drafted a brand-new plan that
8  outlined every department and what they should;
9  do in a fire response scenario.  So within -- it
10  also included in this case patient transport.
11  Nursing administration.  Because don't forget,
12  we are working in the hospital.  So if we're
13  going to have to move people, we're going to
14  have to move people.
15        Somebody from respiratory should --
16  should respond in an emergency because if
17  there's people on oxygen, they are the ones that
18  are going to have to either get cylinders up
19  there or -- or make the determination, could
20  this person be moved and how we're going to move
21  them.
22        So I put together this big detailed
23  plan.  I had meetings with the departments that
24  we interacted with.  So I had meetings with
25

Pasquarello

1  facilities, so I had the meeting with plumbing,
2  with HVAC, with electric, so they would
3  understand what was coming down the pike.  I
4  had -- any feedback they might have had, john
5  Barton took the lead in providing his feedback,
6  so I took some of his suggestions and
7  incorporated them.
8         We discussed other things that he
9  thought might not have been important.  Some he
10  seen my way.  A couple of things I seen his way.
11  I -- I couldn't give you exact examples right
12  now, but it was a very good back and forth with
13  John.
14        And then it was ready to present up in
15  to the -- that committee I told you before, that
16  I'm a part of, where it had the -- the hospital
17  leadership, Pat Lamb, Dr. Rich, emergency
18  management, public safety, nursing, so we would
19  have those meetings monthly.  They kind of
20  stopped during COVID because you couldn't be in
21  the same room, and then they went remote.
22        But I handed those -- those plans to
23  Mike on several occasions and told him to --
24  that I wanted to have this added to the agenda,
25

Pasquarello

1  our department's agenda for the next meeting,
2  and he just would not do it.  It went on like
3  that for months that he wouldn't do it.
4         Then after the fire, I pointed out to
5  him that a lot of the things I had in there
6  would have made that go a lot smoother, because
7  there -- there was room for improvement during
8  that fire.
9         Again, the fire department -- the
10  lobbies were very congested.  Public safety
11  didn't stop entrance, so the first responders
12  were moving around.  They came in at shift
13  change, so they were taking different elevators
14  instead of one elevator.  So the fire department
15  got separated because public safety and fire
16  safety took them up two different ways instead
17  of coordinating one way.  And these are things
18  that could have been avoided if it was initially
19  presented.
20         I tried to present it again after that
21  in the immediate after-action report, and Mike
22  again refused saying that, This isn't the time
23  to bring that out.  Let's just show what we did,
24  and then we'll do another meeting and ask for
25

Pasquarello

1 the improvements later.
2
3         So that's why I told you earlier I had
4 drafted two, one with the proposed improvements
5 and then one that just really spoke about the
6 event.  And that's -- that's what this paragraph
7 is all about.
8     Q.    The -- are you done with your answer?
9     A.    Yes.
10     Q.    The third sentence of this paragraph
11 says:  Time and again Defendant Roche refused to
12 move plaintiff's submissions forward in an
13 effort to prevent other people at Crothall and
14 Mount Sinai from recognizing plaintiff's
15 abilities.
16         How do you know that he intended to
17 prevent other people from recognizing you?
18     A.    Because I think Mike is very -- I mean
19 we're here because I believe he is
20 discriminating against me because of my age
21 and -- and background.  So, yeah, I don't think
22 he wanted people to know that that was coming
23 from me.  I think he wanted him to be -- the --
24 the person that would present something that
25 would better the place, not -- not a subordinate

Pasquarello

1 of his.
2
3     Q.    Did he tell you that that was his
4 intention?
5     A.    No.  His action said it.
6     Q.    So this statement here, Time and
7 again, all the way to the end, that's
8 speculation on your part, right?
9     A.    It's not speculation.  Time and again
10 I asked him to present it, and he wouldn't
11 present it.  That's all I'm saying here.  I gave
12 him a very cohesive plan.  It was reviewed by
13 facilities.  It was reviewed by John for the
14 facilities part of it.  So I knew the fire
15 safety part and the facilities part was solid.
16         Now we needed input from public safety
17 and -- and nursing, and -- and, you know, the
18 medical side of the hospital at that point.  And
19 Mike refused to present it to the emergency
20 management committee, or whatever -- I'm drawing
21 a blank on what the actual committee's name is
22 that we would meet monthly.
23         But all those departments are in that
24 monthly meeting, and he did not want it
25 presented at that meeting through me.  He just

Pasquarello

1 would not present this for me.
2     Q.    Because he didn't want other people to
3 recognize your abilities, right?
4     A.    I believe that.  That's what I
5 believe, yes.
6     Q.    Okay.  Did Mike Roche ever express to
7 you a disappointment or an issue with you not
8 attending meetings of the emergency committee?
9     A.    Not the emergency committee, I
10 attended all those meetings.
11     Q.    Were there meetings that you did not
12 attend that Mike Roche expressed some issue with
13 you not attending them?
14     A.    There was one issue that Mike wanted
15 to make an issue that I didn't attend.  He said
16 I didn't attend a medical gas shutdown meeting.
17 I sent the representative from the department to
18 that meeting.  I don't remember if it was Matt
19 or -- or Ron, but either/or I had one of the
20 managers there.
21         And I told him, I said, This is a med
22 gas shutdown.  I says, Fire safety's only role
23 in that is the ILSM, which is going to include
24 putting the elevator, carrying the cylinders

Pasquarello

1 into independent mode.  It's going to inquire --
2 require that the tanks are secured to the hand
3 trucks as they're moving through.  And we're
4 going to place extra marshals throughout the
5 hospital in case anything happens.
6         I said, That's it.  This is not a
7 meeting that I need to miss another meeting for.
8 And it came about after the fact.  So I covered
9 the meeting.  I was asked to attend five, six,
10 seven meetings a day.  I attended as many as I
11 could.  Mike's thing in my write-up that I'm not
12 attending meetings, that's misleading.  I was
13 attending a half a dozen meetings almost a day.
14 If I missed one or two, they weren't meetings
15 that were -- they weren't -- I had to prioritize
16 the meetings I went to.
17         So to satisfy his PIP, I said, Mike,
18 what do you want me to do, just turn down these
19 meetings before I know, maybe the other one
20 ended early and I could run over there and make
21 an appearance?  You know, because nothing was
22 ever done without me following up with the --
23 the person holding that meeting or presenting
24 any ILSMs that needed.
25

Pasquarello

1                        Pasquarello

2      So it wasn't -- again, it was just

3  something to pad his write-up.  It's not that I

4  was missing critical meetings that put anybody

5  or anything in that hospital at risk in any way.

6      Q.   Take look at paragraph 48.  It's a

7  long one, so I'll let you take a look at it

8  yourself.  Let me know when you're done.

9      A.   Okay.

10     (Witness reviewing document.)

11    A.   Okay.

12    Q.   I want to focus on the last sentence

13  of that paragraph:  The fire safety department

14  manages over 100 of these impairments every

15  month.

16     Sorry, the second-to-last sentence.

17     And then the last sentence says:  If

18  plaintiff managed every impairment on his own,

19  he would not be able to do any of his work as

20  the head of fire safety.

21     You see those two sentences?

22    A.   Yes.

23    Q.   Are those accurate?

24    A.   It's accurate in the sense that an

25  impairment coordinator was a full-time job at

Pasquarello

1                        Pasquarello

2  that hospital, yes.

3    Q.   Prior to -- strike that.

4     Do you -- are you aware of whether

5  Crothall has ever employed an impairment

6  coordinator to handle the impairments?

7    A.   I don't know that.  I do know that

8  Crothall agreed to the position after hearing

9  the proposal.

10    Q.   Who managed the impairments before

11  you?

12    A.   Well, they weren't managed properly

13  before me but that would have been Matt Bond in

14  his tenure, and then Mark Matthews before him.

15    Q.   Was there a point in time during which

16  Bob Shaffer was the only member of the fire

17  safety department?

18    A.   Now, that's so misleading it's not

19  even funny.  Yeah, Bob Shaffer started the

20  department there when it started.  Bob knew

21  he -- it wasn't a one-man job, and he hired

22  two -- two managers to run it with him.  His

23  first one he managed was a retired battalion

24  chief or deputy chef from New York City Fire

25  Department.  What was his name?  Anyway.

Pasquarello

1                        Pasquarello

2     He -- and then he was able to get a --

3  another manager, and then it -- it grew from

4  there.  So, no, Bob Shaffer he admitted it to me

5  himself, it was never a one-man department.

6    Q.   The second sentence that we read says,

7  or starts:  If plaintiff managed every

8  impairment on his own.

9     Let me stop there.  At any point

10  during your employment did you manage every

11  impairment on your own?

12    A.   Yeah, there was times I was doing most

13  of the impairments as I was training -- not

14  most, all of the impairment as I went training

15  the staff to be able to respond to these

16  impairments.

17     So, again, when we are going to impair

18  a system, it needs a full understanding of what

19  that impairment is going to affect and any means

20  we need to do to mitigate any possible effects.

21  That's the ILSM.

22     So an impairment coordinator not only

23  does he have to coordinate with the shop who is

24  going to do the work, he needs to inspect the

25  area, make sure that it's safe to conduct the

Pasquarello

1                        Pasquarello

2  work that they're looking to conduct, an example

3  with that would be hot works or something like

4  that, and he also needs to be able to see what

5  that impairment is going to affect, and what

6  ILSM measures, if any, are needed to employ.

7     So, yeah, being an impairment

8  coordinator is a very important job.  Now, when

9  was made this suggestion, we were doing a lot of

10  impairments.  Now, don't forget, the hospital is

11  under constant renovations, and we are in the

12  midst of Joint Commission preparation.  So it

13  was even more impairments than would have

14  normally been.

15     So it -- it required somebody's full

16  time attention to -- to -- to run those properly

17  and to make sure that things went off smoothly

18  and on time.  So, yeah, it was a full -- an

19  impairment pos -- for a hospital of that size,

20  14, 15 buildings, and -- and all the work, I

21  mean, it was a -- was it a couple million square

22  feet, that hospital, needed a full-time

23  impairment coordinator.

24     And we presented it.  We -- we gave

25  them numbers.  We gave them reasons.  And Chris

```
                    Pasquarello
1
2    and -- and Ron, not -- well, Ron helped me
3    present it.  Chris, Bob, and even John Barton
4    all agreed that, yeah, that that would be a good
5    thing to help every -- everybody else.  It would
6    make everything better if we could get an
7    impairment coordinator.
8         Q.   I'm sure some part of that answer
9    answered the question I asked, but the answer
10   was so long, I don't remember if it did.  We are
11   going to be here for a very long time if we're
12   going to do three pages of answers to one
13   sentence of question.
14             At any point during your 23 months of
15   employment at Crothall did you have a one-man
16   department in fire safety?
17        A.   Yes.
18        Q.   When?
19        A.   My last three months there.
20        Q.   So from June of 2021 to September of
21   2021 you were the only member of that
22   department?
23        A.   Yes.  When Omelfi left, I became the
24   only member of that department.  I think Ron
25   left before her so that's when Omelfi left.
```

```
                    Pasquarello
1
2         Q.   From --
3         A.   And I never really had Omelfi so even
4    longer than that.
5         Q.   From October of 2019 until whenever
6    Omelfi left, whether it was in June 2021 or some
7    other date, there were at least two members of
8    the fire safety department; is that right?
9         A.   For that 11 months it was me and Matt,
10   and then when -- Matt left right after Ron came
11   in, when -- then there was -- I don't even know
12   if it was a month when Ron and Omelfi were
13   together.  But like I said, I never really had
14   Omelfi.  Omelfi was still busy training Matt for
15   his new position and training Mario for his
16   position, which was the replacement for Omelfi.
17             So I never really had her working as a
18   manager.  She was really only helping at that
19   point get TeamDocs and -- and the books up to
20   date, really the -- the inventories we were
21   working on together.
22             So, yeah, I ran that department alone
23   I would say from the time Ron left, you know --
24   not to say Omelfi's help wasn't warranted, but
25   it was -- had nothing to do with the day-to-day
```

```
                    Pasquarello
1
2    operations of the department.
3         Q.   Look at paragraph 60.  It says:  On
4    May 7, 2021, plaintiff discovered that Defendant
5    Roche had not only prevented others from
6    recognizing plaintiff's skill, but he was also
7    denigrating plaintiff in front of other Crothall
8    employees, including Mr. Shaffer.
9              You see that?
10        A.   Yes.
11        Q.   How did you discover that Mr. Roche
12   was denigrating you?
13        A.   Well, when somebody says, I always
14   have to defend you, that doesn't mean somebody
15   is talking good about you.  So I'm assuming, you
16   know, guys like Chris Hariegal, he's never on
17   site so he only knows what somebody like Mike
18   tells him.
19             So if you're going to come here and
20   think there's something missing when all the
21   measurable parts of the department have been
22   better since I'm there and you're going to
23   believe it, it has to be bad talk from the
24   person you're listening to.  So that -- that's
25   where that comes from.
```

```
                    Pasquarello
1
2         Q.   I don't think that answered my
3    question.  How did you discover that Mr. Roche
4    was denigrating you?
5         A.   When Bob Shaffer says, I always have
6    to defend you from him.  So that -- those were
7    the words that made me know he's talking,
8    denigrating me, you know, to others.
9         Q.   What did Mike Roche say that was
10   denigrating about you?
11        A.   I don't know.  All I know is that, you
12   know, somebody is saying he has to defend me.
13   And when you read his answer, he -- he answers
14   that most of what I'm saying is right.  So I
15   don't know exactly what he was saying behind my
16   back.
17        Q.   Did you ask what he was saying that
18   denigrated you?
19        A.   Probably not at that point.  I don't
20   recall.
21        Q.   Did you ask at any point?
22        A.   Not I -- I don't recall.
23        Q.   Mr. Shaffer was the head of fire
24   safety; is that right?
25        A.   Mr. Shaffer was the head of systems,
```

Pasquarello

1
2  as far as -- is what I believe his title was
3  when I was there.
4       Q.   The system director of fire safety,
5  right?
6       A.   If that -- if that's -- yeah, if
7  that's his title, that's his title.
8       Q.   Do you believe it's inappropriate for
9  your manager to speak with the system director
10 of fire safety about your performance as an
11 assistant director of fire safety?
12      A.   If he's talking truthful and honest,
13 no.  But if he's making, you know, denigrating
14 and derogatory statements that aren't true,
15 yeah, it's a problem.  And I know the statements
16 he was making is not true, so, yeah, there was a
17 problem with that.
18      Q.   Didn't you tell me a moment ago that
19 you have no idea what Mr. Roche was saying that
20 was denigrating to you?
21      A.   I know what I was told from
22 Mr. Shaffer is that I was missing deadlines
23 and -- and I was missing work, which I -- the
24 paperwork shows I didn't miss anything.
25      Q.   What else did Mr. Shaffer tell you

Pasquarello

1
2  about what Mr. Roche was saying to denigrate
3  you?
4       A.   I don't recall.  That's what I recall.
5       Q.   Is it inaccurate that you have missed
6  deadlines?  It's yes or no?  Is it inaccurate
7  that you missed work?
8       A.   Yes.  That's definitely inaccurate.  I
9  didn't miss any work.
10      Q.   Paragraph 61 says:  On May 10,
11 plaintiff questioned Defendant Roche about
12 disparaging comments he made to Mr. Shaffer.
13      What specifically did you say to
14 question Defendant Roche about disparaging
15 comments he made?
16      A.   I asked him what did Bob mean that he
17 always has to defend me.
18      Q.   Anything else that you did to question
19 Mr. Roche about disparaging comments?
20      A.   That -- that's all I recall.
21      MS. SELIGER:  I'm not at all trying to
22 rush you.  I just was wondering if you have
23 any sense of how much more you have?
24      MR. CLARK:  It largely depends on the
25 answers.  I really don't have all that many

Pasquarello

1
2       questions.  But based on the answers I'm
3       hearing, it could be another 60 minutes or
4       so.  It depends -- largely depends on the
5       answers I think.
6       Q.   Take a look at paragraph 70.  It says:
7  Plaintiff pointed out to Defendant Roche that he
8  was treated differently than his younger
9  counterparts and also held to a different
10 standard in terms of work performance.  In
11 response, Defendant Roche made clear to
12 plaintiff that his days in fire safety were
13 number -- were numbered.
14      Excuse me.  You see that?
15      A.   Yes.
16      Q.   How did Defendant Roche make clear to
17 you that your days in fire safety were numbered?
18      A.   He said to me he doesn't see me
19 lasting there more than sixth months.
20      Q.   When was this conversation?
21      A.   That was the conversation that was
22 right after Bob Shaffer called me and right
23 before he wrote me up.
24      Q.   Sometime in May or June of 2021?
25      A.   Yes.  If that -- if that's when that

Pasquarello

1
2  all happened, yes.  I think we read before, it
3  might have been the May 10th, but I could be
4  just confusing two documents.
5       He also said he had no intentions of
6  firing me but he doesn't see me there after
7  six months.  Maybe he could get me transferred,
8  which was starting to fit the MO I seen he did
9  to Joe Jerrain, even though it was me that, you
10 know, pushed for Joe to get transferred and not
11 fired.  And it also -- be -- he also said that
12 he doesn't --
13      Q.   I don't think there's a question
14 pending.  Are you answering a question I've
15 asked?
16      A.   Well, I'm answering the rest of that
17 point.
18      Q.   Okay.  You can continue.
19      A.   You know, he said my days were
20 numbered, and I asked him, What do you mean that
21 they're numbered?  That's what you asked me.  He
22 said six -- I don't see you here more than six
23 months.  I don't see how anything is going to
24 change.  But I'm not firing you.  Maybe we'll
25 transfer you.

Pasquarello

1
2        I mean, that -- that was leaving a big
3   question mark over everything.  You're not
4   firing me but you don't see me here in six
5   months.  I mean, that's talking out of both
6   sides of your face.
7        Q.   Take a look at paragraph 97.  It
8   refers to Defendant Roche's demotion of you.
9   You see that?
10       A.   Yes.
11       Q.   Between the time you started your
12  employment and the time you separated your
13  employment, did your title ever change?
14       A.   No.
15       Q.   Between the time you started your
16  employment and the time you separated your
17  employment, did your salary ever decrease?
18       A.   No.
19       Q.   Between the time you started your
20  employment and the time you separated your
21  employment, did your work location ever change?
22       A.   No.
23       Q.   Between the time you started your
24  employment and the time you separated your
25  employment, did any aspect of your duties

Pasquarello

1
2   change?
3        A.   I left before I can answer that
4   question.  So when I left, I was running the
5   department by myself, so I was still the
6   de facto director of that department.  The
7   director that was coming in had the same exact
8   job title, or -- yeah, job description, not job
9   title, job description as mine.
10       So I don't know what was going to
11  change, but obviously my duties were going to
12  have to change if he was doing the same duties I
13  was just doing.  So it became clear that even
14  though I was going to still be called an
15  assistant director, I was being denoted down to
16  one of the manager's positions.  Which one I
17  don't know.  Well --
18       Q.   Did any --
19       A.   -- I do know, because Bernie asked me
20  which one did I want to do.  He asked me if I
21  wanted to be the administrative manager or go
22  upstairs and work with the -- the marshals
23  directly.  So, yeah, it was clear that I was
24  losing my responsibilities.
25       Q.   Did anybody tell you that your

Pasquarello

1
2   position would change from assistant director to
3   manager?
4        A.   No, what Bernie Nunez told me was my
5   role was changing.  My title was staying the
6   same.  But just because my title stood the same
7   and now I was doing the manager's work and he
8   was going to take over the director's work,
9   yeah, that -- that's in essence a demotion even
10  if it's not in title or salary.
11       Q.   Do you recall when Mr. Nunez started
12  as the director of fire safety at the Mount
13  Sinai Hospital?
14       A.   I don't remember the date.  I do
15  remember he came in and introduced himself, but
16  he never really started while I was there.
17       Q.   So as of September 2021 when you
18  separated, he was not yet employed at the Mount
19  Sinai Hospital?
20       A.   No, I didn't say that.  I said he
21  wasn't assuming the responsibilities of the
22  director of our department.  He was -- I don't
23  know what he was doing.  He said he was helping
24  out other departments -- other hospitals for
25  their Joint Commission surveys, readiness, so

Pasquarello

1
2   he -- he was, like, helping out other -- other
3   places is what he told me.
4        So he -- he and I never really worked
5   together.  It was a couple -- it was days at the
6   most.  I -- I don't remember exactly how long,
7   but Bernie and I didn't really work together as
8   director and assistant director or manager.
9        Q.   As of September 21, 2021, were you
10  still performing the duties as the assistant
11  director of fire safety?
12       A.   Yes, I was.
13       Q.   What damages do you claim you've
14  suffered as a result of the discrimination and
15  retaliation that you allege in your complaint?
16       A.   Physical sickness at the time,
17  palpitations, IBS.  Loss of my reputation in the
18  field, at least at that hospital, and anybody
19  else Mike was talking to.
20       Q.   Anything else?
21       A.   Not -- not that I recall at this
22  point.  I mean, that's the main things that got
23  me.
24       Q.   You said loss of your reputation.  Did
25  anybody ever tell you -- strike that.

Pasquarello

1
2      Related to your loss of reputation,
3  did anybody ever say to you that Mr. Roche had
4  made comments about you after you separated from
5  your employment?
6      A.   After I -- no, nobody said anything.
7  I haven't had contact with any of his inner
8  circle since I left there.
9      Q.   Did anybody ever say to you anything
10 that suggested that you no longer had the
11 reputation you previously had after you
12 separated from your employment?
13     A.   It -- it -- to be pushed down in front
14 of everybody the way it happened, yeah, it -- it
15 hurt within that group my standing as an
16 experienced fire safety professional.  It -- you
17 know, they -- they, in Chris' words, rather have
18 the administrator over the -- safety
19 professional.  And I took that as a slight to --
20 to my reputation in both sides of the -- the
21 field, if you will.
22     Q.   Chris told you they would rather have
23 an administrator than a fire safety
24 professional?
25     A.   Yeah.  I asked him straight out.  I

Pasquarello

1
2  said, why would -- I never had a full staff.
3  Why is Bernie coming as the full director?  And,
4  you know, I said, What's his experience in fire
5  safety?  So he says, There's nobody questioning
6  your experience with fire safety.  You're
7  certainly more experienced than he is there, but
8  he's more -- what the -- the Crothall way.
9       So my question then was, so why isn't
10 he coming as my assistant to help me get this
11 department fully on track?  The only thing
12 that's lacking here, if it is, in fact, lacking,
13 is the administrative portion of the job.  So
14 you're going to put somebody with no practical
15 experience in the field of emergency management,
16 risk assessments, fire safety, life safety,
17 first responder, a step below the guy who knows
18 how to run TeamDocs?  Which you never gave me
19 the full training in?
20      So, yeah, that -- that's not good.
21 It's not -- I didn't find it right, and I
22 thought it was based on the disparaging remarks
23 that he must have been getting from Mike Roche.
24 This is why we're here.
25     Q.   Did you suffer from IBS before

Pasquarello

1
2  starting your employment at Crothall?
3      A.   No, never had a problem.
4      Q.   When is the first time you were
5  diagnosed with IBS?
6      A.   When I went to -- to my doctor with
7  the second time, and they changed my -- my
8  medicine for the hot -- my blood pressure was
9  up.  So I told him about my stomach, and I don't
10 even know if it was a full diagnosis.  He said,
11 Ah, it's just a touch of IBS.  Are you under
12 stress?  And then I told him what was going on,
13 and he says, That makes sense.
14     Q.   When was that?
15     A.   Probably June, July of -- what was
16 that, '21?
17     Q.   And who was the doctor who told you it
18 was a touch of IBS?
19     A.   Dr. Ceka.  He was my cardiologist on
20 Staten Island.
21     Q.   Did Dr. Ceka provide -- prescribe you
22 any medications for your IBS symptoms?
23     A.   They gave me, like, a -- yeah, it was
24 a medicine to -- to, like, help you calm down,
25 but I -- I didn't take it.  I didn't -- I don't

Pasquarello

1
2  believe in taking that kind of pills.  But he --
3  he did give me, like, some kind of -- I don't
4  remember the name of the prescription.  I just
5  never took it.  I never filled it either.  But
6  he prescribed something that would supposedly
7  calm me down and relieve it, but I -- I don't
8  take anything that would alter anything.
9      Q.   What specific symptoms of IBS did you
10 have beginning in 2021?
11     A.   Stomach pains, diarrhea, you know.
12 Every time I got into work I felt my stomach was
13 flipping upside down.
14     Q.   Do you still suffer from IBS?
15     A.   I'm -- no, I'm -- I'm feeling better
16 with that.
17     Q.   When did you start feeling better?
18     A.   When I got out of that environment.
19     Q.   How long after leaving Crothall did
20 you start feeling better?
21     A.   I would say months, maybe six months.
22     Q.   You said you suffer from heart
23 palpitations?
24     A.   This is only about six.  About four
25 months, five months it took me.

Pasquarello

1
2      Q.   You said you suffer from heart
3   palpitations; is that right?
4      A.   Yeah.  There was days I was at work,
5   my chest was pounding.  My head was spinning.
6   It felt like everything was closing in around
7   me.  I went from --
8      Q.   Prior --
9      A.   -- ER one day for it, and then I went
10  to my own doctor after that another time.
11          THE COURT REPORTER:  I believe there
12      was a part of that answer I'm sorry I
13      didn't hear.  I went from something, and
14      then you said, I went to my own doctor
15      after that?
16      A.   I went to the emergency room one day
17  at work when I was feeling that way.  That was,
18  I think, in June.  And then it happened again in
19  July, and that's when I went to my own doctor.
20          THE COURT REPORTER:  Thanks.
21      Q.   Prior to your employment at Crothall
22  had you ever had heart palpitations before?
23  A.   No.  Well --
24  Q.   Did you have --
25  A.   -- I went through a period after 9/11

---

Pasquarello

1
2   where I didn't feel good, I was injured at the
3   Trade Centers, so, yeah, there was times I -- I
4   was sick.  So -- but other than that, I was
5   always in good health.  So the only medical
6   problems I had with -- with my heart and lungs
7   was an injury that we can document, we know
8   where it came from.
9      Q.   That was related to 911?
10      A.   Yeah, I was -- I was on scene, I was
11  caught in the collapse of both towers actually
12  that day.  So I wound up getting some lung
13  injuries, and then -- so my lungs don't fully
14  function as pro -- you know, as they should, but
15  they thought it was the heart and then they
16  found out that it wasn't my heart.  It was my
17  lungs causing the palpitations.
18      Q.   Did you see the FDNY doctor about that
19  condition sometime after 9/11?
20      A.   I see them every year.
21      Q.   Are you on a three-quarter disability
22  pension right now?
23      A.   I am.  That was the pension you asked
24  my other income earlier, it's a three-quarter
25  disability pension from the fire department.

---

Pasquarello

1
2      Q.   When did you retire?
3      A.   2003.
4      Q.   When did you start looking for a new
5   job while you were employed at Crothall?
6      A.   I didn't look for a new job.  I was
7   getting ready to -- to leave.  I felt like I was
8   being forced out, and I don't want a blemish on
9   my record to -- to have somebody, you know, fire
10  me.  It just was coincidental that I was given a
11  call from an old colleague that had an opening
12  at Columbia University.
13          And I interviewed.  I was given the
14  offer.  It was a step backwards for me at that
15  point in my career, but I felt it was worth --
16  worth it for my health and my reputation to --
17  to leave at that point, so I went to Columbia.
18      Q.   Who is the former colleague who called
19  you about the job?
20      A.   Oh, man.  Give me one second.  I don't
21  know how in the world I'm drawing a blank on --
22  Paul -- Paul Girardi.  Paul Girardi was the
23  director of -- of the program, and I became the
24  manager in the Manhattanville campus.
25      Q.   And when did Mr. Girardi first call

---

Pasquarello

1
2   you about the job at Columbia?
3      A.   Couple of weeks before I took it.
4   Maybe -- it only took about two weeks to get
5   on-boarded there, so it was pretty quick.
6      Q.   Was that sometime in August or
7   September of 2021?
8      A.   I would think September because I
9   started in October, so it was mid-September he
10  called me.
11      Q.   At any point in 2021 did you apply for
12  any other positions, other than the position
13  that you eventually took at Columbia?
14      A.   No.
15      Q.   Have you ever sought treatment, either
16  psychiatric or psychological or from a social
17  worker, for mental health condition?
18      A.   Well, during our 9/11 physicals every
19  year, part of that is a mental health survey, so
20  you do talk to the social worker every year.
21  But I've never been under treatment from a --
22  from a social worker or psychiatrist or anything
23  like that, if that's what you're asking.  I'm
24  not sure if I answered -- if I understood the
25  question fully.

Pasquarello

1
2     Q.   Did you seek treatment for any
3  emotional distress that you suffered as a result
4  of any actions by anybody at Crothall?
5     A.   No.
6     Q.   Did you discuss your mental health
7  with Dr. Ceka?
8     A.   Not at this particular time, no, but
9  Dr. Ceka knows my -- my history.  I -- he's been
10 my doctor for a long time, so he knows what I
11 went through after the 11th.
12    Q.   When is the last time you saw an FDNY
13 doctor?
14    A.   It was a couple of months ago.  As a
15 matter of fact, I have all my follow-up
16 appointments I have to do, so it was recent.
17 What is this now?  September?  I could get you
18 the exact date if you need it.  It was a few
19 months ago.
20    Q.   You won't need to.
21 RQ     MR. CLARK:  Let me make a request on
22    the record.  I don't think we've gotten it
23    and I'm happy to be corrected if we have,
24    but we'll need a HIPAA authorization for
25    the FDNY medical file.  I'll follow up in

Pasquarello

1
2  writing on that.
3       MR. CLARK:  All right.  Let's take
4  five.  I am hopeful that we are close to
5  wrapping up to -- Mr. Pasquarello and
6  everybody on the call, but let me take five
7  to go over my notes, and then we'll come
8  back.
9       THE VIDEOGRAPHER:  The time is
10 5:39 p.m., and we are going off the record.
11    (Recess from 5:39 to 5:45.)
12    THE VIDEOGRAPHER:  The time is
13 5:45 p.m., and we are back on the record.
14    Q.   Mr. Pasquarello, welcome back from the
15 break.  Earlier we talked about other sources of
16 income that you currently received -- do you
17 currently receive Social Security disability
18 insurance?
19    A.   No.
20    Q.   Okay.  Have you applied for Social
21 Security disability?
22    A.   When I first retired, I did, but I --
23 when I didn't get it, I went back to work.
24    Q.   So you applied but it was denied?
25    A.   Yes.

Pasquarello

1
2       MR. CLARK:  Okay.  I do not have
3    further questions at the moment.  I am
4    going to reserve the right to recall you
5    based on some documents that I don't know
6    that we have gotten, particularly the --
7    the HIPAA authorization for your FDNY
8    medical records, which do have some
9    relevant information in them.  So hopefully
10   we don't need to recall you.  I am
11   reserving the right on the record.  And I
12   will turn it over to Ms. Seliger if she has
13   questions.
14    MS. SELIGER:  Okay.
15 EXAMINATION BY MS. SELIGER:
16    Q.   I'm going to ask just a very few
17 amount of questions.
18       Mr. Pasquarello, I just want to go
19 back to very early today you were answering
20 questions about who your boss or supervisor was.
21 And I believe at one time you said Bob Shaffer
22 was the boss, and another time you said Mike
23 Roche was the boss.  Can you clarify what you
24 meant?
25    A.   Yes.

Pasquarello

1
2       MR. CLARK:  Objection to form.
3    A.   I know that Mike Roche is my direct
4  supervisor.  I report directly to Mike.  I do
5  know that I -- I had the assumption based on
6  systems fire safety -- you know, director of
7  systems and that he was the final say or the
8  final interview.  I believe Bob is higher on
9  the -- the chain of command, if you will, than
10 Mike was.  I could have been wrong about that,
11 but that was my impression of Bob all along.
12 But I know Mike Roche is my direct supervisor.
13 He's always been.
14    Q.   Okay.  During one of the breaks you
15 just let me know a correction regarding
16 depositions, Shaun asked you if you had been
17 deposed.  Can you make any corrections about
18 times you've been deposed.  I don't -- I can
19 rephrase that question.
20       Was there a time you were deposed that
21 you didn't mention on the record?
22    A.   I didn't -- I was deposed for the 9/11
23 Victims Compensation Fund, so that -- that was
24 probably the first deposition I ever did.  So
25 that was back in 2002.

Pasquarello

1
2    Q.   Okay.
3    A.   But I didn't remember that one as a
4 deposition but it was.
5    Q.   At some point today you discussed
6 meeting with Mike Roche for one-on-ones.  Do you
7 recall whether or not he took notes during those
8 meetings?
9    A.   Yes.  Mike took notes in all the
10 meetings.
11   Q.   You saw him taking notes?
12   A.   Yes.
13 RQ   MS. SELIGER:  Okay.  I am going to note
14 that we requested those documents, and we did not
15 receive notes from one-on-ones.
16   Q.   When you -- when you met with Pat
17 Lizarazo any -- any of times you described
18 today, did you see her taking notes?
19   A.   Yes.  She took copious notes.  Pat
20 took a lot of notes while we were talking.
21 RQ   MS. SELIGER:  Okay.  I'm also going to
22 note for the record that we're going to request
23 the production of those notes.
24   Q.   You mentioned today that you saw
25 Dr. Ceka at various points during your tenure

Pasquarello

1
2 with Crothall.  When you saw him, did you talk
3 about stress at work?
4    MR. CLARK:  Objection to form.
5    A.   I did.  Like I said, after I went --
6 it was around July, I went in, I wasn't feeling
7 well.  My -- I was -- like I said, I was getting
8 chest pains.  Seeing that my blood pressure was
9 a little high, they -- they prescribed a second
10 medication.  I told him about the stress and how
11 my stomach was upset, and he, like I said
12 earlier, prescribed another medication.  It's
13 supposed to be like a relaxer.  That one -- I
14 don't take that kind of medicine, so I never
15 filled the prescription, but it was prescribed.
16    And then he gave me some tests, you
17 know, like they -- they always do, EKG and
18 whatnot.  Thank God everything was okay.  It was
19 just the -- you know, we thought it was the
20 stress.
21   Q.   At one point during today's deposition
22 you mentioned a conversation with Chris
23 Hariegal -- I'm not sure if I'm pronouncing that
24 right -- about having a discretionary budget.
25 What did Mr. Hariegal tell you about a

Pasquarello

1
2 discretionary budget?
3    A.   When I asked -- after the Joint
4 Commission decision Chris was at the office.  I
5 asked him to come to my office, we could talk,
6 and I reiterated a lot of what was spoken about
7 here.  And the -- the computer monitor was the
8 main thing I was talking about.
9    When he said, Well, what did you even
10 go to him for?  You have your own fund.  Why
11 didn't you just buy it?  And I told him straight
12 out, I said, Chris, this is the first time I am
13 hearing I ever had my own fund that -- that was
14 to my discretion, so I call it a discretionary
15 fund.  And he said that I absolutely did, and
16 that I -- I said, Well, nobody ever told me that
17 I had it.  And -- I would have had that monitor
18 very -- you know, within the first couple of
19 months of being there if I knew that.
20    MS. SELIGER:  So that's it for my
21    questions, but Shaun does have an
22    opportunity to follow up.
23    MR. CLARK:  And of course, questions
24    beget more questions, so we will see if we
25    can do these fast, Mr. Pasquarello.

Pasquarello

1
2 EXAMINATION BY MR. CLARK:
3    Q.   Did you ever ask if you had a
4 departmental discretionary budget?
5    A.   No, I didn't ask that.
6    Q.   You said you saw Mr. Roche take notes
7 at your one-on-one meeting.  Were those
8 handwritten notes or computer notes?
9    A.   Handwritten.
10   Q.   Any idea what he did with those
11 afterwards?
12   A.   Yeah, they were in his bottom -- as he
13 is sitting at his desk, bottom right-hand
14 drawer.
15   Q.   Was it in a -- a spiral notebook or --
16   A.   No, it was in a file.  He would do it
17 on -- on single sheets of paper.  And then when
18 I would come back the following week, he would
19 take out the week earlier's notes, put them
20 down, we would go over what he said in those as
21 he was writing new notes, and then put the
22 two -- so he would always wind up putting two
23 sheets back, take the one sheet out, two sheets
24 back, one sheet out, that -- that was the -- the
25 normal -- the way the meetings went.

Pasquarello

1
2      Q.    Did you ever review those handwritten
3   notes that he wrote?
4      A.    Did I?  To say did I take them and
5   review them?  No.  He -- he would take them out
6   and then review what we spoke about.
7           And -- and something that -- else
8   wasn't mentioned, I would hand him sometimes an
9   agenda like what I did.  I would put it down in
10  writing, and he would put that with his -- and
11  you know, sometimes he would take notes right on
12  my notes.
13     Q.    Did you save a copy of the agendas
14  that you prepared for those meetings?
15     A.    They were in my old computer but I --
16  I didn't have that backed up like that, so I
17  don't have that.
18     Q.    The old computer that you had, is that
19  your personal computer or work computer?
20     A.    That was the -- the computer at work,
21  sorry.
22     Q.    You had a computer at work; is that
23  right?
24     A.    Yeah, my desktop.  So I would type it
25  up on the desktop, go into his office, hand it

Pasquarello

1
2   to him, and, you know, I would remember what he
3   said, go back, put notes on to the computer, and
4   then that's what my checklist would have been.
5   But -- yeah, so the -- the original notes, those
6   still are mine.  I had a copy in the computer
7   but I don't have the computer.
8      Q.    I think you said that Pat Lizarazo
9   also took notes, I think you said copious notes.
10  Were those handwritten or computer?
11     A.    Handwritten and those were in a
12  notebook.
13     Q.    Did you ever review those notes?
14     A.    Her notes?  No.
15     Q.    How do you know she took copious
16  notes?
17     A.    As we were talking she was writing.
18  It was almost like a stenographer, she -- she
19  wrote a lot.
20     Q.    Did you ever ask her for a copy of
21  those notes?
22     A.    No, I didn't.
23     Q.    You said you were deposed in the 9/11
24  Victim Compensation Fund; is that right?
25     A.    For -- yes.

Pasquarello

1
2      Q.    Do you recall if you submitted medical
3   records -- strike that.
4           Let me ask this question first.  Were
5   you a party in that lawsuit?
6      A.    Yes.
7      Q.    Do you recall if you submitted medical
8   records in connection with that lawsuit?
9      A.    Yes.
10     Q.    You did submit medical records?
11     A.    I'm sure -- yeah, I'm sure they --
12  they have my medical records.  It was based off
13  of the lung injury I received.
14     Q.    Do you recall if you signed a -- a
15  HIPAA authorization for the release of your
16  records in that case?
17     A.    That's -- it's a long time.  I don't
18  remember if I did anything with HIPAA back then.
19          MR. CLARK:  Okay.  All right.  I have
20     no further questions at this time.  You'll
21     see this as a dance, so I get to turn it
22     back over to Ms. Seliger, who can follow
23     up, or we might be done.
24          MS. SELIGER:  We're done.
25          MR. CLARK:  Great.

Pasquarello

1
2           THE VIDEOGRAPHER:  This concludes our
3   deposition of Joseph Pasquarello.  The time
4   is 5:57 p.m., and we are going off the
5   record.
6           (Time noted: 5:57 p.m.)
7
8
9
10
11
12          ------------------------
13              JOSEPH PASQUARELLO
14          Subscribed and sworn to before me
15          this    day of         2022.
16
17
18
19
20
21
22
23
24
25

Page 350

```
1
2              C E R T I F I C A T E
3
4   STATE OF NEW YORK   )
                        ) Ss.:
5   COUNTY OF NEW YORK  )
6        I JEFFREY BENZ, a Certified Realtime
7   Reporter, Registered Merit Reporter and
8   Notary Public within and for the State of
9   New York, do hereby certify:
10       That JOSEPH PASQUARELLO, the witness
11  whose examination is hereinbefore set
12  forth, was duly sworn by me and that this
13  transcript of such examination is a true
14  record of the testimony given by such
15  witness.
16       I further certify that I am not
17  related to any of the parties to this
18  action by blood or marriage; and that I am
19  in no way interested in the outcome of this
20  matter.
21       IN WITNESS WHEREOF, I have hereunto
22  set my hand this 27th of July, 2022.
23
        _____
24          JEFFREY BENZ, CRR, RMR
25
```

Page 351

```
1
2   ----------------------INDEX--------------------
3   WITNESS         EXAMINATION BY    PAGE
4   JOSEPH PASQUARELLO  MR. CLARK     6, 345
5                   MS. SELIGER       340
6   --------------------EXHIBITS-------------------
7   NUMBER    DESCRIPTION              PG   LN
8   Exhibit 1  Seven-page document      45   24
9             bearing Bates stamp CH
              1663 through 1669,
10            entitled Job Description
              Fire Safety Assistant
              Director
11
12  Exhibit 2  Series of emails bearing  95    9
              Bates stamp CH 1233
13            through CH 1236
14  Exhibit 3  Emails and attachments   122   22
              bearing Bates stamp CH
15            1223 through CH 1231
16  Exhibit 4  Multi-page email bearing 134   17
              Bates stamp CH 1247
17            through CH 1249
18  Exhibit 5  Year End Process bearing 153    5
              Bates stamp CH 1677
19  Exhibit 6  Series of emails bearing 169   17
              Bates stamp CH 1277
20            through 1279
21  Exhibit 7  Associate Counseling     189   12
              Report bearing Bates stamp
22            CH 1691
23  Exhibit 8  June 1, 2021 performance 211   11
              improvement plan bearing
24            Bates stamp CH 1693
              through CH 1695
25
```

Page 352

```
1
2   Exhibit 9   Associate Counseling    214   13
                Report dated July 19,
3               2021, bearing Bates stamp
                CH 1697
4
5   Exhibit 10  One-page document bearing 221   6
                Bates stamp CH 1745
6   Exhibit 11  Memo to Joseph Pasquarello 224  21
                from Michael Roche dated
7               September 20, 2021, re
                completion of performance
8               improvement plan bearing
                Bates stamp CH 1250 to
9               1251
10  Exhibit 12  One-page document dated  228   13
                September 21, 2021 to Mike
11              Roche and Bernie Nunez
                from Joseph Pasquarello,
12              subject Letter of
                Resignation, bearing Bates
13              stamp CH 1637
14  Exhibit 13  Four-page document dated 265    7
                May 26, 2021, bearing
15              Bates stamp CH 928 through
                CH 931
16
17  Exhibit 14  Complaint               274   12
18  Exhibit 17  Two emails, with Bates   298    2
                stamp numbers CH 1496
                through CH 1502
19
20              *******
21  DOCUMENTS AND/OR INFORMATION REQUESTED:
22  208, 209, 219, 338
23
24
25
```

Page 353

```
1              ERRATA SHEET
2   Case Name:
3   Deposition Date:
4   Deponent:
5   Pg.  No. Now Reads    Should Read  Reason
6   ___  ___  _____  _____  _____
7   ___  ___  _____  _____  _____
8   ___  ___  _____  _____  _____
9   ___  ___  _____  _____  _____
10  ___  ___  _____  _____  _____
11  ___  ___  _____  _____  _____
12  ___  ___  _____  _____  _____
13  ___  ___  _____  _____  _____
14  ___  ___  _____  _____  _____
15  ___  ___  _____  _____  _____
16  ___  ___  _____  _____  _____
17  ___  ___  _____  _____  _____
18  ___  ___  _____  _____  _____
19  ___  ___  _____  _____  _____
20            _____
                     Signature of Deponent
21
22  SUBSCRIBED AND SWORN BEFORE ME
23  THIS _____ DAY OF _____, 2022.
24  _____
25  (Notary Public)   MY COMMISSION EXPIRES:_____
```

Index: $4800..48

**$**

**$4800** 123:25 127:25
128:18

**1**

**1** 4:25 15:19 45:14,22
46:13 118:3,17
183:15 211:7 212:8
215:23 216:4 217:8
227:11 246:6 279:25
280:3

**10** 57:18 81:13,19
82:4 124:21 126:22
127:17 140:11,23
144:13 148:6,11
201:9 208:2 209:17
212:23 220:21 221:4
231:11 323:10

**10-hour** 81:3 82:18,
20

**100** 314:14

**100-** 33:21

**1092** 132:8

**10:00** 5:9

**10th** 123:24 125:3
190:5,7 266:24,25
267:6,8 325:3

**11** 123:24 134:4
224:8,9,13,19,24
319:9

**112-** 33:21

**115-** 33:22

**1184** 191:16 192:3,23
194:23 196:5

**11:00** 57:18

**11:29** 88:4,6

**11:40** 88:6,8

**11th** 338:11

**12** 84:4 201:9 228:2,
11,14

**1223** 122:11,19
123:18

**1224** 124:16

**1226** 125:5

**1231** 122:11,19

**1233** 94:21 95:6

**1236** 94:22 95:6

**1247** 134:11,14

**1248** 136:9

**1249** 134:12,14
136:10

**1250** 224:10,18

**1251** 224:10,18

**1277** 169:7,14

**1279** 169:7,14

**13** 84:4 264:19 265:5,
9 266:8 273:20

**14** 27:16 28:2,6 29:20
273:16,19 274:10
277:25 304:21
317:20

**1496** 297:22 299:2

**14th** 26:18,21 27:16
29:2

**15** 5:8 184:19,22
297:20 317:20

**150,000** 29:22

**1502** 297:22 299:3

**15th** 106:14,23
160:11 173:19,24
174:4,10,11,20,23
184:18

**16** 148:24 149:6,17
297:18,19

**1637** 228:4,10

**1663** 45:16,20

**1665** 118:18

**1667** 79:21

**1669** 45:16,20 47:12

**1677** 152:23 153:3

**1691** 188:22 189:9

**1693** 210:23,24 211:8

**1695** 210:25 211:9

**1697** 214:8,10

**17** 56:7 297:23 298:2,
3,4,9,24 299:6,15,20

**1745** 220:22 221:4

**18** 37:22 198:9 278:2

**18th** 201:25 202:2

**19** 35:6 214:7,10,24
218:23 299:14

**1965** 25:19

**19th** 300:19

**1:19** 167:11,12

**2**

**2** 47:22,25 94:18,20
95:7 102:5 103:7
124:15 158:23 159:8
202:6 246:6

**20** 37:22,25 123:24
148:24 224:16 225:3,
22 226:5 231:2 262:7

**2002** 341:25

**2003** 336:3

**2015** 62:24

**2016** 56:7 57:24 58:2
62:24

**2017** 62:24

**2019** 35:7 137:19
138:10 140:3,8
143:14 144:10 150:8,
13 282:22 319:5

**2020** 47:22,25 96:23
97:12 99:14 100:6
102:2 105:22 107:6
108:3 123:19 124:21
125:20 126:22
127:17 128:2 134:4
140:11,23 148:6,11
150:14 154:3 159:25
162:9 163:19 164:13
169:25 170:17,20
173:6,17,23 178:7
181:24 183:22 184:9,
25 257:20 261:15
262:12 287:14

**299:14,15,20**

**2021** 20:4 26:5 28:2,
22 31:12,18 32:14
36:25 208:2 209:17
211:7 212:8,23
214:7,10,24 215:19
218:2,24 220:9,10
221:19 222:9,14
224:16 225:3,22
226:6 227:11 228:4,8
229:6 240:12 259:19,
21 260:18 262:13
264:20 265:4 266:10,
11,20 267:8 268:4
274:25 275:3,18
305:4,5,12,13
318:20,21 319:6
320:4 324:24 328:17
329:9 333:10 337:7,
11

**2022** 5:8 28:3,6
349:15

**20s** 180:24,25 279:10

**21** 169:25 170:17
173:17,23 175:17
178:7 181:24 184:9
228:4,7 229:6 262:23
277:15 279:2 329:9
332:16

**21-cv-08732** 5:7

**22** 96:23 97:12 99:14
100:6 101:20 105:22
184:23

**228** 5:12

**22nd** 184:11,18,22

**23** 318:14

**24** 14:19,24 221:19
222:9 231:17 281:17
282:9,15 283:9

**24-hour** 289:25

**24/7** 243:6,8,9 244:7,
9,15 288:10

**24th** 245:7 246:22

**25** 77:7 102:2 107:6
108:3 123:19 125:20
128:2 274:25 275:3,
17 282:21 283:7

**25th** 76:19,23 166:13

**215:21**

**26** 137:19 140:3,8
143:14 144:9,14
264:20 265:3

**27** 181:8

**28** 215:19 217:21
218:2 285:10

**29** 154:3 163:19
164:13 287:12

**2:01** 168:3,10

**2:48** 211:22,23

**2:59** 211:23,25

**3**

**3** 122:9,20 123:11,17

**30** 4:16 91:3 137:8
220:7 229:18 231:2
262:8

**30-** 104:25

**30s** 180:24 181:2,21
279:10

**30th** 174:14 216:20

**31** 170:20 172:7
173:6

**31st** 174:14

**32-page** 273:24

**33** 293:16 294:11

**38** 294:21

**4**

**4** 124:10 134:8,10,15,
18,20,21 135:4,20,25
263:8

**4,000** 204:22

**40** 179:5 229:18
231:13,16

**43** 304:25

**45th** 5:13

**48** 171:12 172:3
314:6

**4:00** 264:10,11

**4:11** 264:11,13

---

**5**

**5** 152:20,25 153:3,14

**50** 29:15,16 173:18
175:16 183:3 231:13,
16 279:8,14

**500** 73:17 74:3,4
75:18 203:2,9,19,20

**503212** 215:20 218:3

**50s** 179:21,24 276:17
294:16

**52** 171:12 172:2
173:9

**5:39** 339:10,11

**5:45** 339:11,13

**5:57** 349:4,6

---

**6**

**6** 169:3,5,15 173:16
181:22 193:14
194:18

**60** 73:17 74:2,24
75:4,5,12,14,21,23
203:3 220:7 320:3
324:3

**60-** 104:25

**60s** 277:9 280:8

**61** 323:10

**6th** 192:19,24 194:21
195:6,8,23 196:5

---

**7**

**7** 84:4 188:20 189:10,
13 212:25 265:14
266:9,20 320:4

**70** 324:6

**70s** 280:4 281:11,13

**7th** 266:23

---

**8**

**8** 210:19,21 211:9
212:8 220:3,14
227:4,8

**8/24/21** 222:19

**810** 5:13

**89** 83:19

**8:00** 57:18

**8th** 184:20

---

**9**

**9** 214:6,11,16 220:2,
14,17 231:10

**9/11** 334:25 335:19
337:18 341:22
347:23

**90** 60:10 220:7,8
227:14

**90-day** 104:25

**911** 335:9

**928** 264:21 265:4

**931** 264:21 265:5

**95** 84:4

**97** 326:7

**9:00** 57:18

**9th** 184:20

---

**A**

**a.m.** 5:9 88:4,8

**abilities** 91:21
310:15 312:4

**ability** 14:12,16,20
79:24 80:9

**aboard** 41:17,25
42:10 203:8 253:12,
13 283:20 284:16
285:24

**absolutely** 98:15
99:23 101:19 127:4
344:15

**accelerate** 109:7

**accept** 43:5 228:22

**acceptable** 301:9

**access** 65:11 67:16
76:9 134:19 293:5
306:15

**accompany** 210:12
255:17

**accompanying**
122:3

**accomplish** 99:20
100:18 187:20
204:19

**account** 183:12
191:10 210:10
215:13 270:4

**accountable** 100:7,
8,10 201:14 217:7

**accuracy** 175:7
275:13

**accurate** 48:17 49:2,
4 90:19 114:6 163:17
172:2 191:20 200:17
202:13,16,20 215:25
218:4,11,13,14
222:22 225:21 226:5
275:8,18,23 285:15
295:6 300:6 314:23,
24

**accurately** 10:23
14:8 231:15

**accusation** 273:6

**accusations** 229:17

**acknowledge**
225:17

**acknowledged**
251:14

**acronym** 50:11
81:25 159:22 161:18

**act** 132:11 156:13,14
209:16 217:2 239:2
271:25

**acted** 230:17 260:6

**action** 8:16,22 184:3
230:18 311:5

**actions** 173:19
174:21 194:3 230:19
234:8,10 236:6,16
271:16,21 338:4

**activation** 305:25
306:4,14

**activations** 305:16

**active** 82:23

**activities** 230:24

**actual** 7:8 60:13 69:9
105:4 166:21 311:21

**ad** 100:24 269:20

**AD's** 100:17

**adamant** 115:23

**add** 81:19 121:17
139:10 164:16
235:13 236:11
272:21

**added** 113:19 184:20
187:17 193:10,13
200:14,18,20 272:20
276:5,8 308:25

**adding** 113:8

**addition** 30:25

**additional** 28:17
44:15 61:23 69:16
247:5

**address** 92:18 96:12
119:25 120:7 166:20

**addressed** 16:24
17:4 61:24 75:2,18
162:7 204:14 206:12
208:21

**addressing** 75:17
131:5

**adept** 264:23

**adjustments**
295:16,17

**admin** 52:18

**administration**
81:23 307:12

**administrative** 98:7,
9 113:24 119:25
253:21 327:21
331:13

**administrator**
330:18,23

**admissible** 4:14

**admission** 260:2

**admit** 79:7

**admitted** 316:4

**adoption** 305:8

**ADS** 167:7

**advancement** 34:20

**advice** 143:12
144:23 150:7

**advise** 110:6 133:17

**advisement** 237:8

**advocate** 117:15

**affect** 316:19 317:5

**after-action** 249:13,
15 309:22

**afternoon** 136:14

**age** 16:4,12 21:22
22:23 36:18 177:10
179:11,22 181:10
229:21 230:10,21,25
232:4,20 233:8,13
234:12 236:8,17
237:16 239:9,11
251:8,20 252:6
254:5,14 262:13,18
266:19 267:4,13
268:12,23 292:19
310:20

**agency** 119:25 120:9

**agenda** 308:25 309:2
346:9

**agendas** 346:13

**ages** 180:25

**agree** 11:20 48:25
80:4,7,13,16 97:11
111:25 136:5 154:25
158:2,4,21 159:23

**agreed** 108:15,23
112:2 213:16 315:8
318:4

**agreement** 261:25
273:8

**ahead** 8:8 100:3,4 105:5 139:8 144:24 148:25 152:9 162:14 226:16

**aids** 93:22

**air** 36:11

**alarm** 30:9 50:7,23, 25 63:11 71:13 119:13 126:18 131:20,24 132:9 141:17 145:15 151:11 204:24 305:16,20,23,25 306:14,22

**alarms** 33:8 53:9

**allegation** 8:20 9:2 36:17

**allegations** 6:18 9:7 15:8,12,16 18:24 21:21 24:15

**allege** 229:19 268:21 329:15

**alleviate** 145:20

**allowed** 247:17 289:21

**allowing** 128:9

**alter** 333:8

**altogether** 133:19 196:21

**amassing** 163:20

**amazing** 58:4

**amend** 234:23

**America** 9:5

**amount** 61:6 92:24 207:5 340:17

**analogy** 117:5,6

**and/or** 103:8

**Annenberg** 132:25 232:24 257:6,7

**announcement** 45:2

**annual** 192:23 202:9 216:10 266:11

**answering** 129:23 130:17,20 163:4 244:8 325:14,16 340:19

**answers** 11:3 15:9, 24 22:2 207:19,20 318:12 321:13 323:25 324:2,5

**anymore** 49:18 55:4 74:21 109:24 229:14 251:3

**apartment** 8:11

**apologize** 77:16

**app** 289:20

**apparent** 232:22

**appearance** 74:13 179:25 313:22

**appearing** 13:20 19:18

**Apple** 290:3

**apples** 240:8

**apples-to-apple** 240:3

**application** 39:17,20

**applications** 13:7

**applied** 20:16,17 339:20,24

**apply** 20:11 337:11

**appointments** 338:16

**approached** 294:22

**approved** 27:9 238:9 285:13 286:9,15 287:10,11 290:20

**approximate** 257:11

**approximately** 5:8 7:4 18:11 33:14 35:7 276:16 277:6

**apps** 289:21

**April** 96:23 97:12 99:14 100:6 101:20 102:2 105:22 107:6 108:3

**arbitrary** 166:9

**archived** 57:14 63:6

**area** 72:4,19 89:15 183:11 304:6 305:25 306:4,23 307:7 316:25

**areas** 73:2 91:8,10, 19 92:10 138:23 175:3 225:16 257:15 274:15

**argue** 131:7 132:3,13

**arguing** 246:4

**argument** 9:8 151:4

**arguments** 155:11

**arm** 136:25 137:2

**arms** 151:19,20

**arrested** 24:12

**ASAP** 148:7

**asbestos** 125:16 128:8,9 130:4

**asks** 90:8 125:20 136:17 173:7 199:14 206:17

**aspect** 112:7 117:22 166:8 326:25

**aspects** 44:11 97:14, 15,16

**ass** 302:17

**assert** 271:9

**assessment** 154:25 155:2 159:24

**assessments** 331:16

**asset** 71:25

**assigned** 71:16 78:3

**assistant** 27:7 34:18 35:12 40:16 43:24 45:18,21 80:6,14 86:25 87:3,6,12 96:15 100:25 111:10 114:8 138:6,15 176:10,13 177:25 180:19 228:24 239:17,19 268:23,25

**arbitrary** 166:9

269:3,12 280:4,23 284:23 285:2,4 290:10,24 294:12,14 322:11 327:15 328:2 329:8,10 331:10

**associate** 47:15 153:20 188:21 189:8 190:25 201:22 208:3, 7,9 209:19 210:13 214:6,9 218:16,18

**Associate's** 209:14

**association** 4:4 5:15

**assume** 12:3 87:14 108:14 275:4

**assumed** 40:22

**assuming** 53:18 268:13 320:15 328:21

**assumption** 341:5

**astonishing** 112:13

**at-will** 239:4

**atmosphere** 115:10, 12 117:17 230:5

**attach** 299:20

**attached** 123:22 124:7 128:18 136:15 247:10 300:8

**attachments** 122:18 123:10,13 124:9,15, 18 298:25

**attempt** 105:12

**attend** 186:10 312:13,16,17 313:10

**attended** 312:11 313:11

**attending** 312:9,14 313:13,14

**attention** 57:2 58:8 75:25 121:11,13 141:8 217:4 259:12 262:24 317:16

**attesting** 216:17

**attitude** 144:4

**attorney** 15:10 17:16,19,25 18:8

131:15 219:12,14 221:16 225:8 250:20

**attorneys** 130:21 132:21

**audit** 61:15 62:7,15, 22 63:20 64:25 65:13,22,23 157:14 268:4

**audited** 62:21 63:18

**audits** 36:7 62:12,14 63:20,24 64:23

**August** 221:19 222:9,13 337:6

**authorization** 338:24 340:7 348:15

**automatically** 71:8

**autonomous** 280:19

**avoided** 196:21 309:19

**aware** 14:6 90:20 114:7 143:7 173:23 183:20 184:21 195:19 196:4 199:4 260:8 315:4

**B**

**back** 40:12 48:13 49:19 53:22 54:4 56:5,6,7 63:7 65:2 68:9 76:10 77:12 88:8,9 95:24 96:2 104:4 112:5 117:11 118:3 121:18 122:2, 8,23 125:18 130:21 131:4 133:8 137:2 143:16 158:3 161:9 168:10,12 172:8,21 181:22 209:6 211:25 212:2,10 219:13 220:13 227:4,5 231:10 234:14,18 235:5,9 236:10,13 257:25 258:6 260:10, 11,14,15 264:2,13, 14,18 270:13,22,24 275:11 277:24 285:20 290:6 295:23 304:20,22,23 308:13 321:16 339:8,13,14,

23 340:19 341:25
345:18,23,24 347:3
348:18,22

**backdated** 26:24
27:14 28:25

**backed** 346:16

**background** 13:12
53:10 56:23 64:16
67:13 114:21 115:25
142:25 310:21

**backing** 247:14

**backwards** 336:14

**bad** 36:13 60:25
186:14 221:25
320:23

**balding** 180:9,10

**ball** 117:7 129:14
291:6

**Barton** 179:9,12,13,
15,19,20 180:8
276:4,11,15 279:19
308:6 318:3

**Barton's** 196:13
276:23,25

**based** 39:21 45:2
51:3 56:3 113:24
126:4 157:13 172:23
183:17 184:13
192:21 200:19
205:18 220:17 230:9,
20 231:22 232:2,20
233:13 234:11 236:7,
17 239:9,10 240:12
243:19 251:8 254:13
260:4 262:18 267:4
296:2 324:2 331:22
340:5 341:5 348:12

**basic** 81:14 138:18
231:3,4 238:18 249:2

**basically** 55:19 75:8
130:11 283:18
287:22

**basis** 18:10 62:11
75:17 116:17 177:19
204:7 229:20 246:3
251:6

**Bates** 45:16,19 94:21
95:5 122:10,18

124:16 134:11,13
136:9 152:22 153:2
169:6,13 188:22
189:9 210:22 211:8
214:7,10 220:22
221:3 224:10,18,25
228:3,10 264:21
265:4 273:17 297:21
298:11,13,17 299:2

**Bates-numbered**
298:15

**bathroom** 211:17

**battalion** 315:23

**bear** 152:22 298:6

**bearing** 45:16,19
94:21 95:5 122:10,18
134:11,13 153:2
169:6,13 188:22
189:8 210:22 211:8
214:10 220:22 221:3
224:10,18 228:3,10
264:21 265:4 298:11

**bears** 152:22 299:2

**beds** 44:18 69:16
257:15,17

**beeping** 293:18

**beeps** 294:6,7

**began** 28:21 72:22
143:15

**beget** 344:24

**begin** 25:25 61:13
143:6 162:20 227:19

**beginning** 11:18
37:6 93:3 98:19
100:16 115:13
116:13 185:14 188:4
225:13 281:18
305:22 333:10

**begins** 49:14 118:20
136:8,14 159:9 223:3
227:14 265:14

**behavior** 259:15

**behind-the-curtain**
55:21

**behind-the-scenes**
76:8

**belief** 64:2 114:19
177:12 206:23
282:25

**believed** 109:4
111:17 163:15,16
232:2 259:14 267:3,
14

**believer** 156:14

**believing** 251:6

**Bembry-reid** 170:6

**bending** 151:20

**benefits** 43:5

**Benz** 4:9 5:14 6:6

**Bernie** 85:9 228:5,8
327:19 328:4 329:7
331:3

**bet** 6:25 21:7 107:25

**biased** 302:4

**big** 136:24 156:13
157:18 188:6 189:21
237:22 307:23 326:2

**biggest** 91:16 175:3
296:8

**bins** 145:23,24

**bit** 15:5 41:22 42:4
70:16 100:13 196:2
217:15 266:22
299:10

**blamed** 292:21

**blank** 20:20,23 77:18
159:18 212:14
311:21 336:21

**blanket** 204:21

**blatant** 107:11 293:7

**blatantly** 77:11

**blemish** 336:8

**blocking** 130:8,9,11,
12

**blond** 180:5

**blood** 332:8 343:8

**blow** 246:10

**blue** 190:21 274:25

**board** 119:3 286:6

**Bob** 17:2 35:24 36:14
37:13 40:18,19,22
41:12,14,18 42:19
62:12 63:18 65:14
67:8,11 110:20,22
116:6,8 138:17
142:20 156:17
166:16 178:6 196:17
205:2,16,17 208:21
210:5,7,9 219:5
239:18 251:13
259:24,25 260:2,3,8,
17,23,25 261:9,13,
14,18,25 262:11,21
263:4,13 266:2,10,23
267:2 271:8 278:13,
15,21 315:16,19,20
316:4 318:3 321:5
323:16 324:22
340:21 341:8,11

**Bob's** 111:23

**Bobby** 60:5 61:19
65:16 138:22 143:23
145:2 176:14 178:4
181:10 186:6 239:17
255:8,9,13 256:2
269:5 291:24

**Bobby's** 296:23

**body** 17:10 124:10

**bogus** 205:5

**bolded** 124:14

**Bond** 38:9,12 39:2
60:4 65:7 74:25 85:3
86:23 90:24 91:2,6
92:17 94:3 102:6,11
104:11 107:5 108:3,
5,21 109:10,17,22
110:2,8,18 111:2,21
112:16,19 114:6
136:17 137:18,25
139:11 140:14,19
144:8 146:14,24
150:14 166:2 178:6,7
183:21 203:10
216:16 256:18 282:2,
4 294:13,18,23,25
295:3,10,19 299:22,
25 300:16 301:25
302:25 304:11
315:13

**Bond's** 72:11 73:3
92:11 100:7,9,11
139:23 295:25

**bonus** 62:17 157:2,
11,17 158:25

**bonuses** 157:13

**books** 73:21 245:13,
17,21 319:19

**born** 25:18

**boss** 36:12,19,21
40:20,22 74:8 92:2
127:5,19 151:14
175:13 230:3,12
302:3 340:20,22,23

**bottom** 47:12,14
48:6,7 96:24 136:7,9
153:18 171:11
173:15 190:6,22
213:3 215:2 228:20
345:12,13

**bought** 242:4

**bounce** 172:23

**bowel** 233:6

**bowl** 246:8

**box** 158:23 159:8
198:25

**Boy** 8:20 9:4

**brain** 161:17

**brand** 57:21 145:13
151:15

**brand-new** 292:3
307:8

**break** 12:8,13 87:22
88:10 142:9,24
164:3,9 168:13,14,
17,22 195:25 197:5
211:17 212:3,7
339:15

**breaking** 44:23
142:13 146:2,3
151:20

**breaks** 341:14

**bring** 63:7,12 69:5
76:2,3 93:9,20
117:11 204:5 230:18
231:25 259:11 288:2

309:24

**bringing** 51:9

**brings** 56:25 119:19
137:2

**broadcastify** 289:20

**broke** 145:19 183:5
187:6

**broken** 70:22 89:4
92:23 183:17,19

**brought** 6:15 9:12
22:22 108:7 217:3
249:11 299:8

**budget** 232:9,12,13
292:25 343:24 344:2
345:4

**budgets** 293:6

**building** 50:25
83:15,18 182:24
183:11 204:25 216:9
257:6,7 276:21,22
277:18 280:5,15,19
306:3,15

**buildings** 27:19
28:17 81:9 280:24
281:2 287:17 317:20

**bullet** 50:6,16 51:14,
15,17,18,20,21 68:11
77:25 79:24 80:9
118:14,20 129:16

**bulletin** 198:21

**bullets** 50:4 77:21
80:22 209:15

**business** 252:20

**busy** 61:17 115:10
319:14

**butcher** 9:22

**butchering** 180:13

**buy** 344:11

**bypassed** 88:25
89:4

**C**

**C-A-N** 180:13

**C-A-N-A-T-A** 180:14

**cable** 291:17,20,23,
24 292:2,3

**Cabrera** 241:3

**cadence** 152:12

**calculates** 269:16

**Calendar** 20:17

**call** 18:2,3,9,11 21:18
22:17 23:19 25:3
37:14 39:15 53:14
103:23 104:6 116:12,
18 138:13 159:20
194:16 208:13
219:17 235:5 243:6,8
244:7,9,15 261:13
266:10 287:21
336:11,25 339:6
344:14

**called** 6:5 20:15
22:14,15 23:9,13
37:15 39:7 52:3
82:25 135:16 144:3
204:16 205:2 262:15
263:13 324:22
327:14 336:18
337:10

**calls** 34:6 243:12

**calm** 332:24 333:7

**camp** 9:9

**campus** 27:24,25
28:8 336:24

**campus-wide** 183:9

**Canata** 180:14

**Cantana** 180:13

**capacity** 244:16

**cardiologist** 332:19

**care** 16:19 30:12
104:17 194:16
206:18 241:24

**career** 34:20 43:12
230:16 336:15

**Carolina** 284:3

**carpenter** 71:17

**carpets** 81:22

**carried** 85:11

**carrier** 90:8

**Carry** 68:12

**carrying** 312:25

**case** 4:18 5:6 7:14
8:3 9:10,18 13:24
21:8,14 22:4,6,12,13,
25 24:3,15 47:10
71:9 72:10 127:22
142:21 148:13
168:18 237:22
307:11 313:6 348:16

**cases** 32:19

**cast** 117:14

**catalog** 136:15

**catch** 280:7

**catch-up** 187:19

**catching** 73:19

**category** 171:21
172:16 282:8

**caught** 335:11

**caused** 8:10 25:2

**causing** 335:17

**Ceka** 332:19,21
338:7,9 342:25

**cell** 13:21

**Center** 64:20

**Centers** 335:3

**certificate** 86:10
122:5 131:12

**certification** 81:4
82:19,21 83:3,21
85:13,17,25 86:4

**certifications** 80:24
84:2 85:2,10 86:14,
17 156:15

**cetera** 291:14

**CH** 45:16,20 94:21,22
95:6 118:18 122:11,
19 123:18 134:11,12,
14 152:23 153:3
169:7,14 188:22
189:9 210:23,24,25
211:8 214:8,10

220:22 221:4 224:10,
18 228:4,10 264:21
265:4 297:22 299:2,3

**chain** 75:8 103:24
104:2 105:21 107:6
136:8 139:12,22
140:11 143:14
146:14 147:8,12,17,
22,23,25 173:14
174:17 175:21 210:2
268:15 305:7 341:9

**chance** 134:23
189:12,20

**change** 28:3,7 87:9,
18 133:12 309:14
325:24 326:13,21
327:2,11,12 328:2

**changed** 28:11,21,
23 40:15 65:18 87:10
198:24 216:8,15
297:25 298:4 332:7

**changing** 80:10
115:12 328:5

**charge** 44:5,22
292:15

**Charlotte** 284:2

**chart** 240:13

**chat** 45:8 46:2 49:21
94:19,25 95:18
122:12 134:9,20
152:24 153:8 169:4,
11 189:2 211:5,14
212:11 214:15
220:23 264:24
273:22 298:7

**chatting** 293:19

**check** 78:12 85:20
122:22 136:21 137:6
148:6 150:14 182:10
198:25 219:18
270:22

**checked** 183:7,8

**checking** 182:11,12,
13 214:18

**checklist** 69:8 347:4

**checks** 248:16,17
270:21

**chef** 315:24

**chest** 233:5 334:5
343:8

**chief** 276:15 315:24

**chip** 203:19

**chose** 223:5

**Chris** 17:2 116:9
179:18 208:23,24
209:25 210:3,9 219:5
232:11 255:8,13
256:22 267:16
292:25 317:25 318:3
320:16 330:22
343:22 344:4,12

**Chris'** 330:17

**chute** 135:15 139:17
141:11 144:22 145:8
146:16,17 147:2
248:17

**circle** 330:8

**circuit** 307:3

**circulating** 305:7

**circumstances**
158:20

**citation** 125:11

**citizens** 289:19

**city** 24:18 25:23
31:24 44:24 120:9
125:2 238:13 315:24

**civil** 4:17 287:14,19
289:11

**claim** 281:15 329:13

**claims** 8:8 9:15

**clarify** 340:23

**clarifying** 121:3

**Clark** 4:19 5:17,18
6:10,13 45:13 56:14,
16 87:20 88:2 94:17
122:9 134:7 152:19
164:2,6 167:9 168:11
169:2 178:18 188:19
208:12 209:4 210:18
211:11,19 219:16,25
221:22 233:24 235:8
236:2,14 237:7
260:10 264:4,14,19

273:16 294:2,10 297:16 298:3,6,19 323:24 338:21 339:3 340:2 341:2 343:4 344:23 345:2 348:19, 25

**class** 55:18 56:21

**classes** 55:18

**classroom** 55:14

**clean** 222:6

**clear** 26:25 103:23 118:21 119:9 150:8 165:11 207:5 236:5 238:25 262:17 305:14,18 324:11,16 327:13,23

**clerical** 52:13 72:8

**click** 46:13 49:19

**client** 40:13 146:21 152:2 278:25

**clients** 199:14

**clique** 65:15 85:4 138:13 176:15 262:3, 4

**close** 13:10 137:4 144:20 164:14 166:3 204:23 216:20 231:16 339:4

**closed** 13:13 53:7 59:12,19 71:13 76:19,23 77:6,8,9 84:11 107:14 137:2 159:11 160:5,6,19 164:17,24 165:16,18, 21 170:24 171:12 172:3 173:10,18 174:7 184:24 216:19, 24,25 218:7,12 245:12

**closer** 136:20 137:3, 5 141:9 142:16 143:9 145:7 263:9

**closers** 135:11,14 140:24 142:7,14 143:2,5 144:5,7,19 146:9,17,25 147:10, 15 149:6,14,19 150:23 206:10

**closes** 135:6

**closing** 173:24 216:17 256:16 334:6

**closure** 136:18 137:20 141:7 175:16 182:20

**CNN** 289:25

**coach** 112:8,10

**coaching** 93:21 115:15 116:21 295:22

**code** 44:18 51:3 73:22 89:24 90:4 144:20 145:7 193:7, 25 197:18 199:13 248:18,19

**Codier** 276:5,14 279:22 280:11

**coffee** 41:22 42:4

**cohesive** 311:12

**coincidental** 336:10

**collapse** 335:11

**colleague** 33:7 45:8 152:24 282:11 336:11,18

**colleagues** 20:5 176:10 281:22,25 282:8,15 283:2,6

**color** 180:3

**colors** 156:7 195:13

**Columbia** 25:23 26:14 27:22 29:4,19 31:7,11 336:12,17 337:2,13

**columns** 213:12

**combination** 288:22

**comfortable** 175:21

**command** 103:24 104:3 210:2 268:16 305:7 341:9

**commenced** 35:11 139:11

**commensurate** 269:22

**comment** 225:25 226:3 252:10 254:6 255:12,14 257:9,16 258:15 260:4 300:11, 22

**comments** 254:5 300:9 323:12,15,19 330:4

**Commission** 24:18 53:20 54:19 57:4 60:3 61:15 62:3,7,20 63:20 84:14 137:13 142:24 205:8,10 267:17 268:3 317:12 328:25 344:4

**commitment** 91:17

**committed** 132:12

**committee** 308:16 311:20 312:9,10

**committee's** 311:21

**communicate** 14:2

**companies** 90:5

**company** 8:5,12,14 55:12 56:11 57:21 62:14 130:13 133:8,9 141:17 151:15 193:13,14 194:2,21 195:11,15 199:14 200:3 204:5 237:22 245:7 246:13 270:4 285:7

**company-wide** 36:8 63:24

**comparable** 33:23

**compare** 241:16 247:21

**compared** 281:21

**comparison** 240:3 241:18,21 242:18

**comparisons** 243:15

**compartmentation** 71:4

**Compass** 237:22

**compensation** 43:8 341:23 347:24

**competent** 72:25 84:25 92:4

**complain** 258:16,19 260:2,19 267:12 268:11

**complained** 258:21, 24 259:14 260:23,24 261:6 266:3

**complaining** 232:11 271:10

**complaint** 16:12,14 24:16 177:2 235:25 258:23 260:9 271:20 272:20,21 273:18 274:10,22 275:2,8 277:25 281:9 282:9 286:11 297:17 304:20 329:15

**complaints** 16:3 232:18 259:22 260:5 271:19 272:19

**complete** 77:2 106:14 140:20,25 148:5,11 164:21 213:20 216:22

**completed** 52:22 148:24 149:2,6 150:16 159:13 160:7, 20 161:4,21 163:7,8 164:18 165:4 173:8 206:14,25 213:13 216:18

**completely** 76:25 78:8 101:9 115:16 158:2,21 162:25 191:8 193:15 203:10 205:5 217:5 231:12

**completion** 106:16 170:19 224:17 225:3, 15 280:2

**compliance** 150:24 205:25

**compliant** 44:19,23 144:20 145:7 150:22 166:7

**component** 129:21, 23

**components** 138:19

**compound** 56:15,17

**computer** 13:4,7,19 52:17 76:8 165:8,17, 19,23 166:3,22 167:3 183:18 214:19 239:23,25 241:12,14 242:3 244:10 287:24 288:2 289:12,14,15, 16,17 291:8 293:19, 21 304:24 344:7 345:8 346:15,18,19, 20,22 347:3,6,7,10

**computer-based** 113:8

**computers** 238:2,14 239:19

**concentrate** 98:9,10 117:21

**concern** 67:8 143:25 148:17 267:20

**concerned** 82:11 244:11

**concise** 78:16

**concludes** 349:2

**conclusion** 235:22 236:3

**condescending** 91:24

**condition** 14:10,14 335:19 337:17

**conduct** 143:4 259:23 260:20,25 261:7 316:25 317:2

**conducted** 266:12

**conference** 191:11 210:11 215:14

**confidante** 259:24

**confirm** 293:18 304:10

**confusing** 70:5 325:4

**confusion** 173:4

**congested** 309:11

**connected** 23:23,24 271:5,7

**connection** 105:25 221:7 348:8

**conscience** 242:10

**consideration** 43:15

**considered** 102:7 113:16

**consisted** 255:7

**consistently** 107:14

**constant** 115:14 146:15 317:11

**Constantly** 66:14

**construction** 68:15 69:19,20 70:9 71:21 81:11,15,16 159:20

**constructive** 303:25

**constructively** 229:10

**consultant** 137:13, 16

**contact** 24:5 81:18 330:7

**contacts** 268:15

**contention** 217:9,11

**contents** 215:10

**contingent** 272:14

**continue** 102:25 159:11 160:6 164:24 225:16 237:14 301:3 325:18

**continued** 116:20 168:11

**continues** 136:10

**continuing** 116:17

**contract** 96:13 200:10 280:22

**contractor** 131:20 132:19,22 133:4

**contracts** 205:21

**contractual** 200:7,9

**control** 74:18 112:25 113:16 119:2 125:16 170:12,15 171:2 175:4 245:16 262:3

307:3

**controlled** 230:16

**convenience** 95:19

**conversation** 22:3, 13,25 23:5 36:24 37:7,11 39:10 42:3,7, 12 101:10 145:4,6 157:3 222:25 233:15 262:21 263:4,7,16 266:2,5,23,24 267:2, 9,20,21 324:20,21 343:22

**conversations** 109:13 260:5 261:8 291:9

**convicted** 24:9

**convincing** 150:5

**coordinate** 316:23

**coordinating** 309:18

**coordinator** 314:25 315:6 316:22 317:8, 23 318:7

**copious** 342:19 347:9,15

**copy** 125:6 138:2 182:15 219:7,10,11 263:22 274:21 275:2 299:20 346:13 347:6, 20

**corner** 47:12 48:8

**correct** 60:23 72:21 77:5 131:13 162:8 172:18 200:8 208:18 221:24 240:25

**corrected** 98:14,15 206:4,6 306:10 338:23

**correction** 122:5 131:12 341:15

**corrections** 341:17

**correctly** 86:24 99:5 248:11 297:10

**corridor** 135:8 142:5

**cost** 142:11 269:8 285:21

**costing** 133:11

**Cotter** 136:17 137:10,12,18 141:16 144:3 147:4,5,7 205:9

**Cotter's** 143:24

**counsel** 4:19,21 5:16 6:14 19:5 163:25

**counseling** 188:21 189:8 201:22 208:4, 7,9 209:19 212:24 214:7,9 218:16 223:24

**counterparts** 74:5 85:8 86:23 270:9 283:8 293:8 324:9

**country** 287:15,20 289:11

**couple** 7:12 20:9,10, 13,14 55:16 67:21 102:13 117:10 140:8 154:20 155:4 158:2 185:20 193:20 203:4 273:10 308:11 317:21 329:5 337:3 338:14 344:18

**court** 5:5,14 6:2 7:5 10:15,20 11:4,14 17:6 59:15,20 79:5 119:20,21,25 126:17 163:25 164:3 235:14, 17,20 260:13 264:17 334:11,20

**courtesy** 199:13 200:6

**courtroom** 4:15

**courts** 177:5

**cover** 84:3 204:21 235:7 300:2,4,5 302:16

**coverage** 272:11,15

**covered** 83:21 236:22 313:9

**covering** 272:15

**COVID** 44:16 69:15 75:7 115:13 257:16 308:21

**created** 112:12 202:7 228:17 303:18

**credit** 25:3 165:7

**crew** 30:7 277:5

**crime** 24:10

**criminal** 132:11 217:2

**criteria** 223:20

**critical** 314:4

**cross** 59:14

**Crothall** 5:3,18 6:14 15:9,24 20:4,6 21:5, 19 22:9,23 23:17 24:7 25:9,12 31:8,17 32:24 33:17,23 34:3, 5,11,24 35:5,11,14 37:16 38:24 39:6,8, 17,23 41:8 42:14 43:9,25 48:18 49:3,5 51:23 59:7,10 62:2,6, 13 64:19 83:5,6 85:17 87:18 88:20 90:20 96:8,18 110:19 111:21 120:5,15 152:6 153:16 177:25 179:14 185:8 199:25 203:24 205:17 227:23 228:25 229:6 237:23 252:18,19,25 253:4,7 254:2 267:13 269:16,19 270:3 277:16 282:22,24 310:13 315:5,8 318:15 320:7 331:8 332:2 333:19 334:21 336:5 338:4 343:2

**Crothall's** 90:7 146:21 279:3 283:19

**cup** 41:21

**curious** 255:11 258:24

**current** 26:13 29:23 30:3

**customary** 197:22 202:21,23 234:25

**cut-and-paste** 121:2

**CYA** 302:16

**cycle** 290:3

**cycles** 288:11

**cylinders** 307:19 312:25

---

**D**

**daily** 60:5 70:20 72:12 73:11,12,19,23 74:16 75:17,25 116:13 230:24

**damage** 8:10

**damages** 329:13

**Dampers** 57:20

**dance** 348:21

**danger** 199:11

**dark** 180:5

**date** 15:22 16:20 26:4,12,18,20 31:14, 19 45:23 47:16 64:24 65:24 95:8 101:5 106:15,20 122:21 134:16 148:25 153:4 169:16 173:7 189:11 190:8 209:21 211:10 214:12 216:8,14 220:11 221:5 222:10, 12,15 224:20 226:5, 23 228:12 257:9 263:16,23 264:7 265:6 267:7,18,23,25 268:7 274:11,23 275:17 283:4,13 285:12 286:8,11 297:24 319:7,20 328:14 338:18

**dated** 125:2 214:7,9 224:16 225:2 227:11 228:4,7 264:20 265:3

**dates** 15:21 135:22 272:23

**daughter** 26:8

**day** 16:14 18:6,11,17 25:10 28:25 34:23 47:24 60:6 76:5 79:8 84:16,19 92:25 93:2, 5 120:25 150:11 159:12 160:5,17

164:15,18,22,25
165:5,9,16,17 166:3
181:25 184:12 185:4
194:11,24 196:12
197:6 198:10 201:7,
11 218:21,23 220:8
227:22 229:5 241:23
243:12 267:17
269:22 272:22 284:8
313:11,14 334:9,16
335:12 349:15

**day-to-day** 230:24
238:6 276:9 286:5
319:25

**days** 73:17 74:2,24
75:4,5,12,14,21,23
77:7 173:9 184:22
201:9 203:3 220:7
227:14 271:19
283:17 324:12,17
325:19 329:5 334:4

**de** 327:6

**de-prioritize** 245:25

**deadline** 104:22,23
105:2,4 107:17,21,25
120:19,20 166:10,21
173:19,24 174:10,11,
23 175:10 184:10,21,
23 218:8,12 246:6
247:16

**deadlines** 103:9,17
104:12,15,21 105:8,
16 107:5,9,10,11,15,
16 108:2 150:19
231:6 244:18,19,22,
23 245:4,11 246:16
272:2,7,9 273:3
322:22 323:6

**deal** 55:3 117:18,19,
20 157:18 177:19
220:20

**dealing** 44:13,15
241:13 243:3

**December** 37:5
85:19 169:25 170:17,
20 172:7 173:6,17,23
175:17 178:7 181:24
183:22 184:9,23,25

**decide** 177:5

**decided** 278:13

**decision** 112:3
278:4,9,15,18
292:22,24 293:13,14,
15 302:10 304:15,18,
19 344:4

**decline** 215:6

**declined** 213:7 297:9

**decrease** 326:17

**deemed** 71:25

**defend** 260:3 320:14
321:6,12 323:17

**defendant** 5:24 8:24,
25 9:12 278:3 279:7,
9,10,14 281:21
282:23 285:10,12
286:8 287:17 294:22
295:2 305:2,5 310:11
320:4 323:11,14
324:7,11,16 326:8

**defendants** 4:20
5:18 9:11 221:9
281:19

**defendants'** 4:19

**defending** 196:18

**defends** 196:17

**deficiencies** 68:14
69:18 70:8 71:22
73:2 92:18 202:9
206:19 294:23
295:20 303:21,23
304:4,6

**deficiency** 69:11
71:15 193:10 200:15,
18,20 201:3,12,13,
15,18 245:19,20

**deficient** 92:11

**defined** 113:11

**definition** 282:14

**delay** 95:23 106:15
137:7,9 141:12 143:9
151:22 161:24 195:7

**delayed** 121:7 135:6,
10,14 136:18,20
137:3,20 140:24
141:7,9 142:7 143:2,
5 145:7 147:10,15
149:5,9 161:25

248:16 263:9

**delays** 150:21

**delegated** 50:19
52:15

**demeanor** 180:2

**demote** 114:16

**demoted** 87:15
114:7 229:10 294:18

**demotion** 87:12,17
113:6,17 114:3,5
116:25 117:2,23
303:3,7,15 326:8
328:9

**denial** 286:15,17

**denied** 231:3,4
237:16,20 239:9,10
242:17 287:17 290:9,
22,23 292:9,18
293:10 339:24

**denigrate** 323:2

**denigrated** 321:18

**denigrating** 320:7,
12 321:4,8,10
322:13,20

**Denine** 290:21

**denoted** 294:14
327:15

**Denver** 60:5 138:2,5
140:12,18 142:20
178:6 180:16,23
269:5 270:11 271:6,8
282:2,3

**Denver's** 148:4
271:3 291:24

**deny** 286:12 287:10

**denying** 286:22
287:8

**department** 26:16
27:12 30:6 31:24
38:17,23 42:5 44:5
52:15 58:4,9 64:7
74:17 78:25 79:2
84:11 85:2 87:4
88:20 89:8,23 93:16
94:6 97:7,12,17
99:13 100:18 103:4,
20 104:2,12 105:15

112:11,20,24 113:10,
20 116:21 119:11,16
125:7,11 129:7,12
131:19,25 132:5
133:6 138:7 158:12
160:16 170:12,13
171:3,18 173:10
174:5,19 175:3,15
179:2 182:12 186:13,
19,20 187:3 197:17
198:22 199:8,12
203:2,7 230:13 231:4
232:22 237:21,24
238:10 239:18
240:17 242:18
244:12 246:25
247:23 248:5 253:12
260:4 276:4 279:3
292:16 304:2 306:3,
25 307:9 309:10,15
312:18 314:13
315:17,20,25 316:5
318:16,22,24 319:8,
22 320:2,21 327:5,6
328:22 331:11
335:25

**department's** 99:19
120:11 129:9 309:2

**departmental** 290:8
345:4

**departmental-wise**
306:8

**departments** 129:25
154:22 155:14 171:5
238:19 239:14
242:17,21,22 244:24
246:13 247:12
252:16 272:3 290:18
307:24 311:23
328:24

**depend** 89:19

**depended** 52:25
53:2

**depending** 55:17
64:22 73:9 89:13
174:8

**depends** 89:11
323:24 324:4

**depicted** 126:21

**deponent** 19:10

**deposed** 6:21 7:3
10:6 19:22 341:17,
18,20,22 347:23

**deposition** 4:6,8,25
5:7 7:8 10:9 12:17
13:3,6 15:4,7 16:6
17:13,17,20,24 18:18
19:19,23,24 32:11
88:14 174:4 177:18
234:6 341:24 342:4
343:21 349:3

**depositions** 7:19,24
9:13 298:22 341:16

**deputy** 315:24

**derived** 32:14

**derogatory** 254:5
322:14

**describe** 16:8 43:23
44:2

**description** 45:17,
21 68:9 77:12 79:20
113:13 118:18
129:16 327:8,9

**deserve** 115:24

**designation** 83:17

**designed** 86:18

**desire** 53:21 94:12
242:7

**desk** 13:16 122:2
288:19 345:13

**desktop** 346:24,25

**destruction** 146:15

**detail** 109:14

**detailed** 148:2
191:10 210:10
215:13 307:23

**details** 21:23,24
237:2

**detections** 132:18

**detector** 131:22
132:23

**determination**
307:20

**determinations**
269:19

**determine** 150:15

**determining** 242:19 270:5

**develop** 91:25 97:22 102:24 117:10

**developed** 112:23

**developing** 117:9

**development** 102:7, 12 161:11 300:22,24 302:9

**device** 13:2 145:7 146:3,4 183:5 231:18

**devices** 13:18 151:2 182:14

**diagnosed** 332:5

**diagnosis** 332:10

**diarrhea** 333:11

**difference** 31:20 44:4 156:6 232:3 240:2

**differently** 17:22 71:2 101:23 135:23 176:8 177:9 204:2 230:6 231:3 239:6 260:7 294:24 324:8

**difficult** 38:22 69:10 247:16

**difficulty** 57:16

**direct** 63:16 67:25 68:4,8 97:24 138:12 176:4 178:3,15,22 280:17 294:24 341:3, 12

**directed** 131:7 300:11

**directions** 38:21 194:14 305:18

**directly** 46:3 120:13, 23 121:4,13 123:14 182:12 194:24 279:8, 14 327:23 341:4

**director** 26:16 27:10 28:11,24 30:14,17 34:18 35:12,20 36:5 40:16 43:24 44:4 45:18,21 74:7 79:14

**director's** 248:25 328:8

**director/fire** 228:25

**directors** 176:10,11, 13 177:25 239:19 242:25 268:22,23,25 269:3,4,11,12 282:17 284:22,23 285:2,4

**disability** 335:21,25 339:17,21

**disagree** 224:4,6 226:20

**disagreed** 84:10 98:11 158:8,16,17 215:9

**disagreement** 208:8 209:18,24 210:6

**disappointment** 312:8

**disciplinary** 184:3

**discipline** 93:12 102:15,17 163:20 199:5

**disciplined** 7:13

**discover** 70:20,21 320:11 321:3

**discovered** 61:24 304:5 320:4

**discovering** 57:8

**discrepancy** 275:22,25

**discretion** 344:14

**discretionary** 232:13 292:24 293:5

**display** 94:12

**disregarded** 144:23

**distinguish** 280:14

**distress** 338:3

**District** 5:5,6

**division** 24:17 125:2 279:4,6

**doc** 55:6

**doctor** 332:6,17 334:10,14,19 335:18 338:10,13

**document** 15:13,15, 25 45:10,15,19 46:2, 15,18,19,22,24 47:3, 21 48:11,23 61:21 77:17 95:11,16 96:4 100:12 105:7,15 106:10 108:2 122:4, 10,14,24 123:4 124:7 134:24 152:20 153:8, 9,12,14 154:3,7,15, 19 155:7 157:7,19,24 164:8 169:6,19,22 170:4 188:20 189:6, 16,25 190:13 191:4,8 202:19 208:8,14 209:12,20 210:13,22, 24 211:12 212:13,15, 17,19 213:20 214:6, 22,23 215:7 216:17 217:3,12 220:21,25 221:2,3,6,17 222:17, 24 223:2 224:10,24 225:14,24 226:2,4 228:3,7,17,22 264:6, 20 265:3,10,11,15 266:14 273:24 274:14 275:20 298:8, 11,24 314:10 335:7

**documentation** 59:11,23 60:2 61:14 62:2,6,10 64:8,13 91:14 104:7 120:7 263:18

**documented** 69:22, 23,24 70:3,13 150:18 204:23

**documenting** 103:8 105:13

**documents** 17:11, 12 18:20,22 55:6 60:3 63:6,16 88:11 168:13 169:24 177:22 212:3 221:8, 12,15 261:4 288:18 325:4 340:5 342:14

**door** 70:22,24 71:2, 12,13 76:4,5 136:18, 20,21,25 137:3,5,6 139:16 140:24 141:10 143:2,5 146:9 147:10 148:13 149:5 202:9 203:5,9,22 206:10 231:23 248:16,20 262:23,25 263:2,9,11,13 266:5, 11

**doors** 135:6 136:23 139:4,6 141:7,18,25 142:10,14 143:10 144:6,19 145:16,21, 25 146:16,18 147:2, 15 150:22,25 151:5, 19 175:2 203:5,21,24 204:13,20,24 231:23 262:16 263:3

**double** 231:7

**double-check** 129:6

**double-sided** 77:17

**doubt** 47:23

**doubted** 251:11

**Doug** 138:17 176:14 178:4,6 181:7,10 186:6 239:18 253:5 255:7,13,23 269:5 270:14,20 292:2

**Doug's** 138:22

**Douglas** 138:2,14 142:20 181:3 249:4

**download** 46:2 95:18 169:11 189:2 211:6 212:12 220:23 265:18 274:3 289:20

**downloaded** 46:22 100:15 118:5,8 242:5

**downloading** 134:20 153:8

**dozen** 6:25 7:19,23 21:6 66:18 232:7 313:14

**dozens** 231:24 232:5

**draft** 115:19 275:10 285:11,23 295:14,15, 16,25 296:3 297:9 299:21,24 300:15

**drafted** 295:21 303:18 307:8 310:4

**drafts** 286:7

**drain** 249:22

**drain-down** 155:20

**drawer** 345:14

**drawing** 20:19,23 159:18 311:20 336:21

**drills** 222:18

**drinking** 292:13

**drive** 94:15

**drop** 134:9 152:24

**dropped** 129:14

**dry** 216:9

**due** 52:7 69:19 70:8 77:9 84:12 109:2 165:7,13 170:19 173:12 216:12

**duly** 6:6 168:5

**dust** 131:22

**duties** 26:19 30:2,4, 16,24 44:25 49:9,15 50:3 52:14,19 68:12, 20 270:15 326:25 327:11,12 329:10

**duty** 50:14,15 52:13 68:22 119:4

**dynamically** 115:11

---

**E**

---

**earlier** 43:10 58:17 62:9 63:23 65:21 68:3 86:22 90:24 114:23 118:19 143:3 157:15 158:4 170:12

**earlier's** 345:19

**early** 36:25 180:24, 25 220:9 227:19 257:20 296:11 305:21 313:21 340:19

**earned** 269:4,12 272:14

**easier** 10:12 49:17 118:6,14 288:3,17

**easiest** 63:12

**East** 5:12

**easy** 54:17 57:11,12 63:8,9 70:21 95:16, 25 117:24 120:25 121:21

**ECB** 118:21,25 119:7 120:8 129:10,19,20

**Ecklof** 243:24 244:3 282:2,5

**edge** 233:2

**edit** 62:3

**Education/ experience** 80:19

**EEOC** 24:16

**effect** 127:11

**effective** 229:2

**effects** 316:20

**efficiently** 161:12

**effort** 310:13

**efforts** 102:24

**egress** 130:9,12

**either/or** 312:20

**EKG** 343:17

**electric** 242:24 308:3

**electrical** 306:24,25

**electrician** 245:23

**electricians** 245:24

**electronic** 206:10

**electronically** 175:7 264:6

**elevator** 248:22 249:9 254:16 257:23 270:15,16,21 306:18, 20 309:15 312:25

**elevators** 248:22 252:24 257:8 309:14

**else's** 114:12 247:6 259:12 304:15

**email** 13:8,11 23:24 37:8 96:12,20,23 97:21 98:12 100:9 101:6,11,18,20,24,25 102:4 103:6 105:9, 21,23 106:4,12 107:6 123:18,20 124:7,8, 10,20 125:19,25 126:20 127:5,11,13, 17 128:2 134:11,13 135:13 136:8,13 137:25 139:12,18,22, 23 140:11 143:21 145:2 146:13 147:8, 17,19,21,23,25 148:4,20,21 170:4,17 173:7,14,15,16 174:23 175:5,8,13,21 176:11 177:24 181:24 182:21 184:8 263:8 294:8 299:17, 19 300:2,4,5,7,21 302:15

**emailed** 297:12

**emails** 92:20 93:2,22 94:20 95:5 96:7,12 105:10 122:18 123:3, 10,13 131:17 134:24 135:4,5,19,20,24,25 136:5 143:13 169:8, 12,13 170:5 172:22 174:18 175:15,22 176:5 261:5 285:20 295:22 297:21 299:5, 12

**electric** (continued columns)

**emergencies** 242:23

**emergency** 13:25 82:23 242:21 244:16 246:3 289:4,8 307:17 308:18 311:19 312:9, 10 331:15 334:16

**emotional** 338:3

**employ** 317:6

**employed** 25:20 152:6 153:16 277:16 315:5 328:18 336:5

**employee** 137:14 239:4

**employees** 7:7,10 20:11 37:17,19,25 78:2,9 79:11 109:6 279:8,9 320:8

**employer** 90:16

**employment** 20:4 21:5 22:9 23:17 24:6 25:8 28:22 31:6,8 33:19 34:23 35:11, 17,22 37:16,20 45:4 47:24 58:14 61:25 62:5 83:5 87:7 90:25 92:17 96:8 120:5 136:2 152:17 163:21 185:7,15 229:6 277:15 281:18 316:10 318:15 326:12,13,16,17,20, 21,24,25 330:5,12 332:2 334:21

**empty** 145:24

**encouraged** 295:18

**end** 20:22 93:3 105:12 152:21 153:2 156:24 157:11 159:4 160:8,10,12 165:12, 13,22,25 166:10,20, 23 167:3 174:8 204:13 223:2 226:23 227:19 245:8,13 269:25 300:7 311:7

**end-of-month** 106:8

**ended** 157:2 158:24 220:18 233:17 267:18 313:21

**emergencies** (continued)

**ending** 220:18

**endorse** 93:24 108:9 111:5 296:5,12,14, 16,17 297:5

**endorsed** 115:16

**endorsement** 41:25 108:8 278:14,16 297:7 301:15

**endured** 281:19

**engine** 277:3

**engineer** 158:11

**engineering** 35:20 113:21 155:14 158:15 178:24 181:16 240:16 261:24 279:4,6 280:5

**enjoy** 281:14

**ensure** 50:20 52:19 148:24 194:12 205:25

**entail** 50:15

**entailed** 119:5

**enter** 52:10

**entering** 51:24

**entire** 33:14 35:16 37:20 38:19 73:25 147:12,23,25 191:23

**entirety** 134:19

**entitled** 45:17,20 49:8 79:20,22 80:19 188:21 263:8

**entrance** 309:12

**environment** 80:10 333:18

**environmental** 119:2,8 125:8,12,15 126:18 142:10,13 145:22

**equal** 179:15

**equipment** 231:4,5 232:9,15 237:15 238:18 239:8,10 242:11,17,20 243:4, 11 249:3 285:14 286:10,12 307:2

**ER** 334:9

**erected** 257:14,17

**erroneously** 142:21

**error** 132:19

**escalation** 103:24

**escort** 306:3

**essence** 44:5 96:17
247:8 286:14 289:5
328:9

**essential** 49:9,14
50:2,14,15 68:11
285:13 286:9,12

**establish** 79:25

**estate** 28:13

**estimate** 32:13

**estimation** 179:6

**ethic** 242:7

**evaluations** 72:25

**evening** 57:19

**event** 296:24 310:6

**events** 18:24 287:15
288:15 289:17

**eventually** 302:25
337:13

**everybody's** 36:12
114:4 217:4

**evidence** 176:3,4

**exact** 8:5 15:21 16:20
26:4,12 33:22,25
42:3 61:16 67:18
159:22 161:17
180:25 261:2 263:15,
23 267:7,18,23,25
308:12 327:7 338:18

**exam** 83:8,10

**examination** 6:10
83:8 168:11 340:15
345:2

**examinations** 84:16

**examined** 6:8 168:7

**examples** 250:4,9,
13,16 251:2 308:12

**exception** 165:14

**exclusively** 187:11

**exculpatory** 176:3

**excuse** 282:22 305:4
324:14

**exhausted** 112:7

**exhibit** 45:7,14,22
46:10,13 94:12,18,20
95:7 96:25 101:25
102:5 103:7 118:3,17
122:9,20 123:11,17
124:16,25 125:19
126:21 128:3 134:8,
10,15,18,20,21
135:4,20,25 148:21
152:20,25 153:3,14
169:3,5,15 173:16
181:22 188:20
189:10,13 210:19,21
211:9 212:8,25
213:11 214:5,6,11,16
220:2,3,12,14,21
221:4 224:8,9,13,19,
24 227:4,8 228:2,11,
14 231:10 263:8,20
264:19 265:5,9 266:8
273:16 274:10
277:25 297:18,23
298:9,24 299:6
304:21

**exhibits** 177:20
263:6

**existing** 142:14

**exit** 245:19

**exorbitant** 61:5

**expanding** 44:17

**expansive** 49:6

**expect** 12:4 236:25

**expectations** 94:11
98:17 188:14,17
295:2

**expected** 101:6
162:9 164:14 187:21
188:14 200:4 213:20
243:12

**expediter** 122:6
131:14,15

**expensive** 146:4

**experience** 79:18
82:14 85:12 131:5
206:21 231:20
232:21 233:8 248:10,
14 249:6 250:5,10,18
251:7,11,15 261:19,
21 269:23,24 270:8
284:10 285:24 331:4,
6,15

**experienced** 64:7
330:16 331:7

**experiencing** 75:9

**expert** 30:18,21 32:7,
15 44:12 66:4,7
144:24 151:25
156:14 251:19
252:22

**expertise** 72:17
158:10 306:23

**expired** 83:11 84:6
85:22

**explain** 119:4,16
202:17 205:8 286:25

**explained** 69:16
205:14,17

**explaining** 165:2

**explanation** 106:14,
19

**express** 147:9,18
312:7

**expressed** 312:13

**extended** 184:20
226:11 296:10

**extension** 184:4,17

**extent** 219:16

**external** 89:25

**extinguished**
232:23

**extinguisher**
174:13,16 182:2,15,
18,19 183:15,21

**extinguishers** 59:3
174:11,24 175:2
182:13,23 183:3,4,6,
10,16

**extra** 76:21 113:19
313:5

**extremely** 57:16
127:18

**eyes** 256:16

**F**

**F85** 82:22 83:3,4

**F89** 83:2,4,15 84:3
85:5

**fabricated** 192:18
216:24

**fabrication** 216:22

**face** 131:16 233:19
326:6

**face-to-face** 40:10,
25

**facilities** 87:23
261:23 279:4,5 308:2
311:13,14,15

**facility** 283:18,21

**facing** 203:7

**fact** 19:18 23:4 36:15
54:17 56:5 60:14
62:18 64:22 74:11
91:15 103:3 130:11
134:5 139:7,11
165:15 176:23 177:3
178:24 179:21 194:2
197:19 198:22
203:14 217:11 232:9
245:6,12 249:17
255:14 256:12
304:16 305:2 313:9
331:12 338:15

**facto** 327:6

**factor** 251:9

**factors** 269:18

**factual** 177:22

**failed** 192:24

**failure** 150:19

**failures** 99:18,19
100:7,9,11

**fair** 231:17 242:18

243:15 246:16
247:21 248:2 261:3

**fairly** 60:23 85:22
172:2

**fall** 171:21 243:22

**falling** 101:8 296:9,
20,25 301:6,16

**falls** 30:8 181:17
282:7

**false** 132:9 136:4
162:24 163:15
192:17 216:6 217:6

**falsified** 77:10
216:16 217:3

**falsifying** 217:7

**familiar** 10:10 27:19
72:18 88:18 135:14
139:14 145:10
193:25 212:17
214:21 241:2,6 285:2

**fast** 47:5 214:14
344:25

**favor** 159:6

**FDNY** 84:2 90:3
118:21 119:7 120:8
191:16 192:12,15
193:6 335:18 338:12,
25 340:7

**February** 37:3,4
140:11,23 143:8
144:13 145:3 148:6,
11 149:20 150:13
259:17,19,21 260:18
262:12,22 263:5

**Federal** 4:16

**feedback** 233:23
305:7 306:9 308:5,6

**feel** 20:24 79:10
103:25 214:15
304:22 335:2

**feeling** 54:13 103:14
333:15,17,20 334:17
343:6

**feet** 117:17 317:22

**felt** 54:2 102:16 109:2
150:11 155:23 166:6
196:13 205:24

223:23 262:17 333:12 334:6 336:7, 15

**females** 82:16

**field** 156:15 329:18 330:21 331:15

**fifteen** 164:4

**Fifty-six** 25:17

**figure** 293:22

**figured** 21:25 77:19

**file** 70:9,10 338:25 345:16

**filed** 24:15,24 25:7 274:25 275:5,17

**filing** 24:24

**filled** 121:14 198:5 333:5 343:15

**final** 40:21 341:7,8

**finalize** 115:20

**finalized** 149:18

**finally** 195:15

**finance** 178:14,25

**finances** 292:15

**financial** 34:21

**find** 58:2 60:15 62:14 65:2 141:11 204:10 205:4 232:17 292:23 331:21

**finding** 65:14 69:9 195:17

**findings** 193:20,22 195:18

**fine** 13:23 23:14 43:14 87:25 123:25 127:25 128:6,10,11, 13,14,18,22,25 129:2 130:15 131:7 132:20 150:25 268:9 274:6 294:5 300:21

**fines** 130:18

**finish** 11:19 217:16, 17 233:14

**finished** 160:22

224:14

**fire** 7:12 27:24 30:5,6, 7,22 31:24 33:4,5,8, 9,13 35:12 42:4 43:25 45:17,21 50:7, 23,25 59:3 63:11 66:5 70:24 71:2,5,13 78:25 79:14,17,18 82:22 83:2 84:11 85:2,25 86:5 88:19 89:7,22 90:4 94:6 96:16 104:11 111:10, 11,16,19,21 112:20 113:7,17 114:3,8,9 115:22 117:21 119:11,15 121:5 125:17 126:18,23 129:21,23 131:4,6, 19,25 132:5,22 133:5 138:18 139:3,13,15, 16 141:10 144:21 145:15 147:15 151:10 155:9,13,17, 25 156:4,8,18 158:11,14 161:10 171:8,17 172:16 174:10 182:11,13,15, 17 183:14,15 191:16 192:3,20 193:5 194:24 196:5,7 197:7,8,12,13,17,25 198:5,8,12 199:12 201:23 202:7,9 203:7 204:24 205:24 222:17 232:23 238:2 241:15,22 247:22 248:7,25 249:6,9,17, 21,24 251:15 252:22 254:6 260:6 261:22 266:11 270:12,14,19 279:3 280:23 284:22 285:12,18 289:8 294:12,15 303:16 304:5,7,11 305:3,5, 10,16,23 306:2,22,24 307:3,10 309:5,9,10, 15,16 311:14 312:23 314:13,20 315:16,24 318:16 319:8 321:23 322:4,10,11 324:12, 17 328:12 329:11 330:16,23 331:4,6,16 335:25 336:9 341:6

**fired** 111:8 325:11

**firing** 112:6 303:25 325:6,24 326:4

**firm** 103:8

**firsthand** 277:23 304:16

**fit** 325:8

**fitnesses** 86:11

**five-minute** 157:5

**five-year** 61:2,4

**fix** 54:5,6 57:11,12, 16,22 63:2 133:15 139:3,5 204:9 245:21,22 246:8 301:21

**fixed** 54:7 204:14 245:23

**fixing** 56:6

**flag** 93:7

**flaw** 205:20

**flip** 118:3 211:4 304:20,22

**flippantly** 42:20

**flipped** 304:21

**flipping** 333:13

**fluctuated** 37:21

**fluent** 107:18

**FM** 90:11,13,15,17,20 199:19,21

**focus** 48:14 91:12 96:19 118:13,19 260:17 314:12

**folks** 105:23 111:12 251:24 252:13,18 283:11

**follow** 49:12,23 100:14 193:3 196:14, 18 204:17 209:8 219:19,24 338:25 344:22 348:22

**follow-up** 93:7,8 191:25 209:9 213:13 265:23 287:4 338:15

**footnote** 279:25 280:3 281:4

**force** 109:8 246:4 262:18

**forced** 336:8

**forget** 39:7 74:6 307:12 317:10

**forgot** 260:12

**form** 69:8 121:17 192:4 198:24 210:14 275:3 341:2 343:4

**formal** 16:3 41:20 102:16 103:5 187:23 228:23 232:17 238:8 285:23

**formal-formal** 187:23

**formally** 93:11,19 287:10

**format** 78:16 234:17

**forward** 310:12

**forwarded** 125:14 126:6 137:25

**fostered** 230:4

**fought** 196:16

**found** 54:3 65:6 71:15 194:11 199:16 207:20 232:10 335:16

**Foundation** 178:19 222:3

**four-page** 264:20 265:3,10

**fourth** 79:24 282:3,4

**Fox** 290:2

**frankly** 295:20

**fraud** 24:22 25:4

**fraudulent** 24:25

**free** 20:25 214:15 230:5 237:5 291:19 304:22

**freeze** 25:2 161:17

**frequencies** 51:11, 13

**fresh** 21:25

**front** 13:15 47:4 190:6 268:2 320:7 330:13

**fruitless** 176:18

**full** 11:15 26:15 27:5, 10 28:23 41:25 53:11 145:23 152:14 283:17 295:17 316:18 317:15,18 331:2,3,19 332:10

**full-time** 314:25 317:22

**fully** 10:23 44:6 108:14 154:25 155:10 331:11 335:13 337:25

**fun** 284:7

**function** 45:8 249:3 270:14 335:14

**functioning** 88:25

**functions** 77:21 270:12

**fund** 341:23 344:10, 13,15 347:24

**funny** 57:25 315:19

**future** 34:20 205:21

---

**G**

**gain** 33:25

**gains** 34:21

**game** 105:5 291:6

**Garcia** 20:10 22:8, 11,20 23:15,23 38:16 39:3 115:18 295:14

**gas** 257:18 307:4 312:17,23

**gather** 209:15

**gauged** 213:24

**gave** 15:18 23:3 27:10,17 29:16 111:4 113:13 130:9,25 162:4,6,18 182:2 183:21 184:16 190:2 195:5,24 197:3 200:2 207:10 221:16

225:11 232:7 248:15
250:13 276:12
284:20 311:11
317:24,25 331:18
332:23 343:16

**gears** 118:2

**general** 81:10,14,20
103:19

**generally** 246:17

**generate** 247:5,7

**generated** 71:8,23

**generates** 70:25

**gentleman** 180:2
205:9

**gestures** 11:6

**get all** 61:23

**get-go** 54:8

**Girardi** 336:22,25

**give** 9:23 11:3,8 12:4,
12 20:16 21:18 37:5
38:5 68:2 81:9,10
85:21 92:21 104:23
105:2 107:23 113:4
131:18 132:2,6
181:11 188:24 192:6
234:7 235:5 238:6
242:4,11 243:10,19
251:18 258:6 262:23
270:23 274:18
276:17 300:8 301:15,
25 302:9 308:12
333:3 336:20

**giving** 62:15,17
64:25 92:22 106:7
165:7 184:4 194:14
239:23,24

**gladly** 293:24

**glasses** 254:10

**gleefully** 238:20

**Global** 90:11,14,15,
21 199:19,22

**Global's** 90:17

**goal** 204:19

**God** 343:18

**good** 4:2 5:17 6:11

23:13 36:13 41:16
44:8 53:16,18 59:3
62:16,18 79:18 85:21
87:21 91:14 116:2
120:12 133:14
136:14 164:5 170:18
182:25 194:8 228:16
229:18 232:12
238:22 248:17 249:7
274:18 288:10 302:5
308:13 318:4 320:15
331:20 335:2,5

**gotcha** 64:4 128:4

**grab** 264:6

**grades** 84:24

**granting** 278:5,9

**granular** 117:22
158:15

**gray** 180:5

**great** 139:23 284:19
348:25

**green** 53:14,16,18

**greens** 54:24

**grew** 316:3

**ground** 10:8

**group** 244:5 255:5,7
330:15

**grouped** 203:11

**groups** 74:9

**grow** 115:9

**guess** 9:21,23 17:5,7
26:23 31:5 35:3
42:15 47:5 85:21
94:13 95:14 113:18
120:12 177:4 210:23
300:2,5

**guessing** 67:19
149:17

**guidance** 251:18

**guy** 52:17 74:6 130:9
179:9,12 252:23
253:7 254:17,24
255:8 257:8 258:2
261:19 296:6 331:17

**guys** 140:19 148:5
193:23 208:15

256:25 276:8,22,23
298:6 320:16

———————

**H**

**hair** 180:3

**hairline** 180:11

**half** 6:24 7:19,23
18:19 21:6 46:7
85:10 232:7 296:19
313:14

**hand** 91:18 120:23
128:21 182:15 313:3
346:8,25

**handbook** 249:2

**handed** 184:19 286:4
308:23

**handing** 294:24

**handle** 91:22 121:22,
25 130:2,3 242:21,22
315:6

**handled** 198:15

**handling** 44:12

**hands-on** 63:10
103:16 106:5

**handwriting** 47:18

**handwritten** 345:8,9
346:2 347:10,11

**hang** 51:16 221:23
250:12 297:2

**hanging** 284:8

**happen** 26:4 133:16,
21 144:21 198:20
199:18 216:13
262:20

**happened** 21:19
106:23 132:24
144:14 186:25 195:2,
6,8,23 196:24 201:8,
11,17 236:6 237:10,
12 256:24 325:2
330:14 334:18

**happening** 151:18
185:22 288:15

**happy** 12:12 95:15
99:2,7,13 116:22

122:17 153:7 188:25
197:6 205:7 211:13
250:21 265:11 274:2
338:23

**harassment** 8:20
9:2,8

**hard** 115:6 121:6

**harder** 246:14

**hardworking** 116:3

**Hariegal** 17:2 86:9
116:9 179:18 208:23,
24 209:25 210:4
232:11 251:13
267:16 268:11
292:25 320:16
343:23,25

**harsher** 281:20

**hazard** 81:21

**head** 31:3 52:15
92:13 104:2 107:24
150:4 230:13 247:2
259:6 272:24 314:20
321:23,25 334:5

**heading** 48:20 80:19
191:10 210:8 213:25
215:16

**headings** 17:9

**headlined** 215:13

**headquartered** 5:12

**heads** 57:19 133:13
171:3,4 175:15

**health** 5:18 6:15
81:23 119:8 125:15
142:10 335:5 336:16
337:17,19 338:6

**healthcare** 5:4 96:18
107:20 138:25
228:25

**hear** 11:23 14:16
17:8 59:16 86:3,24
232:6 248:11 277:22
297:10 334:13

**heard** 239:6

**hearing** 123:24
131:8,10 134:4
156:22 315:8 324:3
344:13

**Hearings** 125:2

**heart** 177:6 333:22
334:2,22 335:6,15,16

**held** 5:7 31:6 54:2
61:8 85:7 100:10
129:6 175:19 176:21
177:3 196:25 201:5,
14 217:7 231:6,18
244:17 246:11,20
252:15 272:17
303:15 324:9

**helm** 75:13

**helped** 115:16,17
318:2

**helpful** 10:11 273:25

**helping** 92:7 116:16
319:18 328:23 329:2

**hesitate** 137:4

**Hess** 216:9 276:22
277:18 280:19

**Hey** 129:5 159:5

**hide** 54:17

**hiding** 91:15

**high** 12:20 84:24
171:20 172:4,10
343:9

**higher** 269:25 341:8

**highlighting** 198:22

**hinge** 70:21

**hinges** 231:23
248:20

**HIPAA** 338:24 340:7
348:15,18

**hire** 103:3 111:11,15,
19 156:3 283:4,13
284:13

**hired** 20:20 40:21
115:24 158:12,13
195:16 283:15
284:12 315:21

**history** 338:9

**hit** 83:9

**hold** 9:24 32:3,17
86:15 100:6 132:10

174:18 244:18 245:5
252:9,12 264:25

**holding** 100:8
155:23 196:24 231:9
239:5 241:14 313:24

**holdings** 28:13

**holidays** 243:13

**home** 12:21 41:19
237:18,19 241:12,18
261:13

**honest** 34:8 152:10
284:5 322:12

**honestly** 179:8
186:25 222:15 284:4

**hooked** 287:23

**hope** 117:14 130:19
281:13

**hopeful** 339:4

**hoping** 126:13

**hoppers** 135:17

**hospital** 34:12 40:13
44:17,20 63:14 69:20
71:4 84:17 96:16
107:18 113:2 116:10
117:4 120:16 129:25
132:10 133:5,21
135:18 138:20,22
139:2 142:3,19
145:18 146:8,10,14,
21 151:7 203:6
204:20 205:22 206:2
231:15 241:13,16
243:4 246:7 257:2
278:24 279:6 287:16
288:9,23 289:5,23
291:12 307:13
308:17 311:18 313:6
314:5 315:2 317:10,
19,22 328:13,19
329:18

**hospital's** 289:6

**hospitalized** 233:4

**hospitals** 205:18
328:24

**hostility** 233:3

**hot** 317:3 332:8

**hour** 18:19 62:20
82:4 92:23 233:15

**hours** 14:19,24 81:19
92:25 177:7 231:17
243:12

**house** 42:7

**HR** 16:11 27:4,8
111:18 208:21
209:25 210:3,9 219:5
227:2 258:16,21,23,
25 259:14,22 260:17,
19 268:13,17

**human** 7:14,17
24:17,18 109:9

**hunch** 201:4

**hundred** 28:17 29:8,
18 77:2 98:14

**hundreds** 44:17
69:14 73:16 127:14
237:2,3

**hurt** 43:13 330:15

**HVAC** 242:25 308:3

**hybrid** 112:22

**I**

**IBS** 329:17 331:25
332:5,11,18,22
333:9,14

**idea** 65:18 108:20
109:10 110:17
128:11 185:25
240:19 242:13 244:6
248:18 281:8 322:19
345:10

**identical** 57:10

**identification** 45:23
95:7 122:20 134:15
153:4 169:15 189:10
211:10 214:12 221:5
224:20 228:11 265:6
274:11 297:23

**identified** 206:4
305:22 306:9

**identify** 204:9 224:22
264:7

**identity** 25:4

**illegal** 86:2

**illustrated** 290:15

**illustrates** 174:19

**ILSM** 68:18 70:15,16,
17 71:7,9,11,14,15,
21 73:20 78:20
89:12,16 159:12
161:4,5 163:11
204:21 312:24
316:21 317:6

**ILSMS** 44:19 68:13,
21 70:4,5,6,7,12
71:23 73:20 161:15,
22 313:25

**immature** 258:15

**immediately** 32:23
185:12,13,14 195:5
229:2

**immersed** 283:18

**impact** 70:5,16,17
71:7,15,23

**impacts** 72:14

**impair** 14:7,11,15
316:17

**impaired** 89:2

**impairment** 88:19,
23 89:5,6,11,13,18,
20 90:3 191:15 192:3
194:9 196:4 197:13,
25 198:12 201:23
314:18,25 315:5
316:8,11,14,19,22
317:5,7,19,23 318:7

**impairments** 89:21,
22 90:6,9,12,14,22
197:8 199:20 314:14
315:6,10 316:13,16
317:10,13

**impeccable** 229:16

**implement** 69:11
116:20

**implementation**
68:13

**implemented**
163:12

**implied** 273:9

**implying** 126:14
160:9 161:2

**important** 13:25
71:6 104:10 105:6,14
106:24 246:17
280:13 308:10 317:8

**imposed** 184:24

**impression** 40:19
341:11

**improve** 99:8 160:2,
25 162:10,17 199:8,
17 238:3 286:25
287:2

**improved** 99:3
159:11 161:9

**improvement** 15:20
18:22 91:20 108:6,
11,18,21 109:11,17
110:3,8,18 111:2
112:17 114:25 115:4
210:12,16 211:7
212:9,23 213:8,12,
17,21 220:4,6,15
223:12,16,21 224:17
225:4,17,18,23
226:7,24 227:10,18
295:4,10,24 296:2
299:21 300:15
301:25 309:8

**improvements**
310:2,4

**in-house** 30:9 51:8
52:8 71:17,18
196:12,14 197:23

**in-person** 37:7

**inaccuracies** 64:13
65:6,15

**inaccuracy** 192:9

**inaccurate** 64:11
191:22 192:11
200:16 203:10 216:3
323:5,6,8

**inadvertently** 276:5

**inappropriate** 322:8

**inaudible** 79:4
229:16

**incident** 191:10
210:10 215:14 259:5

**include** 80:24 198:25
312:24

**included** 219:5
307:11

**including** 69:5
223:24 320:8

**income** 31:11,17,20,
22 32:2,5,15 335:24
339:16

**incomplete** 105:24

**incorporated** 308:8

**increase** 29:14,16,18

**increased** 29:21

**increases** 29:9
30:13 269:9

**independent** 248:23
313:2

**independently**
249:10

**indication** 278:21

**indirectly** 270:21

**individual** 274:5
276:21

**individuals** 24:4,5
38:6 276:2,3 279:13

**industry** 250:6

**inevitable** 109:8

**influence** 22:2 297:2

**inform** 71:11 196:7

**informal** 159:5 188:3

**informally** 93:11,13
154:11 285:20

**information** 52:11
61:10,11 63:5 67:2
131:11 135:9 195:5
231:13 282:25 293:3
340:9

**informed** 191:15
192:19,22 194:18,23

**informing** 193:4

inhibit 14:20

initial 284:15 305:14

initially 309:19

initials 48:7,10,11

injured 335:2

injuries 335:13

injury 335:7 348:13

ink 190:21

innuendos 254:9,11, 12,21

inordinate 103:2

input 160:12 165:8 295:17 311:16

inputs 132:5

inputted 167:3

inputting 160:14

inquire 313:2

inquiries 227:2

insisted 144:25 166:17 204:4

inspect 128:9 316:24

inspection 89:15 202:10 266:5,12

inspections 182:18

inspector 128:9

inspectors 204:5

install 137:21 139:24 144:9,13,16 145:13 149:5 151:2 289:19

installation 140:24

installed 130:13 135:10 142:22,23 144:25 145:19 148:18,19 149:13,20 151:3,16 257:18 291:15,16,22,24,25

installing 146:17,25 147:9

instances 105:7

instantly 142:25

institution 30:23

306:12

Institution-wide 306:11

instruct 19:11

instructed 194:12 198:18

instruction 217:14

instructions 293:24

insurance 8:5,12,13 24:21,22 90:5,8 181:9 191:17 192:2, 13 193:10,13,14 194:2,20 195:4,11,14 197:25 198:23 199:2, 11,14 200:3,14 202:3 339:18

insurer 90:16

intended 310:16

intent 117:15

intention 216:25 217:2 311:4

intentions 325:5

interacted 307:25

intercom 270:17

interested 39:13

interim 68:19 69:7 83:10 162:2 231:11 247:5

interject 20:25

internal 63:20 157:14

interpret 301:22

interrogatories 275:21

interrupted 41:5 43:17

interview 34:16 40:4,10,17 41:19,21 111:13 341:8

interviewed 39:22, 25 40:14 278:3 336:13

interviews 39:24 40:3 278:12

introduce 5:16

introduced 328:15

inventories 55:24, 25 56:3,6,23 57:6,9 58:16,17 60:21,22 62:23 65:19 76:11, 14,15,16 182:8,9 288:4 319:20

inventory 57:5 182:16

investigation 207:24

involve 30:22

involved 8:19 23:3 61:2 108:14,16 143:22 186:17 245:19 246:18

irritable 233:5

Island 332:20

ISLMS 69:22 72:6 218:7,11

isolate 233:25 307:2

issue 53:8 57:3 58:5 59:7,9,10,22,25 64:21 84:7 121:3 126:12 142:8 147:5 149:2 203:5,6 223:23 249:8 262:24,25 263:2,11 273:3 312:8,13,15,16

issued 215:20 218:3 220:5

issues 58:21 75:8 141:3,4 146:17,25 147:9,20 158:6,7 174:12 203:9 246:18

item 71:25

items 16:15 183:7 208:3 213:25 224:2 225:8

J

January 37:2,4 305:5,11,13

Jeannie 178:13 240:20 290:22,23

292:8,10 293:10

Jeannie's 178:21 291:23 293:14

Jeff 4:9 5:14 234:18 235:8 236:9,14,20 260:10 264:14

Jeffrey 6:6

Jerrain 38:9,13 39:2 108:19 114:24 115:3 186:21 294:16,25 295:13,21 325:9

Jerrain's 98:4,5 116:24 296:3

Joanie 168:20

job 25:11 30:2,4 34:4 39:5 43:16 44:4 45:2, 17,20 49:3,5 50:20 60:10 66:3 67:7,17 68:9 72:12,20 77:12 78:11,14 79:17,20 82:12 85:2 86:12 113:3,13 118:18 126:17 129:16 148:11 155:25 156:2 158:18 192:21 197:24 203:22 205:24 231:17 242:12 243:8,11 247:9 249:3 278:5, 10,12,22 306:19 314:25 315:21 317:8 327:8,9 331:13 336:5,6,19 337:2

jobs 97:20 98:4 247:8

Joe 38:9,13 108:19 115:5,15,20 116:12 117:13 123:22 148:22 158:5 159:5 161:9 186:21,22 197:19 208:18 223:4, 5 282:5 294:15 325:9,10

Joe's 116:22

john 179:9,12,13,15 180:7,10 196:13 276:4,11,14,23,25 279:18 308:5,14 311:13 318:3

joined 282:22

Joint 53:20 54:19 57:4 60:3 61:14 62:3, 7,20 63:20 84:13 137:13 142:23 205:7, 10 267:17 268:3 317:12 328:25 344:3

joke 156:24 254:19

joking 258:7,9,11

Joseph 5:2,3,21,22 6:4 38:9 115:23 168:4 224:15,25 228:5,9 234:3 243:23,25 244:7 349:3,13

judge 10:20 132:14

July 5:8 26:21 214:7, 10,24 218:23 268:6 332:15 334:19 343:6

jump 122:23 127:21 172:21 285:10

jumped 172:9

june 15:19 27:16 28:2,6 29:20 31:12 123:24 124:21 125:3 126:22 127:17 129:4 208:2 209:17 211:7 212:8,23 215:19,21 217:21 218:2 220:9 223:24 227:11,19 263:6 268:6 318:20 319:6 324:24 332:15 334:18

junior 253:7,9,14

jury 10:20

justify 285:11,18 292:7

K

K-I-D 258:3

Kanterman 20:9 21:4,9,15 22:4 38:13 39:3 193:16 253:11, 16 279:23

keeping 65:8 67:2 103:22 113:19 204:20

**Kettering** 32:25
33:3,11,19 34:4,10,
14 58:14,18,22

**key** 249:7

**keys** 248:22

**kicked** 161:14 163:9

**kid** 111:8 254:7
258:2,3

**kidding** 60:8 147:14

**kind** 11:7 13:2 113:12
144:5,6 186:14
199:10 245:4 262:10
308:20 333:2,3
343:14

**Kirschenbaum** 5:21

**knew** 19:21 42:8,9
75:4 82:5,11,17
90:17 100:10 108:25
145:4 148:15 183:23
201:10 203:23 205:5
229:10 297:6 311:14
315:20 344:19

**knowing** 65:17 156:6

**knowledge** 78:12
177:19 178:3,23
179:25 246:23
277:23 304:16

---

**L**

**L-A-I** 178:13

**labeled** 4:24

**labor** 206:9

**lack** 132:19 232:8

**lacking** 78:11 91:12
162:24 331:12

**ladder** 81:17

**lady** 241:17

**lagging** 163:3

**Lai** 178:13 179:3
240:21 292:10,15,18,
20 293:10

**Lamb** 34:17 40:12,20
41:12 232:25 278:13,
14,23 308:18

**lamp** 78:21

**landlord-tenant**
8:16

**language** 299:25

**laptop** 13:4,19
237:17,20 243:2
244:10

**laptops** 239:13
240:17 244:4

**large** 133:21 135:17
183:16 287:13,19,21,
25

**largely** 323:24 324:4

**lasting** 324:19

**lasts** 85:15

**late** 143:23 180:24,25
182:2 183:21,24
184:4 245:10 280:8

**lateral** 117:5

**law** 236:4

**lawsuit** 6:15,19 7:21,
25 10:7 18:25 21:21
23:7 221:7 229:19
268:21 271:9 348:5,8

**lawsuits** 8:16 10:2

**lawyer** 19:20,25 20:2
21:11,16,17 23:16,22
168:17,22 221:9

**lead** 135:7 308:6

**leader** 8:21 92:2,9
104:5 242:23,24

**leadership** 27:12
91:21 92:12 296:12
305:18 308:18

**leading** 62:20 94:8

**league** 34:13

**Leah** 5:20 18:15
23:12,25 88:15 212:6
263:21 275:5 280:12
303:10

**Leah's** 21:25

**leak** 8:10 307:4

**learn** 36:15,23 39:5
59:6,22 67:12 90:13

**learned** 56:21 59:25
64:20 201:22,25

**learning** 64:19
117:21 199:6

**leave** 13:23,24 33:16
34:9 84:15,17 233:17
298:3 336:7,17

**leaving** 296:10 326:2
333:19

**led** 54:13 243:21

**left** 25:12 33:19
38:13,16 42:5 58:3,8
61:9,11 66:5 72:24
73:25 74:19 78:25
116:21 186:22
190:21 216:6,7
229:14 264:16
277:21 318:23,25
319:6,10,23 327:3,4
330:8

**legal** 4:3 5:11 119:19
120:3 121:19 129:3
141:5 143:5 235:22
236:2

**lent** 161:25

**letter** 16:10,18,20,22,
23 98:11 119:18
121:17 122:4 131:11
228:6,9,23 263:15
265:19 273:9

**letters** 16:2,5,9 18:21
27:8 208:17,19,25
219:21 267:24

**letting** 171:5 297:2

**level** 12:21 84:4
93:16 94:16 103:5
135:8 158:15 194:10
278:11 282:12,17,19

**leveled** 303:16

**license** 156:5

**licensed** 249:21

**licenses** 32:3,18
156:16

**licensing** 156:4

**lied** 41:24 115:24,25

**life** 30:22 50:8,24
68:19 69:7 71:25
138:19 162:2 171:10,
11,15 173:3 202:8
231:11 241:11,15,22
245:18,20 246:18
247:5 248:25 281:14
331:16

**light** 245:22,23

**lights** 245:19

**limit** 39:14 306:14

**limitations** 32:21

**limited** 46:6

**lines** 47:15,19 99:18
140:15 292:3

**link** 13:9 238:14

**linked** 13:8 237:25

**Linkedin** 39:9,12
271:5

**list** 166:25 170:23,24,
25 171:8,14,16,24
182:16

**listed** 44:25 50:15
124:18 190:20 208:3
213:18,25 280:17

**listen** 22:17 107:8
160:25 262:4

**listening** 110:5
261:19,20 320:24

**lists** 208:8

**literally** 60:10 271:19

**litigation** 32:7

**live** 36:23 294:5

**lives** 10:12

**living** 269:9

**Lizarazo** 15:10 16:11
17:3 109:13,16,25
112:14 207:18
221:19 222:8 223:10
259:16 260:9 267:12
268:11,13,18 342:17
347:8

**lobbies** 309:11

**lobby** 257:15

**local** 287:15

**located** 55:15

**location** 116:25
326:21

**log** 55:13 241:22

**long** 18:16 33:10
57:22 75:7 83:23
85:13 92:7 102:18
148:3 160:19 162:5,
18 166:6,16 186:23
195:25 197:4 202:14
204:12 207:10
209:17 220:5 235:9
269:22 272:22
274:14 280:21
284:13 294:2 304:9
314:7 318:10,11
329:6 333:19 338:10
348:17

**longer** 46:14 159:14
161:13 163:4,6
223:19 225:22 226:6
252:20,25 253:4
285:7 319:4 330:10

**looked** 118:18
129:17 135:2 212:24
220:3 230:22 254:10
263:2

**lose** 33:24

**losing** 133:18 327:24

**loss** 262:10 329:17,
24 330:2

**losses** 130:21

**lost** 121:24

**lot** 31:2 45:2 49:5
51:6 69:2 93:9
121:15 133:22
139:17 155:8 186:12
245:15 246:4 261:12
288:8 295:20,22
303:23 309:6,7 317:9
342:20 344:6 347:19

**low** 166:25

**lower** 84:4 105:10,21
269:25 282:18
303:16

**lunch** 164:10 168:20 296:21

**luncheon** 167:12

**lunches** 296:7,10 301:7

**lung** 335:12 348:13

**lungs** 335:6,13,17

**lying** 201:8 293:9

**M**

**machine** 94:9 133:2

**made** 16:12 18:25 75:3 84:7 89:14 102:16 111:14,15 157:17 176:25 192:5, 8 197:15,16 198:16 206:7 224:4 231:14 251:10 254:12 255:13,14 256:8,13, 22 257:3,9,12,13,16 258:10,12 259:22 260:9 262:16 269:6 271:19 275:9 304:3 309:7 317:9 321:7 323:12,15 324:11 330:4

**magnet** 146:7 151:10

**magnets** 141:18 142:6

**main** 43:15 271:24 329:22 344:8

**maintain** 80:10 87:5

**maintains** 71:3

**maintenance** 50:13 51:25 52:12 58:21 105:25 138:21 165:3 172:20 192:23

**major** 98:20 194:9 203:6 303:23

**majority** 60:23 69:12 84:11 203:4,21

**majors** 117:11

**make** 10:11 26:25 28:19 31:19 41:24 42:2,21 44:22 57:19 60:10 69:3 70:21

71:12 72:20 74:10 81:21 111:20 112:3,4 113:3 151:6,7 162:5 166:9 195:11 202:21, 23 203:13 204:12 209:13 218:20 219:2, 23 221:24 232:6,17 234:6 235:6,11,22 246:14 252:24 254:4, 23 281:15 286:23 288:3,16 293:14 295:16 298:12 305:10 307:20 312:16 313:21 316:25 317:17 318:6 324:16 338:21 341:17

**maker** 278:4,9,15,18

**makes** 103:23 198:4, 25 332:13

**making** 16:14 21:21 33:18 51:11 142:12 241:21 243:14 269:9 270:9 322:13,16

**malicious** 132:9

**man** 20:20 30:6 116:3 194:6 241:14 294:16 336:20

**manage** 30:4,6 66:6 316:10

**managed** 33:6,7 37:25 38:3,14 105:8 178:25 279:6,9 314:18 315:10,12,23 316:7

**management** 30:11, 15 35:25 38:20 91:11,17 92:17 93:10,18 97:23 115:7 158:17 159:10 160:3 162:10,17,24 163:2 279:5 289:8 308:19 311:20 331:15

**manager** 27:23,24 28:7 29:7 30:7 33:4, 13 34:7 38:6 40:15 44:8 50:19 52:18 58:6,7 72:10 74:8 86:14,15,16 87:11 97:25 98:19 103:22 106:25 113:7,17,18

114:8,9 115:18 153:24 156:2 160:15 166:8 176:15 186:20 190:9 193:17 194:22 197:9,11,16 198:14 213:4 215:3 243:23 259:18 272:15 282:6 285:6 290:10 294:14 302:10 303:16 304:12 316:3 319:18 322:9 327:21 328:3 329:8 336:24

**manager's** 86:4,10 292:4 327:16 328:7

**managers** 30:5 37:23 38:8,25 44:6 52:16 69:6 167:8 175:15 238:19 239:20,21 243:2 282:17,18 285:3 293:5 294:13 312:21 315:22

**manages** 118:20 314:14

**managing** 38:2 129:18 158:19

**Manhattan** 43:19

**Manhattanville** 27:24,25 28:8 336:24

**manipulate** 245:17 246:12

**manner** 41:14 252:14

**mar** 229:17

**marathon** 12:7

**March** 77:10 216:11

**Mario** 190:18 253:13, 20 319:15

**mark** 34:8 45:13 94:17 122:9 134:7 152:19 169:2 188:19 203:10 210:18 214:5 224:9 264:19 273:16 298:9 315:14 326:3

**marked** 45:22 95:6 122:19 134:14 153:3 169:14 189:9 211:9 212:8 214:11 221:4 224:13,19 228:11

265:5 274:10 277:25 297:18,22 304:21

**market** 296:24

**marking** 210:21 265:9

**married** 26:8

**marshal** 37:21 192:20 193:5 198:5, 16

**marshal's** 192:25 194:25 196:8 198:8 238:16 285:12,18

**marshals** 7:12 20:14 24:4 103:23 161:10 182:17 197:7,12 238:5 248:21 305:15 313:5 327:22

**MASH** 44:20

**master** 156:4 249:21

**materialized** 67:14

**Matt** 38:9,12,16 52:16 54:4 55:10,19 56:7, 11 57:25 58:3 60:4 61:19 65:7,16 72:11 74:5,7,8 76:2 85:3 86:23 93:9,14,20,23, 25 94:9 97:22 98:8 102:19 103:18 104:5, 25 105:7 112:8 121:14 137:19 160:16 165:6 166:12 170:13 176:14 178:5, 6,7,10 181:25 183:20 186:16,22,23 203:10 216:16 233:24 255:8, 13 256:7,9,10,12,14, 17,18 269:6 285:5 299:21 300:9,16 301:25 302:9,25 303:6,19,21 304:2,4, 7,11 312:19 315:13 319:9,10,14

**Matt's** 52:21 58:10 60:10 66:3 99:18 114:12,21

**matter** 5:2 23:9 30:18,20 44:12 144:24 151:25 233:15 251:19 252:22 338:15

**mattered** 230:4,8

**matters** 230:12

**Matthew** 4:3 5:10

**Matthews** 74:6 203:11 315:14

**mature** 92:8 180:2

**means** 50:5 88:23 121:5 184:18 232:15 249:10 316:19

**meant** 83:7 141:10 172:11 289:14 340:24

**measurable** 320:21

**measure** 68:19 69:9, 12

**measured** 213:24

**Measurement** 213:13 214:2

**measures** 69:7 72:20 142:15 162:3 194:12 198:19 231:11 247:6 317:6

**mechanical** 232:23

**mechanics** 30:9 204:6 270:16

**mechanism** 136:24 137:7

**med** 312:22

**Media** 4:24

**medical** 82:23 257:18 311:18 312:17 335:5 338:25 340:8 348:2,7,10,12

**medication** 343:10, 12

**medications** 14:18, 23 332:22

**medicine** 332:8,24 343:14

**meet** 27:18 40:12 41:23 104:12,21 150:19 186:6 221:18 222:7 246:14 247:16 306:2 311:22

**meeting** 34:16 40:24,25 41:24 109:20,21 116:8 144:18 147:13 155:6 157:6 161:8 222:11 223:5,15 246:5 257:5 295:2 301:18 308:2 309:2,25 311:24,25 312:17,19 313:8,10, 24 342:6 345:7

**meetings** 73:19 92:19 141:22,23 144:3 185:9,11,17,24 186:2,3,9 187:4,7,18 188:9 277:20 287:24 288:16 291:2 307:24, 25 308:20 312:9,11, 12 313:11,13,14,15, 17,20 314:4 342:8,10 345:25 346:14

**member** 277:12 289:2,4 315:16 318:21,24

**members** 104:11 110:13 198:21 230:23 249:8 319:7

**memo** 224:15,25 225:14

**Memorial** 32:25 33:3,10,18 34:4,10 58:14,18,21

**men** 82:16

**mental** 14:11,15 337:17,19 338:6

**mention** 92:14 158:5 341:21

**mentioned** 32:11 73:12 109:15 158:2 192:10 276:18 282:20 283:14 342:24 343:22 346:8

**mentions** 263:7

**mentor** 102:14

**merit** 191:7,8 207:20 217:22

**mess** 11:13

**messages** 261:5

**met** 6:12 17:25

131:16 226:19 291:9 342:16

**met all** 223:17,20

**method** 205:16

**methods** 283:19

**metropolitan** 133:21

**mic** 233:25

**Michael** 5:4 22:23 24:23 35:15 36:18 40:5,11,23,24,25 61:20 64:6 66:16 83:11 85:24 103:3 115:17,19,22 116:5,9 129:13 137:25 142:19 144:18 145:12,13 146:10 149:24 150:3 152:3 155:12 158:9 173:16 179:15 186:3 195:6 224:16 225:2 229:25 230:3 243:19 247:15 248:23 271:15,17 278:22 295:13 296:4

**Michael's** 68:7 76:21

**micromanaging** 175:9

**mid** 245:13

**mid-2020** 261:3,6

**mid-month** 106:7

**mid-september** 337:9

**middle** 93:4 191:12 212:14 215:13 217:13 218:17

**midst** 115:13 317:12

**Mike** 5:19 6:15 22:14 41:2,6 58:2 60:4 65:15 67:5 93:19,23 96:23 108:7,10 109:8 111:5 112:10 114:24 123:18 127:9,21 128:13 144:6 145:4 153:25 160:9 165:10 166:12 174:2 178:22 180:21 185:4 186:8 188:10 196:24 200:23 205:3 215:3 216:16 221:18,19

222:7,8,11 223:20 224:5 228:4,8 230:16,19,24 239:14 244:14,17,24 245:4, 24 246:9,20 247:2,23 248:6,9 249:5 251:17 253:2,3,10,18,25 254:4,12 255:14,16, 21 257:22 258:7,13 260:6 262:18 266:24 267:3,10 291:4 292:21 296:6 297:12 301:14 304:11 308:24 309:22 310:18 311:19 312:7, 13,15 313:18 320:17 321:9 329:19 331:23 340:22 341:3,4,10,12 342:6,9

**Mike's** 160:24 174:17 181:17 187:11,12,14 200:21 280:17 292:22,24 302:16 303:20 313:12

**million** 317:21

**mind** 57:20 103:14 114:2,4,5 116:25 233:20 234:20 242:19 295:21

**mine** 13:24 23:11 111:24 129:24 172:3 173:2 238:23 245:12 248:2 273:19 327:9 347:6

**minimize** 49:17,20

**minimum** 62:10

**minors** 117:9

**minute** 166:5

**minutes** 154:12 156:22 159:5,7 164:4 264:5 324:3

**misleading** 70:17 74:4 126:15 128:4,24 163:12 165:20 192:18 231:12 313:13 315:18

**missed** 103:9,17 105:8 107:10,15,16, 21,25 108:2 121:7 185:20 192:7 234:24

245:11 275:12,15 313:15 323:5,7

**misses** 107:9,17

**missing** 16:15 53:17, 21 54:4,18,20 60:6,7 62:19 63:22 64:9,10 65:23 72:16 91:14,15 175:10,11 314:4 320:20 322:22,23

**misspoke** 234:24

**mistaken** 48:4

**mistakenly** 217:18

**misuse** 77:5

**mitigate** 146:15 316:20

**MO** 325:8

**mode** 248:23 313:2

**modules** 81:18

**moment** 18:20 46:7, 8,19 48:14 89:3 99:12,24 103:14 129:17 137:4 152:23 191:9 206:12 209:16 214:4 227:5 260:18 263:25 272:25 297:17 322:18 340:3

**Monday** 26:19 28:23

**money** 33:24 133:11 142:19 269:6,9,13 270:9 273:7

**Monique** 170:5,10, 11,14

**monitor** 72:5,13 234:3 238:12 285:12, 18 286:22 287:8,13, 15,19,21 288:2,6,14, 22 289:11 291:8 344:7,17

**monitoring** 72:9

**monitors** 237:25 291:18

**month** 26:23 27:15 29:2 35:2 38:16 61:16 76:19,24 77:7 104:18,19 105:12 119:14 159:12 160:5, 8,10,11,13,17,19,22

164:15,19,22,25 165:5,6,9,12,14,16, 18,22 166:4,7,11,13, 20,24 167:4 171:2,7, 19 172:2,4 174:8,9, 14,15,25 182:3,14 183:7,22,25 184:2, 10,16,25 188:15,16 190:5,7 195:2,3 216:20,21 245:8,13, 14 246:22 259:18 270:23,25 314:15 319:12

**monthly** 51:4 52:25 62:11 73:9 116:14 183:9 270:17,21 308:20 311:22,24

**months** 27:3 38:10, 11,18,23 63:22 73:24 97:7 98:18 102:14 117:10 152:16 290:21 309:4 318:14, 19 319:9 324:19 325:7,23 326:5 333:21,25 338:14,19 344:19

**morning** 4:2 5:17 6:11 105:24 170:18 246:5 257:5 277:19

**motivation** 94:15

**Mount** 34:11,12 90:7 96:13,16 110:19 111:21 116:11 127:24 137:14 200:2 267:13 278:24 279:5 280:24 288:23 310:14 328:12,18

**mountsinai.org** 96:11

**mouth** 70:6

**move** 49:20 86:21 95:17,18 112:23 117:5,24 295:23 307:14,15,21 310:12

**moved** 303:17 304:2, 17 307:21

**moving** 95:20,21,22 100:20 309:13 313:4

**MSNBC** 290:2

**multi-page** 45:10 122:14 134:10,13

**multiple** 129:25 130:2,22 280:24

**multitask** 80:5

**multitasking** 93:10

**multitasks** 79:25

**mute** 298:16

**N**

**N-A-F-A-S-H** 241:8

**Nafash** 241:9

**naive** 258:13

**named** 178:12 179:9, 12 180:12 181:12 241:2,6

**names** 20:16 38:5 171:4 276:2,6,7

**nature** 8:7 248:7,8 271:23 272:3,6 273:4,12

**necessarily** 51:9 89:3 111:16 130:18 171:19 272:18

**necessity** 84:10

**needed** 44:18 63:16, 22 67:6,16 68:2 75:2, 10,25 83:8 89:16,17 91:7,20 92:7 93:8 94:10 103:4,25 105:11 115:8 116:2,3 131:13 141:13 154:22 155:9 160:2 162:17 166:2 195:19 207:6 237:19 238:16 242:3 243:11 291:6, 15,18,19 311:16 313:25 317:6,22

**needing** 241:22

**negative** 249:13 281:20

**negotiated** 29:12

**negotiation** 42:23

**negotiations** 30:12 44:14

**network** 289:15

**newly** 303:17,18

**news** 56:2 238:12 288:7,10 289:25 290:3

**NFPA** 51:12

**nice** 43:21

**nicely** 201:18

**night** 241:23 243:13 284:9

**nights** 57:21

**nine-page** 122:10

**nods** 11:7

**nominated** 259:17

**non-healthcare** 138:25

**non-high-risk** 172:16

**nonemployees** 38:3

**nonverbal** 11:7

**normal** 62:22 120:10 193:3 246:3 345:25

**North** 284:3

**notarize** 122:7

**notarized** 122:6

**Notary** 6:6 168:6

**notation** 209:13

**note** 279:24 281:3 342:13,22

**notebook** 345:15 347:12

**notebooks** 13:15

**noted** 349:6

**notes** 13:14 110:5 213:13 261:4 275:9, 11 339:7 342:7,9,11, 15,18,19,20,23 345:6,8,19,21 346:3, 11,12 347:3,5,9,13, 14,16,21

**notice** 96:11 124:25 125:10 130:7

**noticed** 195:5,20

**notification** 90:21 132:19 197:16,17,21, 22 198:13 199:11,20 228:23

**notifications** 89:14, 15,22,23 90:18 192:5,8 198:4,17 289:22,24 293:23

**notified** 64:14 89:17 90:2,6,8,12,14 191:16 192:12 193:6 197:18 198:11,23 199:25

**notify** 132:22 191:17 192:2,13,15,17 193:23 194:2,8 197:8,13,24 199:2

**notifying** 133:10 195:7 199:12

**November** 47:22,25 85:19 137:19 138:10 140:3,8 143:14,23 144:9,14 148:23 149:20 150:8,13

**Nowicki** 181:13,18 240:10 282:10

**number** 4:25 5:6 67:18 74:4,12 77:21 80:22 94:21 105:23 122:11 124:10 134:11 136:9 152:22 169:7 185:5 188:22 202:6 203:13 210:23 214:8 215:20,23 216:4 217:8 220:22 224:10,25 228:3 247:21,22 264:21 299:2 324:13

**numbered** 191:14 202:6 215:15,18 218:6 219:14 263:22 324:13,17 325:20,21

**numbers** 34:2 74:11 85:25 86:5 171:25 172:25 173:2 219:15 297:21 298:10,12,14, 18 317:25

**Nunez** 85:9 228:5,8 328:4,11

**nursing** 307:12 308:19 311:17

**NYC** 125:6

**O**

**oath** 7:16 10:15,19, 22 14:2 125:2,11

**objected** 19:7

**objection** 18:4 19:2 56:13,14 59:8,24 107:7 126:25 147:9, 18 149:11,22,24 150:2,9,10,12 156:20 163:23 167:5 178:2, 16,18 179:7 192:4 221:21,22 222:2,5 235:16,18 236:19 237:8,14 303:8,12 304:13 341:2 343:4

**objections** 19:11 149:15,21

**obligation** 200:7 243:10

**obvious** 64:15 65:3

**occasion** 32:6

**occasions** 308:24

**Occupational** 81:23

**occur** 87:18

**occurred** 18:24

**occurring** 45:4 306:5

**occurs** 89:6

**October** 26:3,5,8,11 27:22 28:2,6,22 35:2, 7 48:3,5 77:10 85:18 148:24 149:6,17 154:3 159:25 162:9 163:19 164:13 216:12 274:25 275:3, 17 282:22 299:14,15, 20 319:5 337:9

**offensive** 254:20

**offer** 25:11 41:15 42:6,15,16 55:12 164:6 273:9 278:5, 10,12 336:14

**offered** 27:3 34:17 41:7,10,11 42:13 43:8 61:7 116:9

**office** 27:18 76:3 81:9 115:18 154:11 159:6 187:11,12,14 192:20,25 194:25 196:8 197:20 216:19 221:20 222:8 238:2, 16 259:16 267:19 287:23 290:12 291:11,20,23,25 292:2 296:23 344:4,5 346:25

**offices** 30:5 291:16, 21 292:4

**official** 42:15,16

**offline** 196:9 198:7

**older** 64:7 206:22 230:6 231:2 276:2 277:9 280:9

**oldest** 277:11

**Olympic** 195:16

**Omelfi** 20:10 22:8 23:2 38:16 57:17 115:17 295:14 318:23,25 319:3,6, 12,14,16

**Omelfi's** 319:24

**on-boarded** 337:5

**on-site** 81:7 83:8,10, 17

**on-the-job** 78:2 79:12

**one-building** 116:10

**one-man** 315:21 316:5 318:15

**one-management** 239:25

**one-on-one** 92:19 185:8,24 186:2,3,9, 14 345:7

**one-on-ones** 186:8, 13,15,18,19 187:3 342:6,15

**one-page** 152:20 188:20 214:6 220:21

221:3 228:3,7

**ongoing** 272:8

**open** 13:7,12 46:14
52:22 73:4,8 74:20,
25 75:5,6,12 76:4
96:22 136:25 137:3
142:4,9,14 145:16,21
146:2 151:9,19
170:19,24 171:12
172:3 173:9 206:19
215:20 216:7 217:23,
24,25 233:17 304:23

**opened** 218:3

**opening** 221:13
336:11

**operate** 249:10

**operation** 59:2

**operational** 290:9,
13

**operations** 33:6
36:6 44:10 58:24
276:9 286:5 306:20
320:2

**opinion** 34:14 41:18
86:8 94:16 105:6
142:21 144:4,6 162:3
281:6

**opinions** 231:22

**opportunities** 39:15

**opportunity** 34:3
47:2 69:3 199:7
234:7 344:22

**Ops** 60:15

**order** 69:11 70:23
71:16,24 74:10 75:6,
11,21 77:4,6 203:12,
16,17 206:3 215:19
216:14,23 217:23
218:3 247:7 287:15

**ordered** 293:2

**ordering** 241:25

**orders** 72:6 73:5,8,
10,11,13,14,21 74:2,
9,15,16,20,23 75:14,
15,18,23 76:6,19,23
77:5 113:3,4,24
172:21,22 194:15,16

202:7,21,24 203:3,
12,13,16,17,20
206:7,14,24 207:3
231:7 238:4 246:25
247:4,5,6,11,21,22
248:6 263:12 266:12

**org** 240:12

**organization** 80:10
243:10

**orient** 79:11

**oriented** 284:10

**Orients** 78:2

**original** 265:19,20
347:5

**OSHA** 81:3,7,8,10,
13,16,19,23 82:2,4,
13,15,17,18,20

**outlined** 307:9

**outright** 133:19

**outstanding** 74:24
207:4

**overdue** 74:15
203:20

**override** 293:13

**overrode** 144:6

**overruled** 149:24
150:3,9,12 151:14

**oversaw** 54:16

**oversee** 50:6,18,19

**overseeing** 44:10,11
51:10

**Oversees** 118:20

**oversight** 194:4

**overspray** 131:23
132:23 133:14

**overwhelming**
50:22

**owning** 301:21

**oxygen** 307:18

— **P** —

**p.m.** 167:11 168:10

211:22,25 264:10,13
339:10,13 349:4,6

**package** 42:3 43:4,5,
8

**packet** 78:13 122:8
219:15

**pad** 314:3

**pages** 47:7 77:18
299:5 318:12

**paid** 128:22 268:22

**pains** 233:5 333:11
343:8

**painted** 195:12,19

**painter** 252:23

**painting** 132:24

**palpitations** 329:17
333:23 334:3,22
335:17

**pandemic** 45:3 75:7
83:9 84:13 98:20
115:13 237:19
257:20

**panel** 305:24 306:22

**Pantoja** 255:9

**paper** 57:6 162:16,20
163:20 182:9,15
276:23 279:16
280:16 345:17

**paperwork** 98:7
160:7,16,22 164:18,
21 196:12 322:24

**paragraph** 48:21
99:16,17 102:4 103:6
191:14 202:6 215:18
216:4 218:6 227:13
278:2 279:2 280:3
281:17 282:9,15
283:7,8 285:10
287:12 293:16
294:11,21 301:23
304:25 305:10 310:6,
10 314:6,13 320:3
323:10 324:6 326:7

**paragraphs** 215:15
274:5

**parent's** 181:9

**park** 44:20

**parking** 42:2,22
43:3,16,20 273:6,8

**part** 42:2,22 54:12
56:8 57:5 69:10
70:14 72:10 75:10,11
78:23 84:21 85:4
88:24 109:12 112:25
113:2 120:10,16
133:5 138:13 147:13
151:4 156:11 185:23
187:2 188:8 208:16
209:2 219:14 243:7
249:2 270:15 273:8
279:3 289:6,9 301:16
306:19 308:17 311:8,
14,15 318:8 334:12
337:19

**parties** 4:12 89:25
130:22

**parts** 30:20 55:21
78:14 96:19 98:4
206:9 226:19 291:12
320:21

**party** 7:20,25 8:15,22
10:3,7 130:4,6 131:8
348:5

**Pasquarello** 4:1 5:1,
2,3,22 6:1,4,11 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1,7 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1,22,24 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1,18 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
89:1 90:1 91:1 92:1
93:1 94:1,23 95:1,7
96:1 97:1 98:1 99:1

100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1,15,20
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1,
15,17 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1,3,5
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1,4
163:1 164:1,12 165:1
166:1 167:1 168:1,4,
12 169:1,10,14 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1,23
189:1,9 190:1 191:1
192:1 193:1 194:1
195:1,24 196:1
197:1,3 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1,20
209:1,11 210:1
211:1,3,9 212:1,2
213:1 214:1,11,13
215:1 216:1 217:1
218:1 219:1 220:1
221:1,4,23 222:1
223:1 224:1,12,15,19
225:1,2,5 226:1
227:1 228:1,5,9,13
229:1 230:1 231:1
232:1 233:1 234:1,5
235:1,12,22 236:1,5,
15 237:1,15 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1

254:1 255:1 256:1
257:1 258:1 259:1
260:1,16 261:1 262:1
263:1 264:1 265:1,7
266:1 267:1 268:1
269:1 270:1 271:1
272:1 273:1,23 274:1
275:1 276:1 277:1
278:1 279:1 280:1
281:1,19 282:1 283:1
284:1 285:1 286:1
287:1 288:1 289:1
290:1 291:1 292:1
293:1,18 294:1,4
295:1 296:1 297:1
298:1 299:1,4 300:1
301:1 302:1 303:1
304:1 305:1 306:1
307:1 308:1 309:1
310:1 311:1 312:1
313:1 314:1 315:1
316:1 317:1 318:1
319:1 320:1 321:1
322:1 323:1 324:1
325:1 326:1 327:1
328:1 329:1 330:1
331:1 332:1 333:1
334:1 335:1 336:1
337:1 338:1 339:1,5,
14 340:1,18 341:1
342:1 343:1 344:1,25
345:1 346:1 347:1
348:1 349:1,3,13

**Pasquarello's** 237:9

**passage** 248:25

**passed** 62:13 63:19
64:23,25 65:13,21
83:7 157:15

**passing** 62:14 65:22

**past** 63:6 104:6
173:12,18 207:6

**Pat** 40:12,14,17,20
41:12,14,16,23 42:11
221:18 265:19
278:13,14,21,23
308:18 342:16,19
347:8

**path** 130:9,12,13

**patient** 291:14
307:11

**Patricia** 34:17 222:8,

11

**Patty** 16:10 17:2
109:13 207:18 223:3,
4 259:16,22 260:9

**Paul** 336:22

**pause** 11:16,17 46:8

**pay** 33:23 127:25
128:6,10 132:17,20
270:5

**payroll** 241:17,24

**payrolls** 30:12

**PCRA** 159:13,17,19
161:16

**PDF** 46:21 49:13
94:24 96:21 100:14
118:6 304:23

**penalize** 160:18

**pencils** 241:25

**pending** 4:18 12:9
242:15 325:14

**pension** 31:23
335:22,23,25

**people** 63:14 106:21
131:16 138:11
158:19 176:16
177:13,14,16 178:5
204:5,22 219:4 230:6
231:18 240:10,14,20
242:7 243:5 245:22
253:7 255:10,17
256:5 259:10 268:14
270:5 276:25 281:11,
13 282:16 306:13
307:14,15,18 310:13,
17,22 312:3

**people's** 231:22

**perceived** 161:24

**percent** 29:15,16
60:10 77:2 98:14
171:12 172:2,3
173:9,18 175:16
183:3,15

**percentage** 183:2,
13,16 184:24

**percentages**
170:19,24

**Perez** 4:3 5:10

**perform** 78:7 243:11
270:11

**performance** 15:18,
19 18:21 91:6,20
92:11 108:6,11,18,21
109:4,11,17 110:3,8,
18 111:2 112:17
114:25 115:4 152:5
153:15 159:24
210:11,15 211:7
212:9,22 213:8,12,
17,21 220:4,5,15
223:12,15,17,21
224:17 225:3,23
226:6,24 227:10,18
294:15,22 295:2,4,
10,24 296:2,9 297:10
299:21 300:15
301:25 322:10
324:10

**performed** 78:6
216:10,11 222:18

**performing** 86:11
203:25 329:10

**period** 25:9 35:17
37:20 231:14 334:25

**periods** 296:22

**perk** 43:21,22

**permit** 198:6

**permitted** 218:17

**Persaud** 190:18
253:20

**person** 42:16 108:17
133:25 134:3 137:11
178:12 187:5,8
190:14,20 205:25
230:25 253:21
258:15 261:10 301:2
303:16 305:23,24
306:2,22 307:21
310:24 313:24
320:24

**person's** 240:23

**persona** 92:2

**personal** 94:7 109:3
346:19

**personally** 192:5,8

**personnel** 78:3
156:8 304:17 306:18

**persons** 132:11,12

**Peter** 241:3,4

**pettiness** 233:7

**phased** 83:3

**phone** 13:21 18:2,12,
14 23:19 34:6 37:8,9,
10 39:10 40:3,4,24
57:21 141:16 261:11,
12,13 289:12,19,25
290:5

**physical** 14:11,15
329:16

**physically** 229:13

**physicals** 337:18

**pick** 62:21,24,25
64:12 101:6 288:10

**picking** 44:7

**picturing** 256:17

**piece** 45:11 47:8
95:12 134:18 285:13
286:9,12

**pike** 308:4

**piles** 121:24

**piling** 104:16

**pills** 333:2

**PIP** 15:9,12,16 16:3,
4,16,18 76:24 83:12
84:21 93:23,24 208:5
245:6 313:18

**Piro** 133:15

**Piro's** 63:13

**place** 36:24 108:23
114:17,24 116:6
117:24 145:23
155:18,19 185:18
187:4,8 198:19
233:6,10 283:24
293:13 306:6 310:25
313:5

**places** 329:3

**placing** 108:20

**plaintiff** 4:22 5:21
8:24 9:12,14 237:5
278:3,5 279:7 281:19
282:21,24 285:11
287:13 294:11 305:2
314:18 316:7 320:4,7
323:11 324:7,12

**plaintiff's** 4:21 9:17
283:2 294:23 305:6
310:12,14 320:6

**plan** 15:20 18:22
102:8,12,22 104:25
108:6,12,18,21
109:4,11,18,24
110:3,8,11,18 111:3,
4 112:16,17 114:25
115:4,15 210:12,16
211:8 212:9,23
213:8,10,17 220:4,6,
16,17 223:5,12,16,21
224:17 225:4,15,16,
23 226:7,9,10,19,22,
24 227:6,10,19
295:4,11,13 296:2
297:10 299:21 300:8,
15,22,24 301:25
302:5,9 307:8,24
311:12

**planned** 194:19

**plans** 85:25 86:5
295:24 308:23

**plant** 243:23 276:8,
15,20,22,25

**player** 117:8

**pleasure** 238:23,24
290:14 292:5

**plumber** 249:21

**plumbers** 245:25
249:20

**plumbing** 155:15
156:3 197:2,23
242:24 243:21 244:3,
4 257:18 282:6
307:4,5 308:2

**PM** 50:12 51:8 52:11
70:18 77:6 160:7
165:2 172:25 182:20
216:6,8

**PMS** 50:8,24 51:7,24
52:7,22 53:2,7,8 56:3

57:8 58:25 59:2,4,7,
10,12,17 77:4,5
107:12,13 159:11
160:5,20 164:14,17,
24 165:3,18,21 166:3
170:19 171:6,8,14,16
172:15,20 173:7,12,
25 174:5 182:22
184:24 245:7 246:21

**point** 11:12,22 20:24
23:16 24:23 35:3
40:9,11,14 42:8,9,18
44:18 61:17,22,25
62:5 65:17 68:4,22
98:15 102:14,18
108:5 114:22 115:14,
22 132:20 141:6
145:5 148:14,16
154:20 155:5 158:4
160:24 161:19
163:13,14 164:5
172:4 175:5 176:14
185:7 186:24 197:9
203:19 205:16
207:16 226:25
229:13,15,18 231:24
233:4 253:15 262:2,
12,17 263:24 272:23
301:12 302:6,24
311:18 315:15 316:9
318:14 319:19
321:19,21 325:17
329:22 336:15,17
337:11 342:5 343:21

**pointed** 61:6 155:4
157:5 184:13 309:5
324:7

**points** 16:17 81:17
342:25

**policy** 76:4 78:15
199:19,21 245:8

**poor** 91:8,10

**poorly** 99:21

**pop** 32:19 273:21

**popped** 259:6

**popping** 214:20

**pops** 118:9

**portion** 46:9 182:22
194:4 195:17 265:9
270:22,24 331:13

**pos** 317:19

**position** 20:12,17,18
25:14,25 26:13 27:4,
10 30:3,15 33:2
34:18,19 39:13,17,22
40:15 41:7,10,11
42:6,9,14 43:22 48:5
80:6,14 87:17 92:4
112:12,19,21,22
114:10,11,20 115:9
120:4 179:14 228:24
229:8 252:12 269:7,8
276:19 303:2,7,15,18
304:4,12 315:8
319:15,16 328:2
337:12

**positions** 20:12 33:6
43:12 251:21,23
252:8,15 305:15
327:16 337:12

**possibility** 275:14

**possibly** 205:21

**potential** 102:20

**pounding** 334:5

**power** 111:11,17,19

**practical** 104:20
331:14

**practice** 86:7 90:5
199:24

**pre-installed** 290:4

**preceding** 99:16

**predate** 209:6

**predated** 280:22

**predates** 299:14

**predecessor** 203:11

**prefaced** 80:23

**prefacing** 244:8

**preferred** 80:23
205:15

**prep** 18:7

**preparation** 16:6
17:13 18:18 61:14
62:3,7 317:12

**prepare** 15:3,6 17:24

**prepared** 346:14

**preparedness** 82:24

**preparing** 280:6
281:5

**prescribe** 332:21

**prescribed** 333:6
343:9,12,15

**prescription** 14:19
333:4 343:15

**present** 34:22 154:7
190:13,16 255:4
288:16 308:15
309:21 310:24
311:10,11,19 312:2
318:3

**presented** 7:14
93:24 154:15 155:6
190:17 210:13
214:23 263:20
302:11 309:20
311:25 317:24

**presenting** 313:24

**president** 27:6,7

**pressure** 76:21
166:11 332:8 343:8

**prestige** 34:10

**prestigious** 34:12

**pretty** 58:4 72:23,24
107:22 182:25 188:7
304:9 337:5

**prevalent** 31:5

**prevent** 14:7 124:3
125:21 310:13,17

**preventative** 51:24
52:12 58:20

**prevented** 305:6
320:5

**preventive** 50:13
165:3 172:20

**previous** 64:23
90:16 115:6 124:8
204:3 223:24 260:23
305:18

**previously** 69:15
76:7 82:8 168:5
193:11 200:15,22

201:13 330:11

**priced** 146:3

**primary** 30:19

**printouts** 13:15

**prior** 32:23 42:12
165:18 259:21
260:18 305:4,11,13
315:3 334:8,21

**priorities** 79:25

**prioritize** 246:2
247:19 313:16

**prioritizing** 97:23

**priority** 107:22
166:24,25 247:19

**private** 273:7

**privilege** 168:25

**pro** 335:14

**problem** 53:25 56:9
58:2 64:3 71:12 76:7
91:16 121:16 145:21
146:5 151:18,23
166:19,23 173:5
174:16 175:3 238:20
274:12 290:14
306:10,11 322:15,17
332:3

**problems** 54:12
298:20 335:6

**procedures** 4:17
78:15 193:3 196:19
238:4 305:3,11

**proceed** 139:24
144:9,15

**process** 27:9,14
34:16 51:23 111:14
148:3 152:21 153:2
157:12 166:2 199:8,
17 205:8,11,12,13,
15,19,20,22 206:17,
18

**processes** 238:3

**procrastinate**
121:23

**produce** 176:5
208:25

**produced** 208:15
219:17 221:8

**produces** 53:15

**production** 77:18
208:14,17 209:3,7
219:22 342:23

**professional** 79:2
94:8 117:7 144:4
330:16,19,24

**program** 13:11 50:18
51:11 52:6,9 54:4,15,
21 55:4,22 64:16
70:15 72:12 183:9,25
184:7 336:23

**programs** 50:7
53:23 118:21 129:19

**progress** 223:25

**progressed** 102:23

**prohibited** 248:19

**project** 139:12,13,
14,15 142:18 143:11
149:9 150:15,19
151:12 152:4 159:21
161:14 163:9,11
202:24 204:13

**projects** 202:22
244:23

**prolonged** 137:8

**promoted** 26:15,17
27:5 29:14

**promotion** 26:18,20,
24 27:14

**prompt** 230:18

**prompted** 263:14

**promptly** 283:3,12

**pronounces** 190:19

**pronouncing**
343:23

**prop** 142:9

**proper** 64:17 69:6,11
76:16 78:19,20 143:5
156:4 195:12 196:11
204:17 307:6

**properly** 52:20 68:23
69:21 88:25 97:20

209:16 214:19 315:12 317:16

**properties** 31:25

**property** 8:9

**proposal** 110:2 112:16 285:11,17 286:2,7 292:6 315:9

**proposals** 238:8 285:24 288:3

**proposed** 106:15,20 310:4

**propped** 145:21

**protect** 287:16

**protection** 112:13 125:8,12 155:9,17

**protest** 145:12,14 288:9

**proud** 74:19 78:24

**provide** 79:12 119:22 131:10 188:9, 13 285:17 306:22 332:21

**provided** 106:16 107:3 250:17 285:19 286:7 287:9 291:19

**provider** 191:17 192:2,13 193:10 195:4 197:25 198:23 199:3 200:14 202:3

**providing** 129:7 272:15 308:6

**prudent** 302:6

**psychiatric** 337:16

**psychiatrist** 337:22

**psychological** 337:16

**public** 6:7 168:6 289:7 306:12,14 308:19 309:11,16 311:16

**pull** 79:4 132:4,7,8,15 171:22,23 297:16

**pump** 191:16 192:3, 24 193:2,6,22 194:23 195:9,21 196:5,8,20

197:14,19 198:2,6,12 201:23 216:9

**pump's** 192:23

**pumps** 197:8

**purchase** 232:16

**purely** 61:8

**purpose** 62:8 142:17 187:18

**purposely** 217:19

**Purse** 44:22

**pursue** 32:4,18

**pursuing** 9:14

**purview** 138:20,22

**pushed** 38:20 142:20 143:10 325:10 330:13

**put** 13:22 44:19,21 45:8,9,12 57:13,15 58:6 65:19 69:14 70:22 74:10 78:12 83:12 86:4 93:23,25 94:18,19,25 102:11, 22 108:22 109:3,10, 23 110:2,7,17 112:16 114:15,17 115:15,20 116:6 117:9 122:3,12 133:13 138:18 141:7, 9 143:9 144:5,7,18 145:24 147:15 149:14 151:9 158:23 161:20 162:15,20 163:13 166:11 169:4, 5,9 186:14 203:12,15 204:21 210:20 211:5 212:9 214:13,14 220:13,23,24 223:20 227:5 228:2,13 238:8 248:16,22 249:20 254:9 262:9 264:7, 22,23 267:3 269:24 272:9 285:25 296:13, 18 297:18 298:8 300:16 302:4 306:6, 17 307:23 314:4 331:14 345:19,21 346:9,10 347:3

**puts** 113:2 156:11

**putting** 70:6 72:21 76:21 102:6 109:17

110:11 111:2 141:18 142:15 151:6 166:12 213:16 230:7 257:14 273:24 295:3,10,13 297:4 312:25 345:22

---

## Q

**qualification** 80:5, 14

**qualifications** 79:21,22 82:12

**quarterly** 51:5

**Queens** 116:11

**question** 11:8,15,17, 18,19,23 12:4,9,10 18:9 25:6 31:14,15 34:7 46:23 48:16 56:15,17 65:12 66:25 82:6,13 86:20,21 123:2,8,9 127:20 134:22 139:20 147:17 153:10 162:7 169:11 176:6,17 177:18 179:11 182:25 188:2 189:5 195:25 197:4 217:13, 16,20,21 221:24 222:5 226:4 237:5 239:8 240:5 241:19 242:13,14 244:9 252:11 259:5 260:11, 16,23 264:15 274:8 280:12 287:7 299:11 304:8,9 318:9,13 321:3 323:14,18 325:13,14 326:3 327:4 331:9 337:25 341:19 348:4

**questioned** 7:15 92:13 250:21 323:11

**questioning** 7:17 331:5

**questions** 6:18 10:23 11:4 12:11 14:12,16 21:25 44:13 46:17 56:12,20 60:17,19 63:15 66:21,23,24 67:3,4 101:13 116:18 164:7 189:22 212:18 274:4 287:5 300:10 324:2

340:3,13,17,20 344:21,23,24 348:20

**quick** 154:11 159:5 211:18 337:5

**quickly** 60:24 85:22 143:20 154:17

**quote** 281:4

---

## R

**R-O-T-H-E-N-B-E-R-G** 9:25

**raised** 156:21

**ramped** 233:3

**ran** 44:5 244:3 319:22

**ranch** 12:20

**range** 269:23,25

**rare** 130:24 133:20

**rated** 139:4,16

**rates** 182:20

**rating** 25:3

**re-ask** 62:4 222:5

**re-got** 84:7

**reach** 39:12

**reached** 39:9

**read** 17:9,10 46:3 47:5 48:15 50:17 96:5 99:4,5,12 127:8 153:6,8 157:19,23 169:17,19,23 189:20 202:18 207:19 234:14,18,23 235:9 236:9,13 241:8 260:11,14 264:14,18 265:12,15,18 300:23 301:23 316:6 321:13 325:2

**readable** 211:4

**readiness** 328:25

**reading** 78:16 160:4 301:3

**ready** 194:22 274:7 277:8 308:15 336:7

**real** 28:13 53:12 166:10 211:17

**realistic** 237:11

**reality** 276:24 279:17

**realize** 298:10

**realized** 225:17 258:8

**reason** 14:6 47:23 128:20 131:2 149:10, 19 161:17 190:4 205:15 242:8 289:10 296:20 301:16

**reasoning** 288:21

**reasons** 75:6 231:24 232:5 294:15 296:8 317:25

**recall** 8:5 15:21 16:25 19:16 24:2 35:4 37:3 39:19 40:5 67:18 108:4 109:14 110:24 112:18 123:12 124:12,20,22 125:10 126:2,22 138:24 149:8 150:17, 18,20,21 152:17 157:8 166:5 183:23 185:2,3,6 200:12 221:11,14,16 222:12, 13,23 223:10,13 227:24,25 235:23,24 237:2 239:12 254:25 266:21 267:22,23 268:3,7,19 275:9,24 321:20,22 323:4,20 328:11 329:21 340:4, 10 342:7 348:2,7,14

**recalling** 266:22 272:25

**receipt** 101:18 213:19

**receive** 55:7 124:23 125:14 127:13 152:5, 8 154:2 210:15 212:22 339:17 342:15

**received** 16:13 29:9 55:9 56:10 66:12 85:5 96:8,9 126:7,20 135:21 136:2 152:15, 16,18 153:16 154:19

157:6 169:25 176:11
178:10 194:6 201:12
202:3 209:11 212:24
219:13,22 227:18
266:10 283:19 293:8
302:15 339:16
348:13

**receiving** 124:20
125:10 165:25
218:22

**recent** 148:21 338:16

**recently** 26:15

**recess** 88:6 167:12
211:23 264:11
339:11

**recipient** 170:18

**recognition** 62:17

**recognize** 46:23
95:3 100:19 123:2,10
134:24 135:3 153:11
169:12,20 170:2
189:6 299:4,12 312:4

**recognizing** 69:10
310:14,17 320:6

**recollection** 18:23
126:8 127:10,12
135:10 255:22,25
256:3,6,11,21,23

**recommend** 301:4,9
302:19

**recommendation**
111:20 112:4 133:9
301:5 302:3,22,23

**recommendations**
111:14,15,18

**recommended**
112:6

**recommending**
302:4,20

**record** 4:7 19:7
45:14 77:11 88:5,8
164:9 167:9,11
168:10 175:10
208:13 211:20,22,25
217:10 222:6 224:23
229:15 236:13
250:14 260:14 264:5,
8,10,13,18 274:20

**recording** 4:13

**records** 85:20 217:8
219:9,18 340:8
348:3,8,10,12,16

**recruited** 33:17 34:5

**recruiter** 40:4 42:17,
23

**recruiters** 39:9

**rectify** 194:3

**recycling** 291:13

**red** 53:14,16 56:24

**reduced** 128:10
130:20 131:7

**reevaluate** 72:19

**refer** 82:8 86:22
100:24 200:5 203:17

**reference** 280:2

**referenced** 127:25

**referencing** 159:9
280:11

**referred** 16:23 40:23
58:16 82:4,5 105:20
174:3 178:4 279:20
281:24 282:8 283:6,8
292:8

**referring** 15:13,15
26:21 32:17 46:16
98:25 99:7 102:6
106:3 154:5 156:6,20
174:2 208:6 256:18
262:25 263:11

**refers** 129:18 210:11
218:7 326:8

**reflection** 93:15 94:3
99:19

**reflects** 99:21

**refresh** 18:23

**refuse** 86:2 191:4

**refused** 190:25
209:12 295:3 296:14,
16,17 309:23 310:11

311:19

**regular** 18:9 69:18,
19 70:5 77:3 152:12
185:8

**reintroduce** 6:13

**reiterated** 344:6

**relate** 126:23 131:6
171:8 182:20

**related** 171:23 266:5
330:2 335:9

**relation** 171:15,17

**relationship** 109:3,5
110:12 135:6

**relationships** 195:8

**relaxed** 188:8

**relaxer** 343:13

**release** 348:15

**relevant** 201:2
239:15 240:5 241:20
281:3 340:9

**relieve** 333:7

**rely** 66:6

**relying** 67:25

**remains** 215:20
218:3

**remarks** 331:22

**remember** 16:20
23:25 26:11 33:22,25
34:25 40:6 55:4
61:16,17 92:22
109:19 123:12
126:12 139:19
148:18 149:13,18
150:11 151:16,17
152:15 154:5,6
159:22 173:12 181:8
182:7 187:2 190:3
198:16,17,25 202:25
210:8 222:10,15,24
234:10 254:22
257:17 263:15
267:18 268:6 274:23
283:16,23,25 284:4,6
288:8 303:3 312:19
318:10 328:14,15
329:6 333:4 342:3
347:2 348:18

**remind** 74:25 217:14

**reminders** 106:8

**reminds** 52:6

**remote** 4:5,13 12:17
55:12 298:21 308:22

**remotely** 4:8,11
230:25 238:15

**removed** 135:18
142:6 193:11 200:15,
22 201:13

**rename** 274:19

**renewed** 83:11

**renovations** 317:11

**rental** 8:9 31:24
130:6

**rentals** 130:4

**renumber** 273:21
298:2

**renumbered** 273:18

**repair** 71:24 192:21
194:9,25 195:20,22
196:9

**repaired** 73:22

**repairs** 193:7 202:8

**repeat** 59:17

**repeating** 234:15

**rephrase** 11:24 12:2
105:17 245:2 286:18,
19 341:19

**replaced** 113:15
151:21,22 174:13

**replacement** 319:16

**report** 138:8,9 144:3
181:15 185:4 188:21
189:8 200:19 201:22
202:3 208:4,7,9
209:19 214:7,9
218:16,19 249:12,13
270:16,23,24 276:24
279:14 282:12
294:24 309:22 341:4

**reported** 38:7 39:2
111:12 179:17
180:21 181:4 239:14

**remind** 74:25 217:14

**reminders** 106:8

**reminds** 52:6

**remote** 4:5,13 12:17
55:12 298:21 308:22

**remotely** 4:8,11
230:25 238:15

**removed** 135:18
142:6 193:11 200:15,
22 201:13

**rename** 274:19

**renewed** 83:11

**renovations** 317:11

**rental** 8:9 31:24
130:6

**rentals** 130:4

**renumber** 273:21
298:2

**renumbered** 273:18

**repair** 71:24 192:21
194:9,25 195:20,22
196:9

**repaired** 73:22

**repairs** 193:7 202:8

**repeat** 59:17

**repeating** 234:15

**rephrase** 11:24 12:2
105:17 245:2 286:18,
19 341:19

**replaced** 113:15
151:21,22 174:13

**replacement** 319:16

**report** 138:8,9 144:3
181:15 185:4 188:21
189:8 200:19 201:22
202:3 208:4,7,9
209:19 214:7,9
218:16,19 249:12,13
270:16,23,24 276:24
279:14 282:12
294:24 309:22 341:4

**reported** 38:7 39:2
111:12 179:17
180:21 181:4 239:14

240:10,14,20,24
241:4 244:14,19,24
247:2,23 248:6
253:10,16,18,24
255:9

**reporter** 4:9 5:14 6:2
10:15 11:4,14 17:6
59:15,20 79:5 163:25
164:3 235:14,17,20
260:13 264:17
334:11,20

**Reporting** 4:5 5:11,
15

**reports** 138:12
249:14 276:14 279:8
280:17

**representation**
209:5

**representative**
16:11 312:18

**reputation** 116:22
329:17,24 330:2,11,
20 336:16

**request** 159:17
198:24 209:9 286:22
287:8,17 292:3,6,9
293:11 338:21
342:22

**requested** 146:8,11
148:23 287:13
342:14

**requests** 159:13

**require** 72:2 114:21
158:9 199:19 313:3

**required** 72:17 89:24
90:21 119:24 127:25
128:6 197:7,12
199:13 200:4 206:9
207:5 223:19 317:15

**requirement** 76:18

**requirements** 90:17
223:5,15,18

**requires** 10:22
156:15 223:19

**rerouted** 120:17

**research** 63:4
141:13,14,15 143:4,
6,15

**researching** 141:6

**reserve** 234:22 340:4

**reserving** 340:11

**resign** 229:8

**Resignation** 228:6, 10

**resigning** 228:24

**resolve** 9:10

**resources** 7:14,17 109:10 289:22

**respect** 24:14 68:21 175:13

**respiratory** 307:16

**respond** 118:21 121:9 125:25 129:19 223:6 257:22 305:19 307:17 316:15

**responded** 101:20 119:13 120:24 126:22 300:18

**responder** 331:17

**responders** 306:15 309:12

**responding** 254:15

**responds** 137:18 139:22

**response** 11:8 16:3 23:20 25:4 66:19 68:14 71:21 110:2,14 111:7 120:6 121:2,18 127:3,17 143:24 148:4 181:24 208:2 209:14 218:15,18 237:13 305:3,11 307:10 324:11

**responses** 120:18

**responsibilities** 43:24 44:3 49:9,15 50:3 68:12 120:11 327:24 328:21

**responsibility** 52:10 72:5,9,11 78:23 113:19

**responsible** 28:14, 18 129:22 132:10 139:3,5 155:13,15

196:25 200:24 201:3 241:15 304:7

**rest** 138:21 174:19 251:10 276:9 277:3,5 281:14 282:16 325:16

**restate** 11:24 12:3

**restroom** 12:13

**result** 51:8 104:7 132:4 165:25 193:9 200:14 329:14 338:3

**resulting** 191:10 210:11 215:14

**resume** 39:16,20 115:25 271:3

**resumed** 168:5

**retaliate** 271:17

**retaliated** 271:13

**retaliation** 271:10 329:15

**retaliatory** 271:22, 25 272:3,6,18 273:4, 11

**retire** 281:12 336:2

**retired** 315:23 339:22

**retirement** 277:8 280:6 281:5

**retraining** 305:14

**retrieve** 145:22

**review** 16:6 17:11 61:21 62:2,6 72:3 88:11 96:2 108:8,9, 11 114:14 134:23 156:24 157:14 159:7, 21 168:13 189:12 205:5 212:3 221:8,10 274:6,16 296:4 297:9,14 300:14 346:2,5,6 347:13

**reviewed** 15:8,11,23 18:23 44:19 62:10 95:4 96:5 163:11 169:20 221:12 271:2 275:2,7,13 311:12,13

**reviewing** 48:23

60:2 61:13 96:4 123:4 134:25 153:12 169:22 202:19 210:14 314:10

**reviews** 57:4,5 152:6 153:15 159:12 161:4, 5,16 163:5

**revised** 305:3

**revisions** 305:10

**revolving** 34:6

**rewrote** 78:14

**Ricardo** 180:12,14

**Rich** 232:25 308:18

**Rick** 136:17 137:10, 12 141:16 143:23 205:9

**rid** 64:4 74:15,21 114:18 267:4

**right-hand** 345:13

**Rights** 24:17,18

**rises** 194:10

**risk** 151:7 171:20 172:4,10 314:5 331:16

**Robert** 138:2,5 140:12 180:16

**Roche** 5:4,19 6:15 15:18 22:14 35:15,22 41:3,4,6 60:4 66:16 67:6 96:23 99:18 100:6,11 101:6 102:2 108:10,22 110:9 112:14 114:24 123:18 124:9,21 125:19,20 126:9 127:11 129:13 134:2 137:25 138:9 139:22 140:15 144:8 148:22 149:8 154:7 155:6 157:5,10 159:25 162:9 163:19 164:14 173:16 175:14 177:24 180:21 181:4 184:9 185:4,9 186:10 188:10 190:13 198:13 201:21 207:12,17 213:20 216:16 221:18 222:7

224:5,16 225:2 228:4,8 229:25 230:19 233:12 234:8 236:16 237:16 239:14 244:14,17,25 245:4 246:20 247:2, 24 248:6,10 250:9,17 251:7,24 253:2,3,10, 18,25 254:4,12 255:14,16 257:3 259:15 271:15,17,22 273:5 278:3,8,18 279:7,9,10,15 281:21 282:23 285:10,13 286:9,19,21 287:7,17 290:17 293:9 294:22 295:3,8 297:9 299:12,15,20 300:11 301:24 304:11 305:3, 6 310:11 312:7,13 320:5,11 321:3,9 322:19 323:2,11,14, 19 324:7,11,16 330:3 331:23 340:23 341:3, 12 342:6 345:6

**Roche's** 110:12 138:12 153:25 181:24 190:11 213:5 215:3 221:19 222:8 257:22 326:8

**role** 30:16,20 35:25 38:6 48:17 58:18,21 68:20,22 92:9 100:17 113:12,14 114:3 115:6 116:16 261:22, 23 312:23 328:5

**roles** 113:23 155:12

**roll** 100:20 106:5 184:6

**rolled** 101:16

**rolling** 102:25 184:5

**Rome** 138:3 140:14 142:20 178:6 181:3,6 249:4 253:5 269:5 270:11,15 271:6 282:2,4

**Rome's** 138:14 271:3 292:2

**Ron** 20:9 38:15 193:23,25 194:12,14 198:18 253:11 276:4,

12,14 279:16,17,21, 22 280:11 285:23 286:4 312:20 318:2, 24 319:10,12,23

**Ronald** 38:13 193:16

**room** 4:6,10 12:18,22 13:19,22 133:2 141:11,24 144:22 146:16,18 147:2 232:24 277:3 291:14 308:22 309:8 334:16

**rooms** 135:7,15 139:17 145:8 248:17

**rotating** 204:7

**rotation** 204:11 206:13

**rotations** 204:8 206:7

**Rothenberg** 9:19

**roughly** 37:25

**rounds** 70:20 255:10,18 256:4,5, 15,24,25

**route** 297:5

**routine** 246:2

**routinely** 86:4 283:2

**RQ** 208:12 209:4 219:16 338:21 342:13,21

**rule** 4:16 27:4

**rules** 4:16,17 10:9 44:24 196:15

**run** 158:11 276:25 291:17 292:3 313:21 315:22 317:16 331:18

**running** 97:7,13,17, 24 327:4

**runs** 280:19

**rush** 151:5 323:22

**Ryan** 181:12,16,20 240:10,15 282:10

# S

**safe** 6:25 21:7 107:25 204:20 231:16 242:7 246:7 316:25

**safely** 307:3

**safest** 141:20

**safety** 24:7 30:5,6, 22 33:4,5,13 35:12 43:25 45:18,21 50:8, 24 66:5 68:19 69:7 71:25 78:25 79:14, 17,18 81:7,23 82:22 83:2 85:25 86:5 88:19 89:8 94:6 96:16 104:11 111:11 112:20 113:7,17 114:3,8,9 117:22 119:8 121:5 125:15, 17 126:24 129:21,23 131:4,6 132:22 138:19 139:13,15 142:10,13 150:24 155:13,25 156:8,18 158:14 162:2 171:9, 10,12,17 172:16 173:3 182:11 202:8 203:7 205:24,25 228:25 231:11 238:2 241:11,13,15,22 243:3 245:18,20 246:18 247:6,22 248:7,25 249:6,17,24 251:15 252:22 260:6 261:22 270:12,14 279:3 280:23 284:22 287:16 289:7,8 294:12,15 303:17 304:5,7,12 305:3,11 306:12,14 308:19 309:11,16,17 311:15, 16 314:13,20 315:17 318:16 319:8 321:24 322:4,10,11 324:12, 17 328:12 329:11 330:16,18,23 331:5, 6,16 341:6

**safety's** 312:23

**salary** 29:6,10,15,18, 21,23 30:13 31:11 33:22 43:2,12,14 113:18 117:3 269:16,

18 326:17 328:10

**Salt** 180:4

**salutation** 302:8

**Samaritan's** 44:22

**sat** 41:21 115:19

**Satisfactory** 91:8

**satisfied** 43:7 84:21

**satisfy** 313:18

**save** 219:7 346:13

**scenario** 307:10

**scene** 335:10

**scenes** 36:7

**schedule** 282:24

**scheduled** 283:3,12

**school** 64:18

**Scout** 8:20

**Scouts** 9:4

**screen** 45:9,10,12 46:5,9,11,15,20 47:10 49:11,12,17, 18,24,25 53:3,4 60:12 68:10 77:13,22 80:20 94:20 95:2,10, 13 96:21 100:13 118:4,11,12,15,16 122:13,15 134:10,17 152:25 153:6 169:5,9 181:23 188:24 189:14,15 211:2,13 212:10 214:14 220:24 227:5,8 228:14 264:22 265:8 273:22,25 288:19,20 298:8 304:22

**screens** 46:6

**scroll** 46:3,20 47:10 80:18 95:10,15 96:20,21 100:13 105:20 122:16 124:6, 24 134:22 137:24 139:21 143:16 153:7 158:3 170:3 173:13 188:25 189:4,19 190:6 191:9 211:13 224:11 265:11 274:2

**scrolled** 173:13

**scrolling** 49:11 140:10 213:3 227:7

**scrutiny** 178:11

**second-to-last** 314:16

**seconds** 137:8

**secret** 262:7

**section** 48:15 49:8, 14 77:15,20 79:19,22 191:11 209:13 215:12 218:17

**secure** 291:11

**secured** 313:3

**security** 288:24 289:2 339:17,21

**seek** 338:2

**self-close** 136:24

**self-imposed** 104:23

**self-inflicting** 246:15

**Seliger** 4:21 5:20 18:4,17 19:2,4,9 56:13,15 59:8,24 107:7 126:25 149:11, 22 150:10 163:23 167:5 178:2,16,19 179:7 192:4 208:15, 24 209:10 219:20 221:21 222:3 235:16, 18,19,21 236:19,24 293:20 294:7 303:8, 12 304:13 323:21 340:12,14,15 342:13, 21 344:20 348:22,24

**sells** 205:17

**semiannual** 51:5

**send** 92:20 106:4 119:18 128:15 131:11 171:2 176:20 264:24 299:25 306:21

**sending** 105:11 127:11

**sends** 176:19 252:23

**senior** 27:11 35:20 179:16 279:18

**sense** 166:24 252:24 314:24 323:23 332:13

**sentence** 97:5 98:21,24 99:6,12 100:24 106:12 128:5 159:9 215:22 216:4 222:16 223:3,22 225:13 265:13,16 266:17 302:7 310:10 314:12,16,17 316:6 318:13

**sentences** 314:21

**sentiment** 97:11

**separate** 49:13 61:9 70:9 96:22 100:14 118:6 193:15 280:5, 14

**separated** 20:3 22:8 23:16 31:8 58:24 277:14 309:16 326:12,16,20,24 328:18 330:4,12

**separating** 21:4 24:6 25:8

**separation** 31:17

**September** 31:18 123:19,24 125:20 128:2 129:4 134:4 220:10 224:16 225:3, 22 226:5 227:20,25 228:4,7 229:6 277:15 318:20 328:17 329:9 337:7,8 338:17

**sequence** 155:20

**sequences** 249:23

**series** 6:17 12:11 40:2 94:20 95:5 123:3,10 124:9 134:24 135:3 169:7, 13 170:5

**serve** 125:6 142:16

**served** 32:6 38:6

**service** 135:8 142:5 193:7

**serviced** 174:14

**services** 25:3 70:19 145:22 205:18 279:5

**serving** 32:15

**set** 92:24 131:22 174:4,11,20 198:19 204:3 238:11 272:2 305:14,21

**sets** 204:5 290:12 292:4

**settled** 8:13

**setup** 65:5

**seven-page** 45:15, 19 298:24

**Shaffer** 17:2 35:24 36:9 40:18,19 41:12 42:6,13 62:13 63:19 65:14 67:9,15 68:4,6 86:9 110:20,22,25 111:6 112:15 156:17 166:16 196:17 205:16 208:21 259:24 260:8,24,25 261:6 262:12 266:3, 10,19 267:11 268:10 278:14 315:16,19 316:4 320:8 321:5, 23,25 322:22,25 323:12 324:22 340:21

**Shaffer's** 36:4 278:15

**shame** 133:24

**share** 118:11,12 122:13 134:9 152:25

**shared** 288:17

**sharing** 134:17 214:4

**Sharpe** 5:23 297:25 298:5,16

**Shaun** 5:17 6:13 172:17 208:15 211:16 235:21 236:22,24 293:20 341:16 344:21

**sheet** 345:23,24

**sheets** 78:12 92:23

182:2,19 183:21
345:17,23

**Shelby** 240:24

**shield** 114:13,16
304:4

**shielding** 303:21

**shift** 305:22 309:13

**shining** 232:21

**ship** 98:13 162:25
277:2

**shooter** 82:23

**shop** 71:17 76:25
171:22 172:9,10
173:3 197:2 316:23

**shops** 172:23

**short** 23:5 50:22
129:24 197:4 204:12
296:9

**shortcomings**
114:13,15

**shortly** 266:25

**shoulders** 98:2
290:25

**show** 45:7,11 56:24
118:3 119:24 126:16
132:14 133:25 134:3
171:21 177:14
201:16,20 261:5
263:25 293:7 309:24

**showed** 69:6 97:22
123:25 126:13
128:13,25 131:19
133:6,24 205:19
220:12 225:8,12

**showing** 53:22
55:11,20 79:8 129:2
193:18 275:6

**shown** 123:11 135:4,
19,24 182:20

**shows** 62:16 120:22
200:20 322:24

**shrugged** 290:24

**shuffle** 121:24

**shut** 177:15 294:9

**shut-down** 155:20

**shutdown** 198:24
249:22 312:17,23

**shutdowns** 238:4

**shutoffs** 307:7

**shy** 274:16

**sick** 229:13 335:4

**sickness** 329:16

**side** 23:9,12 59:2
81:20 311:18

**sides** 326:6 330:20

**sign** 47:21 108:11
157:22 159:6 190:25
191:4 209:12 213:7
215:6 272:12

**sign-on** 273:8

**signal** 63:13

**signature** 47:15,19
153:20,21,23,24
190:9,11 213:4,5
215:2,3,4 228:19

**signatures** 153:19

**signed** 49:5 122:2,3
157:20,24 348:14

**significant** 43:22
113:6 182:22 183:7

**significantly** 281:20

**silence** 293:22

**silencing** 293:23

**silent** 13:21

**similar** 172:22
175:14 177:24

**simple** 71:10 84:20

**simply** 137:20

**Sinai** 34:11,12 96:14,
16 110:19 111:22
116:11 127:24
137:14 200:2 267:13
278:24 279:5 280:24
288:23 310:14
328:13,19

**Sinai's** 90:8

**single** 196:19 345:17

**Sir** 225:24 240:6
250:19

**sit** 205:3,7 234:9
244:13 250:8,15,21,
25 254:21 275:24
295:14,15 297:14

**site** 193:14,16,17
194:20 320:17

**sitting** 141:23 177:2,
7,11 207:22 291:6
296:22 345:13

**situation** 91:23
194:17 196:21
204:19

**situations** 45:3
130:4

**six-year** 61:3

**sixth** 77:25 324:19

**size** 317:19

**skill** 320:6

**skills** 91:11 93:10
97:23 162:24

**skipping** 297:19
298:10

**slack** 44:7 101:7

**sleeves** 100:20
101:17 102:25 106:6

**slight** 330:19

**slightly** 190:24

**Sloan** 32:25 33:3,11,
19 34:4,10,13 58:14,
18,22

**Slow** 141:8

**small** 194:9

**smaller** 117:4,17,24

**smell** 142:5

**smoke** 71:5 131:22
132:23 133:13

**smoother** 309:7

**smoothly** 97:8,13,18
317:17

**social** 337:16,20,22
339:17,20

**solid** 311:15

**solve** 146:5 151:23

**somebody's** 317:15

**somethings** 262:8

**sort** 35:25

**sought** 24:20 337:15

**sound** 10:9

**source** 32:5

**sources** 31:10,16,
20,21 32:2 289:25
339:15

**Southern** 5:5

**speak** 17:16,19
18:17 21:16 23:15
88:13,16 112:15
168:16,21 212:5
268:17 274:17 322:9

**speaking** 17:15
19:13 24:2 237:8,13
268:19

**specialist** 5:11

**specialized** 206:10

**specific** 15:12,24
83:17 126:8 127:10,
12,20 230:19 255:20,
22,25 256:3,6,11,21,
23 258:18 271:16
274:4 290:8 291:7
333:9

**specifically** 9:6
23:10 155:5 226:4
248:19 261:14 295:8
323:13

**specifics** 163:3

**speculating** 175:18
176:24

**speculation** 311:8,9

**speed** 63:7,13

**spell** 9:20 241:7

**spend** 55:13

**spin** 128:15

**spinning** 334:5

**spiral** 345:15

**split** 33:5 138:17,23,
24 139:2

**spoke** 15:10 20:9
23:25 41:22 42:4,17,
24 88:15 145:10
170:12 205:9 292:25
301:2,12 310:5 346:6

**spoken** 20:5,8,10,12
21:3 22:7,11 24:3
85:23 344:6

**sports** 296:24

**spot** 199:2,5 273:7

**spots** 60:14

**spread** 135:21

**spreading** 71:5

**spreadsheet** 204:3,
4,12

**square** 317:21

**staff** 27:19 30:4 33:7
37:21 50:20 68:23,24
69:4,5,21 71:11 72:4
78:17,18 82:16 86:16
91:22 92:5 97:20,25
106:6 117:19 120:24
193:5 198:3,4 288:24
289:3 305:14 316:15
331:2

**staffed** 44:6 50:22

**stairs** 254:17,24
255:4,15 256:8
257:8,24 258:4

**stamp** 45:16,20 95:5
122:10,19 124:16
134:11,13 136:9
152:22 153:2 169:6,
13 189:9 210:22
211:8 214:8,10 221:3
224:18 228:10 265:4
297:21 299:2

**stamped** 273:17

**stamps** 169:18

**stand** 50:12 156:17
260:3

**standard** 54:3 61:9

85:7 129:6 155:24
174:4,18 175:20
176:22 177:4 201:5
245:9,14 246:12,21
249:24 272:17
282:24 324:10

**standards** 51:13
229:12 231:19
246:14 290:16

**standing** 330:15

**standpipe** 246:8,10

**standpoint** 104:20

**stands** 83:16 174:10

**start** 4:24 10:14
28:15 50:5,11 96:22
105:11 136:7 137:4
143:22 159:8 162:16
163:10 172:11,13
185:11 257:19 278:2
299:19 303:24
333:17,20 336:4

**started** 26:5,10,19
27:15,17,18,21 35:5,
8 38:8 48:3,4 60:2,5
78:18 85:18 87:6
90:20 105:9 106:7
143:19,24 151:18
186:21 203:18 224:8
285:5,19 315:19,20
326:11,15,19,23
328:11,16 337:9

**starting** 11:20 29:6,
10 38:11 85:17
183:25 263:17 267:3
269:16 325:8 332:2

**starts** 316:7

**state** 4:17 6:7 24:17
80:7

**stated** 223:23

**statement** 48:25
49:4,6 70:17 98:25
111:23,25 128:24
162:19 163:12,15
191:20,23 200:13,16
215:25 216:5 218:2,4
224:4 256:7,13,22
257:3,23 258:10,12,
17,18,20,25 285:15
295:6 311:6

**statements** 104:4
251:17 259:4 286:23
322:14,15

**Staten** 332:20

**states** 5:5 196:17

**stating** 200:3

**station** 132:4,7,8,16

**stationed** 63:14

**status** 52:22 73:4,7

**statute** 32:21

**stay** 51:12,20 75:6,12
92:21 145:16 151:8
189:15 262:5 282:19

**staying** 328:5

**stays** 71:13

**steady** 32:5

**stenographer**
347:18

**step** 89:12 116:4
205:6 217:18,20
300:4 331:17 336:14

**stepped** 187:15

**steps** 89:7,10 92:16
102:17 112:9 124:2
125:21

**Steven** 241:7

**stipulate** 4:12

**stipulates** 4:20,22

**stock** 296:23

**stomach** 332:9
333:11,12 343:11

**stood** 328:6

**stop** 70:7 99:11
214:4 266:14 281:23
283:5 287:18 294:17
295:5 305:9 309:12
316:9

**stopped** 9:14 308:21

**stopping** 306:13

**story** 204:12

**straight** 146:6 196:7
272:24 330:25

344:11

**streaming** 289:15,16

**street** 5:13 44:21

**stress** 332:12 343:3,
10,20

**strictly** 103:18

**strike** 17:21 31:13
41:13 62:4 99:4
101:22 136:12 138:8
144:12 171:15
242:15 251:5 252:9
269:2 299:18 315:3
329:25 348:3

**Strongly** 80:23

**structured** 188:7

**Strudy** 20:16

**stuck** 249:9

**studied** 17:5

**study** 84:23 157:21

**stuff** 44:10 52:8
53:10,21,22 54:3
55:19 60:9,15 63:7,9,
22 64:2 65:2,23,24,
25 67:13 76:6,8 93:6,
7 98:9 115:8 117:21
154:21 156:7 219:15
238:5 254:8,23
272:23 287:25

**stupid** 254:11 258:14

**subject** 30:18,20
44:12 144:24 151:25
228:6,9 229:20
251:18 252:21 266:9

**subjected** 271:10

**submission** 218:20
219:3,8,12

**submissions**
310:12

**submit** 39:16 120:6
196:11 207:11
209:18,23 218:15,19
348:10

**submittals** 292:6

**submitted** 39:19
72:7 208:2,11 210:4,
8 249:16 305:2

348:2,7

**submitting** 246:21

**subordinate** 87:2
108:12 109:24 178:8
272:12,14 310:25

**subordinate's** 103:2

**subordinates** 101:7
106:25 186:5 239:16

**subrogate** 130:14,
21 133:7,17,18

**Subscribed** 349:14

**sudden** 58:5 60:4
65:22 232:24

**sued** 8:11

**suffer** 14:10,14
331:25 333:14,22
334:2

**suffered** 329:14
338:3

**suffering** 261:16
262:14 267:15

**sufficient** 71:14
79:10

**suggest** 139:12
266:18 299:24
300:23

**suggested** 295:9
330:10

**suggestion** 317:9

**suggestions** 142:12
249:15 300:9 305:6
308:7

**suggests** 179:23

**suit** 22:22 231:25

**Suite** 5:13

**summary** 48:15,17,
21 49:2,6

**summer** 268:4

**summons** 119:15,23
120:2,7,19 125:7
126:18,19,23 127:8,
9,13 128:14,19,20
129:2,8,9,10 130:10,
11,25 132:2,3 133:7,

18

**summonses** 121:10
124:17 125:16 126:5,
10,16 130:17,24
131:6 133:23

**supercedes** 83:19

**superseded** 85:9

**supervise** 30:7
37:17,19 68:13

**supervised** 90:25
91:5 294:13

**supervising** 109:22

**supervisor** 35:13,16
36:10,16 52:21 58:10
68:2,5,7,8 73:3
144:15,17 167:2
178:15,20,21 230:3
340:20 341:4,12

**supervisors** 35:21

**Supervisory** 77:16,
20

**supplement** 298:13

**supply** 75:8

**support** 110:9 295:3

**supported** 108:16

**supportive** 295:9

**supposed** 14:24
54:11 65:8 77:9
78:10 126:14 133:25
134:3 160:21 193:8
216:7,8,13,15 217:24
248:21 282:23
306:17 343:13

**supposedly** 116:23
156:17 333:6

**suppression** 30:10
33:9 50:7,24 51:2
156:5,8 158:11,14
193:19 249:21

**surprise** 240:14,16

**surprised** 127:16,18,
21

**survey** 60:3 337:19

**surveys** 328:25

**suspended** 64:2

**swear** 4:10 6:2

**swearing** 4:14

**Switch** 118:2

**sworn** 6:6 7:16 168:6 349:14

**symptoms** 332:22 333:9

**syndrome** 233:6

**system** 50:24 51:2 52:2 53:11,15 57:9, 23 63:11 65:3,4,9 66:4,6,7 68:14 70:25 71:8,24 72:7 76:17 78:8 88:23,24 105:4 113:2,5,25 155:19 166:15 175:6 203:24 241:23 242:5 270:18, 19 316:18 322:4,9

**systems** 30:7,10 33:8 36:5 51:2 58:24, 25 69:25 70:7 89:7 154:21 155:9,17,21 156:3,9 158:8,9,14 193:19 238:16 249:18 321:25 341:6, 7

**T**

**table** 213:11

**tails** 57:19

**takes** 270:3

**taking** 11:5 43:15 110:5 112:24 241:24 257:23 296:21 309:14 333:2 342:11, 18

**talk** 11:13 21:11 41:18 42:10 53:5 79:7 123:6 139:19 164:9 206:15,16,17 262:2 320:23 337:20 343:2 344:5

**talked** 17:12 18:20 76:5 90:24 180:16 181:3 276:11 339:15

**talking** 40:8 51:10,14 59:14 62:22 63:3 70:10 77:3,4 79:13, 14 89:20 91:22 103:18 129:11 139:13 141:16,17,18 157:15 158:7 178:9 181:8 220:14,15 224:8 263:12 266:2 275:5 277:4 284:6 290:11 294:4 300:25 320:15 321:7 322:12 326:5 329:19 342:20 344:8 347:17

**talks** 77:16 93:21

**tanks** 132:25 313:3

**tapered** 116:14

**task** 78:6,7 91:13,18 213:12 291:7

**tasks** 100:18 101:17 213:18,21,24 270:17 301:17

**taught** 60:16

**teach** 68:23 69:21 82:15 104:25

**teaching** 79:15,16

**team** 16:12 61:18,19 66:8 93:18 106:10 110:13 145:22 174:21 196:13 230:23 239:24,25 251:11 276:10 289:4, 7,9

**Teamdoc** 55:3,8 60:14 113:25 114:14 222:19

**Teamdocs** 52:3,4,5, 11,19 56:10 58:13 66:8 70:2,13 72:12, 13 79:16 93:6 113:9, 20 319:19 331:18

**Teamop** 55:3 113:25

**Teamops** 52:3,11,19 55:2 69:25 70:13,14 72:11,13 79:15 93:6 113:9,20

**technologies** 115:7

**television** 238:11

**288:22 290:8,11 291:10,17 292:4**

**televisions** 290:18

**telling** 18:13 55:25 61:10 63:2,21 64:25 81:12 126:9 175:21 182:7 302:21

**tells** 320:18

**ten** 8:19 164:4 173:9 184:16 264:5

**ten-day** 184:17 204:7

**ten-minute** 88:10

**tenant** 8:4,6

**tents** 44:20 69:17 257:13

**tenure** 252:17,19 270:4 315:14 342:25

**tenured** 253:25

**term** 88:18,22

**terminal** 135:15 141:10 144:22 145:8 146:16 248:17

**terminate** 163:21

**terminated** 7:13

**termination** 7:6,10

**terms** 105:15 161:10 230:7 261:17 324:10

**terrible** 233:9

**Terry** 20:17

**test** 78:21 84:24 194:7,25 216:9,10,12 270:17

**tested** 51:3

**testified** 6:8 168:7 259:2

**testify** 14:20 225:25 237:10,11

**testifying** 10:19 14:2,7 196:3

**testimony** 14:3 28:20 163:18 192:14, 16 196:3 207:23,25 224:3 234:6 235:4

**294:5 302:25 303:4**

**testing** 50:8,24 51:6, 11 53:9 59:12 61:3,4 70:19 192:23

**testings** 61:2

**tests** 51:3,4,5 343:16

**text** 261:5

**theft** 25:5

**thing** 28:15 56:20 60:18 71:6 73:24 74:17 84:20 102:16 112:6 118:9 122:6 154:12 156:21 159:7 172:13 192:10,21 195:10 242:9 249:19 251:20 252:4 262:9 265:12 313:12 318:5 331:11 344:8

**things** 29:12 30:14 52:6 53:13 54:17 61:5 71:18,20 81:22 93:8 106:11 107:11 130:2 133:16,20,22 154:21 155:5,23 156:12,16 158:3,16 182:10 188:7 195:22 196:16 206:8 231:16 233:18 242:2 249:13 254:17 261:18,21 288:4 308:9,11 309:6,18 317:17 329:22

**thinking** 190:4 240:4

**Thomas** 276:6,18,20 277:6,15 280:2,4,14 281:4

**thought** 19:7 35:24 36:21 66:7 68:4,6,7 95:13,23 98:8 102:19 160:2 223:4,6,11,17 230:17 232:12 235:10 249:7 254:19 261:15 262:13 268:16 272:16 308:10 331:22 335:15 343:19

**thoughts** 187:24

**thousand** 29:8,18 183:8

**threat** 64:5

**Threatening** 239:3

**three-day** 231:14

**three-hour** 296:7,21 301:7

**three-line** 48:21

**three-management** 239:24

**three-page** 169:6 210:24 212:15 298:11

**three-quarter** 335:21,24

**threw** 57:14 274:19

**throw** 57:12 273:22

**Thursday** 170:20

**tied** 145:15 151:10 270:18

**tight** 109:6

**till** 174:7

**time** 7:2 11:14 12:8 19:14 20:15,21 26:10 28:21,24 29:17 32:9 37:24 38:19 40:18 45:4,11 47:8 53:8,12 55:13 57:22 59:13, 18,19 61:6 73:25 87:21 88:3,7 90:10, 19 91:5,11,13,17 93:5,10 94:24 97:19, 21,23 102:8 107:9, 14,18,20 110:23 115:6,9,18 133:12 150:2 155:3 158:17, 19 159:10,13 160:2, 21 161:4 162:10,17, 23 163:5,8 164:11 165:21 167:10 168:9 176:20 180:8,19 186:23 189:22,24 196:20 201:15 203:18 204:6 211:21, 24 226:13 237:9 238:13,21 241:23 254:10 258:8,10,12 259:13,25 260:24 264:9,12 267:6,16 271:20 272:13,14 274:19,21 275:7

277:4,14 280:21
284:7,11 287:14
291:7 294:8 305:5
306:19 309:23
310:11 311:6,9
315:15 317:16,18
318:11 319:23
326:11,12,15,16,19,
20,23,24 329:16
332:4,7 333:12
334:10 338:8,10,12
339:9,12 340:21,22
341:20 344:12
348:17,20 349:3,6

**timeframe** 131:25
163:10 206:5

**times** 6:23 20:10,11,
13 21:3 22:7,10
50:22 60:6 66:17
67:10,15,21,23 84:18
85:24 93:20 130:18
133:6 186:12 197:23
217:17 238:7 246:4
250:9 261:12 273:10
290:2 301:8 305:4
316:12 335:3 341:18
342:17

**title** 27:21 28:3,7,21,
23 29:2,3,7 34:19
35:10,19 36:4 43:11
87:5,9 113:18 117:4
138:14 152:21
156:13 180:18 322:2,
7 326:13 327:8,9
328:5,6,10

**titles** 28:20

**today** 6:18 10:12
11:2,12 12:8,18 14:8,
21 19:22 25:10 29:24
131:20 177:3,7,11
185:23 197:19
234:10 244:13 250:8,
15 254:22 275:24
290:11 340:19 342:5,
18,24

**today's** 10:9 13:3
15:3,6 16:6 17:13,17,
20,24 18:18 19:19
343:21

**toilet** 246:8

**told** 8:17 10:3 21:22
22:15 24:23 28:13,25

30:17,25 41:23 54:5
63:22 65:10 66:11
68:3 92:3 94:2 109:2
110:10 114:23 126:6
141:22 143:3 144:8,
15 146:5,10 155:16
157:7 184:15 192:25
193:24 201:7 205:6
225:5 226:8,10
232:10 233:11
236:18 237:20 239:9
240:12 242:16
244:17 248:9 249:4,
25 252:3 260:17,22
262:16 278:19
285:11 293:10 296:6,
17 302:25 308:16,24
310:3 312:22 322:21
328:4 329:3 330:22
332:9,12,17 343:10
344:11,16

**tongue-tied** 269:22

**tool** 106:9 107:3

**tools** 92:21

**top** 31:3 46:7,9 75:14
100:16 101:24 102:5
107:24 123:17
124:15 136:24
152:20 224:11 227:7
265:8 266:8 274:24
299:13

**Torch** 195:16

**total** 9:21 16:5 38:18

**totals** 28:16

**touch** 18:7 20:21
196:20 332:11,18

**tough** 290:25

**towers** 335:11

**toxic** 233:6

**track** 52:9,22 73:4,7
92:22 105:13 106:21
107:2,4 113:4 202:8
203:23 238:3 331:11

**tracked** 54:24 175:7
204:11

**tracking** 51:24

**Trade** 335:3

**trades** 306:21

**trail** 162:16,20
163:20

**train** 78:17 112:8,9

**trained** 116:2 204:22

**training** 53:11 55:7,
9,20 56:10 58:6
64:17 65:2 66:12,13,
20 67:6,16 68:2 69:3
72:22 78:3,10,13
79:11,12 81:7,8,11,
12 82:9,15 97:19
161:10 282:25 283:3,
12,22 284:14,16,23
285:6 316:13,14
319:14,15 331:19

**trainings** 55:13

**transcript** 234:13,24

**transfer** 114:2 116:8,
10,24 325:25

**transferred** 38:10
112:11,19 303:2,6
304:11 325:7,10

**transitioning** 115:6

**transport** 307:11

**trash** 135:17

**treat** 230:6

**treated** 65:17 176:7
177:9 231:3 260:6
324:8

**treating** 229:11

**treatment** 36:18
258:22 281:21 290:7
293:4,7 337:15,21
338:2

**trial** 177:17,20

**triple** 231:8

**tripping** 81:21

**trouble** 117:8

**trucks** 313:4

**true** 193:12 201:6
304:10 322:14,16

**truth** 21:19 23:10,11
146:12 201:10

**truthful** 22:18 322:12

**truthfully** 10:23 14:7

**TSG** 4:4 5:11,15

**tunnel** 257:4

**turn** 128:12 132:7,15,
21 176:18 227:4
277:24 288:20
313:19 340:12
348:21

**turned** 36:2 91:3
116:7 133:4 162:25
181:8 205:19 219:11
238:17 290:22

**TV** 238:22 287:22
291:4,5 292:18
293:11

**TVS** 291:12,14,18

**two-** 212:15 296:7,21
301:7

**two-page** 210:22
212:13 224:9,24

**two-year** 61:3

**type** 23:2 34:21 55:12
71:15 73:10 90:2
128:4 130:3 143:10
144:19 178:10 187:3
231:25 234:16
244:23 248:20
346:24

**types** 81:8 82:9 90:6
139:5 141:7

**Typical** 30:14

**U**

**Uh-huh** 136:11 170:7
292:11

**ultimate** 278:4,9,18

**ultimately** 7:13 8:13
39:16 41:7 114:18
129:13 142:23 144:7
145:11 149:14
151:13 170:13
172:24 278:13

**umbrella** 181:17
243:22

**truthful** 22:18 322:12

**unable** 106:13

**uncomfortable**
109:2 110:11

**underneath** 266:9

**understand** 6:19
10:15,18,24 11:9,22
12:5,14 14:4 19:13
28:19 50:5 53:19
73:13 82:6 100:5
101:5 155:10 159:25
161:19 162:6,19
163:15 164:13,20
165:10 177:8,12
196:2 213:19,23
217:9 222:4 245:15
259:7 302:14 308:4

**understanding** 36:8
129:18 154:23
155:17,22 177:23
226:21 227:17,21
249:18 261:22
267:23 269:15,18
270:2 285:8 316:18

**understatement**
66:18

**understood** 11:10
12:3 101:9 156:23
160:24 162:8 337:24

**undertrained** 68:24

**unemployed** 25:14

**unemployment**
24:20,25 25:7,10

**unexperienced**
231:21

**unfair** 36:18 54:13
65:17

**unfounded** 76:25
119:15 162:19 217:6
229:17

**union** 44:14

**unions** 117:19

**unit** 44:20

**United** 5:5

**University** 25:23
26:14 27:22 29:4,19
31:7,12 336:12

**university-wide**
28:12

**unknown** 132:12

**unlike** 92:24

**unnecessary** 84:19

**unprecedented**
107:20

**unrealistic** 236:25

**unrelated** 193:16

**unrest** 238:12
287:14,19 289:11

**unwarranted** 131:20

**update** 165:8 170:25
188:10 238:15

**updated** 52:20 53:23
57:15,23 58:7 78:16
165:17,19,24

**updating** 166:22

**upload** 165:23

**uploaded** 222:18
242:5

**upset** 194:7 343:11

**upside** 333:13

**upstairs** 238:15
327:22

**urgent** 70:5,12,15,
16,17 71:7,14,23
72:14

**utilized** 266:13

---

**V**

**vacation** 25:13
185:21 272:10 273:3

**validity** 4:13

**valve** 155:18 246:8,
10

**valves** 156:7 193:18
195:12,19 249:23
307:6

**variously** 208:21

**vendor** 30:11 51:9
63:10 71:18 156:3

203:25 204:2

**vendors** 38:2 44:11
51:7 57:7 61:23 63:5
182:13 287:25
288:17

**verbal** 11:3,9 12:5
286:17

**verbally** 147:12
251:16

**verify** 142:12

**versed** 82:17 158:14

**version** 122:16
273:19,20 298:15,17

**versus** 5:3 8:4
261:23

**vice** 27:6,7

**victim** 24:22 347:24

**Victims** 341:23

**video** 4:13 5:11

**video-recorded**
4:25

**videotape** 4:8

**view** 114:12 288:17

**violation** 119:11
120:2,8 123:23 125:6
129:20 132:6

**violations** 118:22
119:7,10 121:10
129:19

**virtual** 13:3

**visit** 194:20

**voiced** 67:8 86:8
267:20

**voicing** 143:25
148:17

**voluntarily** 120:17

**vouched** 27:11

---

**W**

**waive** 168:24

**waiver** 27:8,9

**walk** 50:3 81:17
148:13 194:22
254:17,24 255:3

**walk-through**
193:16,21

**walking** 193:17
255:5,15 256:8 257:4

**wall** 8:10 229:9

**wanted** 77:6 82:13
84:20 85:24 90:14
102:14 103:5 108:15
115:22 128:17 142:6
151:2,14 165:10
176:16 188:14
209:15 238:23 245:7
295:23 297:14
308:25 310:22,23
312:15 327:21

**wanting** 243:19

**warranted** 319:24

**waste** 135:7 142:19

**watching** 291:6
296:23

**water** 12:13 87:22

**waves** 11:7

**Wayne** 276:6,18,20
277:7,11,15,17
279:17,21 280:3,9,
10,16,18

**ways** 45:25 188:24
233:11 234:8 235:10
309:17

**web** 39:21

**wedging** 142:14
145:25 151:19

**Wednesday** 218:8,
12

**weeds** 156:10,12
158:6 249:20

**week** 25:13 26:7,9,11
27:20 28:16 131:23
133:3 185:19 187:20,
21 188:5,6,15 192:22
206:5 209:22 283:17
345:18,19

**weekends** 57:21
243:13

**weekly** 52:25 73:9
116:13 185:24,25

**weeks** 140:9 145:19
185:20 337:3,4

**weird** 120:12

**well-run** 79:2 94:9

**whatnot** 72:4 161:11
182:14 270:18
295:22 343:18

**wide** 116:23

**wife** 12:24 19:20,21
168:22

**wind** 345:22

**window** 13:5

**windows** 13:6 206:6

**wisdom** 231:21
248:10,14 250:10,18
251:7

**witnessed** 186:7
259:11

**woefully** 68:24 78:11

**woman's** 39:7
179:11

**wondering** 323:22

**word** 11:5 89:2 98:6
175:23,24 269:21

**worded** 128:24

**words** 36:2 59:16
70:6 145:12 183:14
200:21 245:18
247:13 262:10
306:23 321:7 330:17

**work** 26:10 32:4,23
33:10 36:20 38:4
43:19 44:16 58:13,
17,20 61:24 62:18,19
63:5 64:24 65:4
70:23 71:16,24 72:6,
9 73:4,8,10,11,12,14,
20 74:2,9,10,12,13,
15,16,20,23 75:6,11,
13,15,18,20,22 76:6,
18,23 77:4,5,6 79:14
87:23 91:7 93:21,22
94:10 98:2,22 103:2
104:16,19 112:25
113:3,4,8,16,24

119:9 131:21 133:11,
13 160:9,11,20
161:2,3,20 165:11
166:17,18,19,21
170:12,15,25 172:21,
22 183:4 188:10
192:20 193:2 195:20
202:7,21,23 203:3,
12,13,15,16,17,20
204:7,18 206:2,3,4,7,
14,24 207:2,5 215:19
216:14,18,23 217:23
218:3 229:18 231:7,9
233:6 237:18,19
238:4,14,24,25 242:6
243:7 245:15,25
246:2,25 247:3,4,6,7,
10,12,19,21,22
248:3,4,6 263:12
266:12 278:23
281:15,16 284:8
289:16,18 314:19
316:24 317:2,20
322:23 323:7,9
324:10 326:21
327:22 328:7,8 329:7
333:12 334:4,17
339:23 343:3 346:19,
20,22

**worked** 49:3 74:17
93:8 94:5 96:17
114:23 170:11 204:2,
3 206:18 239:20,21
280:24 281:2 329:4

**worker** 337:17,20,22

**workers** 170:15

**working** 28:15 32:24
44:22 60:21 61:22
75:24 76:12,13,15
83:18 89:2 107:19
150:25 151:5 182:8
186:16 188:11
193:22 198:10
203:24 206:22
214:19 229:13 233:9
307:13 319:17,21

**workings** 270:7

**works** 36:7 276:21,
22 277:18 317:3

**world** 336:21

**worry** 77:19 93:3
156:25 157:16

158:25 206:2 258:5
262:19

**worth** 336:15,16

**wound** 151:21
335:12

**wrap** 12:11

**wrapping** 339:5

**write** 103:7,12
106:13 115:17
119:18 181:23,25
184:9 199:16 206:20
207:11 297:3

**write-up** 15:17 16:22
104:8 189:18 207:20
313:12 314:3

**write-ups** 103:9
271:18,25 272:6
273:2

**writes** 97:6 99:18
139:23 148:22
170:16 173:17

**writing** 201:6,16
209:8 229:9 339:2
345:21 346:10
347:17

**written** 16:15 25:12
76:22 106:14 152:5
153:15 197:22
199:21 201:19
209:18 210:6 218:15,
19 219:2,7,12 226:12
281:9 286:7,15
295:24

**wrong** 31:14 56:2,4
177:5 208:19 341:10

**wrote** 16:20 27:8
77:8 78:8 102:5
103:15 111:4 148:5
163:16 207:15
208:20 217:6 226:18
249:14,19 263:15
266:15,18 271:20
297:12 324:23 346:3
347:19

—————

**Y**

**yard** 12:25

**year** 21:13 25:18
27:2,5 29:13 33:12,
14 35:4 37:6 38:12
61:4 62:16,21 63:19
73:18 74:14 75:19,24
84:12 85:15 148:23
152:21 153:2 155:10
157:11 165:25
181:11 207:6 237:12
286:14 335:20
337:19,20

**year's** 207:6

**yearly** 152:13 156:23

**years** 7:5,7 8:19
32:12 56:5,6 61:4
66:3 85:4,6 111:8
127:14 152:14 203:4
204:15 206:19
229:18 231:2 252:20
261:20

**yes-or-no** 202:15

**yesterday** 18:6,12,
17 26:22

**York** 5:6,13 6:8
24:17,18 25:24 31:23
125:2 290:2 315:24

**young** 20:20 284:10

**younger** 74:5 85:4
109:6 110:12 231:21
238:19 270:8 276:3,6
281:22,24 282:8,15,
16 283:2,5,7 293:8
294:23 324:8

**Yulfo** 20:16

—————

**Z**

**Z89** 83:6,10,13 84:3
85:13,16

**Zack** 5:23 94:17,18
122:12 134:8 169:4
211:5 214:14 220:22
264:24 273:18
274:18 297:17
298:14

**zone** 156:7

**Zoom** 5:8 13:5,9