# EXHIBIT B

Page 1

1

2   UNITED STATES DISTRICT COURT

    SOUTHERN DISTRICT OF NEW YORK

3   -----------------------------------------X

    JOSEPH PASQUARELLO,

4

                              PLAINTIFF,

5

            -against-          Index No.:

6                              21-CV-8732

7   CROTHALL HEALTHCARE, INC., and

    MICHAEL ROCHE,

8

                              DEFENDANTS.

9   -----------------------------------------X

10

                         DATE:  August 2, 2022

11                       TIME:  10:00 a.m.

12

13

14          EXAMINATION BEFORE TRIAL of the

15   Defendant, CROTHALL HEALTHCARE, INC., by a

16   witness, CHRISTOPHER HARIGEL, taken by the

17   Plaintiff, pursuant to a Court Order, held

18   by videoconference, before LORI PICKMAN, a

19   Notary Public of the State of New York.

20

21

22

23

24

25

Page 2

```
1
2  A P P E A R A N C E S:
3
4  JOSEPH & KIRSCHENBAUM, LLP
     Attorneys for the Plaintiff
5  32 Broadway - Suite 601
     New York, New York 10004
6  BY:  LEAH SELIGER, ESQ.
     leah@jk-llp.com
7
8
     LITTLER MENDELSON, P.C.
9  Attorneys for the Defendants
     900 Third Avenue
10 New York, New York 10022
     BY:  SHAWN MATTHEW CLARK, ESQ.
11 ALSO PRESENT:  ZACK SHARPE, ESQ.
     smclark@littler.com
12
13
14
              *      *      *
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2  F E D E R A L  S T I P U L A T I O N S
3
     IT IS HEREBY STIPULATED AND AGREED by and
4  between the counsel for the respective
     parties herein that the sealing, filing and
5  certification of the within deposition be
     waived; that the original of the deposition
6  may be signed and sworn to by the witness
     before anyone authorized to administer an
7  oath, with the same effect as if signed
     before a Judge of the Court; that an
8  unsigned copy of the deposition may be used
     with the same force and effect as if signed
9  by the witness, 30 days after service of
     the original & 1 copy of same upon counsel
10 for the witness.
11
     IT IS FURTHER STIPULATED AND AGREED that
12 all objections except as to form, are
     reserved to the time of trial.
13
              *      *      *      *
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1              C. HARIGEL
2  C H R I S T O P H E R   H A R I G E L,
3  called as a witness, having been first duly
4  sworn by a Notary Public of the State of
5  New York, was examined and testified as
6  follows:
7  EXAMINATION BY
8  MS. SELIGER:
9     Q.   Please state your name for the
10 record.
11    A.   Christopher Harigel.
12    Q.   What is your office address?
13    A.   126 East 56th Street, New York,
14 New York 10022.
15    Q.   Hi, Chris.  Do you go by Chris
16 or Christopher?
17    A.   Chris is fine.
18    Q.   Have you been deposed before?
19    A.   Yes.
20    Q.   When was that?
21    A.   Probably close to sixteen years
22 ago, maybe seventeen, I can't remember
23 exactly, but it was quite awhile ago.
24    Q.   I am going to go over the
25 basics.  I am going to be asking you
```

Page 5

```
1              C. HARIGEL
2  a number of questions today.  Lori, the
3  court reporter, will take down everything
4  we say.  Because she's transcribing this,
5  it is important that you give verbal
6  responses to all my questions.  The court
7  reporter cannot record nods or gestures.
8        Do you understand that?
9     A.   Yes, I do.
10    Q.   The court reporter has sworn
11 you in and you are answering all questions
12 under oath today.
13       Do you understand that you
14 have the same obligation to tell the truth
15 and are subject to the same penalties for
16 perjury as if you were testifying in court?
17    A.   Yes, I do.
18    Q.   If you don't understand a
19 question that I have asked, please let
20 me know and I will rephrase it.  If you
21 answer the question, I will assume that
22 you understood it.
23       Do you understand that?
24    A.   Yes, I do.
25    Q.   Let me finish asking my
```

2 (Pages 2 - 5)

Page 6

C. HARIGEL

1
2 question before you start to answer it,
3 even if you anticipate what I'm asking.
4 This way the court reporter can get both
5 of our statements down and there's no
6 confusion.
7       Does that make sense?
8    A.   Yes.
9    Q.   If you need a break at
10 anytime, just let us know and we will try
11 to accommodate you. I would just ask that
12 if a question is pending, that you answer
13 the question first and then we'll take a
14 break.
15       Does that make sense?
16    A.   Yes.
17    Q.   Also, you can talk to your
18 lawyer before a question is asked and after
19 you have answered a question, but while a
20 question is pending, you must answer the
21 question first and then have that
22 conversation.
23       Do you understand?
24    A.   Yes.
25    Q.   During the deposition,

Page 7

C. HARIGEL

1
2 your attorney may object to my questions.
3 However, unless he specifically instructs
4 you not to answer, you must answer the
5 question even after he objects.
6       Do you understand that?
7    A.   Yes.
8    Q.   Are you currently taking any
9 medications that may impair your ability
10 to testify truthfully today?
11    A.   No.
12    Q.   Is there any other reason why
13 you may not be able to testify truthfully
14 today?
15    A.   No.
16    Q.   Have you ever been a party to a
17 lawsuit?
18    A.   Not to my knowledge, no.
19    Q.   Without revealing any
20 attorney/client communications, what,
21 if anything, did you do to prepare for
22 this deposition?
23    A.   I met with my lawyers.
24    Q.   Did you review any documents?
25    A.   Yes.

Page 8

C. HARIGEL

1
2    Q.   During the deposition, I am
3 going to be referring to Joe Pasquarello
4 as plaintiff or Mr. Pasquarello or Joe.
5 If at anytime you are not clear who I
6 am referring to, please ask me.
7       Do you have any documents with
8 you today at the deposition, other than the
9 exhibits that I have sent?
10    A.   No. And I don't have those
11 available to me now.
12       MS. SELIGER:  Are you able to
13    forward those to Chris just in case
14    it is hard to see when I share my
15    screen?
16       MR. CLARK:  I did forward them
17    to him. I suspect he does not have
18    them open on his computer at the
19    moment. If you want him to do that,
20    he can open them now or he can open
21    them one at a time. He does have
22    them, he probably doesn't have
23    them open at the moment.
24    Q.   Chris, did you go to college?
25    A.   Yes.

Page 9

C. HARIGEL

1
2    Q.   What did you study in college?
3    A.   Mechanical engineering.
4    Q.   Do you have any advanced
5 degrees?
6    A.   I have a Bachelors of
7 engineering degree.
8    Q.   Do you have any fire safety
9 training?
10    A.   Yes.
11    Q.   What is that?
12    A.   I attended several NFPA
13 sessions.
14    Q.   What is your current age?
15    A.   I'm fifty years old.
16    Q.   When did you begin working for
17 Crothall?
18    A.   December of 2000.
19    Q.   What is your current job title?
20    A.   Regional vice president.
21    Q.   For how long have you had that
22 position?
23    A.   Approximately two years.
24    Q.   What was your previous
25 position?

3 (Pages 6 - 9)

C. HARIGEL

1
2     MR. CLARK:  Objection to the
3   form.
4     Q.   What was your position prior to
5   the position you have now?
6     A.   I was the vice president of
7   operations.
8     Q.   What are your current main job
9   responsibilities?
10     A.   I oversee our facilities
11  management services at the Mount Sinai
12  Health System in New York City.  I also
13  oversee our medical gas division and I
14  oversee our project and energy services
15  group.
16     Q.   In your prior position, what
17  were your main job responsibilities?
18     MR. CLARK:  Objection to the
19   form.  You can answer.
20     A.   If you are referring to when I
21  was vice president of operations, it was
22  mainly the Mount Sinai Health System.
23     Q.   How many employees do you
24  currently supervise?
25     A.   Can you clarify that to be

C. HARIGEL

1
2   directly supervise or under my team?
3     Q.   Let's start with how many
4   employees do you directly supervise?
5     A.   Approximately eight.
6     Q.   Do you determine their
7   compensation?
8     A.   No.
9     Q.   Do you determine whether they
10  get bonuses?
11     A.   Can you clarify that question,
12  please?
13     Q.   Do you make decisions about
14  whether an employee will receive their
15  annual bonus, if they're eligible?
16     A.   There is a process that is
17  filled out with credentials and items that
18  have to be hit per the plan, so the plan is
19  filled out and then submitted.  So it's all
20  spelled out and the employees sign off on
21  the elements of their plan.
22     Q.   Is their bonus dependent on
23  their own performance or something else?
24     A.   It is a composite of several
25  different items, some performance and

C. HARIGEL

1
2   some the team.
3     Q.   Who are the eight employees
4   that currently are your direct reports?
5     A.   Michael Roche, Dorothy Perez,
6   John Barton, Jason Kerley, Tom Sevcik,
7   Hashim Khan, Robert Ross.  Did I say Bob
8   Shaffer?  And Bob Shaffer.  Those are all
9   eight of them.
10     Q.   In your prior role, I'm
11  forgetting the title, but in your prior
12  role to the one you have now, how many
13  direct reports did you have?
14     A.   It would have been similar.
15  Probably not having Hashim Khan at the
16  time.
17     Q.   Do you write performance
18  reviews for your direct reports?
19     A.   I do.
20     Q.   Do you write performance
21  reviews for anyone other than your
22  direct reports?
23     A.   I do not.
24     Q.   Where is your office located?
25     A.   126 East 56th Street in

C. HARIGEL

1
2   Manhattan, New York.
3     Q.   Is that the same building where
4   Mike Roche is based?
5     A.   No, it is not.
6     Q.   Who do you report to?
7     A.   I report to Bruce Bashwiner.
8     Q.   I'm going to ask you to
9   help me understand something.  I understand
10  that there is a main Mount Sinai Hospital
11  campus, and I will give you a chance to
12  correct me if I mischaracterize any of
13  this, and there is also a Mount Sinai Beth
14  Israel, a Mount Sinai Queens, Mount Sinai
15  Brooklyn.
16     Does each hospital campus have
17  a separate facilities team?
18     A.   Yes.
19     Q.   Are all the Mount Sinai
20  Hospital campuses managed by Crothall?
21     A.   No.
22     Q.   Which are the campuses managed
23  by Crothall?
24     A.   You have Mount Sinai Hospital
25  which is on the east side, 99th Street,

Page 14

C. HARIGEL

1
2 which you referred to as main; there is
3 Mount Sinai Morningside; Mount Sinai West;
4 Mount Sinai BI; Mount Sinai New York Eye
5 & Ear; Mount Sinai Downtown Union Square;
6 Mount Sinai Chelsea; Mount Sinai Queens;
7 and Mount Sinai Brooklyn.
8     Q.   In your current role, do you
9 oversee the facilities management in all
10 of those campuses?
11    A.   Indirectly they all roll up
12 under me, yes.
13    Q.   How many buildings comprise the
14 Mount Sinai Hospital main campus?
15    A.   Approximately fourteen.
16    Q.   How many buildings are in the
17 Mount Sinai Beth Israel campus?
18    A.   It varies.  That campus is in
19 transition.  Somewhere between seven and
20 nine at any given time.
21    Q.   How many buildings are part of
22 the Mount Sinai Queens campus?
23    A.   Again, there are several
24 satellite facilities, but on the main
25 campus for Queens there are two main

Page 15

C. HARIGEL

1
2 buildings.
3     Q.   How many buildings are in the
4 Mount Sinai Brooklyn campus?
5     A.   Two main facilities.
6     Q.   I will ask one last one, how
7 many buildings comprise the Mount Sinai
8 Morningside campus?
9     A.   Approximately six to eight.
10    Q.   Which of these hospital
11 campuses did Joe Pasquarello work
12 in when he was at Crothall?
13    A.   He worked at Mount Sinai
14 Hospital on 99th Street.
15    Q.   Is that what we were referring
16 to as the main campus?
17    A.   Correct.  We don't call it main
18 campus, but most people know when they call
19 it main campus, they're talking about Mount
20 Sinai Hospital.
21    Q.   How does Crothall refer to it,
22 so I use the right name?
23    A.   Mount Sinai Hospital.
24    Q.   If I say Mount Sinai Hospital,
25 I will be referring to that system or that

Page 16

C. HARIGEL

1
2 campus.
3     A.   Yes, ma'am.
4     Q.   Were you Joe Pasquarello's
5 supervisor when he worked at Crothall?
6     A.   Not his direct supervisor, no.
7     Q.   Who was his direct supervisor?
8     A.   Mike Roche.
9     Q.   Did Mike Roche report to you at
10 the time?
11    A.   Yes, he did.
12    Q.   As far as you know, when did
13 Joe Pasquarello work for Crothall?
14    A.   He came in in the fall or
15 winter of 2019 and he left similarly
16 September-ish of 2021.
17    Q.   What was his title?
18    A.   He was the assistant director
19 of fire safety.
20    Q.   When Joe Pasquarello worked at
21 Crothall, how often did you see him in
22 person per month let's say?
23    A.   Probably not per month.  Maybe
24 every other month or quarterly, at least
25 quarterly, but probably not every month.

Page 17

C. HARIGEL

1
2     Q.   Where would that be?
3     A.   Either during a site visit to
4 Mount Sinai Hospital or during sessions
5 that were conducted at my office.
6     Q.   How often would you say you
7 spoke to him by phone, let's use a month
8 again?
9     A.   Rarely by phone.
10    Q.   How often would you say you
11 emailed with him each month?
12    A.   Once a month would be a lot.
13 if there was something I wanted to get
14 clarification from him on, I would email
15 him directly, but it wouldn't be on a
16 monthly basis.
17    Q.   Based on your interactions with
18 Joe or your knowledge of his work, were you
19 aware that Joe updated the hospital's New
20 Beginnings fire safety presentation for all
21 Mount Sinai employees?
22        MR. CLARK:  Objection to the
23    form.  You can answer.
24    A.   I believe I was aware he was
25 working on updating those documents, yes.

5 (Pages 14 - 17)

Page 18

C. HARIGEL

1
2     Q.   Were you aware that he
3  updated the annual computer base training
4  presentation used to train Mount Sinai
5  Hospital staff?
6          MR. CLARK:  Objection to the
7      form.  You can answer.
8      A.   I'm not sure if I recall him
9  updating that one, I don't remember.
10     Q.   Were you aware that he updated
11  and developed new policies and procedures
12  for the Mount Sinai Hospital fire safety
13  department?
14         MR. CLARK:  Objection to the
15     form.  You can answer.
16     A.   Yes, I was aware he was working
17  on updating some of the forms, yes.
18     Q.   Were you aware that he updated
19  all the training programs for the operating
20  room, MRI, NICU and pediatric areas?
21         MR. CLARK:  Objection to the
22     form.  You can answer.
23     A.   No, I was not aware of that.
24     Q.   Were you aware that he
25  conducted negotiations with the fire

Page 19

C. HARIGEL

1
2  marshals' union?
3          MR. CLARK:  Objection to the
4      form.  You can answer.
5      A.   Yes.
6      Q.   Were you aware that he trained
7  and handled disciplinary matters for the
8  fire marshals on his campus, on the Mount
9  Sinai Hospital campus?
10         MR. CLARK:  Objection to the
11     form.  You can answer.
12     A.   Can you clarify the
13  disciplinary piece, please?
14     Q.   He was able to identify
15  low-performing fire marshals and counsel
16  them, if necessary, or terminate, if
17  necessary?
18         MR. CLARK:  Objection to the
19     form.  You can answer.
20     A.   We don't terminate Mount Sinai
21  employees.  Their labor relations
22  department handles that.
23     Q.   Were you aware that he trained
24  the fire marshals at Mount Sinai Hospital?
25         MR. CLARK:  Objection to form.

Page 20

C. HARIGEL

1
2      You can answer.
3      A.   Yes.
4      Q.   Were you aware that he updated
5  fire marshal scheduling to reduce overtime
6  and increase coverage?
7          MR. CLARK:  Objection to the
8      form.  You can answer.
9      A.   I'm not sure that addressed all
10  the items you referred to, but I know the
11  schedule was updated, yes.
12     Q.   Do you know that Joe updated
13  the schedule?
14         MR. CLARK:  Objection to the
15     form.  You can answer.
16     A.   Yes, I know the schedule was
17  changed during Joe's time there, yes.
18     Q.   Were you aware that Joe
19  developed a training guide for the fire
20  marshals and a way to track their training?
21         MR. CLARK:  Objection to the
22     form.  You can answer.
23     A.   I don't believe I knew that was
24  done, no.
25     Q.   Were you aware that he

Page 21

C. HARIGEL

1
2  developed shift reports for the fire
3  marshals that allowed managers and other
4  fire marshals to know what happened on any
5  given shift and this had not existed when
6  he arrived?
7          MR. CLARK:  Same objection.
8      You can answer.
9      A.   I know there were some changes
10  to it.  I wouldn't say it didn't exist
11  before where the shift didn't know what
12  the prior shift did.  I knew there were
13  some changes to it under Joe, yes.
14     Q.   Were you aware that he created
15  a process of tracking the fire marshals'
16  certificates of fitness?
17         MR. CLARK:  Objection to the
18     form.  You can answer.
19     A.   That I was not aware of, but we
20  did track that in the past.
21     Q.   Were you aware that when Joe
22  arrived, there were over five hundred open
23  work orders that were over sixty days old?
24         MR. CLARK:  Objection to the
25     form.  You can answer.

6 (Pages 18 - 21)

Page 22

C. HARIGEL

2 A.  I don't know the exact number,
3 no.
4 Q.  Were you aware that there were
5 a significant number of open work orders
6 that were overdue?
7 MR. CLARK:  Objection to the
8 form.  You can answer.
9 A.  Overdue is a difficult thing
10 to discuss.  I know there were numerous
11 work orders.  We handle tens of thousands
12 of requests, so that number is not
13 something that is out of category
14 for what his area would cover.
15 Q.  I will rephrase.
16 Were you aware that there were
17 a significant number of open work orders
18 that were over sixty days old when he
19 started his position?
20 MR. CLARK:  Objection to the
21 form.  You can answer.
22 A.  Yes, I believe I saw that
23 documented.
24 Q.  Were you aware that when Joe
25 left in September of 2021, all of those

Page 23

C. HARIGEL

2 work orders had been closed?
3 MR. CLARK:  Objection to the
4 form.  You can answer.
5 A.  I believe I saw that noted
6 someplace as well, yes.
7 Q.  Were you aware that Joe
8 identified testing that had not been
9 addressed prior to his arrival and he
10 was able to get that safety testing
11 done during his tenure?
12 MR. CLARK:  Objection to the
13 form.  You can answer.
14 A.  No, I'm not aware of that.
15 Q.  Were you aware that Joe
16 Pasquarello revised the hospital's
17 outdated fire safety inventories?
18 MR. CLARK:  Objection to the
19 form.  You can answer.
20 A.  No.
21 Q.  Were you aware that Joe
22 Pasquarello managed over a thousand
23 fire safety impairments in 2021?
24 MR. CLARK:  Objection to the
25 form.  You can answer.

Page 24

C. HARIGEL

2 A.  I wouldn't know the exact
3 number, but it sounds reasonable.
4 Q.  Were you aware that Joe
5 Pasquarello was involved in saving the
6 hospital from a fire on January 28, 2021?
7 MR. CLARK:  Objection to the
8 form.  You can answer.
9 A.  Can you clarify the question,
10 saving the hospital?
11 Q.  He was involved in
12 extinguishing the fire that occurred
13 on January 28th of 2021.
14 MR. CLARK:  Objection to the
15 form.  You can answer.
16 A.  I'm aware he was involved in
17 the fire incident that occurred on that
18 date, yes.
19 Q.  What is your awareness of his
20 involvement?
21 A.  Can you clarify that?
22 Q.  Do you know what he did when
23 the fire occurred?
24 A.  Yes.  He is part of a response
25 team that responded to the scene and took

Page 25

C. HARIGEL

2 action to extinguish the fire ahead of the
3 Fire Department responding.
4 Q.  Were you aware that he was
5 subsequently hospitalized for smoke
6 inhalation after that fire?
7 MR. CLARK:  Objection to the
8 form.  You can answer.
9 A.  I am aware that he visited the
10 ED, I'm not aware of what it was for.
11 MS. SELIGER:  Mark this as
12 Plaintiff's Exhibit 1.
13 (Whereupon, the aforementioned
14 Complaint was marked as Plaintiff's
15 Exhibit 1 for identification as of
16 this date by the Reporter.)
17 Q.  Have you seen this document
18 before?
19 A.  I've seen this cover page, yes.
20 Q.  Have you seen the rest of the
21 document?  This is the Complaint that was
22 filed in Joe Pasquarello's action against
23 Crothall and Michael Roche.
24 A.  I'm seeing page 1 of 32,
25 meaning there are 31 pages I don't

7 (Pages 22 - 25)

C. HARIGEL

1
2  see.  I would assume that is the document
3  I have seen, but I cannot testify that
4  I know every single page that you have
5  there.
6      Q.   Take a minute and look on your
7  screen and verify this is the Complaint.
8          Can you let me know whether you
9  have seen it before or not?
10     A.   On the quick review I just
11 conducted, it appears to be the same
12 document that I received, yes.
13     Q.   Have you read it in the past?
14 Not just now, but prior to today, have you
15 read through this Complaint?
16     A.   Yes, I have.
17     Q.   When was the first time you saw
18 this Complaint?
19     A.   I don't recall exactly, but I
20 received it -- I was served it.
21     Q.   By whom?
22     A.   I don't remember who served me.
23 It was in my office.
24     Q.   Do you recall when you learned
25 about this lawsuit?

C. HARIGEL

1
2      A.   It would have been around the
3  same time I received the service.
4      Q.   Do you recall if it was before
5  or after Joe Pasquarello left Crothall?
6      A.   Before.
7      Q.   Do you know who Bob Shaffer is?
8      A.   Yes.
9      Q.   I think you mentioned earlier
10 he is one of your direct reports; is that
11 correct?
12     A.   Yes.
13     Q.   What is his current title?
14     A.   System director of fire safety.
15     Q.   How long has he had that title?
16     A.   Approximately seven years.
17     Q.   How often do you interact with
18 him in any given month?
19     A.   A few times a month.
20     Q.   Is that inconclusive of phone,
21 email, in-person interactions?
22     A.   Yes.
23     Q.   What are his main
24 responsibilities?
25          MR. CLARK:  Objection to the

C. HARIGEL

1
2       form.  You can answer.
3      A.   He assists the fire safety at
4  each location in the Mount Sinai Health
5  System.
6      Q.   In what ways does he assist
7  fire safety in each location?
8      A.   He reviews their progress on
9  required inspection testing and maintenance
10 and adherence to our Crothall programs.
11     Q.   Does he conduct audits of the
12 various facilities?
13     A.   From a fire safety standpoint,
14 yes.
15     Q.   Are the bonuses for fire safety
16 employees dependent on the outcome of Bob
17 Shaffer's audits?
18     A.   It is a small component of it,
19 yes.
20     Q.   What are the other components
21 to them earning their bonuses?
22     A.   There's a full audit which is
23 the full program, which fire safety is a
24 subset of a subset.
25     Q.   So passing the fuller program

C. HARIGEL

1
2  would also influence whether fire safety
3  employees receive their bonuses?
4      A.   It's not a pass.  They are
5  graded and the grade puts it in a range,
6  yes.
7      Q.   Is each individual employee
8  graded or is it done by department?
9      A.   The audit is the department as
10 a whole.
11     Q.   Can you tell me, what is the
12 Joint Commission audit?
13     A.   Can you clarify the question,
14 please?
15     Q.   Are you familiar with, I don't
16 know if I'm using the right word, audit or
17 survey done by the Joint Commission?
18     A.   Correct.  If you are referring
19 to the tri-annual survey conducted by the
20 Joint Commission, I am familiar.
21     Q.   Can you tell me what that is?
22     A.   Yes.
23     Q.   You said it was tri-annual.
24 Does that mean it occurs every three years?
25     A.   Yes, usually.

Page 30

C. HARIGEL

1
2    Q.   Why only usually?
3    A.   They can come more frequently
4 if issues are identified.
5    Q.   What is the Joint Commission
6 looking for in their survey?
7        MR. CLARK:  Objection to the
8    form.  You can answer.
9    A.   There are thousands of
10 items that the Joint Commission is
11 looking for during their survey;
12 it is a multidisciplinary team.
13    Q.   Which disciplines does it
14 involve?
15    A.   Everything in the entire
16 hospital.
17    Q.   Related to the facilities
18 maintenance?
19    A.   No.  Related to the hospital
20 operation.
21    Q.   Can you be more specific?
22    A.   The Joint Commission is the
23 deeming agency for the centers for Medicaid
24 and Medicare services, validating that the
25 hospital is operating within their

Page 31

C. HARIGEL

1 standards.
2    Q.   Is there some sort of guide
3 that allows facilities to know what the
4 Joint Commission is going to scrutinize
5 or survey?
6    A.   Can you clarify facilities,
7 please?
8    Q.   Is there a guide that allows
9 Mount Sinai Hospital to know in advance
10 what the Joint Commission will be
11 surveying?
12    A.   Yes.
13    Q.   Based on what you just said
14 about the Joint Commission, does passing
15 the Joint Commission allow the hospital
16 to access certain funding?
17    A.   There is no passing.  There's
18 either accredited or nonaccredited.
19    Q.   If a hospital does not get
20 accredited after a Joint Commission survey,
21 what is the consequence?
22    A.   Numerous.  It could involve
23 financial issues as well, but that's not
24 something I deal with.

Page 32

C. HARIGEL

1
2    Q.   Is becoming accredited an
3 important objective for Mount Sinai
4 Hospital?
5        MR. CLARK:  Objection to the
6    form.
7    A.   Yes.
8    Q.   Why is that?
9        MR. CLARK:  Objection to the
10    form.
11    A.   You have to be accredited to
12 participate in CMS funding.
13    Q.   What is CMS funding?
14    A.   It's how hospitals can bill
15 back Medicaid and Medicare for services.
16    Q.   If they don't have access to
17 that funding, then they cannot bill back
18 for those services?
19        MR. CLARK:  Objection to the
20    form.
21    A.   It's not an area I deal with,
22 so I wouldn't be able to answer.
23    Q.   What percentage of the Joint
24 Commission survey involves fire safety
25 items?

Page 33

C. HARIGEL

1
2    A.   I would be hard-pressed to give
3 an exact answer, but maybe five percent on
4 less.
5    Q.   What are you basing that answer
6 on?
7    A.   The Joint Commission Hospital
8 Accreditation Program manual.
9    Q.   Do you have that manual in your
10 position?
11    A.   I have access to it, yes.
12    Q.   Where would that be?
13    A.   I access it online, on the
14 Joint Commission website.
15    Q.   Is it true that preparing for
16 the Joint Commission survey generates a
17 significant amount of work for the
18 facilities teams?
19        MR. CLARK:  Objection to the
20    form.  You can answer.
21    A.   Yes, typically.
22    Q.   Why is that?
23    A.   Because outside of our
24 department, other departments request
25 numerous work of the department as they

Page 34

C. HARIGEL

1
2  are prepping as well.
3      Q.   Can you clarify?  I'm not sure
4  what you mean by our department and other
5  departments.
6      A.   We run the facilities
7  management department in the hospital.
8  Every other department in the hospital can
9  request work orders from our department.
10  As they prep for Joint Commission as
11  well, because they are surveyed, they
12  will request work of us which increases
13  our workload.
14      Q.   What would show up as a problem
15  for the hospital during a Joint Commission
16  survey, for example?
17          MR. CLARK:  Objection to the
18      form.
19      A.   I could give you one of
20  ten thousand examples.  The hospital is
21  inspected for numerous man days or surveyor
22  days and they have a manual -- they have
23  several items that can be cited in all
24  different disciplines inside the hospital.
25      Q.   Is the Joint Commission survey

Page 35

C. HARIGEL

1
2  a physical inspection of the facilities
3  or is it an inspection of documents?
4      A.   Both.
5      Q.   Which documents does Crothall
6  present to the Joint Commission as part of
7  the survey?
8      A.   Can you clarify Crothall?
9      Q.   The Crothall facilities team,
10  what documents do they present as part of
11  the document survey?
12      A.   There are numerous documents
13  in the field of utilities, fire safety and
14  operations that are presented to the Joint
15  Commission during the survey.
16      Q.   Are those physical documents or
17  are those documents that are stored online?
18      A.   A combination of both.
19      Q.   Where do those documents exist
20  right now?
21      A.   You would have to clarify which
22  documents you are referring to.
23      Q.   Where do the online documents
24  get stored?
25      A.   For Crothall facilities

Page 36

C. HARIGEL

1
2  management in the Mount Sinai Health
3  System, we rely heavily on our Team Doc
4  program to store our regulatory compliance
5  documents.
6      Q.   After the Joint Commission
7  audit is complete, do you continue to
8  store those documents?
9      A.   Yes.
10          MS. SELIGER:  We have called
11      for the production of those documents
12      numerous times.  I'm going to
13      call for the production of those
14      documents, the ones that were
15      submitted to the Joint Commission.
16          MR. CLARK:  I don't know
17      that you have called for production
18      of them.  You will have to be more
19      specific than just the documents
20      that were submitted.  They are
21      never submitted, they are reviewed
22      and there are thousands.  You will
23      have to be more specific.  We can
24      do it offline, we don't have to do
25      it on the record, but you will need

Page 37

C. HARIGEL

1
2      to be more specific as to what
3      specific documents you are looking
4      for as opposed to just every document
5      in a database.
6          MS. SELIGER:  We can go back to
7      the document requests and we can do
8      that offline.
9      Q.   You said there were physical
10  documents as well.
11          Just regarding fire safety at
12  Mount Sinai Hospital, where are those
13  documents stored?
14      A.   We have both the physical
15  documents and the electronic storage
16  documents.  We use the electronic storage
17  program, but we have both.
18      Q.   The physical documents are
19  duplicates of what is stored online?
20      A.   The online are duplicates of
21  the physical documents.
22      Q.   When was the last Joint
23  Commission audit of Mount Sinai Hospital?
24      A.   Approximately July of 2021.
25      Q.   Did you participate in the

10 (Pages 34 - 37)

C. HARIGEL

1        C. HARIGEL
2 preparation for that survey?
3   A.   Yes.
4   Q.   What was your role in preparing
5 for the survey?
6   A.   I have overall responsibility
7 for the performance of the facilities
8 management department.
9   Q.   Did you participate during the
10 survey, itself?
11   A.   Yes.
12   Q.   What was your role during the
13 survey, itself?
14   A.   I have overall responsibility
15 for the performance of the facilities
16 management department.
17   Q.   Does that mean you walked
18 through the facilities with people
19 from the Joint Commission?
20   A.   Yes.
21   Q.   Does that mean you presented
22 the documentation to the Joint Commission?
23   A.   I participated in that, yes.
24   Q.   Did the hospital maintain it's
25 accreditation after the most recent Joint

1        C. HARIGEL
2 Commission survey?
3   A.   Yes.
4   Q.   How do you know that?
5   A.   I'm privy to the report.
6   Q.   So the Joint Commission
7 provides you with a report of their
8 observations?
9   A.   Yes.
10   Q.   Did you receive any feedback
11 during the survey from the Joint
12 Commission?
13   A.   Yes.
14   Q.   Was it positive feedback?
15   A.   Yes.
16   Q.   Did the Joint Commission team
17 provide feedback regarding Mount Sinai
18 Hospital's fire safety department?
19   A.   Not specifically the
20 department, no.
21   Q.   Did they provide feedback
22 regarding Mount Sinai Hospital's fire
23 safety performance?
24   A.   Not specifically, no.
25   Q.   After the completion of the

1        C. HARIGEL
2 Joint Commission audit, did you make any
3 announcements regarding the performance
4 of the hospital in the Joint Commission?
5   A.   I don't think I spoke on the
6 hospital as a whole, more as the facilities
7 management department inside the hospital.
8   Q.   What did you say?
9   A.   Paraphrasing, I thought we did
10 a very good job and I was very pleased with
11 the outcome of the survey.
12   Q.   Where did you make that
13 announcement?
14   A.   Probably in several locations.
15   Q.   Can you tell me what those
16 locations may have been?
17   A.   One that I can think of would
18 have been down in the main facilities
19 management office on the SC-2 level of
20 Mount Sinai Hospital.
21   Q.   Who were you speaking to when
22 you made that announcement?
23   A.   I can't recall everyone who was
24 present, but it was a larger group of the
25 facilities management team.

1        C. HARIGEL
2   Q.   Did it include the fire safety
3 team of Mount Sinai Hospital?
4   A.   I believe there were members of
5 the team there, yes.
6   Q.   Do you recall seeing Joe
7 Pasquarello there?
8   A.   I can't say I recall him being
9 there, but I know he was present because
10 I talked with him after that announcement.
11   Q.   Did you commend Joe Pasquarello
12 specifically for his role in preparing for
13 the hospital audit?
14   A.   I don't believe so.
15   Q.   Why not?
16   A.   I didn't commend anyone
17 specifically. I commended the team.
18   Q.   Do you remember what you and
19 Joe Pasquarello said after that
20 announcement?
21     MR. CLARK:  Objection to the
22 form.  You can answer.
23   A.   Vaguely.  It was awhile ago,
24 but vaguely, yes.
25   Q.   Can you tell me what Joe said

Page 42

C. HARIGEL

1
2 to you or what you said to him, that you
3 recall?
4     A.   After I had the words with the
5 team, we had lunch.  Joe asked if I would
6 come to his office with him, which I did.
7 Joe was questioning me on the appointment
8 of a new director of fire safety and was a
9 little discouraged about that process and
10 also about some counseling forms he had
11 received.
12    Q.   Did he say anything else to
13 you?
14    A.   I'm sure he did, it
15 was probably a ten-, fifteen-minute
16 conversation.  Again, I don't remember
17 every aspect of it.
18    Q.   Do you recall him talking to
19 you about discrimination that he felt he
20 was experiencing?
21          MR. CLARK:  Objection to the
22     form.
23    A.   I don't remember him
24 specifically mentioning discrimination
25 at that time.  I don't remember it

Page 43

C. HARIGEL

1
2 specifically, no.
3     Q.   Why was Joe upset about a
4 director being hired?
5          MR. CLARK:  Objection to the
6     form.
7          MS. SELIGER:  I will rephrase
8     my question.
9     Q.   What did Joe tell you was the
10 reason he was upset about a new director
11 being hired?
12    A.   Joe asked me about his
13 performance and there were several areas
14 of his performance that I told him he was
15 lacking in.  Those were part of the reason
16 that a new director was being brought in.
17    Q.   What were those areas of his
18 performance that were lacking?
19    A.   Following specific directions
20 on our programs and procedures; maintaining
21 proper documentation of our fire and life
22 safety systems inspection testing and
23 maintenance; and areas of that nature.
24          MS. SELIGER:  Mark this as
25     Plaintiff's Exhibit 2.

Page 44

C. HARIGEL

1
2          (Whereupon, the aforementioned
3     Org Charts were marked as Plaintiff's
4     Exhibit 2 for identification as of
5     this date by the Reporter.)
6     Q.   Exhibit 2 is a compilation of
7 org charts that were produced by Crothall.
8 They were produced to us as org charts
9 dating from 2013 to 2021.  I don't believe
10 each page is labeled with the year, but
11 I attempted to put them in the order in
12 which they were labeled by defendants,
13 so starting with the most recent and then
14 going back to 2013.
15          I am going to give you a
16 chance to scroll through them and just
17 look at them and let me know when you have
18 finished.  I don't know if it is easier for
19 me to scroll through it or for you to see
20 it on your own screen.
21          Are you able to see it on your
22 own screen?
23    A.   I am.
24    Q.   Do you recognize these as org
25 charts for Crothall facilities department

Page 45

C. HARIGEL

1
2 for Mount Sinai Hospital?
3     A.   It's not just Crothall on some
4 of the org charts, but yes, these are for
5 the facilities management department.
6     Q.   Just to clarify, you are saying
7 the org charts may include employees who
8 are not necessarily Crothall employees?
9     A.   Yes, they do include employees
10 who are not Crothall employees.
11    Q.   I believe the most recent one,
12 the most recent org chart I have is from
13 2021.
14          Who currently works in the
15 Mount Sinai Hospital fire safety
16 department?
17    A.   Bernie Nunez and Matt Bond.
18    Q.   What is Bernie Nunez' title?
19    A.   Director of fire safety.
20    Q.   And what is Matt Bond's title?
21    A.   Assistant director of fire
22 safety.
23    Q.   Are there any other employees
24 in fire safety, not including the fire
25 marshals?

12 (Pages 42 - 45)

Page 46

C. HARIGEL

1
2     A.   I don't believe so at this
3  time.
4     Q.   Is it possible there are and
5  you are not aware?
6          MR. CLARK:  Objection to the
7     form.
8     A.   It is possible.
9     Q.   Are you aware of any current
10  job openings for that department?
11    A.   I can't recall.
12    Q.   Do you need to approve anything
13  before a job is posted for the fire safety
14  department at Mount Sinai Hospital?
15    A.   No.
16    Q.   Do you know who John Barton is?
17    A.   Can you be more specific?
18    Q.   Do you know who John Barton is,
19  the Crothall employee?
20    A.   Again, can you be more
21  specific?  We have two John Bartons,
22  John Barton, Sr., and John Barton, Jr.
23    Q.   What is the title of John
24  Barton, Sr.?
25    A.   His Crothall title is resident

Page 47

C. HARIGEL

1
2  regional director of operation.
3     Q.   Is he the John Barton that you
4  mentioned earlier reports to you?
5     A.   Yes.
6     Q.   Who is John Barton, Jr.?
7     A.   He is the assistant director of
8  operations at Queens.
9     Q.   How long have you known John
10  Barton, Sr.?
11    A.   Approximately sixteen years.
12    Q.   Did you ever work with John
13  Barton, Sr., at a different employer?
14    A.   No.
15    Q.   For how long has John Barton,
16  Sr., had the title that you said he
17  currently has?
18    A.   Approximately four years.
19    Q.   What are the main
20  responsibilities he has in that role?
21         MR. CLARK:  Objection to the
22    form.  You can answer.
23    A.   John has a dual reporting
24  relationship, he reports to both myself
25  and Michael Roche.  For me he handles items

Page 48

C. HARIGEL

1
2  outside of the Mount Sinai Health System
3  and for Mike he handles operations inside
4  the Mount Sinai Health System.
5     Q.   Who reports to John Barton, if
6  you know?
7     A.   I don't know the exact list
8  of his direct reports.  I know several
9  of them, but I wouldn't say it's all of
10  them.
11    Q.   Who are those people that you
12  do know?
13    A.   Ron Cordier, Ryan Nowicki,
14  Felippe Garcia, Maria Gross and there are
15  others now that I'm just not remembering
16  exactly.
17    Q.   As part of his responsibility
18  within the Mount Sinai Hospital system,
19  does John Barton manage testing and
20  maintenance of fire pumps, as far as
21  you know?
22    A.   He's involved in that at this
23  time, yes.
24    Q.   How long has he been involved
25  in that?

Page 49

C. HARIGEL

1
2     A.   I would say approximately two
3  years.
4     Q.   What aspect is he involved in?
5     A.   He oversees the testing and
6  maintenance of the fire pumps.
7     Q.   Who did it prior to him doing
8  it two years ago?
9     A.   It was performed by a different
10  contractor.
11    Q.   So an outside vendor managed
12  it?
13    A.   They didn't manage it, no.
14  They performed the test.
15    Q.   Who was that outside vendor?
16    A.   At that time it would have been
17  Lund.
18    Q.   Beginning approximately two
19  years ago, did you testify that he took
20  over the testing of the fire pumps?
21    A.   He took over the management of
22  the testing of the fire pumps, correct.
23    Q.   You testified that prior to
24  that, Lund was handling the management
25  of the testing?

13 (Pages 46 - 49)

C. HARIGEL

1
2      MR. CLARK:  Objection to the
3   form.
4      A.   No.  They were doing the actual
5   testing.
6      Q.   So who was managing it before
7   John Barton took over that management two
8   years ago?
9      A.   Fire safety.
10     Q.   Who in fire safety?
11     A.   It would have been the fire
12  safety department.  It was one of their
13  required testing, so it would have gone
14  under the individuals in fire safety
15  at the time.
16     Q.   Two years ago, are you saying
17  beginning in 2020, approximately, John
18  Barton took over the testing of the fire
19  pumps?
20     MR. CLARK:  Objection to the
21   form.
22     A.   The timeframe is approximate,
23  but again, he took over the management of
24  the testing, correct.
25     Q.   Can you explain to me how you

C. HARIGEL

1
2   are differentiating management of testing
3   and actual testing?
4      A.   John Barton did not do the
5   test, himself; he managed the process.
6      Q.   I assume he would manage either
7   an internal or an external team to do the
8   testing?
9      A.   That is correct.
10     Q.   Prior to him doing that,
11  who was the person who was managing
12  the internal or external team doing
13  the testing?
14     A.   The fire safety department.
15     Q.   Are you saying that a
16  particular person in the fire safety
17  department was managing it or do you
18  not know?
19     A.   I do not know who they assign
20  that task to in the fire safety department
21  at Mount Sinai Hospital.
22     Q.   Does fire safety actually
23  conduct the tests of fire pumps?
24     MR. CLARK:  Objection to the
25   form.

C. HARIGEL

1
2      Currently or two years ago?
3      Q.   Does fire safety currently test
4   fire pumps?
5      A.   We are referring to just Mount
6   Sinai Hospital, correct?
7      Q.   Correct.
8      A.   No, fire safety is not
9   currently testing the fire pumps
10  at Mount Sinai Hospital.
11     Q.   Who is currently testing the
12  fire pumps?
13     A.   There are several different
14  tests conducted, there's a monthly and
15  there's an annual.  I believe the monthlies
16  are conducted with in-house staff and the
17  annual is an external vendor.
18     Q.   When you say in-house staff, is
19  that fire marshals or is that a different
20  team?
21     A.   It's a different team.
22     Q.   Which team is that?
23     A.   I believe it is part of the
24  plant operations team under John Barton.
25     Q.   Two years ago who was

C. HARIGEL

1
2   conducting those tests of the fire
3   pumps?
4      A.   Again, Lund Fire.
5      Q.   Two years ago, before John
6   Barton took over management of the testing,
7   who was managing the testing?
8      A.   The fire safety department.
9      Q.   Are you saying you don't know
10  specifically who was managing the fire pump
11  testing prior to John Barton?
12     MR. CLARK:  Objection to the
13   form.
14     A.   Correct, I don't know who fire
15  safety assigned to manage that, I don't
16  know.
17     Q.   Is it possible Matt Bond was
18  managing the testing of the fire pumps
19  prior to John Barton taking over?
20     A.   Yes, it is possible.
21     Q.   Does Doug Rome report to Mike
22  Roche?
23     A.   Yes.
24     Q.   Does Ryan Nowicki report to
25  Mike Roche?

14 (Pages 50 - 53)

Page 54

C. HARIGEL

1
2    A.   Not at the present time.
3    Q.   Did he ever report to Mike
4 Roche?
5    A.   Yes.
6    Q.   Does Matt Bond report to Mike
7 Roche?
8    A.   No.
9    Q.   Has he ever reported to Mike
10 Roche?
11   A.   Maybe.  I can't really recall,
12 but potentially, yes.
13   Q.   Does Bernie Nunez report to
14 Mike Roche?
15   A.   Yes.
16   Q.   Does Bobby Denver report to
17 Mike Roche?
18   A.   Yes.
19   Q.   Does Joe Ecklof report to Mike
20 Roche?
21   A.   No.
22   Q.   Who does he report to?
23   A.   I believe directly to John
24 Barton.
25   Q.   Do you know how old Mike Roche

Page 55

C. HARIGEL

1
2 is?
3    A.   Approximately 35.
4    Q.   You testified earlier that Joe
5 Pasquarello complained to you about some
6 disciplinary matter, I think that's how
7 you characterized it.
8        Who was disciplining Joe
9 Pasquarello?
10   A.   The counseling came from Mike
11 Roche.
12   Q.   When did you first become aware
13 that Mike Roche wanted to write Joe up?
14   A.   Approximately the winter of
15 2020.
16   Q.   How did you learn that?
17   A.   Mike requested a meeting with
18 myself and Bob Shaffer.
19   Q.   What did he tell you was the
20 reason he wanted to write up Joe?
21   A.   Performance issues inside the
22 fire safety department.
23   Q.   What were the specific
24 performance issues?
25   A.   I can't remember all of them,

Page 56

C. HARIGEL

1
2 but some of them related to the
3 documentation process.
4    Q.   The documentation of what?
5    A.   Our required inspection,
6 testing, maintenance and followup of
7 all of our fire and life safety systems.
8    Q.   Is that the documentation in
9 the Team Doc program?
10   A.   Yes.
11   Q.   Any other documentation?
12   A.   I believe there were parts with
13 work order performance as well.
14   Q.   In December of 2020 or the
15 winter of 2020?
16   A.   It would have been the winter
17 of 2020, yes.
18   Q.   Aside from documentation, were
19 there any other performance issues that
20 Mike Roche was informing you and
21 Mr. Shaffer about?
22   A.   I can't recall at this time.
23   Q.   Do you know whether Mike Roche
24 actually did issue Joe a write-up or
25 professional counseling?

Page 57

C. HARIGEL

1
2        MR. CLARK:  Objection to the
3    form.  You can answer.
4    A.   No, he did not.
5    Q.   Why is that, if you know?
6    A.   Mr. Shaffer and I interceded
7 and said we would spend extra time with
8 Joe.
9    Q.   Did you spend extra time with
10 Joe?
11   A.   Both Bob and I did, yes.
12   Q.   When did you spend extra time
13 with Joe with respect to this particular
14 issue?
15   A.   Mine was remote and Bob was
16 onsite approximately weekly assisting.
17   Q.   When you say yours was remote,
18 what do you mean by that?
19   A.   I would audit the program
20 remotely through our electronic database
21 and send reports.
22   Q.   You would audit which program
23 and send reports to who?
24   A.   I would audit Team Doc and let
25 Joe know items I saw.

15 (Pages 54 - 57)

Page 58

C. HARIGEL

1
2      Q.   You would send him emails
3   presumably with items that you saw that
4   were problematic?
5      A.   Yes.
6          MS. SELIGER:  Those emails have
7      not been produced and they were
8      certainly requested.
9      Q.   Was that the extent of your
10  extra time spent with Joe Pasquarello
11  with respect to this particular matter?
12     A.   Yes.
13     Q.   How frequently did you send him
14  those emails?
15     A.   I don't recall.
16     Q.   You mentioned that Bob Shaffer
17  met with Joe on a weekly basis with respect
18  to this performance issue; is that correct?
19     A.   Approximately weekly, yes.
20     Q.   Do you know what Bob Shaffer
21  was discussing or doing with Joe during
22  these weekly meetings?
23     A.   Yes, evaluating the program.
24     Q.   Which program?
25     A.   The fire and life safety

Page 59

C. HARIGEL

1
2   testing and maintenance at Mount Sinai
3   Hospital.
4      Q.   Is that the documentation
5   program again, the Team Docs?
6      A.   For the most part, yes.
7      Q.   Do you know if Bob Shaffer also
8   sent any feedback to Joe regarding his
9   documentation performance?
10     A.   I do not.
11     Q.   Is there any documentation of
12  Bob's weekly meetings with Joe regarding
13  his performance since the winter of 2020?
14     A.   I'm not aware of any, no.
15     Q.   Did you tell Joe that a
16  performance issue had been identified
17  with respect to documentation as of
18  the winter of 2020?
19     A.   No, I don't recall that.
20     Q.   Were there any other issues
21  that you recall being discussed, aside
22  from documentation?
23          MR. CLARK:  Objection to the
24      form.
25          MS. SELIGER:  I will clarify my

Page 60

C. HARIGEL

1
2      question.
3      Q.   Regarding the performance
4   problems identified by Mike Roche beginning
5   in the winter of 2020, were there any other
6   performance problems with Joe Pasquarello,
7   aside from documentation?
8      A.   I can't recall any.
9          MS. SELIGER:  Off the record.
10         (Whereupon, an off the record
11      discussion was held.)
12     Q.   You mentioned previously that
13  you had read the Complaint filed in this
14  case.
15          Were you aware that Joe
16  Pasquarello had made formal complaints
17  internally of age discrimination against
18  Mike Roche?
19     A.   Yes.
20     Q.   When did you first learn that
21  Joe had made these discrimination
22  complaints?
23     A.   Approximately late May of 2021.
24          MS. SELIGER:  Mark this as
25      Plaintiff's Exhibit 3.

Page 61

C. HARIGEL

1
2          (Whereupon, the aforementioned
3      Human Resources Document was marked
4      as Plaintiff's Exhibit 3 for
5      identification as of this date
6      by the Reporter.)
7      Q.   Chris, if you are able to look
8   through it and let me know when you are
9   ready.
10     A.   Okay.
11     Q.   Do you know what this document
12  is?
13     A.   It looks like a communication
14  between Patty, who was our HR manager, and
15  the Crothall Human Resources Service
16  Center.
17     Q.   Does it appear to be a record
18  of their communications with respect to
19  Joe Pasquarello?
20     A.   Yes.
21     Q.   Does it look like a log of
22  their communications in response to his
23  complaint?
24          MR. CLARK:  Objection to the
25      form.

16 (Pages 58 - 61)

```
 1          C. HARIGEL
 2    Q.   Does it look like their
 3 communications regarding his complaint?
 4 It says, "Joe Pasquarello's Allegations"
 5 under subject.
 6          MR. CLARK:  Objection to the
 7    form.  You can answer.
 8    A.   I would say it looks like a
 9 continuation to that, yes.
10    Q.   It's certainly not the full
11 record.
12          If you look at the middle of
13 this first page, it appears to be, like you
14 said, a communication between Pat Lizarazo
15 and somebody named Shani, I'm not sure if
16 I'm pronouncing that right.
17          I am going to direct you to
18 look at the bottom of the first page where
19 it says, "For performance improvement
20 plan."
21          Do you see that?
22    A.   I do.
23    Q.   Do you see where it says
24 paragraph numbered one, it says, "All
25 his preventive maintenance tasks have
```

```
 1          C. HARIGEL
 2 been 100 percent compliant for March,
 3 April and May.  Reports from Mike show 100
 4 percent completion of all areas as this is
 5 a monthly," then I'm going to scroll to the
 6 next page, "requirement.  I also verified
 7 the information with Chris Harigel, VP for
 8 facilities management."
 9          Do you see that?
10    A.   I do.
11    Q.   Is this an accurate account
12 with respect to the part that references
13 you?
14          MR. CLARK:  Objection to the
15    form.  You can answer.
16    A.   I would have no reason to say
17 it wasn't.  It was over a year ago, but I
18 would have no reason to doubt it.
19    Q.   Right after that, do you see
20 where it says, "Other areas are not" and
21 then it lists for March, April and May,
22 14 percent open for general, 3 percent
23 high risk? I'm not going to read all
24 of this, but do you see that?
25    A.   I do see it, yes.
```

```
 1          C. HARIGEL
 2    Q.   As far as you know, are those
 3 statistics at the bullet points where it
 4 says March, April and May, are those other
 5 departments open preventive measures?
 6    A.   Not other departments.  Other
 7 areas inside of the facilities management
 8 department.  I cannot speak to the validity
 9 of the data though.
10    Q.   Are you aware that part of the
11 disciplinary action that was issued to Joe
12 Pasquarello involved the closing of his
13 preventive measures?
14          MR. CLARK:  Objection to the
15    form.  You can answer.
16    A.   Yes, I believe I'm aware of
17 that.
18    Q.   Do you know if the other
19 people responsible for the open preventive
20 measures were similarly disciplined?
21    A.   Again, I cannot speak to the
22 validity of that data, so I won't answer.
23    Q.   I'm not asking you about the
24 validity.
25          Are you aware of any other
```

```
 1          C. HARIGEL
 2 people responsible for preventive measures
 3 who were disciplined for having open
 4 preventive measures?
 5    A.   If the data is not accurate,
 6 then I can't comment on if they were
 7 disciplined, if the data is not accurate.
 8    Q.   Who are the different
 9 departments, or I think you used a
10 different word, that would be responsible
11 for the other areas of preventive measures,
12 namely, general, high risk and non-high
13 risk?
14          MR. CLARK:  Read back the
15    question.
16          (Whereupon, the Reporter read
17    back the referred to question.)
18          MR. CLARK:  Objection to the
19    form.  You can answer.
20    A.   There were several different
21 areas under the facilities management
22 department that could potentially be
23 responsible for the work that falls under
24 these categories.  I don't see what it is,
25 so I can't answer who it would have been.
```

17 (Pages 62 - 65)

Page 66

C. HARIGEL

1
2    Q.   Who are the different
3 departments that are responsible for
4 preventive measures, aside from fire
5 safety?
6    A.   Some fall to our electrical
7 trades, some fall to our HVAC trades,
8 and some fall to our plumbing trades.
9    Q.   Are you aware of whether
10 or not any of the people in those other
11 departments or trades were disciplined
12 for having open preventive measures
13 during those three months?
14    A.   I'm not aware of any.
15    Q.   Has anyone ever complained to
16 you or HR about Mike Roche?
17       MR. CLARK:  Objection to the
18    form.  You can answer.
19    A.   Other than Joe Pasquarello, no,
20 I don't believe so.
21    Q.   Do you know a former employee
22 named Cortland Scott?
23    A.   I do.
24    Q.   Isn't it true that Cortland
25 Scott complained of harassment and

Page 67

C. HARIGEL

1
2 retaliation by Mike Roche?
3       MR. CLARK:  Objection to the
4    form.  You can answer.
5    A.   Not that I can recall.
6    Q.   Do you know an employee named
7 Celeste Valentine?
8    A.   Yes, I do.
9    Q.   Isn't it true that Celeste
10 Valentine complained of FMLA retaliation
11 by Mike Roche?
12       MR. CLARK:  Objection to the
13    form.  You can answer.
14    A.   I don't recall it being
15 directed toward Mike Roche, I don't
16 recall.
17    Q.   If there was a complaint made
18 about Mike Roche or any of your direct
19 reports, are you generally notified?
20    A.   Yes.
21    Q.   Do you know who Ron Kanterman
22 is?
23    A.   I do.
24    Q.   Is it true that he was a
25 manager reporting to Joe Pasquarello

Page 68

C. HARIGEL

1
2 for some amount of time?
3    A.   Yes, he was.
4    Q.   Was he a full-time employee?
5    A.   Yes.
6    Q.   Isn't it true that Ron
7 Kanterman left the fire safety team at
8 Mount Sinai Hospital in approximately
9 June of 2021?
10    A.   The date sounds about right,
11 yes.
12    Q.   Do you know who Omelfi Garcia
13 is?
14    A.   I do.
15    Q.   Was she a full-time employee?
16    A.   Yes.
17    Q.   Do you know what her role was
18 before she left Crothall?
19    A.   She worked in the fire safety
20 area.  I believe she was a fire safety
21 supervisor.
22    Q.   Did she also report to Joe
23 Pasquarello?
24    A.   Yes.
25    Q.   Isn't it true that Omelfi

Page 69

C. HARIGEL

1
2 Garcia left in approximately March of 2021?
3    A.   It was probably approximately
4 that time.  I will take your word on the
5 dating.
6    Q.   You don't have to.
7       Isn't it true that when Ron
8 Kanterman and Omelfi Garcia left fire
9 safety, Joe was running fire safety by
10 himself?
11       MR. CLARK:  Objection to the
12    form.  You can answer.
13    A.   He would have been the only
14 Crothall manager in the fire safety area,
15 yes, at Mount Sinai Hospital.
16    Q.   Isn't it true that Joe
17 Pasquarello requested that those two
18 roles, the role held by Ron Kanterman
19 and Omelfi Garcia, he requested those
20 roles be replaced in order for fire
21 safety to run effectively?
22    A.   I can't recall if it was done,
23 but I'm sure it was.
24    Q.   Do you recall whether or not
25 Joe asked for it to be done?

18 (Pages 66 - 69)

Page 70

```
 1          C. HARIGEL
 2     A.   I can't recall.
 3     Q.   While Joe was running fire
 4  safety on his own, isn't it true he was
 5  fulfilling the duties of those two
 6  employees?
 7     A.   He was running the fire safety
 8  area of Mount Sinai Hospital, yes, so all
 9  the responsibilities he would have been
10  handling, yes.
11     Q.   He was covering two full-time
12  employees in addition to himself?
13     A.   Your comment on two full-time
14  employees doesn't bear any merit.  There's
15  no set number of employees as to how we
16  staff a department.
17     Q.   Would you say the workload
18  decreased around the time those two
19  employees left in early to mid 2021?
20     A.   No.
21     Q.   When did you first learn that
22  Mike Roche wanted to hire a fire safety
23  director for Mount Sinai Hospital while
24  Joe Pasquarello was employed?
25     A.   I can't recall.
```

Page 71

```
 1          C. HARIGEL
 2     Q.   Do you recall when you learned
 3  that Mike Roche wanted to hire Bernie Nunez
 4  as fire safety director?
 5     A.   I don't believe it was Mike's
 6  call to want to hire Bernie Nunez.
 7     Q.   Whose call was it?
 8     A.   I believe in discussion with
 9  Mike, Bob Shaffer and I recommended that
10  Bernie be considered for the opportunity.
11     Q.   For the opportunity of fire
12  safety director?
13     A.   To apply for the position that
14  was posted, correct.
15     Q.   Who interviewed Bernie for the
16  job?
17     A.   I don't know who interviewed
18  Bernie for the job.
19     Q.   When you discussed with
20  Bob Shaffer and Mike Roche Bernie as a
21  candidate for the fire safety director
22  position, did Bob Shaffer recommend
23  him for the position of director?
24     A.   Yes, I believe so.
25     Q.   Was that to be in addition to
```

Page 72

```
 1          C. HARIGEL
 2  the two manager positions that were then
 3  open?
 4          MR. CLARK:  Objection to the
 5      form.  You can answer.
 6     A.   No, not in addition.
 7     Q.   Why not?
 8     A.   We were restructuring the
 9  department to put a director back in
10  charge of fire safety.
11     Q.   Are you saying a director as
12  opposed to an assistant director?
13     A.   Yes.
14     Q.   Was Bernie Nunez replacing
15  anyone?
16     A.   No.
17     Q.   What would you say the
18  difference is between the director
19  and the assistant director?
20     A.   The director has overall
21  responsibility for every aspect of
22  the fire safety department at Mount
23  Sinai Hospital.
24     Q.   Isn't it true that Joe
25  Pasquarello had overall responsibility
```

Page 73

```
 1          C. HARIGEL
 2  for the fire safety department prior
 3  to Bernie starting as director?
 4     A.   No, I don't believe he did.
 5     Q.   Didn't you just testify that he
 6  had overall responsibility for fire safety?
 7          MR. CLARK:  Objection to the
 8      form.
 9     A.   I don't believe I ever
10  testified to that.
11     Q.   Aside from Joe Pasquarello, who
12  else had responsibility for fire safety at
13  Mount Sinai Hospital after his two managers
14  left?
15     A.   There were no other managers at
16  the site to work in fire safety, correct.
17  It is not overall responsibility for the
18  fire safety department though.
19     Q.   What am I missing?  What
20  responsibility did he not have as an
21  assistant director versus a director?
22          MR. CLARK:  Objection to the
23      form.  You can answer.
24     A.   As we already discussed, we
25  took the fire pump testing and maintenance
```

19 (Pages 70 - 73)

Page 74

C. HARIGEL

1
2  away from the fire safety department and
3  handed it to the plant operations
4  department.
5      Q.   As an assistant director,
6  Joe Pasquarello did not have management
7  responsibility for the fire pump testing?
8      A.   Not when it was transitioned to
9  plant operations, no, under John Barton.
10     Q.   Is that the main difference
11 between his level of responsibility as
12 an assistant director and Bernie Nunez'
13 responsibility as a director?
14         MR. CLARK:   Objection to the
15     form.  You can answer.
16     A.   No, there were probably other
17 operational items that the roles assumed
18 when we divided up the director role.  I
19 don't have all of them off the top of my
20 head at the present time.
21     Q.   At the time Bernie was hired,
22 there was no intention to replace the
23 managers that left; is that correct?
24     A.   Not to hire the two positions
25 after Bernie was hired, no.

Page 75

C. HARIGEL

1
2      Q.   Just so I understand, you are
3  saying once Bernie was hired, there was no
4  intention to hire two additional managers
5  or one additional manager?
6      A.   There was no intention to hire
7  two additional managers.  I believe the one
8  was probably under consideration, but no
9  intention to hire two.
10     Q.   Was that communicated to Joe
11 Pasquarello at the time?
12     A.   I don't know.
13         MS. SELIGER:   Mark this as
14     Plaintiff's Exhibit 5.
15         (Whereupon, the aforementioned
16     Progressive Counseling and
17     Performance Improvement Plan was
18     marked as Plaintiff's Exhibit 5 for
19     identification as of this date by
20     the Reporter.)
21     Q.   I am going to show you Exhibit
22 5. Let me know when you have had a chance
23 to review this.
24     A.   Okay.
25     Q.   Do you recognize these

Page 76

C. HARIGEL

1
2  documents as the first progressive
3  counseling and performance improvement
4  plan issued by Mike Roche to Joe
5  Pasquarello?
6      A.   Yes.
7      Q.   Have you seen these documents
8  in the past?
9      A.   Yes.
10     Q.   When did you see them?
11     A.   Most recently my attorney
12 forwarded them to me this morning.
13     Q.   At anytime prior to that?
14     A.   I would have seen this on
15 submission to HRSC as well.
16     Q.   Would Mike Roche have submitted
17 it to you first or would HR have sent it to
18 you?
19     A.   Mike Roche would have reviewed
20 it with me.
21     Q.   Did he review the progressive
22 counseling and performance improvement
23 plan with you?
24     A.   To my recollection, yes, we
25 did.

Page 77

C. HARIGEL

1
2      Q.   Did that occur before June
3  10th, which looks like the date it was
4  issued to Joe?
5      A.   Yes.
6      Q.   Did Mike Roche provide you with
7  any documentation to support this write-up?
8      A.   Not to my knowledge.
9      Q.   Did he ask for your consent to
10 write up --
11     A.   No.
12     Q.   You testified earlier that Joe
13 Pasquarello complained to you about being
14 put on a PIP or performance improvement
15 plan.
16         Is this the performance
17 improvement plan that you believe
18 he was complaining about?
19     A.   I would assume so, yes.
20     Q.   You mentioned he complained to
21 you about it after the announcement of the
22 Joint Commission outcome; is that correct?
23     A.   Yes.
24     Q.   Isn't it true that he
25 questioned why he was on a PIP given the

C. HARIGEL

1
2 successful outcome of the Joint Commission
3 survey?
4        MR. CLARK:  Objection to the
5    form.
6    A.   I can't recall if that was an
7 exact statement.
8        MS. SELIGER:  Mark this as
9    Plaintiff's Exhibit 13.
10       (Whereupon, the aforementioned
11   Progressive Counseling was marked
12   as Plaintiff's Exhibit 13 for
13   identification as of this date
14   by the Reporter.)
15   Q.   Let me know if you are able to
16 see it on your screen.
17   A.   Yes, I can see it on my screen.
18   Q.   After you have had a chance to
19 review it, let me know when you are ready.
20   A.   Okay.
21   Q.   Have you seen this document
22 prior to today?
23   A.   I would say yes.
24   Q.   Do you recognize this as the
25 second progressive counseling issue to

C. HARIGEL

1
2 Joe Pasquarello by Mike Roche?
3    A.   Yes.
4    Q.   It looks like it was issued
5 July 19, 2021; is that correct?
6    A.   Yes.
7    Q.   When do you recall seeing this?
8    A.   I don't recall.
9    Q.   Do you know if you saw it
10 before it was issued to Joe or after?
11   A.   I believe I would have seen it
12 before it was issued.
13   Q.   Do you recall if Mike Roche
14 spoke to you about the contents of this
15 progressive counseling?
16   A.   I can't recall.
17   Q.   I want to direct you to the
18 detailed account of the incident resulting
19 in the conference.  It appears that the
20 paragraph numbered 1 has to do with a
21 preventative measure.
22       Is that your understanding?
23       MR. CLARK:  Objection to the
24   form.
25   A.   From what I'm reading, yes, it

C. HARIGEL

1
2 appears that way.
3    Q.   The second paragraph looks
4 like it has to do with something called an
5 urgent impact ILSM or urgent impact ILSMs,
6 plural.
7    A.   Is there a question?
8    Q.   I'm just asking if you agree
9 that that is what paragraph 2 concerns,
10 urgent impact ILSMs?
11   A.   Yes, it appears that way.
12       MS. SELIGER:  Mark this as
13   Plaintiff's Exhibit 6.
14       (Whereupon, the aforementioned
15   Emails were marked as Plaintiff's
16   Exhibit 6 for identification as
17   of this date by the Reporter.)
18   Q.   I would like to show you
19 Exhibit 6.  Chris, let me know when you
20 have had a chance to review these five
21 pages.
22   A.   Okay.
23   Q.   Have you seen these documents
24 before?
25   A.   Yes.

C. HARIGEL

1
2    Q.   It looks like this is an
3 email sent from Joe Pasquarello to Patricia
4 Lizarazo, you and Bob Shaffer.  The subject
5 says, "Response to second progressive
6 counseling report and complaint of
7 retaliation, harassment, hostile work
8 environment and age discrimination."
9        Do you see that?
10   A.   Yes.
11   Q.   On the second page of this
12 exhibit, do you recognize this letter which
13 also appears to be from Joe Pasquarello to
14 Patricia Lizarazo, you and Bob Shaffer, do
15 you recognize this as the letter that was
16 sent in that email?
17   A.   Yes, it appears to be.
18   Q.   Did you respond to this email?
19   A.   I can't recall exactly
20 responding to the email, but I believe
21 I would have informed Patty to forward
22 to our Human Resources Center and follow
23 the process that they lay out.
24   Q.   Did you speak to human
25 resources about it?

C. HARIGEL

1
2     A.   I believe I may have had a
3  conversation with some representatives
4  of our Human Resources Services Center,
5  yes.
6     Q.   Did you speak with Mike Roche
7  about it?
8     A.   I don't recall speaking
9  directly to Mike Roche about this.
10    Q.   You don't recall alerting him
11 that a complaint had been made about him?
12       MR. CLARK:  Objection to the
13    form.  You can answer.
14    A.   I don't know if I did or if I
15 instructed Patty, our HR manager, to do it.
16    Q.   Did you ever speak to him about
17 it after he was alerted that there was a
18 complaint?
19       MR. CLARK:  Objection to the
20    form.  You can answer.
21    A.   I can't say for one hundred
22 percent, but I'm quite certain we would
23 have had a conversation about this.
24    Q.   Do you remember what you
25 discussed?

C. HARIGEL

1
2     A.   I do not.
3       MR. CLARK:  Let's take a short
4    break.
5       (Whereupon, a recess was
6    taken.)
7       MS. SELIGER:  Mark this as
8    Plaintiff's Exhibit 7.
9       (Whereupon, the aforementioned
10    Human Resources Service Center Emails
11    was marked as Plaintiff's Exhibit 7
12    for identification as of this date
13    by the Reporter.)
14    Q.   Chris, I am going to ask you to
15 open up Exhibit 7.
16    A.   I have it open.
17    Q.   This looks like another record
18 similar to what we saw before.
19       Can you review it and let me
20 know what you recognize this to be?
21    A.   It looks like to be email
22 records from our HR Service Center.
23    Q.   Do you see the part in gray, it
24 looks like that entry is dated August 2,
25 2021; do you see that?

C. HARIGEL

1
2     A.   Yes.
3     Q.   The content starting in the
4  middle, it says, "Hi, Chris."  It looks
5  like this is a communication to you from
6  someone named Naomi Giampaolo.
7     A.   Yes.
8     Q.   It says, "Joe Pasquarello has
9  contacted the HR Service Center to dispute
10 his second PC that was issued recently."
11       Do you understand PC to mean
12 progressive counseling?
13    A.   Yes.
14    Q.   At the end, do you see where
15 it says, "Please review the attached and
16 let me know how we can investigate these
17 allegations of falsification, et cetera";
18 do you see that?
19    A.   Yes.
20    Q.   If you look just below it in
21 the white, do you see the next entry is
22 dated August 4, 2021?
23    A.   Yes.
24    Q.   It looks like that is a
25 communication from you in response saying,

C. HARIGEL

1
2  "Have conducted a review.  Please let me
3  know when you would like to discuss."
4       Do you recall that being your
5  communication?
6     A.   I don't recall it, but it
7  appears correct, yes.
8     Q.   Do you recall what the
9  investigator had sent you to review?
10       MR. CLARK:  Objection to the
11    form.  You can answer.
12    A.   I don't recall, but the prior
13 exhibit was what I believe it to be.
14    Q.   So the complaint from Joe
15 Pasquarello about his second progressive
16 counseling?
17    A.   Yes.
18    Q.   What did you review or
19 investigate before you responded
20 to this person?
21    A.   I don't exactly recall what we
22 reviewed at that time.
23    Q.   When you say we, I'm just
24 asking about you.
25       Do you recall, aside from

22 (Pages 82 - 85)

C. HARIGEL

1
2  reading the complaint that Joe wrote,
3  did you review any documents?
4      A.   I can't recall.
5      Q.   Did you speak to Mike Roche or
6  anyone else about the complaint at that
7  point?
8      A.   I don't recall, but I probably
9  would have reviewed it with Patty.
10     Q.   Do you recall speaking about it
11 or doing anything else as part of your
12 review?
13     A.   I don't recall exactly what we
14 did, no.
15     Q.   You are responding as we.  I'm
16 just asking about you.
17     A.   I don't recall exactly what I
18 did.
19     Q.   Did you support Mike Roche in
20 issuing the second progressive counseling?
21     A.   My support was not required to
22 issue this counseling.
23     Q.   Did you support his decision to
24 issue the second progressive counseling?
25     A.   I think his decision was

C. HARIGEL

1
2  warranted, yes.
3      Q.   Based on what?
4      A.   Based on him not hitting the
5  elements of his performance improvement
6  plan.
7      Q.   Based on the two items
8  identified in the second progressive
9  counseling, which were two failures to
10 meet his PIP requirements; is that what
11 you are saying?
12     A.   Correct, yes.
13     Q.   Was that based on your own
14 personal knowledge of Joe not meeting
15 those requirements?
16     A.   No.
17         MR. CLARK:  Objection to the
18     form.
19     Q.   Was it based on what you had
20 been informed about his performance?
21     A.   Yes.
22     Q.   Aside from Mike Roche, who was
23 informing you about Joe's performance?
24     A.   Bob Shaffer at times.
25     Q.   How frequently was Bob Shaffer

C. HARIGEL

1
2  reporting to you about Joe's performance?
3      A.   No set frequency.
4      Q.   You testified earlier about how
5  frequently you interacted with Bob.
6          Were all of those interactions
7  concerning Joe Pasquarello's performance?
8      A.   No.
9      Q.   Would you say then, and
10 I don't recall the number of times
11 you described meeting with Bob Shaffer,
12 interacting with him, but your discussions
13 with him would have been fewer than that?
14         MR. CLARK:  Objection to the
15     form.
16     A.   Yes.
17     Q.   You testified earlier
18 that Mike Roche showed you the first
19 progressive counseling and PIP prior to
20 issuing it to Joe Pasquarello; is that
21 correct?
22     A.   Yes, I believe I was copied on
23 it.
24     Q.   Did you support Mike Roche in
25 issuing the first progressive counseling?

C. HARIGEL

1
2      A.   My support was not required for
3  this submission.
4      Q.   Did you support Mike Roche's
5  decision to issue the first progressive
6  counseling?
7      A.   Yes.
8      Q.   Did you support Mike's decision
9  to issue the performance improvement plan?
10     A.   Again, my support was not
11 required for him to issue that performance
12 improvement plan.
13     Q.   But did you support his
14 decision to do so?
15     A.   Yes.
16     Q.   Again, was that based on your
17 personal knowledge of Joe's performance?
18     A.   No.
19         MS. SELIGER:  Mark this as
20     Plaintiff's Exhibit 8.
21         (Whereupon, the aforementioned
22     Human Resources Investigation
23     Document was marked as Plaintiff's
24     Exhibit 8 for identification as of
25     this date by the Reporter.)

23 (Pages 86 - 89)

Page 90

```
1              C. HARIGEL
2      Q.   Let me know when you have the
3  document up and let me know when you have
4  had a chance to review it.
5      A.   Okay, I reviewed it.
6      Q.   Can you tell me what this
7  document appears to be to you?
8      A.   The investigation from a
9  complaint that Joe submitted.
10     Q.   It looks like this part of
11 the investigation record is dated August
12 4th.
13          Do you see at the top where it
14 says, "Submitter Full Name," and it looks
15 like Naomi Giampaolo submitted this part
16 of the record?
17     A.   Yes.
18     Q.   Does that look correct to you?
19     A.   Yes.
20     Q.   Over by audit message at the
21 top, it says, "Spoke with RDO Chris Harigel
22 about Joe's performance PC's and
23 background."
24          What does RDO stand for?
25     A.   That is a title in Crothall
```

Page 91

```
1              C. HARIGEL
2  Healthcare that I held years and years
3  ago.
4      Q.   Is she mistakenly referring to
5  you by that title?
6      A.   Yes.
7      Q.   Aside from that inaccuracy,
8  does this look like an accurate account
9  of what you shared with Naomi Giampaolo?
10     A.   Yes.
11     Q.   In the second sentence of her
12 account, it says, "In December 2020, they
13 were preparing to issue a performance PC
14 to Joe, but chose to work with him through
15 coaching."
16          Who is they?
17     A.   They in the first sentence
18 would have been Mike Roche going to issue
19 a performance counsel.  They who chose to
20 work with him would have been Bob Shaffer
21 and myself.
22     Q.   At that point in time, in
23 December of 2020, Joe Pasquarello was not,
24 in fact, issued a progressive counseling;
25 is that true?
```

Page 92

```
1              C. HARIGEL
2      A.   Yes.
3      Q.   That was decided among you,
4  Mike Roche and Bob Shaffer?
5      A.   Yes.
6      Q.   The part of the sentence
7  saying, "but chose to work with him through
8  coaching," were you saying that Mike Roche
9  and Bob Shaffer chose to work with Joe
10 through coaching?
11     A.   Yes, all three of us chose to
12 work with Joe through coaching.
13     Q.   As far as you know, is there
14 any documentation of the coaching that
15 occurred?
16     A.   I'm not aware.
17     Q.   I think you may have covered
18 this already, but in what area was Joe
19 meant to improve at that time?
20     A.   There were issues with him
21 following our procedures and properly
22 closing out and having all of his required
23 documentation in our systems on time.
24     Q.   Do you see later, I would
25 say it is a third of the way down, do
```

Page 93

```
1              C. HARIGEL
2  you see where it's written, "Joe filed a
3  lawsuit against Crothall, case pending,
4  then contacted the HRSC to dispute the
5  second PC"; do you see that?
6      A.   I do.
7      Q.   Are you aware that this lawsuit
8  was filed in October of 2021?
9          MR. CLARK:  Objection to the
10     form.  You can answer.
11     A.   I am not.
12     Q.   Why did you believe that Joe
13 had filed a lawsuit as of August 4, 2021?
14         MR. CLARK:  Objection to the
15     form.  You can answer.
16     A.   I don't believe those are my
17 words.
18     Q.   At this point in time did you
19 mention Joe's lawsuit to the HR person,
20 Naomi Giampaolo?
21     A.   I don't recall.
22     Q.   A little lower down, it says, I
23 would say it is a third of the way up from
24 the bottom, it says, "Prior to Joe, they
25 had one person doing the entire job."
```

Page 94

C. HARIGEL

1       C. HARIGEL
2       Do you see that?
3   A.  I do.
4   Q.  Is that accurate?
5   A.  Not prior to Joe, no.
6   Q.  Was there any time when one
7   person managed all the requirements of
8   the Mount Sinai Hospital fire safety
9   department?
10  A.  Yes.
11  Q.  When was that?
12  A.  When we first started in May of
13  2013.
14  Q.  How long did that last?
15  A.  I don't recall exactly.
16  Q.  Was the department always
17  intended to be a one-person job?
18      MR. CLARK:  Objection to the
19      form.
20  A.  It is not a department,
21  it's an area in the facilities management
22  department, so I can't fully answer that
23  question.
24  Q.  Is it your understanding that
25  all of fire safety for Mount Sinai Hospital

Page 95

1       C. HARIGEL
2   is a one-person job?
3       MR. CLARK:  Objection to the
4       form.
5   A.  It can be, yes.
6   Q.  Aside from when it started, I
7   think you said in 2013, has it ever been
8   staffed by just one person?
9       MR. CLARK:  Objection to the
10      form.  You can answer.
11  A.  Not that I can recall.
12  Q.  After it says, "Prior to Joe,
13  they had one person doing the entire
14  job" -- actually, I'm going to stop
15  there.
16      That statement, is that a
17  statement you made to Naomi Giampaolo?
18  A.  No, I wouldn't believe so.
19  Q.  In the next sentence where it
20  says, "When that person left, they could
21  not find anyone at that level and created
22  a team approach, the three positions."
23      Can you tell me who is being
24  referred to as that person who left?
25  A.  The director that came

Page 96

1       C. HARIGEL
2   directly after Bob Shaffer was a director
3   of fire safety.  He stayed in the role for
4   approximately eighteen months, I believe.
5   When he left, we recruited for a director
6   and we could not find one, so we created
7   two assistant directors in that role.
8   Q.  So you created two assistant
9   directors to lead fire safety back in
10  what year?
11  A.  It would have been
12  approximately 2015 or 2016.
13  Q.  So what are the three positions
14  referred to here?
15  A.  We also had a fire safety
16  supervisor.
17  Q.  At least starting from 2015 or
18  2016, there were three positions in fire
19  safety at Mount Sinai Hospital?
20      MR. CLARK:  Objection to the
21      form.  You can answer.
22  A.  I cannot say if they were
23  always filled at all times, so I don't
24  know if there were three people in each
25  role.

Page 97

1       C. HARIGEL
2   Q.  But at least starting at that
3   point, there was more than one person
4   there?
5   A.  Yes.
6   Q.  Is this information that you
7   shared with this HR person?
8   A.  I would assume, based on what
9   is in those notes, that some of that came
10  from me, yes.
11  Q.  Is the implication here that
12  you were discussing the years 2013 to
13  either 2015 or 2016?
14      MR. CLARK:  Objection to the
15      form.  You can answer.
16  A.  I would assume that I went over
17  the history of the fire safety area at
18  that account since our inception in 2013.
19  Q.  Then it says, if you look at
20  the next sentence after the parenthetical,
21  it says, "When the manager resigned, she
22  had positive things to say about
23  leadership."
24      Which manager is being referred
25  to there?

25 (Pages 94 - 97)

Page 98

C. HARIGEL

1
2     A.   I can't recall who I was
3  referring to, but if it was a she, the
4  only she that was in fire safety was
5  Omelfi Garcia.
6     Q.   Was Omelfi Garcia in fire
7  safety from 2015 or 2016 all the way
8  through the time of this record?
9     A.   No.
10     Q.   Do you know what positive
11  things Omelfi Garcia had to say about
12  which member of leadership?
13     A.   Omelfi Garcia worked directly
14  for Mike Roche for several years.  She had
15  very positive things to say about Michael
16  and his leadership style.
17     Q.   Didn't she also work for Joe
18  Pasquarello?
19     A.   Yes, for a very brief period.
20     Q.   The positive things she said
21  about leadership, what were you referring
22  to?
23     A.   She made a comment about
24  Michael Roche specifically and his
25  leadership style and supportive nature.

Page 99

C. HARIGEL

1
2     Q.   When was that comment made?
3     A.   During her exit interview.
4     Q.   Is there documentation of that
5  exit interview?
6     A.   Yes.
7     Q.   How do you know that?
8     A.   Because I reviewed it with
9  Patty.
10        MS. SELIGER:  That is
11     information that we also requested
12     and that was not produced.
13     Q.   Do you see where it says, "The
14  supervisor also left, so currently Joe is
15  the sole fire safety person"?
16     A.   Yes.
17     Q.   Are you referring to Ron
18  Kanterman then as the supervisor who left?
19     A.   Again, I didn't write that so I
20  don't know what the person was referring
21  to.
22     Q.   This appears to be a record of
23  this person's conversation with you.
24        Do you recall if this was part
25  of your conversation with her?

Page 100

C. HARIGEL

1
2        MR. CLARK:  Objection to the
3     form.  You can answer.
4     A.   I am assuming that yes, it
5  is a record of my conversation and maybe
6  the manager who was Ron and the supervisor
7  who was Omelfi were just mixed up in how
8  the document came out.
9     Q.   So it's possible this person
10  recorded Omelfi as manager and Ron as a
11  supervisor when it may have been the
12  opposite?
13     A.   Yes.
14     Q.   Let's look again at Exhibit 13.
15  Let me know when you have it in front of
16  you.
17     A.   I have it in front of me.
18     Q.   Do you see the section
19  "Detailed account of incident resulting
20  in conference"?
21     A.   Yes.
22     Q.   I'm looking back at the
23  paragraph with the number 1.
24     A.   I do.
25     Q.   It says, "Failure to uphold

Page 101

C. HARIGEL

1
2  the requirements of improvement plan.
3  The first item in the plan states "Timely
4  completion and closing of all preventative
5  maintenance tasks completed by a vendor
6  or in-house fire safety staff.'"  Then
7  it says, "'Measurement:  PM's are to be
8  completed and closed in TeamOps by the
9  25th of the month,' as of June 28, 2021.
10  Work order number 503212 remains issued
11  and opened after the 25th of June."
12        Do you see that?
13     A.   Yes.
14     Q.   I'm going to ask you to scroll
15  down to the second page of this exhibit.
16        Do you see at the top where it
17  says "Work Order" and then it says numbers,
18  "48007-503212"?
19     A.   Yes.
20     Q.   Is this the work order
21  referenced in the progressive counseling
22  we were just looking at?
23     A.   It does appear to be, yes.
24     Q.   Do you see what it says towards
25  the left, a little bit down, "Reason for

26 (Pages 98 - 101)

C. HARIGEL

2 the work order"?
3    A.   Yes.
4    Q.   Do you see it says, "Dry
5 sprinkler pump annual PM"?
6    A.   Yes.
7    Q.   PM I'm assuming is preventive
8 measure?
9    A.   Preventive maintenance.
10    Q.   Just above that, do you see
11 that it states when the last preventive
12 maintenance was conducted?
13    A.   Yes.
14    Q.   Do you see it says March 25,
15 2021?
16    A.   Yes.
17    Q.   Are annual preventive
18 maintenance actions generally taken
19 on an annual basis?
20    A.   Yes.
21    Q.   Isn't it true that an annual
22 test that was conducted on March 25th
23 of 2021 would not be due again until
24 approximately March 25th of 2022?
25         MR. CLARK:  Objection to the

C. HARIGEL

2    form.  You can answer.
3    A.   Yes.
4    Q.   Isn't it true this preventive
5 maintenance was not actually due in June
6 of 2021?
7         MR. CLARK:  Objection to the
8    form.  You can answer.
9    A.   I would have to read through
10 every item that is on the task list to
11 ensure that none of the tasks listed on
12 there are more frequent, but if it was
13 completed in March, then it would not
14 be due until March of the next year.
15    Q.   Did you go over this work order
16 in detail when you spoke to the HR person
17 investigating Joe's complaint?
18    A.   I do not recall.
19    Q.   Do you recall ever going over
20 this work order?
21    A.   I do not recall.
22    Q.   But you did support the issuing
23 or you supported Mike's decision to issue a
24 progressive counseling based on his failure
25 with respect to this work order?

C. HARIGEL

2    A.   Yes.
3    Q.   I would like you to look at the
4 bottom of the third page of this exhibit.
5         Do you see where it says,
6 "Assigned" and then it has the date
7 6/30/2021 or June 30, 2021?
8    A.   Yes.
9    Q.   It looks like this work order
10 was assigned to three people on June 30,
11 2021; is that correct?
12         MR. CLARK:  Objection to the
13    form.  You can answer.
14    A.   No, it wouldn't have been
15 assigned on June 30, 2021.
16    Q.   So what does that mean there
17 that it was assigned on June 30th of 2021?
18    A.   That's a target date for
19 closure.  They printed this work order
20 on 6/28/2021, so it was assigned before
21 that date.
22    Q.   So it was assigned to be
23 completed by June 30th of 2021?
24    A.   That's a target date generated
25 by the system.

C. HARIGEL

2    Q.   I see up at the top of page 2,
3 it says, "Target 6/30/2021."
4    A.   Correct.
5    Q.   So both target and assigned
6 means the same thing?
7    A.   No.
8    Q.   Can you help me understand the
9 difference?
10    A.   Do you see the first
11 highlighted requested, 5/31/2021?
12    Q.   Yes.
13    A.   That is when the work order
14 would have been assigned with a target date
15 for completion of 6/30/2021, auto-generated
16 by the system.
17    Q.   At the bottom, what does the
18 assigned mean?
19    A.   Those are the individuals who
20 that piece of equipment is assigned to in
21 the system.
22    Q.   Is there a reason that Joe
23 Pasquarello had to have this closed prior
24 to the target date?
25    A.   For one, it was part of the

27 (Pages 102 - 105)

Page 106

1           C. HARIGEL
2 performance improvement plan generated by
3 Mike Roche and the second reason, which can
4 be more critical, is dates -- certain tests
5 have dates for the inspections that they
6 have to fall within, that usually our work
7 order system will not know exactly.  So it
8 can be -- that can be a potential for the
9 reason.
10    Q.   As far as we know, the last
11 preventive maintenance with respect to the
12 dry sprinkler pump annual PM was conducted
13 in March of 2021?
14        MR. CLARK:  Objection to the
15    form.
16    A.   Based on what I see, yes, I
17 would agree to that.
18        MS. SELIGER:  Mark this as
19    Plaintiff's Exhibit 9.
20        (Whereupon, the aforementioned
21    Email was marked as Plaintiff's
22    Exhibit 9 for identification as
23    of this date by the Reporter.)
24    Q.   Let me know when you have it in
25 front of you and when you have had a chance

Page 107

1           C. HARIGEL
2 to review it.
3    A.   I have.
4    Q.   Do you recognize this, at least
5 at the top, as an email from you to Pat
6 Lizarazo?
7    A.   Yes.
8    Q.   When did you find out that Mike
9 Roche wanted to hire a new director of fire
10 safety for Mount Sinai Hospital?
11    A.   I'm not exactly sure when we
12 reviewed it.
13    Q.   But you did review with him, I
14 guess, his desire for someone in that
15 position?
16    A.   Yes.
17    Q.   Did you ever review with him
18 the need to fill the manager positions
19 left by Ron Kanterman and Omelfi Garcia?
20    A.   I don't know if I reviewed
21 those specifically with him.
22    Q.   You don't recall if you did?
23    A.   No, I don't recall if I did.
24    Q.   But you do recall discussing
25 the hiring of the new director of fire

Page 108

1           C. HARIGEL
2 safety; is that correct?
3    A.   Yes.
4    Q.   It looks as if you are
5 responding to Joe's complaint about the
6 hiring of Bernie Nunez as the new director
7 of fire safety.
8        Would you agree with that?
9    A.   Yes.
10    Q.   In the third paragraph,
11 "The position was properly posted through
12 recruiting.  Joe was aware of this, as I
13 believe Mike discussed it with him.  You
14 can confirm that with Mike."
15        Is it your belief that Mike
16 told Joe about this position?
17    A.   Based on reading what's there,
18 yes.  At the time, I would say yes.
19    Q.   Did you personally tell Joe
20 that this position was being posted?
21    A.   No.
22    Q.   Did Mike tell you that he told
23 Joe about this position being posted?
24    A.   I cannot recall.
25    Q.   Then the next paragraph, it is

Page 109

1           C. HARIGEL
2 one line, it says, "As you know, Ron had
3 already submitted his resignation letter
4 prior to the position being posted."
5        Do you see that?
6    A.   Yes.
7    Q.   Did you believe Bernie's
8 position was going to be replacing
9 Ron Kanterman's position?
10    A.   No.
11        MR. CLARK:  Objection to the
12    form.
13    A.   No.
14    Q.   Isn't it true that Ron
15 Kanterman was a manager reporting
16 to Joe Pasquarello?
17    A.   Yes.
18    Q.   It appears you are implying
19 here that Bernie is replacing Ron
20 Kanterman; is that correct?
21        MR. CLARK:  Objection to the
22    form.  You can answer.
23    A.   No.
24    Q.   So what is the connection
25 between Ron Kanterman resigning and

28 (Pages 106 - 109)

Page 110

C. HARIGEL

1
2 the posting of the director position?
3     A.   I believe this would have had
4 to do with internal candidates applying
5 for a position that's open.
6     Q.   Are you referring to the open
7 manager position or an open director
8 position?
9     A.   The open director position.
10     Q.   Again, Ron was not the
11 director, so what is the connection between
12 his resignation and candidates for the
13 director position?
14         MR. CLARK:  Objection to the
15 form.  You can answer again.
16     A.   Ron would not be a candidate to
17 apply for the director position.
18     Q.   Why is that?
19     A.   Because he had resigned.
20     Q.   Prior to the position being
21 posted?
22     A.   Correct.
23     Q.   Who was the hiring manager for
24 the director of fire safety position?
25     A.   Michael Roche.

Page 111

C. HARIGEL

1
2     Q.   You said earlier, and it looks
3 like you said it in this email, that Mike
4 Roche did not recommend Bernie Nunez for
5 the job of fire safety director.
6         Can you repeat to me who did
7 recommend him for this role?
8     A.   I recommended Bernie apply
9 for the position.  My recommendation was
10 supported by Bob Shaffer.  In the end,
11 Mike Roche supported it, as he hired him.
12     Q.   Is there documentation of your
13 recommendation of Bernie for this role?
14     A.   I can't recall if there's
15 documents of this recommendation or
16 if it was verbal.
17     Q.   Would you have communicated
18 that to Mike Roche in an email?
19     A.   Again, I can't recall if I
20 communicated it in writing or verbally.
21     Q.   When it was discussed with Bob
22 Shaffer, was that a discussion done orally
23 or in writing?
24     A.   Most likely it was a verbal
25 discussion as well.

Page 112

C. HARIGEL

1
2     Q.   Verbal meaning oral?
3     A.   Yes.
4     Q.   You mentioned other internal
5 candidates.
6         Were there other applicants for
7 the role of fire safety director?
8     A.   I do not believe anybody else
9 applied for this position.
10     Q.   How do you know that?
11     A.   I don't know it.  I said I do
12 not believe there were any other
13 candidates.
14     Q.   Based on what do you have that
15 belief?
16     A.   In my recalling, I do not
17 remember anybody else applying for the
18 position.
19     Q.   Were you part of the hiring
20 process?
21     A.   I was not.
22     Q.   If you look again at this
23 exhibit, there's a paragraph that starts,
24 "As far as education goes, Bernie is very
25 qualified for the role."

Page 113

C. HARIGEL

1
2         Do you see that?
3     A.   I do.
4     Q.   Then you say, "He likely has
5 more credentials, NYC C of Fs than Joe
6 does."
7         Is that NYC certificates of
8 fitness?
9     A.   That is correct.
10     Q.   What is a certificate of
11 fitness?
12     A.   It is a certificate issued
13 by the Fire Department of New York for
14 competency in several areas around fire
15 systems and components.
16     Q.   Based on what did you make that
17 statement?
18     A.   I have reviewed both Bernie's
19 resume and certificates and Joe's as well.
20     Q.   Which certificates does Bernie
21 have that exceed Joe's?
22     A.   The main one is Bernie holds a
23 certificate of fitness as a fire and life
24 safety director and Joe does not.
25     Q.   What is that certificate?

29 (Pages 110 - 113)

Page 114

C. HARIGEL

1
2    A.   It's a required certificate
3  from the Fire Department of New York that
4  certain staff members must possess when
5  certain systems are installed in their
6  building.
7    Q.   Does it have a particular name,
8  other than certificate of fire and life
9  safety director?
10    A.   It is a certificate of fitness
11 as the fire and life safety director.  It
12 has a number, yes.
13    Q.   What does that certificate
14 allow that person to do?
15    A.   It doesn't allow them to do
16 anything.  It is required when certain
17 systems are in certain buildings.
18    Q.   Is that the primary credential
19 that was considered when looking at Bernie
20 as a candidate for this job?
21    A.   No.
22    Q.   What was the qualification that
23 Bernie had that qualified him for this job?
24    A.   Bernie had been doing the job
25 longer in the Mount Sinai Health System

Page 115

C. HARIGEL

1
2  with Crothall.  He had been performing
3  extremely well, managing a program on his
4  own, such to the fact that we expanded his
5  responsibility probably six months prior
6  to offering him this job, where he had
7  multiple facilities that he had assistance
8  for.
9    Q.   Where was he previous to
10 becoming the director of fire safety at
11 Mount Sinai Hospital?
12    A.   He was stationed at Mount Sinai
13 Beth Israel.
14    Q.   How many buildings are in that
15 campus or facility?
16    A.   Again, I testified earlier,
17 I would say approximately six to eight.
18 It's a transitioning campus, so buildings
19 come in and go off, but at that time it
20 was probably six to eight, maybe nine.
21    Q.   Do you know Matt Bond?
22    A.   I do.
23    Q.   You testified earlier that he
24 is the current assistant director of fire
25 safety; is that correct?

Page 116

C. HARIGEL

1
2    A.   Yes, I believe so.
3    Q.   How long has Matt Bond worked
4  at Crothall?
5    A.   Between seven and eight years.
6    Q.   Do you know what other roles,
7  if any, Matt Bond has held since he has
8  been with Crothall?
9    A.   Yes.
10    Q.   Can you tell me what they were?
11    A.   Yes.  He first came to us,
12 I believe he was still a college student
13 and he was an intern for us in fire
14 safety because that was a requirement
15 for his degree.  He has held positions of
16 supervisor, manager and assistant director
17 in fire safety.  He also held a role in
18 engineering operations.
19    Q.   Isn't it true that Matt Bond
20 was the assistant director of fire safety
21 just prior to Joe Pasquarello being hired?
22    A.   I believe that's correct.
23    Q.   Isn't it true that from that
24 role, he moved to a manager role in fire
25 safety?

Page 117

C. HARIGEL

1
2    A.   I believe it was titled
3  manager.  I believe Crothall's title
4  is still assistant director.
5    Q.   What does that mean, his
6  Crothall title was assistant director?
7    A.   Crothall has titles that we use
8  in our hierarchy.
9    Q.   So he maintained his internal
10 assistant director status, but his working
11 title was manager; is that an accurate
12 recap?
13    A.   Yes.
14    Q.   Why was he transitioned from
15 assistant director to manager?
16    A.   I don't know the exact
17 specifics of it.  That was under, I
18 believe, Mike at the time.
19    Q.   Isn't it true that subsequent
20 to that manager role, he moved to
21 engineering?
22    A.   Yes.
23    Q.   In that engineering role, he
24 reported to Mike Roche directly?
25    A.   I don't believe he reported to

30 (Pages 114 - 117)

Page 118

1        C. HARIGEL
2 Mike Roche in that role.
3     Q.   Who do you believe he was
4 reporting to?
5     A.   I don't recall, but I don't
6 believe it was Mike Roche.
7     Q.   Do you have any guess as to who
8 it could be within engineering?
9        MR. CLARK:  Objection to the
10     form.  Don't guess.  I instruct the
11     witness not to guess.  Either he
12     knows or he doesn't.
13    A.   I don't know exactly.
14    Q.   But you know he was in
15 engineering and no longer in fire
16 safety at some point?
17    A.   Yes.
18    Q.   Is it true that after that
19 engineering role, he returned to fire
20 safety as assistant director?
21    A.   Yes.
22    Q.   When did he make that
23 transition?
24    A.   I don't know the exact timing.
25 It would have been, I believe, late 2021.

Page 119

1        C. HARIGEL
2     Q.   Whose decision would that have
3 been to move him to the assistant director
4 position?
5     A.   His own.
6     Q.   He chose --
7     A.   He applied for an open
8 position, we interviewed him and we
9 moved.  The decision was his to make
10 to apply.
11    Q.   Whose decision was it to hire
12 him in that role?
13    A.   I'm not sure who the hiring
14 manager was for that.  It may have been
15 Bernie.
16    Q.   We spoke earlier about Omelfi
17 Garcia.
18       Isn't it true that when Matt
19 Bond left fire safety, when he left his
20 fire safety manager role, Omelfi Garcia
21 joined fire safety to take over that role?
22    A.   I don't know if she backfilled
23 his position, I couldn't speak to that, I
24 don't know.
25    Q.   We discussed earlier that

Page 120

1        C. HARIGEL
2 Omelfi left fire safety in approximately
3 March of 2021.
4        Do you recall that Joe
5 Pasquarello requested her role be
6 refilled or replaced?
7     A.   I don't recall it, but I can
8 fathom that he would request it, yes.
9     Q.   I believe you testified that
10 her role was not actually replaced while
11 Joe was still the assistant director; is
12 that correct?
13    A.   I don't know if I testified to
14 that, but if I did -- I don't know if it
15 was replaced while Joe was still there,
16 I don't.
17    Q.   We have discussed that Joe was
18 the only person in fire safety at the end
19 of his tenure with Crothall.
20       Did another manager join before
21 he left?
22       MR. CLARK:  Objection to the
23     form.  You can answer.
24    A.   Yes, Bernie joined before Joe
25 left.

Page 121

1        C. HARIGEL
2     Q.   Are you saying that Bernie is a
3 manager?
4        MR. CLARK:  Objection to the
5     form.
6     A.   Your question was Joe was the
7 only person in fire safety and he was not.
8     Q.   When did Bernie join fire
9 safety?
10    A.   I don't have his actual
11 effective date, but it would have been
12 sometime in the summer of 2021.
13    Q.   Aside from Bernie, did anyone
14 else join the fire safety department while
15 Joe Pasquarello was still employed?
16       MR. CLARK:  Objection to the
17     form.
18    A.   If you are referring to the
19 end of his tenure, then I would say no.
20 but during his tenure there were other
21 employees.
22    Q.   I'm just talking about after
23 Ron Kanterman left in June of 2021, aside
24 from Bernie, did anyone else join the fire
25 safety department of Mount Sinai Hospital?

31 (Pages 118 - 121)

Page 122

C. HARIGEL

1
2    A.   Not to my knowledge.
3    Q.   Who is responsible for
4  approving and issuing equipment to
5  the fire safety department of Mount
6  Sinai Hospital?
7    A.   Define equipment.
8    Q.   If equipment is needed by
9  any leadership in fire safety, such as
10  a director, an assistant director or a
11  manager, who approves the issuing of that
12  equipment?
13    A.   Mount Sinai has a purchasing
14  policy that we follow as stewards of their
15  financial resources.
16    Q.   If a department needs N95 masks
17  or pencils, do they go through that
18  process?
19    A.   Yes.
20    Q.   What is that process called?
21  I missed what you said.
22    A.   We would follow their
23  purchasing policy.
24    Q.   What is that purchasing policy?
25    A.   It's Mount Sinai's purchasing

Page 123

C. HARIGEL

1
2  policy.
3    Q.   What does that process involve?
4    A.   Putting in a purchase
5  requisition.  Depending on what it is
6  and how large it is, it would go through
7  a specific process inside of Mount Sinai's
8  purchasing queue to where it eventually
9  would get a purchase order number issued
10  to a vendor and then the purchase is made.
11    Q.   If a director or an assistant
12  director needed pencils, would they
13  initiate that process?
14    A.   Per your example, no.  We
15  maintain a supply of pencils and pens
16  and paper in the department to handle
17  those requests.
18    Q.   If there was something larger,
19  like a computer screen or a monitor, would
20  that go through that process?
21    A.   It depends.  Computers go
22  through IT and it's a different process
23  versus a normal purchase order for supplies
24  and equipment.
25    Q.   What is the first stage of that

Page 124

C. HARIGEL

1
2  process?
3        MR. CLARK:  Objection to the
4    form.
5    A.   I don't know what process you
6  are referring to.
7    Q.   If we have a director, an
8  assistant director that needs some form of
9  equipment, let's say a monitor, what would
10  be the first thing that employee does to
11  request it?
12    A.   As long as it wasn't something
13  that IT would get involved in and need to
14  authorize, they would submit a purchase
15  requisition through the system.
16    Q.   What is that system?
17    A.   It's Mount Sinai's purchasing
18  system.
19    Q.   Would they submit it to their
20  supervisor?
21    A.   It depends on the size of the
22  purchase.  I'm not exactly sure anymore
23  on the purchasing limits and the hierarchy,
24  but there's approvals built into each item.
25    Q.   What does that mean, built in?

Page 125

C. HARIGEL

1
2    A.   A purchase requisition for
3  zero to ten thousand dollars may require
4  these three people to approve before it
5  even leaves the department and goes to
6  Mount Sinai purchasing.  So it all depends
7  on the size of the purchase and how Mount
8  Sinai looks at each bucket and then it
9  has an approval queue outside, all the
10  way through Mount Sinai's sourcing for
11  final approval.
12    Q.   So that director or assistant
13  director would submit a request through
14  Mount Sinai Hospital's process or their
15  system that you just described?
16    A.   That is correct.
17    Q.   Are they required to go through
18  their supervisor before doing that?
19    A.   I wouldn't say required, but
20  if their supervisor was in their queue for
21  approval, they would probably want to let
22  them know they are putting this through
23  so they would expect it.
24    Q.   Did the various divisions
25  within facilities at Mount Sinai Hospital,

32 (Pages 122 - 125)

Page 126

C. HARIGEL

1
2 did they have any funds available to them
3 to make more expedient purchases, smaller
4 purchases?
5    A.   I don't understand your
6 question.
7    Q.   Are there any purchases
8 that are made by directors or assistant
9 directors for their jobs that do not
10 go through the Mount Sinai Hospital
11 purchasing process?
12    A.   Not to my knowledge.
13 Everything runs through their
14 purchasing system for approval.
15    Q.   Are assistant directors and
16 directors instructed on how to submit their
17 requests through Mount Sinai Hospital's
18 purchasing system?
19    A.   Yes.
20    Q.   Who instructs them on how to do
21 that?
22    A.   The finance staff we have at
23 Mount Sinai Hospital.
24    Q.   Is that part of their
25 onboarding process?

Page 127

C. HARIGEL

1
2    A.   Yes.
3    Q.   Do you recall Joe Pasquarello
4 speaking to you about wanting to buy
5 equipment at some point during his
6 tenure with Crothall?
7    A.   Yes.
8    Q.   Do you recall telling him to
9 use something like a discretionary budget
10 to get it done?
11       MR. CLARK:   Objection to the
12    form.  You can answer.
13    A.   I didn't say it in those words.
14    Q.   What words did you say?
15    A.   Each area has a department
16 that is at their discretion to spend
17 those funds.  Everything still needs to
18 be approved through its process, but they
19 are arbiters or stewards of those funds
20 and spend them on behalf of Mount Sinai.
21 Again, everything gets approved by Mount
22 Sinai.  We don't issue a Mount Sinai
23 purchase order, Mount Sinai does.
24    Q.   When you say they are the
25 arbiters, who are you referring to?

Page 128

C. HARIGEL

1
2    A.   They meaning the people in the
3 actual department, managers, supervisors,
4 coordinators all can make a purchase order.
5 It still goes into the queue and follows
6 Mount Sinai's process.
7    Q.   How is that different from the
8 process we were just discussing a minute
9 ago?
10       MR. CLARK:   Objection to the
11    form.
12    A.   There is no difference, it is
13 the same exact process we were discussing
14 before.
15    Q.   So when you instructed Joe to
16 do that, did he know what you were talking
17 about?  Did he respond that he knew about
18 the Mount Sinai Hospital purchasing system?
19       MR. CLARK:   Objection to the
20    form.  You can answer.
21    A.   I don't exactly recall his
22 answer.
23    Q.   Do you recall if he said he
24 already tried that, the purchasing system?
25    A.   I know he said he made the

Page 129

C. HARIGEL

1
2 request.  I don't remember him saying
3 he went through the purchasing system.
4    Q.   Who did he make the request to?
5    A.   I don't recall.  I believe he
6 said Mike Roche.
7       MS. SELIGER:   Mark this as
8    Plaintiff's Exhibit 11.
9       (Whereupon, the aforementioned
10    Email was marked as Plaintiff's
11    Exhibit 11 for identification as
12    of this date by the Reporter.)
13    Q.   I am going to ask you to take a
14 look at Exhibit 11.  Let me know when you
15 have had a chance to pull it up and also
16 to review it.
17    A.   I have.
18    Q.   This looks like an email from
19 Joe Pasquarello sent on February 22, 2021
20 to you and then copied to Bob Shaffer,
21 Mike Roche, John Barton, Ron Kanterman
22 and Omelfi Garcia.  Is that correct?
23    A.   Yes.
24    Q.   It says on the second
25 line of the text of the email, it says,

33 (Pages 126 - 129)

C. HARIGEL

1
2  "Thank you for coming in today.  As per
3  your instructions, here are the year to
4  date fire safety statistics."  Correct?
5      A.   Yes.
6      Q.   Do you recall having a meeting
7  with Joe and possibly others related to
8  the content of this email?
9          MR. CLARK:  Objection to the
10     form.  You can answer.
11     A.   Yes.
12     Q.   Joe seems to be providing
13 statistics.
14         Are these impairment
15 statistics?
16     A.   Not all of them.
17     Q.   Can you explain what is an
18 impairment in the context of fire safety?
19     A.   An impairment is when a system
20 is either knowingly taken out of service
21 or out of service due to a deficiency for
22 a period of time.  We would document that
23 and follow a procedure.
24     Q.   Do you recall discussing
25 impairments at a meeting that seemed

1           C. HARIGEL
2  to occur on this day?
3          MR. CLARK:  Objection to the
4     form.
5      A.   Yes.
6      Q.   Do you recall who attended that
7  meeting?
8      A.   I believe everybody who was
9  either sent this email or carbon copied
10 on this email was in attendance.  I also
11 believe Ryan Nowicki may have attended,
12 but I can't be a hundred percent sure.
13     Q.   Is it true that at this
14 meeting, there was a discussion about
15 an impairment coordinator position?
16     A.   I wouldn't say position, but
17 the responsibilities of an impairment
18 coordinator, yes.
19     Q.   Do you see in the second to
20 last line of Joe's email in Exhibit 11
21 where it says, "Fire safety can provide
22 a job description for the position of
23 impairment coordinator upon request"?
24     A.   Yes.
25     Q.   Was the impairment coordinator

1           C. HARIGEL
2  position discussed at this meeting?
3      A.   The responsibilities of an
4  impairment coordinator were discussed
5  and what those responsibilities would
6  entail were discussed and that's why
7  the description came out of it.
8      Q.   That's why what description
9  came out of it?
10     A.   The description that fire
11 safety was offering.
12     Q.   They were offering a job
13 description based on what was discussed at
14 the meeting, is that what you are saying?
15     A.   Yes.
16     Q.   Isn't it true that fire safety
17 was handling a large number of impairments,
18 particularly in the lead-up to the Joint
19 Commission audit?
20         MR. CLARK:  Objection to the
21     form.
22     A.   I don't believe the lead-up
23 to Joint Commission has any bearing on
24 impairments, so I can't answer that
25 question in its form.

1           C. HARIGEL
2      Q.   You don't believe preparing for
3  the Joint Commission caused additional
4  impairments to occur?
5      A.   Correct.
6      Q.   Why was this meeting called?
7      A.   I don't recall exactly.
8      Q.   Do you recall who called for
9  the meeting?
10     A.   I believe Joe may have.
11     Q.   Isn't it true it was agreed
12 that these responsibilities, as you are
13 describing them, wasn't it agreed that
14 they needed to be fulfilled?
15         MR. CLARK:  Objection to the
16     form.  You can answer.
17     A.   Yes, absolutely.  The
18 requirements of an impairment coordinator
19 absolutely need to be fulfilled.
20     Q.   It seems clear that there was
21 at least some discussion about this being
22 a separate role; is that correct?
23         MR. CLARK:  Objection to the
24     form.
25     A.   There was discussion about

34 (Pages 130 - 133)

Page 134

C. HARIGEL

1   C. HARIGEL
2  placing these responsibilities with
3  somebody, yes, correct.
4      Q.   Were you aware that Joe
5  Pasquarello submitted a job description
6  for the impairment coordinator the same
7  day as this email was written?
8      MR. CLARK:  Objection to the
9   form.  You can answer.
10     A.   I can't recall that being
11 submitted, no.
12     Q.   So you never saw the job
13 description that Joe Pasquarello submitted
14 for an impairment coordinator?
15     MR. CLARK:  Objection to the
16  form.
17     A.   I didn't say that.  I said I
18 don't recall.
19     Q.   You don't recall seeing the job
20 description, is that what you are saying?
21     A.   Yes.
22     Q.   Is it possible that you did see
23 it?
24     A.   Potentially, yes.
25     Q.   Who would have given it to you?

Page 135

C. HARIGEL

1   C. HARIGEL
2      MR. CLARK:  Objection to the
3   form.  You can answer.
4      A.   It may have come directly from
5  Joe, I don't know.
6      Q.   Do you recall taking any action
7  to further address who would handle the
8  responsibilities in that job description?
9      A.   No.
10     Q.   Do you recall whether
11 discussing whether any particular person
12 could take over the impairment coordinator
13 responsibilities that were discussed?
14     A.   The responsibilities of
15 impairment coordinator were discussed,
16 yes.
17     Q.   Was anyone suggested as someone
18 who could take on those responsibilities?
19     A.   Yes.
20     Q.   Who was suggested to do that?
21     A.   As per Joe Pasquarello,
22 leadership in fire safety were the
23 impairment coordinators for the
24 facility.
25     Q.   I'm not sure I understand that.

Page 136

C. HARIGEL

1   C. HARIGEL
2      Are you saying Joe Pasquarello
3  said he and his staff were the impairment
4  coordinators?
5      A.   Yes.
6      Q.   It seems here that he's
7  asking for additional support with these
8  responsibilities; is that not correct?
9      MR. CLARK:  Objection to the
10  form.  I'm not sure where we are
11  looking.
12     Q.   We've discussed that there
13 are impairment responsibilities that
14 were discussed at this meeting.  We've
15 discussed that Joe Pasquarello drafted a
16 job description for those responsibilities.
17     Are you saying he also --
18 I'm not sure what you are saying.  Can
19 you repeat what you are saying regarding
20 whether or not any specific person was
21 recommended to assist with the impairment
22 responsibilities?
23     MR. CLARK:  Objection to the
24  form.  You can answer.
25     A.   Yes.  I was in a meeting

Page 137

C. HARIGEL

1   C. HARIGEL
2  with Joe when impairments came up and his
3  response to who has impairment coordinator
4  responsibility was to say that he and
5  his management team in fire safety have
6  responsibility for impairments.  That's
7  why I'm saying that.
8      Q.   Is that the meeting that
9  happened on February 22, 2021?
10     A.   No, it is not.
11     Q.   There was a second meeting
12 you had with Joe about impairment
13 responsibilities?
14     A.   He had a safety meeting with
15 his union hourly staff that I happened to
16 attend and this was an item on the agenda.
17     Q.   When was that meeting?
18     A.   I can't recall exactly.
19     Q.   Was it before February 22,
20 2021?
21     A.   I'm not going to guess, I don't
22 know.
23     Q.   I understand that you attended
24 a meeting at some point, we don't know
25 when, where he said he was handling those

35 (Pages 134 - 137)

Page 138

C. HARIGEL

1
2 responsibilities, but is it not the case
3 that he was requesting support on those
4 responsibilities at this February 22nd
5 meeting?
6        MR. CLARK:  Objection to form.
7    A.   I'm not sure if he was
8 requesting support or that these
9 responsibilities be issued to one
10 single person, I'm not exactly sure
11 what his full request was.
12    Q.   What else do you remember from
13 that meeting?
14    A.   Which meeting are you referring
15 to?
16    Q.   The meeting that occurred on
17 February 22, 2021.
18    A.   I don't recall anything else
19 other than this email jogging my memory
20 of that meeting.
21    Q.   Did anyone take notes of that
22 meeting?
23    A.   I don't believe so.
24        MS. SELIGER:  Mark this as
25    Plaintiff's Exhibit 10.

Page 139

C. HARIGEL

1
2        (Whereupon, the aforementioned
3    Emails were marked as Plaintiff's
4    Exhibit 10 for identification as of
5    this date by the Reporter.)
6    Q.   Let me know when you have had a
7 chance to pull it up and review it.
8    A.   Okay.
9    Q.   Do you see in the middle
10 of the first page, just under that yellow
11 line that says, "Use caution," do you see
12 a line that says, "Weren't we talking about
13 transitioning Matt Bond into the impairment
14 coordinator position"?
15    A.   Yes.
16    Q.   That is a communication from
17 Bob Shaffer on March 26th to you, Mike
18 Roche, Joe Pasquarello and Ryan Nowicki;
19 is that correct?
20    A.   Yes.
21    Q.   If you scroll up to the top,
22 do you see Mike Roche's response where
23 he says, "Yes, and I still think that can
24 work, but it will not happen before TJC,"
25 which I think is The Joint Commission; is

Page 140

C. HARIGEL

1
2 that correct?
3    A.   Yes.
4    Q.   So at least Bob Shaffer
5 seems to recall a discussion about Matt
6 Bond filling an impairment coordinator
7 position.
8        Do you now remember any
9 discussions to that effect?
10        MR. CLARK:  Objection to the
11    form.  You can answer.
12    A.   Again, we discussed
13 transitioning those responsibilities
14 to one person.  Matt Bond was in an
15 existing role and we thought the role
16 he was in, he could potentially assist
17 with the impairments.
18    Q.   When did that discussion take
19 place?
20    A.   At the meeting.
21    Q.   So now you recall that Matt
22 Bond was a specific person mentioned to
23 take over those responsibilities?
24        MR. CLARK:  Objection to the
25    form.  You can answer.

Page 141

C. HARIGEL

1
2    A.   I don't recall being told
3 that a specific person was asked for
4 that position.  Matt Bond had a role,
5 we thought he could do some of these
6 extra duties as well, but that was us
7 in a room discussing.
8    Q.   Us in a room discussing on
9 February 22nd, is that what you are
10 saying?
11    A.   Yes.
12    Q.   What was Matt Bond's role at
13 the time?
14    A.   He was an engineering manager.
15    Q.   Who was he reporting to at the
16 time?
17    A.   The same answer as the last
18 time you asked, I don't recall, I don't
19 know.
20    Q.   What were his responsibilities
21 as an engineering manager?
22    A.   He oversaw our work center.
23    Q.   Is the work center the center
24 that, I guess, addresses or takes in work
25 orders?

36 (Pages 138 - 141)

Page 142

```
1              C. HARIGEL
2      A.   That's correct, yes.
3      Q.   Who had been doing that prior
4  to him?
5      A.   Kim Brown.
6          MS. SELIGER:  I have no further
7  questions.
8          MR. CLARK:  I have no
9  questions.
10         For the record, we are
11 requesting a copy of the transcript
12 and we are also requesting on
13 Mr. Harigel's behalf the opportunity
14 to review and revise the transcript.
15         (Whereupon, at 1:25 p.m., the
16 Examination of this witness was
17 concluded.)
18
19      °      °      °      °
20
21
22
23
24
25
```

Page 143

```
1              C. HARIGEL
2          D E C L A R A T I O N
3
4     I hereby certify that having been
5  first duly sworn to testify to the truth, I
6  gave the above testimony.
7
8     I FURTHER CERTIFY that the foregoing
9  transcript is a true and correct transcript
10 of the testimony given by me at the time
11 and place specified hereinbefore.
12
13
14
        _____
15         CHRISTOPHER HARIGEL
16
17
18 Subscribed and sworn to before me
19 this _____ day of _____ 20___.
20
21
   _____
22   NOTARY PUBLIC
23
24
25
```

Page 144

```
1              C. HARIGEL
2          E X H I B I T S
3
4  PLAINTIFF'S EXHIBITS
5
6  EXHIBIT   EXHIBIT              PAGE
7  NUMBER    DESCRIPTION
8  1     Complaint            25
9  2     Org Charts           44
10 3     Human Resources Document  61
11 5     Associate Counseling
12       Report               75
13 13    Associate Counseling
14       Report               78
15 6     Emails               80
16 7     Human Resources Service
17       Center Emails        83
18 8     Investigation Document  89
19 9     Email                106
20 11    Email                129
21 10    Emails               138
22
23
24     (Exhibits retained by Counsel.)
25
```

Page 145

```
1              C. HARIGEL
2          I N D E X
3
4  EXAMINATION BY            PAGE
5  MS. SELIGER              4
6
7
8  INFORMATION AND/OR DOCUMENTS REQUESTED
9  INFORMATION AND/OR DOCUMENTS     PAGE
10 Production of regulatory
11 compliance documents       36
12 Production of emails to
13 Mr. Pasquarello of performance
14 issues                     58
15 Production of documentation of
16 Ms. Garcia's exit interview    99
17
18
19
20
21
22
23
24
25
```

37 (Pages 142 - 145)

Page 146

```
 1          C. HARIGEL
 2        C E R T I F I C A T E
 3
 4  STATE OF NEW YORK      )
                    : SS.:
 5  COUNTY OF KINGS        )
 6
 7       I, LORI PICKMAN, a Notary Public for
 8  and within the State of New York, do hereby
 9  certify:
10       That the witness whose examination is
11  hereinbefore set forth was duly sworn and
12  that such examination is a true record of
13  the testimony given by that witness.
14       I further certify that I am not
15  related to any of the parties to this
16  action by blood or by marriage and that I
17  am in no way interested in the outcome of
18  this matter.
19       IN WITNESS WHEREOF, I have hereunto
20  set my hand this 3rd day of AUGUST, 2022.
21
22
23
              _____
                LORI PICKMAN
24
25
```

Page 147

```
 1            ERRATA SHEET
           VERITEXT/NEW YORK REPORTING, LLC
 2
    CASE NAME: Pasquarello v. Crothall Healthcare, Inc. Et Al
 3  DATE OF DEPOSITION: 8/2/2022
    WITNESSES' NAME: Chris Harigel
 4
 5  PAGE  LINE (S)    CHANGE        REASON
 6    |_____|_____|_____|_____
 7    |_____|_____|_____|_____
 8    |_____|_____|_____|_____
 9    |_____|_____|_____|_____
10    |_____|_____|_____|_____
11    |_____|_____|_____|_____
12    |_____|_____|_____|_____
13    |_____|_____|_____|_____
14    |_____|_____|_____|_____
15    |_____|_____|_____|_____
16    |_____|_____|_____|_____
17    |_____|_____|_____|_____
18    |_____|_____|_____|_____
19    |_____|_____|_____|_____
20    |_____|_____|_____|_____
21          _____
                Chris Harigel
22  SUBSCRIBED AND SWORN TO BEFORE ME
    THIS ____ DAY OF _____, 20__.
23
24
    _____        _____
25  (NOTARY PUBLIC)        MY COMMISSION EXPIRES:
```

38 (Pages 146 - 147)

| & |
| --- |
| **&**   2:4 3:9 14:5 |

| 1 |
| --- |

**1**   3:9 25:12,15,24
  79:20 100:23
  144:8
**10**   138:25 139:4
  144:21
**100**   63:2,3
**10004**   2:5
**10022**   2:10 4:14
**106**   144:19
**10:00**   1:11
**10th**   77:3
**11**   129:8,11,14
  131:20 144:20
**126**   4:13 12:25
**129**   144:20
**13**   78:9,12
  100:14 144:13
**138**   144:21
**14**   63:22
**19**   79:5
**1:25**   142:15

| 2 |
| --- |

**2**   1:10 40:19
  43:25 44:4,6
  80:9 83:24
  105:2 144:9
**20**   143:19 147:22
**2000**   9:18
**2013**   44:9,14
  94:13 95:7
  97:12,18
**2015**   96:12,17
  97:13 98:7

**2016**   96:12,18
  97:13 98:7
**2019**   16:15
**2020**   50:17 55:15
  56:14,15,17
  59:13,18 60:5
  91:12,23
**2021**   16:16 22:25
  23:23 24:6,13
  37:24 44:9
  45:13 60:23
  68:9 69:2 70:19
  79:5 83:25
  84:22 93:8,13
  101:9 102:15,23
  103:6 104:7,11
  104:15,17,23
  106:13 118:25
  120:3 121:12,23
  129:19 137:9,20
  138:17
**2022**   1:10 102:24
  146:20
**21**   1:6
**22**   129:19 137:9
  137:19 138:17
**22nd**   138:4
  141:9
**24746**   146:23
**25**   102:14 144:8
**25th**   101:9,11
  102:22,24
**26th**   139:17
**28**   24:6 101:9
**28th**   24:13

| 3 |
| --- |

**3**   60:25 61:4
  63:22 144:10
**30**   3:9 104:7,10
  104:15
**30th**   104:17,23
**31**   25:25
**32**   2:5 25:24
**35**   55:3
**36**   145:11
**3rd**   146:20

| 4 |
| --- |

**4**   84:22 93:13
  145:5
**44**   144:9
**48007-503212**
  101:18
**4th**   90:12

| 5 |
| --- |

**5**   75:14,18,22
  144:11
**5/31/2021**
  105:11
**503212**   101:10
**56th**   4:13 12:25
**58**   145:14

| 6 |
| --- |

**6**   80:13,16,19
  144:15
**6/28/2021**
  104:20
**6/30/2021**   104:7
  105:3,15
**601**   2:5
**61**   144:10

| 7 |
| --- |

**7**   83:8,11,15
  144:16
**75**   144:12
**78**   144:14

| 8 |
| --- |

**8**   89:20,24
  144:18
**8/2/2022**   147:3
**80**   144:15
**83**   144:17
**8732**   1:6
**89**   144:18

| 9 |
| --- |

**9**   106:19,22
  144:19
**900**   2:9
**99**   145:16
**99th**   13:25 15:14

| a |
| --- |

**a.m.**   1:11
**ability**   7:9
**able**   7:13 8:12
  19:14 23:10
  32:22 44:21
  61:7 78:15
**absolutely**
  133:17,19
**access**   31:17
  32:16 33:11,13
**accommodate**
  6:11
**account**   63:11
  79:18 91:8,12
  97:18 100:19

**accreditation**
33:8 38:25
**accredited** 31:19
31:21 32:2,11
**accurate** 63:11
65:5,7 91:8 94:4
117:11
**action** 25:2,22
64:11 135:6
146:16
**actions** 102:18
**actual** 50:4 51:3
121:10 128:3
**addition** 70:12
71:25 72:6
**additional** 75:4
75:5,7 133:3
136:7
**address** 4:12
135:7
**addressed** 20:9
23:9
**addresses**
141:24
**adherence** 28:10
**administer** 3:6
**advance** 31:10
**advanced** 9:4
**aforementioned**
25:13 44:2 61:2
75:15 78:10
80:14 83:9
89:21 106:20
129:9 139:2
**age** 9:14 60:17
81:8
**agency** 30:23

**agenda** 137:16
**ago** 4:22,23
41:23 49:8,19
50:8,16 52:2,25
53:5 63:17 91:3
128:9
**agree** 80:8
106:17 108:8
**agreed** 3:3,11
133:11,13
**ahead** 25:2
**al** 147:2
**alerted** 82:17
**alerting** 82:10
**allegations** 62:4
84:17
**allow** 31:16
114:14,15
**allowed** 21:3
**allows** 31:4,9
**amount** 33:17
68:2
**announcement**
40:13,22 41:10
41:20 77:21
**announcements**
40:3
**annual** 11:15
18:3 29:19,23
52:15,17 102:5
102:17,19,21
106:12
**answer** 5:21 6:2
6:12,20 7:4,4
10:19 17:23
18:7,15,22 19:4
19:11,19 20:2,8
20:15,22 21:8,18

21:25 22:8,21
23:4,13,19,25
24:8,15 25:8
28:2 30:8 32:22
33:3,5,20 41:22
47:22 57:3 62:7
63:15 64:15,22
65:19,25 66:18
67:4,13 69:12
72:5 73:23
74:15 82:13,20
85:11 93:10,15
94:22 95:10
96:21 97:15
100:3 103:2,8
104:13 109:22
110:15 120:23
127:12 128:20
128:22 130:10
132:24 133:16
134:9 135:3
136:24 140:11
140:25 141:17
**answered** 6:19
**answering** 5:11
**anticipate** 6:3
**anybody** 112:8
112:17
**anymore** 124:22
**anytime** 6:10 8:5
76:13
**appear** 61:17
101:23
**appears** 26:11
62:13 79:19
80:2,11 81:13,17
85:7 90:7 99:22
109:18

**applicants** 112:6
**applied** 112:9
119:7
**apply** 71:13
110:17 111:8
119:10
**applying** 110:4
112:17
**appointment**
42:7
**approach** 95:22
**approval** 125:9
125:11,21
126:14
**approvals**
124:24
**approve** 46:12
125:4
**approved** 127:18
127:21
**approves** 122:11
**approving** 122:4
**approximate**
50:22
**approximately**
9:23 11:5 14:15
15:9 27:16
37:24 47:11,18
49:2,18 50:17
55:3,14 57:16
58:19 60:23
68:8 69:2,3 96:4
96:12 102:24
115:17 120:2
**april** 63:3,21
64:4
**arbiters** 127:19
127:25

**area**  22:14 32:21
    68:20 69:14
    70:8 92:18
    94:21 97:17
    127:15
**areas**  18:20
    43:13,17,23 63:4
    63:20 64:7
    65:11,21 113:14
**arrival**  23:9
**arrived**  21:6,22
**aside**  56:18
    59:21 60:7 66:4
    73:11 85:25
    87:22 91:7 95:6
    121:13,23
**asked**  5:19 6:18
    42:5 43:12
    69:25 141:3,18
**asking**  4:25 5:25
    6:3 64:23 80:8
    85:24 86:16
    136:7
**aspect**  42:17
    49:4 72:21
**assign**  51:19
**assigned**  53:15
    104:6,10,15,17
    104:20,22 105:5
    105:14,18,20
**assist**  28:6
    136:21 140:16
**assistance**  115:7
**assistant**  16:18
    45:21 47:7
    72:12,19 73:21
    74:5,12 96:7,8
    115:24 116:16

116:20 117:4,6
    117:10,15
    118:20 119:3
    120:11 122:10
    123:11 124:8
    125:12 126:8,15
**assisting**  57:16
**assists**  28:3
**associate**  144:11
    144:13
**assume**  5:21
    26:2 51:6 77:19
    97:8,16
**assumed**  74:17
**assuming**  100:4
    102:7
**attached**  84:15
**attempted**  44:11
**attend**  137:16
**attendance**
    131:10
**attended**  9:12
    131:6,11 137:23
**attorney**  7:2,20
    76:11
**attorneys**  2:4,9
**audit**  28:22 29:9
    29:12,16 36:7
    37:23 40:2
    41:13 57:19,22
    57:24 90:20
    132:19
**audits**  28:11,17
**august**  1:10
    83:24 84:22
    90:11 93:13
    146:20

**authorize**  124:14
**authorized**  3:6
**auto**  105:15
**available**  8:11
    126:2
**avenue**  2:9
**aware**  17:19,24
    18:2,10,16,18,23
    18:24 19:6,23
    20:4,18,25 21:14
    21:19,21 22:4,16
    22:24 23:7,14,15
    23:21 24:4,16
    25:4,9,10 46:5,9
    55:12 59:14
    60:15 64:10,16
    64:25 66:9,14
    92:16 93:7
    108:12 134:4
**awareness**  24:19
**awhile**  4:23
    41:23

**b**

**b**  144:2
**bachelors**  9:6
**back**  32:15,17
    37:6 44:14
    65:14,17 72:9
    96:9 100:22
**backfilled**
    119:22
**background**
    90:23
**barton**  12:6
    46:16,18,22,22
    46:24 47:3,6,10
    47:13,15 48:5,19

50:7,18 51:4
    52:24 53:6,11,19
    54:24 74:9
    129:21
**bartons**  46:21
**base**  18:3
**based**  13:4 17:17
    31:14 87:3,4,7
    87:13,19 89:16
    97:8 103:24
    106:16 108:17
    112:14 113:16
    132:13
**bashwiner**  13:7
**basics**  4:25
**basing**  33:5
**basis**  17:16
    58:17 102:19
**bear**  70:14
**bearing**  132:23
**becoming**  32:2
    115:10
**beginning**  49:18
    50:17 60:4
**beginnings**
    17:20
**behalf**  127:20
    142:13
**belief**  108:15
    112:15
**believe**  17:24
    20:23 22:22
    23:5 41:4,14
    44:9 45:11 46:2
    52:15,23 54:23
    56:12 64:16
    66:20 68:20
    71:5,8,24 73:4,9

75:7 77:17
79:11 81:20
82:2 85:13
88:22 93:12,16
95:18 96:4
108:13 109:7
110:3 112:8,12
116:2,12,22
117:2,3,18,25
118:3,6,25 120:9
129:5 131:8,11
132:22 133:2,10
138:23
**bernie** 45:17,18
54:13 71:3,6,10
71:15,18,20
72:14 73:3
74:12,21,25 75:3
108:6 109:19
111:4,8,13
112:24 113:20
113:22 114:19
114:23,24
119:15 120:24
121:2,8,13,24
**bernie's** 109:7
113:18
**beth** 13:13 14:17
115:13
**bi** 14:4
**bill** 32:14,17
**bit** 101:25
**blood** 146:16
**bob** 12:7,8 27:7
28:16 55:18
57:11,15 58:16
58:20 59:7 71:9
71:20,22 81:4,14

87:24,25 88:5,11
91:20 92:4,9
96:2 111:10,21
129:20 139:17
140:4
**bob's** 59:12
**bobby** 54:16
**bond** 45:17
53:17 54:6
115:21 116:3,7
116:19 119:19
139:13 140:6,14
140:22 141:4
**bond's** 45:20
141:12
**bonus** 11:15,22
**bonuses** 11:10
28:15,21 29:3
**bottom** 62:18
93:24 104:4
105:17
**break** 6:9,14
83:4
**brief** 98:19
**broadway** 2:5
**brooklyn** 13:15
14:7 15:4
**brought** 43:16
**brown** 142:5
**bruce** 13:7
**bucket** 125:8
**budget** 127:9
**building** 13:3
114:6
**buildings** 14:13
14:16,21 15:2,3
15:7 114:17
115:14,18

**built** 124:24,25
**bullet** 64:3
**buy** 127:4

**c**

**c** 2:2 4:1,2 5:1
6:1 7:1 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1

102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1,5
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1
134:1 135:1
136:1 137:1
138:1 139:1
140:1 141:1
142:1 143:1,2
144:1 145:1
146:1,2,2
**call** 15:17,18
36:13 71:6,7
**called** 4:3 36:10
36:17 80:4
122:20 133:6,8
**campus** 13:11,16
14:14,17,18,22
14:25 15:4,8,16
15:18,19 16:2
19:8,9 115:15,18
**campuses** 13:20
13:22 14:10
15:11
**candidate** 71:21
110:16 114:20

**[candidates - communication]**                                                      Page 5

candidates 110:4
  110:12 112:5,13
carbon 131:9
case 8:13 60:14
  93:3 138:2
  147:2
categories 65:24
category 22:13
caused 133:3
caution 139:11
celeste 67:7,9
center 61:16
  81:22 82:4
  83:10,22 84:9
  141:22,23,23
  144:17
centers 30:23
certain 31:17
  82:22 106:4
  114:4,5,16,17
certainly 58:8
  62:10
certificate
  113:10,12,23,25
  114:2,8,10,13
certificates
  21:16 113:7,19
  113:20
certification 3:5
certify 143:4,8
  146:9,14
cetera 84:17
chance 13:11
  44:16 75:22
  78:18 80:20
  90:4 106:25
  129:15 139:7

change 147:5
changed 20:17
changes 21:9,13
characterized
  55:7
charge 72:10
chart 45:12
charts 44:3,7,8
  44:25 45:4,7
  144:9
chelsea 14:6
chose 91:14,19
  92:7,9,11 119:6
chris 4:15,15,17
  8:13,24 61:7
  63:7 80:19
  83:14 84:4
  90:21 147:3,21
christopher 1:16
  4:11,16 143:15
cited 34:23
city 10:12
clarification
  17:14
clarify 10:25
  11:11 19:12
  24:9,21 29:13
  31:7 34:3 35:8
  35:21 45:6
  59:25
clark 2:10 8:16
  10:2,18 17:22
  18:6,14,21 19:3
  19:10,18,25 20:7
  20:14,21 21:7,17
  21:24 22:7,20
  23:3,12,18,24
  24:7,14 25:7

27:25 30:7 32:5
  32:9,19 33:19
  34:17 36:16
  41:21 42:21
  43:5 46:6 47:21
  50:2,20 51:24
  53:12 57:2
  59:23 61:24
  62:6 63:14
  64:14 65:14,18
  66:17 67:3,12
  69:11 72:4 73:7
  73:22 74:14
  78:4 79:23
  82:12,19 83:3
  85:10 87:17
  88:14 93:9,14
  94:18 95:3,9
  96:20 97:14
  100:2 102:25
  103:7 104:12
  106:14 109:11
  109:21 110:14
  118:9 120:22
  121:4,16 124:3
  127:11 128:10
  128:19 130:9
  131:3 132:20
  133:15,23 134:8
  134:15 135:2
  136:9,23 138:6
  140:10,24 142:8
clear 8:5 133:20
client 7:20
close 4:21
closed 23:2
  101:8 105:23

closing 64:12
  92:22 101:4
closure 104:19
cms 32:12,13
coaching 91:15
  92:8,10,12,14
college 8:24 9:2
  116:12
combination
  35:18
come 30:3 42:6
  115:19 135:4
coming 130:2
commend 41:11
  41:16
commended
  41:17
comment 65:6
  70:13 98:23
  99:2
commission
  29:12,17,20 30:5
  30:10,22 31:5,11
  31:15,16,21
  32:24 33:7,14,16
  34:10,15,25 35:6
  35:15 36:6,15
  37:23 38:19,22
  39:2,6,12,16
  40:2,4 77:22
  78:2 132:19,23
  133:3 139:25
  147:25
communicated
  75:10 111:17,20
communication
  61:13 62:14
  84:5,25 85:5

139:16
communications
  7:20 61:18,22
  62:3
compensation
  11:7
competency
  113:14
compilation  44:6
complained  55:5
  66:15,25 67:10
  77:13,20
complaining
  77:18
complaint  25:14
  25:21 26:7,15,18
  60:13 61:23
  62:3 67:17 81:6
  82:11,18 85:14
  86:2,6 90:9
  103:17 108:5
  144:8
complaints
  60:16,22
complete  36:7
completed  101:5
  101:8 103:13
  104:23
completion
  39:25 63:4
  101:4 105:15
compliance  36:4
  145:11
compliant  63:2
component
  28:18
components
  28:20 113:15

composite  11:24
comprise  14:13
  15:7
computer  8:18
  18:3 123:19
computers
  123:21
concerning  88:7
concerns  80:9
concluded
  142:17
conduct  28:11
  51:23
conducted  17:5
  18:25 26:11
  29:19 52:14,16
  85:2 102:12,22
  106:12
conducting  53:2
conference
  79:19 100:20
confirm  108:14
confusion  6:6
connection
  109:24 110:11
consent  77:9
consequence
  31:22
consideration
  75:8
considered
  71:10 114:19
contacted  84:9
  93:4
content  84:3
  130:8
contents  79:14

context  130:18
continuation
  62:9
continue  36:7
contractor  49:10
conversation
  6:22 42:16 82:3
  82:23 99:23,25
  100:5
coordinator
  131:15,18,23,25
  132:4 133:18
  134:6,14 135:12
  135:15 137:3
  139:14 140:6
coordinators
  128:4 135:23
  136:4
copied  88:22
  129:20 131:9
copy  3:8,9
  142:11
cordier  48:13
correct  13:12
  15:17 27:11
  29:18 49:22
  50:24 51:9 52:6
  52:7 53:14
  58:18 71:14
  73:16 74:23
  77:22 79:5 85:7
  87:12 88:21
  90:18 104:11
  105:4 108:2
  109:20 110:22
  113:9 115:25
  116:22 120:12
  125:16 129:22

130:4 133:5,22
  134:3 136:8
  139:19 140:2
  142:2 143:9
cortland  66:22
  66:24
counsel  3:4,9
  19:15 91:19
  144:24
counseling  42:10
  55:10 56:25
  75:16 76:3,22
  78:11,25 79:15
  81:6 84:12
  85:16 86:20,22
  86:24 87:9
  88:19,25 89:6
  91:24 101:21
  103:24 144:11
  144:13
county  146:5
court  1:2,17 3:7
  5:3,6,10,16 6:4
cover  22:14
  25:19
coverage  20:6
covered  92:17
covering  70:11
created  21:14
  95:21 96:6,8
credential
  114:18
credentials
  11:17 113:5
critical  106:4
crothall  1:7,15
  9:17 13:20,23
  15:12,21 16:5,13

16:21 25:23
27:5 28:10 35:5
35:8,9,25 44:7
44:25 45:3,8,10
46:19,25 61:15
68:18 69:14
90:25 93:3
115:2 116:4,8
117:6,7 120:19
127:6 147:2
**crothall's** 117:3
**current** 9:14,19
10:8 14:8 27:13
46:9 115:24
**currently** 7:8
10:24 12:4
45:14 47:17
52:2,3,9,11
99:14
**cv** 1:6

**d**

**d** 3:2 143:2
145:2
**data** 64:9,22
65:5,7
**database** 37:5
57:20
**date** 1:10 24:18
25:16 44:5 61:5
68:10 75:19
77:3 78:13
80:17 83:12
89:25 104:6,18
104:21,24
105:14,24
106:23 121:11
129:12 130:4

139:5 147:3
**dated** 83:24
84:22 90:11
**dates** 106:4,5
**dating** 44:9 69:5
**day** 131:2 134:7
143:19 146:20
147:22
**days** 3:9 21:23
22:18 34:21,22
**deal** 31:25 32:21
**december** 9:18
56:14 91:12,23
**decided** 92:3
**decision** 86:23
86:25 89:5,8,14
103:23 119:2,9
119:11
**decisions** 11:13
**decreased** 70:18
**deeming** 30:23
**defendant** 1:15
**defendants** 1:8
2:9 44:12
**deficiency**
130:21
**define** 122:7
**degree** 9:7
116:15
**degrees** 9:5
**denver** 54:16
**department**
18:13 19:22
25:3 29:8,9
33:24,25 34:4,7
34:8,9 38:8,16
39:18,20 40:7
44:25 45:5,16

46:10,14 50:12
51:14,17,20 53:8
55:22 64:8
65:22 70:16
72:9,22 73:2,18
74:2,4 94:9,16
94:20,22 113:13
114:3 121:14,25
122:5,16 123:16
125:5 127:15
128:3
**departments**
33:24 34:5 64:5
64:6 65:9 66:3
66:11
**dependent** 11:22
28:16
**depending** 123:5
**depends** 123:21
124:21 125:6
**deposed** 4:18
**deposition** 3:5,5
3:8 6:25 7:22
8:2,8 147:3
**described** 88:11
125:15
**describing**
133:13
**description**
131:22 132:7,8
132:10,13 134:5
134:13,20 135:8
136:16 144:7
**desire** 107:14
**detail** 103:16
**detailed** 79:18
100:19

**determine** 11:6,9
**developed** 18:11
20:19 21:2
**difference** 72:18
74:10 105:9
128:12
**different** 11:25
34:24 47:13
49:9 52:13,19,21
65:8,10,20 66:2
123:22 128:7
**differentiating**
51:2
**difficult** 22:9
**direct** 12:4,13,18
12:22 16:6,7
27:10 48:8
62:17 67:18
79:17
**directed** 67:15
**directions** 43:19
**directly** 11:2,4
17:15 54:23
82:9 96:2 98:13
117:24 135:4
**director** 16:18
27:14 42:8 43:4
43:10,16 45:19
45:21 47:2,7
70:23 71:4,12,21
71:23 72:9,11,12
72:18,19,20 73:3
73:21,21 74:5,12
74:13,18 95:25
96:2,5 107:9,25
108:6 110:2,7,9
110:11,13,17,24
111:5 112:7

113:24 114:9,11
115:10,24
116:16,20 117:4
117:6,10,15
118:20 119:3
120:11 122:10
122:10 123:11
123:12 124:7,8
125:12,13
**directors**  96:7,9
126:8,9,15,16
**disciplinary**
19:7,13 55:6
64:11
**disciplined**
64:20 65:3,7
66:11
**disciplines**  30:13
34:24
**disciplining**  55:8
**discouraged**
42:9
**discretion**
127:16
**discretionary**
127:9
**discrimination**
42:19,24 60:17
60:21 81:8
**discuss**  22:10
85:3
**discussed**  59:21
71:19 73:24
82:25 108:13
111:21 119:25
120:17 132:2,4,6
132:13 135:13
135:15 136:12

136:14,15
140:12
**discussing**  58:21
97:12 107:24
128:8,13 130:24
135:11 141:7,8
**discussion**  60:11
71:8 111:22,25
131:14 133:21
133:25 140:5,18
**discussions**
88:12 140:9
**dispute**  84:9
93:4
**district**  1:2,2
**divided**  74:18
**division**  10:13
**divisions**  125:24
**doc**  36:3 56:9
57:24
**docs**  59:5
**document**  25:17
25:21 26:2,12
35:11 37:4,7
61:3,11 78:21
89:23 90:3,7
100:8 130:22
144:10,18
**documentation**
38:22 43:21
56:3,4,8,11,18
59:4,9,11,17,22
60:7 77:7 92:14
92:23 99:4
111:12 145:15
**documented**
22:23

**documents**  7:24
8:7 17:25 35:3,5
35:10,12,16,17
35:19,22,23 36:5
36:8,11,14,19
37:3,10,13,15,16
37:18,21 76:2,7
80:23 86:3
111:15 145:8,9
145:11
**doing**  49:7 50:4
51:10,12 58:21
86:11 93:25
95:13 114:24
125:18 142:3
**dollars**  125:3
**dorothy**  12:5
**doubt**  63:18
**doug**  53:21
**downtown**  14:5
**drafted**  136:15
**dry**  102:4 106:12
**dual**  47:23
**due**  102:23
103:5,14 130:21
**duly**  4:3 143:5
146:11
**duplicates**  37:19
37:20
**duties**  70:5
141:6

**e**

**e**  2:2,2 3:2,2 4:2
4:2 143:2 144:2
145:2 146:2,2
**ear**  14:5

**earlier**  27:9 47:4
55:4 77:12 88:4
88:17 111:2
115:16,23
119:16,25
**early**  70:19
**earning**  28:21
**easier**  44:18
**east**  4:13 12:25
13:25
**ecklof**  54:19
**ed**  25:10
**education**
112:24
**effect**  3:7,8
140:9
**effective**  121:11
**effectively**  69:21
**eight**  11:5 12:3,9
15:9 115:17,20
116:5
**eighteen**  96:4
**either**  17:3 31:19
51:6 97:13
118:11 130:20
131:9
**electrical**  66:6
**electronic**  37:15
37:16 57:20
**elements**  11:21
87:5
**eligible**  11:15
**email**  17:14
27:21 81:3,16,18
81:20 83:21
106:21 107:5
111:3,18 129:10
129:18,25 130:8

131:9,10,20
134:7 138:19
144:19,20
**emailed** 17:11
**emails** 58:2,6,14
80:15 83:10
139:3 144:15,17
144:21 145:12
**employed** 70:24
121:15
**employee** 11:14
29:7 46:19
66:21 67:6 68:4
68:15 124:10
**employees** 10:23
11:4,20 12:3
17:21 19:21
28:16 29:3 45:7
45:8,9,10,23
70:6,12,14,15,19
121:21
**employer** 47:13
**energy** 10:14
**engineering** 9:3
9:7 116:18
117:21,23 118:8
118:15,19
141:14,21
**ensure** 103:11
**entail** 132:6
**entire** 30:15
93:25 95:13
**entry** 83:24
84:21
**environment**
81:8
**equipment**
105:20 122:4,7,8

122:12 123:24
124:9 127:5
**errata** 147:1
**esq** 2:6,10,11
**et** 84:17 147:2
**evaluating** 58:23
**eventually** 123:8
**everybody** 131:8
**exact** 22:2 24:2
33:3 48:7 78:7
117:16 118:24
128:13
**exactly** 4:23
26:19 48:16
81:19 85:21
86:13,17 94:15
106:7 107:11
118:13 124:22
128:21 133:7
137:18 138:10
**examination**
1:14 4:7 142:16
145:4 146:10,12
**examined** 4:5
**example** 34:16
123:14
**examples** 34:20
**exceed** 113:21
**exhibit** 25:12,15
43:25 44:4,6
60:25 61:4
75:14,18,21 78:9
78:12 80:13,16
80:19 81:12
83:8,11,15 85:13
89:20,24 100:14
101:15 104:4
106:19,22

112:23 129:8,11
129:14 131:20
138:25 139:4
144:6,6
**exhibits** 8:9
144:4,24
**exist** 21:10 35:19
**existed** 21:5
**existing** 140:15
**exit** 99:3,5
145:16
**expanded** 115:4
**expect** 125:23
**expedient** 126:3
**experiencing**
42:20
**expires** 147:25
**explain** 50:25
130:17
**extent** 58:9
**external** 51:7,12
52:17
**extinguish** 25:2
**extinguishing**
24:12
**extra** 57:7,9,12
58:10 141:6
**extremely** 115:3
**eye** 14:4

**f**

**f** 3:2 146:2
**facilities** 10:10
13:17 14:9,24
15:5 28:12
30:17 31:4,7
33:18 34:6 35:2
35:9,25 38:7,15

38:18 40:6,18,25
44:25 45:5 63:8
64:7 65:21
94:21 115:7
125:25
**facility** 115:15
135:24
**fact** 91:24 115:4
**failure** 100:25
103:24
**failures** 87:9
**fall** 16:14 66:6,7
66:8 106:6
**falls** 65:23
**falsification**
84:17
**familiar** 29:15
29:20
**far** 16:12 48:20
64:2 92:13
106:10 112:24
**fathom** 120:8
**february** 129:19
137:9,19 138:4
138:17 141:9
**feedback** 39:10
39:14,17,21 59:8
**felippe** 48:14
**felt** 42:19
**fewer** 88:13
**field** 35:13
**fifteen** 42:15
**fifty** 9:15
**filed** 25:22 60:13
93:2,8,13
**filing** 3:4
**fill** 107:18

**filled** 11:17,19
  96:23
**filling** 140:6
**final** 125:11
**finance** 126:22
**financial** 31:24
  122:15
**find** 95:21 96:6
  107:8
**fine** 4:17
**finish** 5:25
**finished** 44:18
**fire** 9:8 16:19
  17:20 18:12,25
  19:8,15,24 20:5
  20:19 21:2,4,15
  23:17,23 24:6,12
  24:17,23 25:2,3
  25:6 27:14 28:3
  28:7,13,15,23
  29:2 32:24
  35:13 37:11
  39:18,22 41:2
  42:8 43:21
  45:15,19,21,24
  45:24 46:13
  48:20 49:6,20,22
  50:9,10,11,14,18
  51:14,16,20,22
  51:23 52:3,4,8,9
  52:12,19 53:2,4
  53:8,10,14,18
  55:22 56:7
  58:25 66:4 68:7
  68:19,20 69:8,9
  69:14,20 70:3,7
  70:22 71:4,11,21
  72:10,22 73:2,6

  73:12,16,18,25
  74:2,7 94:8,25
  96:3,9,15,18
  97:17 98:4,6
  99:15 101:6
  107:9,25 108:7
  110:24 111:5
  112:7 113:13,14
  113:23 114:3,8
  114:11 115:10
  115:24 116:13
  116:17,20,24
  118:15,19
  119:19,20,21
  120:2,18 121:7,8
  121:14,24 122:5
  122:9 130:4,18
  131:21 132:10
  132:16 135:22
  137:5
**first** 4:3 6:13,21
  26:17 55:12
  60:20 62:13,18
  70:21 76:2,17
  88:18,25 89:5
  91:17 94:12
  101:3 105:10
  116:11 123:25
  124:10 139:10
  143:5
**fitness** 21:16
  113:8,11,23
  114:10
**five** 21:22 33:3
  80:20
**fmla** 67:10
**follow** 81:22
  122:14,22

  130:23
**following** 43:19
  92:21
**follows** 4:6 128:5
**followup** 56:6
**force** 3:8
**foregoing** 143:8
**forgetting** 12:11
**form** 3:12 10:3
  10:19 17:23
  18:7,15,22 19:4
  19:11,19,25 20:8
  20:15,22 21:18
  21:25 22:8,21
  23:4,13,19,25
  24:8,15 25:8
  28:2 30:8 32:6
  32:10,20 33:20
  34:18 41:22
  42:22 43:6 46:7
  47:22 50:3,21
  51:25 53:13
  57:3 59:24
  61:25 62:7
  63:15 64:15
  65:19 66:18
  67:4,13 69:12
  72:5 73:8,23
  74:15 78:5
  79:24 82:13,20
  85:11 87:18
  88:15 93:10,15
  94:19 95:4,10
  96:21 97:15
  100:3 103:2,8
  104:13 106:15
  109:12,22
  110:15 118:10

  120:23 121:5,17
  124:4,8 127:12
  128:11,20
  130:10 131:4
  132:21,25
  133:16,24 134:9
  134:16 135:3
  136:10,24 138:6
  140:11,25
**formal** 60:16
**former** 66:21
**forms** 18:17
  42:10
**forth** 146:11
**forward** 8:13,16
  81:21
**forwarded** 76:12
**four** 47:18
**fourteen** 14:15
**frequency** 88:3
**frequent** 103:12
**frequently** 30:3
  58:13 87:25
  88:5
**front** 100:15,17
  106:25
**fs** 113:5
**fulfilled** 133:14
  133:19
**fulfilling** 70:5
**full** 28:22,23
  62:10 68:4,15
  70:11,13 90:14
  138:11
**fuller** 28:25
**fully** 94:22
**funding** 31:17
  32:12,13,17

**funds** 126:2
127:17,19
**further** 3:11
135:7 142:6
143:8 146:14

**g**

**g** 4:2
**garcia** 48:14
68:12 69:2,8,19
98:5,6,11,13
107:19 119:17
119:20 129:22
**garcia's** 145:16
**gas** 10:13
**general** 63:22
65:12
**generally** 67:19
102:18
**generated**
104:24 105:15
106:2
**generates** 33:16
**gestures** 5:7
**giampaolo** 84:6
90:15 91:9
93:20 95:17
**give** 5:5 13:11
33:2 34:19
44:15
**given** 14:20 21:5
27:18 77:25
134:25 143:10
146:13
**go** 4:15,24 8:24
37:6 103:15
115:19 122:17
123:6,20,21

125:17 126:10
**goes** 112:24
125:5 128:5
**going** 4:24,25
8:3 13:8 31:5
36:12 44:14,15
62:17 63:5,23
75:21 83:14
91:18 95:14
101:14 103:19
109:8 129:13
137:21
**good** 40:10
**grade** 29:5
**graded** 29:5,8
**gray** 83:23
**gross** 48:14
**group** 10:15
40:24
**guess** 107:14
118:7,10,11
137:21 141:24
**guide** 20:19 31:3
31:9

**h**

**h** 4:2,2,2 144:2
**hand** 146:20
**handed** 74:3
**handle** 22:11
123:16 135:7
**handled** 19:7
**handles** 19:22
47:25 48:3
**handling** 49:24
70:10 132:17
137:25

**happen** 139:24
**happened** 21:4
137:9,15
**harassment**
66:25 81:7
**hard** 8:14 33:2
**harigel** 1:16 4:1
4:11 5:1 6:1 7:1
8:1 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1,7 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1,21
91:1 92:1 93:1
94:1 95:1 96:1

97:1 98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1
134:1 135:1
136:1 137:1
138:1 139:1
140:1 141:1
142:1 143:1,15
144:1 145:1
146:1 147:3,21
**harigel's** 142:13
**hashim** 12:7,15
**head** 74:20
**health** 10:12,22
28:4 36:2 48:2,4
114:25
**healthcare** 1:7
1:15 91:2 147:2
**heavily** 36:3
**held** 1:17 60:11
69:18 91:2
116:7,15,17

Case 1:21-cv-08732-JLR   Document 47-2   Filed 10/04/22   Page 50 of 68

**help**   13:9 105:8
**hereinbefore**
   143:11 146:11
**hereunto**   146:19
**hi**   4:15 84:4
**hierarchy**   117:8
   124:23
**high**   63:23 65:12
   65:12
**highlighted**
   105:11
**hire**   70:22 71:3,6
   74:24 75:4,6,9
   107:9 119:11
**hired**   43:4,11
   74:21,25 75:3
   111:11 116:21
**hiring**   107:25
   108:6 110:23
   112:19 119:13
**history**   97:17
**hit**   11:18
**hitting**   87:4
**holds**   113:22
**hospital**   13:10
   13:16,20,24
   14:14 15:10,14
   15:20,23,24 17:4
   18:5,12 19:9,24
   24:6,10 30:16,19
   30:25 31:10,16
   31:20 32:4 33:7
   34:7,8,15,20,24
   37:12,23 38:24
   40:4,6,7,20 41:3
   41:13 45:2,15
   46:14 48:18
   51:21 52:6,10

59:3 68:8 69:15
70:8,23 72:23
73:13 94:8,25
96:19 107:10
115:11 121:25
122:6 125:25
126:10,23
128:18
**hospital's**   17:19
   23:16 39:18,22
   125:14 126:17
**hospitalized**
   25:5
**hospitals**   32:14
**hostile**   81:7
**hourly**   137:15
**house**   52:16,18
   101:6
**hr**   61:14 66:16
   76:17 82:15
   83:22 84:9
   93:19 97:7
   103:16
**hrsc**   76:15 93:4
**human**   61:3,15
   81:22,24 82:4
   83:10 89:22
   144:10,16
**hundred**   21:22
   82:21 131:12
**hvac**   66:7

**i**

**identification**
   25:15 44:4 61:5
   75:19 78:13
   80:16 83:12
   89:24 106:22

129:11 139:4
**identified**   23:8
   30:4 59:16 60:4
   87:8
**identify**   19:14
**ilsm**   80:5
**ilsms**   80:5,10
**impact**   80:5,5,10
**impair**   7:9
**impairment**
   130:14,18,19
   131:15,17,23,25
   132:4 133:18
   134:6,14 135:12
   135:15,23 136:3
   136:13,21 137:3
   137:12 139:13
   140:6
**impairments**
   23:23 130:25
   132:17,24 133:4
   137:2,6 140:17
**implication**
   97:11
**implying**   109:18
**important**   5:5
   32:3
**improve**   92:19
**improvement**
   62:19 75:17
   76:3,22 77:14,17
   87:5 89:9,12
   101:2 106:2
**inaccuracy**   91:7
**inception**   97:18
**incident**   24:17
   79:18 100:19

**include**   41:2
   45:7,9
**including**   45:24
**inconclusive**
   27:20
**increase**   20:6
**increases**   34:12
**index**   1:5
**indirectly**   14:11
**individual**   29:7
**individuals**
   50:14 105:19
**influence**   29:2
**information**
   63:7 97:6 99:11
   145:8,9
**informed**   81:21
   87:20
**informing**   56:20
   87:23
**inhalation**   25:6
**initiate**   123:13
**inside**   34:24 40:7
   48:3 55:21 64:7
   123:7
**inspected**   34:21
**inspection**   28:9
   35:2,3 43:22
   56:5
**inspections**
   106:5
**installed**   114:5
**instruct**   118:10
**instructed**   82:15
   126:16 128:15
**instructions**
   130:3

**instructs** 7:3
126:20
**intended** 94:17
**intention** 74:22
75:4,6,9
**interact** 27:17
**interacted** 88:5
**interacting**
88:12
**interactions**
17:17 27:21
88:6
**interceded** 57:6
**interested**
146:17
**intern** 116:13
**internal** 51:7,12
110:4 112:4
117:9
**internally** 60:17
**interview** 99:3,5
145:16
**interviewed**
71:15,17 119:8
**inventories**
23:17
**investigate**
84:16 85:19
**investigating**
103:17
**investigation**
89:22 90:8,11
144:18
**investigator**
85:9
**involve** 30:14
31:23 123:3

**involved** 24:5,11
24:16 48:22,24
49:4 64:12
124:13
**involvement**
24:20
**involves** 32:24
**ish** 16:16
**israel** 13:14
14:17 115:13
**issue** 56:24
57:14 58:18
59:16 78:25
86:22,24 89:5,9
89:11 91:13,18
103:23 127:22
**issued** 64:11
76:4 77:4 79:4
79:10,12 84:10
91:24 101:10
113:12 123:9
138:9
**issues** 30:4 31:24
55:21,24 56:19
59:20 92:20
145:14
**issuing** 86:20
88:20,25 103:22
122:4,11
**item** 101:3
103:10 124:24
137:16
**items** 11:17,25
20:10 30:10
32:25 34:23
47:25 57:25
58:3 74:17 87:7

**j**

**january** 24:6,13
**jason** 12:6
**jk** 2:6
**job** 9:19 10:8,17
40:10 46:10,13
71:16,18 93:25
94:17 95:2,14
111:5 114:20,23
114:24 115:6
131:22 132:12
134:5,12,19
135:8 136:16
**jobs** 126:9
**joe** 8:3,4 15:11
16:4,13,20 17:18
17:19 20:12,18
21:13,21 22:24
23:7,15,21 24:4
25:22 27:5 41:6
41:11,19,25 42:5
42:7 43:3,9,12
54:19 55:4,8,13
55:20 56:24
57:8,10,13,25
58:10,17,21 59:8
59:12,15 60:6,15
60:21 61:19
62:4 64:11
66:19 67:25
68:22 69:9,16,25
70:3,24 72:24
73:11 74:6
75:10 76:4 77:4
77:12 79:2,10
81:3,13 84:8
85:14 86:2
87:14 88:7,20

90:9 91:14,23
92:9,12,18 93:2
93:12,24 94:5
95:12 98:17
99:14 105:22
108:12,16,19,23
109:16 113:5,24
116:21 120:4,11
120:15,17,24
121:6,15 127:3
128:15 129:19
130:7,12 133:10
134:4,13 135:5
135:21 136:2,15
137:2,12 139:18
**joe's** 20:17 87:23
88:2 89:17
90:22 93:19
103:17 108:5
113:19,21
131:20
**jogging** 138:19
**john** 12:6 46:16
46:18,21,22,22
46:23 47:3,6,9
47:12,15,23 48:5
48:19 50:7,17
51:4 52:24 53:5
53:11,19 54:23
74:9 129:21
**join** 120:20
121:8,14,24
**joined** 119:21
120:24
**joint** 29:12,17,20
30:5,10,22 31:5
31:11,15,16,21
32:23 33:7,14,16

34:10,15,25 35:6
35:14 36:6,15
37:22 38:19,22
38:25 39:6,11,16
40:2,4 77:22
78:2 132:18,23
133:3 139:25
**joseph** 1:3 2:4
**jr** 46:22 47:6
**judge** 3:7
**july** 37:24 79:5
**june** 68:9 77:2
101:9,11 103:5
104:7,10,15,17
104:23 121:23

**k**

**kanterman**
67:21 68:7 69:8
69:18 99:18
107:19 109:15
109:20,25
121:23 129:21
**kanterman's**
109:9
**kerley** 12:6
**khan** 12:7,15
**kim** 142:5
**kings** 146:5
**kirschenbaum**
2:4
**knew** 20:23
21:12 128:17
**know** 5:20 6:10
15:18 16:12
20:10,12,16 21:4
21:9,11 22:2,10
24:2,22 26:4,8

27:7 29:16 31:4
31:10 36:16
39:4 41:9 44:17
44:18 46:16,18
48:6,7,8,12,21
51:18,19 53:9,14
53:16 54:25
56:23 57:5,25
58:20 59:7 61:8
61:11 64:2,18
66:21 67:6,21
68:12,17 71:17
75:12,22 78:15
78:19 79:9
80:19 82:14
83:20 84:16
85:3 90:2,3
92:13 96:24
98:10 99:7,20
100:15 106:7,10
106:24 107:20
109:2 112:10,11
115:21 116:6
117:16 118:13
118:14,24
119:22,24
120:13,14 124:5
125:22 128:16
128:25 129:14
135:5 137:22,24
139:6 141:19
**knowingly**
130:20
**knowledge** 7:18
17:18 77:8
87:14 89:17
122:2 126:12

**known** 47:9
**knows** 118:12

**l**

**l** 3:2,2 4:2 143:2
**labeled** 44:10,12
**labor** 19:21
**lacking** 43:15,18
**large** 123:6
132:17
**larger** 40:24
123:18
**late** 60:23
118:25
**lawsuit** 7:17
26:25 93:3,7,13
93:19
**lawyer** 6:18
**lawyers** 7:23
**lay** 81:23
**lead** 96:9 132:18
132:22
**leadership** 97:23
98:12,16,21,25
122:9 135:22
**leah** 2:6,6
**learn** 55:16
60:20 70:21
**learned** 26:24
71:2
**leaves** 125:5
**left** 16:15 22:25
27:5 68:7,18
69:2,8 70:19
73:14 74:23
95:20,24 96:5
99:14,18 101:25
107:19 119:19

119:19 120:2,21
120:25 121:23
**letter** 81:12,15
109:3
**level** 40:19 74:11
95:21
**life** 43:21 56:7
58:25 113:23
114:8,11
**limits** 124:23
**line** 109:2
129:25 131:20
139:11,12 147:5
**list** 48:7 103:10
**listed** 103:11
**lists** 63:21
**little** 42:9 93:22
101:25
**littler** 2:8
**littler.com** 2:11
**lizarazo** 62:14
81:4,14 107:6
**llc** 147:1
**llp** 2:4
**llp.com** 2:6
**located** 12:24
**location** 28:4,7
**locations** 40:14
40:16
**log** 61:21
**long** 9:21 27:15
47:9,15 48:24
94:14 116:3
124:12
**longer** 114:25
118:15
**look** 26:6 44:17
61:7,21 62:2,12

62:18 84:20
90:18 91:8
97:19 100:14
104:3 112:22
129:14
**looking** 30:6,11
37:3 100:22
101:22 114:19
136:11
**looks** 61:13 62:8
77:3 79:4 80:3
81:2 83:17,21,24
84:4,24 90:10,14
104:9 108:4
111:2 125:8
129:18
**lori** 1:18 5:2
146:7,23
**lot** 17:12
**low** 19:15
**lower** 93:22
**lunch** 42:5
**lund** 49:17,24
53:4

**m**

**ma'am** 16:3
**main** 10:8,17
13:10 14:2,14,24
14:25 15:5,16,17
15:19 27:23
40:18 47:19
74:10 113:22
**maintain** 38:24
123:15
**maintained**
117:9

**maintaining**
43:20
**maintenance**
28:9 30:18
43:23 48:20
49:6 56:6 59:2
62:25 73:25
101:5 102:9,12
102:18 103:5
106:11
**man** 34:21
**manage** 48:19
49:13 51:6
53:15
**managed** 13:20
13:22 23:22
49:11 51:5 94:7
**management**
10:11 14:9 34:7
36:2 38:8,16
40:7,19,25 45:5
49:21,24 50:7,23
51:2 53:6 63:8
64:7 65:21 74:6
94:21 137:5
**manager** 61:14
67:25 69:14
72:2 75:5 82:15
97:21,24 100:6
100:10 107:18
109:15 110:7,23
116:16,24 117:3
117:11,15,20
119:14,20
120:20 121:3
122:11 141:14
141:21

**managers** 21:3
73:13,15 74:23
75:4,7 128:3
**managing** 50:6
51:11,17 53:7,10
53:18 115:3
**manhattan** 13:2
**manual** 33:8,9
34:22
**march** 63:2,21
64:4 69:2
102:14,22,24
103:13,14
106:13 120:3
139:17
**maria** 48:14
**mark** 25:11
43:24 60:24
75:13 78:8
80:12 83:7
89:19 106:18
129:7 138:24
**marked** 25:14
44:3 61:3 75:18
78:11 80:15
83:11 89:23
106:21 129:10
139:3
**marriage** 146:16
**marshal** 20:5
**marshals** 19:2,8
19:15,24 20:20
21:3,4,15 45:25
52:19
**masks** 122:16
**matt** 45:17,20
53:17 54:6
115:21 116:3,7

116:19 119:18
139:13 140:5,14
140:21 141:4,12
**matter** 55:6
58:11 146:18
**matters** 19:7
**matthew** 2:10
**mean** 29:24 34:4
38:17,21 57:18
84:11 104:16
105:18 117:5
124:25
**meaning** 25:25
112:2 128:2
**means** 105:6
**meant** 92:19
**measure** 79:21
102:8
**measurement**
101:7
**measures** 64:5
64:13,20 65:2,4
65:11 66:4,12
**mechanical** 9:3
**medicaid** 30:23
32:15
**medical** 10:13
**medicare** 30:24
32:15
**medications** 7:9
**meet** 87:10
**meeting** 55:17
87:14 88:11
130:6,25 131:7
131:14 132:2,14
133:6,9 136:14
136:25 137:8,11
137:14,17,24

138:5,13,14,16
138:20,22
140:20
**meetings** 58:22
59:12
**member** 98:12
**members** 41:4
114:4
**memory** 138:19
**mendelson** 2:8
**mention** 93:19
**mentioned** 27:9
47:4 58:16
60:12 77:20
112:4 140:22
**mentioning**
42:24
**merit** 70:14
**message** 90:20
**met** 7:23 58:17
**michael** 1:7 12:5
25:23 47:25
98:15,24 110:25
**mid** 70:19
**middle** 62:12
84:4 139:9
**mike** 13:4 16:8,9
48:3 53:21,25
54:3,6,9,14,17
54:19,25 55:10
55:13,17 56:20
56:23 60:4,18
63:3 66:16 67:2
67:11,15,18
70:22 71:3,9,20
76:4,16,19 77:6
79:2,13 82:6,9
86:5,19 87:22

88:18,24 89:4
91:18 92:4,8
98:14 106:3
107:8 108:13,14
108:15,22 111:3
111:11,18
117:18,24 118:2
118:6 129:6,21
139:17,22
**mike's** 71:5 89:8
103:23
**mine** 57:15
**minute** 26:6
42:15 128:8
**mischaracterize**
13:12
**missed** 122:21
**missing** 73:19
**mistakenly** 91:4
**mixed** 100:7
**moment** 8:19,23
**monitor** 123:19
124:9
**month** 16:22,23
16:24,25 17:7,11
17:12 27:18,19
101:9
**monthlies** 52:15
**monthly** 17:16
52:14 63:5
**months** 66:13
96:4 115:5
**morning** 76:12
**morningside**
14:3 15:8
**mount** 10:11,22
13:10,13,14,14
13:19,24 14:3,3

14:4,4,5,6,6,7,14
14:17,22 15:4,7
15:13,19,23,24
17:4,21 18:4,12
19:8,20,24 28:4
31:10 32:3 36:2
37:12,23 39:17
39:22 40:20
41:3 45:2,15
46:14 48:2,4,18
51:21 52:5,10
59:2 68:8 69:15
70:8,23 72:22
73:13 94:8,25
96:19 107:10
114:25 115:11
115:12 121:25
122:5,13,25
123:7 124:17
125:6,7,10,14,25
126:10,17,23
127:20,21,22,23
128:6,18
**move** 119:3
**moved** 116:24
117:20 119:9
**mri** 18:20
**multidisciplin...**
30:12
**multiple** 115:7

**n**

**n** 2:2 3:2 143:2
145:2
**n95** 122:16
**name** 4:9 15:22
90:14 114:7
147:2,3

**named** 62:15
66:22 67:6 84:6
**naomi** 84:6
90:15 91:9
93:20 95:17
**nature** 43:23
98:25
**necessarily** 45:8
**necessary** 19:16
19:17
**need** 6:9 36:25
46:12 107:18
124:13 133:19
**needed** 122:8
123:12 133:14
**needs** 122:16
124:8 127:17
**negotiations**
18:25
**never** 36:21
134:12
**new** 1:2,19 2:5,5
2:10,10 4:5,13
4:14 10:12 13:2
14:4 17:19
18:11 42:8
43:10,16 107:9
107:25 108:6
113:13 114:3
146:4,8 147:1
**nfpa** 9:12
**nicu** 18:20
**nine** 14:20
115:20
**nods** 5:7
**non** 65:12
**nonaccredited**
31:19

normal 123:23
notary 1:19 4:4
  143:22 146:7
  147:25
noted 23:5
notes 97:9
  138:21
notified 67:19
nowicki 48:13
  53:24 131:11
  139:18
number 5:2 22:2
  22:5,12,17 24:3
  70:15 88:10
  100:23 101:10
  114:12 123:9
  132:17 144:7
numbered 62:24
  79:20
numbers 101:17
numerous 22:10
  31:23 33:25
  34:21 35:12
  36:12
nunez 45:17,18
  54:13 71:3,6
  72:14 74:12
  108:6 111:4
nyc 113:5,7

**o**

o 3:2 4:2 143:2
oath 3:7 5:12
object 7:2
objection 10:2
  10:18 17:22
  18:6,14,21 19:3
  19:10,18,25 20:7

20:14,21 21:7,17
21:24 22:7,20
23:3,12,18,24
24:7,14 25:7
27:25 30:7 32:5
32:9,19 33:19
34:17 41:21
42:21 43:5 46:6
47:21 50:2,20
51:24 53:12
57:2 59:23
61:24 62:6
63:14 64:14
65:18 66:17
67:3,12 69:11
72:4 73:7,22
74:14 78:4
79:23 82:12,19
85:10 87:17
88:14 93:9,14
94:18 95:3,9
96:20 97:14
100:2 102:25
103:7 104:12
106:14 109:11
109:21 110:14
118:9 120:22
121:4,16 124:3
127:11 128:10
128:19 130:9
131:3 132:20
133:15,23 134:8
134:15 135:2
136:9,23 138:6
140:10,24
objections 3:12
objective 32:3

objects 7:5
obligation 5:14
observations
  39:8
occur 77:2 131:2
  133:4
occurred 24:12
  24:17,23 92:15
  138:16
occurs 29:24
october 93:8
offering 115:6
  132:11,12
office 4:12 12:24
  17:5 26:23
  40:19 42:6
offline 36:24
  37:8
okay 61:10
  75:24 78:20
  80:22 90:5
  139:8
old 9:15 21:23
  22:18 54:25
omelfi 68:12,25
  69:8,19 98:5,6
  98:11,13 100:7
  100:10 107:19
  119:16,20 120:2
  129:22
onboarding
  126:25
once 17:12 75:3
ones 36:14
online 33:13
  35:17,23 37:19
  37:20

onsite 57:16
open 8:18,20,20
  8:23 21:22 22:5
  22:17 63:22
  64:5,19 65:3
  66:12 72:3
  83:15,16 110:5,6
  110:7,9 119:7
opened 101:11
openings 46:10
operating 18:19
  30:25
operation 30:20
  47:2
operational
  74:17
operations 10:7
  10:21 35:14
  47:8 48:3 52:24
  74:3,9 116:18
opportunity
  71:10,11 142:13
opposed 37:4
  72:12
opposite 100:12
oral 112:2
orally 111:22
order 1:17 44:11
  56:13 69:20
  101:10,17,20
  102:2 103:15,20
  103:25 104:9,19
  105:13 106:7
  123:9,23 127:23
  128:4
orders 21:23
  22:5,11,17 23:2
  34:9 141:25

org  44:3,7,8,24
  45:4,7,12 144:9
original  3:5,9
outcome  28:16
  40:11 77:22
  78:2 146:17
outdated  23:17
outside  33:23
  48:2 49:11,15
  125:9
overall  38:6,14
  72:20,25 73:6,17
overdue  22:6,9
oversaw  141:22
oversee  10:10,13
  10:14 14:9
oversees  49:5
overtime  20:5

**p**

p  2:2,2 3:2 4:2
p.c.  2:8
p.m.  142:15
page  25:19,24
  26:4 44:10
  62:13,18 63:6
  81:11 101:15
  104:4 105:2
  139:10 144:6
  145:4,9 147:5
pages  25:25
  80:21
paper  123:16
paragraph  62:24
  79:20 80:3,9
  100:23 108:10
  108:25 112:23

paraphrasing
  40:9
parenthetical
  97:20
part  14:21 24:24
  35:6,10 43:15
  48:17 52:23
  59:6 63:12
  64:10 83:23
  86:11 90:10,15
  92:6 99:24
  105:25 112:19
  126:24
participate
  32:12 37:25
  38:9
participated
  38:23
particular  51:16
  57:13 58:11
  114:7 135:11
particularly
  132:18
parties  3:4
  146:15
parts  56:12
party  7:16
pasquarello  1:3
  8:3,4 15:11
  16:13,20 23:16
  23:22 24:5 27:5
  41:7,11,19 55:5
  55:9 58:10 60:6
  60:16 61:19
  64:12 66:19
  67:25 68:23
  69:17 70:24
  72:25 73:11

74:6 75:11 76:5
  77:13 79:2 81:3
  81:13 84:8
  85:15 88:20
  91:23 98:18
  105:23 109:16
  116:21 120:5
  121:15 127:3
  129:19 134:5,13
  135:21 136:2,15
  139:18 145:13
  147:2
pasquarello's
  16:4 25:22 62:4
  88:7
pass  29:4
passing  28:25
  31:15,18
pat  62:14 107:5
patricia  81:3,14
patty  61:14
  81:21 82:15
  86:9 99:9
pc  84:10,11
  91:13 93:5
pc's  90:22
pediatric  18:20
penalties  5:15
pencils  122:17
  123:12,15
pending  6:12,20
  93:3
pens  123:15
people  15:18
  38:18 48:11
  64:19 65:2
  66:10 96:24
  104:10 125:4

128:2
percent  33:3
  63:2,4,22,22
  82:22 131:12
percentage
  32:23
perez  12:5
performance
  11:23,25 12:17
  12:20 38:7,15
  39:23 40:3
  43:13,14,18
  55:21,24 56:13
  56:19 58:18
  59:9,13,16 60:3
  60:6 62:19
  75:17 76:3,22
  77:14,16 87:5,20
  87:23 88:2,7
  89:9,11,17 90:22
  91:13,19 106:2
  145:13
performed  49:9
  49:14
performing
  19:15 115:2
period  98:19
  130:22
perjury  5:16
person  16:22
  27:21 51:11,16
  85:20 93:19,25
  94:7,17 95:2,8
  95:13,20,24 97:3
  97:7 99:15,20
  100:9 103:16
  114:14 120:18
  121:7 135:11

136:20 138:10
140:14,22 141:3
**person's** 99:23
**personal** 87:14
89:17
**personally**
108:19
**phone** 17:7,9
27:20
**physical** 35:2,16
37:9,14,18,21
**pickman** 1:18
146:7,23
**piece** 19:13
105:20
**pip** 77:14,25
87:10 88:19
**place** 140:19
143:11
**placing** 134:2
**plaintiff** 1:4,17
2:4 8:4
**plaintiff's** 25:12
25:14 43:25
44:3 60:25 61:4
75:14,18 78:9,12
80:13,15 83:8,11
89:20,23 106:19
106:21 129:8,10
138:25 139:3
144:4
**plan** 11:18,18,21
62:20 75:17
76:4,23 77:15,17
87:6 89:9,12
101:2,3 106:2
**plant** 52:24 74:3
74:9

**please** 4:9 5:19
8:6 11:12 19:13
29:14 31:8
84:15 85:2
**pleased** 40:10
**plumbing** 66:8
**plural** 80:6
**pm** 102:5,7
106:12
**pm's** 101:7
**point** 86:7 91:22
93:18 97:3
118:16 127:5
137:24
**points** 64:3
**policies** 18:11
**policy** 122:14,23
122:24 123:2
**position** 9:22,25
10:4,5,16 22:19
33:10 71:13,22
71:23 107:15
108:11,16,20,23
109:4,8,9 110:2
110:5,7,8,9,13
110:17,20,24
111:9 112:9,18
119:4,8,23
131:15,16,22
132:2 139:14
140:7 141:4
**positions** 72:2
74:24 95:22
96:13,18 107:18
116:15
**positive** 39:14
97:22 98:10,15
98:20

**possess** 114:4
**possible** 46:4,8
53:17,20 100:9
134:22
**possibly** 130:7
**posted** 46:13
71:14 108:11,20
108:23 109:4
110:21
**posting** 110:2
**potential** 106:8
**potentially**
54:12 65:22
134:24 140:16
**prep** 34:10
**preparation**
38:2
**prepare** 7:21
**preparing** 33:15
38:4 41:12
91:13 133:2
**prepping** 34:2
**present** 2:11
35:6,10 40:24
41:9 54:2 74:20
**presentation**
17:20 18:4
**presented** 35:14
38:21
**president** 9:20
10:6,21
**pressed** 33:2
**presumably** 58:3
**preventative**
79:21 101:4
**preventive** 62:25
64:5,13,19 65:2
65:4,11 66:4,12

102:7,9,11,17
103:4 106:11
**previous** 9:24
115:9
**previously** 60:12
**primary** 114:18
**printed** 104:19
**prior** 10:4,16
12:10,11 21:12
23:9 26:14 49:7
49:23 51:10
53:11,19 73:2
76:13 78:22
85:12 88:19
93:24 94:5
95:12 105:23
109:4 110:20
115:5 116:21
142:3
**privy** 39:5
**probably** 4:21
8:22 12:15
16:23,25 40:14
42:15 69:3
74:16 75:8 86:8
115:5,20 125:21
**problem** 34:14
**problematic**
58:4
**problems** 60:4,6
**procedure**
130:23
**procedures**
18:11 43:20
92:21
**process** 11:16
21:15 42:9 51:5
56:3 81:23

112:20 122:18
122:20 123:3,7
123:13,20,22
124:2,5 125:14
126:11,25
127:18 128:6,8
128:13
**produced** 44:7,8
58:7 99:12
**production**
36:11,13,17
145:10,12,15
**professional**
56:25
**program** 28:23
28:25 33:8 36:4
37:17 56:9
57:19,22 58:23
58:24 59:5
115:3
**programs** 18:19
28:10 43:20
**progress** 28:8
**progressive**
75:16 76:2,21
78:11,25 79:15
81:5 84:12
85:15 86:20,24
87:8 88:19,25
89:5 91:24
101:21 103:24
**project** 10:14
**pronouncing**
62:16
**proper** 43:21
**properly** 92:21
108:11

**provide** 39:17,21
77:6 131:21
**provides** 39:7
**providing**
130:12
**public** 1:19 4:4
143:22 146:7
147:25
**pull** 129:15
139:7
**pump** 53:10
73:25 74:7
102:5 106:12
**pumps** 48:20
49:6,20,22 50:19
51:23 52:4,9,12
53:3,18
**purchase** 123:4
123:9,10,23
124:14,22 125:2
125:7 127:23
128:4
**purchases** 126:3
126:4,7
**purchasing**
122:13,23,24,25
123:8 124:17,23
125:6 126:11,14
126:18 128:18
128:24 129:3
**pursuant** 1:17
**put** 44:11 72:9
77:14
**puts** 29:5
**putting** 123:4
125:22

**q**

**qualification**
114:22
**qualified** 112:25
114:23
**quarterly** 16:24
16:25
**queens** 13:14
14:6,22,25 47:8
**question** 5:19,21
6:2,12,13,18,19
6:20,21 7:5
11:11 24:9
29:13 43:8 60:2
65:15,17 80:7
94:23 121:6
126:6 132:25
**questioned**
77:25
**questioning** 42:7
**questions** 5:2,6
5:11 7:2 142:7,9
**queue** 123:8
125:9,20 128:5
**quick** 26:10
**quite** 4:23 82:22

**r**

**r** 2:2 3:2 4:2,2,2
143:2 146:2
**range** 29:5
**rarely** 17:9
**rdo** 90:21,24
**read** 26:13,15
60:13 63:23
65:14,16 103:9
**reading** 79:25
86:2 108:17

**ready** 61:9 78:19
**really** 54:11
**reason** 7:12
43:10,15 55:20
63:16,18 101:25
105:22 106:3,9
147:5
**reasonable** 24:3
**recall** 18:8 26:19
26:24 27:4
40:23 41:6,8
42:3,18 46:11
54:11 56:22
58:15 59:19,21
60:8 67:5,14,16
69:22,24 70:2,25
71:2 78:6 79:7,8
79:13,16 81:19
82:8,10 85:4,6,8
85:12,21,25 86:4
86:8,10,13,17
88:10 93:21
94:15 95:11
98:2 99:24
103:18,19,21
107:22,23,24
108:24 111:14
111:19 118:5
120:4,7 127:3,8
128:21,23 129:5
130:6,24 131:6
133:7,8 134:10
134:18,19 135:6
135:10 137:18
138:18 140:5,21
141:2,18
**recalling** 112:16

recap 117:12
receive 11:14
  29:3 39:10
received 26:12
  26:20 27:3
  42:11
recess 83:5
recognize 44:24
  75:25 78:24
  81:12,15 83:20
  107:4
recollection
  76:24
recommend
  71:22 111:4,7
recommendation
  111:9,13,15
recommended
  71:9 111:8
  136:21
record 4:10 5:7
  36:25 60:9,10
  61:17 62:11
  83:17 90:11,16
  98:8 99:22
  100:5 142:10
  146:12
recorded 100:10
records 83:22
recruited 96:5
recruiting
  108:12
reduce 20:5
refer 15:21
referenced
  101:21
references 63:12

referred 14:2
  20:10 65:17
  95:24 96:14
  97:24
referring 8:3,6
  10:20 15:15,25
  29:18 35:22
  52:5 91:4 98:3
  98:21 99:17,20
  110:6 121:18
  124:6 127:25
  138:14
refilled 120:6
regarding 37:11
  39:17,22 40:3
  59:8,12 60:3
  62:3 136:19
regional 9:20
  47:2
regulatory 36:4
  145:10
related 30:17,19
  56:2 130:7
  146:15
relations 19:21
relationship
  47:24
rely 36:3
remains 101:10
remember 4:22
  18:9 26:22
  41:18 42:16,23
  42:25 55:25
  82:24 112:17
  129:2 138:12
  140:8
remembering
  48:15

remote 57:15,17
remotely 57:20
repeat 111:6
  136:19
rephrase 5:20
  22:15 43:7
replace 74:22
replaced 69:20
  120:6,10,15
replacing 72:14
  109:8,19
report 13:6,7
  16:9 39:5,7
  53:21,24 54:3,6
  54:13,16,19,22
  68:22 81:6
  144:12,14
reported 54:9
  117:24,25
reporter 5:3,7
  5:10 6:4 25:16
  44:5 61:6 65:16
  75:20 78:14
  80:17 83:13
  89:25 106:23
  129:12 139:5
reporting 47:23
  67:25 88:2
  109:15 118:4
  141:15 147:1
reports 12:4,13
  12:18,22 21:2
  27:10 47:4,24
  48:5,8 57:21,23
  63:3 67:19
representatives
  82:3

request 33:24
  34:9,12 120:8
  124:11 125:13
  129:2,4 131:23
  138:11
requested 55:17
  58:8 69:17,19
  99:11 105:11
  120:5 145:8
requesting 138:3
  138:8 142:11,12
requests 22:12
  37:7 123:17
  126:17
require 125:3
required 28:9
  50:13 56:5
  86:21 89:2,11
  92:22 114:2,16
  125:17,19
requirement
  63:6 116:14
requirements
  87:10,15 94:7
  101:2 133:18
requisition
  123:5 124:15
  125:2
reserved 3:12
resident 46:25
resignation
  109:3 110:12
resigned 97:21
  110:19
resigning 109:25
resources 61:3
  61:15 81:22,25
  82:4 83:10

89:22 122:15
144:10,16
**respect** 57:13
58:11,17 59:17
61:18 63:12
103:25 106:11
**respective** 3:4
**respond** 81:18
128:17
**responded** 24:25
85:19
**responding** 25:3
81:20 86:15
108:5
**response** 24:24
61:22 81:5
84:25 137:3
139:22
**responses** 5:6
**responsibilities**
10:9,17 27:24
47:20 70:9
131:17 132:3,5
133:12 134:2
135:8,13,14,18
136:8,13,16,22
137:13 138:2,4,9
140:13,23
141:20
**responsibility**
38:6,14 48:17
72:21,25 73:6,12
73:17,20 74:7,11
74:13 115:5
137:4,6
**responsible**
64:19 65:2,10,23
66:3 122:3

**rest** 25:20
**restructuring**
72:8
**resulting** 79:18
100:19
**resume** 113:19
**retained** 144:24
**retaliation** 67:2
67:10 81:7
**returned** 118:19
**revealing** 7:19
**review** 7:24
26:10 75:23
76:21 78:19
80:20 83:19
84:15 85:2,9,18
86:3,12 90:4
107:2,13,17
129:16 139:7
142:14
**reviewed** 36:21
76:19 85:22
86:9 90:5 99:8
107:12,20
113:18
**reviews** 12:18,21
28:8
**revise** 142:14
**revised** 23:16
**right** 15:22
29:16 35:20
62:16 63:19
68:10
**risk** 63:23 65:12
65:13
**robert** 12:7
**roche** 1:7 12:5
13:4 16:8,9

25:23 47:25
53:22,25 54:4,7
54:10,14,17,20
54:25 55:11,13
56:20,23 60:4,18
66:16 67:2,11,15
67:18 70:22
71:3,20 76:4,16
76:19 77:6 79:2
79:13 82:6,9
86:5,19 87:22
88:18,24 91:18
92:4,8 98:14,24
106:3 107:9
110:25 111:4,11
111:18 117:24
118:2,6 129:6,21
139:18
**roche's** 89:4
139:22
**role** 12:10,12
14:8 38:4,12
41:12 47:20
68:17 69:18
74:18 96:3,7,25
111:7,13 112:7
112:25 116:17
116:24,24
117:20,23 118:2
118:19 119:12
119:20,21 120:5
120:10 133:22
140:15,15 141:4
141:12
**roles** 69:18,20
74:17 116:6
**roll** 14:11

**rome** 53:21
**ron** 48:13 67:21
68:6 69:7,18
99:17 100:6,10
107:19 109:2,9
109:14,19,25
110:10,16
121:23 129:21
**room** 18:20
141:7,8
**ross** 12:7
**run** 34:6 69:21
**running** 69:9
70:3,7
**runs** 126:13
**ryan** 48:13 53:24
131:11 139:18

| s |
|---|

**s** 2:2 3:2,2 4:2
144:2 147:5
**safety** 9:8 16:19
17:20 18:12
23:10,17,23
27:14 28:3,7,13
28:15,23 29:2
32:24 35:13
37:11 39:18,23
41:2 42:8 43:22
45:15,19,22,24
46:13 50:9,10,12
50:14 51:14,16
51:20,22 52:3,8
53:8,15 55:22
56:7 58:25 66:5
68:7,19,20 69:9
69:9,14,21 70:4
70:7,22 71:4,12

71:21 72:10,22
73:2,6,12,16,18
74:2 94:8,25
96:3,9,15,19
97:17 98:4,7
99:15 101:6
107:10 108:2,7
110:24 111:5
112:7 113:24
114:9,11 115:10
115:25 116:14
116:17,20,25
118:16,20
119:19,20,21
120:2,18 121:7,9
121:14,25 122:5
122:9 130:4,18
131:21 132:11
132:16 135:22
137:5,14
**satellite** 14:24
**saving** 24:5,10
**saw** 22:22 23:5
26:17 57:25
58:3 79:9 83:18
134:12
**saying** 45:6
50:16 51:15
53:9 72:11 75:3
84:25 87:11
92:7,8 121:2
129:2 132:14
134:20 136:2,17
136:18,19 137:7
141:10
**says** 62:4,19,23
62:24 63:20
64:4 81:5 84:4,8

84:15 90:14,21
91:12 93:22,24
95:12,20 97:19
97:21 99:13
100:25 101:7,17
101:17,24 102:4
102:14 104:5
105:3 109:2
129:24,25
131:21 139:11
139:12,23
**sc** 40:19
**scene** 24:25
**schedule** 20:11
20:13,16
**scheduling** 20:5
**scott** 66:22,25
**screen** 8:15 26:7
44:20,22 78:16
78:17 123:19
**scroll** 44:16,19
63:5 101:14
139:21
**scrutinize** 31:5
**sealing** 3:4
**second** 78:25
80:3 81:5,11
84:10 85:15
86:20,24 87:8
91:11 93:5
101:15 106:3
129:24 131:19
137:11
**section** 100:18
**see** 8:14 16:21
26:2 44:19,21
62:21,23 63:9,19
63:24,25 65:24

76:10 78:16,17
81:9 83:23,25
84:14,18,21
90:13 92:24
93:2,5 94:2
99:13 100:18
101:12,16,24
102:4,10,14
104:5 105:2,10
106:16 109:5
113:2 131:19
134:22 139:9,11
139:22
**seeing** 25:24
41:6 79:7
134:19
**seen** 25:17,19,20
26:3,9 76:7,14
78:21 79:11
80:23
**seliger** 2:6 4:8
8:12 25:11
36:10 37:6 43:7
43:24 58:6
59:25 60:9,24
75:13 78:8
80:12 83:7
89:19 99:10
106:18 129:7
138:24 142:6
145:5
**send** 57:21,23
58:2,13
**sense** 6:7,15
**sent** 8:9 59:8
76:17 81:3,16
85:9 129:19
131:9

**sentence** 91:11
91:17 92:6
95:19 97:20
**separate** 13:17
133:22
**september** 16:16
22:25
**served** 26:20,22
**service** 3:9 27:3
61:15 83:10,22
84:9 130:20,21
144:16
**services** 10:11
10:14 30:24
32:15,18 82:4
**sessions** 9:13
17:4
**set** 70:15 88:3
146:11,20
**sevcik** 12:6
**seven** 14:19
27:16 116:5
**seventeen** 4:22
**shaffer** 12:8,8
27:7 55:18
56:21 57:6
58:16,20 59:7
71:9,20,22 81:4
81:14 87:24,25
88:11 91:20
92:4,9 96:2
111:10,22
129:20 139:17
140:4
**shaffer's** 28:17
**shani** 62:15
**share** 8:14

| | | | |
|---|---|---|---|
| shared 91:9 97:7 | 114:25 115:11 | 127:4 | start 6:2 11:3 |
| sharpe 2:11 | 115:12 121:25 | specific 30:21 | started 22:19 |
| shawn 2:10 | 122:6,13 125:6,8 | 36:19,23 37:2,3 | 94:12 95:6 |
| sheet 147:1 | 125:14,25 | 43:19 46:17,21 | starting 44:13 |
| shift 21:2,5,11 | 126:10,17,23 | 55:23 123:7 | 73:3 84:3 96:17 |
| 21:12 | 127:20,22,22,23 | 136:20 140:22 | 97:2 |
| short 83:3 | 128:18 | 141:3 | starts 112:23 |
| show 34:14 63:3 | sinai's 122:25 | specifically 7:3 | state 1:19 4:4,9 |
| 75:21 80:18 | 123:7 124:17 | 39:19,24 41:12 | 146:4,8 |
| showed 88:18 | 125:10 128:6 | 41:17 42:24 | statement 78:7 |
| side 13:25 | single 26:4 | 43:2 53:10 | 95:16,17 113:17 |
| sign 11:20 | 138:10 | 98:24 107:21 | statements 6:5 |
| signature 146:23 | site 17:3 73:16 | specifics 117:17 | states 1:2 101:3 |
| signed 3:6,7,8 | six 15:9 115:5,17 | specified 143:11 | 102:11 |
| significant 22:5 | 115:20 | spelled 11:20 | stationed 115:12 |
| 22:17 33:17 | sixteen 4:21 | spend 57:7,9,12 | statistics 64:3 |
| similar 12:14 | 47:11 | 127:16,20 | 130:4,13,15 |
| 83:18 | sixty 21:23 22:18 | spent 58:10 | status 117:10 |
| similarly 16:15 | size 124:21 | spoke 17:7 40:5 | stayed 96:3 |
| 64:20 | 125:7 | 79:14 90:21 | stewards 122:14 |
| sinai 10:11,22 | small 28:18 | 103:16 119:16 | 127:19 |
| 13:10,13,14,14 | smaller 126:3 | sprinkler 102:5 | stipulated 3:3,11 |
| 13:19,24 14:3,3 | smclark 2:11 | 106:12 | stop 95:14 |
| 14:4,4,5,6,6,7,14 | smoke 25:5 | square 14:5 | storage 37:15,16 |
| 14:17,22 15:4,7 | sole 99:15 | sr 46:22,24 | store 36:4,8 |
| 15:13,20,23,24 | somebody 62:15 | 47:10,13,16 | stored 35:17,24 |
| 17:4,21 18:4,12 | 134:3 | ss 146:4 | 37:13,19 |
| 19:9,20,24 28:4 | someplace 23:6 | staff 18:5 52:16 | street 4:13 12:25 |
| 31:10 32:3 36:2 | sort 31:3 | 52:18 70:16 | 13:25 15:14 |
| 37:12,23 39:17 | sounds 24:3 | 101:6 114:4 | student 116:12 |
| 39:22 40:20 | 68:10 | 126:22 136:3 | study 9:2 |
| 41:3 45:2,15 | sourcing 125:10 | 137:15 | style 98:16,25 |
| 46:14 48:2,4,18 | southern 1:2 | staffed 95:8 | subject 5:15 |
| 51:21 52:6,10 | speak 64:8,21 | stage 123:25 | 62:5 81:4 |
| 59:2 68:8 69:15 | 81:24 82:6,16 | stand 90:24 | submission |
| 70:8,23 72:23 | 86:5 119:23 | standards 31:2 | 76:15 89:3 |
| 73:13 94:8,25 | speaking 40:21 | standpoint 28:13 | submit 124:14 |
| 96:19 107:10 | 82:8 86:10 | | 124:19 125:13 |

| | | t | |
|---|---|---|---|
| 126:16 | 111:11 | | 90:6 95:23 |
| submitted  11:19 | supportive  98:25 | t  3:2,2 4:2 143:2 | 108:19,22 |
| 36:15,20,21 | sure  18:8 20:9 | 144:2 146:2,2 | 116:10 |
| 76:16 90:9,15 | 34:3 42:14 | take  5:3 6:13 | telling  127:8 |
| 109:3 134:5,11 | 62:15 69:23 | 26:6 69:4 83:3 | ten  34:20 42:15 |
| 134:13 | 107:11 119:13 | 119:21 129:13 | 125:3 |
| submitter  90:14 | 124:22 131:12 | 135:12,18 | tens  22:11 |
| subscribed | 135:25 136:10 | 138:21 140:18 | tenure  23:11 |
| 143:18 147:22 | 136:18 138:7,10 | 140:23 | 120:19 121:19 |
| subsequent | survey  29:17,19 | taken  1:16 83:6 | 121:20 127:6 |
| 117:19 | 30:6,11 31:6,21 | 102:18 130:20 | terminate  19:16 |
| subsequently | 32:24 33:16 | takes  141:24 | 19:20 |
| 25:5 | 34:16,25 35:7,11 | talk  6:17 | test  49:14 51:5 |
| subset  28:24,24 | 35:15 38:2,5,10 | talked  41:10 | 52:3 102:22 |
| successful  78:2 | 38:13 39:2,11 | talking  15:19 | testified  4:5 |
| suggested | 40:11 78:3 | 42:18 121:22 | 49:23 55:4 |
| 135:17,20 | surveyed  34:11 | 128:16 139:12 | 73:10 77:12 |
| suite  2:5 | surveying  31:12 | target  104:18,24 | 88:4,17 115:16 |
| summer  121:12 | surveyor  34:21 | 105:3,5,14,24 | 115:23 120:9,13 |
| supervise  10:24 | suspect  8:17 | task  51:20 | testify  7:10,13 |
| 11:2,4 | sworn  3:6 4:4 | 103:10 | 26:3 49:19 73:5 |
| supervisor  16:5 | 5:10 143:5,18 | tasks  62:25 | 143:5 |
| 16:6,7 68:21 | 146:11 147:22 | 101:5 103:11 | testifying  5:16 |
| 96:16 99:14,18 | system  10:12,22 | team  11:2 12:2 | testimony  143:6 |
| 100:6,11 116:16 | 15:25 27:14 | 13:17 24:25 | 143:10 146:13 |
| 124:20 125:18 | 28:5 36:3 48:2,4 | 30:12 35:9 36:3 | testing  23:8,10 |
| 125:20 | 48:18 104:25 | 39:16 40:25 | 28:9 43:22 |
| supervisors | 105:16,21 106:7 | 41:3,5,17 42:5 | 48:19 49:5,20,22 |
| 128:3 | 114:25 124:15 | 51:7,12 52:20,21 | 49:25 50:5,13,18 |
| supplies  123:23 | 124:16,18 | 52:22,24 56:9 | 50:24 51:2,3,8 |
| supply  123:15 | 125:15 126:14 | 57:24 59:5 68:7 | 51:13 52:9,11 |
| support  77:7 | 126:18 128:18 | 95:22 137:5 | 53:6,7,11,18 |
| 86:19,21,23 | 128:24 129:3 | teamops  101:8 | 56:6 59:2 73:25 |
| 88:24 89:2,4,8 | 130:19 | teams  33:18 | 74:7 |
| 89:10,13 103:22 | systems  43:22 | tell  5:14 29:11 | tests  51:23 52:14 |
| 136:7 138:3,8 | 56:7 92:23 | 29:21 40:15 | 53:2 106:4 |
| supported | 113:15 114:5,17 | 41:25 43:9 | text  129:25 |
| 103:23 111:10 | | 55:19 59:15 | |

**thank**  130:2
**thing**  22:9 105:6
  124:10
**things**  97:22
  98:11,15,20
**think**  27:9 40:5
  40:17 55:6 65:9
  86:25 92:17
  95:7 139:23,25
**third**  2:9 92:25
  93:23 104:4
  108:10
**thought**  40:9
  140:15 141:5
**thousand**  23:22
  34:20 125:3
**thousands**  22:11
  30:9 36:22
**three**  29:24
  66:13 92:11
  95:22 96:13,18
  96:24 104:10
  125:4
**time**  1:11 3:12
  8:21 12:16
  14:20 16:10
  20:17 26:17
  27:3 42:25 46:3
  48:23 49:16
  50:15 54:2
  56:22 57:7,9,12
  58:10 68:2,4,15
  69:4 70:11,13,18
  74:20,21 75:11
  85:22 91:22
  92:19,23 93:18
  94:6 98:8
  108:18 115:19

117:18 130:22
  141:13,16,18
  143:10
**timeframe**  50:22
**timely**  101:3
**times**  27:19
  36:12 87:24
  88:10 96:23
**timing**  118:24
**title**  9:19 12:11
  16:17 27:13,15
  45:18,20 46:23
  46:25 47:16
  90:25 91:5
  117:3,6,11
**titled**  117:2
**titles**  117:7
**tjc**  139:24
**today**  5:2,12
  7:10,14 8:8
  26:14 78:22
  130:2
**told**  43:14
  108:16,22 141:2
**tom**  12:6
**top**  74:19 90:13
  90:21 101:16
  105:2 107:5
  139:21
**track**  20:20
  21:20
**tracking**  21:15
**trades**  66:7,7,8
  66:11
**train**  18:4
**trained**  19:6,23
**training**  9:9 18:3
  18:19 20:19,20

**transcribing**  5:4
**transcript**
  142:11,14 143:9
  143:9
**transition**  14:19
  118:23
**transitioned**
  74:8 117:14
**transitioning**
  115:18 139:13
  140:13
**tri**  29:19,23
**trial**  1:14 3:12
**tried**  128:24
**true**  33:15 66:24
  67:9,24 68:6,25
  69:7,16 70:4
  72:24 77:24
  91:25 102:21
  103:4 109:14
  116:19,23
  117:19 118:18
  119:18 131:13
  132:16 133:11
  143:9 146:12
**truth**  5:14 143:5
**truthfully**  7:10
  7:13
**try**  6:10
**two**  9:23 14:25
  15:5 46:21 49:2
  49:8,18 50:7,16
  52:2,25 53:5
  69:17 70:5,11,13
  70:18 72:2
  73:13 74:24
  75:4,7,9 87:7,9
  96:7,8

**typically**  33:21
  **u**
**u**  3:2
**understand**  5:8
  5:13,18,23 6:23
  7:6 13:9,9 75:2
  84:11 105:8
  126:5 135:25
  137:23
**understanding**
  79:22 94:24
**understood**  5:22
**union**  14:5 19:2
  137:15
**united**  1:2
**unsigned**  3:8
**updated**  17:19
  18:3,10,18 20:4
  20:11,12
**updating**  17:25
  18:9,17
**uphold**  100:25
**upset**  43:3,10
**urgent**  80:5,5,10
**use**  15:22 17:7
  37:16 117:7
  127:9 139:11
**usually**  29:25
  30:2 106:6
**utilities**  35:13
  **v**
**v**  147:2
**vaguely**  41:23,24
**valentine**  67:7
  67:10
**validating**  30:24

**validity** 64:8,22
64:24
**varies** 14:18
**various** 28:12
125:24
**vendor** 49:11,15
52:17 101:5
123:10
**verbal** 5:5
111:16,24 112:2
**verbally** 111:20
**verified** 63:6
**verify** 26:7
**veritext** 147:1
**versus** 73:21
123:23
**vice** 9:20 10:6,21
**videoconference**
1:18
**visit** 17:3
**visited** 25:9
**vp** 63:7

**w**

**waived** 3:5
**walked** 38:17
**want** 8:19 71:6
79:17 125:21
**wanted** 17:13
55:13,20 70:22
71:3 107:9
**wanting** 127:4
**warranted** 87:2
**way** 6:4 20:20
80:2,11 92:25
93:23 98:7
125:10 146:17

**ways** 28:6
**we've** 136:12,14
**website** 33:14
**weekly** 57:16
58:17,19,22
59:12
**went** 97:16
129:3
**west** 14:3
**whereof** 146:19
**white** 84:21
**winter** 16:15
55:14 56:15,16
59:13,18 60:5
**witness** 1:16 3:6
3:9,10 4:3
118:11 142:16
146:10,13,19
**witnesses'** 147:3
**word** 29:16
65:10 69:4
**words** 42:4
93:17 127:13,14
**work** 15:11
16:13 17:18
21:23 22:5,11,17
23:2 33:17,25
34:9,12 47:12
56:13 65:23
73:16 81:7
91:14,20 92:7,9
92:12 98:17
101:10,17,20
102:2 103:15,20
103:25 104:9,19
105:13 106:6
139:24 141:22
141:23,24

**worked** 15:13
16:5,20 68:19
98:13 116:3
**working** 9:16
17:25 18:16
117:10
**workload** 34:13
70:17
**works** 45:14
**write** 12:17,20
55:13,20 56:24
77:7,10 99:19
**writing** 111:20
111:23
**written** 93:2
134:7
**wrote** 86:2

**x**

**x** 1:3,9 144:2
145:2

**y**

**year** 44:10 63:17
96:10 103:14
130:3
**years** 4:21 9:15
9:23 27:16
29:24 47:11,18
49:3,8,19 50:8
50:16 52:2,25
53:5 91:2,2
97:12 98:14
116:5
**yellow** 139:10
**york** 1:2,19 2:5,5
2:10,10 4:5,13
4:14 10:12 13:2
14:4 113:13

114:3 146:4,8
147:1

**z**

**zack** 2:11
**zero** 125:3

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.