# EXHIBIT C

Page 1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No.:  1:21-cv-08732-JMF

5     - - - - - - - - - - - - - - - - - - -x

6    JOSEPH PASQUARELLO,

7                        Plaintiff,

8          v.

9    CROTHALL HEALTHCARE, INC. and MICHAEL

     ROCHE,

10

                        Defendants.

11

     - - - - - - - - - - - - - - - - - - -x

12

          Zoom Videoconference Deposition

13

14                      August 5, 2022

                        10:16 a.m.

15

16     VIRTUAL DEPOSITION of MICHAEL ROCHE,

17   the Defendant and 30(b)(6) Witness, in the

18   above-entitled action, held at the above

19   time and place via Zoom Videoconference,

20   taken before Melissa Coreas, a Shorthand

21   Reporter and Notary Public of the State of

22   New York, pursuant to the Federal Rules of

23   Civil Procedure, Notice, and stipulations

24   between Counsel.

25              *     *     *

Page 2

1
2  APPEARANCES VIA ZOOM VIDEOCONFERENCE:
3
   JOSEPH & KIRSCHENBAUM, LLP
4    Attorneys for Plaintiff
     32 Broadway
5    Suite 601
     New York, New York  10004
6
   BY:  LEAH SELIGER, ESQ.
7
8
9
   LITTLER MENDELSON, P.C.
10   Attorneys for Defendants
     900 Third Avenue
11   New York, New York  10022
12 BY:  SHAWN MATTHEW CLARK, ESQ. & ZACK
     SHARPE, ESQ.
13 File #:  024778.1655
14
15
16
17
        *   *   *
18
19
20
21
22
23
24
25

Page 3

1
2          STIPULATIONS
3    IT IS HEREBY STIPULATED AND AGREED, by
4  and among counsel for the respective
5  parties hereto, that the filing, sealing
6  and certification of the within deposition
7  shall be and the same are hereby waived;
8    IT IS FURTHER STIPULATED AND AGREED
9  that all objections, except as to form of
10 the question, shall be reserved to the
11 time of the trial;
12   IT IS FURTHER STIPULATED AND AGREED
13 that the within deposition may be signed
14 before any Notary Public with the same
15 force and effect as if signed and sworn to
16 before the Court.
17        *   *   *
18
19
20
21
22
23
24
25

Page 4

1
2       THE COURT REPORTER:  Due to the
3  need for this deposition to take place
4  remotely, the parties will stipulate
5  that the court reporter may swear in
6  the witness over Zoom Videoconference
7  and that the witness has verified that
8  he is, in fact, Michael Roche.
9       MR. CLARK:  Yep.  Defendants so
10 stipulate.
11      MR. SHARPE:  Defendants so
12 stipulate.
13      MS. SELIGER:  Plaintiff so
14 stipulates.
15 M I C H A E L   R O C H E, the Witness
16 herein, having first been duly sworn by
17 the Notary Public, was examined and
18 testified as follows:
19 BY THE
20 COURT REPORTER:
21   Q.   Please state your full name for
22 the record.
23   A.   Michael Roche.
24   Q.   Please state your address for
25 the record.

Page 5

1
2   A.   468 Belden Hill Road, Wilton,
3  Connecticut 06897.
4  EXAMINATION BY
5  MS. SELIGER:
6    Q.   So Mr. Roche, is it Roesh
7  (phonetic) or Roach (phonetic)?
8    A.   Roach (phonetic).
9    Q.   Okay.  Have you ever been
10 deposed before?
11   A.   No.
12   Q.   So Melissa took some of my work
13 away.  She already gave you some of the
14 instructions I intended to give you, but
15 I'm going to go through my usual
16 instructions just to make sure we're all
17 on the same page.
18      I'm going to be asking you a
19 number of questions today, and the court
20 reporter is going to be taking down
21 everything we say.  So because she's
22 transcribing this, it's important that all
23 of your responses be oral, verbal
24 responses.  She cannot record any nods or
25 gestures.  Do you understand this?

2 (Pages 2 - 5)

Page 6

M. ROCHE

1
2    A.   (No verbal response given.)
3    Q.   Are you nodding yes to that?
4    A.   I said yes.
5    Q.   Oh, okay.  Sorry.  I didn't hear
6  the sound.  The court reporter has sworn
7  you in and you're answering all questions
8  under oath today.  Do you understand that
9  you have the same obligation to tell the
10  truth and are subject to the same
11  penalties for perjury as if you were
12  testifying in court?
13    A.   Yes, I do.
14    Q.   If you don't understand a
15  question that I ask, please let me know,
16  and I'll rephrase it.  If you answer the
17  question, I will assume that you
18  understood it.  Does that make sense?
19    A.   Yes.
20    Q.   As Melissa said, let me finish
21  asking the question before you answer it,
22  and I will also make sure to let you
23  finish your answers before I start.
24        If you need a break at any time
25  today, please let us know.  I'm sure we

Page 7

M. ROCHE

1
2  can accommodate breaks, and we'll
3  certainly need them.  I just ask that if a
4  question is pending, if I've already asked
5  a question, please answer the question
6  first and then we can go on the break.
7  Does that make sense?
8    A.   Yes.
9    Q.   Also, you may talk to your
10  lawyer before a question is asked or after
11  you've answered a question, but not while
12  a question is pending; is that clear?
13    A.   Yes.
14        THE COURT REPORTER:  Mr. Roche,
15    you got a little low there.  I don't
16    know if it was, you know, the audio or
17    anything like that, but just try and
18    keep your voice nice and loud.  But I
19    did hear the "yes."
20        THE WITNESS:  Sure.  Yes.
21    Q.   During this deposition, your
22  attorney may object to my questions;
23  however, unless he specifically instructs
24  you not to answer a question, you must
25  answer even if your attorney objects.  Do

Page 8

M. ROCHE

1
2  you understand this instruction?
3    A.   Yes.
4    Q.   Are you currently taking any
5  medications that may impair your ability
6  to testify truthfully today?
7    A.   No.
8    Q.   Is there any other reason why
9  you may not be able to testify truthfully
10  today?
11    A.   No.
12    Q.   Are you currently taking any
13  medications that may impair your memory?
14    A.   No.
15    Q.   Is there any other reason that
16  your memory may be impaired today?
17    A.   No.
18    Q.   Have you ever been a party to a
19  lawsuit?
20    A.   No.
21    Q.   Without revealing any
22  attorney-client communications, what, if
23  anything, did you do to prepare for this
24  deposition?
25    A.   I had a prep call yesterday.

Page 9

M. ROCHE

1
2    Q.   And did you review any documents
3  in preparation for the deposition?
4    A.   Briefly, yes.
5    Q.   Did you bring any documents with
6  you to this deposition?
7    A.   No.
8    Q.   Did you talk to anyone other
9  than your attorneys about the deposition?
10    A.   Yes.
11    Q.   Who was that?
12    A.   My wife.
13    Q.   Today, you are here testifying
14  in both your personal capacity and as
15  Crothall's -- Crothall Healthcare's
16  30(b)(6) witness; is that correct?
17    A.   Yes.
18    Q.   One last thing for my
19  preliminary questions.  I'm going to be
20  referring to the plaintiff in this case as
21  Plaintiff or Joe Pasquarello or Joe.  If
22  at any time I ask a question and you're
23  not sure who I'm referring to, please tell
24  me that you need clarification before you
25  answer.  Is that -- is that clear?

3 (Pages 6 - 9)

M. ROCHE

1
2  A.  Yes.
3  Q.  Okay.  Great.  Let's start at
4  the very beginning.  Do you have a college
5  degree?
6  A.  Yes.
7  Q.  What did you study in college?
8  A.  Mechanical engineering.
9  Q.  Do you have any advanced
10  degrees?
11  A.  No.
12  Q.  Do you have any fire safety
13  training?
14  A.  Yes.
15  Q.  What is that training?
16  A.  I've received certificates of
17  fitness, as well as training through
18  Crothall when I started with the company.
19  Q.  What was that training with the
20  company?
21  A.  It's called Foundations.
22  Q.  And what do they teach or train
23  you on in Foundations?
24  A.  They train us on the Fire Safety
25  program, how it's supposed to be run, and

M. ROCHE

1
2  what code requirements to follow.
3  Q.  And who participates in that
4  program, in that training program?
5  A.  The managers that start with
6  Crothall, as well as senior leadership and
7  subject matter experts.
8  Q.  Those different people you just
9  described, are you referring to those
10  people within the Facilities Management
11  division?
12  A.  Yes.
13  Q.  Is it anyone beyond Facilities
14  Management?
15  A.  No.
16  Q.  Can you remind me what the name
17  of that training is?  I'm sorry.  I
18  forgot.
19  A.  Foundations.
20  Q.  Foundations.  And is there
21  anything else that's taught in that course
22  or -- or training program?
23  A.  Yes.
24  Q.  What else?
25  A.  Teaches how our program is run

M. ROCHE

1
2  from an engineering standpoint, what the
3  requirements are, and it teaches the --
4  our training systems, such as TeamOps.
5  Q.  Okay.  And what is TeamOps?
6  A.  TeamOps is a program that we use
7  to track all of our work orders.
8  Q.  And I'm sure we'll talk about
9  this later, but what is TeamDocs [sic]?
10  A.  TeamDocs is a newer program that
11  is used to house all of our documents and
12  our records.
13  Q.  And do you receive training on
14  TeamDocs as well at -- at this program
15  you've been describing?
16  A.  I did not because TeamDocs did
17  not exist at the time that I went through
18  the program.
19  Q.  And now, would that program
20  include training on TeamDocs?
21  A.  It would likely include that,
22  although that program is -- has not
23  restarted since COVID because we're still
24  not able to gather together in a
25  conference room setting.

M. ROCHE

1
2  Q.  Got it.  What is your current
3  job title?
4  A.  I have two current job titles.
5  I have a title from Mount Sinai Hospital,
6  and I have a title from Crothall
7  Healthcare.
8  Q.  Can you tell me what your title
9  is under each organization?
10  A.  Yes.  For Mount Sinai, I'm a
11  senior director of engineering.  For
12  Crothall, I'm a regional director of
13  operations.
14  Q.  Okay.  And how long have you
15  held these positions?  Or -- or those
16  current titles, I should say?
17  A.  Those are current.
18  Q.  Since when?
19  A.  I've been a senior director for
20  approximately four years, and I've been a
21  regional director of operations for
22  approximately three months.
23  Q.  And prior to being a regional
24  director of operations, what was your
25  title?

M. ROCHE

2  A.  My title was resident regional
3  manager.
4  Q.  Okay.  And do you have separate
5  job responsibilities under each title?
6  A.  There's separate requirements on
7  the Crothall side in terms of finance, but
8  beyond that, they are -- they're mirrored;
9  same oversight responsibilities.
10  Q.  And what were the titles you had
11  from both organizations when Plaintiff was
12  employed at Crothall?
13  A.  Mount Sinai, I was still the
14  senior director of engineering, and from
15  Crothall, I was the two titles already
16  mentioned.
17  Q.  You had two titles from Crothall
18  during Mr. Pasquarello's tenure?
19  A.  Excuse me.  No.  Let me retract
20  that.  My recent title change was -- was
21  very recent.  I was the resident regional
22  manager during Pasquarello's tenure.
23  Q.  Okay.  And have -- have your
24  actual responsibilities changed since you
25  got that new title you -- I think you said

M. ROCHE

2  three months ago?
3  A.  Yes, they have.
4  Q.  Okay.  So can you describe to me
5  what your responsibilities were, but
6  during the time that Mr. Pasquarello was
7  employed?
8  A.  I'm responsible for or I was
9  responsible for all aspects of Engineering
10  and Fire Safety, oversight of
11  approximately five million square feet and
12  approximately a hundred million dollar a
13  year operational budget with a $40 million
14  capital budget all rolling up in the two
15  hospitals; Mount Sinai Hospital and Mount
16  Sinai Queens, approximately 160 union
17  employees, and approximately 34 Crothall
18  employees reporting up through me.
19  Q.  Got it.  And how many employees
20  were you directly supervising at that
21  time?
22  A.  Around six.
23  Q.  Do you recall who they were?
24  A.  At that time, Joe Pasquarello,
25  Ryan Nowicki, Robert Denver, Omelfi Garcia

M. ROCHE

2  for a period of time, Doug Rome, Richard
3  Cannata.  I believe that's it.
4  Q.  Okay.  And are you responsible
5  for writing performance evaluations for
6  your direct reports?
7  A.  I am, yes.
8  Q.  And do you write them for anyone
9  other than your -- do you write
10  performance evaluations for anyone other
11  than your direct reports?
12  A.  I do not.  There may be a time
13  where I would provide guidance or feedback
14  on a lower level manager, but I would not
15  be -- that would not be required.  Only as
16  needed.
17  Q.  Okay.  And do you make decisions
18  with respect to compensation amounts for
19  your direct reports?
20  A.  Decisions when staffing -- when
21  there is a new hire?  Yes.
22  Q.  Do you make decisions with
23  respect to compensation for employees who
24  are not directly reporting to you, but may
25  be a level down or -- or even further down

M. ROCHE

2  the chain?
3  A.  Not regularly, but it would not
4  be uncommon for a manager to ask my
5  opinion.
6  Q.  Okay.  Were you involved in the
7  decision regarding compensation for Joe
8  Pasquarello when he was hired?
9  MR. CLARK:  Objection to form.
10  You can answer.
11  A.  Yes.
12  Q.  Were you -- were you involved in
13  the decision regarding the compensation
14  offered to Matt Bond when he reported to
15  you?
16  A.  Yes.
17  Q.  Were you involved in the
18  decisions regarding compensation for Ryan
19  Nowicki?
20  A.  No.
21  THE COURT REPORTER:  I'm sorry,
22  sir.  Your answer was "no"?
23  THE WITNESS:  That's correct.
24  My answer was "no."
25  THE COURT REPORTER:  Thank you.

5 (Pages 14 - 17)

Page 18

M. ROCHE

1
2  Q.  Were you involved in
3  compensation decisions regarding
4  compensation for Doug Rome?
5  A.  Yes.
6  Q.  Sorry.  I'm trying to remember
7  the names you said.  Were you involved in
8  decisions regarding a compensation amount
9  for Bobby Denver?
10  A.  Yes.
11  Q.  Okay.  And you mentioned that
12  you oversee two hospitals.  What -- what
13  were the two hospitals that you mentioned?
14  A.  Mount Sinai Hospital and Mount
15  Sinai Queens.
16  Q.  Okay.  And how many actual
17  buildings comprise the Mount Sinai
18  Hospital system?
19  MR. CLARK:  Objection to form.
20  A.  There are -- there are 6
21  healthcare buildings, and in total,
22  including real estate, there are
23  approximately 14 buildings.
24  Q.  Okay.  And with respect to Mount
25  Sinai Queens, how many buildings are part

Page 19

M. ROCHE

1
2  of that system?
3  MR. CLARK:  Objection to form.
4  A.  Mount Sinai Queens has two
5  hospital buildings and approximately four
6  off-site clinics.
7  Q.  So is the -- the facilities
8  management services that you oversee, do
9  you over -- sorry.  Do those facilities
10  management services address all of the
11  buildings that you just described in Mount
12  Sinai Hospital?
13  A.  Yes.
14  Q.  And the same for Mount Sinai
15  Queens?
16  MR. CLARK:  Objection to form.
17  A.  Yes.
18  Q.  And do you know how many
19  buildings -- I know you don't oversee
20  Mount Sinai Beth Israel, but do you know
21  how many buildings are part of that
22  hospital?
23  A.  No.
24  Q.  How many fire marshals are
25  employed at Mount Sinai Hospital?

Page 20

M. ROCHE

1
2  A.  Currently, there are 18
3  positions.  When Joe started, there were I
4  believe 12.
5  Q.  And when he left, how many were
6  there?
7  A.  I believe we were budgeted for
8  18.  I don't think they were all filled at
9  the time, but we were recruiting for 18.
10  Q.  And in Mount Sinai Queens, do
11  you know how many fire marshals are
12  employed there?
13  A.  Yes.
14  Q.  How many are there?
15  A.  There are six.
16  Q.  Okay.  Is that because it's a
17  fewer number of buildings?
18  A.  Yes.
19  Q.  When did you start working at
20  Crothall?
21  A.  Two thousand thirteen.
22  Q.  And what other titles have you
23  had since -- since you've started at the
24  company?
25  A.  I started as an operations

Page 21

M. ROCHE

1
2  manager.  I was promoted to the director
3  of engineering for the School of Medicine.
4  I was then promoted to the director of
5  engineering for the hospital, and I was
6  then promoted to senior director of
7  engineering for the campus.  And then I
8  was promoted to that same role, senior
9  director of engineering for the campus,
10  with additional oversight of Mount Sinai
11  Queens.
12  Q.  So when you say "the campus," is
13  that referring to Mount Sinai Hospital?
14  A.  Yes.
15  Q.  Okay.  And how old are you?
16  A.  Thirty-four.
17  Q.  And when Joe Pasquarello worked
18  at Crothall, I think you may have said
19  this already, but were you his direct
20  supervisor?
21  A.  Yes, I was.
22  Q.  And what was Joe Pasquarello's
23  title when he was working at Crothall?
24  A.  Joe was the assistant director
25  of fire safety.

6 (Pages 18 - 21)

Page 22

M. ROCHE

1  
2    Q.   Are you aware of any employees
3  at Crothall other than Joe Pasquarello
4  that have filed internal complaints
5  against you?
6    A.   Are you asking for the whole --
7  my -- throughout my duration within --
8  with the company?
9    Q.   Yes.
10   A.   Then, yes, I am.
11   Q.   Who were those employees?
12   A.   Celeste Valentine.
13   Q.   Sorry.  I didn't hear.
14   A.   Her name was Celeste Valentine.
15   Q.   And do you remember
16 approximately when that was?
17   A.   I believe it was around 2015,
18 but I do not remember the specifics of it.
19   Q.   Do you remember what her
20 complaint was?
21   A.   I know she has a long history of
22 progressive counselings.  I believe she
23 put a complaint -- filed a complaint
24 against me.  The only thing that I
25 remember related to it was that it was

Page 23

M. ROCHE

1  
2  investigated, and it was determined to be
3  unfounded.
4    Q.   And do you know if her history
5  of progressive counselings are performance
6  related?
7    A.   They're both performance and
8  attendance.
9    Q.   Okay.  And was there any other
10 employee who filed an internal complaint
11 against you?
12   A.   Not that I'm aware of, no.
13   Q.   Do you recall an employee named
14 Cortland Stat (phonetic)?
15   A.   Yes.
16   Q.   Do you recall whether he filed a
17 complaint against you?
18   A.   Yes.  I do believe he did.  He's
19 another person who had a long history of
20 counseling.  I was not his direct manager,
21 and I believe that it was also related to
22 a counseling.
23   Q.   Have you ever been issued a
24 progressive counseling while at Crothall?
25   A.   No, I have not.

Page 24

M. ROCHE

1  
2    Q.   When Joe Pasquarello was at
3  Crothall, how often did the two of you
4  interact in person per week?
5    A.   Daily.
6    Q.   Did you also speak on the phone?
7    A.   As needed.
8    Q.   And did you also e-mail each
9  other?
10   A.   Yes, as needed.
11   Q.   So most frequently, your
12 interaction was in person; is that
13 correct?
14   A.   I don't know that that was any
15 more frequent than e-mail, but it was not
16 uncommon to interact in any of those
17 forms.
18   Q.   Okay.  And did you write Joe
19 Pasquarello's performance reviews?
20   A.   Joe Pasquarello only had one
21 performance review due to the length of
22 time he was with the company, but yes, I
23 wrote that one review.
24   Q.   Okay.  And were there any other
25 places where you documented your

Page 25

M. ROCHE

1  
2  assessments of his performance?
3       MR. CLARK:  Objection to form.
4  You can answer.
5    A.   Multiple e-mails that made it
6  clear that he was not meeting
7  expectations.
8    Q.   I missed the first part of that.
9  Did you say "in multiple e-mails"?
10   A.   Yes.  In multiple e-mails, I
11 made clear to him that he was not meeting
12 expectations.
13   Q.   And were all of the e-mails that
14 you're referring to produced to us during
15 the discovery period?
16   A.   Yes.
17   Q.   Are there any other places where
18 you documented your assessment of his
19 performance?
20       MR. CLARK:  Objection to form.
21 You can answer.
22   A.   Documented?  Maybe not.  We used
23 to have weekly one-on-one meetings where
24 we reviewed his performance, we reviewed
25 the expectations, and we reviewed what

7 (Pages 22 - 25)

M. ROCHE

1          M. ROCHE
2   needed to be completed.
3          There were times where I took
4   notes on those documents, but they were
5   certainly not all inclusive of everything
6   we discussed and probably did not document
7   the fact that he was not meeting -- it was
8   mostly a verbal communication at that
9   point.
10  Q.   When you say "verbal," you mean
11  oral?
12  A.   Correct.
13  Q.   Do you recall if you ever wrote
14  notes on -- on your -- or wrote notes
15  during those weekly one-on-ones that did
16  refer to Joe's failure to perform?
17  A.   I don't recall.  I do recall
18  writing notes about having to extend
19  deadlines.  I don't recall about if it was
20  specifically related to his performance.
21  Q.   And were those notes about
22  having to extend deadlines produced to us?
23  A.   (Inaudible.)
24       THE COURT REPORTER:  Can you
25  repeat your answer, sir?  It kind of

1          M. ROCHE
2   cut out.
3   A.   Yes.
4   Q.   And you said the notes weren't
5   specifically related to Joe's performance;
6   is that correct?
7   A.   Yes.  The notes were not full
8   sentences.  They were not meant to be
9   turned over to anybody.  They were for me
10  to notate what was going on at that time.
11  Q.   And the need to extend
12  deadlines, were those related to Joe's
13  performance or someone else's performance?
14       MR. CLARK:  Objection to form.
15  You can answer.
16  A.   Everything we discussed in that
17  meeting was related to Joe's performance.
18  Q.   So you did not discuss the
19  performance of any other individuals
20  during your weekly one-on-one meetings?
21  A.   If they were within Fire Safety,
22  yes.  We discussed the entire department,
23  so there were times where other people may
24  have been discussed.
25  Q.   Were deadlines extended because

1          M. ROCHE
2   of Joe and his failure to do things or
3   were they extended because of failures of
4   other people within Fire Safety or
5   elsewhere?
6       MR. CLARK:  Objection to form.
7   You can answer.
8   A.   I think there's cases of both.
9   Q.   And I know we'll get to this
10  later, but I believe Joe was counseled
11  regarding your belief that he wasn't
12  meeting deadlines; is that correct?
13  A.   That was one of a number of
14  things that he was counseled on.
15  Q.   Were the other people who were
16  not meeting deadlines also counseled about
17  that?
18  A.   That would have been Joe's
19  responsibility, assuming they were
20  within -- with -- assuming they were his
21  direct reports.
22  Q.   And would you want him to
23  counsel them if they were not meeting
24  deadlines?
25  A.   If their performance deemed a

1          M. ROCHE
2   counseling, then as a manager, he should
3   have counseled them.
4   Q.   And if Joe wanted to do that,
5   would you support that and stand by it?
6       MR. CLARK:  Objection to form.
7   You can answer.
8   A.   Yes.
9   Q.   Did you document your perception
10  of Joe's performance in progressive
11  counselings?
12  A.   The progressive counselings were
13  related to specific events and the failure
14  to complete them.
15  Q.   And whose failure to complete
16  them?
17  A.   In this case, Joe's failure to
18  complete them.
19  Q.   And we will also talk about this
20  later, but I believe you issued Joe a
21  performance improvement plan; is that
22  correct?
23  A.   Yes.
24  Q.   And was the performance
25  improvement plan based on your assessment

8 (Pages 26 - 29)

Page 30

M. ROCHE

1  M. ROCHE
2 of Joe's performance?
3    A.   The performance improvement plan
4 was based on my assessment of Joe's
5 individual performance, as well as the
6 Fire Safety performance and just overall
7 managerial skills.
8    Q.   So you issued Joe Pasquarello a
9 PIP for both his performance and the
10 performance of the overall Fire Safety
11 Department; is that what you are saying?
12    A.   I'm saying that Joe was in
13 charge of the Fire Safety Department and
14 is responsible to a degree of the actions
15 of his direct reports.
16    Q.   So was any part of that
17 performance improvement plan connected
18 with the actions of his direct reports?
19       MR. CLARK:  Objection to form.
20    You can answer.
21    A.   Joe's performance improvement
22 plan was given to him and it was intended
23 for him to respond and be responsible for
24 the items on that list.  If he deemed it
25 appropriate to have his direct reports

Page 31

M. ROCHE

1  M. ROCHE
2 complete those tasks, then I -- I think
3 he's putting -- that was his decision, but
4 he was also responsible for ensuring that
5 they did get completed as required by the
6 improvement plan.
7    Q.   I'm not sure I understand what
8 you're saying.  Just -- I'll tell you what
9 I've understood; that he was issued a
10 performance improvement plan and it was
11 based on your assessment of his individual
12 performance and the overall performance of
13 the Fire Safety Department; is that
14 correct?
15    A.   What I'm saying is that the
16 improvement plan was given to him with
17 actions that I expected him to complete.
18 If he took the -- if he made a decision to
19 have direct reports complete them and,
20 therefore, they did not get complete,
21 that's still a failure of him to complete
22 those actions.
23    Q.   At the time you issued him the
24 performance improvement plan, did he have
25 any direct reports?

Page 32

M. ROCHE

1  M. ROCHE
2    A.   There was a lot of transition
3 during that period.  I'm not sure if I
4 can -- I don't know if he did or did not.
5 He had -- prior to that, he did, and some
6 of the people were transferred out.
7    Q.   Okay.  So would you say that
8 between the progressive counselings that
9 were issued to him by you, the performance
10 improvement plan, your annual review of
11 his performance, and your conversations
12 with him in your weekly one-on-one
13 meetings, that that is the body of
14 documentation for your assessment of his
15 performance?
16       MR. CLARK:  Objection to form.
17    A.   I think it excludes a lot of
18 verbal communication that occurred in that
19 time frame.  But in terms of
20 documentation, that, as well as e-mails
21 and everything that we provided, would
22 provide a -- a good overview of his
23 performance.
24    Q.   Okay.  So in terms of written
25 documentation, you have provided all of

Page 33

M. ROCHE

1  M. ROCHE
2 that that reflects Joe's performance while
3 at Crothall?
4    A.   We have provided everything that
5 has been requested.
6    Q.   Is there anything we -- well, we
7 requested everything related to his
8 performance, so is there anything --
9 strike that.
10    Is there anything related to his
11 performance that has not been produced?
12    A.   Not that I'm aware of.
13       MS. SELIGER:  I'd like to --
14    Shawn, did you receive the exhibits
15    from me in multiple e-mails?
16       MR. CLARK:  I did.
17       MS. SELIGER:  Okay.  Is it
18    possible to e-mail them to Mr. Roche?
19    So I'm going to share them on my
20    screen, but like -- like we did in
21    previous depositions, I think it's
22    helpful when the deponent has them in
23    front of him.  If not, it's okay.
24       MR. CLARK:  I think it's
25    possible we may have done it.  Zack,

Page 34

M. ROCHE

1
2 were you able to forward all those
3 e-mails we got this morning?
4       MR. SHARPE:  Yeah.  I e-mailed
5 them to you, Mike.
6       MR. CLARK:  Okay.
7    Q.   So Mr. Roche, I'm going to ask
8 you.  I know you probably received a
9 barrage of e-mails with these exhibits,
10 but each -- each file should be labeled
11 saying "Exhibit" and then a number.
12       The -- first one I'd like
13 you to look at is called Exhibit 1, and it
14 is the complaint filed in this case, and I
15 am going to attempt to share it on my
16 screen as well.
17       [The document was hereby marked
18 as Plaintiff's Exhibit 1 for
19 identification, as of this date.]
20       (Ms. Seliger starts Screen Share
21 function.)
22    Q.   Are you able to see my screen?
23    A.   Yes.
24    Q.   For some reason, I cannot see my
25 screen.  Are you able to see the -- the

Page 35

M. ROCHE

1
2 Exhibit 1 on your own screen, the one that
3 was e-mailed to you?
4    A.   Yes.
5       (Ms. Seliger stops Screen Share
6 function.)
7    Q.   Okay.  So I am going to stop
8 share because my screen turns blank when I
9 share the screen.  Have you seen this
10 document before, the -- Exhibit 1?
11    A.   Yes.
12    Q.   Have you read it?
13    A.   It's been quite some time, but I
14 have read it at one point.
15    Q.   When was the first time you read
16 the complaint?
17    A.   Shortly after it was issued.  I
18 don't know exactly.
19    Q.   Do you remember if it was --
20 when you say "issued," do you mean sent to
21 you or provided to you?
22    A.   It was provided to my company
23 and then provided to me.
24    Q.   Do you remember if that was
25 while Joe Pasquarello was still employed

Page 36

M. ROCHE

1
2 or -- or after he left?
3    A.   I don't remember.  I don't think
4 it was while he was employed.
5    Q.   Did you discuss it with anyone
6 other than your attorney and potentially
7 your spouse?
8    A.   (No verbal response given.)
9    Q.   Was that -- I didn't hear you.
10    A.   Sorry.  No.
11    Q.   Were you involved in gathering
12 documents and other information as part of
13 the discovery process in this lawsuit?
14    A.   Yes.
15    Q.   What did you do to search for
16 documents and information responsive to
17 Plaintiff's discovery requests?
18    A.   I looked through e-mail on my
19 computer and through my files.  Also ran
20 reports related to salaries.  Some of the
21 data was provided by others.
22    Q.   Did you work with anyone to
23 conduct searches for documents and
24 e-mails?
25    A.   Yes.

Page 37

M. ROCHE

1
2    Q.   Who did you work with?
3    A.   To put together the information,
4 I didn't have access to all of it.  Some
5 of it came from Chris Hariegel.  Some of
6 it came from Mount Sinai Legal.
7    Q.   Did you request that anyone else
8 search for documents and information
9 responsive to Plaintiff's discovery
10 requests?
11    A.   I requested Chris Hariegel.  He
12 was mentioned and he was on many of the
13 e-mails.
14    Q.   Did you have any documents
15 created in response to the discovery
16 requests?
17       MR. CLARK:  Objection to form.
18 Hang on a second, Mike, on that.  Are
19 you asking if he's created work
20 product in this litigation?
21       MS. SELIGER:  No.  I'm asking if
22 he created any new documents and then
23 submitted them to us as part of
24 discovery.
25       MR. CLARK:  All right.  So let

10 (Pages 34 - 37)

Page 38

M. ROCHE

1
2  me give my witness an instruction.
3  You can answer as to any documents
4  that you may have created and turned
5  over in discovery.  You should not
6  answer as to any documents you created
7  for your lawyers in this case.
8      A.   Could you repeat the question,
9  please?
10     Q.   Sure.
11         MS. SELIGER:  Melissa, do you
12  mind reading back my question?
13         (Requested testimony was read.)
14     Q.   And I just want to add, as your
15  lawyer instructed, I'm not asking about
16  anything you created or used to
17  communicate with your attorneys.
18     A.   Well, everything that we created
19  was sent through our attorneys, so I'm not
20  quite sure how to answer this question.
21     Q.   Sure.  Maybe an example will
22  help.  Can you look at your e-mails and
23  open Exhibit 3?
24         [The document was hereby marked
25  as Plaintiff's Exhibit 3 for

Page 39

M. ROCHE

1
2  identification, as of this date.]
3      A.   Yes.
4      Q.   Have you seen this document
5  before?
6      A.   Yes.
7      Q.   This document was turned over to
8  us by Defendants.  Can you tell me what
9  this is?
10     A.   Yes.  This is an ongoing
11  document as provided to management every
12  week to review open positions and
13  recruiting.
14     Q.   Okay.  And on the second page, I
15  know it's very small.  Are you able to see
16  what's on the second page?
17     A.   (No verbal response given.)
18     Q.   Are you able to see the
19  information on the second page?
20     A.   Yes.
21     Q.   And what -- what is that data
22  describing?
23         MR. CLARK:  Objection to form.
24  You can answer.
25     A.   It's describing details related

Page 40

M. ROCHE

1
2  to job titles and dates.
3      Q.   Is it showing when jobs were --
4  when job openings were posted and -- and
5  filled and the names of the people who
6  left or filled those positions?
7      A.   Yes.
8         THE COURT REPORTER:  I'm sorry,
9  sir.  Was that -- can you repeat that?
10     A.   Yes.
11         THE COURT REPORTER:  Thank you.
12     Q.   And on the first page, it looks
13  like those are positions that, I guess at
14  the time this was created, those were
15  positions that were posted but still open?
16     A.   Sorry.  One second.  Let me just
17  get back there.  Yes.  The first page is
18  showing open positions, as well as
19  potential candidates and dates.
20     Q.   And on -- sorry to do this to
21  you, but on the second page, are you able
22  to tell what time period is covered by
23  this document?
24     A.   No.  I'm able to tell what's on
25  this list.  I see that it starts in

Page 41

M. ROCHE

1
2  2016 -- I lost it again.  Hold on.  And it
3  looks like it goes through 2022.  I can't
4  verify that it's inclusive of all
5  positions that were posted, though.  I
6  don't create this document.
7      Q.   Who creates this document?
8      A.   This document is created by
9  Dorothy Perez.
10     Q.   And do you know what -- where
11  she pulls the information to create this
12  document?
13     A.   I know that it's various
14  sources, but I do not know specifically.
15     Q.   And why does she create this
16  document?  Is this -- you said it's an
17  ongoing document.  Does she continuously
18  update it?
19         MR. CLARK:  Objection to form.
20     A.   Yes.
21     Q.   Yes, she updates it
22  continuously?
23     A.   Yes.
24     Q.   And if a job is listed and
25  filled, would it generally be a part of

11 (Pages 38 - 41)

M. ROCHE

1        M. ROCHE
2 this document?
3    A.   Generally, yes.
4    Q.   And is there any reason why a
5 job would -- that was posted and filled,
6 is there any reason why a job that was
7 posted and filled would not appear on this
8 document?
9    A.   I'm not sure.  I would have to
10 speak with her, but I don't think the
11 intention would be to leave anything out.
12    Q.   Do you know who she provides
13 this document to?
14       MR. CLARK:  Objection to form.
15    A.   She sends this document on a
16 weekly basis to all the engineering
17 directors.
18    Q.   And who are the engineering
19 directors?
20    A.   All the different hospital
21 sites, so whoever manages each of the
22 seven hospitals.
23    Q.   Are you one of those directors?
24    A.   (Inaudible.)
25       THE COURT REPORTER:  Can you

1        M. ROCHE
2 repeat that, sir?  Sorry.
3    A.   Sorry.  Yes, I am one of those
4 directors.
5    Q.   Does Crothall keep a record of
6 all job requisitions and job postings?
7    A.   Yes.
8    Q.   Is this that record or are there
9 other records?
10    A.   No.  There are other records.
11    Q.   What would those other records
12 be?
13    A.   We have a software system that
14 tracks it.  It's called People Hub.  This
15 is only notes related to each of those
16 positions.
17    Q.   So if, somehow, information did
18 not appear on this, it would certainly
19 appear on People Hub?
20       MR. CLARK:  Objection to form.
21 You can answer.
22    A.   All the information should
23 always be on People Hub.
24    Q.   Does People Hub record job
25 openings that are posted internally and

1        M. ROCHE
2 externally?
3    A.   Yes.
4    Q.   Okay.  You mentioned a -- strike
5 that.
6       Just a little earlier, we were
7 talking about a training program.  I think
8 you said it used to be off site and it has
9 not continued since COVID.  What was the
10 name of that training program again?
11    A.   That was called Foundations.
12    Q.   When do new employees
13 participate in that training?
14    A.   Generally within the first two
15 years.
16    Q.   So it's possible that a new
17 employee would not get that training for
18 two years?
19    A.   Certainly.  Yes.
20    Q.   Do you know of anyone who
21 participated in that training later than
22 one year after their hire with Crothall?
23    A.   Yes.
24    Q.   Who is that?
25    A.   Wayne Thomas, Bob Murphy, Omelfi

1        M. ROCHE
2 Garcia.
3    Q.   And --
4    A.   There's a number of people.
5    Q.   Sorry.  And why did they not
6 participate earlier, as far as you know?
7    A.   Various reasons.
8    Q.   Who is responsible for signing a
9 new employee up for that training?
10    A.   Generally, it's the manager.
11    Q.   The employees' manager?
12    A.   (Inaudible.)
13       THE COURT REPORTER:  Can you
14 repeat that, sir?
15    A.   Yes.
16    Q.   Did Joe Pasquarello ever
17 participate in the Foundations training?
18    A.   So I believe I already mentioned
19 that the Foundation [sic] training was put
20 on hold due to COVID.  So Joe was here for
21 the -- most of the duration of his
22 employment here was during the COVID.
23    Q.   Do you recall when Joe
24 Pasquarello was hired?  What approximate
25 date?

12 (Pages 42 - 45)

M. ROCHE

2    A.   I believe it was October of
3  20 -- of 2020.
4    Q.   All right.
5    A.   I'm sorry.  No.  No.  I think it
6  was '19.  I don't recall the specifics.
7    Q.   Do you think it was in October
8  of 2019 or October of 2020?
9    A.   If you give me a moment, I will
10  look at Exhibit 3 and I should be able to
11  tell you.  (Perusing.)  It appears to be
12  October 14, 2019.
13    Q.   So and I believe COVID started
14  around -- was it March of 2020?  Would you
15  agree that's approximately accurate?
16        MR. CLARK:  Objection to form.
17    Q.   Or --
18    A.   I believe we had -- so we
19  actually had the first case in New York
20  City, and I believe it was earlier than
21  that.
22    Q.   About when do you think that
23  COVID as a pandemic started in New York?
24        MR. CLARK:  Objection to form.
25    A.   Early 2020.

M. ROCHE

2    Q.   Okay.  And were you his
3  manager -- were you Joe's manager when he
4  started at Crothall?
5    A.   Yes.
6    Q.   And did you sign him up for the
7  Foundations program when he started?
8    A.   As I said earlier, most
9  employees go within the first two years,
10  so I did not sign him up in the first four
11  months, no.
12    Q.   Did he ask to be signed up for
13  the training?
14    A.   No.
15    Q.   Did he ever ask you for Crothall
16  training?
17    A.   (Inaudible.)
18    Q.   Sorry.  I couldn't hear.
19    A.   Yes.
20    Q.   So what training did he ask you
21  for?
22    A.   We trained him on all our
23  software systems multiple times, so that
24  includes TeamDoc, TeamOps.  We trained him
25  on the program requirements.  We went over

M. ROCHE

2  the binders and all the regulatory
3  documents with him.  We went over our
4  audit program and all his
5  responsibilities.
6        He had an issue absorbing the
7  training.  He would repeatedly ask for
8  additional training, but be unable to
9  specify the specifics of what he did not
10  understand and what he needed training on.
11    Q.   You said that "we" trained him
12  on various things.  Who -- who actually
13  provided training to Joe?
14    A.   It's a number of people.  I
15  myself provided training on multiple
16  occasions to Joe.  Matthew Bond provided
17  training on multiple occasions to Joe.
18  Robert Ross provided training on multiple
19  occasions to Joe.  Robert Denver provided
20  training on multiple occasions to Joe.
21  Bob Shaffer provided training on multiple
22  occasions to Joe.  Chris Hariegel provided
23  training on multiple occasions to Joe.
24  I'm sure there's a number of others, but
25  those are right off the top of my head.

M. ROCHE

2    Q.   And when you say they provided
3  training, was this formal training or are
4  you talking about people answering
5  questions?
6        MR. CLARK:  Objection to form.
7  You can answer.
8    A.   Both formal and informal.
9    Q.   So of all the names that you
10  just mentioned, how many of them provided
11  formal training to Joe?
12        MR. CLARK:  Objection to form.
13    A.   Robert Ross and Matt Bond.
14  Robert Ross is the person who generally
15  gives the training for TeamOps at the
16  Foundations training, and Matt Bond is
17  probably the next person most closely
18  familiar with that and has given trainings
19  to other employees in the past.
20    Q.   When did the first person, I
21  think -- did you say his last name is
22  Ross?
23    A.   Ross.  Robert Ross.
24    Q.   When did Robert Ross provide Joe
25  with training?

M. ROCHE

1
2     A.   I don't know the exact date that
3 he was here.  He is not local to New York,
4 but he does both remote trainings through
5 Zoom and in-person trainings.
6     Q.   And would he have provided that
7 training within the first four months
8 to -- yeah.  Within the first four months
9 of Joe's arrival at Crothall?
10    A.   I'm not sure of that answer.
11    Q.   But you know that he did provide
12 Joe with training?
13    A.   Yes.
14    Q.   Do you know any specific time
15 when he did that; if it was 2019, 2020, or
16 2021?
17         MR. CLARK:  Objection to form.
18 You can answer.
19    A.   Again, I don't know the specific
20 date.  I would assume it was earlier in
21 his tenure.
22    Q.   Why would you assume that?
23    A.   That's generally how we train.
24    Q.   So in general, when a new
25 employee comes, you provide them with

M. ROCHE

1
2 training early on?
3     A.   To the best of our ability, yes.
4     Q.   Was there any reason Joe could
5 not participate in the Foundations
6 training before COVID happened?
7     A.   Yes.
8     Q.   What was that reason?
9     A.   That type of training only
10 occurs maybe once every six months.  It's
11 off-site and it's scheduled well in
12 advance, so there's not always
13 opportunities and spots for that training.
14 So it's very likely that he would not have
15 been able to complete that training in the
16 first four months of his employment.
17    Q.   Do you know whether there was a
18 Foundations training between October 2019
19 and March of 2020?
20    A.   I do not schedule them, so I do
21 not personally know.
22    Q.   Who schedules them?
23    A.   The Training Department or out
24 of Crothall Corporate.
25    Q.   Okay.  And do you know -- I'm

M. ROCHE

1
2 going to change modes a little.  Do you
3 know who Bob Shaffer is?
4     A.   Yes.
5     Q.   What is Bob Shaffer's current
6 title?
7     A.   I believe he's the system fire
8 safety director.
9     Q.   Do you know how long he's held
10 that title?
11    A.   I'd say approximately five or
12 six years.  Could be as many as seven or
13 eight.  It's been a while, but no.  I
14 don't know specifically.
15    Q.   Does he report to you?
16    A.   No, he does not.
17    Q.   Do you report to him?
18    A.   No, I do not.
19    Q.   How often do you interact with
20 him in person?
21    A.   As needed.  I was with him
22 earlier this week.
23    Q.   On average per month, how often
24 do you interact with him in person?
25    A.   Bob is not in person that

M. ROCHE

1
2 frequently.  He works two days per week
3 and mostly remote.
4     Q.   And has he always worked on that
5 schedule?
6     A.   No.
7         MR. CLARK:  Objection to form.
8     Q.   Was he working on that schedule
9 in 2019?
10    A.   Yes, I believe he was.
11    Q.   And what about 2020?
12    A.   Yes, I believe he was.
13    Q.   And what about 2021?
14    A.   Yes, I believe he was.
15    Q.   And when he is in person, is his
16 office in the same building as your
17 office?
18    A.   No.  He generally does not work
19 often out of his office.  He's at various
20 sites.
21    Q.   When you say "sites," where are
22 you -- is -- are you referring to Mount
23 Sinai Hospital sites?
24    A.   Yes.
25    Q.   Does he only work with the Mount

14 (Pages 50 - 53)

1          M. ROCHE
2  Sinai Hospital or does he work with --
3  does he work with Mount Sinai Queens or
4  any of the other Mount Sinai systems?
5     A.   Yes, he does.
6     Q.   Which Mount Sinai -- I'm not
7  sure how to refer to them.  Which other
8  Mount Sinai campuses does he work with?
9     A.   All seven of them.
10    Q.   Okay.  So did you say he only
11 works two days a week?
12    A.   Yes.
13    Q.   And generally, he works remotely
14 on those two days; is that correct?
15    A.   No.  I would not say typically.
16 It's just that he has the ability to.  If
17 -- if there's an issue that he's made
18 aware of that requires his presence, he
19 comes to the city as needed.
20    Q.   Okay.  And how often would you
21 inter -- how often do you interact with
22 him by phone?
23    A.   Frequently.
24    Q.   What do you mean by
25 "frequently"?  Like per week, how often

1          M. ROCHE
2  would you speak -- how often do you speak
3  to him by phone?
4          MR. CLARK:  Objection to form.
5     You can answer.
6     A.   I speak to him by phone a
7  minimum of once a week.  He's on a weekly
8  call that we have every single week, and
9  as needed when issues come up where I need
10 some feedback or guidance.
11    Q.   Okay.  What is that weekly
12 meeting that you have with him?
13    A.   It's a call with all the Mount
14 Sinai directors.
15    Q.   Do you know who reports directly
16 to him?
17    A.   Nobody reports directly to him.
18    Q.   Okay.  And who does he report
19 to?
20    A.   He reports to Chris Hariegel.
21    Q.   And do you know what are his
22 responsibilities?
23    A.   (Inaudible.)
24        THE COURT REPORTER:  Sorry, sir.
25    Can you repeat that?

1          M. ROCHE
2     A.   I said yes.
3     Q.   Can you describe them for me?
4     A.   He oversees all of the Fire
5  Safety components across the Mount Sinai
6  Health System.
7     Q.   In -- in what ways does he
8  oversee Fire Safety?
9     A.   He reviews all of the
10 documentation and provides guidance to the
11 managers and assistant directors as
12 needed.
13    Q.   When you say "documentation,"
14 are you referring to TeamDocs?
15    A.   TeamDocs is part of it.  What
16 I'm really referring to is -- is vendor
17 testing reports, repair reports, anything
18 that would be shown to joint -- the Joint
19 Commission.
20    Q.   What is shown to the Joint
21 Commission?
22        MR. CLARK:  Objection to form.
23    You can answer.
24    A.   Vendor testing reports and
25 repair reports and whatever other

1          M. ROCHE
2  information they request.
3     Q.   Is there, I guess, a set body of
4  information that the Joint Commission
5  requests or do they make specific
6  requests?
7     A.   Specified code, and within that
8  code, there's quite a number of different
9  requirements that outline the testing
10 frequency, the testing functions and
11 tasks, and they will review, upon their
12 request, any of those reports.
13    Q.   So just so I understand, Bob
14 Shaffer focuses on the fire safety aspect
15 of all of that documentation?
16        MR. CLARK:  Objection to form.
17    You can answer.
18    A.   Yes.
19    Q.   Aside from reviewing vendor
20 reports and TeamDocs, does he review
21 TeamOps?
22    A.   He ensures that the preventative
23 maintenance tasks get closed out on the
24 required frequency when -- when it's
25 information that will be provided to Joint

15 (Pages 54 - 57)

Page 58

M. ROCHE

1           M. ROCHE
2 Commission.
3     Q.   Okay.  So maybe now is a good
4 time for me to ask.  Can you just explain
5 the difference between TeamOps and
6 TeamDocs?
7     A.   Sure.  In a simplified way,
8 TeamOps is the program that generates
9 certain work requests, and TeamDoc is a
10 program where vendor testing reports as
11 well as internal testing reports and
12 repairs are hosted.
13     Q.   So just to make sure I
14 understand, TeamOps is a program that
15 keeps track of work that needs to get
16 done?  No.  Strike that.
17        I'm sorry.  Would you mind
18 explaining in a little more detail what
19 TeamOps does?
20     A.   TeamOps is a program where you
21 can create new work tasks, where different
22 end users within the institution can
23 request different types of work.  There's
24 a work order number associated with
25 everything that's requested and it's a way

Page 59

1           M. ROCHE
2 to comment on those work orders at
3 completion.
4        Another aspect of it is it
5 generates all of our required preventative
6 maintenance tasks.
7     Q.   So if a preventative maintenance
8 task is upcoming, it will show whoever is
9 looking that it is upcoming?
10     A.   Yes.  Assuming -- so the manager
11 has some responsibility there.  The
12 manager's responsibility is to ensure that
13 that work ticket is generated at the
14 correct frequency based upon the required
15 testing.
16     Q.   So if TeamOps shows that a
17 preventative measure or preventative
18 maintenance is required soon, the manager
19 has to take action to create a work order?
20        MR. CLARK:  Objection to form.
21     A.   Could you repeat that question?
22     Q.   Sure.  I'm just trying to
23 understand.  The preventative maintenance
24 aspect of TeamOps, I believe you said it
25 keeps track of when preventative

Page 60

1           M. ROCHE
2 maintenance is due.  Does it also show
3 what needs to be done for each
4 preventative maintenance that's due?
5     A.   So at the beginning of the
6 month, it will issue -- or sometimes the
7 last day of the previous month.  But
8 generally, at the beginning of the month,
9 it will issue the work orders and
10 preventative maintenance tasks that it
11 knows are upcoming.  But the information
12 for those tasks sometimes needs to be
13 modified and the frequency needs to be --
14 needs to be changed dependent on when the
15 last task was performed.
16     Q.   And does that program assign the
17 work to various departments or
18 individuals?
19     A.   Sometimes it does auto assign
20 and sometimes it just assigns it to a
21 shop, such as Plumbing or Fire Safety, et
22 cetera, and it's the manager's
23 responsibility to ensure that it gets
24 completed and assigned appropriately.
25     Q.   So how does it know where to

Page 61

1           M. ROCHE
2 assign various tasks?
3     A.   Well, every single asset that we
4 have is barcoded throughout the
5 institution.  We have thousands and
6 thousands of assets.  Every single one of
7 them is barcoded with a specific number.
8 That number is inputted into a database,
9 which is TeamOps, and TeamOps generates
10 those based upon the information plugged
11 into it when capturing that asset.
12        So maybe a piece of equipment
13 needs annual PMs, maybe it needs
14 quarterly, maybe it needs daily.  The
15 program is going to submit -- is going to
16 issue work tickets based on the needs of
17 the equipment.
18     Q.   So it's linked to a particular
19 asset?
20     A.   Correct.
21     Q.   And when you say "asset," is
22 that parts of the facility?
23     A.   Yes.
24     Q.   It's not a person?
25     A.   Correct.

16 (Pages 58 - 61)

Page 62

M. ROCHE

1
2  Q.  Okay.  And what part of that,
3  going back to Bob Shaffer's role, what
4  part of that is -- what part of TeamOps is
5  presented to the Joint Commission?
6      MR. CLARK:  Objection to form.
7  You can answer.
8   A.  We present everything that's
9  requested, so it depends on the surveyor
10 that you get.
11  Q.  Does the Joint Commission
12 request records that preventative
13 maintenance has been conducted?
14  A.  Sometimes they may.  There are
15 certain -- there's no standard -- there
16 are standards for what's required to be
17 performed, but there's no standard across
18 what they can -- they can request anything
19 within that area.
20  Q.  So there are -- there are
21 standards that the facility has to meet,
22 but you don't know necessarily what your
23 particular Joint Commission auditor is
24 going to specifically scrutinize; is that
25 what you're saying?

Page 63

M. ROCHE

1
2  A.  That's correct.
3  Q.  Okay.  But you have to prepare
4  everything, I would imagine?
5   A.  The expectation is that
6  everything is a hundred percent compliant.
7   Q.  And when a Joint Commission
8  auditor, if that's what they're called, a
9  Joint Commission surveyor requests to
10 inspect something, are they -- are they
11 inspecting your records in TeamOps?
12  A.  They may.
13  Q.  What else would they inspect?
14  A.  They -- they would likely look
15 at TeamDocs.
16  Q.  And TeamDocs.  Remind me what
17 that platform does?
18  A.  Sure.  So, again, TeamDocs is
19 hosting platform that -- that hosts
20 documentation from vendor reports, as well
21 as whatever closed work -- closed work
22 orders from TeamOps or any other related
23 work task that the manager chooses to
24 upload to that database.
25  Q.  So that is the -- TeamDocs is --

Page 64

M. ROCHE

1
2  is it correct to say that that is all the
3  data showing work performed, whether it's
4  in -- whether the work was done in house
5  or through vendors?
6      MR. CLARK:  Objection to form.
7   A.  Sorry.  Could you just repeat --
8  rephrase that?
9   Q.  So just so I understand,
10 TeamDocs houses documentation of work
11 performed in house by the hospital's
12 Facilities team and also by vendors?
13  A.  Yes, that's correct.
14  Q.  Okay.  What -- what kind of --
15 what kind of things in -- in the Joint
16 Commission survey would create a problem
17 or would be noted as problematic or -- or
18 deficient?
19      MR. CLARK:  Objection to form.
20 You can answer.
21  Q.  Let -- actually, let me
22 rephrase.  During the Joint Commission
23 audit, with respect to the part of the
24 audit relating to facilities, what types
25 of things are problematic or -- or

Page 65

M. ROCHE

1
2  would -- would be considered negative
3  for -- for the hospital's performance in
4  the commission survey?
5      MR. CLARK:  Objection to form.
6  You can answer.
7   A.  So any deficiency which did not
8  have an appropriate follow up or an
9  appropriate method of tracking that follow
10 up would be considered problematic.
11  Q.  Can you give me an example just
12 so I understand what -- what that means?
13  A.  Well, if we had repairs
14 scheduled on fire doors and there were a
15 number of deficiencies noted, we would
16 have to create a work order for each one
17 of those deficiencies in order to track
18 the process to completion.  It would be a
19 problem if we did not have a means of
20 tracking those deficiencies within our
21 TeamOps system.
22  Q.  So a deficiency like something
23 -- like a hinge broken on a door, is that
24 an example of a deficiency in a door?
25  A.  Yep.  Or a closer.  Something

17 (Pages 62 - 65)

M. ROCHE

2 that -- that -- that renders it not
3 operable in the sense that it's been
4 designed to operate.
5    Q.   So using this -- using TeamDocs,
6 if -- in this example, if there was a
7 broken hinge on the door, the deficiency
8 would be noted, the broken hinge; is that
9 correct?
10   A.   So in this particular case,
11 there's a vendor that reviews and inspects
12 this.  They, by the end of the day within
13 that shift, they're responsible for
14 reporting it to a manager.  That manager
15 is then responsible for ensuring that that
16 gets documented within TeamOps and that an
17 appropriate follow up is conducted.
18   Q.   So an appropriate follow up
19 would be, I guess, assessing what needed
20 to happen to fix the broken door and then
21 assigning it or creating a work order; is
22 that correct?
23       MR. CLARK:  Objection to form.
24   A.   That's part of -- that's part of
25 it.  Part of it may be staff training

M. ROCHE

2 because you have an inoperable fire door
3 and there might be safety hazards related
4 to that.  Part of it might be calling in a
5 vendor, getting a price to repair it,
6 getting a PO, getting them on-site,
7 scheduling it.  You know, it's all part of
8 the same process.
9    Q.   Is a PO a purchase order?
10   A.   Yes.
11   Q.   And then once that broken hinge
12 in this example is fixed, the hospital has
13 to document that it was fixed; is that
14 correct?
15   A.   In this case, yes.  The fire
16 safety manager should be -- Fire Safety
17 Department should be documenting the
18 repair and ensuring that that work order
19 was closed.  And because it's a life
20 safety deficiency, they would then upload
21 proof of that and the work order to
22 TeamDocs.
23   Q.   And if you have a vendor working
24 on the doors, would the vendor's reports
25 about that work be part of the evidence?

M. ROCHE

2   A.   If it --
3       MR. CLARK:  Objection to form.
4   Go ahead.
5   A.   If that report was received same
6 day, then that would be a part of it.  The
7 manager or -- or assistant director in
8 this case would still need to create a
9 work order describing that.
10      There needs to be basically a
11 time stamped document connecting from the
12 moment it was found or reported, what the
13 repair was, all the way up until it's been
14 closed out.  So if there's a lapse of time
15 and you don't have documentation showing
16 -- proving the state of that asset during
17 that amount of time, that would be an
18 issue.
19   Q.   And what are the different ways
20 that -- that you -- that -- that a Fire
21 Safety Department documents that?
22      MR. CLARK:  Objection to form.
23   A.   The only way to document it is
24 in TeamOps.
25   Q.   And you can upload documents to

M. ROCHE

2 TeamOps to show the -- that the work was
3 done or was ordered?
4   A.   You can, but usually TeamOps is
5 the platform that would -- which is where
6 you would upload that documentation.
7   Q.   Do you know who -- sorry.  I'm
8 going -- I'm going to get us out of
9 documentation for a while, clear my head.
10 Do you know who John Barton is?
11  A.   Yes.
12  Q.   I recently learned there are two
13 John Bartons.  I'm speaking about John
14 Barton Senior right now.  Do you know who
15 I'm talking about?
16  A.   Yes.
17  Q.   Okay.  What is his current
18 title, if you know?
19  A.   He is currently senior director
20 of plant and energy.
21  Q.   And do you know how long he's
22 held that title?
23  A.   It's approximately a year.
24 Prior to that, he was -- he was only
25 responsible for this site, and his title

18 (Pages 66 - 69)

Page 70

```
1            M. ROCHE
2  was director of engineering.  I'm sorry.
3  Director of -- director of plant and
4  energy.
5      Q.   When you say "this site," are
6  you referring to the Mount Sinai Hospital?
7      A.   Yes.
8      Q.   And -- and now his purview has
9  expanded?
10     A.   Yes.
11     Q.   What -- what does he now
12 oversee?
13     A.   So he oversees the plants for
14 each of the facilities within the health
15 system.  So all seven hospitals, if they
16 have a boiler plant or a chiller plant, he
17 oversees that, as well as HVAC and Plant
18 operations at this site, Mount Sinai
19 Hospital.
20     Q.   Okay.  So I'm going to focus
21 only on Mount Sinai Hospital.  When you
22 say "plant," I -- other than things that
23 grow from the ground, I don't really
24 understand what that means.  Can you just
25 tell me what -- is that a facility?
```

Page 71

```
1            M. ROCHE
2      A.   So we refer to a plant as,
3  really, a boiler plant or a chiller plant,
4  and it's the main area of a facility that
5  produces all of the hot water or all of
6  the cold water for -- for -- it basically
7  controls the heating and cooling
8  throughout the campus.
9      Q.   Does it also control water
10 supply in the campus?
11     A.   Generally, that would be
12 considered under the Plumbing Department,
13 although it does have some oversight of
14 that.
15     Q.   Is Plumbing separate from the
16 Plant?
17     A.   Yes.  We have a separate
18 plumbing manager who is an assistant chief
19 engineer.
20     Q.   So is there someone -- I'm
21 trying to understand what John Barton's
22 responsibilities are just with respect to
23 Mount Sinai Hospital.  Is -- he's managing
24 all the heating and cooling systems; is
25 that accurate?
```

Page 72

```
1            M. ROCHE
2      A.   Yes.  He oversees heating and
3  cooling and energy management programs.
4  So within energy management, there's some
5  HVAC, which is, again, with heating and
6  cooling as well as medical gas
7  distribution systems, plumbing systems,
8  any real utility.
9      Q.   And does he have people who
10 report to him who are technicians in all
11 of those areas?
12     A.   Yes.  So in all of those areas,
13 there are managers or supervisors who
14 report to him and then under them, there's
15 a union staff, which are the technicians.
16     Q.   Got it.  Do you know who the
17 managers are that report to him?
18     A.   Yes.
19     Q.   And this is just with respect to
20 Mount Sinai Hospital.  Who are those
21 people?
22     A.   Currently?
23     Q.   If you remember the people who
24 reported to him during Mr. Pasquarello's
25 tenure?
```

Page 73

```
1            M. ROCHE
2      A.   Sure.  So Ron Cordier, Felipe
3  Garcia, Kevin Anderson.  There's --
4  there's one or two more now, but I believe
5  not -- I don't think they were reporting
6  to him during Joe's tenure.
7      Q.   And who are those people?
8      A.   Ryan Nowicki now reports to him
9  and Craig Heaney reports to him.  I'm
10 sorry.  Ryan Heaney.  We have two Heaney
11 brothers and Ryan Heaney is the one who
12 reports to John.
13     Q.   Okay.  And what was Ryan
14 Nowicki -- who was Ryan Nowicki reporting
15 to previous to reporting to John Barton?
16     A.   Previously, he was reporting to
17 me.
18     Q.   And what -- what was his title
19 when he was reporting to you?
20     A.   He was the director of
21 engineering for the medical school.
22     Q.   And what is his current title?
23     A.   He's the director of plant.
24     Q.   Okay.  And what -- when he --
25 when Joe Pasquarello was employed at
```

19 (Pages 70 - 73)

M. ROCHE

1
2 Crothall, what were Ryan Nowicki's
3 responsibilities in the role he had at
4 that time?
5     A.   He oversaw any issues related to
6 impacts or problems within the medical
7 school square footage.  There's a -- they
8 have various -- they operate out of
9 various buildings on campus, and he would
10 be responsible for communicating to school
11 leadership, as well as, you know,
12 expediting repairs in certain areas or
13 getting involved with certain trades as
14 needed.
15     Q.   Is the medical school part of
16 the Mount Sinai Hospital campus?
17     A.   Yes.
18     Q.   So I'm just trying to
19 understand.  Was he in charge of all
20 facilities that were part of the medical
21 school?
22     A.   He was in charge of anything
23 that would have any impact in the medical
24 school.
25     Q.   It sounds like "impact" might be

M. ROCHE

1
2 a more technical term than I'm thinking.
3 What do you mean by "impact"?
4     A.   If there were any assets or
5 equipment or if anything negatively
6 impacted any users of school or any school
7 space, he would be the primary person to
8 get involved and resolve those issues.
9     Q.   Can you give me an example just
10 to illustrate what you mean by that kind
11 of impact?
12     A.   Sure.  So if there was an air
13 handler that failed, he would be involved
14 with the communication of that,
15 potentially involved with the repair, and
16 expediting the process.  But it -- it --
17 it really was more than just HVAC.  He
18 would have oversight over any one of the
19 trades, including Fire Safety in this
20 case.
21     Q.   So when you say "oversight," he
22 would have to coordinate the different
23 trades to address a particular impact?
24     A.   He would not be directly
25 coordinating because in the example I

M. ROCHE

1
2 gave, HVAC, he's not the HVAC manager.
3 But he would be responsible for -- he
4 would be responsible for ensuring that we
5 can meet the expectations of the facility
6 and that we properly communicate with the
7 key stakeholders.
8     Q.   And then the technicians would
9 do the actual work to address the impact;
10 is that correct?
11     A.   At times, it's in-house
12 technicians.  At times, it's vendors.  You
13 know, at times, it's construction
14 companies.  It -- it -- it could be any
15 number of things.
16     Q.   But --
17         MR. CLARK:  Leah, at a
18 convenient time -- I'm sorry.  At a
19 convenient time, can we take a
20 five-minute break?
21         MS. SELIGER:  Sure.  I'll just
22 finish this bit and then we can take a
23 break.
24     Q.   So he didn't -- he didn't
25 facilitate the work of an impact, but he

M. ROCHE

1
2 would -- he would be in communication with
3 the medical school to alert them about the
4 impact?
5     A.   He may facilitate the work
6 depending on the severity of the work.  He
7 may give direction to managers and
8 assistant directors involved in that type
9 of whatever it is, testing, repair.
10 Anything that's -- that's providing any
11 significant impact to the facilities of
12 the medical school, he would have
13 oversight of.
14     Q.   Okay.
15         MS. SELIGER:  I'm happy to take
16 a break now, Shawn, if you want.
17         MR. CLARK:  Yeah.  Please.
18         THE WITNESS:  Great.
19         MS. SELIGER:  Sure.  It looks
20 like it's almost 2:00.  Do you want to
21 come back at 2:05?
22         MR. CLARK:  I've got almost
23 noon.
24         MS. SELIGER:  Oh.  Sorry.
25         MR. CLARK:  Yeah.  No, I know.

Page 78

M. ROCHE

1
2 You're in a different time zone.
3      MS. SELIGER:  It's not almost
4 2:00 here.  It's been almost two
5 hours.  It's -- it's almost 9:30.
6      MR. CLARK:  Yeah.  So it's seven
7 minutes to.  You want to do -- come
8 back at five minutes after?  Is that
9 enough time?
10      MS. SELIGER:  It's your call.
11 Yes, that's fine with me.
12      MR. CLARK:  Great.  Thank you.
13      MS. SELIGER:  Sure.
14      (A recess was taken.)
15 Q.   Mr. Roche, I want to take a look
16 now at Exhibit 2.
17      [The document was hereby marked
18      as Plaintiff's Exhibit 2 for
19      identification, as of this date.]
20 Q.   This is -- Exhibit 2 comprises
21 of various org charts that were produced
22 by Crothall.  The way they were presented,
23 it showed they were dated somewhere
24 between 2013 and 2021.
25      I just want to point out that

Page 79

M. ROCHE

1
2 you'll see there's numerous pages to this
3 exhibit.  The pages that are blank with a
4 big CH and a number, those are the Bates
5 stamped documents.  That's not part of the
6 actual -- that's the Bates number.  It's
7 not part of the actual data of the
8 documents.
9      I'd like to ask you to look
10 through those org charts and just let me
11 know when -- when you've had a chance to
12 take a look at them.
13 A.   So you mean all 30 pages' worth,
14 right?
15 Q.   Yeah.  You don't have to
16 memorize them.
17 A.   Okay.  I will let you know.
18 (Perusing.)  Okay.
19 Q.   So starting at the top, I'm
20 not -- these were two different documents
21 that were provided to us.  I'm not sure if
22 they're the same, these two org charts.
23 One has the number D251 at the bottom.
24 The next one has the number CH1895.
25      Do these look like an accurate

Page 80

M. ROCHE

1
2 portrayal of the Facilities staff at some
3 point in 2020 or 2021?
4 A.   Yes.  I think it's important to
5 note that this is only a snapshot in time
6 of whenever that was printed and there was
7 a lot of transition, but based on what
8 I've seen so far, it looks fairly
9 accurate.
10 Q.   Okay.  And then -- and then
11 there's the -- then there's a list of
12 names and titles that -- that were part of
13 that same spreadsheet.  Or no.  I'm sorry.
14 I don't know if it's part of the same
15 spreadsheet, but can you look at that list
16 and let me know if that is a
17 representation of the facility staff at --
18 at any point in time while you have been
19 there?
20      MR. CLARK:  Leah, so that I
21      know, we're looking at the third page
22      of the exhibit?
23      MS. SELIGER:  Yes.  And because
24      it was -- it was produced in its
25      native format, it doesn't have a Bates

Page 81

M. ROCHE

1
2 number on it.  But I -- and in this
3 moment, I can't tell if it's part of
4 CH1889 or CH1895 right before it, but
5 we can certainly -- I can certainly
6 look that up on our next break.
7 A.   So just to be clear, the
8 question was does that look accurate at
9 any point in time?
10 Q.   Yeah.
11 A.   Yes.  That looks like a list
12 prior to Joe Pasquarello's start.  So --
13 Q.   Okay.
14 A.   -- that would be either sometime
15 in '19 or before.
16 Q.   Okay.  And then the next page
17 has the Bates number on it.  It says
18 CH1889.  The next document, does this look
19 like an accurate portrayal of the Mount
20 Sinai staff -- forgive me.  I thought the
21 -- I thought the years were on here.  Give
22 me one minute.  Does this look like a
23 portrayal of the Facilities staff in 2019
24 approximately?
25 A.   Yes.

21 (Pages 78 - 81)

M. ROCHE

1
2    Q.   Okay.  And I'm going to skip the
3  next page and -- and page seven.  I
4  believe it's page ten of this document.
5  It shows what looks like just a snapshot
6  of the Fire Safety Department; is that
7  correct?
8    A.   Yes, that's correct.  I'm not
9  sure that this was updated in 2019, so
10  that may represent previous year data, but
11  it was certainly accurate at one point in
12  time.
13    Q.   Okay.  By the way, all of these
14  are part of that same Excel Spreadsheet,
15  CH1889.
16    A.   Right.  It wouldn't be uncommon,
17  though, to only -- only update the -- the
18  first tab, which would be the Crothall
19  Table of Organization.  Some of those
20  other tabs are, you know, for
21  informational purposes, but they're not
22  updated on a regular basis.
23    Q.   Got it.  So on page 14, you'll
24  see another Bates number, CH1892.  In the
25  labeling of this file that we received, it

M. ROCHE

1
2  indicated that this next document was from
3  2018, but I don't know for sure.
4        If you -- if you look at page 15
5  right after that numbered sheet, that
6  looks like the whole -- or it looks like
7  the Facilities Department.  Does this look
8  like it may have been accurate at some
9  point in 2018?
10    A.   Yes.  Probably early '18, before
11  I was moved to my current role.
12    Q.   Okay.  Oh, I see what -- I see
13  someone named -- is it Jason Curley?  At
14  the top, it says, I think, "Resident
15  Regional Director, Jason Curley."  Did you
16  take over that role at some point?
17    A.   Yes.
18    Q.   Okay.  And then I want to scroll
19  down past this list.  On page 17, we have
20  another Bates number.  It's CH1891.  That
21  was -- the file name that we received
22  indicated that this next document was from
23  2016.
24        I, again, don't know if that's
25  correct, but if you scroll down to page 18

M. ROCHE

1
2  of the document, you see another
3  spreadsheet or org chart.  Does this look
4  like this was accurate at some point in
5  2016?
6    A.   Yes.
7    Q.   Okay.  Let's see.  I'm going to
8  scroll to the next numbered page.  Page 25
9  has Bates stamp CH1898.  Again, the file
10  name that we received indicated that this
11  next document was from 2015.
12        If you scroll down to page 26 of
13  the exhibit, does this look like it is an
14  accurate depiction of Facilities staff in
15  2015?
16    A.   Yes.
17    Q.   Sorry.  I -- the sound --
18    A.   Yes, it does.
19    Q.   Okay.  Then you see if you
20  scroll down to page 27, it has Bates stamp
21  number CH1897.  Again, the file name for
22  this document produced in native format
23  indicated that it was from 2014.
24        And if you scroll down to page
25  28 of this exhibit, it's another org

M. ROCHE

1
2  chart.  Do you know if this is an accurate
3  depiction of the Facilities staff in 2014
4  at some point?
5    A.   It does appear to be accurate.
6    Q.   Okay.  And I think this is the
7  last one.  If you scroll down to page 29,
8  Bates number CH1896, this file name
9  indicated that the next document was from
10  2013.  If you scroll down, there is an org
11  chart.  Can you take a look at it and let
12  me know if this looks like it was an
13  accurate depiction of Facilities in 2013
14  at some point?
15    A.   This was prior to my time, so I
16  don't know if this was accurate.
17    Q.   Okay.  Got it.  All right.  I'm
18  going to -- I'm done with that exhibit.
19        Getting back to the present, who
20  currently works in the Mount Sinai
21  Hospital Fire Safety Department?
22    A.   You're talking about from a
23  management level, I assume?
24    Q.   Yeah.  Not -- not including fire
25  marshals.

22 (Pages 82 - 85)

Page 86

M. ROCHE

2 A. Sure. So that would be Bernie
3 Nuñez and Matt Bond.
4 Q. Is anyone else in the Fire
5 Safety Department aside from the fire
6 marshals?
7 A. No. Well, Bob Shaffer is still
8 with the company.
9 Q. He's -- Bob Shaffer is still
10 with the company. Is he considered part
11 of the Mount Sinai Hospital Fire Safety
12 Department?
13 A. He still has an -- he still
14 oversees them and may have an indirect
15 role, but if you're asking for all the
16 people involved, he would -- he would
17 basically be involved.
18 Q. Okay. What is Bernie Nuñez's
19 title?
20 A. Bernie is a director of fire
21 safety.
22 Q. And who does he report to?
23 A. He reports to me.
24 Q. And what is Matt Bond's title?
25 A. Matt Bond's title is the

Page 87

M. ROCHE

2 assistant director of fire safety.
3 Q. And who does he report to?
4 A. He reports to Bernie Nuñez.
5 Q. Does Mario -- does someone named
6 Mario Persaud work in the Fire Safety
7 Department?
8 A. No.
9 Q. Does someone named Colin Knarich
10 with a K at the beginning work in Fire
11 Safety?
12 A. No.
13 Q. Regarding the fire marshals, are
14 there certain -- are there different types
15 of fire marshals or is there just fire
16 marshals?
17 A. There's, I believe, fire marshal
18 one and fire marshal two. That has
19 changed a bit in the past, so I'm not sure
20 of the current exact title. There used to
21 be one, two, three. Now there's, I
22 believe, one and two. Those employees are
23 all employees of Mount Sinai Hospital.
24 Q. Got it. And are they -- are
25 fire marshals required to have any special

Page 88

M. ROCHE

2 certifications?
3 A. Yes.
4 Q. What are the certifications that
5 they have to hold?
6 A. I don't know the specifics
7 because I'm a little far removed from
8 that, but there's a number of certificates
9 of fitness, and based upon the level that
10 they work is what determines which
11 certificates of fitness are required.
12 Q. So different -- different
13 responsibilities within the fire marshal
14 team necessitate different certificates of
15 fitness?
16 A. Correct.
17 Q. And is that -- those
18 certificates of fitness relate to the work
19 that they actually do?
20 A. In some cases. In some cases,
21 it does not.
22 Q. So how -- how does the Fire
23 Safety Department know which fire marshals
24 need which certificates?
25 A. There's a job description that

Page 89

M. ROCHE

2 they use to determine the level.
3 Q. Got it. Are there any current
4 job openings in the Fire Safety Department
5 above the level of fire marshal?
6 A. For Crothall?
7 Q. For Crothall, yes.
8 A. Currently, no.
9 Q. Do you know any employee at
10 Crothall named Colin?
11 A. Yes.
12 Q. What's his last name?
13 A. You had it right. It's Knarich.
14 Q. Knarich with a K. What is his
15 current title?
16 A. He is a supervisor.
17 Q. In which department?
18 A. He works right now in the
19 Plumbing Department.
20 Q. And who does he report to?
21 A. He reports to an assistant chief
22 engineer.
23 Q. And what's his name?
24 A. His name is Joe -- Joseph
25 Ecklof.

23 (Pages 86 - 89)

M. ROCHE

1
2    Q.   Going back to Bernie Nuñez, what
3    are his responsibilities as director of
4    fire safety?
5    A.   He oversees the Fire Safety
6    program here, so he's responsible for all
7    aspects of maintenance and repairs for any
8    fire suppression or fire alarm systems.
9          He is involved with -- he
10   attends the Mount Sinai Medical Center
11   safety committee meetings where he
12   presents data on Fire Safety, repairs,
13   work orders, any impacts, number of
14   trainings, fire drills, et cetera.  And he
15   works with -- there's a number of
16   high-level leadership meetings which he
17   attends in that role.
18   Q.   And when you say he's in charge
19   of the Fire Safety systems and -- and
20   maintenance, does he actually repair Fire
21   Safety systems?
22   A.   Physically with his hands?
23   Q.   Yeah.
24   A.   No, he does not.
25   Q.   So in what way does he -- in

M. ROCHE

1
2    what way is he responsible for those
3    systems?
4    A.   He's responsible for identifying
5    when a repair is required, responsible for
6    ensuring that the maintenance gets
7    conducted as required, responsible for
8    appropriately recording it, determining
9    the impact of it, providing any training
10   as a result of it, getting vendors in,
11   scheduling.  The whole aspect of --
12   anything within the fire safety world that
13   needs to be identified, repaired, fixed,
14   he's responsible for coordinating those
15   efforts.
16   Q.   I'd like to ask you to look at
17   Exhibit 4.
18        [The document was hereby marked
19        as Plaintiff's Exhibit 4 for
20        identification, as of this date.]
21   Q.   Let me know when you have that
22   in front of you.
23   A.   Okay.  Okay.
24   Q.   So this Exhibit 4, which is
25   Bates stamped D255 to D258, it looks like

M. ROCHE

1
2    this is a job description for Unit
3    Director - Fire Safety.  Would you agree
4    that that's what this is?
5    A.   Yes.
6    Q.   Did Bernie Nuñez sign a job
7    description when he was hired for his
8    current role?
9    A.   I believe so, but I am not a
10   hundred percent certain.
11   Q.   Okay --
12   A.   It's usually something that we
13   do -- sorry.  It's usually something that
14   we do on an annual basis, so I'm not sure
15   if it got done yet.
16   Q.   Okay.  When did Bernie Nuñez
17   start in his role as director?
18   A.   Shortly before Joe left, so that
19   could be in late 2021.
20   Q.   Okay.  Does this job description
21   look like an accurate description of
22   Bernie Nuñez's current role?
23   A.   Yes.  Based on my quick read of
24   the material.
25   Q.   Who creates the job descriptions

M. ROCHE

1
2    that are signed annually?
3    A.   Our Human Resources Department.
4    Q.   Do they do that in collaboration
5    with people from each department?  I
6    imagine an HR person doesn't necessarily
7    know all the Duties and Responsibilities
8    of a Fire Safety director.
9         MR. CLARK:  Objection to form.
10   You can answer.
11   A.   Yes.  They do so in
12   collaboration with a subject matter
13   expert.
14   Q.   So who would supply HR with the
15   job descriptions for a Fire Safety
16   director?
17        MR. CLARK:  Objection to form.
18   You can answer.
19   A.   If I were to guess, I would say
20   that it would be done with feedback from
21   Chris Hariegel.
22   Q.   And if you look at the second
23   page of this document near the bottom, it
24   says "Qualifications," or no.  I'm sorry.
25   Further down, third page.  It's Bates

M. ROCHE

1
2 stamped D257 and it's actually
3 highlighted.  Do you see where it says
4 "Education/Experience"?
5    A.   Yes.
6    Q.   And there's a highlighted list
7 there of -- it says, "Certification
8 requirements include," and then it says,
9 "OSHA 10-hour, F-85, S-12, S-13, S-95,
10 F-07," and then I think it says, "NFPA 101
11 training."  Are those certifications
12 required for the director of fire safety?
13    A.   Well, I'm not sure who
14 highlighted this like this, but from my
15 view of this, there's a green highlight
16 under "preferred" and then that green
17 highlight continues under "Certification
18 requirements."  Based on my read of that,
19 it appears that those are preferred --
20 preferred certifications.
21    Q.   Mm-hmm.  So they're not
22 necessarily required for -- for a Fire
23 Safety unit director?
24    A.   They may be.  I really can't
25 answer that question.

M. ROCHE

1
2    Q.   Don't you hire the Fire Safety
3 unit directors?
4    A.   Yes.
5    Q.   So when you hire them or when
6 you supervise them, do you require them to
7 have these certifications?
8    A.   So I've only hired one Fire
9 Safety director and that person has these
10 certifications, so it's irrelevant whether
11 they're preferred or required because they
12 were met, so I really don't know.  I'd
13 have to speak with HR to get a better
14 answer for you.
15    Q.   Was that a requirement you had
16 upon hiring him, that he have all of these
17 certifications?
18    A.   Sorry.  Who is "him"?
19    Q.   I'm assuming the one director
20 you hired, that was Bernie Nuñez; is that
21 correct?
22    A.   That's correct.
23    Q.   So upon hiring him, was it a
24 requirement that he had these
25 certifications?

M. ROCHE

1
2    A.   So it's a moot point.  He had
3 the certifications.  Again, if I were
4 to -- if he didn't and I still wanted to
5 move forward, I would involve HR for their
6 feedback.
7    Q.   If he did not have all of these
8 certifications at the time that you were
9 looking to hire him, would you have asked
10 him to get these certifications?
11       MR. CLARK:  Objection to form.
12    You can answer.
13    A.   So that seems like a
14 hypothetical question.  I guess what I
15 would do is reach out to Human Resources
16 and get further direction from them.
17    Q.   You would ask them if it was
18 important for a Fire Safety director to
19 have these certifications?
20       MR. CLARK:  Objection to form.
21    You can answer.
22    A.   No.  Clearly, they are
23 important, which is why they're preferred.
24 Again, based on -- this is a form that
25 comes from HR, so based on my

M. ROCHE

1
2 interpretation, those all appear to be
3 preferred.  So if they were not -- if that
4 individual did not have them, I would want
5 to get feedback from them before moving
6 forward.
7    Q.   Just to be clear, the part that
8 we're reading, it says:
9       "Bachelor's degree in
10 Engineering or related fields and five
11 years responsibility at a director level
12 or eight plus years of applicable
13 experience in health care institution
14 preferred, with related continuous
15 education courses."
16       And then it says:
17       "Certification requirements
18 include:" and then the list that I read
19 earlier.
20       Is it your understanding that
21 the "preferred" refers to the whole
22 paragraph or just the sentence that it's
23 actually in?
24       MR. CLARK:  Objection to form.
25    You can answer.

M. ROCHE

2    A.   So the question you just asked,
3  the -- the -- the text is not capturing
4  the fact that there are multiple color
5  highlights in this document and the word
6  "preferred" is highlighted with one color,
7  which also is where the certification
8  requirements are.
9    Q.   Is the job description
10  highlighted when it's presented to
11  employees or do you think that this
12  highlighting happened later?
13       MR. CLARK:  Objection to form.
14    A.   I don't produce this document.
15  Generally, if there's an opening, I get
16  the required job description from Human
17  Resources.
18    Q.   But Human Resources doesn't
19  determine the requirements of a Fire
20  Safety director; isn't that true?
21       MR. CLARK:  Objection to form.
22    A.   Human Resources gives us the job
23  description based upon the level of -- of
24  the job.
25    Q.   So are you telling me that Human

M. ROCHE

2  Resources tells you that an F-85 Fire
3  Safety director with active shooter, et
4  cetera, certification should be listed on
5  the Fire Safety director job description?
6       MR. CLARK:  Objection to form.
7  You can answer again.
8    A.   I already told you that we work
9  with HR to develop these, but once they
10  are developed, the document comes from HR.
11    Q.   So when you work with HR, do you
12  provide them with the information you want
13  in the job description related to the
14  responsibilities of the role and these
15  qualifications for the role?
16    A.   Again, I think you asked me
17  previously, but I don't create this
18  document.  I don't directly work with HR,
19  so that would have to be asked of the
20  people who do.
21    Q.   Do you establish the
22  qualifications for the employees that you
23  hire?
24       MR. CLARK:  Objection to form.
25    A.   I can provide recommendations to

M. ROCHE

2  my leadership on the preferred
3  requirements, but beyond that, the
4  requirements are based upon the job
5  description, which, again, is a document
6  produced by HR.
7    Q.   And I think you said Chris
8  Hariegel drafted this?
9    A.   I said I -- I would assume he
10  did.  I don't know that to be true.
11    Q.   Why would you assume that he is
12  responsible for drafting this?
13    A.   Because he is the regional vice
14  president, and there's not much that goes
15  through the department without going
16  through him.
17    Q.   And you said earlier that when
18  Bernie Nuñez was hired, he had all these
19  certifications; is that correct?
20    A.   I don't recall saying that.
21    Q.   Did he have these
22  certifications?
23    A.   I believe he has all the
24  required -- all the certificates, yes.
25    Q.   He has them now or he had them

M. ROCHE

2  when you hired him?
3    A.   This is an old document.  The
4  F-85 does not exist anymore.
5    Q.   Okay.  Has it been replaced?
6    A.   Yes.
7    Q.   What is the new name for that
8  certification?
9    A.   I believe it's the 89.
10    Q.   Okay.  And when Bernie was
11  hired, did he have the F-89 and the rest
12  of the certifications listed here?
13    A.   Yes.
14    Q.   And how do you know that?
15    A.   I don't recall.  I believe he
16  submitted them all through our regional
17  office.  So Dorothy Perez is the person in
18  our regional office who maintains
19  everybody's certifications.
20    Q.   So Dorothy Perez would hold all
21  the data about which certifications he or
22  his predecessors had and when they got
23  them and when they expired?
24    A.   She generally has a copy of the
25  license, which generally has that

26 (Pages 98 - 101)

M. ROCHE

1        M. ROCHE
2  information, yes.
3     Q.   Do you think it's important for
4  a unit director of fire safety to have
5  these certifications?
6     A.   I think it's important for any
7  manager to have the certifications that
8  people working under them have.
9     Q.   Does --
10    A.   If they're managing -- I'm
11  sorry.  Just to clarify.  What I mean by
12  that is if they're managing direct staff
13  and technicians that have said
14  certifications, they should also have
15  those certifications in order to direct
16  them and basically have an expertise
17  within that field.
18    Q.   So did you check to make sure
19  that Bernie Nuñez had these certifications
20  when you hired him?
21    A.   (Inaudible.)
22        THE COURT REPORTER:  Can you
23  repeat that, sir?
24    A.   Yes.
25        THE COURT REPORTER:  Thank you.

M. ROCHE

1        M. ROCHE
2     Q.   How did you check to see that he
3  had them?
4     A.   He sent me -- I believe we
5  reviewed all of the licenses.  He's got
6  copies of all of these licenses except for
7  the one I already mentioned.  The 85 does
8  not exist.
9     Q.   So does he have the F-89 or did
10  he have the F-89 when you hired him?
11    A.   Yes.
12    Q.   And did he have a -- I believe
13  the F-89 is specific to a particular
14  building; is that correct?
15    A.   Correct.
16    Q.   Did he have it for the building
17  that he would be working in as director of
18  fire safety?
19    A.   So the way the process works is
20  you can request an on-site exam through
21  the fire department.  You have the -- you
22  have the certification.  There's two
23  pieces to it; it's passing a test, which
24  gets you the certification, but that
25  certification then needs to be linked to a

M. ROCHE

1        M. ROCHE
2  building.
3        The time frame for actually
4  requesting a test, having the fire
5  department administer it on site, and then
6  issuing that actual license is quite
7  extensive.  It's, you know, it can
8  probably take up to two years to get.  The
9  request was made as soon as he started.
10    Q.   And are all of his
11  certifications up to date right now?
12    A.   To the best of my knowledge,
13  they are.
14    Q.   Don't you keep track of that?
15        MR. CLARK:  Objection to form.
16    A.   I don't specifically keep track
17  of it, no.  Again, that generally is
18  managed by Dorothy Perez in our regional
19  office.
20    Q.   But if one of his certifications
21  was expired, would that be a problem?
22        MR. CLARK:  Objection to form.
23    A.   What -- what sort of problem?
24    Q.   From your perspective, would it
25  be a performance problem if Bernie's

M. ROCHE

1        M. ROCHE
2  certifications were not up to date at any
3  given time?
4        MR. CLARK:  Objection to form.
5  You can answer.
6     A.   I think we would make every
7  effort to have him renew and retest as
8  required to obtain them again.
9     Q.   Would you -- would you think it
10  was a problem if he didn't have it done
11  within a year of his -- strike that.
12        Would you think it was a problem
13  if he didn't have his F-89 certification
14  linked to one of his current buildings
15  within a year of his hire?
16        MR. CLARK:  Objection to form.
17    A.   Again, I think I mentioned it's
18  quite an extensive process with dealing
19  with the FDNY.  I would think it's a
20  problem if he had not made that request
21  for the test within a year of employment.
22    Q.   Okay.  Let's go to Matt Bond.
23  You said he's currently the assistant
24  director of fire safety?
25    A.   Yes.

27 (Pages 102 - 105)

Page 106

```
1            M. ROCHE
2    Q.   At Mount Sinai Hospital; is that
3  correct?
4    A.   (Inaudible.)
5        THE COURT REPORTER:  Can you
6    repeat that, sir?
7    A.   Yes, that's correct.
8    Q.   What are his current job
9  responsibilities?
10    A.   He oversees testing and
11  maintenance of the fire alarm and fire
12  suppression systems and ensures that we
13  remain compliant.
14    Q.   Can you get a little more
15  granular for me?  When you say "he
16  oversees," what -- what does that mean?
17  Does he watch them do that testing and
18  maintenance with his eyes?
19        MR. CLARK:  Objection to form.
20    You can answer.
21    A.   I would say generally not.  It's
22  certainly not a requirement for him to
23  watch people do the work.
24    Q.   So what does he do to oversee
25  those things?
```

Page 107

```
1            M. ROCHE
2    A.   He ensures that they get done in
3  the required time frame.  He ensures that
4  they are repaired, that they're recorded.
5    Q.   So is he -- is he documenting
6  those repairs and I think you -- did you
7  say testing as well?
8    A.   I did, yes.
9    Q.   Is there anything else that's
10  part of his responsibilities?
11    A.   Yes.
12    Q.   Sorry.  The sound cut out.  I
13  didn't hear.
14    A.   I said yes.
15    Q.   What else would you say is part
16  of his list of responsibilities?
17    A.   Any task given to him by his
18  manager.
19    Q.   Is that Bernie Nuñez?
20    A.   Yes.
21    Q.   And he -- Bernie Nuñez writes
22  his performance reviews?
23    A.   Yes.
24        MR. CLARK:  Objection to form.
25    Q.   Is Matt Bond required to have
```

Page 108

```
1            M. ROCHE
2  any certifications in his role as
3  assistant director of fire safety?
4    A.   Yes.
5    Q.   Which ones is he required to
6  have?
7    A.   Well, I'm not looking at the job
8  description right now, but it's -- it's
9  well stated in that job description.
10    Q.   Did Matt Bond sign a job
11  description?
12    A.   I'm not sure of that.
13    Q.   So how would you or he know what
14  certifications are expected of him?  Which
15  job description would he have to look at?
16        MR. CLARK:  Objection to form.
17    A.   So he's currently in an
18  assistant director role, so he would look
19  at the assistant director job description.
20    Q.   And are the certifications for
21  the assistant director also preferred as
22  opposed to required?
23    A.   I'm not looking at the document
24  right now, but I would assume so.  There
25  are -- I do believe that he has all those
```

Page 109

```
1            M. ROCHE
2  certifications as well.
3    Q.   I mean, I personally do not -- I
4  did not receive from Defendants a signed
5  job description so I also don't know what
6  his job description is, but if there was
7  one signed by him, it was called to be
8  produced, so I am going to call for it to
9  be produced.
10        MR. CLARK:  We've produced the
11    assistant director job description in
12    a number of formats.  You definitely
13    have it.
14        MS. SELIGER:  But just not a
15    signed one.  So if there's a signed
16    one, I'm calling for that.  I -- we
17    also requested a signed job
18    description for Bernie Nuñez, which
19    was not produced if -- if one exists.
20        MR. CLARK:  If it exists, we'll
21    produce it.
22    Q.   And you said you believe that
23  Matt Bond has whatever certifications are
24  required of him; is that correct?
25    A.   That's -- that's correct.
```

28 (Pages 106 - 109)

Page 110

M. ROCHE

1
2    Q.    And how do you know that?
3    A.    I know that he has his F-89 and
4  I've seen copies.  I can't confirm that
5  they're current or the other ones, but I
6  have seen his license in the past.
7    Q.    Why can't you confirm that
8  they're current?
9    A.    Because I --
10         MR. CLARK:  Objection to form.
11    A.    Because I haven't looked at them
12  within the last year.
13    Q.    So a year has gone by and you
14  haven't checked the status of his
15  certifications; is that correct?
16         MR. CLARK:  Objection to form.
17    You can answer.
18    A.    Matt Bond does not report to me.
19    Q.    So is Bernie responsible for
20  making sure that his subordinates'
21  certifications are up to date?
22    A.    Dorothy Perez manages the
23  license process for the region.
24    Q.    I understand she manages it, but
25  isn't it Bernie's responsibility to make

Page 111

M. ROCHE

1
2  sure that his employee has all the
3  necessary certifications for the job?
4         MR. CLARK:  Objection to form.
5    You can answer.
6    A.    That's something that is done by
7  Dorothy Perez for this health system.
8    Q.    Okay.  I'd like to go through
9  the roles that Matt Bond has held since he
10  started working for Crothall.  I know
11  there's overlap in your tenure at Crothall
12  and his, so to the extent you know, what
13  was Matt Bond's first position with
14  Crothall?
15    A.    I believe Matt started as an
16  intern.  An hourly intern.
17    Q.    Do you know what year he
18  started?
19    A.    It was back in the '13, '14 time
20  frame.  I don't know specifically when.
21    Q.    And then after he completed
22  that, do you know what his next role was
23  with Crothall?
24    A.    I don't just because I was not
25  directly involved with that group at that

Page 112

M. ROCHE

1
2  time.  I would assume that he was a
3  supervisor after that.
4    Q.    In -- in Fire Safety?  If I said
5  that he had a Fire Safety role in 2017,
6  does that sound right?
7         MR. CLARK:  Objection to form.
8    A.    That does sound right.
9    Q.    You said supervisor.  Is
10  supervisor the same as manager?
11    A.    No, it's not.
12    Q.    What is the difference?
13    A.    Supervisor is a lower level
14  position that has a lower salary and
15  generally oversees less things.
16    Q.    Okay.  And what was -- why don't
17  you go through his next roles?  So he was
18  a -- he was an intern and then you think
19  he was a Fire Safety supervisor.  What was
20  his next role?
21    A.    I believe it was a manager, but
22  we could look at the table of organization
23  if you'd like.
24    Q.    Sure.  That was Exhibit 2, I
25  believe.  I think in 2018, it looks like

Page 113

M. ROCHE

1
2  he was a Fire Safety assistant director?
3    A.    I agree.
4    Q.    And do you know what he -- what
5  position he had prior to becoming the Fire
6  Safety assistant director?
7    A.    I believe he was a manager.
8    Q.    And then after he was -- after
9  he was a Fire Safety assistant director in
10  2018, what was his next role?
11    A.    Can you repeat the question?
12    Q.    What was Matt Bond's role after
13  he was a Fire Safety assistant director in
14  2018?
15    A.    So I don't know the exact time
16  frame, but as an assistant director, he
17  reported to me.  And around that time
18  frame, I demoted him to a lower level
19  position, which would be the manager
20  position.
21    Q.    Around what time did you do
22  that?
23    A.    I would have to look through the
24  table of organization.
25    Q.    Would it have been around the

29 (Pages 110 - 113)

M. ROCHE

1
2  time you hired a new assistant director?
3      A.   You're asking is it shortly
4  before Joe Pasquarello was hired?
5      Q.   Yeah.
6      A.   I believe it was.
7      Q.   And did Joe Pasquarello replace
8  Matt Bond as the assistant director of
9  fire safety?
10     A.   Yes, he did.
11     Q.   And then I believe Matt Bond's
12  position changed again in 2020; is that
13  correct?
14     A.   Yes.
15     Q.   What was his next position in
16  2020?
17     A.   So Matt Bond had some personal
18  issues with Joe Pasquarello and he asked
19  if -- if there were any opportunities
20  outside of the Fire Safety Department for
21  him.  There was a vacancy as a Work
22  Control manager.
23     Q.   So who did he replace as the
24  Work Control manager?
25     A.   So that was a new position for

M. ROCHE

1
2  Crothall.  Previously, it was a Mount
3  Sinai position.
4      Q.   And when he had that new
5  position, who did he report to?
6      A.   He reported to Ryan Nowicki.
7      Q.   And you mentioned earlier that
8  you demoted him from assistant director to
9  manager.  Why did you do that?
10     A.   Having issues completing his
11  tasks, meeting certain deadlines, and I
12  think he, you know, he was -- had a good
13  knowledge base, but didn't have the
14  managerial skills to perform at that
15  level.
16     Q.   Sorry.  Did you say "to perform
17  at that level"?
18     A.   Yes.
19     Q.   So you moved him to a Fire
20  Safety manager role and hired Joe
21  Pasquarello to head the department
22  instead; is that correct?
23     A.   Well, I -- I didn't actually
24  move him.  I informed him that he was not
25  fit for the job at that level and that he

M. ROCHE

1
2  would be better suited at a more junior
3  level.  He, at that point, agreed and
4  applied for a vacant position and was
5  ultimately put into that vacant position.
6      Q.   Meaning he applied for the Fire
7  Safety manager position and then got that
8  position?
9      A.   Correct.  It was -- it was
10  really a, I guess, consensual demotion.
11  He admitted that he was not able to
12  perform at that level, and rather than
13  going down a path of counseling, he
14  accepted a position at a lower level.
15     Q.   At the time that he moved from
16  Fire Safety manager to his -- his newly
17  created role in 2020, I think you said
18  Work Control; is that correct?
19          MR. CLARK:  Objection to form.
20     Q.   Anyway, when he moved from his
21  Fire Safety manager role to his newly
22  created role in 2020, how had he been
23  performing as a Fire Safety manager?
24          MR. CLARK:  Objection to form.
25     You can answer.

M. ROCHE

1
2      A.   I just want to correct something
3  you said.  You said "newly created."  It
4  was not newly created.  It was newly -- it
5  was a new Crothall position that was
6  previously done by a Mount Sinai employee.
7      Q.   Got it.  So at the time he moved
8  from Fire Safety to his new role in 2020,
9  how had he been performing as a Fire
10  Safety manager?
11     A.   Not well, according to his
12  supervisor.
13     Q.   Who hired him for his new role
14  in 2020?
15     A.   Ryan Nowicki.
16     Q.   And Ryan Nowicki was the one who
17  interviewed him for that role?
18     A.   Yes.
19     Q.   And was he considered well
20  qualified for that role?
21          MR. CLARK:  Objection to form.
22     You can answer.
23     Q.   If you know?
24     A.   Yes.
25     Q.   Did you play any part in the

M. ROCHE

1        M. ROCHE
2  hiring or interviewing of Matt Bond for
3  his role, his new role in 2020?
4      A.   No, I did not.
5      Q.   And then I understand that now,
6  he holds the role of fire safety assistant
7  director again; is that correct?
8      A.   That's correct.
9      Q.   Do any managers report to him
10  right now?
11     A.   No.
12     Q.   You mentioned that before he
13  moved in 2020, that he had not been
14  performing that well as a Fire Safety
15  manager.  Was he counseled at all for
16  whatever shortcomings he had?
17     A.   I think I mentioned that he was
18  not performing well under the belief of
19  his direct supervisor, which was Joe
20  Pasquarello.  He was not counseled at any
21  point under Joe's tenure.
22     Q.   When you say "counseled," are
23  you talking about formal counseling filed
24  with HR or are you talking about informal
25  counseling, like guidance, instructions,

M. ROCHE

1        M. ROCHE
2  things like that?
3      A.   I'm talking about a formal
4  counseling with HR.
5      Q.   Did Joe Pasquarello provide
6  informal counseling for Matt Bond?
7      A.   I assume so.  They met on a
8  regular basis, but I was not in the room.
9      Q.   Did Joe tell you that he was
10  working with Matt Bond on Matt Bond's
11  performance?
12     A.   Joe told me that he was having
13  issues with Matt Bond's performance, but
14  he couldn't articulate specifically what
15  they were.  I told him that if there are
16  issues, then he needs to determine clear
17  expectations in writing and provide them
18  to him.  I don't believe that Joe ever did
19  that.
20     Q.   So Joe never e-mailed to you
21  communications between him and Matt Bond
22  spelling out what Matt Bond needed to do
23  or what he needed to improve on?
24         MR. CLARK:  Objection to form.
25     You can answer.

M. ROCHE

1        M. ROCHE
2      A.   Joe sent me, you know, all kinds
3  of communications.  He did send me a
4  proposed improvement plan for Matt Bond,
5  and I reviewed it and I thought it was
6  appropriate and I told him that, "You need
7  to give it to him if this is what you
8  think is going on."
9      Q.   So you took a hands-off
10  approach?
11         MR. CLARK:  Objection to form.
12     A.   My role is to manage my direct
13  reports, as is every other manager's.  I
14  wouldn't say that I took a hands-off
15  approach at all.  I would say that Joe
16  Pasquarello was not a competent manager.
17     Q.   So as far as you know, did Joe
18  ever give Matt Bond detailed instructions
19  about what he expected from Matt?
20     A.   I would assume that he did.
21  It's very likely that he did.  I don't
22  recall a situation where I've reviewed
23  that.
24     Q.   In what way was Joe Pasquarello
25  not a good manager to Matt Bond?

M. ROCHE

1        M. ROCHE
2      A.   I don't think that he had the
3  ability to provide direction.  I don't
4  think he had the ability to prioritize
5  tasks.  I don't think he really provided
6  much coaching.
7      Q.   Why -- why do you think that he
8  didn't provide those things?  Not why
9  didn't he, but why do you believe that
10  that didn't happen?
11         MR. CLARK:  Objection to form.
12     A.   I guess because I don't -- I
13  hadn't seen any improvement during the
14  time that Matt worked under Joe from Matt.
15  And I think partially that's because of he
16  was not getting clear direction.
17     Q.   So you assumed that Joe didn't
18  counsel him because Matt didn't get better
19  at his job.  Is it possible Joe did
20  counsel him, but Matt just didn't get
21  better at his job?
22         MR. CLARK:  Objection to the
23     form.  You can answer.
24     A.   I don't think I assumed that
25  Matt didn't get better at his job because

31 (Pages 118 - 121)

Page 122

M. ROCHE

1
2 he wasn't counseled.  I think that's
3 related, but I don't think that's the
4 reason.
5    Q.   But you were aware that he
6 wasn't doing well at his job?
7    A.   (Inaudible.)
8        THE COURT REPORTER:  Can you
9 repeat that, sir?
10    A.   I said yes.
11    Q.   Do you believe that Joe
12 Pasquarello's performance improved over
13 the course of his tenure with Crothall?
14    A.   I think there were things that
15 Joe did that caused improvement and I
16 think there were certainly aspects of his
17 role that he did improve, but I don't
18 believe that he performed on the level
19 that would be required in that role.
20    Q.   Is that because you didn't
21 counsel him or provide him with enough
22 support and direction?
23        MR. CLARK:  Objection to form.
24    A.   (Inaudible.)
25        THE COURT REPORTER:  Can you

Page 123

M. ROCHE

1
2 repeat that, sir?
3    A.   Sorry, yes.  I said no.
4    Q.   So when Joe's subordinate does
5 not improve, you assume that he did not
6 provide counseling and direction, but when
7 your subordinate does not improve in
8 certain respects, it's not actually
9 related to your support and direction?
10 Isn't that what you just said?
11        MR. CLARK:  Objection to form.
12    A.   No.  That's not what I said, and
13 I don't think that's a fair
14 characterization of what I'm saying.  What
15 I -- you asked me questions of did Joe
16 provide counseling to Matt?  If -- if the
17 question is did he provide a progressive
18 counseling in order to try and rectify his
19 problem behavior, the answer is no, Joe
20 did not provide that.  I provided that to
21 Joe because his performance was less than
22 what it should have been.
23    Q.   But you also stated that you
24 don't think Joe provided informal
25 counseling to Matt Bond; is that correct?

Page 124

M. ROCHE

1
2        MR. CLARK:  Objection.  Are you
3 going to continue to argue with the
4 witness?  I'll allow to you answer
5 this question, but if we're going to
6 continue to start our questions with
7 "but," I'm going to not allow him to
8 answer anymore.  Go ahead.  You can
9 answer, Mike.
10    A.   Could you restate the question?
11        MS. SELIGER:  Melissa, could you
12 read back the question?  I can't
13 remember how I stated it.
14        THE COURT REPORTER:  One moment,
15 please.
16    Q.   But Mr. Roche, when she restates
17 it, I'll restate it again without the
18 "but."
19        (Requested testimony was read.)
20    Q.   Okay.  So do you believe that
21 Joe Pasquarello provided informal
22 counseling to Matt Bond regarding his
23 performance?
24    A.   I think you asked that already,
25 and I think my answer was along the lines

Page 125

M. ROCHE

1
2 of that I assumed he did because he had
3 regular one-on-one weekly meetings and a
4 lot of interaction with him.
5    Q.   Did Joe ever tell you that he
6 was informally counseling Matt Bond?
7    A.   Yes.
8    Q.   So then he told you he was
9 informally counseling Matt Bond.  Does
10 that mean you knew that he was informally
11 counseling Matt Bond?
12        MR. CLARK:  Objection to form.
13    A.   Say that one more time?
14    Q.   No.  You can strike the
15 question.  I just want to clarify you said
16 that Joe Pasquarello did tell you that he
17 was informally counseling Matt Bond; is
18 that correct?
19        MR. CLARK:  Objection to form.
20    You can answer again.
21    A.   I guess I don't understand what
22 you mean by "informally counseling."  They
23 had regular meetings where they talked
24 about performance and expectations.  If
25 that's what you mean by informal

32 (Pages 122 - 125)

M. ROCHE

1
2 counseling, then yes, he certainly
3 informally counseled Matt on a regular
4 basis.
5    Q.   I guess I would -- I would --
6 strike that.
7        Aside from their oral
8 conversations, did Joe Pasquarello give
9 Matt Bond specific instructions about what
10 Matt Bond was supposed to complete or
11 perform in terms of his duties?
12    A.   I think that's a question that
13 needs to be answered by Joe Pasquarello or
14 Matt Bond.  If it was given, it would have
15 been given not in my company.
16    Q.   Okay.  I'd like to direct you to
17 open Exhibit 5.
18        [The document was hereby marked
19    as Plaintiff's Exhibit 5 for
20    identification, as of this date.]
21    Q.   These documents which each have
22 Bates stamp numbers on them are the offer
23 letters to Matt Bond that were produced to
24 us.  Let me know when you have them in
25 front of you.

M. ROCHE

1
2    A.   Yes.  I have them in front of
3 me.
4    Q.   Do these look to be the accurate
5 offer letters that Matt Bond was provided
6 over the years?
7    A.   -- accurate.
8        THE COURT REPORTER:  Sorry, sir.
9    Can you repeat your answer, please?
10    A.   Sure.  I said yes, they look
11 accurate.
12    Q.   If you scroll down to it's page
13 ten of this document, it's a document with
14 the Bates number D000620 and it's dated
15 12/14/2020.  Do you see that document?
16    A.   Yes, I do.
17    Q.   And it says:
18        "Congratulations.  This letter
19 will confirm the terms of our offer of
20 employment for the position of engineering
21 manager for Crothall Healthcare, a member
22 of Compass Group U.S.A., the company,
23 reporting to Michael Roche."
24        Do you see that?
25    A.   I do see that and I believe

M. ROCHE

1
2 that's not accurate.
3    Q.   Why is that?
4    A.   Because I believe that that's --
5 that's the offer for his management role
6 for Work Control, the one we previously
7 talked about where he reported to Ryan
8 Nowicki.
9    Q.   Right.  That's what I'm asking
10 you.  It says here -- oh.  So you're
11 saying the -- what are you saying is
12 inaccurate about it?  The title?
13    A.   I'm saying I believe that letter
14 is inaccurate where it states that it
15 reports to me.  That position did not
16 report to me.
17    Q.   Which position?  Engineering
18 manager?
19    A.   Yes.
20    Q.   And is that documented somewhere
21 that there was an engineering manager
22 reporting to Ryan Nowicki?
23        MR. CLARK:  Objection to form.
24    You can answer.
25    A.   I believe so.

M. ROCHE

1
2    Q.   So there's the offer letter
3 here, and if you scroll down to page 13,
4 at the end, it says, "Sincerely, Michael
5 Roche."  Is this not the offer letter that
6 was presented to Matt Bond for the role he
7 took on in or about December of 2020 or it
8 looks like the start date was January '21?
9        MR. CLARK:  Objection to form.
10    A.   That is -- it is the offer
11 letter.  It appears to be.  My point is I
12 don't believe that the information within
13 it is accurate.
14    Q.   Is anything accurate in this
15 letter?
16        MR. CLARK:  Objection to form.
17    Q.   How about the start date?  Does
18 that look accurate?
19    A.   -- the best of my recollection.
20        THE COURT REPORTER:  I'm sorry,
21    sir.  Please repeat that.
22    A.   To the best of my recollection,
23 it looks accurate.
24    Q.   And what about his salary grade?
25    A.   That I would have to look up,

Page 130

```
1            M. ROCHE
2  but I presume it's accurate.
3      Q.   What about his actual salary
4  amount?  Does that look accurate?
5      A.   Again, that I would have to look
6  up, but I presume it's accurate.
7      Q.   Were you involved in determining
8  his salary for the role he took on at the
9  end of 2020 or beginning of '21?
10     A.   I would have been involved to
11 make sure that it was within a certain
12 range, within the budgeted range, but it
13 would have been Ryan Nowicki that would
14 determine that exact salary.
15     Q.   Did Ryan Nowicki write Matt
16 Bond's performance reviews in this role?
17     A.   He would, yes.  Based upon the
18 time that he was in that role, I don't
19 know that he ever did a performance
20 evaluation in that role.
21     Q.   Okay.
22     A.   Just to add, this letter is an
23 automated letter from our software system.
24 This is not a letter that's written by me.
25 I am the signator on it, but again, that's
```

Page 131

```
1            M. ROCHE
2  automated.  So it's possible that it was
3  listed as a direct report because of the
4  fact that I'm the head of the account.
5  That doesn't necessarily mean that that's
6  the way it should be or, operationally,
7  that's how the table of organization
8  looked.
9      Q.   And so does Ryan Nowicki report
10 to you?
11     A.   He doesn't right now, but he
12 did, yes.
13     Q.   At the time of this letter, he
14 did?
15     A.   (Inaudible.)
16         THE COURT REPORTER:  If you
17 could repeat that?
18     A.   Yes.
19     Q.   So was Matt Bond then further
20 demoted?
21         MR. CLARK:  Objection to form.
22     A.   Could you restate your question?
23     Q.   Was the move from Fire Safety
24 manager to this position, whatever it was
25 called, reporting to Ryan Nowicki, was
```

Page 132

```
1            M. ROCHE
2  that a further demotion?
3      A.   This is a manager-level
4  position.  It was what I would consider a
5  lateral move.
6      Q.   Okay.  And it looks like his
7  salary went up.  Here it states he would
8  be earning $107,120 in this role, but I
9  think in 2019, the document Bates stamped
10 619 -- sorry -- D000619 just above, it
11 looks like he was making 104,000.  So
12 he -- he received a slight raise, is that
13 correct, when he moved positions?
14         MR. CLARK:  Objection to form.
15     A.   No.  That's not correct.  What
16 you're looking at is an offer of a certain
17 salary.  He -- in between those two
18 offers, he did receive an annual increase,
19 as all employees do.
20     Q.   Got it.  And then at the bottom,
21 it looks like -- sorry.  On page 624, it
22 looks like that is the offer letter for
23 his current role; is that correct?  Sorry.
24 That's page 14 of the exhibit.  The Bates
25 number is 624.
```

Page 133

```
1            M. ROCHE
2      A.   Sure.  Yes.  That's what it
3  looks like to me.
4      Q.   Okay.  I'm done with that
5  exhibit.
6         THE COURT REPORTER:
7  Ms. Seliger, I'm sorry.  Can I just
8  have two minutes really quickly?  I
9  just have, like, a technical issue.  I
10 apologize.
11         MS. SELIGER:  Sure.
12         THE COURT REPORTER:  Thank you.
13 One moment, please.
14         (A brief recess was taken.)
15     Q.   I'd like to open Exhibit 6.  If
16 you can just let me know when you have it
17 open in front of you.
18     A.   Okay.  Yes, I'm looking at it.
19     Q.   Okay.  Can you tell me what --
20 after you have a chance to kind of scroll
21 through it, can you tell me what these
22 notes appear to be or what these documents
23 appear to be?
24     A.   Should I look at all 22 pages or
25 do you want to just start by looking at
```

34 (Pages 130 - 133)

M. ROCHE

1    M. ROCHE
2 the first one?
3  Q. If you want to just scroll
4 through just to get a sense of what they
5 are and then we can look at individual
6 pages.
7  A. Just standby for a while.  I'm
8 going to read through this.
9  Q. Sure.
10  MS. SELIGER:  Melissa, I'm
11 sorry.  I completely forgot my
12 commitment to say I'd like to mark
13 this as Exhibit 6.  I would like to
14 mark this as Exhibit 6.
15  [The document was hereby marked
16 as Plaintiff's Exhibit 6 for
17 identification, as of this date.]
18  MS. SELIGER:  For the record,
19 the exhibits that we've discussed thus
20 far, I would like them marked as
21 described during the deposition.
22  Q. Again, whenever you're ready,
23 I'm not -- I'm not going to test you on
24 every word of these documents, but just
25 when you're ready, and no rush, let me

1    M. ROCHE
2 know what these documents appear to be to
3 you.
4  A. Okay.  I'm on page 19, so a few
5 more minutes.
6  Q. Okay.
7  A. Okay.  I'm all set.
8  Q. Okay.  What -- what do you
9 believe this collection of documents to
10 be?
11  A. This looks like the weekly
12 agenda that Joe would have drafted to
13 provide to me for our one-on-one meetings.
14 And then there's some period of time where
15 it looks like after Joe resigned, when
16 Bernie continued these -- this one-on-one
17 meeting with me.
18  Q. So after Joe left, who would
19 have been drafting these documents?
20  A. After Joe resigned, Bernie would
21 have been drafting these.
22  Q. Okay.  If you scroll down to --
23 let's see.  It's Bates -- it's a page with
24 the Bates stamp 643.  I'll tell you what
25 page of the exhibit it is.  Yeah.  Six

1    M. ROCHE
2 forty-three, it looks like page 17 of this
3 exhibit.
4  A. Okay.
5  Q. Do you see at the top in the
6 caption, it looks like it's dated
7 October 5, 2021, and it says,
8 "Participants:  Michael Roche and Bernie
9 Nuñez."  Do you see that?
10  A. Yes.
11  Q. Sorry.  Was that a "yes"?
12  A. Yes, I see that.
13  Q. So would this have been the
14 agenda for your meeting with Bernie Nuñez
15 on that date?
16  A. That does appear to be what it
17 is.
18  Q. And do you see the handwritten
19 notes on the document?
20  A. Yes.
21  Q. Is that your handwriting?
22  A. Yes.
23  Q. So did you generally take notes
24 during these meetings on the actual
25 agenda?

1    M. ROCHE
2  A. Only on items that I had a
3 specific interest in, but yes, it was not
4 uncommon for me to do so.
5  Q. Did you do the same when Joe
6 Pasquarello was having one-on-one meetings
7 with you?
8  A. Yes.
9  Q. Sorry.  I can't --
10  A. Yes.
11  Q. Okay.  If you look at the -- the
12 first item on the agenda, it says, "Vacant
13 Positions."  It says, "Two manager
14 positions."  Were you and Bernie Nuñez
15 discussing the hiring of two manager
16 positions at that time?
17  A. I'm not sure.  During that
18 period of time, again, there was a lot of
19 transition and I don't know specifically
20 what date -- I just -- I can't remember
21 off the top of my head the exact day that
22 Joe resigned, but it does look like we
23 were talking about staffing.
24  Q. So if I told you that Joe left
25 Crothall on or about September 21, 2021,

M. ROCHE

1
2 you don't have to take my word for it, but
3 if -- I'm going to put that out there that
4 I -- I believe that's approximately the
5 time Joe was no longer at Crothall.  If he
6 was at Crothall, would he have been part
7 of this meeting in October?
8        MR. CLARK:  Objection to form.
9     You can answer.
10    A.   So this meeting is a direct
11 report meeting for me.  It's a way of me
12 getting up to speed on what's going on for
13 all of my direct reports.  So the
14 requirement is that my direct report sit,
15 you know, have that meeting.
16        It's not uncommon for -- to
17 bring along a direct report of theirs or a
18 manager related, especially during a
19 transition like this, so it really just
20 depends how comfortable Bernie would have
21 been at that point.
22    Q.   So the item that says, "Two
23 manager positions," does that mean you
24 discussed two manager positions in Fire
25 Safety?

M. ROCHE

1
2    A.   So, again, this is a document
3 produced by Bernie, not produced by
4 myself, so that might have been related to
5 a question of are we going to hire two
6 manager positions?  Without any notes on
7 it, I really don't know what it was for,
8 but I assume it was a question from him to
9 me on how we would staff the department.
10    Q.   So after Joe Pasquarello was no
11 longer at Crothall, did you and Bernie
12 ever discuss adding or -- or staffing two
13 manager positions in Fire Safety?
14    A.   I would not be surprised if we
15 did.  Ultimately, we chose to not do that.
16    Q.   Why would you hire anyone other
17 than Bernie in Fire Safety?
18        MR. CLARK:  Objection to form.
19    A.   Could you restate that?  I'm not
20 quite sure what you're asking.
21    Q.   Well, Bernie Nuñez was the
22 director of fire safety at this time; is
23 that correct?
24    A.   Yes.
25    Q.   So why would he need any

M. ROCHE

1
2 additional staff?
3        MR. CLARK:  Objection to form.
4    A.   It was always an intention to
5 have more than one manager.
6    Q.   It was always whose intention to
7 have more than one manager?
8    A.   It's always been my intention as
9 well as any of my predecessors.
10    Q.   So was it ever the case that you
11 envisioned Fire Safety to be a one-person
12 job?
13    A.   It was the case that it was a
14 one-person job at one point in time.
15    Q.   Which point was that?
16    A.   Back in 2013.
17    Q.   Ah.  Okay.  So I'm not good at
18 math, but is that eight, nine years ago?
19    A.   Yes.
20    Q.   And I guess if you scroll to
21 page 641, so scroll up.  It looks like it
22 says under, "Vacant positions," it says,
23 "Two manager positions," and then it has a
24 bullet point:  "Julie/Mario contacting
25 prospects for interviews."  Can you

M. ROCHE

1
2 explain to me what that agenda item means?
3    A.   It's likely referring to Julie,
4 who is our recruiter, and Mario, who, at
5 the time, was our facility coordinator.
6 Generally, that person would be
7 responsible for arranging interviews to
8 take some of the workload off of our
9 managers.
10    Q.   So Julie and Mario were helping
11 Bernie contact prospects for interviews?
12 Is that what that means?
13    A.   Yes.
14    Q.   And it looks like they would be
15 prospects for these manager positions; is
16 that correct?
17    A.   Yes.  That's what it looks like.
18    Q.   Okay.  And then if you scroll up
19 to page 637 or Bates number 637, it looks
20 like on this page, page 11 of the
21 document, under "Management positions" on
22 November 16th of 2021, it says, "Matt Bond
23 - Assistant Director."  Can you tell me
24 what this agenda item means?
25    A.   It looks like Bernie's proposing

M. ROCHE

1 M. ROCHE
2 recruiting Matt Bond for an assistant
3 director level position.
4    Q.   Why -- did you discuss this
5 suggestion at that meeting?
6    A.   Yeah. I'm sure we did.
7    Q.   And do you recall what the
8 discussion was around hiring Matt Bond as
9 an assistant director?
10    A.   I don't recall that specific
11 discussion. If I were to answer the
12 question right now, I -- I'm sure that I
13 would have said that Matt Bond has a very
14 good knowledge base of the systems and
15 operationally has been good in the role,
16 but he had a lot of deficiencies and
17 issues with the timeliness of his
18 documentation.
19    Q.   So, ultimately, what was the
20 discussion -- or strike that.
21       What caused you or Bernie to
22 approve Matt Bond as the assistant
23 director of fire safety ultimately?
24       MR. CLARK: Objection to form.
25    You can answer.

M. ROCHE

1 M. ROCHE
2    A.   So to clarify, Matt Bond would
3 have been reporting to Bernie, so it would
4 have been 100 percent Bernie's decision.
5 And, ultimately, I voiced hesitation, but
6 not to the point where I told him that he
7 would not be considered. If Bernie wanted
8 to hire him, I was giving Bernie that
9 managerial ability to hire him.
10    Q.   Why was Matt Bond hired as an
11 assistant director as opposed to a
12 manager?
13    A.   We were having discussions at
14 that point of how to staff the department;
15 whether to staff it with two junior level
16 persons or one more -- more seasoned
17 person, and I guess, ultimately, Bernie
18 decided that he would like one person with
19 more knowledge and some historical
20 knowledge than two more green people,
21 lower level people.
22    Q.   And so even though Matt Bond had
23 not been in the Fire Safety Department
24 since he left in 2020 or January of '21,
25 he was considered a seasoned Fire Safety

M. ROCHE

1 M. ROCHE
2 employee?
3       MR. CLARK: Objection to form.
4    A.   I think he was considered
5 somebody with a vast knowledge of Fire
6 Safety systems and historical knowledge on
7 the campus. In that respect, he knew far
8 more than Bernie or Joe Pasquarello mostly
9 related to his tenure here. He's been
10 here nine years. It takes a lot of time
11 to learn all the systems. And, again,
12 that was a decision made by the then
13 director of fire safety.
14    Q.   But he knew Matt Bond's history
15 in his former circuit in Fire Safety when
16 he made that decision?
17       MR. CLARK: Objection to form.
18    You can answer.
19    A.   Yes. He was made well aware of
20 Matt Bond's previous issues.
21    Q.   Okay. I'm done with this
22 exhibit. Are you familiar with the
23 Outmatch Assessment Service for employers?
24    A.   I've seen it. I wouldn't
25 consider myself familiar. I have seen it

M. ROCHE

1 M. ROCHE
2 maybe twice. It's a relatively new
3 program by HR and primarily I think used
4 by HR, but I have seen a report, yes.
5    Q.   Do you know how HR uses that
6 service?
7    A.   So my understanding is it's a --
8 kind of a survey type personality based
9 question where you answer a number of
10 questions and they come up with a
11 determination on how fit for the role you
12 are.
13    Q.   And is it used in decision
14 making regarding prospective candidates?
15    A.   So it's one of many tools. It
16 misses completely your knowledge base and
17 technical skills. It's more geared
18 towards personalities and understanding
19 relationships and kind of the soft skills.
20 Not -- not as much, you know,
21 knowledge-based requirements.
22    Q.   Okay. I'd like to open
23 Exhibit 7.
24       MS. SELIGER: I'd like to mark
25    this as Exhibit 7.

37 (Pages 142 - 145)

1        M. ROCHE
2        [The document was hereby marked
3    as Plaintiff's Exhibit 7 for
4    identification, as of this date.]
5        Q.   You'll see these are documents
6    Bates stamped D504 to D512. These are
7    what look like personnel type records
8    related to Matt Bond. Do you see that?
9        A.   I am looking --
10       MR. CLARK: Objection to form.
11   Go ahead.
12       A.   I'm looking at it right now.
13   Yes, I see it.
14       Q.   Do you see the -- the first few
15   pages of the document or two pages,
16   rather, look like a resume for Matt Bond?
17       A.   Yes.
18       Q.   Okay. And then if you scroll
19   down, the bottom of the -- of page three,
20   Bates stamp 506, that it looks like some
21   other sort of record begins. This is --
22   would you agree that this is no longer his
23   resume?
24       A.   Yes. This is no longer his
25   resume.

1        M. ROCHE
2        Q.   Okay. If you scroll down to
3    page -- it's Bates stamped 511, page eight
4    of this document.
5        A.   Yes.
6        Q.   Do you see -- I guess it starts
7    at the bottom of page seven, it lists
8    certifications possessed by Matt Bond.
9    So, actually, the page Bates stamped D510
10   is where it seems to start.
11       A.   Yes.
12       Q.   So it looks like he has some
13   certification called CHFM; is that
14   correct?
15       A.   Yes.
16       Q.   And it says it has an effective
17   date listed there and then an expiration
18   date, which is October 31, 2022; is that
19   correct?
20       A.   Yes. That's what it looks like.
21       Q.   And then if you scroll down to
22   the next page, there are similar entries
23   for a certification called F-60, W-7, F-7,
24   F-1, S-14, S-13, S-12, and S-95. Do you
25   see that?

1        M. ROCHE
2        A.   Yes.
3        Q.   Do you see that there are no
4    effective dates or expiration dates next
5    to those entries?
6        A.   Yes.
7        Q.   It appears that this is a place
8    where certifications are recorded; is that
9    true?
10       MR. CLARK: Objection to form.
11       A.   This is the first time I'm
12   seeing this document and I'm not familiar
13   with it. It does look like those are
14   certifications.
15       Q.   Do you know if Matt Bond had any
16   of these at the time that he was assistant
17   director in 2018 and '19?
18       A.   Yes, he did.
19       Q.   Do you know why it's not
20   recorded here?
21       A.   My assumption would be that he
22   didn't fill that text box in when he
23   applied for his current role, but no. I
24   do not know why it's not listed here.
25       Q.   And does he have those

1        M. ROCHE
2    certifications now?
3        A.   I think you already asked me
4    that and, again, my understanding is yes,
5    but I don't know that to be true.
6        Q.   Okay. But when he was assistant
7    director of fire safety in 2018 and '19,
8    you did know that to be true?
9        A.   Yes. He had the fire
10   certifications. I'm not sure if he had
11   the CHFM and there was one new one that he
12   got. Yeah. Based on what's listed, I
13   would say that he had all of those up to
14   that point.
15       Q.   But wouldn't it be based on you
16   seeing evidence of those certifications?
17       MR. CLARK: Objection to form.
18       A.   I likely did at some point in
19   time. I don't recall specifics of it.
20       Q.   Okay. Is that because it was
21   not a priority to have evidence of those
22   certifications?
23       MR. CLARK: Objection to form.
24       A.   No. It's because that was a
25   long time ago.

38 (Pages 146 - 149)

1          M. ROCHE
2     Q.   And I don't see the F-89 listed
3  here.  Does he have the F-89 right now?
4     A.   Yes.
5     Q.   How do you know?
6     A.   I've seen a copy of that.
7          MS. SELIGER:  That was also a
8  document that we requested and that
9  was not produced, so I'll ask that it
10  be produced.
11          MR. CLARK:  Okay.  Send us a
12  note and we will follow up.
13          MS. SELIGER:  Will do.
14     Q.   Okay.  When you put Joe
15  Pasquarello on a performance improvement
16  plan, you required him to get certain
17  certifications by a certain date; is that
18  correct?
19     A.   Yes.
20     Q.   And I believe you required him
21  to get the F-1, F-3, F-4, F-7, W-7, S-12,
22  S-13, S-14, S-95, and F-89; is that
23  correct?
24     A.   Yes.  Some of those he already
25  had, but I just wanted to document the

1          M. ROCHE
2  fact that they were current and that he
3  had them.
4     Q.   So it became very important to
5  you to document the status of his
6  certifications at that time; is that
7  correct?
8          MR. CLARK:  Objection to form.
9     A.   Can you just ask that question
10  again?
11     Q.   Was it important to you to
12  document the status of his certifications
13  at the time you gave him the performance
14  improvement plan?
15     A.   So at the start of his
16  employment, he made mention to me that he
17  had all those certifications.  I don't
18  know if that's true or not.  What I know
19  is that he did not have the F-89 for the
20  bulk of his time here.
21          I mentioned that obviously when
22  we started as well as during his annual
23  appraisal and he made no effort to do
24  that, so I felt it important to document
25  it so that he would follow through.

1          M. ROCHE
2     Q.   How did you know he made no
3  effort to get certain certifications?
4     A.   Because he didn't have them.
5     Q.   How did you know he didn't have
6  them?
7     A.   When he got them, he -- shortly
8  before his -- shortly before he resigned,
9  he produced a copy of all of his
10  certifications, which was the first time
11  that some of them I had seen.  So I know
12  that some of them were new.
13     Q.   So it's first time you saw the
14  documentation, so how would you know that
15  he didn't have it?
16     A.   Because on the --
17          MR. CLARK:  Hang on.  Objection
18  to form.  Go ahead, Mike.  You can
19  answer.
20     A.   On the documentation is a copy
21  of the license.  That documentation has
22  the license issue date.
23     Q.   Mm-hmm.  So you only knew that
24  he didn't have it prior once he actually
25  attained the goal?  Is that what

1          M. ROCHE
2  you're saying?
3          MR. CLARK:  Objection --
4  objection to form.
5     A.   No.  What I'm saying is that
6  some of them were newly -- were newly
7  issued.
8     Q.   Mm-hmm.  Which ones?
9     A.   I'm going to have to look that
10  up.
11     Q.   Were you aware that Joe
12  Pasquarello came into the position with a
13  Z-89 certification?
14          MR. CLARK:  Objection to form.
15     A.   He made mention of that to me
16  and I have never seen it.  He told me that
17  he just had to go and take a test.  He let
18  it expire and he lost it.  He then, after
19  I had given him the -- the performance
20  improvement plan, he took time off of work
21  and he, at Crothall's expense, took a
22  class and they reissued it.
23          So there was a long period of
24  time during his tenure here where,
25  although he says he had it when he came

Page 154

1        M. ROCHE
2  in, he did not have it and it was not
3  valid.
4      Q.   So first of all, did Crothall
5  reimburse him for the cost of that class?
6      A.   If he submitted an expense
7  report, they would have, yes.
8      Q.   Is there -- would there be
9  documentation of that reimbursement?
10     A.   If he submitted an expense
11 report, there would be documentation of
12 that expense report.
13     Q.   And what is the connection or
14 not between a Z-89 certification and an
15 F-89 certification?
16     A.   So my understanding is the Z-89
17 is -- basically says that you took the
18 class and you passed the written test, and
19 the F-89 is after you've taken and passed
20 the on-site practical exam.
21     Q.   So you can come into a job with
22 a Z-89 certification, but you can't
23 actually get the F-89 certification until
24 you're in a building; is that correct?
25     A.   Correct.

Page 155

1        M. ROCHE
2      Q.   And didn't you testify earlier
3  that the process of getting an F-89
4  certification is lengthy?
5      A.   It is lengthy.  The issue that I
6  took with it is that it wasn't requested.
7      Q.   What wasn't requested?
8      A.   You have to submit a form to
9  request that exam through the fire
10 department.
11     Q.   Do you know on what date Joe
12 Pasquarello's certification expired?
13     A.   I do not.
14     Q.   So how did you know that it was
15 an issue when you wrote that performance
16 plan?
17         MR. CLARK:  Objection to form.
18     You can answer.
19     A.   How did I know it was an issue?
20 What do you mean by that?
21     Q.   How did you know it was expired?
22     A.   I asked him if he has the
23 license and he said no, he had allowed it
24 to expire.
25     Q.   He allowed it or does it

Page 156

1        M. ROCHE
2  naturally expire after a certain period?
3         MR. CLARK:  Objection to form.
4      A.   Can you restate?
5      Q.   It's okay.  I'll move on.  Who
6  issues the F-89 certification?
7      A.   New York City Fire Department.
8      Q.   And like you -- you testified
9  earlier that Joe joined Crothall just
10 before COVID hit.  Was the fire department
11 testing and issuing certifications during
12 COVID?
13     A.   There was a period of time that
14 they were not, but they were still
15 accepting requests and the only way for
16 you to -- if you had submitted that
17 request, they would have put your license
18 so that it wouldn't expire.
19         So they would have allowed even
20 if -- even if the test date, based upon
21 their scheduling availability, was after
22 your expiration, as long as you requested
23 it, they wouldn't require you to go
24 through the course again.
25         In this case, Joe never

Page 157

1        M. ROCHE
2  requested it.  He allowed the license to
3  expire.  He then had to retake the class
4  and retake the test and be issued a new
5  license.
6      Q.   And when did you make it clear
7  to Joe that you wanted him to make the
8  request?
9      A.   During my interview with him.  I
10 said that would it be a problem for him to
11 get his license assigned to the building?
12 He stated that no, he has the license
13 already and it would be simple.
14     Q.   Okay.  So you asked him if it
15 would be a problem.  And when did you
16 direct him to make sure he got that F-89
17 certification?
18     A.   On his first day --
19         MR. CLARK:  Objection to form.
20     A.   On his first day of employment,
21 we went over expectations.  That was one
22 of the expectations.
23     Q.   And --
24     A.   During our annual appraisal, we
25 reviewed and I think it's documented on

40 (Pages 154 - 157)

1        M. ROCHE
2  it, we reviewed it and it didn't happen
3  after that.  It wasn't until I put it on
4  an improvement plan that he actually
5  followed through with it.
6     Q.   When you mentioned getting the
7  certification on his annual review, did
8  you give him a time frame within which to
9  obtain it?
10    A.   I don't recall.  It certainly
11 would have been within the year prior to
12 the next -- prior to the next annual
13 appraisal.
14    Q.   What appraisal are you talking
15 about?
16        MR. CLARK:  Objection to form.
17    A.   -- appraisal.
18        THE COURT REPORTER:  If you
19 could repeat that, Mr. Roche?
20    A.   I'm talking about the Crothall
21 annual appraisal.
22    Q.   Oh.  So you think you would have
23 given him 12 months to get that done?
24    A.   Well, that was --
25        MR. CLARK:  Objection to form.

1        M. ROCHE
2  Sorry, Mike.  Objection to form.
3        THE WITNESS:  Sorry.
4        MR. CLARK:  Go ahead.
5     A.   That was a goal on his annual
6  appraisal, to the best of my recollection.
7     Q.   And did he get that done within
8  a year?
9     A.   He did -- he did get it done
10 after I put it on the improvement plan, so
11 yes, he got it done within a year.
12    Q.   Right.  But it's not -- you put
13 it on the improvement plan prior to him
14 failing to meet that goal; is that
15 correct?
16        MR. CLARK:  Objection to form.
17    A.   Yeah.  I'm not sure I
18 understand.
19    Q.   Meaning in -- at the end of 2020
20 when you provided him an annual review and
21 gave him 12 months to get the F-89
22 certification -- sorry.  At the end of
23 2020, I imagine at some point you gave him
24 an annual review and you gave him about a
25 year to get that F-89 training or

1        M. ROCHE
2  certification; is that correct?
3     A.   It's not correct.  That was a
4  goal.  My expectation was that it -- was
5  that it would be completed far before
6  12 months.
7     Q.   That --
8     A.   I would have been -- I would
9  have been disappointed had it not been.
10    Q.   Although you've testified that
11 you're well aware that this is a lengthy
12 process that could last two years; isn't
13 that correct?
14        MR. CLARK:  Objection to form.
15    A.   I think I already said that I
16 would have been sufficiently satisfied if
17 the request had been made.
18    Q.   So when Joe received a PIP from
19 you, which I believe was in or about June
20 of 2021, it had not been 12 months since
21 his annual review; is that correct?
22    A.   Yes.
23    Q.   So is it correct that an item on
24 his performance plan was an item that was
25 not yet due to be performed?

1        M. ROCHE
2        MR. CLARK:  Objection to form.
3  You can answer it again.
4     A.   Could you ask the question
5  again?
6     Q.   In June of 2021, had Joe
7  Pasquarello missed the deadline you had
8  set for him to obtain his F-89
9  certification?
10    A.   There was no deadline presented.
11 It was a goal and an expectation, but
12 there was no documented deadline.  My
13 expectation was that it would have been
14 completed before having to put him on an
15 improvement plan.  My expectation is it
16 would have been completed quickly.
17    Q.   And aside from Joe's first day
18 at work, did you communicate your desire
19 that he have that certification at other
20 times?
21        MR. CLARK:  Objection to form.
22    A.   I would say we regularly talked
23 about it.
24    Q.   Was it on the agendas for your
25 one-on-one meetings?

41 (Pages 158 - 161)

M. ROCHE

1
2    A.   Joe produces the agendas so I
3  don't believe he included it in the
4  agendas, but it was certainly discussed.
5    Q.   Did you ever e-mail him about
6  getting that certification?
7    A.   I don't recall.
8    Q.   But it sounds like you felt it
9  was very important that it be up to date?
10        MR. CLARK:  Objection to form.
11   A.   It's important that a manager
12  has the certifications within their
13  fields.
14   Q.   Okay.  Do you know -- I'm going
15  to switch over.  Do you know who Joe
16  Jurain is?
17   A.   Yes.
18   Q.   Do you know approximately how
19  old he is?
20   A.   I would say he's in his fifties,
21  but no, I don't know exactly.
22   Q.   What is his current job?
23   A.   He is a Fire Safety manager at
24  Mount Sinai Queens.
25   Q.   Is that a facility that you are

M. ROCHE

1
2  in charge of?
3    A.   Yes.
4    Q.   And what was his prior position?
5    A.   He was a -- either a Mount Sinai
6  Fire Safety manager or supervisor.  I
7  can't quite recall, but he worked in the
8  Fire Safety Department at Mount Sinai
9  Hospital under Joe.
10   Q.   And did he work for Joe's
11  predecessor as well?
12   A.   Joe -- Joe's predecessor was
13  Matt Bond.  I don't recall whether or not
14  he started shortly after or shortly
15  before.  I do know that he was employed
16  when Joe got here.
17   Q.   Okay.  And how was his
18  performance in his role at the Mount Sinai
19  Hospital Fire Safety Department?
20   A.   There were issues with his
21  performance.
22   Q.   And how are -- how do you know
23  that?
24   A.   Joe told me.  Joe Pasquarello
25  told me.

M. ROCHE

1
2    Q.   And did he talk to you about his
3  efforts to counsel -- informally counsel
4  Joe Jurain?
5    A.   I believe so.  We had very
6  similar discussions as the Matt Bond
7  discussions.  There was a lot of back and
8  forth, but also a lot of -- a lot of -- a
9  lot of ambiguity.  He had issues, but had
10  a difficult time specifying exactly what
11  those issues were.
12   Q.   Joe had issues or -- I'm sorry.
13  They're both Joe.  Joe Jurain had issues
14  with specifying or --
15   A.   I'm sorry -- I'm sorry.  I meant
16  Joe Pasquarello had issues specifying
17  exactly what problems he was having with
18  Joe Jurain, but he did make clear that
19  he -- that Joe Jurain was not meeting his
20  expectations.
21   Q.   And did Joe Pasquarello
22  ultimately issue Joe Jurain a progressive
23  counseling or a performance plan?
24   A.   Yes, he did.
25   Q.   Did you support that move?

M. ROCHE

1
2    A.   I felt it was the right move at
3  the time based upon the information that I
4  was being given.
5    Q.   And I'm sorry.  Did Joe
6  Pasquarello issue Joe Jurain a PIP or a
7  progressive counseling?
8    A.   I know that he issued him a PIP.
9  I'm not sure whether or not there was a
10  counseling associated with that.
11        MS. SELIGER:  We've called for
12     the production of that PIP.  It was
13     not produced, so I'm going to call
14     that it be produced.
15   Q.   Do you know if Joe Jurain
16  completed that performance improvement
17  plan?
18   A.   I don't know if he completed it.
19  Ultimately, it was resolved by Joe
20  transferring and applying to and accepting
21  a position within Mount Sinai Queens.
22  And, again, that's Joe Jurain.
23   Q.   Who suggested that he transition
24  to the other hospital?
25   A.   So he was given a performance

42 (Pages 162 - 165)

Page 166

1          M. ROCHE
2 improvement plan. Based upon my
3 recollection, I think we had gotten to a
4 point where it seemed like he was not --
5 he was still not able to achieve all the
6 aspects of that plan and that his workload
7 was more than he could handle.
8          And we had discussions with Bob
9 Shaffer and Chris Hariegel on what the
10 best course of action would be for him.
11 He did have a lot of good qualities and he
12 had some bad qualities. And, ultimately,
13 I believe it was Chris that made the
14 suggestion why not try him at a smaller
15 site where it would be more manageable and
16 a lot less going on.
17    Q.   Was Joe Pasquarello involved in
18 those conversations?
19    A.   Some of them, he was involved
20 in. Some of them, he was not involved in.
21    Q.   Did Joe Pasquarello ever suggest
22 that Joe Jurain be transferred to a
23 smaller facility?
24    A.   I don't recall. It certainly
25 wasn't an idea that he initiated, but he

Page 167

1          M. ROCHE
2 may have heard it from Bob and then
3 brought it up to me.
4    Q.   Do you know who Ron Kanterman
5 is?
6    A.   I do.
7    Q.   And what was -- was he an
8 employee at Crothall?
9    A.   Yes, he was.
10    Q.   What was his role?
11    A.   He was a Fire Safety super --
12       (Court reporter had connection
13    issues.)
14    A.   I would --
15       THE COURT REPORTER: Folks -- I
16    apologize, folks. My connection
17    froze. I will read what I have so
18    far, and then we'll go from there.
19       (Previous testimony was read.)
20       THE COURT REPORTER: And that's
21    where it cut out.
22    A.   Sure. So just to finish that,
23 he was a Fire Safety supervisor.
24    Q.   As a Fire Safety supervisor,
25 what were his responsibilities?

Page 168

1          M. ROCHE
2    A.   Primarily, he was responsible
3 for directly overseeing the Fire Safety
4 marshals, the Mount Sinai staff, and
5 basically managing day-to-day operations,
6 issuing hot-work permits, accepting and
7 approving shutdown requests with input
8 from other members of Fire Safety and
9 Engineering, and then just any -- any
10 other task assigned to him by Joe
11 Pasquarello.
12    Q.   Was he a full-time employee?
13    A.   He was.
14    Q.   Okay. And do you know who
15 Omelfi Garcia is?
16    A.   Yes.
17    Q.   Did she ever work in the Fire
18 Safety Department at Mount Sinai Hospital?
19    A.   Yes.
20    Q.   Do you recall approximately when
21 she did that?
22    A.   Yes. Again, it was under Joe's
23 tenure and I recall that she started -- it
24 would have been 2021, probably shortly
25 after Kanterman, I believe.

Page 169

1          M. ROCHE
2    Q.   Okay. And when do you believe
3 she left?
4    A.   She left either just before or
5 just after Kanterman.
6    Q.   Okay. Was Ron Kanterman
7 replacing anyone when he joined Fire
8 Safety?
9    A.   I don't recall. Over -- over
10 that, you know, three-year period, there
11 were a lot of transitions of who went in
12 and out and what levels they were and, you
13 know, I can't remember specifics.
14    Q.   Did Joe Jurain manage the fire
15 marshals and fire staff before Ron
16 Kanterman got there?
17       MR. CLARK: Objection to form.
18    You can answer.
19    A.   Joe Jurain had some role in
20 managing fire marshals. He did -- he did
21 a lot of other things. At that point in
22 time, I believe that was when Matt Bond
23 and Joe Jurain were still working under
24 Joe Pasquarello.
25       And Joe Pasquarello really

43 (Pages 166 - 169)

M. ROCHE
1       M. ROCHE
2 didn't do a great job with defining roles
3 and responsibilities, which is why there
4 was a lot of jumping around and people
5 taking on new things and -- and basically
6 tasks not getting completed.  There was a
7 lot of mismanagement.  I would say,
8 primarily, Joe Jurain did manage the fire
9 marshals at that point.
10      Q.   And did anyone manage the fire
11 marshals between the time Joe Jurain left
12 and the time Ron Kanterman came in?
13      A.   I don't remember the length of
14 time, but I mean, certainly the answer is
15 yes.  Somebody managed them.  All of that
16 falls under Joe Pasquarello, so Joe
17 Pasquarello probably had a piece of that.
18          And, again, I don't remember
19 specifically the date of when Matt Bond
20 left the department, but, really,
21 throughout the whole -- his whole tenure,
22 it was -- it was up to Joe to determine
23 who was going to do what.
24      Q.   So if he had no managers for any
25 period of time, would that mean that he

1       M. ROCHE
2 was managing the fire marshals?
3      A.   Yes, I -- I believe so.  During
4 that time, he had a lot of assistance from
5 other engineering managers because I think
6 we acknowledged, you know, for that short
7 period of time, he was short-staffed.
8      Q.   Are you referring to the period
9 of time between Joe Jurain leaving and Ron
10 Kanterman coming in?
11      A.   There was a period of time where
12 Joe was the only person within the Fire
13 Safety Department.  That's the period of
14 time I'm referring to.
15      Q.   So which people are you saying
16 were assisting him at that time?
17      A.   So I personally did a lot more
18 than I should have for the department.  I
19 know that Bobby Denver was a big supporter
20 and assisted him in a lot of ways with
21 scheduling and dealing with vendors.  Doug
22 Rome had some role in that.  John Barton
23 assisted him quite a bit.
24      Q.   I mean, those guys are not Fire
25 Safety experts; is that correct?

1       M. ROCHE
2          MR. CLARK:  Objection to form.
3      A.   -- mean by "expert"?
4      Q.   Well, I'm just wondering how
5 Bobby Denver or Doug Rome or John Barton
6 can assist with fire safety related
7 duties?
8          MR. CLARK:  Objection to form.
9 You can answer.  Well, is that a
10 question?  Is the question how did
11 they assist or you're wondering how
12 they assisted?
13          MS. SELIGER:  I'm questioning
14 how they assisted.
15          MR. CLARK:  Objection to form.
16 You can answer.
17      A.   So starting with John Barton,
18 he's got about 40 years of experience.  He
19 is certainly more qualified and
20 knowledgeable even in Fire Safety than Joe
21 Pasquarello is without any doubt.  He
22 holds a number of licenses.  He
23 independently managed multiple programs at
24 other hospitals prior to his time here.
25 So there's no question in my mind or

1       M. ROCHE
2 anyone else's that he would be more
3 qualified than Joe.
4          When it comes to Bobby Denver
5 and Doug -- Doug Rome, both of them are --
6 are engineering graduates with more
7 hospital experience than Joe Pasquarello
8 has.  Both of them are far more
9 knowledgeable in many of the different
10 systems than Joe Pasquarello ever was.  So
11 I think it's fairly easy to determine how
12 they assisted.
13      Q.   What systems are you talking
14 about?
15      A.   Joe did not have a great
16 understanding of the types of testings at
17 times and how to complete them, and he
18 needed assistance coordinating and
19 arranging that type of work and that's the
20 assistance that was provided.
21      Q.   Didn't you say you have a
22 platform or technology that tells managers
23 what maintenance and testing needs to get
24 done?
25          MR. CLARK:  Objection to form.

44 (Pages 170 - 173)

M. ROCHE

2 A. Yes.
3 Q. So did these people that you
4 mentioned do any of the work that you
5 deemed part of Joe Pasquarello's job
6 responsibilities?
7 A. Yes.
8 Q. Which tasks did they do that
9 were part of Joe's actual
10 responsibilities?
11 A. John Barton conducted all of the
12 annual fire pump flows and repairs. Bobby
13 Denver assisted with -- Bobby and Doug
14 both assisted with getting Pyro. Doug
15 specifically -- sorry. Pyro -- PyroSignal
16 is a vendor. I started saying Pyro, but
17 PyroSignal is the fire alarm vendor.
18     Bobby Denver assisted with
19 coordinating them and expediting schedules
20 for certain testing. Doug Rome
21 coordinated elevator testing, which is --
22 has a fire alarm component.
23 Q. And you said John Barton worked
24 with the -- he managed the repairs and
25 flows for fire pumps; is that what you

M. ROCHE

2 said?
3 A. Yes. So there's an annual
4 requirement to test your fire pumps and
5 achieve a certain flow rate. He managed
6 that program as well as correcting any
7 deficiencies. Historically, that was a
8 Fire Safety program, but one that Joe was
9 not able to adequately manage.
10 Q. So was Joe meant to repair the
11 fire pumps or test them himself?
12 A. Himself?
13 Q. Yeah.
14 A. No.
15 Q. So what -- what did John Barton
16 do that Joe Pasquarello should have done?
17 A. Joe didn't have the background
18 to understand what types of repairs were
19 needed and how to achieve those repairs.
20 He couldn't -- he couldn't adequately
21 describe it to a contractor. So John
22 Barton took that on and did that role;
23 ultimately repaired them.
24 Q. Doesn't a contractor know what's
25 involved with those tests and repairs?

M. ROCHE

2     MR. CLARK: Objection to form.
3 A. Usually it's an engineer that
4 would recommend those types of repairs and
5 the contractor follows the direction the
6 engineer gives.
7 Q. So you hired Joe knowing he's
8 not an engineer; is that correct?
9 A. I didn't -- yes, that's correct.
10 Joe is not an engineer.
11 Q. Okay.
12     MR. CLARK: Leah, at a
13 convenient time, can we take a break?
14     MS. SELIGER: Yes. Let me look.
15 We can take a break now.
16     MR. CLARK: Okay. Off the
17 record for a moment.
18     (A discussion was held off the
19 record.)
20     (A lunch recess was taken from
21 2:30 p.m. until 3:16 p.m.)
22     MS. SELIGER: All right. So
23 we're back on the record.
24 Q. I wanted to just finish
25 addressing some things we were talking

M. ROCHE

2 about just before the break.
3     Did you testify earlier that
4 John Barton took over testing and
5 maintenance of the fire pumps at some
6 point during Joe Pasquarello's tenure?
7 A. Well, I think I said that I
8 assisted him -- that he assisted him.
9 Historically, it was always a Fire Safety
10 function. It's obviously a Fire Safety
11 system that serves all the sprinklers.
12 John did get involved and was managing
13 that program for some time.
14 Q. So when you say "managing that
15 program," was managing that program
16 supposed to be Joe Pasquarello's job?
17 A. Yes.
18 Q. Sorry. Did you say yes?
19 A. Yes.
20 Q. Okay. And prior to Joe
21 Pasquarello's tenure, who managed the
22 program of testing and maintenance of the
23 fire pumps?
24 A. Fire Safety.
25 Q. Which individual human being was

45 (Pages 174 - 177)

Page 178

```
1            M. ROCHE
2 the one doing it?
3    A.   I don't recall.  You know, going
4 back as far as 2013 through 2015, it was
5 always in Fire Safety.  Bob Shaffer did it
6 and Bill VanWart did it.  Matt Bond may
7 have done it.  I don't know at what point
8 it transitioned into a Plant activity.
9    Q.   How about in 2019 just before
10 Joe Pasquarello joined Crothall?  Who was
11 managing the testing and maintenance of
12 fire pumps?
13    A.   I don't know.  Again, sometime
14 between -- between, like, 2017 and 2021,
15 it had become managed by Plant.  But
16 historically, it was always a Fire Safety
17 function.
18    Q.   So was it not a Fire Safety
19 function in October of 2019 when Joe
20 Pasquarello joined?  Is that what you're
21 saying?
22    A.   I don't know who was managing it
23 at that time.  It -- the fact of the
24 matter is that it is a Fire Safety device
25 and should be managed by the Fire Safety
```

Page 179

```
1            M. ROCHE
2 Department.
3    Q.   I understand you think it should
4 be managed by the Fire Safety Department,
5 but who was managing the testing and
6 maintenance of fire pumps before Joe
7 Pasquarello?  And I don't mean ancient
8 history.  I mean in 2019, let's say three
9 months before Joe Pasquarello joined, who
10 was the individual who was managing that
11 program?
12        MR. CLARK:  Objection to form.
13    You can answer.
14    A.   So you did ask me that I think
15 same question, and I answered to the best
16 of my ability already.  I don't have any
17 additional information.
18    Q.   So I'm sorry.  I forgot what you
19 said.  Can you just repeat your answer?
20    A.   Sure.  So I said sometime
21 between 2017 and 2021, that function was
22 performed by Plant maintenance as opposed
23 to fire safety, but with the expectation
24 that it would always transition and should
25 be managed by the fire safety group.
```

Page 180

```
1            M. ROCHE
2    Q.   Who had that expectation?
3    A.   I did.
4    Q.   You did?  So you said sometime
5 between 2017 and 2021, that responsibility
6 was put with Plant, but you had always
7 expected to return it to Fire Safety?
8    A.   Yes.  Every other hospital
9 across the system is -- it is managed by
10 Fire Safety.  It's a fire pump, so it's
11 Fire Safety managed.
12        There was a period of time here
13 where people had a lot of issues getting
14 the corrections done and figuring out how
15 to correct it and other people had to step
16 in to resolve that issue, and it is now
17 back in the hands of Fire Safety.
18    Q.   Which individual person is
19 managing the testing and maintenance of
20 the fire pumps now?
21    A.   Right now, it's the director of
22 fire safety, which is Bernie Nuñez.
23    Q.   And I think you mentioned that
24 sometime between 2017 and 2021, that role
25 was moved to Plant.  Is that the area that
```

Page 181

```
1            M. ROCHE
2 John Barton controls?
3    A.   Yes.
4    Q.   Can you narrow down that time
5 frame?  It seems to be significant.
6        MR. CLARK:  Objection to form.
7    I think you've answered this three
8    times now.  If you can answer it
9    again, go for it.
10        MS. SELIGER:  The answer keeps
11    changing.
12        MR. CLARK:  It's not.  It's been
13    2017 to 2021 three times, but go
14    ahead, Mike.  Answer the question.
15        MS. SELIGER:  Well, here.  Why
16    don't I -- why don't I ask it again in
17    -- in a more specific way?  I think I
18    did this once.
19    Q.   I'm only asking you who was
20 managing the testing and maintenance of
21 fire pumps in 2019?  Not any time before
22 it; just 2019?
23        MR. CLARK:  Objection to form.
24    Asked and answered.  You can answer
25    again.
```

46 (Pages 178 - 181)

Page 182

M. ROCHE
1
2      A.   I don't have any more
3  information to add to my previous answer.
4      Q.   I don't think you ever said who
5  was managing this program in 2019.
6          MR. CLARK:  He told you -- hang
7  on, Mike.  He told you that sometime
8  between 2017 and 2021, he doesn't
9  remember, it switched.  There's no --
10  I mean, we can keep asking the same
11  question.  His memory is not going to
12  change in a four-minute period, so I
13  suggest we move on.  This --
14          MS. SELIGER:  Are you --
15          MR. CLARK:  -- is getting
16  harassing already.  No.  I'm repeating
17  his testimony that he's given you now
18  four or five times.
19          MS. SELIGER:  Okay.  It doesn't
20  sound exactly like what Mr. Roche
21  said, so I'll just confirm what I
22  heard.
23      Q.   In 2019, Plant was testing --
24  was managing the testing and maintenance
25  of the fire pumps?

Page 183

M. ROCHE
1
2          MR. CLARK:  Objection to form.
3  You can answer.
4      A.   Was that a question or was that
5  a statement?
6      Q.   I'm asking if that is an
7  accurate understanding of what you said?
8      A.   So, again, I don't know the
9  specific date.  I think I said that a
10  number of times, but I would not be
11  surprised if that is the case.
12      Q.   Are you involved at all in the
13  testing and maintenance of the fire pumps?
14      A.   Not directly, but it does fall
15  under my purview.
16      Q.   So don't you know who's managing
17  that program at any given time?
18          MR. CLARK:  Objection to form.
19      A.   My priority is that the testing
20  gets completed, and if there are issues,
21  they're addressed.  My priority is not to
22  remember who does what testing when.
23      Q.   But you remember who was doing
24  it in 2013; is that correct?
25          MR. CLARK:  Objection to form.

Page 184

M. ROCHE
1
2      A.   I remember when I started here
3  in 2013, it was being done by the Fire
4  Safety group, and it's being done by the
5  Fire Safety group at every other hospital
6  that I now oversee.
7      Q.   That's interesting.
8          MR. CLARK:  Is that a question?
9          MS. SELIGER:  No.  That's not a
10  question.
11          MR. CLARK:  Okay.  We don't need
12  to address what's interesting then.
13      Q.   Who was managing the fire pump
14  testing and maintenance in 2014, to the
15  best of your recollection?
16      A.   Well, if we go down this path, I
17  think I already said sometime between 2017
18  and 2021, it transitioned.  Prior to 2017,
19  it was being managed by Fire Safety.
20      Q.   Okay.  So sometime in the period
21  between 2017 and 2021, you believe that
22  the management of that program moved from
23  Fire Safety to Plant and you cannot
24  pinpoint which year; is that correct?
25          MR. CLARK:  Objection to form.

Page 185

M. ROCHE
1
2  This is time six.  Go ahead.
3      A.   I don't have the exact date that
4  that transition occurred.  That's correct.
5      Q.   And as recently as 2019, you
6  don't know the individual who was managing
7  that program?
8          MR. CLARK:  Objection to form.
9  Asked and answered.
10      A.   Yeah.  I have answered that.  I
11  have nothing else to add.
12      Q.   Do you remember who was the
13  assistant director of fire safety in 2019?
14      A.   Yes.
15      Q.   Who was that?
16      A.   Matt Bond.
17      Q.   And who else was in the Fire
18  Safety Department at that time?
19      A.   I'd have to look back on the T
20  of O, but I believe it was Joe Jurain.
21      Q.   So if Fire Safety was managing
22  the fire pump maintenance and testing,
23  would it have been one of those two
24  people?
25          MR. CLARK:  Objection to form.

47 (Pages 182 - 185)

Page 186

M. ROCHE

1
2    A.   If Fire Safety had been managing
3  it at that time, yes, it would have been
4  one of the two people in the Fire Safety
5  Department.
6    Q.   And if it was already a Plant
7  responsibility, who would have been
8  managing that?
9         MR. CLARK:  Objection to form.
10    A.   If it had been moved to Plant,
11  it would have been under John Barton or
12  his designee.
13    Q.   Okay.  Did you allege that that
14  responsibility was definitively Joe
15  Pasquarello's and it was taken from him
16  because of his bad management?
17         MR. CLARK:  Objection to form.
18    A.   I don't recall having that
19  statement -- saying that statement.  I do
20  recall having discussions of who should be
21  managing the fire pump program, and I did
22  make clear that everywhere else and in my
23  mind, that should be a role of Fire
24  Safety.
25    Q.   You remember having those

Page 187

M. ROCHE

1
2  conversations with who?
3    A.   I remember having that
4  conversation with Joe Pasquarello.  I also
5  remember having that conversation with
6  John Barton and that was John Barton's
7  feeling as well.
8    Q.   So approximately when did you
9  have that conversation?
10    A.   Sometime between 2017 and 2021.
11    Q.   You -- I'm sorry.  I'm -- I'm
12  asking you -- you had a conversation with
13  John Barton about the need for that
14  responsibility to be with Joe Pasquarello
15  in 2017?
16         MR. CLARK:  Objection to form.
17    Q.   Can you clarify your answer?
18    A.   Say that again?
19    Q.   Can you clarify your answer?
20         MR. CLARK:  What -- what answer
21  are we clarifying?
22         MS. SELIGER:  Melissa, do you
23  mind reading back the question?
24         THE COURT REPORTER:  One moment,
25  please.

Page 188

M. ROCHE

1
2         MS. SELIGER:  Or, actually, can
3  you read Mr. Roche's previous answer
4  and then the question that followed?
5         THE COURT REPORTER:  Yes.  One
6  moment, please.
7         (Requested testimony was read.)
8         MS. SELIGER:  Okay.  Thank you.
9    Q.   When did you have a conversation
10  with Joe Pasquarello that you wanted him
11  to take over the responsibility for
12  managing the maintenance and testing of
13  the fire pumps?
14    A.   I can't pinpoint the specific
15  date.  I know that it occurred multiple
16  times.  I know that it occurred probably
17  related to the upcoming annual testing,
18  but off the top of my head, I don't know
19  when that is.
20    Q.   Which annual testing are you
21  talking about?
22    A.   The fire pump annual testing.
23    Q.   What month does that happen in?
24    A.   I don't know off the top of my
25  head.

Page 189

M. ROCHE

1
2    Q.   So how long before that testing
3  do you think you spoke to Joe Pasquarello
4  about taking over that responsibility?
5    A.   I would say within two months
6  before.  As soon as we realized it was
7  upcoming when we started to plan for that
8  event.
9    Q.   And you told him -- what did you
10  tell him?
11    A.   I don't remember specifics of
12  the conversation.  I don't remember the
13  date.  I remember making clear my feelings
14  that that task should fall under the
15  purview of Fire Safety.
16    Q.   Do you remember which year it
17  was?
18    A.   No.
19    Q.   Do you think it was within the
20  first two months of his employment?
21    A.   I don't know.
22    Q.   Did it ever become his
23  responsibility to manage the testing of
24  the fire pumps?
25    A.   I don't recall when it

48 (Pages 186 - 189)

Page 190

1        M. ROCHE
2  transitioned back to Fire Safety.  I can
3  tell you that it is currently with Fire
4  Safety.
5      Q.   So you can't remember if it ever
6  was Joe Pasquarello's responsibility to
7  manage --
8          MR. CLARK:  Objection to form.
9      Q.   To manage the testing and
10  maintenance of the fire pumps; is that
11  correct?
12          MR. CLARK:  Sorry.  I jumped the
13      gun.  Objection to form.
14      A.   Well, it was always Joe
15  Pasquarello's responsibility.  It's a life
16  safety device.  It's a fire suppression
17  system.  It falls with -- under the job
18  description of a Fire Safety manager,
19  assistant director, director.  Who --
20  whatever level, it falls squarely within
21  the Fire Safety Department.
22      Q.   Do the fire pumps also involve
23  water?
24      A.   Yes.
25      Q.   What departments deal with the

Page 191

1        M. ROCHE
2  water aspect of the fire pumps?
3      A.   Of the fire pumps?  Fire Safety.
4      Q.   Who works on those fire pumps?
5  Who does the actual work?
6      A.   Our fire suppression company.
7      Q.   What company is that?
8      A.   Lund.
9          THE COURT REPORTER:  Can you
10      repeat that, sir?  I'm sorry.
11          THE WITNESS:  Yes.  Lund,
12      L-U-N-D.
13          THE COURT REPORTER:  Thank you.
14      A.   And they have a contract with us
15  under PyroSignal.  They're a subcontractor
16  of PyroSignal.
17      Q.   Okay.
18          MS. SELIGER:  Sorry.  Melissa,
19      can you read me back my last question?
20          (Requested testimony was read.)
21      Q.   Do you ever have in-house
22  technicians working on the fire pumps?
23      A.   In-house technicians will
24  perform the testing of them sometimes,
25  although the annual testing is performed

Page 192

1        M. ROCHE
2  by a vendor.
3      Q.   Okay.  And which -- what type of
4  technician works on the pumps?  Is it an
5  electrician, a plumber?
6      A.   It's a fire suppression
7  technician working under a Master Fire
8  Suppression License.
9      Q.   What is a fire suppression
10  technician?  Is that --
11      A.   It's a -- so there -- the City
12  of New York recognizes two different types
13  of licenses that are allowed to work on
14  fire pumps.  One is a master plumber and
15  one is a Master Fire Suppression License
16  holder.
17      Q.   So if you had an in-house
18  technician doing it, who would that
19  technician be reporting to?
20          MR. CLARK:  Objection to form.
21      You can answer.
22      A.   Doing what?
23      Q.   Your in-house technicians who
24  are fire suppression people, who do they
25  report to?

Page 193

1        M. ROCHE
2      A.   I don't have any in-house fire
3  suppression techs.
4      Q.   So who are the in-house people
5  that do the actual work when it is given
6  to in-house people?
7      A.   It depends on the type of work
8  being done.
9      Q.   Okay.  Can you give me an
10  example of a particular person?  Not their
11  name, but their title, who would do that
12  work?
13          MR. CLARK:  Objection to form.
14      A.   If it's an electrical issue, it
15  would be an electrician.
16      Q.   And if it was a different issue?
17          MR. CLARK:  Objection to form.
18      A.   What sort of issue?
19      Q.   Okay.  So if it was an
20  electrical issue, would the electrician --
21  who would the electrician -- who does the
22  electrician report to?
23      A.   Our electrical manager.
24      Q.   Who's that?
25      A.   Steve Ferland.

49 (Pages 190 - 193)

M. ROCHE

2    Q.   And if there's a plumbing issue
3  with the fire pumps, what kind of
4  technician would be sent to --
5    A.   If it's a plumbing issue, a
6  plumber would be sent.
7    Q.   And who would that plumber
8  report to?
9    A.   The plumber would report to the
10  plumbing manager.
11    Q.   And who is that?
12    A.   That's Joe Ecklof.
13    Q.   And who does he report to?
14    A.   He reports to Ron Cordier.
15    Q.   I'd like to go to Exhibit 16.
16        MS. SELIGER:  I'm marking this
17  Exhibit 16.  It is Bates stamped D670
18  to D678.
19        [The document was hereby marked
20  as Plaintiff's Exhibit 16 for
21  identification, as of this date.]
22    Q.   Yeah.  Let me know when you have
23  it in front of you.
24    A.   I'm looking at it now.
25    Q.   Does this look like a letter

M. ROCHE

2  from the vendor you recently mentioned
3  called PyroSignal?
4    A.   Yes, it does.
5    Q.   And do you see notes in the
6  margins?
7    A.   Yes, I do.
8    Q.   Are those notes in your
9  handwriting?
10    A.   Yes.
11    Q.   Do you see halfway through the
12  first paragraph, part of the sentence is
13  highlighted; that the beginning of the
14  sentence begins, "I trust that you will
15  recall"?  Do you see that sentence?
16    A.   Yeah.  You said halfway through
17  the first paragraph?
18    Q.   Yeah.  On the left.  It's right
19  near the handwritten notes.  The sentence
20  reads:
21        "I trust that you will recall
22  that these tests were scheduled for the
23  3rd of September, but were cancelled due
24  to the plumber's inability to supply
25  personnel."

M. ROCHE

2        Do you see that?
3    A.   I do, yes.
4    Q.   Is this sentence referring to
5  in-house plumbers?
6    A.   Yes.
7    Q.   Sorry.  I'm going to just back
8  up.  I want to -- above the greeting, do
9  you see where it says, "Reference:  Recent
10  Testing Issues"?
11    A.   Yes.
12    Q.   And then in the first sentence,
13  it refers to, "Hydrostatic testing of the
14  combination sprinkler systems."  Do you
15  see that?
16    A.   Yes.
17    Q.   Is this letter related to fire
18  pump testing?
19    A.   It's related, yes.  It is not
20  the same, but it is related.
21    Q.   On the second page, let's look
22  at -- you see Paragraph 3D?  It starts:
23        "It was determined that we would
24  not be testing on Monday and the day would
25  be spent by the plumbers who would do a

M. ROCHE

2  test drain down of all the remaining
3  systems.  We rescheduled the balance of
4  our men for Monday and left two on site to
5  work with the plumbers."
6        Is that, again, referring to
7  Crothall's in-house plumbers?
8    A.   Crothall does not have any
9  in-house plumbers.  You might be referring
10  to Mount Sinai staff.  We do have Mount
11  Sinai plumbers, and this is a reference to
12  what he's talking about where it says they
13  "left two," I assume talking about
14  technicians, but the technicians they're
15  talking about are Lund employees.  Those
16  are the people that -- directing the work
17  or advising our plumbers on what valve to
18  shut and where.
19    Q.   Okay.  And who manages the Mount
20  Sinai plumbers?  Do they report to
21  Crothall employees?
22        MR. CLARK:  Objection to form.
23    A.   So the plumbers are managed by
24  the plumbing manager, whose name is Joe
25  Ecklof, who is a Crothall employee, yes.

M. ROCHE

1
2    Q.   If you look on the next page,
3  Paragraph 4.  This is the page Bates
4  stamped 672.  It says -- do you see where
5  it says, "We arrived on site"?
6    A.   Yes.
7    Q.   So it says:
8        "We arrived on site with two
9  (three) men to work with the plumbing
10 department to implement the drain downs to
11 confirm the drain down capability of each
12 of the systems.  Mount Sinai plumbing
13 department for some reason was unprepared
14 to perform these drain downs."
15       Do you know if anyone was
16 disciplined regarding that failure to be
17 prepared for the drain downs?
18   A.   Failure to be prepared for the
19 drain downs was a failure on the part of
20 Joe Pasquarello, based on what I
21 recollect.
22   Q.   Is -- why is that?  Does he
23 manage the plumbers?
24       MR. CLARK:  Objection to form.
25   You can answer both questions.

M. ROCHE

1
2    A.   Sure.  So your question is does
3  Joe Pasquarello manage the plumbers?
4    Q.   Yes.
5    A.   This is the third time now that
6  I'm informing you that Joe Ecklof manages
7  the plumbers.  Joe Pasquarello is
8  responsible for the scheduling of these
9  tests, and he did not inform, at this
10 point, the -- any of the internal plumbers
11 that the testing was going to occur.
12   Q.   Why didn't the plumbers'
13 supervisor inform them?
14   A.   Because Lund and PyroSignal do
15 not work for the plumbing supervisor.
16 They work for Joe Pasquarello.
17   Q.   So is it your belief that they
18 were unprepared because Joe didn't -- is
19 it your belief the plumbers were
20 unprepared because Joe Pasquarello didn't
21 tell them to be prepared?
22   A.   My belief is that Joe
23 Pasquarello did not understand the scope
24 of the testing that he had approved to
25 happen and he did not communicate with any

M. ROCHE

1
2  necessary parties in order to conduct that
3  testing.
4    Q.   Do -- does the plumbing
5  supervisor or manager -- I keep forgetting
6  his name.  What was his name?
7    A.   His name was Joe -- his name was
8  Joe Ecklof.
9    Q.   Does Joe Ecklof communicate at
10 all with PyroSignal or Lund?
11   A.   No.
12   Q.   Is Joe Ecklof notified if
13 PyroSignal or Lund are working on the fire
14 pumps?
15   A.   If Joe Pasquarello notifies him.
16   Q.   Is that his only way of finding
17 out about work being done?
18   A.   So Lund and PyroSignal do not
19 just show up when they feel like it.  They
20 show up when they're told to come or told
21 to be there by a certain date by Joe
22 Pasquarello or somebody in Fire Safety.
23   Q.   Okay.
24   A.   So it's also that manager's
25 responsibility to notify any parties that

M. ROCHE

1
2  they need assistance on specifically what
3  the scope is, specifically what they need
4  assistance on, when it will occur, and
5  confirm that there's manpower associated
6  with that in order to complete the task.
7    Q.   On the next page or it's page
8  four, it's Bates stamped 673.  At the
9  beginning of Paragraph 5, do you see that
10 -- do you see where it says, "We arrived
11 on site and met with Mr. Matthew Bond"?
12   A.   Yes.
13   Q.   And then in the next numbered
14 paragraph, do you see where it says, "We
15 arrived on site and met with Mr. Bond,"
16 again?
17   A.   Yes.
18   Q.   Was Mr. Bond managing the
19 particular project that this letter is
20 addressing?
21   A.   This letter is addressed to Joe
22 Pasquarello.  I don't recall at that -- on
23 that date who reported to who, but
24 ultimately, the responsibility is Joe
25 Pasquarello.  If he directs one of his

Page 202

1           M. ROCHE
2 employees to assist, that's certainly
3 allowable, but it is his role to ensure
4 that it gets completed appropriately.
5     Q.   Does it look like -- so are you
6 saying this project was managed by Joe
7 Pasquarello at the time?
8         MR. CLARK:  Objection to form.
9     A.   I'm saying the letter's directed
10 to Joe Pasquarello, so in my mind, that's
11 a clear fact that -- that clearly shows
12 that he was in charge of that project.
13     Q.   Are you --
14     A.   He might have had assistance
15 from other managers.  Joe Ecklof was
16 probably one of them.  Matt Bond was
17 probably one of them.  Anybody else listed
18 in this document was probably one of them,
19 but the letter was written to Joe
20 Pasquarello.
21     Q.   I understand it was written to
22 Joe Pasquarello, but are you inferring
23 that he was managing this project just by
24 the reading?
25         MR. CLARK:  Objection to form.

Page 203

1           M. ROCHE
2     A.   Well, I guess what I'm stating
3 is that Joe Pasquarello at that point was
4 the highest ranking manager within Fire
5 Safety.  He was the person who -- whose
6 responsibility it was to manage these
7 vendors, Lund and PyroSignal, and he's the
8 person who should be aware of whatever
9 activities his contractors are conducting
10 on these days.
11     Q.   Does it look like Mr. Bond was
12 the person who PyroSignal was working with
13 on this project?
14         MR. CLARK:  Objection to form.
15     A.   It looks like he was involved.
16     Q.   Were you involved in this
17 project?
18     A.   I was aware of it.
19     Q.   Did you direct any part of the
20 project?
21     A.   I don't recall.
22     Q.   Were you simply aware of it or
23 were you monitoring it?
24         MR. CLARK:  Objection to form.
25     A.   I'm not quite sure.  It was --

Page 204

1           M. ROCHE
2 it was a long time ago.  I don't know to
3 what level of involvement I had in it, but
4 I do, as I read this, I do recall the work
5 and I do recall it occurring.  I was
6 certainly not in a role that was directing
7 the work, but I was advised of it at the
8 time and supplying my feedback as
9 necessary.
10     Q.   How often do you think you
11 supplied feedback about this project?
12     A.   I don't understand.  At what
13 point?
14     Q.   How -- was this a long-term
15 project or was it -- I'll leave it at
16 that.  Was it a long-term project?
17     A.   It looks like, based on what I'm
18 reading, it was multiple days.
19     Q.   So how many times do you
20 remember being consulted about it or
21 informed about it during these days?
22     A.   Certainly multiple times.
23 Probably at least once a day.
24     Q.   So you must have known who was
25 managing it then; is that not correct?

Page 205

1           M. ROCHE
2         MR. CLARK:  Objection.  You can
3 answer.
4     A.   Fire Safety was managing it, and
5 the highest ranking person in Fire Safety
6 is Joe Pasquarello.
7     Q.   Right.  So I know that Fire
8 Safety as a department was managing it and
9 I know what Joe's title was, but who was
10 actually doing the work of managing this
11 project?
12         MR. CLARK:  Objection to form.
13     A.   I think you asked me that
14 already and I'm not sure what else I can
15 tell you.  I -- the -- the fact is, I
16 don't recall specifically who it was.  I
17 know that Matt was involved.  I know that
18 Joe Ecklof was involved.  I know that Joe
19 Pasquarello was involved.
20     Q.   Can you scroll down to the page
21 stamped 676?  It's page seven of this
22 exhibit.  At the top of the page, do you
23 see the paragraph that starts with the
24 number 12?
25     A.   Yes.

52 (Pages 202 - 205)

Page 206

M. ROCHE

1
2  Q.  It says:
3      "Tuesday, November 6th, 2020.
4  Received an e-mail from Mr. Mike Roche to
5  attempt to facilitate the repairs prior to
6  the rescheduled NYFD testing."
7      Do you see that?
8  A.  Yes.
9  Q.  Do you recall giving that
10 instruction?
11     MR. CLARK:  Objection to form.
12 A.  I don't recall the specific
13 e-mail.  I'm not surprised to see that.  I
14 think it's always my intention to expedite
15 any repairs and testing as best as
16 possible.
17 Q.  So you got involved -- strike
18 that.
19     How did you know that the
20 testing was -- how did you know that the
21 NYFD testing was coming?
22 A.  Because I review the regulatory
23 documentation.
24 Q.  And why did you decide to change
25 the date for the -- for the vendor to

Page 207

M. ROCHE

1
2  come?
3      MR. CLARK:  Objection to form.
4  A.  I wanted the repair and testing
5  to occur quicker, as quickly as possible.
6  Sometimes it requires somebody at my level
7  to get involved and send an e-mail
8  requesting that.
9  Q.  Do you see the next paragraph
10 with the number 13?  It says:
11     "Thursday November 8th, 2020.
12 Arrived on site with three men to shut
13 down the new expanded valve schedule
14 previously provided.  We were advised by
15 Mr. Matthew Bond that he was unaware of
16 the scheduled date, despite e-mail
17 notifications on the previous date."
18     Do you see that?
19 A.  I do see that line, yes.
20 Q.  Was Matt Bond reprimanded for
21 not being aware of the work or not being
22 aware of the scheduled visit from
23 PyroSignal?
24 A.  Matt Bond reported to Joe
25 Pasquarello.  If he was going to be

Page 208

M. ROCHE

1
2  counseled, it would have been done so by
3  Joe Pasquarello.  I don't believe he was.
4  Q.  Do you think he should have
5  been?
6  A.  This states one side of the
7  story.  I don't know if that e-mail was
8  sent.  Based on what they're saying, I
9  don't know what time that e-mail was sent.
10 There's a lot of factors in here that I
11 don't have enough context to make a
12 judgment on.
13 Q.  Were you alerted about the visit
14 from PyroSignal that was scheduled for
15 that day?
16 A.  I don't recall.  It's possible
17 that I was.
18 Q.  Is it likely that you were?
19     MR. CLARK:  Objection to form.
20 A.  I wouldn't say it's likely.  It
21 is clear that I had reached out -- prior.
22     THE COURT REPORTER:  I'm sorry,
23 sir.  You said, "It is clear that I
24 had reached out"?
25 A.  It's clear from this letter that

Page 209

M. ROCHE

1
2  I had reached out two days prior on
3  November 6th, but I don't know if I
4  received that e-mail.  I get a lot of
5  e-mails and it was two years ago.
6  Q.  You can take a minute to look
7  through the remainder of the letter, but
8  can you let me know if Joe Pasquarello is
9  mentioned at any point in the letter?
10 A.  Yes, he is --
11     MR. CLARK:  You want him to just
12 look at the -- sorry.  Let me -- do
13 you want him to just look at the
14 remainder of the letter or the entire
15 nine-page, single-spaced letter?
16     MS. SELIGER:  All right.  I'm
17 going to strike that question.
18 Q.  Do you know why the vendor
19 drafted this letter?
20     MR. CLARK:  Objection to form.
21 You can answer.
22 A.  I do not.
23 Q.  All right.  I am done with that
24 exhibit.  Can you tell me when you first
25 decided that you wanted to hire a Fire

53 (Pages 206 - 209)

M. ROCHE

1
2 Safety director for Mount Sinai Hospital?
3     A.   No.  I don't have the exact
4 date.  I know that I started initially
5 having issues with Joe Pasquarello's
6 performance back in December of 2020 to
7 the point where I had considered giving
8 him a counseling at that point and
9 previously back in about October,
10 September/October time frame which is when
11 his annual evaluation was done.
12        So from then on, I had concerns
13 about his abilities.  I had concerns about
14 him not being able to function at the
15 level that his title reflected.  So it was
16 always in the back of my mind.  That's the
17 best answer I can give you for that.
18     Q.   So had you been considering
19 replacing him for a long time?
20        MR. CLARK:  Objection to form.
21     A.   I never considered replacing
22 him.  What I had considered was moving
23 somebody in there that could provide the
24 direction that he clearly needed and could
25 dedicate more time to working with him.

M. ROCHE

1
2     Q.   So when did you finally make the
3 decision that you had to hire someone as
4 the director?
5     A.   I would say probably in -- in
6 May of 2021, it had gotten to the point
7 where I didn't think the issues could be
8 resolved by any other method than bringing
9 in somebody who was more experienced in
10 what we do in, specifically, Fire Safety.
11     Q.   And is Bernie Nuñez more
12 experienced in Fire Safety than Joe
13 Pasquarello?
14     A.   Yes.
15     Q.   In what way?
16     A.   He has far more health care
17 experience.  He's more familiar with the
18 codes.  He's more familiar with Joint
19 Commission.  He has successfully for
20 multiple years done an excellent job at
21 documentation.  He's proven himself at
22 multiple levels, continuously taking on
23 more responsibility and he was a strong
24 prospect.
25     Q.   Did you ever write up Joe

M. ROCHE

1
2 Pasquarello prior to May of 2021?
3     A.   I had drafted a counseling back
4 in December of the previous year.
5 Ultimately, we decided not to issue that
6 counseling.  By "we," I mean myself.
7        I decided not to issue that
8 counseling after a conversation that I had
9 with Chris Hariegel and Bob Shaffer where
10 they acknowledged that there were issues
11 with his performance, but they also -- Bob
12 specifically committed to working more
13 closely and directly and spending at least
14 one full day per week with him to review
15 everything that was going on.
16        So I told Bob that I was willing
17 to give it a chance.  Ultimately, that was
18 not successful.  Joe did not improve and
19 we began a counseling.
20     Q.   Did you meet with Chris Hariegel
21 and Bob Shaffer together or separately
22 when you discussed Joe Pasquarello's
23 performance?
24     A.   Together.  For the --
25     Q.   Okay.

M. ROCHE

1
2     A.   -- the specific -- I'm sorry.
3 But the specific meeting I'm -- I'm
4 thinking of took place in Chris Hariegel's
5 office with Bob Shaffer there.  Obviously
6 we had other conversations outside --
7 independently outside of that specific
8 conversation, so it was discussed in
9 multiple times.
10     Q.   And do you remember
11 approximately when that meeting was?
12     A.   Yes.  It likely would have been
13 in December.  I have a draft counseling
14 dated in December of 2020.
15        MS. SELIGER:  That draft
16     counseling was not provided to us.
17     I'm going to ask that it be produced.
18     It was requested.
19     Q.   Did you ever file that
20 counseling or did you decide not to?
21     A.   I didn't file it.  I didn't send
22 it to HR.  I reviewed it with Bob Shaffer
23 and Chris Hariegel.
24     Q.   And did Chris Hariegel also
25 volunteer to provide support to Joe

54 (Pages 210 - 213)

1          M. ROCHE
2 Pasquarello?
3    A.   No.
4    Q.   What did Bob Shaffer say he
5 would do to support Joe Pasquarello?
6    A.   Met with him regularly.  He
7 coached him.  He tried to give him
8 direction and advice.
9    Q.   And did you say he did that on a
10 weekly basis?
11    A.   Yes.
12    Q.   And how do you know that that
13 happened on a weekly basis?
14    A.   Because I work at the same place
15 that Joe works at and I saw Bob
16 frequently.  Bob committed to meeting with
17 him weekly.
18    Q.   So you saw him meet with Joe on
19 a weekly basis after that point, after
20 sometime in December of 2020?
21    A.   Very frequently, yeah.  I mean,
22 I wasn't signing him in and out of the
23 institution, but he was here far more than
24 he was previously.
25    Q.   And when he was at your

1          M. ROCHE
2 building, he was with Joe Pasquarello
3 training him?
4    A.   Yes.
5    Q.   And did he report back to you
6 about his interactions on a weekly basis?
7    A.   No.
8    Q.   Did he ever give you feedback
9 about his meetings with Joe Pasquarello?
10    A.   Yes.
11    Q.   How often?
12    A.   Not that often.  Probably
13 monthly.  Maybe less often than that.
14    Q.   So between December of 2020 and
15 June of 2021, over those six months, how
16 often do you recall getting feedback from
17 Bob Shaffer about Joe Pasquarello's
18 performance?
19    A.   It's tough to say.  A handful of
20 times.
21    Q.   And what was the feedback?
22    A.   Started out decent.  He felt --
23 Bob felt like they were making progress.
24 Sometime over those six months, it -- it
25 kind of stagnated a bit and Bob seemed to

1          M. ROCHE
2 feel that it was getting to be repetitive,
3 where he would ask for training on the
4 same things he was already trained on.
5          Towards the end, he basically
6 said that, you know, he didn't think that
7 he had what it would take to continue in
8 this role or be successful in the role.
9    Q.   Was Bob's feedback ever
10 documented by you or Bob?
11    A.   Not that I'm aware of, no.  It
12 all happened verbally.
13    Q.   Do you know if that feedback was
14 ever provided to HR?
15    A.   It may have been provided.  I
16 know that I didn't provide it, but it
17 likely would have been provided during the
18 investigation of the case that he opened
19 up with HR.
20    Q.   That Joe Pasquarello opened up?
21    A.   Yes.
22    Q.   But as far as you know or do you
23 know if there are any written statements
24 from Bob Shaffer about Joe Pasquarello?
25    A.   Specific to this occurrence?

1          M. ROCHE
2    Q.   As just related to Joe
3 Pasquarello's performance?
4    A.   I don't know.
5    Q.   And when did you post the job
6 for the Fire Safety director?
7    A.   Probably -- probably early --
8 early June, give or take a month.
9    Q.   And how did you go about posting
10 it?
11    A.   Well, the same way I go about
12 posting every job where I reach out to --
13 I think in this case, it was posted by
14 Dorothy Perez.  But usually, immediately
15 after it's posted, a recruiter will get in
16 touch with me and will be assigned to fill
17 that role.
18    Q.   And so did you give Dorothy
19 Perez information about the title and
20 responsibilities that the role would
21 encompass?
22    A.   So I told her that we were
23 looking to hire a director of fire safety.
24 She already had the job description for
25 that role and level, which she included in

55 (Pages 214 - 217)

1        M. ROCHE
2 the posting.
3     Q.   Did you tell anyone before you
4 posted it?
5     A.   I told Joe.
6     Q.   When did you tell him?
7     A.   On -- it was one of our weekly
8 meetings on May 25, 2001 -- I'm sorry --
9 2021, where I had voiced that, you know,
10 two previous issues that were not
11 acceptable that were under his control
12 which resulted in poor outcome, that he
13 would be receiving a counseling report as
14 a result of that.
15        I believe that's the date where
16 I also informed him that it was our
17 intention to bring in somebody above him
18 in order to provide assist -- assist --
19 additional direction and help with
20 prioritization.
21     Q.   So you told him you think in
22 that May 25, 2021 meeting that you were
23 going to be looking for a director; is
24 that what you said?
25     A.   I believe so, yes.

1        M. ROCHE
2     Q.   And did you make it clear to him
3 that he would not be eligible to apply for
4 that role?
5     A.   Well, as -- as a company policy,
6 he was not eligible to apply for that
7 role.  If you have a disciplinary -- must
8 be -- I'm a little less certain about
9 those dates right now.  I may have the
10 dates mixed up.
11     Q.   Are you certain that he was not
12 eligible to apply for the position?
13     A.   I'm not certain that he wasn't
14 eligible.  I am certain that he did not
15 apply, but that he was made aware of it
16 and I don't think that he would have been
17 considered due to ongoing poor
18 performance.
19     Q.   But did you tell him he could
20 apply?
21     A.   I believe I even sent him the
22 link.
23     Q.   You think you e-mailed him a
24 link to the job posting?
25     A.   I think I did.  I'm not certain

1        M. ROCHE
2 of that, but I think I did.
3     Q.   Is there any reason you would
4 not have sent him the link to the job
5 posting?
6        MR. CLARK:  Objection to form.
7     A.   Well, again, I don't think he
8 would have been a good candidate.  He was
9 not performing adequately at a lower level
10 and we don't generally promote people that
11 have a history of poor performance.
12     Q.   What about Matt Bond?
13        MR. CLARK:  Objection to form.
14 What -- what about him?
15     Q.   Would you say he has a history
16 of poor performance?
17     A.   He did have a period of poor
18 performance.
19        MS. SELIGER:  If, in fact, an
20 e-mail was sent to Joe Pasquarello
21 with a link to the job posting, I am
22 calling for its production.
23     Q.   Was the position posted for
24 external candidates or internal
25 candidates?

1        M. ROCHE
2        MR. CLARK:  Objection to form.
3     A.   So it's always posted
4 internally.  Not every position is posted
5 externally, so I do not know how it -- if
6 it was posted both ways or only
7 internally.
8     Q.   Whose decision is that?
9     A.   Sometimes we try to -- we post
10 it internally to see if there's any
11 interest before opening it up externally.
12 There's no clear procedure that specifies
13 whose decision it is.  It could be the
14 hiring manager, which is me.  It could be
15 the recruiter.  In this case, I don't
16 think I specified one way or the other, so
17 it got posted however, you know, it
18 defaulted to get posted.
19     Q.   Had you already had someone in
20 mind for the position when you posted it?
21     A.   Not at that time, no.
22     Q.   If it was posted internally,
23 would it show up as a notification to
24 employees who opt for job posting
25 notifications?

56 (Pages 218 - 221)

M. ROCHE

1
2      MR. CLARK:  Objection to form.
3    A.   If it was posted internally, it
4  would show up to anybody who looked at the
5  online job postings as an employee.
6    Q.   How many applicants applied for
7  that job?
8    A.   In this case, I believe it was
9  only one.  I'm not certain of that, but I
10 don't think we had much interest.
11   Q.   Did Ron Kanterman apply for the
12 job?
13   A.   Not to my knowledge.  That would
14 be a bit odd, though, for a supervisor to
15 jump an assistant director and go right
16 into a director role.
17   Q.   Did you interview Bernie for the
18 job?
19   A.   I did, yes.
20   Q.   If there were other applicants,
21 would the recruiter or Dorothy tell you
22 that other applicants had come in?
23      MR. CLARK:  Objection to form.
24   A.   A recruiter -- that would be the
25 responsibility of the recruiter.  They

M. ROCHE

1
2  don't pass along every resume that's
3  received.  She does -- she does tend to do
4  her own screening of it and only passes
5  along what she deems to be qualified for
6  the job based on the requirements of the
7  job and their experience and the level of
8  the job.
9    Q.   When did you interview Bernie
10 Nuñez for the role?
11   A.   I don't know the exact date.
12 While the job was posted.
13   Q.   Did anyone else interview him?
14   A.   I believe Bob Shaffer
15 interviewed him as well.
16   Q.   Is there documentation from the
17 interviews?
18   A.   No.
19   Q.   Scheduling or notes?
20   A.   Nothing that I'm aware of, no.
21   Q.   Do you think you had it in your
22 calendar to interview Bernie Nuñez?
23   A.   I'm not certain I did.  He's an
24 internal, you know, he's familiar with the
25 site.  It could have been something where

M. ROCHE

1
1 I just called him and told him to come by
2 on this date, so no, I don't know that
3 there's any documentation.
5    Q.   And how soon after his interview
6  did he get the job offer?
7    A.   I don't remember the exact
8  circumstances around it and time frame.  I
9  would say it's -- it was less than a
10 month.
11   Q.   Do you recall a day when Bernie
12 Nuñez came to the building and introduced
13 himself to Joe Pasquarello as the new
14 director of fire safety?
15   A.   Not specifically, no.
16   Q.   Do you remember a day when
17 Bernie Nuñez came to the building and
18 introduced himself to the fire marshals as
19 the new director of fire safety?
20   A.   No, not specifically.  I assume
21 that was the same day.
22   Q.   I'd like to look for a moment
23 back at Exhibit 3.  Let me know when you
24 have it open.
25   A.   Okay.  I have it.

M. ROCHE

1
2    Q.   So, again, this was the
3  spreadsheet that we were looking at
4  earlier with job openings and the names of
5  people who left or filled those positions.
6  Do you see Bernie Nuñez's name on there?
7    A.   Want to help me out a bit?  I'm
8  trying to find it, but.
9    Q.   Yeah.  It looks like -- I see
10 his name first show up I think it's line
11 113.  It's hard to see --
12      MR. CLARK:  Are these lines
13 numbered?  Mine aren't numbered.  I'm
14 not sure I can count 113.
15      MS. SELIGER:  Oh.  Oh, sorry.
16 Yeah.  I'm looking at it in native
17 format.
18   Q.   In this document, the names are
19 organized by date.  So if you look at --
20 there's a date, March 23, 2021, under the
21 column for Open Position Requisition Date?
22   A.   Yes, I see it.  That's his
23 first -- that's unrelated to Mount Sinai
24 Hospital.  That was when he was still at
25 Beth Israel.

57 (Pages 222 - 225)

1          M. ROCHE
2     Q.   And what was his position at
3 Beth Israel?
4     A.   I believe he was a manager at
5 Beth Israel.
6     Q.   Okay.  And then the next time I
7 see his name -- oh, sorry.  This is a
8 previous date.  If you go up to the date
9 12/7/17?
10    A.   Seventeen.  Hold on.  Yes.  I
11 see a Bernie Nuñez.
12    Q.   Is that also a Mount Sinai Beth
13 Israel position?
14    A.   Yes.
15    Q.   And can you tell what that line
16 is showing?  Is he leaving a position or
17 filling a position?
18    A.   It looks like he's filling a
19 position.
20    Q.   And is that Fire Safety manager?
21    A.   Yes.
22    Q.   Okay.  So that one predates the
23 one we looked at before.  And those are
24 the only two places I see his name on this
25 document.  I don't see a record of the

1          M. ROCHE
2 opening for Fire Safety director or a
3 record of him fill the position.
4          MR. CLARK:  Is that a question?
5          MS. SELIGER:  No.
6     Q.   Do you know why that is?
7     A.   I do not.
8     Q.   I just want to go to -- nope.
9 Changed my mind.  I want to go to
10 Exhibit 4.  Oh, I'm sorry.  You can close
11 Exhibit 4.  Sorry.  It's Exhibit 12.
12         MS. SELIGER:  If I haven't
13 already, I'm marking this as
14 Exhibit 12.
15         [The document was hereby marked
16 as Plaintiff's Exhibit 12 for
17 identification, as of this date.]
18    Q.   And let me know when you have it
19 open.
20    A.   Okay.  So I have it open.
21    Q.   Okay.  I am going to ask you to
22 scroll down to page -- it's page eight of
23 this document.  It's Bates stamped
24 D000520.
25         At the very bottom of the

1          M. ROCHE
2 page -- well first, actually, before we do
3 that.  Would you agree that this is some
4 sort of personnel record connected with
5 Bernie Nuñez?
6          MR. CLARK:  Objection to form.
7     A.   This looks like the same
8 document we were looking at earlier with
9 Matt Bond.  It's not a document that I've
10 ever seen or am familiar with, but it
11 appears to be related to the application
12 and the information that they inputted in
13 their application.
14    Q.   Okay.  So at the very bottom of
15 page eight, highlighted in blue, it says:
16         "Please list any certifications
17 or licenses related to this position."
18         Do you see that?
19    A.   I do.
20    Q.   And if you scroll to the next
21 page, you see a list of certifications
22 with effective dates and expiration dates.
23 Do you see that?
24    A.   (Inaudible.)
25         THE COURT REPORTER:  Can you

1          M. ROCHE
2 repeat that, sir?
3     A.   I do.
4     Q.   Do you see where it says in the
5 first certification listing, it's FDNY
6 Certificate of Fitness S-95?
7     A.   Yes.
8     Q.   Do you see where it says the
9 expiration date of January 4, 2022?
10    A.   (Inaudible.)
11         THE COURT REPORTER:  If you
12 could repeat that, sir.
13    A.   Yes.
14    Q.   Has Bernie renewed that
15 certification?
16    A.   I would imagine so, but I don't
17 know for sure.
18    Q.   Why don't you know?
19    A.   Because I don't track the
20 licenses.  That is done by Dorothy Perez.
21    Q.   Is it a requirement for his job
22 to have this certification up to date?
23    A.   I think it's listed in the job
24 description, but again, we had a lengthy
25 conversation about whether it's preferred

Page 230

M. ROCHE

1  or required, so --
2  Q.   Is it required by you to have
3  this certification?
4  MR. CLARK:  Sorry.  Mike, were
5  you done with your last answer?
6  THE WITNESS:  Yes.  I'm sorry.
7  I was.
8  MR. CLARK:  Then you can answer
9  the next question.  Sorry for my
10  confusion.
11  MS. SELIGER:  Sorry.  I didn't
12  mean to interrupt.
13  Q.   Do you require Bernie to
14  maintain this certification throughout his
15  employment?
16  A.   I think it's important that all
17  managers have certifications that the
18  people they are supervising have.
19  Q.   So I'm not sure that answered my
20  question.  So then do you actually require
21  him to keep this current?
22  A.   My expectation is that he does.
23  It's not a requirement.
24  Q.   What about the next
25

Page 231

M. ROCHE

1  certification listed, the FDNY Certificate
2  of Fitness W-07?  Do you see that?
3  A.   I do.
4  Q.   It looks like that one expired
5  on October 27, 2021.  Has Bernie renewed
6  that certification?
7  A.   I would have to reach out to
8  Bernie or Dorothy Perez.  I'm not sure
9  that this information is current.
10  Q.   Do you ask him to make sure that
11  his certifications stay current?
12  A.   I have not asked him recently.
13  Q.   Have you made it clear that
14  that's an expectation you have for the
15  job?
16  A.   I made it clear that my
17  expectation is that he has all the
18  licenses that anybody under him has.
19  Q.   Do you see the next
20  certification listed?  It says the FDNY
21  Certificate of Fitness F-89?
22  A.   Yes.
23  Q.   Do you see that that one expired
24  October 4, 2021?
25

Page 232

M. ROCHE

1  A.   Based on this document, yes.  I
2  agree that's what it says.
3  Q.   Do you know if Bernie has
4  requested to renew that certification
5  since October of 2021?
6  A.   That I do know, yes.  He has
7  requested an on site with the fire
8  department.
9  Q.   And has he had that on site yet?
10  A.   He's waiting for the scheduling,
11  but has not yet had the on site.
12  Q.   Have you given him a time frame
13  within which he has to have that
14  completed?
15  A.   I don't have the authority to
16  schedule the fire department, so I
17  don't -- it's not able to -- I'm not able
18  to select the date which the fire
19  department shows up for that test.
20  The request was in and, again,
21  we spoke earlier about Mr. Pasquarello
22  related to his on site and it would have
23  been sufficient had he requested that same
24  test.
25

Page 233

M. ROCHE

1  Q.   And did you make that clear to
2  Mr. Pasquarello that all he had to do was
3  request the test?
4  A.   We did have a conversation when
5  the PIP was given to him where he was
6  uncertain if he could obtain these because
7  of the fact that some of them were
8  dependent on fire department scheduling.
9  Pat Lizararo [sic], the HR
10  representative, was in the room while we
11  discussed that and I made clear to him
12  that all he needed to do was pass the
13  written and schedule the test, not
14  necessarily complete the test within that
15  time frame.
16  Q.   All right.  I'm done with that
17  exhibit.  I'd like to open up Exhibit 13.
18  You can let me know, Mr. Roche, when you
19  have it open.
20  MS. SELIGER:  I'm marking this
21  as Exhibit 13.  It's a document Bates
22  stamped CH1517 to CH1520.
23  [The document was hereby marked
24  as Plaintiff's Exhibit 13 for

59 (Pages 230 - 233)

Page 234

```
1            M. ROCHE
2    identification, as of this date.]
3    A.   I'm looking at it now.
4    Q.   Can you tell me what this is?
5    A.   This looks like a job
6  description for a Fire Safety assistant
7  director.
8    Q.   And on the last page, there's an
9  associate name and signature.  Who -- who
10 is that?
11   A.   Joseph Pasquarello.
12   Q.   Is this a job description that
13 he was asked to sign while working at
14 Crothall?
15   A.   I'm sorry.  Did you not hear me
16 again?  I said yes.
17   Q.   Okay.  And did you have him sign
18 this document?
19   A.   No.
20   Q.   Who had him sign this document?
21   A.   I believe Lizarazo.
22   Q.   Is this an accurate description
23 of the responsibilities he had while
24 working as an assistant director of fire
25 safety?
```

Page 235

```
1            M. ROCHE
2    A.   It's an accurate description of
3  all the items that he was supposed to
4  oversee, yes.
5    Q.   I'm not sure if it's on this
6  list.  It may be, but was Joe Pasquarello
7  required to attend meetings as part of his
8  assistant director responsibilities?
9    A.   Yes.
10   Q.   Which meetings did you expect
11 him to attend?
12   A.   I expected him to attend any
13 meetings that he was invited to and had
14 any responsibility over any topics being
15 discussed.
16   Q.   Was that expectation regardless
17 of the volume of meetings that he was
18 invited to?
19   A.   That's a standard expectation
20 that I think anyone who has a job should
21 be held to.  The -- are we -- are we
22 referring just in general or are we
23 referring to the improvement plan?
24   Q.   I guess we can go to the
25 improvement plan.  Was the issue of not
```

Page 236

```
1            M. ROCHE
2  attending meetings part of the improvement
3  plan that you issued him?
4    A.   It was.
5    Q.   And what exactly did you want
6  him to do differently as part of the
7  improvement plan?
8    A.   Do you -- are you going to call
9  the improvement plan as an exhibit?
10 Because it would be easier to take a look
11 at that if you plan to do so.
12   Q.   I don't know if I created an
13 exhibit for that.  But I guess prior to
14 going -- I can.  I can add one in one
15 second.  But prior to going into the
16 improvement plan, do you know which
17 meetings Joe was invited to on a daily
18 basis?
19        MR. CLARK:  Objection to form.
20   A.   No.  I did not manage Joe's
21 calendar.
22   Q.   Do you know how many meeting
23 invitations he received per day?
24   A.   I can confirm with certainty
25 that it's less than I receive.
```

Page 237

```
1            M. ROCHE
2    Q.   Do you go to all meetings that
3  you're invited to?
4    A.   The requirement for the
5  improvement plan was to either attend the
6  -- the meetings that he was invited to or
7  to advise the organizer that he would be
8  unable to attend.
9    Q.   And how did you know he was not
10 attending meetings?
11   A.   I received multiple complaints
12 from different people that there was no
13 Fire Safety representation at any number
14 of meetings.
15   Q.   Do you know if those people
16 contacted Joe personally?
17   A.   I think at least one of them
18 did.
19   Q.   Did --
20   A.   Scratch that.  Two.
21   Q.   Sorry.
22   A.   At least two of them did.
23   Q.   Who were those people?
24   A.   One was Don Cardone, who is the
25 direct -- senior director of emergency
```

M. ROCHE

1 M. ROCHE
2 management and one was Ryan Nowicki.
3    Q.   And did they complain to him
4 about not attending one meeting or were
5 there more -- was there more than one
6 meeting that they had wanted Joe to
7 attend?
8    A.   More than one meeting for both
9 cases.
10    Q.   Did Joe ever send one of his
11 managers to attend meetings?
12    A.   I'm not sure if he did.  That
13 would have been totally appropriate for
14 him to do as long as he confirmed with
15 them that they would go.  The specific
16 examples that I'm referring to are
17 examples where no -- no representation
18 whatsoever from Fire Safety attended the
19 meeting.
20    Q.   When did you first tell Joe that
21 he needed to start attending all meetings?
22    A.   It would have been early 2020,
23 if not even late 2019.  It was an ongoing
24 issue with him.
25    Q.   Was Joe responsible for the fire

1 M. ROCHE
2 marshals in the Fire Safety Department?
3    A.   When?
4    Q.   Whenever he did not have a
5 manager doing that?
6    A.   I don't understand.  Can you
7 specify when?
8    Q.   I think we discussed that at
9 various times, there were managers in the
10 Fire Safety Department who were
11 responsible for the fire marshals and --
12 and all the things connected with them.
13 During the periods of time when there was
14 not a manager in Fire Safety doing that,
15 was Joe responsible for managing the fire
16 marshals?
17    A.   So Joe was responsible for
18 managing the Fire Safety Department, and
19 in the absence of other managers, by
20 default, he would be responsible for
21 managing the fire marshals.
22    Q.   Was he responsible for training
23 the new managers that joined his team,
24 such as Ron Kanterman and Omelfi Garcia?
25    A.   Training them on what?

1 M. ROCHE
2    Q.   Orienting them to the
3 department?
4    A.   He was responsible for training
5 them for any -- anything Fire Safety
6 specific, but there is a separate
7 onboarding process that gives them some
8 exposure to the facility and the programs.
9    Q.   What is that onboarding process?
10 Is that the Foundations program or
11 something else?
12    A.   That's something else.  So --
13       MR. CLARK:  Objection to form.
14    A.   There's a separate orientation
15 that all new employees go through called
16 New Beginnings.  It's a Mount Sinai
17 training that updates everybody on who to
18 get in touch with for certain issues.  It
19 lays out Fire Safety security procedures.
20 Just generally, not to the -- not to the
21 level that a manager would, but just a
22 general orientation to a new facility.
23    Q.   Was Joe Pasquarello responsible
24 for reviewing and updating the Fire Safety
25 policies and procedures?

1 M. ROCHE
2    A.   Joe Pasquarello chose to do
3 that.  It was not a requirement.  Just to
4 elaborate on that, all the policies
5 existed previously.  We've been in, you
6 know, we've been operating here for nine
7 years, so anything new that Joe did was a
8 revision or there were some new kind of,
9 not policies legally, but procedures or
10 methods of doing something that he did
11 draft, but again, not -- it was generally
12 not something that he had to do.  More --
13 more likely that he did it as a way to try
14 and improve an issue.
15    Q.   Do policies or procedures get
16 updated over time?
17       MR. CLARK:  Objection to form.
18    A.   So in our world, a policy is a
19 very specific thing because a policy -- if
20 you have something called a policy, it has
21 to be presented to Joint Commission if
22 requested.  So the only policies we have
23 are critical infrastructure policies,
24 response type policies, things that Joe
25 himself would not be responsible for.

61 (Pages 238 - 241)

Page 242

M. ROCHE

1
2      What he'd be responsible for is
3  what we would refer to as a procedure,
4  which is generally a one-page document of,
5  you know, how we want certain things to
6  occur.
7      Q.   And did he update procedures for
8  the Fire Safety Department?
9      A.   Yes.
10     Q.   Sorry.  Did you say yes?
11     A.   I said yes.
12     Q.   Was Joe responsible for
13  conducting Fire Safety training for Mount
14  Sinai Hospital staff?
15     A.   Joe was responsible for ensuring
16  that it got done.  Most of the training
17  was conducted by the fire marshals.
18     Q.   And did he train the fire
19  marshals on how to conduct the training?
20     A.   Not generally.  Ron Kanterman
21  did.  It's a -- these types of questions,
22  you've got to be very specific with your
23  time frame.
24     Q.   If he had no manager, was he
25  doing that job?

Page 243

M. ROCHE

1
2      A.   -- onboarded any new fire
3  marshals during the brief time where there
4  was no manager.
5      THE COURT REPORTER:  I'm so
6  sorry, sir.  The beginning got cut
7  off.  If you could repeat that answer?
8      A.   Sure.  I said that I don't
9  believe we onboarded any new fire marshals
10  during the brief time that Joe had no
11  managers under him.
12     Q.   When the hospital does
13  construction, was Joe responsible for
14  walking the construction area and
15  assessing any impact on Fire Safety?
16     A.   The Fire Safety Department is.
17  So, again, in absence of no other manager,
18  that is Joe, unless he were to direct that
19  to any one of the 17 fire marshals to do
20  it in his place.
21     Q.   Is that something a fire marshal
22  can do?
23     A.   Yes.
24     MR. CLARK:  Objection to form.
25     A.   Yes.

Page 244

M. ROCHE

1
2      Q.   Are you aware of whether or not
3  Joe conducted construction risk
4  assessments?
5      A.   He did.
6      Q.   Did Joe manage work orders that
7  were assigned to Fire Safety?
8      A.   That was part of his
9  responsibility.
10     Q.   Did he manage Fire Safety
11  impairments?
12     A.   Yes.  And I believe all these
13  are covered in his job description.
14     Q.   Probably.  When COVID-19 started
15  and throughout the pandemic, was Joe
16  Pasquarello responsible for addressing the
17  Fire Safety issues that arose for the
18  hospital as a result of the pandemic?
19     A.   Can you specify what Fire Safety
20  issues you're referring to?
21     Q.   Well, did the circumstances of
22  the hospital change during COVID-19?
23     MR. CLARK:  Objection to form.
24     A.   Well, clearly, they changed.  Is
25  your question did they change in a -- in

Page 245

M. ROCHE

1
2  a -- in a Fire Safety sense?
3      Q.   Did they change in a way that
4  would have impacted Fire Safety in any
5  way?
6      A.   We were involved -- I mean, we
7  were kind of the epicenter of the New York
8  City outbreak.  We worked with charity
9  organizations to build a hospital in
10  Central Park, so there was a lot of things
11  that occurred which are out of the
12  ordinary from a day-to-day basis.
13     I don't believe that his
14  involvement in that specific -- related to
15  the -- the Central Park hospital, I don't
16  think he was involved in that.  And I
17  can't think of any other ways that they
18  would have changed specific to Fire
19  Safety, you know, other than wearing
20  masks, like everyone else did, other than
21  being careful and cleaning, like everyone
22  else did.
23     Q.   When -- when the hospital
24  erected the hospital in Central Park, was
25  that in a tent?

62 (Pages 242 - 245)

M. ROCHE
1
2   A.   Yes.
3   Q.   So who addressed the Fire Safety
4 concerns for the tent and the people who
5 would be in it?
6   A.   Myself and Chris Hariegel.
7   Q.   So Joe did not advise or get
8 involved at all in Fire Safety concerns
9 for these tent facilities?
10   A.   We asked Joe to call the vendor
11 and order, I don't know, 50 fire
12 extinguishers.  He did that.  We may have
13 asked -- we may have asked his marshals to
14 provide a training to the employees in the
15 tent, but beyond that, I can't think of
16 any substantial way that he was involved.
17   Q.   Are you and Chris Hariegel Fire
18 Safety experts?
19   A.   We are --
20      MR. CLARK:  Objection to form.
21   Q.   Hmm?
22   A.   Chris and I are more experienced
23 in Fire Safety than Joe Pasquarello is,
24 yes.
25   Q.   So you were able to assess all

M. ROCHE
1
2 the Fire Safety needs of these tent
3 facilities without input from Joe
4 Pasquarello; is that what you're saying?
5   A.   Yes.
6   Q.   Were there any new -- excuse me.
7 Were there any new code requirements that
8 were established because of COVID?
9   A.   In Fire Safety?
10   Q.   Yes.
11   A.   -- aware.
12      THE COURT REPORTER:  Can you
13   repeat that, sir?
14   A.   I said I am not aware of any.
15   Q.   But you trusted your own
16 judgment to make Fire Safety assessments
17 without knowing if there were any new code
18 requirements?
19      MR. CLARK:  Objection to form.
20   A.   So that's not the question you
21 asked.  You asked are there any?  I'm
22 considering that to be a present day
23 question, which I said I was not aware of.
24      If your question is related to
25 December or January of 2020, were there

M. ROCHE
1
2 any?  Then the answer, with certainty, is
3 no.
4   Q.   Did Joe Pasquarello have any
5 other responsibilities that we haven't
6 discussed yet or that are not listed on
7 the job description?
8   A.   None that immediately come to
9 mind, but we do have, you know, a very
10 quickly changing environment.  It's not
11 uncommon for somebody to be asked to take
12 something on.
13   Q.   Okay.  I'm sorry.  I'm losing my
14 voice here.  Do you recall having a
15 conversation with Joe at some point in May
16 about his performance in the Fire Safety
17 Department?
18   A.   Yes, I do.
19   Q.   I think -- I'm sorry.  I think
20 you mentioned one conversation on May 25,
21 2021; is that correct?
22   A.   That's -- yes.  That's correct.
23   Q.   Do you recall that this
24 conversation was later the subject of one
25 of Joe's complaints to HR?

M. ROCHE
1
2      MR. CLARK:  Objection to form.
3   A.   I recall that the conversation
4 was related to two failures to complete
5 job duties and that it ultimately led to a
6 progressive counseling.
7   Q.   Did you have another
8 conversation with Joe Pasquarello prior to
9 that where you also informed him of his
10 failure to meet certain expectations?
11   A.   It's very likely that I did, but
12 no specific conversation comes to mind.
13   Q.   I'm sorry.  I'm going to
14 specify.  In -- in that same month, in
15 May, was there another conversation that
16 predated the May 25th conversation where
17 you and Joe Pasquarello were discussing
18 your concerns about his performance?
19   A.   There likely was.  No specific
20 conversation comes to mind.
21   Q.   Okay.  And in May of -- on
22 May 25, 2021 or in May of 2021 -- strike
23 that.
24      At that point, did you want Joe
25 Pasquarello to resign?

63 (Pages 246 - 249)

Page 250

M. ROCHE
1
2   A.   No.
3   Q.   Did you -- I apologize.  Did you
4 alert Joe that you thought his time in the
5 department was limited?
6   A.   Looked at Joe.  That -- I did
7 not think that he was adequately
8 performing.  I thought that there -- I
9 told him that I think that there have been
10 continuous issues since he got there, that
11 I had kind of cut him a little bit of
12 slack due to, you know, training and
13 onboarding and being a new employee, a
14 little bit more during COVID.  We went to
15 a week on, week off rotation.  And that
16 ever since then, which had been at least a
17 year in continuous full schedule, I hadn't
18 seen improvement and that I didn't -- I
19 didn't see, based on what he had showed me
20 to that point, any ability to improve.
21       MR. CLARK:  Leah, at a
22   convenient time, can we take a short
23   break?
24       MS. SELIGER:  Yeah.  Actually,
25   now would be a great time because I

Page 251

M. ROCHE
1
2 wanted to quickly create an exhibit
3 that has the PIP in it.
4       MR. CLARK:  Okay.  So is ten
5 minutes enough time for you?
6       MS. SELIGER:  Ten minutes is
7 fine.
8       MR. CLARK:  Okay.  Thank you.
9       MS. SELIGER:  Sure.
10       (A recess was taken.)
11   Q.   So Mr. Roche, I'm going to ask
12 you to open up Exhibit 19, which I think
13 your attorney recently sent to you.
14   A.   Okay.  I have it open now.
15   Q.   Okay.
16       MS. SELIGER:  I'd like to mark
17 this as Exhibit 19 for the record.
18       [The document was hereby marked
19   as Plaintiff's Exhibit 19 for
20   identification, as of this date.]
21   Q.   And can you, Mr. Roche, tell me
22 what this is?
23   A.   This is a counseling report that
24 was issued to Joe Pasquarello.
25   Q.   By who?

Page 252

M. ROCHE
1
2   A.   It was reviewed by Human
3 Resources and issued by me.
4   Q.   Okay.  Who -- who wanted to
5 issue Joe a progressive counseling at this
6 time?
7   A.   Who wanted to issue him one?
8   Q.   Correct.
9   A.   So I -- I was his direct
10 manager.  I felt that his performance was
11 lacking and that it would be appropriate
12 to issue him a counseling.
13   Q.   Okay.  And is it true that you
14 identified two specific items that you
15 thought were worthy of progressive
16 counseling?
17   A.   This progressive counseling
18 contains two specific incidents for which
19 he was counseled.
20   Q.   And can you take a look at the
21 first incident?  There's a paragraph with
22 the number one before it in the "Detailed
23 Account" section.  Can you tell --
24   A.   Yes.
25   Q.   -- me what -- what you were

Page 253

M. ROCHE
1
2 writing up Joe Pasquarello for in that
3 paragraph?
4   A.   Yes.  So the rule violated, if
5 it matters, is neglect of job duties and
6 responsibilities where gross neglect is
7 not involved.  This specific event, there
8 were two.  The first one is failure to
9 notify our insurance provider that the
10 fire pump was being taken out -- taken out
11 of service.
12   Q.   And was that the first time that
13 someone in Fire Safety had neglected to
14 alert the insurance company that the
15 system would be offline?
16   A.   The first time ever?
17   Q.   The first time in your
18 experience with Mount Sinai Hospital?
19   A.   No, it was not.
20   Q.   Had it ever happened while you
21 were in the position you had at that time?
22       MR. CLARK:  Objection to form.
23   A.   It had happened previously.  I
24 believe I was in my current role, but I
25 don't know the specific date.  It was a

M. ROCHE
1
2 while back, yes.
3    Q.  Do you remember who was
4 involved?
5    A.  I do not.
6    Q.  Do you know if the person who
7 neglected to call the insurance company
8 was written up?
9    A.  I do not.
10   Q.  Would that person -- wasn't that
11 person a Fire Safety person?
12   A.  (Inaudible.)
13      THE COURT REPORTER:  I'm sorry.
14 One more time, sir.
15   A.  Yes.
16   Q.  Do you remember how long ago it
17 happened?
18   A.  I do not.
19   Q.  But you think it's while you
20 still had the title that you had at the
21 time that Joe was at Crothall?
22   A.  Could you restate that question?
23   Q.  Sure.  In any time previous to
24 this incident in May of 2021, did you
25 write up an employee or advise that an

M. ROCHE
1
2 employee be written up for failing to
3 notify the insurance company of an
4 impairment to the fire system?
5    A.  I don't believe there was any
6 case where an employee was previously
7 written up for this occurrence.  In this
8 specific occurrence, it's a little bit
9 different than what happened previously.
10 This occurrence happened shortly after a
11 new procedure was set up to document how
12 we have had to notify the insurance
13 company.
14      It did happen in the past, but
15 at that point, that manager was never
16 trained or informed of the fact that it
17 happened.  Joe does not fall into that.
18 Prior to this event, we had the
19 discussion.  They happened to have been
20 successfully doing it for a while, and
21 this was a failure to do that.
22   Q.  I think I lost you somewhere
23 with the this and that, but I think you
24 said at some point, there was a change in
25 the procedures about notifying the

M. ROCHE
1
2 insurance company?  Is that what you said?
3    A.  There was a procedure put
4 together to document how it's supposed
5 to -- the notification process.  So when a
6 -- a procedure was put together to say
7 that when the fire pump is being taken out
8 of service, the fire department must be
9 contacted and the insurance company must
10 be contacted.  That new procedure was
11 written under Joe Pasquarello's tenure
12 here.  It was followed for some time and
13 this is an event where it was not
14 followed.
15   Q.  Who wrote that procedure?
16   A.  That was either Joe or Ron
17 Kanterman.  I don't know specifically who.
18   Q.  And that revision was done prior
19 to this event?
20   A.  What revision?
21   Q.  The revision to the procedure.
22 Was that done prior to the event that Joe
23 was written up for?
24   A.  There was no revision to the
25 procedure.  It was -- it was a brand new

M. ROCHE
1
2 procedure that was produced under Joe's
3 leadership.
4    Q.  Okay.  And was that new
5 procedure created prior to this event?
6    A.  It was discussed prior to the
7 event.  I believe they -- that Joe and/or
8 Ron better documented it immediately
9 following this event.
10   Q.  When you say "it was discussed,"
11 can you tell me who discussed it?
12   A.  I discussed it with Joe.
13   Q.  And -- and when did you discuss
14 putting in place a new procedure for
15 alerting the insurance company?
16   A.   -- specific date.
17      THE COURT REPORTER:  Can you
18 repeat that, sir?
19   A.  I said I don't know the specific
20 date.  Previously, we received a report
21 from the insurance company recommending
22 that as a new procedure.  We then enacted
23 that new procedure.  That all occurred
24 prior to this date.
25   Q.  There was a communication from

M. ROCHE

1          M. ROCHE
2 the insurance company prior to this date
3 asking that you create a new procedure for
4 notifying them?
5     A.   Yes.
6     Q.   And who did they send that
7 communication to?
8     A.   That would have been sent to
9 myself and John Barton most likely.
10    Q.   So how did Joe Pasquarello know
11 about it?
12    A.   Because I reviewed the entire
13 report with Joe Pasquarello.
14    Q.   And who sent that report?
15    A.   The insurance company.
16    Q.   What is the insurance company
17 called?
18    A.   FM Global.
19    Q.   And can you recall, even, you
20 know, to the best of your ability, when
21 that communication came in?
22    A.   No.  What I can recall is that
23 they inspect our site at least annually.
24 There was previously, let's say 2019 or
25 before 2019, there was a recommendation to

1          M. ROCHE
2 enact that procedure of notifying them.
3 There was sometime where they came back
4 for a follow-up visit and they
5 acknowledged that that procedure had been
6 in place.  And on May 6th, they came back
7 again and found the fire pump offline and
8 they had not been notified.
9     Q.   When did they, meaning the --
10 meaning FM Global, acknowledge that the
11 new procedure had been in place?
12    A.   Probably -- so they come
13 annually.  Honestly, I don't know, but if
14 they were there in May of 2021, they were
15 most likely there in May of 2020.  I would
16 assume that's when they removed that
17 recommendation from their report.
18    Q.   Sorry.  When would they have
19 removed what recommendation?
20    A.   In May of 2020 is when they
21 would probably have removed the
22 recommendation that we had to -- that we
23 had to notify them because they would have
24 acknowledged that we had been notifying
25 them.

1          M. ROCHE
2     Q.   Okay.  Did this incident cause
3 any change to the company's insurance
4 premium with FM Global?
5     A.   Not for Crothall.  The -- the
6 insurance is under Mount Sinai Hospital
7 and I don't review those fines.  I'm
8 sorry.  Premiums.  It did negatively
9 impact our score for which the premiums
10 are based upon.
11    Q.   And how do you know that?
12    A.   It says it in the document.
13 They -- they define what the risk score
14 is, what impacts the risk score, and what
15 the risk score means for premiums.
16    Q.   And so did you see the
17 hospital's risk score prior to this event
18 and then you saw that risk score after the
19 event?
20    A.   I've seen all of them, yes.
21    Q.   And were you told that the risk
22 score was negatively impacted by this
23 specific event?
24    A.   That's documented in the -- in
25 the report; that the risk has increased

1          M. ROCHE
2 because of our failure to follow that --
3 their recommended procedure.
4     Q.   And what changed as a
5 consequence of that?
6     A.   You already asked me that and I
7 said I don't know.
8     Q.   So as far as you know, there
9 could have been no change to the premiums?
10    A.   What I know is that our risk
11 increased and their premiums are based on
12 the risk.
13    Q.   Do you know if the risk
14 increased the last time you saw that the
15 insurance company had not been notified of
16 an impairment?
17    A.   Ask that again?
18    Q.   We discussed a previous incident
19 where the fire -- the insurance company
20 was present and saw that an impairment had
21 not been reported to them.  Did you
22 observe that the hospital's risk score
23 went up in that incident as well?
24    A.   I can't answer that with any
25 certainty.  I'm not even sure that I was

Page 262

M. ROCHE

1  in my current role when that initial
2  report came out.
3      Q.   But as far as you know, other
4  than this one incident and the one that
5  you vaguely remember, the insurance
6  company had never observed an impairment
7  that -- that had not been reported to
8  them?
9      MR. CLARK:  Objection to form.
10      A.   Could you -- could you just ask
11  that one more time?
12      Q.   As far as you know, I guess
13  during your tenure in the role that you
14  had at this -- at this time -- I'm sorry.
15  Can you just tell me what the title was
16  again?
17      A.   My title?
18      Q.   Yeah.
19      A.   Senior director.
20      Q.   During your tenure as senior
21  director, had you ever witnessed another
22  time when the -- when the insurance
23  company came to the hospital and observed
24  an impairment that had not been previously

Page 263

M. ROCHE

1  reported to them?
2      A.   What was the question?
3      Q.   Did you ever observe that
4  happening in the past while you were a
5  senior director?
6      A.   It's very common to observe --
7  to have new findings.  That's not the
8  issue here.  The issue here is that this
9  finding was a result of negligence and
10  failure to follow a procedure.
11      Q.   Who is -- who is responsible for
12  calling the insurance company when there's
13  a scheduled impairment?
14      A.   It's a Fire Safety impairment.
15  Fire Safety is responsible for notifying
16  the insurance company.
17      Q.   Does it matter who calls?
18      A.   It doesn't matter to me as long
19  as it gets done.  Ultimately, everything
20  stops with Joe Pasquarello.  If he assigns
21  somebody under him to do it, that's fine,
22  but it is his role to make sure and ensure
23  that get -- that gets done.
24      Q.   Do you instruct all of your

Page 264

M. ROCHE

1  direct reports to make sure that the
2  insurance company is called for every
3  impairment?
4      A.   I didn't have direct reports --
5  the -- the only impairments that the
6  insurance company cares about are fire and
7  life safety impairments.
8      Q.   When Matt Bond was the assistant
9  director of fire safety, did you
10  specifically instruct him to make sure the
11  insurance company was called for every
12  impairment?
13      A.   I don't know the time period
14  where we became aware of that requirement.
15  After that requirement, it was reviewed
16  and he was certainly aware of it.
17      Q.   And I think you said that after
18  a certain point, the insurance company
19  removed that requirement from the
20  hospital; is that correct?
21      A.   That is --
22      MR. CLARK:  Objection to form.
23      Q.   So at the time --
24      THE COURT REPORTER:  I'm sorry.

Page 265

M. ROCHE

1  I apologize.  Mr. Roche, please repeat
2  your answer.
3      A.   That is correct.
4      Q.   And so at the time that this
5  incident occurred, had they already put
6  that requirement back on?
7      A.   No.  This was the incident that
8  required them to put it back on.
9      Q.   I want to go to the second item
10  on the performance -- sorry -- progressive
11  counseling, the same exhibit, Exhibit 19.
12  Can you tell me what the second item
13  concerns?
14      A.   Related to fire door testing.
15      Q.   And what was your particular
16  concern with what Joe did?
17      A.   My concern with this one was
18  that, again, Joe did not follow procedure
19  and he did not track the deficiencies as
20  they should be tracked, which is within
21  TeamOps.
22      Q.   Did he address the deficiencies?
23      A.   Over what period of time?
24      Q.   How long was this fire door

67 (Pages 262 - 265)

M. ROCHE

1
2 project going on?
3    A.   So all of the repairs that were
4 noted in that report have been addressed.
5    Q.   That were noted in -- in what
6 report?
7    A.   In the annual door inspection.
8    Q.   So that was a 2020 annual door
9 inspection.  So had he addressed all
10 the -- all the repairs for the fire doors?
11       MR. CLARK:  Objection to form.
12    A.   He addressed the repairs.
13 That's not the issue here.  That's not why
14 he was written up.  He was written up for
15 failing to follow the procedure, including
16 the -- the required documentation in order
17 to prove that all the deficiencies were
18 sufficiently tracked and we have a record
19 showing that.
20    Q.   And do you need that record for
21 the Joint Commission?
22    A.   Yes.
23    Q.   And did Joe have any record of
24 the deficiencies and repairs that he had
25 been addressing?

M. ROCHE

1
2    A.   Joe had an inspection report
3 showing all the deficiencies and he had,
4 at a later date, a completion report
5 showing the completed repaired
6 deficiencies.
7    Q.   Did he have any other
8 documentation that he used to manage the
9 repairs of the fire doors?
10       MR. CLARK:  Objection to form.
11    A.   He did not have the
12 documentation sufficient or -- sufficient
13 to show that we had an understanding of
14 which doors were opened at what date
15 between those two reports.
16    Q.   So did he have some
17 documentation, just not the right
18 documentation, in your opinion?
19       MR. CLARK:  Objection to form.
20    A.   No.  He definitely did not have
21 the right documentation.  I can confirm
22 that.  There were no work orders made.  I
23 don't know if he had any other
24 documentation, but it's -- it's kind of
25 unrelated because it's not the right

M. ROCHE

1
2 documentation.
3    Q.   How long did that project go on?
4    A.   Off the top of my head, I don't
5 know.
6    Q.   Was it a matter of days or weeks
7 or months?
8    A.   It was definitely more than
9 weeks.  It was probably months, but again,
10 I don't know.
11    Q.   Did you and Joe ever discuss
12 progress related to the fire door repairs?
13    A.   Yes.
14    Q.   And what did you discuss
15 regarding the fire doors?
16    A.   The status of the repairs.
17    Q.   And would Joe report to you the
18 status of the repairs?
19    A.   (Inaudible.)
20       THE COURT REPORTER:  Can you
21    repeat that, sir?
22    A.   Yes.
23    Q.   Did he ever show you the
24 documentation that he was using to keep
25 track of the repairs?

M. ROCHE

1
2       MR. CLARK:  Objection to form.
3    A.   I'm really not sure.  It would
4 help if you told me what documentation he
5 says that he had, but I don't -- I do not
6 recall seeing documentation.  The only
7 thing I know for certain is that he did
8 not follow our process, which is to create
9 a work order in TeamOps.
10    Q.   Did he ever tell you that he was
11 using a different system to track his
12 progress with the repairs of the doors?
13       MR. CLARK:  Objection to form.
14    A.   I don't remember the system he
15 was using or any conversations related to
16 it.
17    Q.   When did the annual door
18 inspection repairs get completed?
19    A.   Let me -- let me reread this
20 document.
21    Q.   Sure.
22    A.   Looks like the inspection was in
23 February of 2021 and the repairs were
24 completed sometime between then and the
25 first week of May.

68 (Pages 266 - 269)

M. ROCHE

1
2  Q.   I'm trying to understand the --
3  what's written here.  It says:
4       "The annual fire door inspection
5  originally performed beginning July 2021,
6  completed in November 2020."
7       Is -- is there a typo somewhere?
8  A.   Yes.  That's a typo.  It looks
9  like it -- it intended to be July 2020,
10  completed in November 2020.
11  Q.   So the inspection finished in
12  November of 2020 and then after that, is
13  that when the repair project began?
14  A.   No.  To me, that looks like the
15  inspection began in July.  The inspection
16  is only maybe a week worth of work.  The
17  inspection is the easy part.  The
18  inspection began in July.  The repairs had
19  been completed in November, but no work
20  orders were made.  At that point, we
21  reviewed the procedure that we require
22  with Joe to put in place and how to track
23  any deficiencies with work orders.
24       We then decided to, because we
25  did not have good documentation proving

M. ROCHE

1
2  what happened, we did the annual test
3  again, which started in February of 2021.
4  The repairs were then done shortly after,
5  completed by May of 2021.  And the
6  deficiency here is, again, he did -- he
7  failed to follow the procedure that we had
8  just reviewed with him.
9  Q.   So when was he not using the
10  procedure?  At what point?
11  A.   Between -- well, at both points.
12  So he failed to use the procedure July '20
13  through November 2020.  At that point, he
14  was, I don't want to say counseled, but I
15  guess retrained on what the expectation
16  is, how he needs to track the documents.
17       And because the documents were
18  in poor shape and we did not have work
19  orders showing our progress, we decided to
20  redo it.  And then, again, in February,
21  between February and May, he again failed
22  to follow that process.
23  Q.   In February and May of 2020?
24  A.   Twenty-one.
25  Q.   Ah.  In February and May of

M. ROCHE

1
2  2021.  So it sounds like there was a long
3  process where he was managing the door
4  repairs and then there was a second
5  inspection, and then I think you said then
6  he was counseled on the appropriate way to
7  manage the documentation.  When did that
8  occur, that --
9       MR. CLARK:  Object -- objection
10  to form.
11  A.   I don't -- I don't want to use
12  the word "counseled."  Trained.  He was
13  retrained on it.  That occurred after
14  November of 2020.  In between November of
15  2020 and February of 2021.
16  Q.   And who trained him on that?
17  A.   Myself, Bob Shaffer, Bobby
18  Denver.  I believe that's it.
19  Q.   Okay.  I'd like to pull up
20  another exhibit.  I'm done with this one
21  for now.  Sorry.  I'm just -- it's
22  Exhibit 18.
23       MS. SELIGER:  I'd like to mark
24  this as Exhibit 18.
25       [The document was hereby marked

M. ROCHE

1
2  as Plaintiff's Exhibit 18 for
3  identification, as of this date.]
4  Q.   Let me know when you are able to
5  see it.
6  A.   I'm looking at it right now.
7  Q.   Can you tell me what you believe
8  these documents are?
9  A.   I'm sorry.  I'm just -- just
10  making sure I understand it.  Just bear
11  with me.
12  Q.   Sure.
13  A.   So it looks like these are the
14  agendas that Joe provided for our weekly
15  meetings.
16  Q.   Okay.  And there are handwritten
17  notes.  Do you recognize that handwriting
18  as yours?
19  A.   Yes.
20  Q.   So I think this exhibit is
21  organized in descending chronological
22  order, so I want, if you don't mind,
23  please scroll all the way to the second to
24  last page, page 18.  Do you see that page
25  that's -- it says, "November 2, 2020" at

M. ROCHE

1 the top?
2    A.   November 2, 2020?  Yes.
3    Q.   Do you see under "Vendor
4 Management" where it says, "Fire Door
5 Solutions, phase one complete, should get
6 report this week with the phase two
7 quote"?
8    A.   Yes.
9    Q.   Is that related to the fire door
10 project that Joe was working on?
11   A.   Yes.
12   Q.   Did you and Joe discuss the fire
13 door project at that meeting?
14   A.   Yes.
15   Q.   If you scroll up to the previous
16 note or page 16, do you see near the
17 bottom where it says, "FLSD Plans," the
18 second -- the third bullet point, the
19 second white bullet point.  It says:
20      "Break down of the remaining
21 doors from the last Brand report.  I am
22 following up on it.  Not satisfied with
23 what was provided.  Asked Olympic to
24 supply a quote, still waiting."

M. ROCHE

1      Do you see that?
2    A.   Yes.
3    Q.   Is that related to the same fire
4 door project?
5    A.   It is related to fire doors.  I
6 don't believe it's related to the same
7 fire door project because it references a
8 different vendor.  The vendor it
9 references is Brand Services and the other
10 fire door provider was Fire Door
11 Solutions.  He references them somewhere.
12 You'll see FDS.
13   Q.   Okay.  If you scroll up to the
14 previous entry, I'm looking for the first
15 page.  It's page 12 of this exhibit.  It's
16 dated December 22, 2020?
17   A.   Yes, I see it.
18   Q.   Do you see near the bottom of
19 that page, it's Bates stamped D660, where
20 it says, "Doors" in bold and it says:
21      "Working with FDS to close all
22 door issues and have staff trained by
23 venue [sic] -- vendor.  Waiting for date
24 of next phase, parts on order."

M. ROCHE

1      And then it says:
2      "Green - fully resolved doors,
3 no further attention is needed at this
4 time.  Orange - parts ordered, to be
5 repaired at a later time," and "Red -
6 client will address needs -- client will
7 address, needs further attention."
8      Do you see that whole section?
9    A.   Yes.
10   Q.   Do you know what Joe is
11 referring to with the green, orange, and
12 red?
13   A.   Yes.  He's referring to the
14 report that we received from Fire Door
15 Solutions.  They use kind of a
16 color-coding scheme to show you the status
17 of the doors.
18      It shows you green is completed
19 or working properly.  Orange is that it's
20 not working properly and they need to
21 order parts.  And red is either that it's
22 not working properly, maybe it's a bigger
23 issue, maybe they need to replace the door
24 or maybe they have something blocking the

M. ROCHE

1 door, and the client, in this case Joe,
2 would need to directly address.
3    Q.   So do you believe you discussed
4 all that at that meeting where this --
5 where these notes are listed?
6    A.   So, clearly, he presented it to
7 me.  I don't know what level of detail we
8 discussed.
9    Q.   Okay.  If you scroll up to page
10 ten of this document, it's a page -- D658.
11   A.   Yes.
12   Q.   Do you see, kind of a third away
13 from the bottom, where it says "Doors" in
14 black and then it says in blue, "Working
15 with FDS to close all door issues"?
16   A.   Yes.
17   Q.   What does that mean?
18   A.   I think it means he's working
19 with Fire Door Solutions to close all the
20 door deficiencies.
21   Q.   And so he likely reported that
22 to you?
23   A.   It was presented to me, yes.
24   Q.   I'm going to scroll up again.

70 (Pages 274 - 277)

Page 278

M. ROCHE

1
2 On page nine, again, near the bottom of
3 the written section, it says:
4      "FDS order all parts to complete
5 all remaining doors and new finds will be
6 back 2 to 15 [sic] to complete.  2021
7 inspection to be scheduled for end of
8 February or early March."
9      Do you see that?
10   A.   Sorry.  I lost you.  We're on
11 page ten or we're above that?
12   Q.   Sorry.  Page nine.  It's Bates
13 stamped 657.
14   A.   Okay.  On there, yeah.  Three
15 bullets up from the bottom.  I see that
16 line, yes.
17   Q.   Does it look like Joe gave you
18 another update on the doors?
19   A.   Yes.
20   Q.   I'm going to ask you to scroll
21 up again.  Do you see on page four, it's
22 Bates stamped D652, it's dated June 1,
23 2021?
24   A.   Yes.
25   Q.   Do you see the last paragraph

Page 279

M. ROCHE

1
2 that has a bullet point?  It says:
3      "At the meeting with Chris in
4 February, it was agreed to add an
5 impairment coordinator, a position I still
6 believe will help the shop get to the next
7 level.  I submitted a draft of a job
8 description back in February."
9      Do you see that?
10   A.   I do, yes.
11   Q.   Did you and Joe discuss the
12 impairment coordinator position at that
13 meeting?
14      MR. CLARK:  Objection to form.
15 Which meeting are we talking about?
16      MS. SELIGER:  The meeting that
17 happened on June 1, 2021.  This --
18 these seem to be notes from June 1,
19 2021.
20   A.   We addressed it on multiple
21 occasions.  Based on this, yes, it does
22 look like we spoke about it on that day.
23   Q.   If you scroll up to page three,
24 it looks like the notes from a June 8,
25 2021 meeting.  Right in the beginning, it

Page 280

M. ROCHE

1
2 says:
3      "Fire Door Solutions, two doors
4 on order and two doors being checked by
5 Brand."
6      Is that -- is that related to
7 the fire doors project that we were
8 discussing?
9   A.   It appears to be, yeah.  It
10 appears that he's got two different
11 vendors working on different issues, so
12 I'm not sure which one is which, but,
13 certainly, it's related to fire doors.
14   Q.   So would you agree that you
15 received week -- regular updates on the
16 door system?  I mean, on the door repair
17 project?
18      MR. CLARK:  Objection to form.
19   Q.   I'm sorry --
20   A.   -- received --
21   Q.   Sorry.
22   A.   I did receive updates and Joe
23 was not counseled for a failure to provide
24 updates.
25   Q.   Are you saying that he never

Page 281

M. ROCHE

1
2 showed you the documentation he was using
3 or he never described his process of
4 documenting the project?
5      MR. CLARK:  Objection to form.
6   A.   What you just showed me and what
7 we just went through is not sufficient
8 documentation by any means.  It's very
9 simplistically an update of where he's at.
10 If you don't have work orders that go
11 along with all of those repairs that are
12 time stamped and show you when every
13 specific door was completed, then it's
14 irrelevant.
15   Q.   I understand that.  I guess my
16 question is in all of the updates that you
17 were being provided, did Joe ever show you
18 the documentation he was using for the
19 project?
20   A.   Are you considering what we're
21 looking at documentation?
22   Q.   No.  I'm asking if he showed you
23 the documentation he actually used?
24   A.   I think you --
25      MR. CLARK:  Objection to form.

71 (Pages 278 - 281)

1          M. ROCHE
2     Go ahead.
3     A.   I think you asked me earlier if
4  he used an alternate form of documentation
5  and I think I answered that by saying I'm
6  not sure what type of documentation he --
7  he used.
8          If you're -- if you're calling
9  this documentation, then it's not
10 sufficient and it -- it does not apply.
11 If there was some other form, again, I
12 don't know that.  What I have reviewed
13 with Joe were the initial inspection
14 reports and the, ultimately, at the end,
15 the completion reports.
16    Q.   And nothing else?  No other
17 documentation from him?
18    A.   So that's the third time you've
19 asked me that.  Again, I'll answer I don't
20 recall any other type of documentation.  I
21 don't know how he was documenting it.
22    Q.   And then the final report,
23 when -- when, again, was that received?
24    A.   Which final report?
25    Q.   The final inspection report?

1          M. ROCHE
2     A.   -- top of my head.
3          THE COURT REPORTER:  Can you
4     repeat that, sir?
5     A.   I would have to look --
6          THE COURT REPORTER:  I'm sorry.
7     A.   I said I -- I said I don't know
8  off the top of my head.  I could look that
9  up on TeamDocs, but that's not something
10 that I have in front of me.
11    Q.   Do you remember -- I think
12 you've already stated this -- when the --
13 when the fire door inspection project was
14 finally completed?
15         MR. CLARK:  Objection to form.
16    A.   There were multiple projects.  I
17 don't know which one you're referring to
18 and I don't know when they were completed.
19    Q.   The -- the one that is the
20 subject of this write up, this -- the
21 first progressive counseling.  When did
22 that project end?
23    A.   I think I may have previously
24 said that it was May 10th or the first
25 week of May, and I believe that I misspoke

1          M. ROCHE
2  by stating that.  After rereading that, I
3  see that it was brought to my attention
4  during that period.  So to answer your
5  initial question, I don't have the date
6  where that was completed.
7     Q.   And how was it brought to your
8  attention on May 10th or the week of
9  May 10th?
10    A.   Most likely during a document
11 review session on TeamDocs.
12    Q.   And who would you be doing that
13 document review session with?
14    A.   Probably Joe Pasquarello, Robert
15 Denver, and Bob Shaffer.
16    Q.   So would that have been the
17 first time you realized that he was not
18 using the proper documentation that
19 Crothall requires?
20    A.   Most likely yes.
21    Q.   Okay.  I want to quickly look at
22 the performance improvement plan which
23 starts on page two of Exhibit 19.
24         THE COURT REPORTER:  I'm sorry,
25    Mr. Roche.  Did you say something

1          M. ROCHE
2  there?  I might have missed it.
3          THE WITNESS:  I was just
4     acknowledging okay.
5     Q.   Okay.  So just quickly, I'm --
6  I'm looking at what I think is the first
7  page of the performance improvement plan
8  or -- no.  I'm sorry.  The second page of
9  the performance improvement plan.  And was
10 this issued to Mr. Pasquarello on the same
11 day as the progressive counseling?
12    A.   Yes, it was.
13    Q.   Okay.  And I'm -- I'm noticing
14 that it's called a Performance Improvement
15 Plan and not a Performance Enhancement
16 Plan.  Why is that?
17         MR. CLARK:  Objection to form.
18    A.   So there's two ways to issue
19 this -- these types of plans.  One is if
20 the associate is receiving a counseling
21 along with this plan or if they've
22 previously received counseling and are
23 getting this plan as a result of that
24 counseling or if this plan is being
25 produced just as an improvement plan

72 (Pages 282 - 285)

M. ROCHE
1
2 without any deficiencies in their
3 performance.
4    Q.   So you opted to issue it as a
5 performance improvement plan?
6    A.   I felt that the two items noted
7 were severe enough to reach that level.
8    Q.   And had you -- strike that.
9         Let's go to the first item,
10 "Timely completion and closing of all
11 preventative maintenance tasks completed
12 by a vendor or in-house Fire Safety
13 staff."  What was Joe not doing in this
14 regard?
15    A.   I don't think that this implies
16 there was something that he was not doing.
17    Q.   So there's -- and are you saying
18 that this item is on the performance plan,
19 but he wasn't actually -- he wasn't
20 actually failing to accomplish this?
21    MR. CLARK:  Objection to form.
22    A.   He wasn't failing to accomplish
23 it, but there was plenty of room for
24 improvement.
25    Q.   Right now, with Bernie Nuñez as

M. ROCHE
1
2 the director of Fire Safety, is he getting
3 all of the preventative maintenance tasks
4 completed and documented by the 25th of
5 every month?
6    A.   I haven't requested that from
7 him.
8    Q.   Let's look at the next -- the
9 next item, "Attend all required meetings."
10 I'm not going to read the whole thing.  I
11 think we discussed this already.
12        When did you decide that putting
13 meeting -- when did you decide that Joe
14 had missed enough meetings that it was a
15 performance concern?
16    A.   It had been an ongoing concern.
17 While drafting this performance plan, I
18 felt that it was warranted to include that
19 statement.
20    Q.   Why at that time?
21    A.   Because it was an ongoing issue
22 that had not improved even after me
23 discussing with him of the issue.  So I
24 felt it best to document that issue in
25 order to ensure that it approved --

M. ROCHE
1
2 improved.
3    Q.   The next item looks like it
4 concerns the F-89 certificate, and I think
5 I have explored certificates plenty with
6 you today, so I'm not going to bring it up
7 again.  The next item says:
8         "Ensure all regulatory
9 documentation for the previous month is
10 received, reviewed, and uploaded to
11 TeamDocs by the 10th of the current
12 month."
13        So am I understanding correctly
14 that any regulatory documentation from
15 month one would have to be uploaded into
16 TeamDocs by the 10th of month two?
17    A.   Yes, that's correct.
18    Q.   And is regulatory documentation
19 documentation of preventive measures?
20    A.   Some of it is.
21    Q.   Okay.  And right now, under the
22 direction -- while Fire Safety is under
23 the direction of Bernie Nuñez, are all
24 regulatory documents for the previous
25 month being received, reviewed, and

M. ROCHE
1
2 uploaded to TeamDocs by the 10th of every
3 month?
4    A.   I don't believe so.  This was
5 not direction that I've given to Bernie
6 because he hasn't shown me that he
7 requires this type of micromanaging, if
8 you will.
9         This item came as a result of my
10 experience with Joe and is specific to
11 Joe.  It was included as a way to ensure
12 that he meets the requirements.  Prior to
13 this, it was not uncommon for it to take
14 two or three months for him to upload
15 data, which is not acceptable.  If I felt
16 that Bernie is going down that same path,
17 I would correct that in a similar fashion.
18    Q.   And how did you know he wasn't
19 uploading documentation for months at a
20 time?
21    A.   Because I can check it in real
22 time and see what's there.
23    Q.   And did Joe ever have managers
24 who were assigned with keeping
25 documentation, regulatory documentation

M. ROCHE

1        M. ROCHE
2  current in TeamDocs?
3     A.   So I don't mean to be
4  repetitive, but I am going to say it
5  again.  Joe was the assistant director of
6  Fire Safety, and Joe was ultimately
7  responsible for the actions of the Fire
8  Safety Department.  If Joe assigned those
9  duties to a subordinate, Joe was also
10 responsible for ensuring that they got
11 accomplished.
12    Q.   What if Joe was absent?  Like
13 let's say he was on vacation or sick, who
14 is responsible for addressing these things
15 in his absence?
16    A.   He set that up with -- ahead of
17 time.  It's not uncommon for people to
18 review their, you know, if it's a planned
19 absence or even if it's unplanned, you
20 know, we're -- we're basically -- this
21 role is you're available almost 24/7.
22 It's a salaried position.
23        The expectation is you have your
24 duties covered.  If you have to be out of
25 work for some time, the expectation is

1        M. ROCHE
2  that you make arrangements sufficient to
3  stay compliant.
4     Q.   And if you're out sick
5  unexpectedly, who is responsible for
6  meeting these conditions?
7     A.   I have -- personally have
8  arrangements with other managers where if
9  I'm out, they'll know which meetings have
10 to get attended or what duties have to get
11 done.  Many of the other managers have
12 similar arrangements.  I don't know what
13 Joe's was.  I presume he never took those
14 appropriate actions.
15    Q.   Why do you presume that?
16    A.   Because there were a number of
17 times where he was out and issues were
18 missed.
19    Q.   And were all of those times when
20 he had managers to take on those
21 responsibilities?
22    A.   There's always managers to take
23 on those responsibilities.  Even if
24 they're within Engineering, it's a team
25 environment.  I mean, it's -- it's not

1        M. ROCHE
2  uncommon for one person to ask another to
3  cover them for any type of meeting or
4  deadline or anything.  So we have 33
5  people here.  There were people that he
6  could have asked.
7     Q.   Okay.  So I'm going to go to the
8  next item.  It says:
9        "Ensure life safety work orders
10 are created for all life safety
11 deficiencies by the next business day per
12 your current procedure."
13        Does that mean that Joe was
14 actually doing this and you're telling him
15 to continue?
16        MR. CLARK:  Objection to form.
17    A.   What it really means is that he
18 has a procedure, a written procedure in
19 place that he failed to follow on a fairly
20 regular basis.  This was a way to document
21 that and ensure that it gets done
22 appropriately.
23    Q.   Did you ever express to him that
24 he was not meeting your expectations with
25 respect to this item?

1        M. ROCHE
2     A.   Yes, regularly.  And we had,
3  again, this item is directly related to
4  the door repair conversation we had where
5  he was not making work orders for new
6  deficiencies.
7     Q.   And right now, do you require
8  Bernie Nuñez to ensure that life safety
9  work orders are created for all life
10 safety deficiencies by the next business
11 day?
12    A.   Yes.
13    Q.   And has he met that expectation?
14    A.   Yes.
15    Q.   The last one says:
16        "Ensure all urgent impact ISLM
17 are completed properly and closed out in
18 TeamOps within 24 hours."
19        Can you tell me what that means?
20    A.   Yes.  So that's -- that's
21 actually a typo.  It should be ILSM, and
22 it stands for Interim Life Safety Measure.
23    Q.   Mm-hmm.
24    A.   And basically, what it's -- if a
25 deficiency is found, there needs to be an

74 (Pages 290 - 293)

M. ROCHE

1
2 immediate work order created identifying
3 that deficiency.  And if it's for a life
4 safety system, which most of Fire Safety
5 is, there needs to be an assessment of
6 that work -- of what the impact of that
7 deficiency is.  So there are different
8 measures that you can come up with,
9 depending on what the impact is.
10        If it's something simple, it
11 might be just staff training in that area
12 so that they're aware of it.  Something
13 more permanent might require construction
14 or something to do immediately in order to
15 correct that deficiency.
16        What this comment is about is
17 once that life safety work order is made,
18 the Fire Safety Department has a
19 responsibility to -- to review that,
20 determine what the appropriate safety
21 measures are to make that area safe, and
22 document that in written form in a comment
23 on the work order.
24    Q.   And that has to be completed
25 within 24 hours; is that correct?

M. ROCHE

1
2    A.   Yes.
3    Q.   And what is the system that you
4 have that tracks how timely these urgent
5 impact I -- ILSMs are closed out?
6    A.   The system is TeamOps.
7    Q.   So you can -- are you able to
8 pull a report from any given period and
9 see whether or not these IL -- urgent
10 impact ILSMs were completed within
11 24 hours or 28 hours, et cetera?
12    A.   Talking about historical data?
13    Q.   Yeah.
14    A.   So I believe you can.  I haven't
15 personally done that.  What I've done
16 is -- is pull the -- a current report to
17 show you what's currently open without a
18 comment.
19        We've also set up an automatic
20 notification where every morning, if
21 there's any -- any work orders that are in
22 that category and don't have a comment,
23 you'll immediately get an e-mail with that
24 information basically alerting you to log
25 in and go place a comment.

M. ROCHE

1
2    Q.   When did you set up that
3 notification?
4    A.   Back in 2019, '18.  It's been in
5 place I believe throughout Joe
6 Pasquarello's tenure.
7    Q.   And does the notification come
8 to him or someone else?
9    A.   It goes to him as well as other
10 people.
11    Q.   Have you received any such
12 notifications since Joe Pasquarello left
13 Crothall?
14    A.   Not to my knowledge.
15    Q.   So there's never been an ILSM --
16 an urgent impact ILSM that was closed
17 later than 24 hours?
18    A.   There's been plenty of work
19 orders, but there haven't been, again, to
20 my knowledge, new work orders without
21 comments.  Bernie and Matt do a very good
22 job of putting a comment in on a -- in a
23 timely manner.
24    Q.   But on the PIP here, was your
25 expectation -- it looks like your

M. ROCHE

1
2 expectation was not to add comment, but to
3 close out in TeamOps within 24 hours.
4        MR. CLARK:  Is that a question?
5    Objection to form.
6    Q.   I'm asking if closing out the
7 urgent impact ILSM in TeamOps is different
8 than adding comments.
9    A.   So it is, but bear with me
10 because it gets a little bit complicated
11 here.
12        So there's an original work
13 order for the issue.  So let's say there
14 is a sprinkler that's out of service.
15 That's the work order.  It has a work
16 order ticket number assigned to it, and
17 it's a life safety work order.
18        The next day that -- or
19 overnight, if that work order doesn't have
20 a comment, the system will automatically
21 issue a follow up work order that will
22 reference that work order number and it'll
23 say, "You haven't reviewed this yet.  What
24 are -- what are the safety implications of
25 this issue?"

75 (Pages 294 - 297)

1          M. ROCHE
2          And that's what an urgent impact
3 ILSM is.  It's related to the initial work
4 order, but it's a different work order
5 number.
6     Q.   And so when you add a comment to
7 the urgent impact ILSM, does that close it
8 out?
9     A.   Yeah.  So that's -- so you add a
10 comment and then you close it out.  And
11 once that's done, that -- that basically
12 gets tagged back to the original work
13 order so the system won't continue to send
14 out those required notifications because
15 it's aware of the fact that you've already
16 commented on this, you've reviewed it, and
17 you're good.  You might be working on a
18 repair, but there's no additional
19 immediate action needed.
20    Q.   Okay.  And can you just put in a
21 comment or do you have to inspect anything
22 or -- or do -- take any action prior to
23 adding a comment?
24    A.   It depends on the issue.
25 There's -- there's some stuff that is

1          M. ROCHE
2 descriptive enough for you to do it
3 without viewing it, but for most items,
4 you would have to see, you know, what --
5 what the occupancy of the space is, what's
6 the impact of not doing it.  So the more
7 conservative approach is to actually go up
8 there and physically see it.
9     Q.   So if it requires a physical
10 inspection and the Fire Safety director or
11 assistant director is not present, who
12 would be responsible for ensuring that the
13 urgent impact ILSM is addressed?
14    A.   So they can be assigned to
15 anybody.  They can -- they can be assigned
16 to any other manager, but more
17 appropriately, they should probably be
18 assigned to the fire -- fire marshals.  We
19 have, you know, 17 fire marshals and
20 they're more than capable of reviewing a
21 safety condition.
22    Q.   Was there ever a time when Joe
23 was absent and there were no managers
24 reporting to him?
25          MR. CLARK:  Objection to form.

1          M. ROCHE
2     A.   I wouldn't be surprised if there
3 was.
4     Q.   So I imagine these ILSMs come in
5 frequently; is that true?
6          MR. CLARK:  Objection to form.
7     A.   It depends on the time period.
8 If there's a lot of repairs coming due, if
9 it's -- if it's the time of the year or
10 month where a lot of preventative
11 maintenance tasks are being done, then
12 they would come in frequently.  If it's,
13 you know, there's not a lot of work being
14 done, then no, it's not uncommon to go a
15 couple days without anything.  It's also
16 not uncommon to go with multiples every
17 day.
18    Q.   If your Fire Safety staff was
19 out for some reason, would you take
20 responsibility to make sure these urgent
21 impact ILSMs were addressed?
22    A.   Would I personally?
23    Q.   Yes.
24    A.   Probably not.  There are other
25 people that do review it and should be

1          M. ROCHE
2 reassigning it.
3     Q.   Would you instruct the ILSMs to
4 be reassigned?
5          MR. CLARK:  Objection to form.
6     A.   My goal is to make sure that
7 they're completed in a compliant way.
8 That would be what I would do if I -- I'm
9 sure it's happened.  I may not have
10 noticed that, but my expectation is that
11 either a manager, supervisor, assistant
12 director within Fire Safety, and if none
13 of them, then a Work Control supervisor
14 would see that these are being issued,
15 nobody is responsing [sic] -- responding
16 to them.  Let me respond -- let me
17 reassign it to somebody else.
18    Q.   So at the end of the day, if the
19 Fire Safety staff is not there, on whose
20 shoulders does it fall if certain ILSMs
21 are not addressed?  Would that be your --
22          MR. CLARK:  Objection --
23    objection to form.
24    A.   Well, again, it goes back to I
25 think poor management on the -- on behalf

M. ROCHE

1
2 of the assistant director of Fire Safety.
3 There should be a process in place to deal
4 with exactly that.
5         It's not my role as the senior
6 director to go out and physically inspect
7 every piece of equipment that is
8 identified, but a more appropriate
9 response would be to make sure to review
10 it with the fire marshals if -- set up a
11 process that's sustainable, that there's
12 always somebody to do it.
13    Q.   And did you set up such a
14 process?
15    A.   I --
16         MR. CLARK:  Objection to form.
17    A.   I have not held a role as the
18 assistant director of Fire Safety.
19    Q.   Right.  But ultimately, doesn't
20 that assistant director of Fire Safety or
21 director of Fire Safety report to you?
22         MR. CLARK:  Objection to form.
23    A.   Currently, the director of Fire
24 Safety does.  At the time, yes, Joe
25 reported to me.

M. ROCHE

1
2         MS. SELIGER:  Can we take a
3 five-minute break just so I can see
4 how much is left?
5         MR. CLARK:  Sure.
6         MS. SELIGER:  Okay.  Thanks.
7         (A recess was taken.)
8    Q.   I'd like to look at Exhibit 20,
9 which I think, Mr. Roche, I think your
10 attorney e-mailed that to you together
11 with Exhibit 19.
12         MS. SELIGER:  I'm marking this
13 as Exhibit 20.
14         [The document was hereby marked
15 as Plaintiff's Exhibit 20 for
16 identification, as of this date.]
17    A.   Yes.  Okay.  I'm ready whenever
18 you are.
19    Q.   Can you identify what this
20 document is?
21    A.   So this looks like the -- a
22 second progressive counseling for Joe
23 Pasquarello.
24    Q.   And did you issue this
25 progressive counseling to him?

M. ROCHE

1
2    A.   Yes, I did.
3    Q.   And if you scroll to the second
4 page of this exhibit, what is that?
5    A.   This second page is a specific
6 work order which is a preventative
7 maintenance task required to be closed.
8 The target date on it is 6/30.  Based on
9 his improvement plan, it would be required
10 to be closed a little before that -- that
11 on June 25th.
12    Q.   Okay.  And is this the work
13 order that is cited in the second
14 progressive counseling?
15    A.   It is one of the two items cited
16 in the second progressive counseling.
17    Q.   And do you see where at the top
18 of this page, which is Bates stamped
19 CH953, where it says, "Reason," and it
20 says, "Dry Sprinkler Pump Annual PM"?
21    A.   Yes.
22    Q.   Is this a work order for an
23 annual preventive measure?
24    A.   Based on the task list where it
25 says -- yes, it is.  If you look right

M. ROCHE

1
2 down below that, you have quarterly task
3 list and on the next page starting at
4 number 170, you have annual task list.
5    Q.   And --
6    A.   When the -- I'm sorry.  But just
7 to give you a little more context, in the
8 annual, you would perform all of the
9 quarterlies plus all of the annuals.
10    Q.   Meaning that they -- these items
11 would all be due during the annual tests?
12    A.   Yes.  So each -- each line
13 there, starting with -- on the
14 quarterlies, 30, 40, 50, each one of those
15 is a separate task that you would
16 complete.  The way the system works is
17 when it issues an annual, it does the
18 quarterly with the annual so that you do
19 the full -- all the annual tasks.
20    Q.   I'm not sure I understand that.
21    A.   So a preventative maintenance
22 for this specific asset, which is the dry
23 system compressor, gets issued four times
24 per year.  Three of those four, it gets
25 issued only with the quarterly tasks and

77 (Pages 302 - 305)

M. ROCHE

1
2 the numbers on this document would stop at
3 line number 150.  And once per year, it
4 issues the complete task list for an
5 annual PM, which goes down to 260, line
6 260.
7     Q.   And the quarterly tasks, are
8 those due by the end of each quarter?
9     A.   So the -- the work order gets
10 issued on either the last day of the month
11 or the first day of the following month,
12 and it gives you 30 days to get those
13 complete.  Now, for a quarterly work
14 order, that would be issued every three
15 months.
16     Q.   And does the system send an
17 alert to notify whoever needs to be
18 notified that quarterly tasks are due?
19     A.   So we have -- the system --
20 well, not -- not the system, but the Work
21 Control supervisor routinely sends a list
22 of all open PMs to all of the managers.
23 Usually they do that at the beginning of
24 the month, middle of the month, last week
25 of the month, and then probably second to

M. ROCHE

1
2 last day and last day just to ensure that
3 they all get closed before the end of the
4 month.
5        But outside of that notification
6 process, every supervisor, manager,
7 assistant director is familiar with
8 TeamOps.  They have their own login and
9 they have their own queue of work orders
10 that are assigned to them.
11     Q.   And who assigns the work orders
12 to the specific departments?  Is that the
13 Work Control Department?
14     A.   So it's automated.  Every work
15 order is -- is assigned to a shop based on
16 the type of equipment it's servicing.  So,
17 for example, this is a dry sprinkler
18 compressor or a pre-action system, which
19 is a fire sprinkler system.
20        If you see on the first -- in
21 the first box there, in the middle, it
22 says, "Shop."  It says shop is Fire
23 Safety, so this automatically gets issued
24 to the Fire Safety shop at the beginning
25 of the month, or in this case, the -- the

M. ROCHE

1
2 last day of the previous month.
3        And you can further -- you can
4 log into the system and go to that
5 specific asset, which it says, "Dry System
6 Compressor 36184."  That's the barcode
7 number that's on that specific compressor.
8 You can type that into TeamOps and you can
9 automatically have it issued to whomever
10 is responsible for completing that.
11     Q.   And on the second page -- the
12 second page of the work order, it looks
13 like this was assigned to three people.
14 Are all those people Fire Safety people?
15 I know Joseph Pasquarello is, but at that
16 time, were those three people Fire Safety
17 people?
18     A.   So Wayne Thomas is assistant
19 director for the School of Medicine.  He
20 oversees the Hess Building where this
21 specific piece of equipment is.  So we
22 would commonly assign -- some of our
23 buildings have managers that are
24 responsible for just that building and
25 some are just, you know, the shop or the

M. ROCHE

1
2 technical trade.
3        Wherever we do have a geographic
4 responsibility, we also assign them.
5 Not that they're responsible to do it, but
6 just so that if it's assigned to them, it
7 will constantly show up in their queue and
8 they'll know that it's still open at the
9 end of the month.  It's just an extra set
10 of eyes.
11     Q.   All right.  I am going to -- I
12 am done with that exhibit, and just ask
13 some questions.
14        Do you recall having a
15 conversation in about August of 2021 with
16 Pat Lizarazo, Bernie Nuñez, and Joe
17 Pasquarello about missing fire drills?
18     A.   Not specifically, no.  Maybe you
19 can help me refresh my memory?
20     Q.   Do you remember having a
21 conversation with those people about
22 document -- not the actual drills being
23 missing, but the documentation of the fire
24 drills not having been uploaded into
25 TeamDocs?

78 (Pages 306 - 309)

M. ROCHE

2    A.   Vaguely, but no, I don't
3   remember the specifics.
4    Q.   Do you remember wanting to write
5   Joe up for a third progressive counseling
6   at any time for not uploading
7   documentation of fire drills?
8    A.   What do you mean by "wanting
9   to"?
10    Q.   Did you draft a third
11   progressive counseling and base it on not
12   having timely documented fire drills?
13    A.   There -- he did have some
14   trouble meeting aspects of his improvement
15   plan and we did have conversations related
16   to issuing him further progressive
17   counseling, but I don't remember the
18   specifics about it.  Ultimately, we did
19   not issue that counseling.
20    Q.   Whose "we"?
21    A.   Myself and HR.  All the
22   counselings that are issued are first
23   approved through HR and then issued to the
24   employee by the manager.
25    Q.   So do you recall not -- strike

M. ROCHE

2   that.
3       Do you recall talking to Joe
4   Pasquarello with Pat Lizarazo about having
5   missed or about having not timely uploaded
6   fire drill documentation in August of
7   2021?
8       MR. CLARK:  Objection.  Asked
9    and answered.  You can answer again.
10    A.   So, again, I -- I do vaguely
11   remember a conversation.  I don't remember
12   the specifics of that.  What I remember
13   was that there was a deficiency that was
14   recognized for a failure to meet some
15   parts of that plan and, ultimately, the
16   decision was made to not issue a further
17   progressive counseling.
18    Q.   Why is that?
19    A.   I don't recall the specifics of
20   the circumstances.  It could have been
21   related to what happened.  It -- I don't
22   remember what it was related to.
23       MS. SELIGER:  Shawn, I do have a
24    document.  It's actually an exhibit
25    that you have used in prior

M. ROCHE

2   depositions.  I could e-mail it to you
3   now quickly just to refresh the
4   deponent's memory.
5       MR. CLARK:  Sure.
6       MS. SELIGER:  Okay.  I'm sending
7   you what we can mark as Exhibit 21.
8       [The document was hereby marked
9   as Plaintiff's Exhibit 21 for
10   identification, as of this date.]
11       MR. CLARK:  Okay.  I got it.
12   Mike, I'm forwarding it to you.
13       THE WITNESS:  Okay.  I got it.
14    Q.   Let me know when you've had a
15   chance to read through it.
16    A.   Okay.  I'm good.  Thank you.
17   That's helpful and that does refresh my
18   memory.
19    Q.   So were you ever -- were you
20   considering writing Joe up about these --
21   about the documentation for these fire
22   drills?
23    A.   So this was a circumstance that
24   I felt was a deficiency according to his
25   plan.  This document is not a progressive

M. ROCHE

2   counseling document.  It is a record of
3   conversation, so this is a document that
4   would generally be placed in somebody's
5   file.  It's not related to discipline, but
6   it is -- the intention is to document a
7   conversation that took place.  So in this
8   case, Joe failed to upload certain
9   documentation.  So, yes, I do remember
10   this.
11    Q.   And do you know who drafted this
12   document?
13    A.   I believe it was me.
14    Q.   And did you show it to Pat
15   Lizarazo or Joe to confirm its accuracy?
16    A.   Yes.  We had a meeting to review
17   this specific event.
18    Q.   And after the meeting, did you
19   show them your account of it?
20    A.   I certainly showed Patty and I
21   don't remember whether or not Joe saw
22   this.  I presume he did.  But I also
23   don't -- you know what?  No.  He most
24   likely did not review it.  I don't think
25   it's typical that we would share that with

M. ROCHE

1        M. ROCHE
2   a person who is mentioned in this.
3       Q.   And had you considered writing
4   him up for the deficiency that you
5   discussed with him at this meeting?
6       A.   I had that conversation with
7   Patty, who was, again, in HR.  The feeling
8   was that he -- he did not complete a task.
9   His answer was that he thought somebody
10  else was going to do it.  I didn't think
11  that was a sufficient answer.  I think
12  Patty agreed with that statement, but she didn't
13  think it was -- that there was enough
14  documentation to proceed with a
15  counseling.
16      Q.   And did you recommend that
17  Bernie Nuñez get counseled about the
18  failure to upload the documentation to
19  TeamDocs?
20      A.   I did an interview, obviously,
21  with Joe.  This is what that record of the
22  conversation documents.  I then followed
23  up with an interview with Bernie, and he
24  had a differing account of actually what
25  happened.  I reviewed that with HR and,

1        M. ROCHE
2   ultimately, there was too much uncertainty
3   to move forward with counseling for any
4   party, in their opinion.
5       Q.   Did you create a similar record
6   of your conversation with Bernie Nuñez
7   about this deficiency?
8       A.   No.  That -- that wouldn't be
9   standard.  It is standard to investigate
10  the conversation, but this conversation
11  took place as a result of a failure.  So
12  there was an excuse provided.  It's -- it
13  was my obligation to investigate the facts
14  and whether or not that excuse held up.
15  Ultimately, it was determined that it was
16  uncertain.
17      Q.   Who was responsible for the Fire
18  Safety Department in August of 2021?
19      A.   At that point, it would be
20  Bernie.
21      Q.   If Bernie's subordinates were
22  not meeting their tasks, did you hold him
23  responsible to make sure that those tasks
24  got done on time?
25      A.   When you say "tasks," do you

1        M. ROCHE
2   mean regulatory tasks?
3       Q.   I mean their responsibilities.
4       A.   Specifically what?
5       Q.   The uploading of documents to
6   TeamDocs.  If one of Bernie's subordinates
7   was late, in your estimation, to do that,
8   would you hold Bernie responsible?
9       A.   If I gave him a deadline.  In
10  this case, Bernie did not have a deadline.
11  Joe had a deadline and Joe failed to meet
12  that deadline.  Bernie did not -- was not
13  deficient in any way.
14      Q.   What was Bernie's deadline for
15  uploading documents into TeamDocs?
16           MR. CLARK:  Objection to form.
17      A.   There is no deadline.
18      Q.   He's allowed to upload them
19  whenever he wants?
20           MR. CLARK:  Objection to form.
21      A.   So the expectation is that it --
22  all the regulatory documentation gets
23  uploaded in the following month.  Again,
24  we -- I think we discussed this before.
25           The reason Joe was put on this

1        M. ROCHE
2   plan is because we had gone three or
3   four months without any documentation.  So
4   I was required to, you know, assign --
5   further assign a deadline to ensure that
6   it got done.  Bernie did not have the same
7   history of failures.
8       Q.   I'm sorry.  You said that there
9   were many months when Joe had no
10  documentation and that's why he was put on
11  the PIP; is that what you just said?
12      A.   No.  There were -- I'm speaking
13  specifically for that item related to
14  uploading documentation by the 10th of the
15  month.
16      Q.   All right.  I am going to move
17  on.  I'm done with that exhibit.  Have you
18  actually -- have you ever heard Joe
19  Pasquarello use the words "ticked off" or
20  "blow it off"?
21      A.   He documented that I believe in
22  a letter.
23      Q.   He did or you did?
24      A.   I know that I read it.  I may
25  have re -- recanted [sic] what he was

1          M. ROCHE
2 saying, but yes, I have.
3    Q.   You've heard him use those
4 words?  In -- in what context have you
5 heard him use those words?
6    A.   It was related to him being
7 upset about an e-mail that was sent by
8 Matt Bond requesting assistance for a
9 certain task.
10    Q.   Okay.
11          (Court reporter had connection
12 issues.)
13          THE COURT REPORTER:  Hello?  Can
14 anybody hear me?
15          MR. CLARK:  We can hear you.
16          THE COURT REPORTER:  Okay.
17 Sorry.  I think I froze there.  I'm
18 going to read again what I had last,
19 just in case here.
20          (Previous testimony was read.)
21          THE COURT REPORTER:  And that's
22 the last thing I heard.
23    Q.   Oh, boy.  Okay.  Do you have a
24 TV in your office?
25    A.   (Inaudible.)

1          M. ROCHE
2          THE COURT REPORTER:  I'm sorry,
3 sir.  Can you repeat that?  I
4 apologize.
5    A.   Yes.
6    Q.   And what is the business need
7 for you to have a TV in your office?
8          MR. CLARK:  Objection to form.
9    A.   I'm not sure what you mean by
10 "business need."
11    Q.   Do you need that television for
12 the work that you do?
13    A.   No.
14    Q.   Does Bobby Denver have a TV in
15 his office?
16    A.   Yes.
17    Q.   Does he need a television for
18 the work that he does?
19    A.   I don't think anybody needs a
20 television for any reason.  I think there
21 are benefits of having it, but.
22    Q.   Okay.  Does Ryan Nowicki have a
23 television in his office?
24    A.   He does, yes.
25    Q.   Does he need that television for

1          M. ROCHE
2 his job?
3    A.   I don't believe so.
4    Q.   Does Doug Rome have a television
5 in his office?
6    A.   So at the time, Doug Rome and
7 Bobby Denver shared an office.
8    Q.   And neither of them had a need
9 for a television to do their job?
10    A.   I don't think so, no.
11    Q.   If one of your direct reports
12 did have a need for a television, would
13 you approve it?
14          MR. CLARK:  Objection to form.
15    A.   If I felt that the need was
16 justified, I would consider it.  That
17 would have to be bought with Mount Sinai
18 finances, so that's not something that I
19 feel like would be an appropriate request
20 of funding.
21    Q.   Were all of the TVs that we just
22 discussed purchased by Mount Sinai?
23    A.   No.
24    Q.   Were they recycled televisions?
25    A.   Some were.  None of them were

1          M. ROCHE
2 purchased out of this department's funds.
3    Q.   While Joe Pasquarello was
4 working at Crothall, were any of those TVs
5 hooked up during his tenure?
6          MR. CLARK:  Objection to form.
7    A.   Yes.
8    Q.   Which one?
9    A.   I would assume they all were.
10    Q.   Meaning they all -- I'm asking
11 when they were initially hooked up, not --
12          MR. CLARK:  Objection to form.
13    A.   What do you mean by "hooked up"?
14    Q.   Meaning were they installed and
15 allowed to become operative?  I understand
16 you can have a television that's not
17 installed.
18          MR. CLARK:  Objection to form.
19 You can answer.
20    A.   So you're asking if the
21 televisions in their offices worked?
22    Q.   I'm asking if they were
23 installed at any point during Joe
24 Pasquarello's tenure?
25          MR. CLARK:  Objection to form.

81 (Pages 318 - 321)

Page 322

M. ROCHE

1
2    A.   I don't -- honestly, I do not
3  know when the TVs were installed.  It's
4  possible that they were installed during
5  his tenure and it's possible that they
6  were installed prior to that.
7    Q.   Who would pay for that
8  installation?
9    A.   Nobody would pay for it.
10    Q.   Does Crothall pay for installing
11  a television?
12    A.   No.
13    Q.   So is it free to -- is it free
14  to Crothall to take a hand-me-down
15  television and install it into an
16  employee's office?
17        MR. CLARK:  I'm sorry.  Can we
18  have that read back?  I missed it.
19        (Requested testimony was read.)
20        MR. CLARK:  Objection to form.
21  You can answer.
22    A.   Yes.
23    Q.   Does Crothall have access to
24  Mount Sinai Hospital's recycled or -- or
25  recycled televisions or televisions that

Page 323

M. ROCHE

1
2  are no longer in use?
3    A.   There is not, like, a supply
4  depot where they keep older TVs.  No, I'm
5  -- I'm not aware of any storage area for
6  recycled TVs.
7    Q.   So where did these televisions
8  for these employees come from?
9    A.   Probably construction projects
10  when areas were being renovated and there
11  was no longer a need.  It was through
12  contacts that might be getting on a floor
13  somewhere that might be a bigger TV and
14  they're getting rid of a smaller TV.
15  Various ways.
16    Q.   Do you recall Joe Pasquarello
17  requesting a TV in his office so that he
18  could perform certain functions of his
19  job?
20    A.   I recall him asking for a TV.  I
21  don't think that any of those were
22  business related, as you mentioned
23  earlier.
24    Q.   Did he tell you why he wanted
25  the television?

Page 324

M. ROCHE

1
2    A.   He told me he wanted to watch
3  the news.
4    Q.   Why did he want to watch the
5  news at work?
6        MR. CLARK:  Objection to form.
7    A.   That's a question I can't
8  answer.  Why does anybody want to watch
9  the news?
10    Q.   Is it possible there were things
11  going on in the news that impacted the
12  work he does?
13        MR. CLARK:  Objection to form.
14    A.   Like fires on the news?
15  Anything's possible.
16    Q.   Do you remember when he
17  requested the television?
18    A.   I don't remember the specific
19  date.
20    Q.   Did you instruct him to write a
21  proposal or submit any documentation to
22  you to make his request official?
23    A.   I don't remember that, but I'm
24  not stating that it didn't happen.
25    Q.   Do you recall that Joe

Page 325

M. ROCHE

1
2  Pasquarello requested a large monitor to
3  help him manage the fire marshal-related
4  work?
5        MR. CLARK:  Objection to form.
6    A.   Yes.  So that's -- that's a
7  different item, right?
8    Q.   Correct.
9    A.   Yes.  There was a request for
10  two very large monitors to replace two
11  existing whiteboards at a cost of
12  approximately $4,000.  I was concerned
13  that, aside from the price, just of what
14  process -- what -- what exactly they would
15  be used for and what the process would be.
16    Q.   Did Joe or his manager submit a
17  proposal to you regarding the monitor they
18  were requesting or that he was requesting?
19    A.   Yes.
20    Q.   And what did you do with the
21  proposal?
22    A.   I read it and I had a lot of
23  follow-up questions for Joe, very few to
24  none of which he could answer, and I told
25  him to come back to me when you have more

M. ROCHE

1   information.
2   Q.   Did he come back to you at any
3   point or did his manager come back to you
4   at any point with answers or revisions to
5   the proposal?
6   A.   He did come back to me with some
7   of those answers.  My specific question --
8   so he intended to use those monitors to
9   track shutdown requests, which is
10  currently tracked on a whiteboard.  He
11  felt that it would streamline the process
12  and make it so that they would perform
13  better and not miss shutdowns.
14       I agreed with them in theory and
15  I wanted to figure out how they were going
16  to operationalize it, who was going to be
17  doing all of the inputting of the data,
18  who would have access to it, how it was
19  going to be connected.  None of those
20  questions could be answered by me.  What
21  -- what program they would be using, what
22  -- what it would look like.  You know,
23  they -- they were not able to provide that
24  level of information.

M. ROCHE

1   Q.   Given that you agreed that it
2   could be useful, did you suggest anything
3   to them about how it could be best used?
4   A.   I told them that I didn't know
5   what program that would be used, but I
6   think I recommended that they reach out to
7   IT and see if there's anything existing.
8   Q.   You -- you think you did or you
9   did?
10       MR. CLARK:  Objection to form.
11  A.   I had a lot of conversations
12  with them about this.  My recommendation
13  was to reach out to IT to see how it could
14  be used.
15  Q.   Are you familiar with the Mount
16  Sinai Hospital purchasing system or
17  purchasing policy?
18  A.   Yes.
19  Q.   What is that?
20  A.   I don't understand the quest --
21  you -- you want me to describe a policy?
22  Q.   Yeah.  How does it work?
23  A.   It's about --
24       MR. CLARK:  Objection to form.

M. ROCHE

1   A.   It's about 50 pages.  I can send
2   it to you, but I'm not going to go through
3   it.
4   Q.   What is it in -- in synopsis,
5   not the actual step-by-step, but what --
6   what is it used for?
7   A.   Purchasing.
8   Q.   And who uses it to make
9   purchases?
10  A.   Anybody that needs a new item.
11  Q.   Why didn't Joe Pasquarello
12  submit his proposal to the Mount Sinai
13  Hospital purchasing system?
14       MR. CLARK:  Objection to form.
15  A.   Because his -- it was not
16  approved.
17  Q.   By who?
18  A.   Which item are we talking about?
19  The monitors or his TV?
20  Q.   The monitor?
21  A.   The monitors was not approved by
22  me.
23  Q.   Did he know that he could make
24  submissions to the Mount Sinai Hospital

M. ROCHE

1   purchasing system?
2       MR. CLARK:  Did Joseph know --
3   objection to form.
4   A.   Joseph made many requisitions
5   for purchase orders.  He was familiar with
6   the system.  What you need to do in order
7   to request a purchase order is have a
8   proposal from a vendor.  Joe didn't have
9   that.
10  Q.   How do you know he knew about
11  the Mount Sinai Hospital purchasing
12  system?
13       MR. CLARK:  Objection to form.
14  A.   Because he -- he had made, I
15  don't know, anywhere from fifty to a
16  hundred different purchase orders over his
17  tenure.
18       MR. CLARK:  Leah, it's 7:15.  We
19  started at 10:00 a.m. this morning.
20  It's -- we've been on the record for
21  well over eight hours at this point.
22  I thought you said we were wrapping up
23  soon.  Do we have an estimate here?
24       MS. SELIGER:  Yeah.  A few

Page 330

M. ROCHE

1
2    minutes.
3          MR. CLARK:  Okay.  At some
4    point, we're going to have to call it
5    a day.  It's been well over the
6    seven-hour time limit.
7    Q.   I understand that Joe used that
8    system for large purchases or for
9    addressing expenses from vendors, but in
10   terms of supplies or smaller purchases,
11   did Joe know that he could use that system
12   for smaller purchases?
13         MR. CLARK:  Objection to form.
14   Are you asking the witness what Joe
15   knew?  Mike, you can answer if you
16   know.
17   Q.   Was he told he could use that
18   system for smaller purchases?
19   A.   There was a finance person that
20   he could have worked with.  But I think
21   that the issue here is that he didn't use
22   the system because the request was not
23   approved by his manager.
24   Q.   Do all requests that go into the
25   Mount Sinai Hospital purchasing system

Page 331

M. ROCHE

1
2    have to be approved by a manager first?
3    A.   They all have to be -- there's a
4    -- there's an approval hierarchy of
5    specifically who they have to be approved
6    by based on what it's for.  Over a certain
7    limit, everything has to be approved.
8    Q.   And was the cost of the monitor
9    over the limit that required your
10   approval?
11   A.   It would have required multiple
12   manager approval.  I don't think it would
13   have required my approval.
14   Q.   What do you mean by "multiple
15   manager approval"?
16   A.   Well, initially, it would have
17   had to be approved -- submitted and
18   approved by the finance person.  Then
19   there would be a director, and based upon
20   the dollar amount, there might be a senior
21   director, there might be a VP.
22   Q.   Are you saying all that would be
23   needed for the purchase of a monitor?
24   A.   No.
25   Q.   So for a purchase of a monitor

Page 332

M. ROCHE

1
2    in the price range that you mentioned
3    earlier, was your approval needed?
4    A.   I don't believe so.
5    Q.   Did you tell Joe that?
6    A.   Did I tell Joe that my approval
7    would not be needed?
8    Q.   Yeah.
9    A.   No.  Because I did not agree
10   with the concept.  He had an idea that had
11   not been fully worked out.  I told him,
12   "Please come back to me when you work it
13   out, and I'll make it happen."
14         MS. SELIGER:  I am done.
15         MR. CLARK:  Okay.  I don't have
16   any questions.  I do want to put on
17   the record, one, that Mr. Roche
18   requests a copy of the transcript to
19   review and revise as necessary, and
20   two, that Defendants will be ordering
21   their own copy of the transcript; not
22   the original that should be served on
23   Mr. Roche, but their own copy for
24   their files.
25         THE COURT REPORTER:  Mr. Clark,

Page 333

M. ROCHE

1
2    did you want to put the timing on
3    there as well?
4          MR. CLARK:  Please, yeah.  In
5    light of the court appearance we have
6    at the end of next week, we're asking
7    for an expedited transcript.  I think
8    we discussed by Monday, if doable.
9
          [TIME NOTED:  7:19 p.m.]
10
11
12   _____
13      MICHAEL ROCHE
14
15   _____
     Subscribed and sworn to
16   before me this _____
     day of _____, 2022.
17
     _____
18      Notary Public
19
20
21
22
23
24
25

84 (Pages 330 - 333)

**Page 334**

```
1
2         I N D E X
3
   WITNESS   EXAMINATION BY       PAGE
4
   MICHAEL   LEAH SELIGER        5
5  ROCHE
6
7       E X H I B I T S
8  PLAINTIFF'S   DESCRIPTION       PAGE
9  EXHIBIT 1  COMPLAINT          34
    EXHIBIT 2  D000251, CH1895,   78
10      CH1889, CH1892,
        CH1891, CH1898,
11      CH1897, CH1896
    EXHIBIT 3  CH2269            38
12 EXHIBIT 4  D000255 - D000258  91
   EXHIBIT 5  D000611 - D000626  126
13 EXHIBIT 6  D000627 - D000648  134
   EXHIBIT 7  D000504 - D000512  146
14 EXHIBIT 12 D000513 - D000522  227
   EXHIBIT 13 CH1517 - CH1520    233
15 EXHIBIT 16 D000670 - D000678  194
   EXHIBIT 18 D000649 - D000667  272
16 EXHIBIT 19 CH828 - CH830      251
   EXHIBIT 20 CH831, CH953 - CH954  303
17 EXHIBIT 21 CH001493           312
18
19
       REQUESTS
20
     Page      Line
21
     109       3
22   109       14
     150       7
23   165       11
     213       15
24   220       19
25
```

**Page 336**

```
1
2      ERRATA SHEET
       VERITEXT LEGAL SOLUTIONS
3
   CASE NAME:  JOSEPH PASQUARELLO vs.
4  CROTHALL HEALTHCARE, INC., et al.
   DATE OF DEPOSITION:  AUGUST 5, 2022
5  WITNESS' NAME:  MICHAEL ROCHE
6  PAGE/LINE(S)/  CHANGE      REASON
7  ___/___/_____  _____  _____
   ___/___/_____  _____  _____
8  ___/___/_____  _____  _____
   ___/___/_____  _____  _____
9  ___/___/_____  _____  _____
   ___/___/_____  _____  _____
10 ___/___/_____  _____  _____
   ___/___/_____  _____  _____
11 ___/___/_____  _____  _____
   ___/___/_____  _____  _____
12 ___/___/_____  _____  _____
   ___/___/_____  _____  _____
13 ___/___/_____  _____  _____
   ___/___/_____  _____  _____
14 ___/___/_____  _____  _____
   ___/___/_____  _____  _____
15 ___/___/_____  _____  _____
   ___/___/_____  _____  _____
16 ___/___/_____  _____  _____
   ___/___/_____  _____  _____
17 ___/___/_____  _____  _____
   ___/___/_____  _____  _____
18 ___/___/_____  _____  _____
19
20
      _____
      MICHAEL ROCHE
21
   SUBSCRIBED AND SWORN TO
22 BEFORE ME THIS_____ DAY
   OF_____, 20 .
23 _____
24   NOTARY PUBLIC
25 MY COMMISSION EXPIRES_____
```

**Page 335**

```
1
2

        CERTIFICATION
3
4    I, MELISSA COREAS, a Notary Public for
5  and within the State of New York, do
6  hereby certify:
7    That the witness whose testimony as
8  herein set forth, was duly sworn by me;
9  and that the within transcript is a true
10 record of the testimony given by said
11 witness.
12   I further certify that I am not
13 related to any of the parties to this
14 action by blood or marriage, and that I am
15 in no way interested in the outcome of
16 this matter.
17   IN WITNESS WHEREOF, I have hereunto
18 set my hand this 8TH day of AUGUST, 2022.
19
20
21
22     MELISSA COREAS
23
24
25
```

**&**

**&**   2:3,12

**0**

**024778.1655**
  2:13
**06897**   5:3
**07**   94:10 231:3
**08732**   1:4

**1**

**1**   34:13,18 35:2
  35:10 147:24
  150:21 278:22
  279:17,18 334:9
**10**   94:9
**100**   143:4
**10004**   2:5
**10022**   2:11
**101**   94:10
**104,000**   132:11
**107,120**   132:8
**109**   334:21,22
**10:00**   329:20
**10:16**   1:14
**10th**   283:24
  284:8,9 288:11
  288:16 289:2
  317:14
**11**   141:20 334:23
**113**   225:11,14
**12**   20:4 94:9
  147:24 150:21
  158:23 159:21
  160:6,20 205:24
  227:11,14,16
  275:16 334:14
**12/14/2020**
  127:15

**12/7/17**   226:9
**126**   334:12
**13**   94:9 111:19
  129:3 147:24
  150:22 207:10
  233:18,22,25
  334:14
**134**   334:13
**14**   18:23 46:12
  82:23 111:19
  132:24 147:24
  150:22 334:22
**146**   334:13
**15**   83:4 278:6
  334:23
**150**   306:3 334:22
**16**   194:15,17,20
  274:17 334:15
**160**   15:16
**165**   334:23
**16th**   141:22
**17**   83:19 136:2
  243:19 299:19
**170**   305:4
**18**   20:2,8,9 83:10
  83:25 272:22,24
  273:2,24 296:4
  334:15
**18613**   335:21
**19**   46:6 81:15
  135:4 148:17
  149:7 244:14,22
  251:12,17,19
  265:12 284:23
  303:11 334:16
  334:24
**194**   334:15

**1:21**   1:4

**2**

**2**   78:16,18,20
  112:24 273:25
  274:3 278:6
  334:9
**20**   46:3 271:12
  303:8,13,15
  334:16 336:22
**2001**   218:8
**2013**   78:24 85:10
  85:13 140:16
  178:4 183:24
  184:3
**2014**   84:23 85:3
  184:14
**2015**   22:17 84:11
  84:15 178:4
**2016**   41:2 83:23
  84:5
**2017**   112:5
  178:14 179:21
  180:5,24 181:13
  182:8 184:17,18
  184:21 187:10
  187:15
**2018**   83:3,9
  112:25 113:10
  113:14 148:17
  149:7
**2019**   46:8,12
  50:15 51:18
  53:9 81:23 82:9
  132:9 178:9,19
  179:8 181:21,22
  182:5,23 185:5
  185:13 238:23

258:24,25 296:4
**2020**   46:3,8,14
  46:25 50:15
  51:19 53:11
  80:3 114:12,16
  116:17,22 117:8
  117:14 118:3,13
  129:7 130:9
  143:24 159:19
  159:23 206:3
  207:11 210:6
  213:14 214:20
  215:14 238:22
  247:25 259:15
  259:20 266:8
  270:6,9,10,12
  271:13,23
  272:14,15
  273:25 274:3
  275:17
**2021**   50:16 53:13
  78:24 80:3
  92:19 136:7
  137:25 141:22
  160:20 161:6
  168:24 178:14
  179:21 180:5,24
  181:13 182:8
  184:18,21
  187:10 211:6
  212:2 215:15
  218:9,22 225:20
  231:6,25 232:6
  248:21 249:22
  249:22 254:24
  259:14 269:23
  270:5 271:3,5
  272:2,15 278:6

**[2021 - acceptable]**                                                                    Page 2

278:23 279:17
279:19,25
309:15 311:7
315:18
**2022**   1:14 41:3
147:18 229:9
333:16 335:18
336:4
**21**   129:8 130:9
137:25 143:24
312:7,9 334:17
**213**   334:23
**22**   133:24 275:17
**220**   334:24
**227**   334:14
**23**   225:20
**233**   334:14
**24**   293:18 294:25
295:11 296:17
297:3
**24/7**   290:21
**25**   84:8 218:8,22
248:20 249:22
**251**   334:16
**25th**   249:16
287:4 304:11
**26**   84:12
**260**   306:5,6
**27**   84:20 231:6
**272**   334:15
**28**   84:25 295:11
**29**   85:7
**2:00**   77:20 78:4
**2:05**   77:21
**2:30**   176:21

### 3

**3**   38:23,25 46:10
150:21 224:23
334:11,21
**30**   1:17 9:16
79:13 305:14
306:12
**303**   334:16
**31**   147:18
**312**   334:17
**32**   2:4
**33**   292:4
**34**   15:17 334:9
**36184**   308:6
**38**   334:11
**3:16**   176:21
**3d**   196:22
**3rd**   195:23

### 4

**4**   91:17,19,24
150:21 198:3
227:10,11 229:9
231:25 334:12
**4,000**   325:12
**40**   15:13 172:18
305:14
**468**   5:2

### 5

**5**   1:14 126:17,19
136:7 201:9
334:4,12 336:4
**50**   246:11 305:14
328:2
**506**   146:20
**511**   147:3

### 6

**6**   1:17 9:16
18:20 133:15
134:13,14,16
334:13
**6/30**   304:8
**60**   147:23
**601**   2:5
**619**   132:10
**624**   132:21,25
**637**   141:19,19
**641**   140:21
**643**   135:24
**657**   278:13
**672**   198:4
**673**   201:8
**676**   205:21
**6th**   206:3 209:3
259:6

### 7

**7**   145:23,25
146:3 147:23,23
150:21,21
334:13,22
**78**   334:9
**7:15**   329:19
**7:19**   333:9

### 8

**8**   279:24
**85**   94:9 99:2
101:4 103:7
**89**   101:9,11
103:9,10,13
105:13 110:3
150:2,3,22
151:19 153:13
154:14,15,16,19

154:22,23 155:3
156:6 157:16
159:21,25 161:8
231:22 288:4
**8th**   207:11
335:18

### 9

**900**   2:10
**91**   334:12
**95**   94:9 147:24
150:22 229:6
**9:30**   78:5

### a

**a.m.**   1:14 329:20
**abilities**   210:13
**ability**   8:5 51:3
54:16 121:3,4
143:9 179:16
250:20 258:20
**able**   8:9 12:24
34:2,22,25 39:15
39:18 40:21,24
46:10 51:15
116:11 166:5
175:9 210:14
232:18,18
246:25 273:4
295:7 326:24
**absence**   239:19
243:17 290:15
290:19
**absent**   290:12
299:23
**absorbing**   48:6
**acceptable**
218:11 289:15

**accepted** 116:14
**accepting** 156:15
  165:20 168:6
**access** 37:4
  322:23 326:19
**accommodate**
  7:2
**accomplish**
  286:20,22
**accomplished**
  290:11
**account** 131:4
  252:23 313:19
  314:24
**accuracy** 313:15
**accurate** 46:15
  71:25 79:25
  80:9 81:8,19
  82:11 83:8 84:4
  84:14 85:2,5,13
  85:16 92:21
  127:4,7,11 128:2
  129:13,14,18,23
  130:2,4,6 183:7
  234:22 235:2
**achieve** 166:5
  175:5,19
**acknowledge**
  259:10
**acknowledged**
  171:6 212:10
  259:5,24
**acknowledging**
  285:4
**action** 1:18
  59:19 166:10
  298:19,22
  307:18 335:14

**actions** 30:14,18
  31:17,22 290:7
  291:14
**active** 99:3
**activities** 203:9
**activity** 178:8
**actual** 14:24
  18:16 76:9 79:6
  79:7 104:6
  130:3 136:24
  174:9 191:5
  193:5 309:22
  328:6
**add** 38:14
  130:22 182:3
  185:11 236:14
  279:4 297:2
  298:6,9
**adding** 139:12
  297:8 298:23
**additional** 21:10
  48:8 140:2
  179:17 218:19
  298:18
**address** 4:24
  19:10 75:23
  76:9 184:12
  265:23 276:7,8
  277:3
**addressed**
  183:21 201:21
  246:3 266:4,9,12
  279:20 299:13
  300:21 301:21
**addressing**
  176:25 201:20
  244:16 266:25
  290:14 330:9

**adequately**
  175:9,20 220:9
  250:7
**administer**
  104:5
**admitted** 116:11
**advance** 51:12
**advanced** 10:9
**advice** 214:8
**advise** 237:7
  246:7 254:25
**advised** 204:7
  207:14
**advising** 197:17
**agenda** 135:12
  136:14,25
  137:12 141:2,24
**agendas** 161:24
  162:2,4 273:14
**ago** 15:2 140:18
  149:25 204:2
  209:5 254:16
**agree** 46:15 92:3
  113:3 146:22
  228:3 232:3
  280:14 332:9
**agreed** 3:3,8,12
  116:3 279:4
  314:12 326:15
  327:2
**ah** 140:17
  271:25
**ahead** 68:4
  124:8 146:11
  152:18 159:4
  181:14 185:2
  282:2 290:16

**air** 75:12
**al** 336:4
**alarm** 90:8
  106:11 174:17
  174:22
**alert** 77:3 250:4
  253:14 306:17
**alerted** 208:13
**alerting** 257:15
  295:24
**allege** 186:13
**allow** 124:4,7
**allowable** 202:3
**allowed** 155:23
  155:25 156:19
  157:2 192:13
  316:18 321:15
**alternate** 282:4
**ambiguity** 164:9
**amount** 18:8
  68:17 130:4
  331:20
**amounts** 16:18
**ancient** 179:7
**anderson** 73:3
**annual** 32:10
  61:13 92:14
  132:18 151:22
  157:24 158:7,12
  158:21 159:5,20
  159:24 160:21
  174:12 175:3
  188:17,20,22
  191:25 210:11
  266:7,8 269:17
  270:4 271:2
  304:20,23 305:4
  305:8,11,17,18

305:19 306:5
**annually** 93:2
258:23 259:13
**annuals** 305:9
**answer** 6:16,21
7:5,24,25 9:25
17:10,22,24 25:4
25:21 26:25
27:15 28:7 29:7
30:20 38:3,6,20
39:24 43:21
49:7 50:10,18
55:5 56:23
57:17 62:7
64:20 65:6
93:10,18 94:25
95:14 96:12,21
97:25 99:7
105:5 106:20
110:17 111:5
116:25 117:22
119:25 121:23
123:19 124:4,8,9
124:25 125:20
127:9 128:24
138:9 142:11,25
144:18 145:9
152:19 155:18
161:3 169:18
170:14 172:9,16
179:13,19 181:8
181:10,14,24
182:3 183:3
187:17,19,20
188:3 192:21
198:25 205:3
209:21 210:17
230:6,9 243:7

248:2 261:24
265:3 282:19
284:4 311:9
314:9,11 321:19
322:21 324:8
325:24 330:15
**answered** 7:11
126:13 179:15
181:7,24 185:9
185:10 230:20
282:5 311:9
326:21
**answering** 6:7
49:4
**answers** 6:23
326:5,8
**anybody** 27:9
202:17 222:4
231:19 299:15
318:14 319:19
324:8 328:11
**anymore** 101:4
124:8
**anything's**
324:15
**anyway** 116:20
**apologize** 133:10
167:16 250:3
265:2 319:4
**appear** 42:7
43:18,19 85:5
97:2 133:22,23
135:2 136:16
**appearance**
333:5
**appearances** 2:2
**appears** 46:11
94:19 129:11

148:7 228:11
280:9,10
**applicable** 97:12
**applicants** 222:6
222:20,22
**application**
228:11,13
**applied** 116:4,6
148:23 222:6
**apply** 219:3,6,12
219:15,20
222:11 282:10
**applying** 165:20
**appraisal** 151:23
157:24 158:13
158:14,17,21
159:6
**approach** 120:10
120:15 299:7
**appropriate**
30:25 65:8,9
66:17,18 120:6
238:13 252:11
272:6 291:14
294:20 302:8
320:19
**appropriately**
60:24 91:8
202:4 292:22
299:17
**approval** 331:4
331:10,12,13,15
332:3,6
**approve** 142:22
320:13
**approved** 199:24
287:25 310:23
328:17,22

330:23 331:2,5,7
331:17,18
**approving** 168:7
**approximate**
45:24
**approximately**
13:20,22 15:11
15:12,16,17
18:23 19:5
22:16 46:15
52:11 69:23
81:24 138:4
162:18 168:20
187:8 213:11
325:12
**area** 62:19 71:4
180:25 243:14
294:11,21 323:5
**areas** 72:11,12
74:12 323:10
**argue** 124:3
**arose** 244:17
**arrangements**
291:2,8,12
**arranging** 141:7
173:19
**arrival** 50:9
**arrived** 198:5,8
201:10,15
207:12
**articulate**
119:14
**aside** 57:19 86:5
126:7 161:17
325:13
**asked** 7:4,10
96:9 98:2 99:16
99:19 114:18

123:15 124:24
149:3 155:22
157:14 181:24
185:9 205:13
231:13 234:13
246:10,13,13
247:21,21
248:11 261:6
274:24 282:3,19
292:6 311:8
**asking**  5:18 6:21
22:6 37:19,21
38:15 86:15
114:3 128:9
139:20 181:19
182:10 183:6
187:12 258:3
281:22 297:6
321:10,20,22
323:20 330:14
333:6
**aspect**  57:14
59:4,24 91:11
191:2
**aspects**  15:9
90:7 122:16
166:6 310:14
**assess**  246:25
**assessing**  66:19
243:15
**assessment**
25:18 29:25
30:4 31:11
32:14 144:23
294:5
**assessments**  25:2
244:4 247:16

**asset**  61:3,11,19
61:21 68:16
305:22 308:5
**assets**  61:6 75:4
**assign**  60:16,19
61:2 308:22
309:4 317:4,5
**assigned**  60:24
157:11 168:10
217:16 244:7
289:24 290:8
297:16 299:14
299:15,18
307:10,15
308:13 309:6
**assigning**  66:21
**assigns**  60:20
263:21 307:11
**assist**  172:6,11
202:2 218:18,18
**assistance**  171:4
173:18,20 201:2
201:4 202:14
318:8
**assistant**  21:24
56:11 68:7
71:18 77:8 87:2
89:21 105:23
108:3,18,19,21
109:11 113:2,6,9
113:13,16 114:2
114:8 115:8
118:6 141:23
142:2,9,22
143:11 148:16
149:6 185:13
190:19 222:15
234:6,24 235:8

264:9 290:5
299:11 301:11
302:2,18,20
307:7 308:18
**assisted**  171:20
171:23 172:12
172:14 173:12
174:13,14,18
177:8,8
**assisting**  171:16
**associate**  234:9
285:20
**associated**  58:24
165:10 201:5
**assume**  6:17
50:20,22 85:23
100:9,11 108:24
112:2 119:7
120:20 123:5
139:8 197:13
224:20 259:16
321:9
**assumed**  121:17
121:24 125:2
**assuming**  28:19
28:20 59:10
95:19
**assumption**
148:21
**attained**  152:25
**attempt**  34:15
206:5
**attend**  235:7,11
235:12 237:5,8
238:7,11 287:9
**attendance**  23:8
**attended**  238:18
291:10

**attending**  236:2
237:10 238:4,21
**attends**  90:10,17
**attention**  276:4
276:8 284:3,8
**attorney**  7:22,25
8:22 36:6
251:13 303:10
**attorneys**  2:4,10
9:9 38:17,19
**audio**  7:16
**audit**  48:4 64:23
64:24
**auditor**  62:23
63:8
**august**  1:14
309:15 311:6
315:18 335:18
336:4
**authority**  232:16
**auto**  60:19
**automated**
130:23 131:2
307:14
**automatic**
295:19
**automatically**
297:20 307:23
308:9
**availability**
156:21
**available**  290:21
**avenue**  2:10
**average**  52:23
**aware**  22:2
23:12 33:12
54:18 122:5
144:19 153:11

160:11 203:8,18
203:22 207:21
207:22 216:11
219:15 223:20
244:2 247:11,14
247:23 264:15
264:17 294:12
298:15 323:5

**b**

**b**  1:17 9:16
334:7
**bachelor's**  97:9
**back**  38:12
40:17 62:3
77:21 78:8
85:19 90:2
111:19 124:12
140:16 164:7
176:23 178:4
180:17 185:19
187:23 190:2
191:19 196:7
210:6,9,16 212:3
215:5 224:23
254:2 259:3,6
265:7,9 278:6
279:8 296:4
298:12 301:24
322:18 325:25
326:3,4,7 332:12
**background**
175:17
**bad**  166:12
186:16
**balance**  197:3
**barcode**  308:6

**barcoded**  61:4,7
**barrage**  34:9
**barton**  69:10,14
73:15 171:22
172:5,17 174:11
174:23 175:15
175:22 177:4
181:2 186:11
187:6,13 258:9
**barton's**  71:21
187:6
**bartons**  69:13
**base**  115:13
142:14 145:16
310:11
**based**  29:25 30:4
31:11 59:14
61:10,16 80:7
88:9 92:23
94:18 96:24,25
98:23 100:4
130:17 145:8,21
149:12,15
156:20 165:3
166:2 198:20
204:17 208:8
223:6 232:2
250:19 260:10
261:11 279:21
304:8,24 307:15
331:6,19
**basically**  68:10
71:6 86:17
102:16 154:17
168:5 170:5
216:5 290:20
293:24 295:24
298:11

**basis**  42:16
82:22 92:14
119:8 126:4
214:10,13,19
215:6 236:18
245:12 292:20
**bates**  79:4,6
80:25 81:17
82:24 83:20
84:9,20 85:8
91:25 93:25
126:22 127:14
132:9,24 135:23
135:24 141:19
146:6,20 147:3,9
194:17 198:3
201:8 227:23
233:22 275:20
278:12,22
304:18
**bear**  273:10
297:9
**becoming**  113:5
**began**  212:19
270:13,15,18
**beginning**  10:4
60:5,8 87:10
130:9 195:13
201:9 243:6
270:5 279:25
306:23 307:24
**beginnings**
240:16
**begins**  146:21
195:14
**behalf**  301:25
**behavior**  123:19

**belden**  5:2
**belief**  28:11
118:18 199:17
199:19,22
**believe**  16:3 20:4
20:7 22:17,22
23:18,21 28:10
29:20 45:18
46:2,13,18,20
52:7 53:10,12,14
59:24 73:4 82:4
87:17,22 92:9
100:23 101:9,15
103:4,12 108:25
109:22 111:15
112:21,25 113:7
114:6,11 119:18
121:9 122:11,18
124:20 127:25
128:4,13,25
129:12 135:9
138:4 150:20
160:19 162:3
164:5 166:13
168:25 169:2,22
171:3 184:21
185:20 208:3
218:15,25
219:21 222:8
223:14 226:4
234:21 243:9
244:12 245:13
253:24 255:5
257:7 272:18
273:7 275:7
277:4 279:6
283:25 289:4
295:14 296:5

313:13 317:21
320:3 332:4
**benefits** 319:21
**bernie** 86:2,18
86:20 87:4 90:2
92:6,16,22 95:20
100:18 101:10
102:19 107:19
107:21 109:18
110:19 135:16
135:20 136:8,14
137:14 138:20
139:3,11,17,21
141:11 142:21
143:3,7,8,17
144:8 180:22
211:11 222:17
223:9,22 224:11
224:17 225:6
226:11 228:5
229:14 230:14
231:6,9 232:4
286:25 288:23
289:5,16 293:8
296:21 309:16
314:17,23 315:6
315:20 316:8,10
316:12 317:6
**bernie's** 104:25
110:25 141:25
143:4 315:21
316:6,14
**best** 51:3 104:12
129:19,22 159:6
166:10 179:15
184:15 206:15
210:17 258:20
287:24 327:4

**beth** 19:20
225:25 226:3,5
226:12
**better** 95:13
116:2 121:18,21
121:25 257:8
326:14
**beyond** 11:13
14:8 100:3
246:15
**big** 79:4 171:19
**bigger** 276:23
323:13
**bill** 178:6
**binders** 48:2
**bit** 76:22 87:19
171:23 215:25
222:14 225:7
250:11,14 255:8
297:10
**black** 277:15
**blank** 35:8 79:3
**blocking** 276:25
**blood** 335:14
**blow** 317:20
**blue** 228:15
277:15
**bob** 44:25 48:21
52:3,5,25 57:13
62:3 86:7,9
166:8 167:2
178:5 212:9,11
212:16,21 213:5
213:22 214:4,15
214:16 215:17
215:23,25
216:10,24
223:14 272:17

284:15
**bob's** 216:9
**bobby** 18:9
171:19 172:5
173:4 174:12,13
174:18 272:17
319:14 320:7
**body** 32:13 57:3
**boiler** 70:16 71:3
**bold** 275:21
**bond** 17:14
48:16 49:13,16
86:3 105:22
107:25 108:10
109:23 110:18
111:9 114:8,17
118:2 119:6,10
119:21,22 120:4
120:18,25
123:25 124:22
125:6,9,11,17
126:9,10,14,23
127:5 129:6
131:19 141:22
142:2,8,13,22
143:2,10,22
146:8,16 147:8
148:15 163:13
164:6 169:22
170:19 178:6
185:16 201:11
201:15,18
202:16 203:11
207:15,20,24
220:12 228:9
264:9 318:8
**bond's** 86:24,25
111:13 113:12

114:11 119:10
119:13 130:16
144:14,20
**bottom** 79:23
93:23 132:20
146:19 147:7
227:25 228:14
274:18 275:19
277:14 278:2,15
**bought** 320:17
**box** 148:22
307:21
**boy** 318:23
**brand** 256:25
274:22 275:10
280:5
**break** 6:24 7:6
76:20,23 77:16
81:6 176:13,15
177:2 250:23
274:21 303:3
**breaks** 7:2
**brief** 133:14
243:3,10
**briefly** 9:4
**bring** 9:5 138:17
218:17 288:6
**bringing** 211:8
**broadway** 2:4
**broken** 65:23
66:7,8,20 67:11
**brothers** 73:11
**brought** 167:3
284:3,7
**budget** 15:13,14
**budgeted** 20:7
130:12

**build**  245:9
**building**  53:16
  103:14,16 104:2
  154:24 157:11
  215:2 224:12,17
  308:20,24
**buildings**  18:17
  18:21,23,25 19:5
  19:11,19,21
  20:17 74:9
  105:14 308:23
**bulk**  151:20
**bullet**  140:24
  274:19,20 279:2
**bullets**  278:15
**business**  292:11
  293:10 319:6,10
  323:22

**c**

**c**  4:15,15
**calendar**  223:22
  236:21
**call**  8:25 55:8,13
  78:10 109:8
  165:13 236:8
  246:10 254:7
  330:4
**called**  10:21
  34:13 43:14
  44:11 63:8
  109:7 131:25
  147:13,23
  165:11 195:3
  224:2 240:15
  241:20 258:17
  264:3,12 285:14

**calling**  67:4
  109:16 220:22
  263:13 282:8
**calls**  263:18
**campus**  21:7,9
  21:12 71:8,10
  74:9,16 144:7
**campuses**  54:8
**cancelled**  195:23
**candidate**  220:8
**candidates**  40:19
  145:14 220:24
  220:25
**cannata**  16:3
**capability**
  198:11
**capable**  299:20
**capacity**  9:14
**capital**  15:14
**caption**  136:6
**capturing**  61:11
  98:3
**cardone**  237:24
**care**  97:13
  211:16
**careful**  245:21
**cares**  264:7
**case**  1:4 9:20
  29:17 34:14
  38:7 46:19
  66:10 67:15
  68:8 75:20
  140:10,13
  156:25 183:11
  216:18 217:13
  221:15 222:8
  255:6 277:2
  307:25 313:8

316:10 318:19
  336:3
**cases**  28:8 88:20
  88:20 238:9
**category**  295:22
**cause**  260:2
**caused**  122:15
  142:21
**celeste**  22:12,14
**center**  90:10
**central**  245:10
  245:15,24
**certain**  58:9
  62:15 74:12,13
  87:14 92:10
  115:11 123:8
  130:11 132:16
  150:16,17 152:3
  156:2 174:20
  175:5 200:21
  219:8,11,13,14
  219:25 222:9
  223:23 240:18
  242:5 249:10
  264:19 269:7
  301:20 313:8
  318:9 323:18
  331:6
**certainly**  7:3
  26:5 43:18
  44:19 81:5,5
  82:11 106:22
  122:16 126:2
  158:10 162:4
  166:24 170:14
  172:19 202:2
  204:6,22 264:17
  280:13 313:20

**certainty**  236:24
  248:2 261:25
**certificate**  229:6
  231:2,22 288:4
**certificates**
  10:16 88:8,11,14
  88:18,24 100:24
  288:5
**certification**  3:6
  94:7,17 97:17
  98:7 99:4 101:8
  103:22,24,25
  105:13 147:13
  147:23 153:13
  154:14,15,22,23
  155:4,12 156:6
  157:17 158:7
  159:22 160:2
  161:9,19 162:6
  229:5,15,22
  230:4,15 231:2,7
  231:21 232:5
  335:2
**certifications**
  88:2,4 94:11,20
  95:7,10,17,25
  96:3,8,10,19
  100:19,22
  101:12,19,21
  102:5,7,14,15,19
  104:11,20 105:2
  108:2,14,20
  109:2,23 110:15
  110:21 111:3
  147:8 148:8,14
  149:2,10,16,22
  150:17 151:6,12
  151:17 152:3,10

156:11 162:12
228:16,21
230:18 231:12
**certify**  335:6,12
**cetera**  60:22
90:14 99:4
295:11
**ch**  79:4
**ch001493**  334:17
**ch1517**  233:23
334:14
**ch1520**  233:23
334:14
**ch1889**  81:4,18
82:15 334:10
**ch1891**  83:20
334:10
**ch1892**  82:24
334:10
**ch1895**  79:24
81:4 334:9
**ch1896**  85:8
334:11
**ch1897**  84:21
334:11
**ch1898**  84:9
334:10
**ch2269**  334:11
**ch828**  334:16
**ch830**  334:16
**ch831**  334:16
**ch953**  304:19
334:16
**ch954**  334:16
**chain**  17:2
**chance**  79:11
133:20 212:17
312:15

**change**  14:20
52:2 182:12
206:24 244:22
244:25 245:3
255:24 260:3
261:9 336:6
**changed**  14:24
60:14 87:19
114:12 227:9
244:24 245:18
261:4
**changing**  181:11
248:10
**characterization**
123:14
**charge**  30:13
74:19,22 90:18
163:2 202:12
**charity**  245:8
**chart**  84:3 85:2
85:11
**charts**  78:21
79:10,22
**check**  102:18
103:2 289:21
**checked**  110:14
280:4
**chfm**  147:13
149:11
**chief**  71:18
89:21
**chiller**  70:16
71:3
**chooses**  63:23
**chose**  139:15
241:2
**chris**  37:5,11
48:22 55:20

93:21 100:7
166:9,13 212:9
212:20 213:4,23
213:24 246:6,17
246:22 279:3
**chronological**
273:21
**circuit**  144:15
**circumstance**
312:23
**circumstances**
224:8 244:21
311:20
**cited**  304:13,15
**city**  46:20 54:19
156:7 192:11
245:8
**civil**  1:23
**clarification**
9:24
**clarify**  102:11
125:15 143:2
187:17,19
**clarifying**
187:21
**clark**  2:12 4:9
17:9 18:19 19:3
19:16 25:3,20
27:14 28:6 29:6
30:19 32:16
33:16,24 34:6
37:17,25 39:23
41:19 42:14
43:20 46:16,24
49:6,12 50:17
53:7 55:4 56:22
57:16 59:20
62:6 64:6,19

65:5 66:23 68:3
68:22 76:17
77:17,22,25 78:6
78:12 80:20
93:9,17 96:11,20
97:24 98:13,21
99:6,24 104:15
104:22 105:4,16
106:19 107:24
108:16 109:10
109:20 110:10
110:16 111:4
112:7 116:19,24
117:21 119:24
120:11 121:11
121:22 122:23
123:11 124:2
125:12,19
128:23 129:9,16
131:21 132:14
138:8 139:18
140:3 142:24
144:3,17 146:10
148:10 149:17
149:23 150:11
151:8 152:17
153:3,14 155:17
156:3 157:19
158:16,25 159:4
159:16 160:14
161:2,21 162:10
169:17 172:2,8
172:15 173:25
176:2,12,16
179:12 181:6,12
181:23 182:6,15
183:2,18,25
184:8,11,25

185:8,25 186:9
186:17 187:16
187:20 190:8,12
192:20 193:13
193:17 197:22
198:24 202:8,25
203:14,24 205:2
205:12 206:11
207:3 208:19
209:11,20
210:20 220:6,13
221:2 222:2,23
225:12 227:4
228:6 230:5,9
236:19 240:13
241:17 243:24
244:23 246:20
247:19 249:2
250:21 251:4,8
253:22 262:10
264:23 266:11
267:10,19 269:2
269:13 272:9
279:14 280:18
281:5,25 283:15
285:17 286:21
292:16 297:4
299:25 300:6
301:5,22 302:16
302:22 303:5
311:8 312:5,11
316:16,20
318:15 319:8
320:14 321:6,12
321:18,25
322:17,20 324:6
324:13 325:5
327:11,25

328:15 329:3,14
329:19 330:3,13
332:15,25 333:4
**class** 153:22
154:5,18 157:3
**cleaning** 245:21
**clear** 7:12 9:25
25:6,11 69:9
81:7 97:7
119:16 121:16
157:6 164:18
186:22 189:13
202:11 208:21
208:23,25 219:2
221:12 231:14
231:17 233:2,12
**clearly** 96:22
202:11 210:24
244:24 277:7
**client** 8:22 276:7
276:7 277:2
**clinics** 19:6
**close** 227:10
275:22 277:16
277:20 297:3
298:7,10
**closed** 57:23
63:21,21 67:19
68:14 293:17
295:5 296:16
304:7,10 307:3
**closely** 49:17
212:13
**closer** 65:25
**closing** 286:10
297:6
**coached** 214:7

**coaching** 121:6
**code** 11:2 57:7,8
247:7,17
**codes** 211:18
**coding** 276:17
**cold** 71:6
**colin** 87:9 89:10
**collaboration**
93:4,12
**collection** 135:9
**college** 10:4,7
**color** 98:4,6
276:17
**column** 225:21
**combination**
196:14
**come** 55:9 77:21
78:7 145:10
154:21 200:20
207:2 222:22
224:2 248:8
259:12 294:8
296:7 300:4,12
323:8 325:25
326:3,4,7 332:12
**comes** 50:25
54:19 96:25
99:10 173:4
249:12,20
**comfortable**
138:20
**coming** 171:10
206:21 300:8
**comment** 59:2
294:16,22
295:18,22,25
296:22 297:2,20
298:6,10,21,23

**commented**
298:16
**comments**
296:21 297:8
**commission**
56:19,21 57:4
58:2 62:5,11,23
63:7,9 64:16,22
65:4 211:19
241:21 266:21
336:25
**commitment**
134:12
**committed**
212:12 214:16
**committee** 90:11
**common** 263:7
**commonly**
308:22
**communicate**
38:17 76:6
161:18 199:25
200:9
**communicating**
74:10
**communication**
26:8 32:18
75:14 77:2
257:25 258:7,21
**communications**
8:22 119:21
120:3
**companies** 76:14
**company** 10:18
10:20 20:24
22:8 24:22
35:22 86:8,10
126:15 127:22

191:6,7 219:5
253:14 254:7
255:3,13 256:2,9
257:15,21 258:2
258:15,16
261:15,19 262:7
262:24 263:13
263:17 264:3,7
264:12,19
**company's**  260:3
**compass**  127:22
**compensation**
16:18,23 17:7,13
17:18 18:3,4,8
**competent**
120:16
**complain**  238:3
**complaint**  22:20
22:23,23 23:10
23:17 34:14
35:16 334:9
**complaints**  22:4
237:11 248:25
**complete**  29:14
29:15,18 31:2,17
31:19,20,21
51:15 126:10
173:17 201:6
233:15 249:4
274:6 278:4,6
305:16 306:4,13
314:8
**completed**  26:2
31:5 60:24
111:21 160:5
161:14,16
165:16,18 170:6
183:20 202:4

232:15 267:5
269:18,24 270:6
270:10,19 271:5
276:19 281:13
283:14,18 284:6
286:11 287:4
293:17 294:24
295:10 301:7
**completely**
134:11 145:16
**completing**
115:10 308:10
**completion**  59:3
65:18 267:4
282:15 286:10
**compliant**  63:6
106:13 291:3
301:7
**complicated**
297:10
**component**
174:22
**components**
56:5
**compressor**
305:23 307:18
308:6,7
**comprise**  18:17
**comprises**  78:20
**computer**  36:19
**concept**  332:10
**concern**  265:17
265:18 287:15
287:16
**concerned**
325:12
**concerns**  210:12
210:13 246:4,8

249:18 265:14
288:4
**condition**  299:21
**conditions**  291:6
**conduct**  36:23
200:2 242:19
**conducted**  62:13
66:17 91:7
174:11 242:17
244:3
**conducting**
203:9 242:13
**conference**
12:25
**confirm**  110:4,7
127:19 182:21
198:11 201:5
236:24 267:21
313:15
**confirmed**
238:14
**confusion**
230:11
**congratulations**
127:18
**connected**  30:17
228:4 239:12
326:20
**connecticut**  5:3
**connecting**
68:11
**connection**
154:13 167:12
167:16 318:11
**consensual**
116:10
**consequence**
261:5

**conservative**
299:7
**consider**  132:4
144:25 320:16
**considered**  65:2
65:10 71:12
86:10 117:19
143:7,25 144:4
210:7,21,22
219:17 314:3
**considering**
210:18 247:22
281:20 312:20
**constantly**  309:7
**construction**
76:13 243:13,14
244:3 294:13
323:9
**consulted**  204:20
**contact**  141:11
**contacted**
237:16 256:9,10
**contacting**
140:24
**contacts**  323:12
**contains**  252:18
**context**  208:11
305:7 318:4
**continue**  124:3,6
216:7 292:15
298:13
**continued**  44:9
135:16
**continues**  94:17
**continuous**
97:14 250:10,17
**continuously**
41:17,22 211:22

**contract** 191:14
**contractor**
  175:21,24 176:5
**contractors**
  203:9
**control** 71:9
  114:22,24
  116:18 128:6
  218:11 301:13
  306:21 307:13
**controls** 71:7
  181:2
**convenient**
  76:18,19 176:13
  250:22
**conversation**
  187:4,5,9,12
  188:9 189:12
  212:8 213:8
  229:25 233:5
  248:15,20,24
  249:3,8,12,15,16
  249:20 293:4
  309:15,21
  311:11 313:3,7
  314:6,22 315:6
  315:10,10
**conversations**
  32:11 126:8
  166:18 187:2
  213:6 269:15
  310:15 327:12
**cooling** 71:7,24
  72:3,6
**coordinate** 75:22
**coordinated**
  174:21

**coordinating**
  75:25 91:14
  173:18 174:19
**coordinator**
  141:5 279:5,12
**copies** 103:6
  110:4
**copy** 101:24
  150:6 152:9,20
  332:18,21,23
**cordier** 73:2
  194:14
**coreas** 1:20
  335:4,22
**corporate** 51:24
**correct** 9:16
  17:23 24:13
  26:12 27:6
  28:12 29:22
  31:14 54:14
  59:14 61:20,25
  63:2 64:2,13
  66:9,22 67:14
  76:10 82:7,8
  83:25 88:16
  95:21,22 100:19
  103:14,15 106:3
  106:7 109:24,25
  110:15 114:13
  115:22 116:9,18
  117:2 118:7,8
  123:25 125:18
  132:13,15,23
  139:23 141:16
  147:14,19
  150:18,23 151:7
  154:24,25
  159:15 160:2,3

  160:13,21,23
  171:25 176:8,9
  180:15 183:24
  184:24 185:4
  190:11 204:25
  248:21,22 252:8
  264:21 265:4
  288:17 289:17
  294:15,25 325:8
**correcting** 175:6
**corrections**
  180:14
**correctly** 288:13
**cortland** 23:14
**cost** 154:5
  325:11 331:8
**counsel** 1:24 3:4
  28:23 121:18,20
  122:21 164:3,3
**counseled** 28:10
  28:14,16 29:3
  118:15,20,22
  122:2 126:3
  208:2 252:19
  271:14 272:6,12
  280:23 314:17
**counseling** 23:20
  23:22,24 29:2
  116:13 118:23
  118:25 119:4,6
  123:6,16,18,25
  124:22 125:6,9
  125:11,17,22
  126:2 164:23
  165:7,10 210:8
  212:3,6,8,19
  213:13,16,20
  218:13 249:6

  251:23 252:5,12
  252:16,17
  265:12 283:21
  285:11,20,22,24
  303:22,25
  304:14,16 310:5
  310:11,17,19
  311:17 313:2
  314:15 315:3
**counselings**
  22:22 23:5
  29:11,12 32:8
  310:22
**count** 225:14
**couple** 300:15
**course** 11:21
  122:13 156:24
  166:10
**courses** 97:15
**court** 1:2 3:16
  4:2,5,20 5:19
  6:6,12 7:14
  17:21,25 26:24
  40:8,11 42:25
  45:13 55:24
  102:22,25 106:5
  122:8,25 124:14
  127:8 129:20
  131:16 133:6,12
  158:18 167:12
  167:15,20
  187:24 188:5
  191:9,13 208:22
  228:25 229:11
  243:5 247:12
  254:13 257:17
  264:25 268:20
  283:3,6 284:24

318:11,13,16,21
319:2 332:25
333:5
**cover**   292:3
**covered**   40:22
244:13 290:24
**covid**   12:23 44:9
45:20,22 46:13
46:23 51:6
156:10,12
244:14,22 247:8
250:14
**craig**   73:9
**create**   41:6,11
41:15 58:21
59:19 64:16
65:16 68:8
99:17 251:2
258:3 269:8
315:5
**created**   37:15,19
37:22 38:4,6,16
38:18 40:14
41:8 116:17,22
117:3,4 236:12
257:5 292:10
293:9 294:2
**creates**   41:7
92:25
**creating**   66:21
**critical**   241:23
**crothall**   1:9 9:15
10:18 11:6 13:6
13:12 14:7,12,15
14:17 15:17
20:20 21:18,23
22:3 23:24 24:3
33:3 43:5 44:22

47:4,15 50:9
51:24 74:2
78:22 82:18
89:6,7,10 111:10
111:11,14,23
115:2 117:5
122:13 127:21
137:25 138:5,6
139:11 154:4
156:9 158:20
167:8 178:10
197:8,21,25
234:14 254:21
260:5 284:19
296:13 321:4
322:10,14,23
336:4
**crothall's**   9:15
153:21 197:7
**curley**   83:13,15
**current**   13:2,4
13:16,17 52:5
69:17 73:22
83:11 87:20
89:3,15 92:8,22
105:14 106:8
110:5,8 132:23
148:23 151:2
162:22 230:22
231:10,12
253:24 262:2
288:11 290:2
292:12 295:16
**currently**   8:4,12
20:2 69:19
72:22 85:20
89:8 105:23
108:17 190:3

295:17 302:23
326:11
**cut**   27:2 107:12
167:21 243:6
250:11
**cv**   1:4

**d**

**d**   191:12 334:2
**d000251**   334:9
**d000255**   334:12
**d000258**   334:12
**d000504**   334:13
**d000512**   334:13
**d000513**   334:14
**d000520**   227:24
**d000522**   334:14
**d000611**   334:12
**d000619**   132:10
**d000620**   127:14
**d000626**   334:12
**d000627**   334:13
**d000648**   334:13
**d000649**   334:15
**d000667**   334:15
**d000670**   334:15
**d000678**   334:15
**d251**   79:23
**d255**   91:25
**d257**   94:2
**d258**   91:25
**d504**   146:6
**d510**   147:9
**d512**   146:6
**d652**   278:22
**d658**   277:11
**d660**   275:20

**d670**   194:17
**d678**   194:18
**daily**   24:5 61:14
236:17
**data**   36:21 39:21
64:3 79:7 82:10
90:12 101:21
289:15 295:12
326:18
**database**   61:8
63:24
**date**   34:19 39:2
45:25 50:2,20
78:19 91:20
104:11 105:2
110:21 126:20
129:8,17 134:17
136:15 137:20
146:4 147:17,18
150:17 152:22
155:11 156:20
162:9 170:19
183:9 185:3
188:15 189:13
194:21 200:21
201:23 206:25
207:16,17 210:4
218:15 223:11
224:3 225:19,20
225:21 226:8,8
227:17 229:9,22
232:19 234:2
251:20 253:25
257:16,20,24
258:2 267:4,14
273:3 275:24
284:5 303:16
304:8 312:10

324:19 336:4
dated  78:23
  127:14 136:6
  213:14 275:17
  278:22
dates  40:2,19
  148:4,4 219:9,10
  228:22,22
day  60:7 66:12
  68:6 137:21
  157:18,20
  161:17 168:5,5
  196:24 204:23
  208:15 212:14
  224:11,16,21
  236:23 245:12
  245:12 247:22
  279:22 285:11
  292:11 293:11
  297:18 300:17
  301:18 306:10
  306:11 307:2,2
  308:2 330:5
  333:16 335:18
  336:22
days  53:2 54:11
  54:14 203:10
  204:18,21 209:2
  268:6 300:15
  306:12
deadline  161:7
  161:10,12 292:4
  316:9,10,11,12
  316:14,17 317:5
deadlines  26:19
  26:22 27:12,25
  28:12,16,24
  115:11

deal  190:25
  302:3
dealing  105:18
  171:21
december  129:7
  210:6 212:4
  213:13,14
  214:20 215:14
  247:25 275:17
decent  215:22
decide  206:24
  213:20 287:12
  287:13
decided  143:18
  209:25 212:5,7
  270:24 271:19
decision  17:7,13
  31:3,18 143:4
  144:12,16
  145:13 211:3
  221:8,13 311:16
decisions  16:17
  16:20,22 17:18
  18:3,8
dedicate  210:25
deemed  28:25
  30:24 174:5
deems  223:5
default  239:20
defaulted  221:18
defendant  1:17
defendants  1:10
  2:10 4:9,11 39:8
  109:4 332:20
deficiencies
  65:15,17,20
  142:16 175:7
  265:20,23

266:17,24 267:3
  267:6 270:23
  277:21 286:2
  292:11 293:6,10
deficiency  65:7
  65:22,24 66:7
  67:20 271:6
  293:25 294:3,7
  294:15 311:13
  312:24 314:4
  315:7
deficient  64:18
  316:13
define  260:13
defining  170:2
definitely  109:12
  267:20 268:8
definitively
  186:14
degree  10:5
  30:14 97:9
degrees  10:10
demoted  113:18
  115:8 131:20
demotion  116:10
  132:2
denver  15:25
  18:9 48:19
  171:19 172:5
  173:4 174:13,18
  272:18 284:15
  319:14 320:7
department
  27:22 30:11,13
  31:13 51:23
  67:17 68:21
  71:12 82:6 83:7
  85:21 86:5,12

87:7 88:23 89:4
  89:17,19 93:3,5
  100:15 103:21
  104:5 114:20
  115:21 139:9
  143:14,23
  155:10 156:7,10
  163:8,19 168:18
  170:20 171:13
  171:18 179:2,4
  185:18 186:5
  190:21 198:10
  198:13 205:8
  232:9,17,20
  233:9 239:2,10
  239:18 240:3
  242:8 243:16
  248:17 250:5
  256:8 290:8
  294:18 307:13
  315:18
department's
  321:2
departments
  60:17 190:25
  307:12
dependent  60:14
  233:9
depending  77:6
  294:9
depends  62:9
  138:20 193:7
  298:24 300:7
depiction  84:14
  85:3,13
deponent  33:22
deponent's
  312:4

deposed   5:10
deposition   1:12
 1:16 3:6,13 4:3
 7:21 8:24 9:3,6
 9:9 134:21
 336:4
depositions
 33:21 312:2
depot   323:4
descending
 273:21
describe   15:4
 56:3 175:21
 327:22
described   11:9
 19:11 134:21
 281:3
describing   12:15
 39:22,25 68:9
description
 88:25 92:2,7,20
 92:21 98:9,16,23
 99:5,13 100:5
 108:8,9,11,15,19
 109:5,6,11,18
 190:18 217:24
 229:24 234:6,12
 234:22 235:2
 244:13 248:7
 279:8 334:8
descriptions
 92:25 93:15
descriptive
 299:2
designed   66:4
designee   186:12
desire   161:18

despite   207:16
detail   58:18
 277:8
detailed   120:18
 252:22
details   39:25
determination
 145:11
determine   89:2
 98:19 119:16
 130:14 170:22
 173:11 294:20
determined   23:2
 196:23 315:15
determines
 88:10
determining
 91:8 130:7
develop   99:9
developed   99:10
device   178:24
 190:16
difference   58:5
 112:12
different   11:8
 42:20 57:8
 58:21,23 68:19
 75:22 78:2
 79:20 87:14
 88:12,12,14
 173:9 192:12
 193:16 237:12
 255:9 269:11
 275:9 280:10,11
 294:7 297:7
 298:4 325:7
 329:17

differently   236:6
differing   314:24
difficult   164:10
direct   16:6,11,19
 21:19 23:20
 28:21 30:15,18
 30:25 31:19,25
 102:12,15
 118:19 120:12
 126:16 131:3
 138:10,13,14,17
 157:16 203:19
 237:25 243:18
 252:9 264:2,5
 320:11
directed   202:9
directing   197:16
 204:6
direction   77:7
 96:16 121:3,16
 122:22 123:6,9
 176:5 210:24
 214:8 218:19
 288:22,23 289:5
directly   15:20
 16:24 55:15,17
 75:24 99:18
 111:25 168:3
 183:14 212:13
 277:3 293:3
director   13:11
 13:12,19,21,24
 14:14 21:2,4,6,9
 21:24 52:8 68:7
 69:19 70:2,3,3
 73:20,23 83:15
 86:20 87:2 90:3
 92:3,17 93:8,16

94:12,23 95:9,19
 96:18 97:11
 98:20 99:3,5
 102:4 103:17
 105:24 108:3,18
 108:19,21
 109:11 113:2,6,9
 113:13,16 114:2
 114:8 115:8
 118:7 139:22
 141:23 142:3,9
 142:23 143:11
 144:13 148:17
 149:7 180:21
 185:13 190:19
 190:19 210:2
 211:4 217:6,23
 218:23 222:15
 222:16 224:14
 224:19 227:2
 234:7,24 235:8
 237:25 262:20
 262:22 263:6
 264:10 287:2
 290:5 299:10,11
 301:12 302:2,6
 302:18,20,21,23
 307:7 308:19
 331:19,21
directors   42:17
 42:19,23 43:4
 55:14 56:11
 77:8 95:3
directs   201:25
disappointed
 160:9
disciplinary
 219:7

discipline 313:5
disciplined
198:16
discovery 25:15
36:13,17 37:9,15
37:24 38:5
discuss 27:18
36:5 139:12
142:4 257:13
268:11,14
274:13 279:11
discussed 26:6
27:16,22,24
134:19 138:24
162:4 212:22
213:8 233:12
235:15 239:8
248:6 257:6,10
257:11,12
261:18 277:4,9
287:11 314:5
316:24 320:22
333:8
discussing
137:15 249:17
280:8 287:23
discussion 142:8
142:11,20
176:18 255:19
discussions
143:13 164:6,7
166:8 186:20
distribution 72:7
district 1:2,3
division 11:11
doable 333:8
document 26:6
29:9 34:17

35:10 38:24
39:4,7,11 40:23
41:6,7,8,12,16
41:17 42:2,8,13
42:15 67:13
68:11,23 78:17
81:18 82:4 83:2
83:22 84:2,11,22
85:9 91:18
93:23 98:5,14
99:10,18 100:5
101:3 108:23
126:18 127:13
127:13,15 132:9
134:15 136:19
139:2 141:21
146:2,15 147:4
148:12 150:8,25
151:5,12,24
194:19 202:18
225:18 226:25
227:15,23 228:8
228:9 232:2
233:22,24
234:18,20 242:4
251:18 255:11
256:4 260:12
269:20 272:25
277:11 284:10
284:13 287:24
292:20 294:22
303:14,20 306:2
309:22 311:24
312:8,25 313:2,3
313:6,12
documentation
32:14,20,25
56:10,13 57:15

63:20 64:10
68:15 69:6,9
142:18 152:14
152:20,21 154:9
154:11 206:23
211:21 223:16
224:4 266:16
267:8,12,17,18
267:21,24 268:2
268:24 269:4,6
270:25 272:7
281:2,8,18,21,23
282:4,6,9,17,20
284:18 288:9,14
288:18,19
289:19,25,25
309:23 310:7
311:6 312:21
313:9 314:14,18
316:22 317:3,10
317:14 324:21
documented
24:25 25:18,22
66:16 128:20
157:25 161:12
216:10 257:8
260:24 287:4
310:12 317:21
documenting
67:17 107:5
281:4 282:21
documents 9:2,5
12:11 26:4
36:12,16,23 37:8
37:14,22 38:3,6
48:3 68:21,25
79:5,8,20 126:21
133:22 134:24

135:2,9,19 146:5
271:16,17 273:8
288:24 314:22
316:5,15
doing 122:6
178:2 183:23
192:18,22
205:10 239:5,14
241:10 242:25
255:20 284:12
286:13,16
292:14 299:6
326:18
dollar 15:12
331:20
don 237:24
door 65:23,24
66:7,20 67:2
265:15,25 266:7
266:8 268:12
269:17 270:4
272:3 274:5,10
274:14 275:5,8
275:11,11,23
276:15,24 277:2
277:16,20,21
280:3,16,16
281:13 283:13
293:4
doors 65:14
67:24 266:10
267:9,14 268:15
269:12 274:22
275:6,21 276:3
276:18 277:14
278:5,18 280:3,4
280:7,13

**dorothy**   41:9
101:17,20
104:18 110:22
111:7 217:14,18
222:21 229:20
231:9
**doubt**   172:21
**doug**   16:2 18:4
171:21 172:5
173:5,5 174:13
174:14,20 320:4
320:6
**downs**   198:10,14
198:17,19
**draft**   213:13,15
241:11 279:7
310:10
**drafted**   100:8
135:12 209:19
212:3 313:11
**drafting**   100:12
135:19,21
287:17
**drain**   197:2
198:10,11,14,17
198:19
**drill**   311:6
**drills**   90:14
309:17,22,24
310:7,12 312:22
**dry**   304:20
305:22 307:17
308:5
**due**   4:2 24:21
45:20 60:2,4
160:25 195:23
219:17 250:12
300:8 305:11

306:8,18
**duly**   4:16 335:8
**duration**   22:7
45:21
**duties**   93:7
126:11 172:7
249:5 253:5
290:9,24 291:10

### e

**e**   4:15,15 24:8,15
25:5,9,10,13
32:20 33:15,18
34:3,4,9 35:3
36:18,24 37:13
38:22 119:20
162:5 206:4,13
207:7,16 208:7,9
209:4,5 219:23
220:20 295:23
303:10 312:2
318:7 334:2,7
**earlier**   44:6 45:6
46:20 47:8
50:20 52:22
97:19 100:17
115:7 155:2
156:9 177:3
225:4 228:8
232:22 282:3
323:23 332:3
**early**   46:25 51:2
83:10 217:7,8
238:22 278:8
**earning**   132:8
**easier**   236:10
**easy**   173:11
270:17

**ecklof**   89:25
194:12 197:25
199:6 200:8,9,12
202:15 205:18
**education**   94:4
97:15
**effect**   3:15
**effective**   147:16
148:4 228:22
**effort**   105:7
151:23 152:3
**efforts**   91:15
164:3
**eight**   52:13
97:12 140:18
147:3 227:22
228:15 329:22
**either**   81:14
163:5 169:4
237:5 256:16
276:22 301:11
306:10
**elaborate**   241:4
**electrical**   193:14
193:20,23
**electrician**   192:5
193:15,20,21,22
**elevator**   174:21
**eligible**   219:3,6
219:12,14
**else's**   27:13
173:2
**emergency**
237:25
**employed**   14:12
15:7 19:25
20:12 35:25
36:4 73:25

163:15
**employee**   23:10
23:13 44:17
45:9 50:25 89:9
111:2 117:6
144:2 167:8
168:12 197:25
222:5 250:13
254:25 255:2,6
310:24
**employee's**
322:16
**employees**   15:17
15:18,19 16:23
22:2,11 44:12
45:11 47:9
49:19 87:22,23
98:11 99:22
132:19 197:15
197:21 202:2
221:24 240:15
246:14 323:8
**employers**
144:23
**employment**
45:22 51:16
105:21 127:20
151:16 157:20
189:20 230:16
**enact**   259:2
**enacted**   257:22
**encompass**
217:21
**energy**   69:20
70:4 72:3,4
**engineer**   71:19
89:22 176:3,6,8
176:10

engineering   10:8
  12:2 13:11
  14:14 15:9 21:3
  21:5,7,9 42:16
  42:18 70:2
  73:21 97:10
  127:20 128:17
  128:21 168:9
  171:5 173:6
  291:24
enhancement
  285:15
ensure   59:12
  60:23 202:3
  263:23 287:25
  288:8 289:11
  292:9,21 293:8
  293:16 307:2
  317:5
ensures   57:22
  106:12 107:2,3
ensuring   31:4
  66:15 67:18
  76:4 91:6
  242:15 290:10
  299:12
entire   27:22
  209:14 258:12
entitled   1:18
entries   147:22
  148:5
entry   275:15
environment
  248:10 291:25
envisioned
  140:11
epicenter   245:7

equipment   61:12
  61:17 75:5
  302:7 307:16
  308:21
erected   245:24
errata   336:2
especially
  138:18
esq   2:6,12,12
establish   99:21
established
  247:8
estate   18:22
estimate   329:24
estimation   316:7
et   60:21 90:14
  99:3 295:11
  336:4
evaluation
  130:20 210:11
evaluations   16:5
  16:10
event   189:8
  253:7 255:18
  256:13,19,22
  257:5,7,9 260:17
  260:19,23
  313:17
events   29:13
everybody
  240:17
everybody's
  101:19
evidence   67:25
  149:16,21
exact   50:2 87:20
  113:15 130:14
  137:21 185:3

210:3 223:11
  224:7
exactly   35:18
  162:21 164:10
  164:17 182:20
  236:5 302:4
  325:14
exam   103:20
  154:20 155:9
examination   5:4
  334:3
examined   4:17
example   38:21
  65:11,24 66:6
  67:12 75:9,25
  193:10 307:17
examples   238:16
  238:17
excel   82:14
excellent   211:20
excludes   32:17
excuse   14:19
  247:6 315:12,14
exhibit   34:11,13
  34:18 35:2,10
  38:23,25 46:10
  78:16,18,20 79:3
  80:22 84:13,25
  85:18 91:17,19
  91:24 112:24
  126:17,19
  132:24 133:5,15
  134:13,14,16
  135:25 136:3
  144:22 145:23
  145:25 146:3
  194:15,17,20
  205:22 209:24

224:23 227:10
  227:11,11,14,16
  233:18,18,22,25
  236:9,13 251:2
  251:12,17,19
  265:12,12
  272:20,22,24
  273:2,20 275:16
  284:23 303:8,11
  303:13,15 304:4
  309:12 311:24
  312:7,9 317:17
  334:9,9,11,12,12
  334:13,13,14,14
  334:15,15,16,16
  334:17
exhibits   33:14
  34:9 134:19
exist   12:17 101:4
  103:8
existed   241:5
existing   325:11
  327:8
exists   109:19,20
expanded   70:9
  207:13
expect   235:10
expectation   63:5
  160:4 161:11,13
  161:15 179:23
  180:2 230:23
  231:15,18
  235:16,19
  271:15 290:23
  290:25 293:13
  296:25 297:2
  301:10 316:21

**expectations**
25:7,12,25 76:5
119:17 125:24
157:21,22
164:20 249:10
292:24
**expected** 31:17
108:14 120:19
180:7 235:12
**expedite** 206:14
**expedited** 333:7
**expediting** 74:12
75:16 174:19
**expense** 153:21
154:6,10,12
**expenses** 330:9
**experience** 94:4
97:13 172:18
173:7 211:17
223:7 253:18
289:10
**experienced**
211:9,12 246:22
**expert** 93:13
172:3
**expertise** 102:16
**experts** 11:7
171:25 246:18
**expiration**
147:17 148:4
156:22 228:22
229:9
**expire** 153:18
155:24 156:2,18
157:3
**expired** 101:23
104:21 155:12
155:21 231:5,24

**expires** 336:25
**explain** 58:4
141:2
**explaining** 58:18
**explored** 288:5
**exposure** 240:8
**express** 292:23
**extend** 26:18,22
27:11
**extended** 27:25
28:3
**extensive** 104:7
105:18
**extent** 111:12
**external** 220:24
**externally** 44:2
221:5,11
**extinguishers**
246:12
**extra** 309:9
**eyes** 106:18
309:10

**f**

**f** 94:9,10 99:2
101:4,11 103:9
103:10,13
105:13 110:3
147:23,23,24
150:2,3,21,21,21
150:21,22
151:19 154:15
154:19,23 155:3
156:6 157:16
159:21,25 161:8
231:22 288:4
**facilitate** 76:25
77:5 206:5

**facilities** 11:10
11:13 19:7,9
64:12,24 70:14
74:20 77:11
80:2 81:23 83:7
84:14 85:3,13
246:9 247:3
**facility** 61:22
62:21 70:25
71:4 76:5 80:17
141:5 162:25
166:23 240:8,22
**fact** 4:8 26:7
98:4 131:4
151:2 178:23
202:11 205:15
220:19 233:8
255:16 298:15
**factors** 208:10
**facts** 315:13
**failed** 75:13
271:7,12,21
292:19 313:8
316:11
**failing** 159:14
255:2 266:15
286:20,22
**failure** 26:16
28:2 29:13,15,17
31:21 198:16,18
198:19 249:10
253:8 255:21
261:2 263:11
280:23 311:14
314:18 315:11
**failures** 28:3
249:4 317:7

**fair** 123:13
**fairly** 80:8
173:11 292:19
**fall** 183:14
189:14 255:17
301:20
**falls** 170:16
190:17,20
**familiar** 49:18
144:22,25
148:12 211:17
211:18 223:24
228:10 307:7
327:16 329:6
**far** 45:6 80:8
88:7 120:17
134:20 144:7
160:5 167:18
173:8 178:4
211:16 214:23
216:22 261:8
262:4,13
**fashion** 289:17
**fdny** 105:19
229:5 231:2,21
**fds** 275:13,22
277:16 278:4
**february** 269:23
271:3,20,21,23
271:25 272:15
278:8 279:4,8
**federal** 1:22
**feedback** 16:13
55:10 93:20
96:6 97:5 204:8
204:11 215:8,16
215:21 216:9,13

feel 200:19 216:2
320:19
feeling 187:7
314:7
feelings 189:13
feet 15:11
felipe 73:2
felt 151:24 162:8
165:2 215:22,23
252:10 286:6
287:18,24
289:15 312:24
320:15 326:12
ferland 193:25
fewer 20:17
field 102:17
fields 97:10
162:13
fifties 162:20
fifty 329:16
figure 326:16
figuring 180:14
file 2:13 34:10
82:25 83:21
84:9,21 85:8
213:19,21 313:5
filed 22:4,23
23:10,16 34:14
118:23
files 36:19
332:24
filing 3:5
fill 148:22
217:16 227:3
filled 20:8 40:5,6
41:25 42:5,7
225:5

filling 226:17,18
final 282:22,24
282:25
finally 211:2
283:14
finance 14:7
330:19 331:18
finances 320:18
find 225:8
finding 200:16
263:10
findings 263:8
finds 278:5
fine 78:11 251:7
263:22
fines 260:7
finish 6:20,23
76:22 167:22
176:24
finished 270:11
fire 10:12,24
15:10 19:24
20:11 21:25
27:21 28:4 30:6
30:10,13 31:13
52:7 56:4,8
57:14 60:21
65:14 67:2,15,16
68:20 75:19
82:6 85:21,24
86:4,5,11,20
87:2,6,10,13,15
87:15,17,18,25
88:13,22,23 89:4
89:5 90:4,5,8,8
90:12,14,19,20
91:12 92:3 93:8
93:15 94:12,22

95:2,8 96:18
98:19 99:2,5
102:4 103:18,21
104:4 105:24
106:11,11 108:3
112:4,5,19 113:2
113:5,9,13 114:9
114:20 115:19
116:6,16,21,23
117:8,9 118:6,14
131:23 138:24
139:13,17,22
140:11 142:23
143:23,25 144:5
144:13,15 149:7
149:9 155:9
156:7,10 162:23
163:6,8,19
167:11,23,24
168:3,8,17 169:7
169:14,15,20
170:8,10 171:2
171:12,24 172:6
172:20 174:12
174:17,22,25
175:4,8,11 177:5
177:9,10,23,24
178:5,12,16,18
178:24,25 179:4
179:6,23,25
180:7,10,10,11
180:17,20,22
181:21 182:25
183:13 184:3,5
184:13,19,23
185:13,17,21,22
186:2,4,21,23
188:13,22

189:15,24 190:2
190:3,10,16,18
190:21,22 191:2
191:3,3,4,6,22
192:6,7,9,14,15
192:24 193:2
194:3 196:17
200:13,22 203:4
205:4,5,7 209:25
211:10,12 217:6
217:23 224:14
224:18,19
226:20 227:2
232:8,17,19
233:9 234:6,24
237:13 238:18
238:25 239:2,10
239:11,14,15,18
239:21 240:5,19
240:24 242:8,13
242:17,18 243:2
243:9,15,16,19
243:21 244:7,10
244:17,19 245:2
245:4,18 246:3,8
246:11,17,23
247:2,9,16
248:16 253:10
253:13 254:11
255:4 256:7,8
259:7 261:19
263:15,16 264:7
264:10 265:15
265:25 266:10
267:9 268:12,15
270:4 274:5,10
274:13 275:4,6,8
275:11,11

| | | | |
|---|---|---|---|
| 276:15 277:20 | 307:20,21 | **footage**  74:7 | 152:18 153:4,14 |
| 280:3,7,13 | 310:22 331:2 | **force**  3:15 | 155:8,17 156:3 |
| 283:13 286:12 | **fit**  115:25 145:11 | **forgetting**  200:5 | 157:19 158:16 |
| 287:2 288:22 | **fitness**  10:17 | **forgive**  81:20 | 158:25 159:2,16 |
| 290:6,7 294:4,18 | 88:9,11,15,18 | **forgot**  11:18 | 160:14 161:2,21 |
| 299:10,18,18,19 | 229:6 231:3,22 | 134:11 179:18 | 162:10 169:17 |
| 300:18 301:12 | **five**  15:11 52:11 | **form**  3:9 17:9 | 172:2,8,15 |
| 301:19 302:2,10 | 76:20 78:8 | 18:19 19:3,16 | 173:25 176:2 |
| 302:18,20,21,23 | 97:10 182:18 | 25:3,20 27:14 | 179:12 181:6,23 |
| 307:19,22,24 | 303:3 | 28:6 29:6 30:19 | 183:2,18,25 |
| 308:14,16 | **fix**  66:20 | 32:16 37:17 | 184:25 185:8,25 |
| 309:17,23 310:7 | **fixed**  67:12,13 | 39:23 41:19 | 186:9,17 187:16 |
| 310:12 311:6 | 91:13 | 42:14 43:20 | 190:8,13 192:20 |
| 312:21 315:17 | **floor**  323:12 | 46:16,24 49:6,12 | 193:13,17 |
| 325:3 | **flow**  175:5 | 50:17 53:7 55:4 | 197:22 198:24 |
| **fires**  324:14 | **flows**  174:12,25 | 56:22 57:16 | 202:8,25 203:14 |
| **first**  4:16 7:6 | **flsd**  274:18 | 59:20 62:6 64:6 | 203:24 205:12 |
| 25:8 34:12 | **fm**  258:18 | 64:19 65:5 | 206:11 207:3 |
| 35:15 40:12,17 | 259:10 260:4 | 66:23 68:3,22 | 208:19 209:20 |
| 44:14 46:19 | **focus**  70:20 | 93:9,17 96:11,20 | 210:20 220:6,13 |
| 47:9,10 49:20 | **focuses**  57:14 | 96:24 97:24 | 221:2 222:2,23 |
| 50:7,8 51:16 | **folks**  167:15,16 | 98:13,21 99:6,24 | 228:6 236:19 |
| 82:18 111:13 | **follow**  11:2 65:8 | 104:15,22 105:4 | 240:13 241:17 |
| 134:2 137:12 | 65:9 66:17,18 | 105:16 106:19 | 243:24 244:23 |
| 146:14 148:11 | 150:12 151:25 | 107:24 108:16 | 246:20 247:19 |
| 152:10,13 154:4 | 259:4 261:2 | 110:10,16 111:4 | 249:2 253:22 |
| 157:18,20 | 263:11 265:19 | 112:7 116:19,24 | 262:10 264:23 |
| 161:17 189:20 | 266:15 269:8 | 117:21 119:24 | 266:11 267:10 |
| 195:12,17 | 271:7,22 292:19 | 120:11 121:11 | 267:19 269:2,13 |
| 196:12 209:24 | 297:21 325:23 | 121:23 122:23 | 272:10 279:14 |
| 225:10,23 228:2 | **followed**  158:5 | 123:11 125:12 | 280:18 281:5,25 |
| 229:5 238:20 | 188:4 256:12,14 | 125:19 128:23 | 282:4,11 283:15 |
| 252:21 253:8,12 | 314:22 | 129:9,16 131:21 | 285:17 286:21 |
| 253:16,17 | **following**  257:9 | 132:14 138:8 | 292:16 294:22 |
| 269:25 275:15 | 274:23 306:11 | 139:18 140:3 | 297:5 299:25 |
| 283:21,24 | 316:23 | 142:24 144:3,17 | 300:6 301:5,23 |
| 284:17 285:6 | **follows**  4:18 | 146:10 148:10 | 302:16,22 |
| 286:9 306:11 | 176:5 | 149:17,23 151:8 | 316:16,20 319:8 |

320:14 321:6,12
321:18,25
322:20 324:6,13
325:5 327:11,25
328:15 329:4,14
330:13
**formal** 49:3,8,11
118:23 119:3
**format** 80:25
84:22 225:17
**formats** 109:12
**former** 144:15
**forms** 24:17
**forth** 164:8
335:8
**forty** 136:2
**forward** 34:2
96:5 97:6 315:3
**forwarding**
312:12
**found** 68:12
259:7 293:25
**foundation**
45:19
**foundations**
10:21,23 11:19
11:20 44:11
45:17 47:7
49:16 51:5,18
240:10
**four** 13:20 19:5
21:16 47:10
50:7,8 51:16
182:12,18 201:8
278:21 305:23
305:24 317:3
**frame** 32:19
104:3 107:3

111:20 113:16
113:18 158:8
181:5 210:10
224:8 232:13
233:16 242:23
**free** 322:13,13
**frequency** 57:10
57:24 59:14
60:13
**frequent** 24:15
**frequently** 24:11
53:2 54:23,25
214:16,21 300:5
300:12
**front** 33:23
91:22 126:25
127:2 133:17
194:23 283:10
**froze** 167:17
318:17
**full** 4:21 27:7
168:12 212:14
250:17 305:19
**fully** 276:3
332:11
**function** 34:21
35:6 177:10
178:17,19
179:21 210:14
**functions** 57:10
323:18
**funding** 320:20
**funds** 321:2
**further** 3:8,12
16:25 93:25
96:16 131:19
132:2 276:4,8
308:3 310:16

311:16 317:5
335:12

**g**

**garcia** 15:25
45:2 73:3
168:15 239:24
**gas** 72:6
**gather** 12:24
**gathering** 36:11
**geared** 145:17
**general** 50:24
235:22 240:22
**generally** 41:25
42:3 44:14
45:10 49:14
50:23 53:18
54:13 60:8
71:11 98:15
101:24,25
104:17 106:21
112:15 136:23
141:6 220:10
240:20 241:11
242:4,20 313:4
**generated** 59:13
**generates** 58:8
59:5 61:9
**geographic**
309:3
**gestures** 5:25
**getting** 67:5,6,6
74:13 85:19
91:10 121:16
138:12 155:3
158:6 162:6
170:6 174:14
180:13 182:15

215:16 216:2
285:23 287:2
323:12,14
**give** 5:14 38:2
46:9 65:11 75:9
77:7 81:21
120:7,18 126:8
158:8 193:9
210:17 212:17
214:7 215:8
217:8,18 305:7
**given** 6:2 30:22
31:16 36:8
39:17 49:18
105:3 107:17
126:14,15
153:19 158:23
165:4,25 182:17
183:17 193:5
232:13 233:6
289:5 295:8
327:2 335:10
**gives** 49:15
98:22 176:6
240:7 306:12
**giving** 143:8
206:9 210:7
**global** 258:18
259:10 260:4
**go** 5:15 7:6 47:9
68:4 105:22
111:8 112:17
124:8 146:11
152:18 153:17
156:23 159:4
167:18 181:9,13
184:16 185:2
194:15 217:9,11

222:15 226:8
227:8,9 235:24
237:2 238:15
240:15 265:10
268:3 281:10
282:2 286:9
292:7 295:25
299:7 300:14,16
302:6 308:4
328:3 330:24
**goal** 152:25
159:5,14 160:4
161:11 301:6
**goes** 41:3 100:14
296:9 301:24
306:5
**going** 5:15,18,20
9:19 27:10
33:19 34:7,15
35:7 52:2 61:15
61:15 62:3,24
69:8,8 70:20
82:2 84:7 85:18
90:2 100:15
109:8 116:13
120:8 124:3,5,7
134:8,23 138:3
138:12 139:5
153:9 162:14
165:13 166:16
170:23 178:3
182:11 196:7
199:11 207:25
209:17 212:15
213:17 218:23
227:21 236:8,14
236:15 249:13
251:11 266:2

277:25 278:20
287:10 288:6
289:16 290:4
292:7 309:11
314:10 317:16
318:18 324:11
326:16,17,20
328:3 330:4
**good** 32:22 58:3
115:12 120:25
140:17 142:14
142:15 166:11
220:8 270:25
296:21 298:17
312:16
**gotten** 166:3
211:6
**grade** 129:24
**graduates** 173:6
**granular** 106:15
**great** 10:3 77:18
78:12 170:2
173:15 250:25
**green** 94:15,16
143:20 276:3,12
276:19
**greeting** 196:8
**gross** 253:6
**ground** 70:23
**group** 111:25
127:22 179:25
184:4,5
**grow** 70:23
**guess** 40:13 57:3
66:19 93:19
96:14 116:10
121:12 125:21
126:5 140:20

143:17 147:6
203:2 235:24
236:13 262:13
271:15 281:15
**guidance** 16:13
55:10 56:10
118:25
**gun** 190:13
**guys** 171:24

**h**

**h** 4:15,15 334:7
**halfway** 195:11
195:16
**hand** 322:14
335:18
**handful** 215:19
**handle** 166:7
**handler** 75:13
**hands** 90:22
120:9,14 180:17
**handwriting**
136:21 195:9
273:17
**handwritten**
136:18 195:19
273:16
**hang** 37:18
152:17 182:6
**happen** 66:20
121:10 158:2
188:23 199:25
255:14 324:24
332:13
**happened** 51:6
98:12 214:13
216:12 253:20
253:23 254:17

255:9,10,17,19
271:2 279:17
301:9 311:21
314:25
**happening** 263:5
**happy** 77:15
**harassing**
182:16
**hard** 225:11
**hariegel** 37:5,11
48:22 55:20
93:21 100:8
166:9 212:9,20
213:23,24 246:6
246:17
**hariegel's** 213:4
**hazards** 67:3
**head** 48:25 69:9
115:21 131:4
137:21 188:18
188:25 268:4
283:2,8
**health** 56:6
70:14 97:13
111:7 211:16
**healthcare** 1:9
13:7 18:21
127:21 336:4
**healthcare's**
9:15
**heaney** 73:9,10
73:10,11
**hear** 6:5 7:19
22:13 36:9
47:18 107:13
234:15 318:14
318:15

**heard** 167:2
182:22 317:18
318:3,5,22
**heating** 71:7,24
72:2,5
**held** 1:18 13:15
52:9 69:22
111:9 176:18
235:21 302:17
315:14
**hello** 318:13
**help** 38:22
218:19 225:7
269:4 279:6
309:19 325:3
**helpful** 33:22
312:17
**helping** 141:10
**hereto** 3:5
**hereunto** 335:17
**hesitation** 143:5
**hess** 308:20
**hierarchy** 331:4
**high** 90:16
**highest** 203:4
205:5
**highlight** 94:15
94:17
**highlighted** 94:3
94:6,14 98:6,10
195:13 228:15
**highlighting**
98:12
**highlights** 98:5
**hill** 5:2
**hinge** 65:23 66:7
66:8 67:11

**hire** 16:21 44:22
95:2,5 96:9
99:23 105:15
139:5,16 143:8,9
209:25 211:3
217:23
**hired** 17:8 45:24
92:7 95:8,20
100:18 101:2,11
102:20 103:10
114:2,4 115:20
117:13 143:10
176:7
**hiring** 95:16,23
118:2 137:15
142:8 221:14
**historical** 143:19
144:6 295:12
**historically**
175:7 177:9
178:16
**history** 22:21
23:4,19 144:14
179:8 220:11,15
317:7
**hit** 156:10
**hmm** 94:21
152:23 153:8
246:21 293:23
**hold** 41:2 45:20
88:5 101:20
226:10 315:22
316:8
**holder** 192:16
**holds** 118:6
172:22
**honestly** 259:13
322:2

**hooked** 321:5,11
321:13
**hospital** 13:5
15:15 18:14,18
19:5,12,22,25
21:5,13 42:20
53:23 54:2
67:12 70:6,19,21
71:23 72:20
74:16 85:21
86:11 87:23
106:2 163:9,19
165:24 168:18
173:7 180:8
184:5 210:2
225:24 242:14
243:12 244:18
244:22 245:9,15
245:23,24
253:18 260:6
262:24 264:21
327:17 328:14
328:25 329:12
330:25
**hospital's** 64:11
65:3 260:17
261:22 322:24
**hospitals** 15:15
18:12,13 42:22
70:15 172:24
**hosted** 58:12
**hosting** 63:19
**hosts** 63:19
**hot** 71:5 168:6
**hour** 94:9 330:6
**hourly** 111:16
**hours** 78:5
293:18 294:25

295:11,11
296:17 297:3
329:22
**house** 12:11 64:4
64:11 76:11
191:21,23
192:17,23 193:2
193:4,6 196:5
197:7,9 286:12
**houses** 64:10
**hr** 93:6,14 95:13
96:5,25 99:9,10
99:11,18 100:6
118:24 119:4
145:3,4,5 213:22
216:14,19
233:10 248:25
310:21,23 314:7
314:25
**hub** 43:14,19,23
43:24
**human** 93:3
96:15 98:16,18
98:22,25 177:25
252:2
**hundred** 15:12
63:6 92:10
329:17
**hvac** 70:17 72:5
75:17 76:2,2
**hydrostatic**
196:13
**hypothetical**
96:14

**i**

**idea** 166:25
332:10

**identification**
34:19 39:2
78:19 91:20
126:20 134:17
146:4 194:21
227:17 234:2
251:20 273:3
303:16 312:10
**identified** 91:13
252:14 302:8
**identify** 303:19
**identifying** 91:4
294:2
**il** 295:9
**illustrate** 75:10
**ilsm** 293:21
296:15,16 297:7
298:3,7 299:13
**ilsms** 295:5,10
300:4,21 301:3
301:20
**imagine** 63:4
93:6 159:23
229:16 300:4
**immediate** 294:2
298:19
**immediately**
217:14 248:8
257:8 294:14
295:23
**impact** 74:23,25
75:3,11,23 76:9
76:25 77:4,11
91:9 243:15
260:9 293:16
294:6,9 295:5,10
296:16 297:7
298:2,7 299:6,13

300:21
**impacted** 75:6
245:4 260:22
324:11
**impacts** 74:6
90:13 260:14
**impair** 8:5,13
**impaired** 8:16
**impairment**
255:4 261:16,20
262:7,25 263:14
263:15 264:4,13
279:5,12
**impairments**
244:11 264:6,8
**implement**
198:10
**implications**
297:24
**implies** 286:15
**important** 5:22
80:4 96:18,23
102:3,6 151:4,11
151:24 162:9,11
230:17
**improve** 119:23
122:17 123:5,7
212:18 241:14
250:20
**improved**
122:12 287:22
288:2
**improvement**
29:21,25 30:3,17
30:21 31:6,10,16
31:24 32:10
120:4 121:13
122:15 150:15

151:14 153:20
158:4 159:10,13
161:15 165:16
166:2 235:23,25
236:2,7,9,16
237:5 250:18
284:22 285:7,9
285:14,25 286:5
286:24 304:9
310:14
**inability** 195:24
**inaccurate**
128:12,14
**inaudible** 26:23
42:24 45:12
47:17 55:23
102:21 106:4
122:7,24 131:15
228:24 229:10
254:12 268:19
318:25
**incident** 252:21
254:24 260:2
261:18,23 262:5
265:6,8
**incidents** 252:18
**include** 12:20,21
94:8 97:18
287:18
**included** 162:3
217:25 289:11
**includes** 47:24
**including** 18:22
75:19 85:24
266:15
**inclusive** 26:5
41:4

**increase** 132:18
**increased** 260:25
261:11,14
**independently**
172:23 213:7
**indicated** 83:2
83:22 84:10,23
85:9
**indirect** 86:14
**individual** 30:5
31:11 97:4
134:5 177:25
179:10 180:18
185:6
**individuals**
27:19 60:18
**inferring** 202:22
**inform** 199:9,13
**informal** 49:8
118:24 119:6
123:24 124:21
125:25
**informally** 125:6
125:9,10,17,22
126:3 164:3
**information**
36:12,16 37:3,8
39:19 41:11
43:17,22 57:2,4
57:25 60:11
61:10 99:12
102:2 129:12
165:3 179:17
182:3 217:19
228:12 231:10
295:24 326:2,25
**informational**
82:21

**informed** 115:24
204:21 218:16
249:9 255:16
**informing** 199:6
**infrastructure**
241:23
**initial** 262:2
282:13 284:5
298:3
**initially** 210:4
321:11 331:16
**initiated** 166:25
**inoperable** 67:2
**input** 168:7
247:3
**inputted** 61:8
228:12
**inputting** 326:18
**inspect** 63:10,13
258:23 298:21
302:6
**inspecting** 63:11
**inspection** 266:7
266:9 267:2
269:18,22 270:4
270:11,15,15,17
270:18 272:5
278:7 282:13,25
283:13 299:10
**inspects** 66:11
**install** 322:15
**installation**
322:8
**installed** 321:14
321:17,23 322:3
322:4,6
**installing** 322:10

**institution** 58:22
61:5 97:13
214:23
**instruct** 263:25
264:11 301:3
324:20
**instructed** 38:15
**instruction** 8:2
38:2 206:10
**instructions** 5:14
5:16 118:25
120:18 126:9
**instructs** 7:23
**insurance** 253:9
253:14 254:7
255:3,12 256:2,9
257:15,21 258:2
258:15,16 260:3
260:6 261:15,19
262:6,23 263:13
263:17 264:3,7
264:12,19
**intended** 5:14
30:22 270:9
326:9
**intention** 42:11
140:4,6,8 206:14
218:17 313:6
**inter** 54:21
**interact** 24:4,16
52:19,24 54:21
**interaction**
24:12 125:4
**interactions**
215:6
**interest** 137:3
221:11 222:10

**interested**
335:15
**interesting** 184:7
184:12
**interim** 293:22
**intern** 111:16,16
112:18
**internal** 22:4
23:10 58:11
199:10 220:24
223:24
**internally** 43:25
221:4,7,10,22
222:3
**interpretation**
97:2
**interrupt** 230:13
**interview** 157:9
222:17 223:9,13
223:22 224:5
314:20,23
**interviewed**
117:17 223:15
**interviewing**
118:2
**interviews**
140:25 141:7,11
223:17
**introduced**
224:12,18
**investigate**
315:9,13
**investigated**
23:2
**investigation**
216:18
**invitations**
236:23

**invited** 235:13
235:18 236:17
237:3,6
**involve** 96:5
190:22
**involved** 17:6,12
17:17 18:2,7
36:11 74:13
75:8,13,15 77:8
86:16,17 90:9
111:25 130:7,10
166:17,19,20
175:25 177:12
183:12 203:15
203:16 205:17
205:18,19
206:17 207:7
245:6,16 246:8
246:16 253:7
254:4
**involvement**
204:3 245:14
**irrelevant** 95:10
281:14
**islm** 293:16
**israel** 19:20
225:25 226:3,5
226:13
**issue** 48:6 54:17
60:6,9 61:16
68:18 133:9
152:22 155:5,15
155:19 164:22
165:6 180:16
193:14,16,18,20
194:2,5 212:5,7
235:25 238:24
241:14 252:5,7

252:12 263:9,9
266:13 276:24
285:18 286:4
287:21,23,24
297:13,21,25
298:24 303:24
310:19 311:16
330:21
**issued** 23:23
29:20 30:8 31:9
31:23 32:9
35:17,20 153:7
157:4 165:8
236:3 251:24
252:3 285:10
301:14 305:23
305:25 306:10
306:14 307:23
308:9 310:22,23
**issues** 55:9 74:5
75:8 114:18
115:10 119:13
119:16 142:17
144:20 156:6
163:20 164:9,11
164:12,13,16
167:13 180:13
183:20 196:10
210:5 211:7
212:10 218:10
240:18 244:17
244:20 250:10
275:23 277:16
280:11 291:17
305:17 306:4
318:12
**issuing** 104:6
156:11 168:6

310:16
**it'll** 297:22
**item** 137:12
138:22 141:2,24
160:23,24
265:10,13 286:9
286:18 287:9
288:3,7 289:9
292:8,25 293:3
317:13 325:7
328:11,19
**items** 30:24
137:2 235:3
252:14 286:6
299:3 304:15
305:10

**j**

**january** 129:8
143:24 229:9
247:25
**jason** 83:13,15
**jmf** 1:4
**job** 13:3,4 14:5
40:2,4 41:24
42:5,6 43:6,6,24
88:25 89:4 92:2
92:6,20,25 93:15
98:9,16,22,24
99:5,13 100:4
106:8 108:7,9,10
108:15,19 109:5
109:6,11,17
111:3 115:25
121:19,21,25
122:6 140:12,14
154:21 162:22
170:2 174:5

177:16 190:17
211:20 217:5,12
217:24 219:24
220:4,21 221:24
222:5,7,12,18
223:6,7,8,12
224:6 225:4
229:21,23
231:16 234:5,12
235:20 242:25
244:13 248:7
249:5 253:5
279:7 296:22
320:2,9 323:19
**jobs** 40:3
**joe** 9:21,21
15:24 17:7 20:3
21:17,22,24 22:3
24:2,18,20 28:2
28:10 29:4,20
30:8,12 35:25
45:16,20,23
48:13,16,17,19
48:20,22,23
49:11,24 50:12
51:4 73:25
81:12 89:24
92:18 114:4,7,18
115:20 118:19
119:5,9,12,18,20
120:2,15,17,24
121:14,17,19
122:11,15
123:15,19,21,24
124:21 125:5,16
126:8,13 135:12
135:15,18,20
137:5,22,24

138:5 139:10
144:8 150:14
153:11 155:11
156:9,25 157:7
160:18 161:6
162:2,15 163:9
163:12,16,24,24
164:4,12,13,13
164:16,18,19,21
164:22 165:5,6
165:15,19,22
166:17,21,22
168:10 169:14
169:19,23,24,25
170:8,11,16,16
170:22 171:9,12
172:20 173:3,7
173:10,15 174:5
175:8,10,16,17
176:7,10 177:6
177:16,20
178:10,19 179:6
179:9 185:20
186:14 187:4,14
188:10 189:3
190:6,14 194:12
197:24 198:20
199:3,6,7,16,18
199:20,22 200:7
200:8,9,12,15,21
201:21,24 202:6
202:10,15,19,22
203:3 205:6,18
205:18 207:24
208:3 209:8
210:5 211:12,25
212:18,22
213:25 214:5,15

214:18 215:2,9
215:17 216:20
216:24 217:2
218:5 220:20
224:13 235:6
236:17 237:16
238:6,10,20,25
239:15,17
240:23 241:2,7
241:24 242:12
242:15 243:10
243:13,18 244:3
244:6,15 246:7
246:10,23 247:3
248:4,15 249:8
249:17,24 250:4
250:6 251:24
252:5 253:2
254:21 255:17
256:11,16,22
257:7,12 258:10
258:13 263:21
265:17,19
266:23 267:2
268:11,17
270:22 273:14
274:11,13
276:11 277:2
278:17 279:11
280:22 281:17
282:13 284:14
286:13 287:13
289:10,11,23
290:5,6,8,9,12
292:13 296:5,12
299:22 302:24
303:22 309:16
310:5 311:3

312:20 313:8,15
313:21 314:21
316:11,11,25
317:9,18 321:3
321:23 323:16
324:25 325:16
325:23 328:12
329:9 330:7,11
330:14 332:5,6
**joe's** 26:16 27:5
27:12,17 28:18
29:10,17 30:2,4
30:21 33:2 47:3
50:9 73:6
118:21 123:4
161:17 163:10
163:12 168:22
174:9 205:9
236:20 248:25
257:2 291:13
**john** 69:10,13,13
71:21 73:12,15
171:22 172:5,17
174:11,23
175:15,21 177:4
177:12 181:2
186:11 187:6,6
187:13 258:9
**joined** 156:9
169:7 178:10,20
179:9 239:23
**joint** 56:18,18,20
57:4,25 62:5,11
62:23 63:7,9
64:15,22 211:18
241:21 266:21
**joseph** 1:6 2:3
89:24 234:11

308:15 329:3,5
336:3
**judgment**
208:12 247:16
**julie** 140:24
141:3,10
**july** 270:5,9,15
270:18 271:12
**jump** 222:15
**jumped** 190:12
**jumping** 170:4
**june** 160:19
161:6 215:15
217:8 278:22
279:17,18,24
304:11
**junior** 116:2
143:15
**jurain** 162:16
164:4,13,18,19
164:22 165:6,15
165:22 166:22
169:14,19,23
170:8,11 171:9
185:20
**justified** 320:16

**k**

**k** 87:10 89:14
**kanterman**
167:4 168:25
169:5,6,16
170:12 171:10
222:11 239:24
242:20 256:17
**keep** 7:18 43:5
104:14,16
182:10 200:5

230:22 268:24
323:4
**keeping** 289:24
**keeps** 58:15
59:25 181:10
**kevin** 73:3
**key** 76:7
**kind** 26:25 64:14
64:15 75:10
133:20 145:8,19
194:3 215:25
241:8 245:7
250:11 267:24
276:16 277:13
**kinds** 120:2
**kirschenbaum**
2:3
**knarich** 87:9
89:13,14
**knew** 125:10
144:7,14 152:23
329:11 330:15
**know** 6:15,25
7:16,16 19:18,19
19:20 20:11
22:21 23:4
24:14 28:9 32:4
34:8 35:18
39:15 41:10,13
41:14 42:12
44:20 45:6 50:2
50:11,14,19
51:17,21,25 52:3
52:9,14 55:15,21
60:25 62:22
67:7 69:7,10,14
69:18,21 72:16
74:11 76:13

77:25 79:11,17
80:14,16,21
82:20 83:3,24
85:2,12,16 88:6
88:23 89:9
91:21 93:7
95:12 100:10
101:14 104:7
108:13 109:5
110:2,3 111:10
111:12,17,20,22
113:4,15 115:12
117:23 120:2,17
126:24 130:19
133:16 135:2
137:19 138:15
139:7 145:5,20
148:15,19,24
149:5,8 150:5
151:18,18 152:2
152:5,11,14
155:11,14,19,21
162:14,15,18,21
163:15,22 165:8
165:15,18 167:4
168:14 169:10
169:13 171:6,19
175:24 178:3,7
178:13,22 183:8
183:16 185:6
188:15,16,18,24
189:21 194:22
198:15 204:2
205:7,9,17,17,18
206:19,20 208:7
208:9 209:3,8,18
210:4 214:12
216:6,13,16,22

216:23 217:4
218:9 221:5,17
223:11,24 224:3
224:23 227:6,18
229:17,18 232:4
232:7 233:19
236:12,16,22
237:9,15 241:6
242:5 245:19
246:11 248:9
250:12 253:25
254:6 256:17
257:19 258:10
258:20 259:13
260:11 261:7,8
261:10,13 262:4
262:13 264:14
267:23 268:5,10
269:7 273:4
276:11 277:8
282:12,21 283:7
283:17,18
289:18 290:18
290:20 291:9,12
299:4,19 300:13
308:15,25 309:8
312:14 313:11
313:23 317:4,24
322:3 326:23
327:5 328:24
329:3,11,16
330:11,16
**knowing**   176:7
247:17
**knowledge**
104:12 115:13
142:14 143:19
143:20 144:5,6

145:16,21
222:13 296:14
296:20
**knowledgeable**
172:20 173:9
**known**   204:24
**knows**   60:11

**l**

**l**   4:15 191:12
**labeled**   34:10
**labeling**   82:25
**lacking**   252:11
**lapse**   68:14
**large**   325:2,10
330:8
**late**   92:19
238:23 316:7
**lateral**   132:5
**lawsuit**   8:19
36:13
**lawyer**   7:10
38:15
**lawyers**   38:7
**lays**   240:19
**leadership**   11:6
74:11 90:16
100:2 257:3
**leah**   2:6 76:17
80:20 176:12
250:21 329:19
334:4
**learn**   144:11
**learned**   69:12
**leave**   42:11
204:15
**leaving**   171:9
226:16

**led**   249:5
**left**   20:5 36:2
40:6 92:18
135:18 137:24
143:24 169:3,4
170:11,20
195:18 197:4,13
225:5 296:12
303:4
**legal**   37:6 336:2
**legally**   241:9
**length**   24:21
170:13
**lengthy**   155:4,5
160:11 229:24
**letter**   127:18
128:13 129:2,5
129:11,15
130:22,23,24
131:13 132:22
194:25 196:17
201:19,21
202:19 208:25
209:7,9,14,15,19
317:22
**letter's**   202:9
**letters**   126:23
127:5
**level**   16:14,25
85:23 88:9 89:2
89:5 90:16
97:11 98:23
112:13 113:18
115:15,17,25
116:3,12,14
122:18 132:3
142:3 143:15,21
190:20 204:3

207:6 210:15
217:25 220:9
223:7 240:21
277:8 279:7
286:7 326:25
**levels** 169:12
211:22
**license** 101:25
104:6 110:6,23
152:21,22
155:23 156:17
157:2,5,11,12
192:8,15
**licenses** 103:5,6
172:22 192:13
228:17 229:20
231:19
**life** 67:19 190:15
264:8 292:9,10
293:8,9,22 294:3
294:17 297:17
**light** 333:5
**limit** 330:6 331:7
331:9
**limited** 250:5
**line** 207:19
225:10 226:15
278:16 305:12
306:3,5 334:20
336:6
**lines** 124:25
225:12
**link** 219:22,24
220:4,21
**linked** 61:18
103:25 105:14
**list** 30:24 40:25
80:11,15 81:11

83:19 94:6
97:18 107:16
228:16,21 235:6
304:24 305:3,4
306:4,21
**listed** 41:24 99:4
101:12 131:3
147:17 148:24
149:12 150:2
202:17 229:23
231:2,21 248:6
277:6
**listing** 229:5
**lists** 147:7
**litigation** 37:20
**little** 7:15 44:6
52:2 58:18 88:7
106:14 219:8
250:11,14 255:8
297:10 304:10
305:7
**littler** 2:9
**lizararo** 233:10
**lizarazo** 234:21
309:16 311:4
313:15
**llp** 2:3
**local** 50:3
**log** 295:24 308:4
**login** 307:8
**long** 13:14 22:21
23:19 52:9
69:21 149:25
153:23 156:22
189:2 204:2,14
204:16 210:19
238:14 254:16
263:19 265:25

268:3 272:2
**longer** 138:5
139:11 146:22
146:24 323:2,11
**look** 34:13 38:22
46:10 63:14
78:15 79:9,12,25
80:15 81:6,8,18
81:22 83:4,7
84:3,13 85:11
91:16 92:21
93:22 108:15,18
112:22 113:23
127:4,10 129:18
129:25 130:4,5
133:24 134:5
137:11,22 146:7
146:16 148:13
153:9 176:14
185:19 194:25
196:21 198:2
202:5 203:11
209:6,12,13
224:22 225:19
236:10 252:20
278:17 279:22
283:5,8 284:21
287:8 303:8
304:25 326:23
**looked** 36:18
110:11 131:8
222:4 226:23
250:6
**looking** 59:9
80:21 96:9
108:7,23 132:16
133:18,25 146:9
146:12 194:24

217:23 218:23
225:3,16 228:8
234:3 273:6
275:15 281:21
285:6
**looks** 40:12 41:3
77:19 80:8
81:11 82:5 83:6
83:6 85:12
91:25 112:25
129:8,23 132:6
132:11,21,22
133:3 135:11,15
136:2,6 140:21
141:14,17,19,25
146:20 147:12
147:20 203:15
204:17 225:9
226:18 228:7
231:5 234:5
269:22 270:8,14
273:13 279:24
288:3 296:25
303:21 308:12
**losing** 248:13
**lost** 41:2 153:18
255:22 278:10
**lot** 32:2,17 80:7
125:4 137:18
142:16 144:10
164:7,8,8,9
166:11,16
169:11,21 170:4
170:7 171:4,17
171:20 180:13
208:10 209:4
245:10 300:8,10
300:13 325:22

327:12

**loud** 7:18

**low** 7:15

**lower** 16:14
112:13,14
113:18 116:14
143:21 220:9

**lunch** 176:20

**lund** 191:8,11
197:15 199:14
200:10,13,18
203:7

**m**

**m** 4:15 6:1 7:1
8:1 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1

77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1
103:1 104:1
105:1 106:1
107:1 108:1
109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
119:1 120:1
121:1 122:1
123:1 124:1
125:1 126:1
127:1 128:1
129:1 130:1
131:1 132:1
133:1 134:1
135:1 136:1
137:1 138:1
139:1 140:1
141:1 142:1
143:1 144:1
145:1 146:1
147:1 148:1
149:1 150:1
151:1 152:1
153:1 154:1
155:1 156:1
157:1 158:1
159:1 160:1

161:1 162:1
163:1 164:1
165:1 166:1
167:1 168:1
169:1 170:1
171:1 172:1
173:1 174:1
175:1 176:1
177:1 178:1
179:1 180:1
181:1 182:1
183:1 184:1
185:1 186:1
187:1 188:1
189:1 190:1
191:1 192:1
193:1 194:1
195:1 196:1
197:1 198:1
199:1 200:1
201:1 202:1
203:1 204:1
205:1 206:1
207:1 208:1
209:1 210:1
211:1 212:1
213:1 214:1
215:1 216:1
217:1 218:1
219:1 220:1
221:1 222:1
223:1 224:1
225:1 226:1
227:1 228:1
229:1 230:1
231:1 232:1
233:1 234:1
235:1 236:1

237:1 238:1
239:1 240:1
241:1 242:1
243:1 244:1
245:1 246:1
247:1 248:1
249:1 250:1
251:1 252:1
253:1 254:1
255:1 256:1
257:1 258:1
259:1 260:1
261:1 262:1
263:1 264:1
265:1 266:1
267:1 268:1
269:1 270:1
271:1 272:1
273:1 274:1
275:1 276:1
277:1 278:1
279:1 280:1
281:1 282:1
283:1 284:1
285:1 286:1
287:1 288:1
289:1 290:1
291:1 292:1
293:1 294:1
295:1 296:1
297:1 298:1
299:1 300:1
301:1 302:1
303:1 304:1
305:1 306:1
307:1 308:1
309:1 310:1
311:1 312:1

313:1 314:1
315:1 316:1
317:1 318:1
319:1 320:1
321:1 322:1
323:1 324:1
325:1 326:1
327:1 328:1
329:1 330:1
331:1 332:1
333:1
**mail**   24:8,15
33:18 36:18
162:5 206:4,13
207:7,16 208:7,9
209:4 220:20
295:23 312:2
318:7
**mailed**   34:4 35:3
119:20 219:23
303:10
**mails**   25:5,9,10
25:13 32:20
33:15 34:3,9
36:24 37:13
38:22 209:5
**main**   71:4
**maintain**   230:15
**maintains**
101:18
**maintenance**
57:23 59:6,7,18
59:23 60:2,4,10
62:13 90:7,20
91:6 106:11,18
173:23 177:5,22
178:11 179:6,22
180:19 181:20

182:24 183:13
184:14 185:22
188:12 190:10
286:11 287:3
300:11 304:7
305:21
**making**   110:20
132:11 145:14
189:13 215:23
273:10 293:5
**manage**   120:12
169:14 170:8,10
175:9 189:23
190:7,9 198:23
199:3 203:6
236:20 244:6,10
267:8 272:7
325:3
**manageable**
166:15
**managed**   104:18
170:15 172:23
174:24 175:5
177:21 178:15
178:25 179:4,25
180:9,11 184:19
197:23 202:6
**management**
11:10,14 19:8,10
39:11 72:3,4
85:23 128:5
141:21 184:22
186:16 238:2
274:5 301:25
**manager**   14:3,22
16:14 17:4 21:2
23:20 29:2
45:10,11 47:3,3

59:10,18 63:23
66:14,14 67:16
68:7 71:18 76:2
102:7 107:18
112:10,21 113:7
113:19 114:22
114:24 115:9,20
116:7,16,21,23
117:10 118:15
120:16,25
127:21 128:18
128:21 131:24
132:3 137:13,15
138:18,23,24
139:6,13 140:5,7
140:23 141:15
143:12 162:11
162:23 163:6
190:18 193:23
194:10 197:24
200:5 203:4
221:14 226:4,20
239:5,14 240:21
242:24 243:4,17
252:10 255:15
299:16 301:11
307:6 310:24
325:16 326:4
330:23 331:2,12
331:15
**manager's**   59:12
60:22 120:13
200:24
**managerial**   30:7
115:14 143:9
**managers**   11:5
56:11 72:13,17
77:7 118:9

141:9 170:24
171:5 173:22
202:15 230:18
238:11 239:9,19
239:23 243:11
289:23 291:8,11
291:20,22
299:23 306:22
308:23
**manages**   42:21
110:22,24
197:19 199:6
**managing**   71:23
102:10,12 168:5
169:20 171:2
177:12,14,15
178:11,22 179:5
179:10 180:19
181:20 182:5,24
183:16 184:13
185:6,21 186:2,8
186:21 188:12
201:18 202:23
204:25 205:4,8
205:10 239:15
239:18,21 272:3
**manner**   296:23
**manpower**   201:5
**march**   46:14
51:19 225:20
278:8
**margins**   195:6
**mario**   87:5,6
140:24 141:4,10
**mark**   134:12,14
145:24 251:16
272:23 312:7

marked   34:17
38:24 78:17
91:18 126:18
134:15,20 146:2
194:19 227:15
233:24 251:18
272:25 303:14
312:8
marking   194:16
227:13 233:21
303:12
marriage   335:14
marshal   87:17
87:18 88:13
89:5 243:21
325:3
marshals   19:24
20:11 85:25
86:6 87:13,15,16
87:25 88:23
168:4 169:15,20
170:9,11 171:2
224:18 239:2,11
239:16,21
242:17,19 243:3
243:9,19 246:13
299:18,19
302:10
masks   245:20
master   192:7,14
192:15
material   92:24
math   140:18
matt   17:14 49:13
49:16 86:3,24,25
105:22 107:25
108:10 109:23
110:18 111:9,13

111:15 113:12
114:8,11,17
118:2 119:6,10
119:10,13,21,22
120:4,18,19,25
121:14,14,18,20
121:25 123:16
123:25 124:22
125:6,9,11,17
126:3,9,10,14,23
127:5 129:6
130:15 131:19
141:22 142:2,8
142:13,22 143:2
143:10,22
144:14,20 146:8
146:16 147:8
148:15 163:13
164:6 169:22
170:19 178:6
185:16 202:16
205:17 207:20
207:24 220:12
228:9 264:9
296:21 318:8
matter   11:7
93:12 178:24
263:18,19 268:6
335:16
matters   253:5
matthew   2:12
48:16 201:11
207:15
mean   26:10
35:20 54:24
75:3,10 79:13
102:11 106:16
109:3 125:10,22

125:25 131:5
138:23 155:20
170:14,25
171:24 172:3
179:7,8 182:10
212:6 214:21
230:13 245:6
277:18 280:16
290:3 291:25
292:13 310:8
316:2,3 319:9
321:13 331:14
meaning   116:6
159:19 259:9,10
305:10 321:10
321:14
means   65:12,19
70:24 141:2,12
141:24 260:15
277:19 281:8
292:17 293:19
meant   27:8
164:15 175:10
measure   59:17
293:22 304:23
measures   288:19
294:8,21
mechanical   10:8
medical   72:6
73:21 74:6,15,20
74:23 77:3,12
90:10
medications   8:5
8:13
medicine   21:3
308:19
meet   62:21 76:5
159:14 212:20

214:18 249:10
311:14 316:11
meeting   25:6,11
26:7 27:17
28:12,16,23
55:12 115:11
135:17 136:14
138:7,10,11,15
142:5 164:19
213:3,11 214:16
218:22 236:22
238:4,6,8,19
274:14 277:5
279:3,13,15,16
279:25 287:13
291:6 292:3,24
310:14 313:16
313:18 314:5
315:22
meetings   25:23
27:20 32:13
90:11,16 125:3
125:23 135:13
136:24 137:6
161:25 215:9
218:8 235:7,10
235:13,17 236:2
236:17 237:2,6
237:10,14
238:11,21
273:15 287:9,14
291:9
meets   289:12
melissa   1:20
5:12 6:20 38:11
124:11 134:10
187:22 191:18
335:4,22

**member** 127:21
**members** 168:8
**memorize** 79:16
**memory** 8:13,16
   182:11 309:19
   312:4,18
**men** 197:4 198:9
   207:12
**mendelson** 2:9
**mention** 151:16
   153:15
**mentioned** 14:16
   18:11,13 37:12
   44:4 45:18
   49:10 103:7
   105:17 115:7
   118:12,17
   151:21 158:6
   174:4 180:23
   195:2 209:9
   248:20 314:2
   323:22 332:2
**met** 95:12 119:7
   201:11,15 214:6
   293:13
**method** 65:9
   211:8
**methods** 241:10
**michael** 1:9,16
   4:8,23 127:23
   129:4 136:8
   333:13 334:4
   336:5,20
**micromanaging**
   289:7
**middle** 306:24
   307:21

**mike** 34:5 37:18
   124:9 152:18
   159:2 181:14
   182:7 206:4
   230:5 312:12
   330:15
**million** 15:11,12
   15:13
**mind** 38:12
   58:17 172:25
   186:23 187:23
   202:10 210:16
   221:20 227:9
   248:9 249:12,20
   273:22
**mine** 225:13
**minimum** 55:7
**minute** 76:20
   81:22 182:12
   209:6 303:3
**minutes** 78:7,8
   133:8 135:5
   251:5,6 330:2
**mirrored** 14:8
**mismanagement**
   170:7
**missed** 25:8
   161:7 285:2
   287:14 291:18
   311:5 322:18
**misses** 145:16
**missing** 309:17
   309:23
**misspoke** 283:25
**mixed** 219:10
**mm** 94:21
   152:23 153:8
   293:23

**modes** 52:2
**modified** 60:13
**moment** 46:9
   68:12 81:3
   124:14 133:13
   176:17 187:24
   188:6 224:22
**monday** 196:24
   197:4 333:8
**monitor** 325:2
   325:17 328:21
   331:8,23,25
**monitoring**
   203:23
**monitors** 325:10
   326:9 328:20,22
**month** 52:23
   60:6,7,8 188:23
   217:8 224:10
   249:14 287:5
   288:9,12,15,16
   288:25 289:3
   300:10 306:10
   306:11,24,24,25
   307:4,25 308:2
   309:9 316:23
   317:15
**monthly** 215:13
**months** 13:22
   15:2 47:11 50:7
   50:8 51:10,16
   158:23 159:21
   160:6,20 179:9
   189:5,20 215:15
   215:24 268:7,9
   289:14,19
   306:15 317:3,9

**moot** 96:2
**morning** 34:3
   295:20 329:20
**mount** 13:5,10
   14:13 15:15,15
   18:14,14,17,24
   19:4,11,14,20,25
   20:10 21:10,13
   37:6 53:22,25
   54:3,4,6,8 55:13
   56:5 70:6,18,21
   71:23 72:20
   74:16 81:19
   85:20 86:11
   87:23 90:10
   106:2 115:2
   117:6 162:24
   163:5,8,18
   165:21 168:4,18
   197:10,10,19
   198:12 210:2
   225:23 226:12
   240:16 242:13
   253:18 260:6
   320:17,22
   322:24 327:16
   328:13,25
   329:12 330:25
**move** 96:5
   115:24 131:23
   132:5 156:5
   164:25 165:2
   182:13 315:3
   317:16
**moved** 83:11
   115:19 116:15
   116:20 117:7
   118:13 132:13

180:25 184:22
186:10
**moving** 97:5
210:22
**multiple** 25:5,9
25:10 33:15
47:23 48:15,17
48:18,20,21,23
98:4 172:23
188:15 204:18
204:22 211:20
211:22 213:9
237:11 279:20
283:16 331:11
331:14
**multiples** 300:16
**murphy** 44:25

**n**

**n** 191:12 334:2
**name** 4:21 11:16
22:14 44:10
49:21 83:21
84:10,21 85:8
89:12,23,24
101:7 193:11
197:24 200:6,6,7
200:7 225:6,10
226:7,24 234:9
336:3,5
**named** 23:13
83:13 87:5,9
89:10
**names** 18:7 40:5
49:9 80:12
225:4,18
**narrow** 181:4

**native** 80:25
84:22 225:16
**naturally** 156:2
**near** 93:23
195:19 274:17
275:19 278:2
**necessarily**
62:22 93:6
94:22 131:5
233:15
**necessary** 111:3
200:2 204:9
332:19
**necessitate** 88:14
**need** 4:3 6:24 7:3
9:24 27:11 55:9
68:8 88:24
120:6 139:25
184:11 187:13
201:2,3 266:20
276:21,24 277:3
319:6,10,11,17
319:25 320:8,12
320:15 323:11
329:7
**needed** 16:16
24:7,10 26:2
48:10 52:21
54:19 55:9
56:12 66:19
74:14 119:22,23
173:18 175:19
210:24 233:13
238:21 276:4
298:19 331:23
332:3,7
**needs** 58:15 60:3
60:12,13,14

61:13,13,14,16
68:10 91:13
103:25 119:16
126:13 173:23
247:2 271:16
276:7,8 293:25
294:5 306:17
319:19 328:11
**negative** 65:2
**negatively** 75:5
260:8,22
**neglect** 253:5,6
**neglected** 253:13
254:7
**negligence**
263:10
**neither** 320:8
**never** 119:20
153:16 156:25
210:21 255:15
262:7 280:25
281:3 291:13
296:15
**new** 1:3,22 2:5,5
2:11,11 14:25
16:21 37:22
44:12,16 45:9
46:19,23 50:3,24
58:21 101:7
114:2,25 115:4
117:5,8,13 118:3
145:2 149:11
152:12 156:7
157:4 170:5
192:12 207:13
224:13,19
239:23 240:15
240:16,22 241:7

241:8 243:2,9
245:7 247:6,7,17
250:13 255:11
256:10,25 257:4
257:14,22,23
258:3 259:11
263:8 278:5
293:5 296:20
328:11 335:5
**newer** 12:10
**newly** 116:16,21
117:3,4,4 153:6
153:6
**news** 324:3,5,9
324:11,14
**nfpa** 94:10
**nice** 7:18
**nine** 140:18
144:10 209:15
241:6 278:2,12
**nodding** 6:3
**nods** 5:24
**noon** 77:23
**nope** 227:8
**notary** 1:21 3:14
4:17 333:18
335:4 336:24
**notate** 27:10
**note** 80:5 150:12
274:17
**noted** 64:17
65:15 66:8
266:4,5 286:6
333:9
**notes** 26:4,14,14
26:18,21 27:4,7
43:15 133:22
136:19,23 139:6

195:5,8,19
223:19 273:17
277:6 279:18,24
**notice** 1:23
**noticed** 301:10
**noticing** 285:13
**notification**
221:23 256:5
295:20 296:3,7
307:5
**notifications**
207:17 221:25
296:12 298:14
**notified** 200:12
259:8 261:15
306:18
**notifies** 200:15
**notify** 200:25
253:9 255:3,12
259:23 306:17
**notifying** 255:25
258:4 259:2,24
263:16
**november**
141:22 206:3
207:11 209:3
270:6,10,12,19
271:13 272:14
272:14 273:25
274:3
**nowicki** 15:25
17:19 73:8,14,14
115:6 117:15,16
128:8,22 130:13
130:15 131:9,25
238:2 319:22
**nowicki's** 74:2

**number** 5:19
20:17 28:13
34:11 45:4
48:14,24 57:8
58:24 61:7,8
65:15 76:15
79:4,6,23,24
81:2,17 82:24
83:20 84:21
85:8 88:8 90:13
90:15 109:12
127:14 132:25
141:19 145:9
172:22 183:10
205:24 207:10
237:13 252:22
291:16 297:16
297:22 298:5
305:4 306:3
308:7
**numbered** 83:5
84:8 201:13
225:13,13
**numbers** 126:22
306:2
**numerous** 79:2
**nuñez** 86:3 87:4
90:2 92:6,16
95:20 100:18
102:19 107:19
107:21 109:18
136:9,14 137:14
139:21 180:22
211:11 223:10
223:22 224:12
224:17 226:11
228:5 286:25
288:23 293:8

309:16 314:17
315:6
**nuñez's** 86:18
92:22 225:6
**nyfd** 206:6,21

**o**

**o** 4:15 185:20
**oath** 6:8
**object** 7:22
272:9
**objection** 17:9
18:19 19:3,16
25:3,20 27:14
28:6 29:6 30:19
32:16 37:17
39:23 41:19
42:14 43:20
46:16,24 49:6,12
50:17 53:7 55:4
56:22 57:16
59:20 62:6 64:6
64:19 65:5
66:23 68:3,22
93:9,17 96:11,20
97:24 98:13,21
99:6,24 104:15
104:22 105:4,16
106:19 107:24
108:16 110:10
110:16 111:4
112:7 116:19,24
117:21 119:24
120:11 121:11
121:22 122:23
123:11 124:2
125:12,19
128:23 129:9,16

131:21 132:14
138:8 139:18
140:3 142:24
144:3,17 146:10
148:10 149:17
149:23 151:8
152:17 153:3,4
153:14 155:17
156:3 157:19
158:16,25 159:2
159:16 160:14
161:2,21 162:10
169:17 172:2,8
172:15 173:25
176:2 179:12
181:6,23 183:2
183:18,25
184:25 185:8,25
186:9,17 187:16
190:8,13 192:20
193:13,17
197:22 198:24
202:8,25 203:14
203:24 205:2,12
206:11 207:3
208:19 209:20
210:20 220:6,13
221:2 222:2,23
228:6 236:19
240:13 241:17
243:24 244:23
246:20 247:19
249:2 253:22
262:10 264:23
266:11 267:10
267:19 269:2,13
272:9 279:14
280:18 281:5,25

283:15 285:17
286:21 292:16
297:5 299:25
300:6 301:5,22
301:23 302:16
302:22 311:8
316:16,20 319:8
320:14 321:6,12
321:18,25
322:20 324:6,13
325:5 327:11,25
328:15 329:4,14
330:13
**objections** 3:9
**objects** 7:25
**obligation** 6:9
315:13
**observe** 261:22
263:4,7
**observed** 262:7
262:24
**obtain** 105:8
158:9 161:8
233:7
**obviously**
151:21 177:10
213:5 314:20
**occasions** 48:16
48:17,19,20,22
48:23 279:21
**occupancy** 299:5
**occur** 199:11
201:4 207:5
242:6 272:8
**occurred** 32:18
185:4 188:15,16
245:11 257:23
265:6 272:13

**occurrence**
216:25 255:7,8
255:10
**occurring** 204:5
**occurs** 51:10
**october** 46:2,7,8
46:12 51:18
136:7 138:7
147:18 178:19
210:9,10 231:6
231:25 232:6
**odd** 222:14
**offer** 126:22
127:5,19 128:5
129:2,5,10
132:16,22 224:6
**offered** 17:14
**offers** 132:18
**office** 53:16,17
53:19 101:17,18
104:19 213:5
318:24 319:7,15
319:23 320:5,7
322:16 323:17
**offices** 321:21
**official** 324:22
**offline** 253:15
259:7
**oh** 6:5 77:24
83:12 128:10
158:22 225:15
225:15 226:7
227:10 318:23
**okay** 5:9 6:5
10:3 12:5 13:14
14:4,23 15:4
16:4,17 17:6
18:11,16,24

20:16 21:15
23:9 24:18,24
32:7,24 33:17,23
34:6 35:7 39:14
44:4 47:2 51:25
54:10,20 55:11
55:18 58:3 62:2
63:3 64:14
69:17 70:20
73:13,24 77:14
79:17,18 80:10
81:13,16 82:2,13
83:12,18 84:7,19
85:6,17 86:18
91:23,23 92:11
92:16,20 101:5
101:10 105:22
111:8 112:16
124:20 126:16
130:21 132:6
133:4,18,19
135:4,6,7,8,22
136:4 137:11
140:17 141:18
144:21 145:22
146:18 147:2
149:6,20 150:11
150:14 156:5
157:14 162:14
163:17 168:14
169:2,6 176:11
176:16 177:20
182:19 184:11
184:20 186:13
188:8 191:17
192:3 193:9,19
197:19 200:23
212:25 224:25

226:6,22 227:20
227:21 228:14
234:17 248:13
249:21 251:4,8
251:14,15 252:4
252:13 257:4
260:2 272:19
273:16 275:14
277:10 278:14
284:21 285:4,5
285:13 288:21
292:7 298:20
303:6,17 304:12
312:6,11,13,16
318:10,16,23
319:22 330:3
332:15
**old** 21:15 101:3
162:19
**older** 323:4
**olympic** 274:24
**omelfi** 15:25
44:25 168:15
239:24
**onboarded**
243:2,9
**onboarding**
240:7,9 250:13
**once** 51:10 55:7
67:11 99:9
152:24 181:18
204:23 294:17
298:11 306:3
**ones** 26:15 108:5
110:5 153:8
**ongoing** 39:10
41:17 219:17
238:23 287:16

287:21
**online** 222:5
**open** 38:23
39:12 40:15,18
126:17 133:15
133:17 145:22
224:24 225:21
227:19,20
233:18,20
251:12,14
295:17 306:22
309:8
**opened** 216:18
216:20 267:14
**opening** 98:15
221:11 227:2
**openings** 40:4
43:25 89:4
225:4
**operable** 66:3
**operate** 66:4
74:8
**operating** 241:6
**operational**
15:13
**operationalize**
326:17
**operationally**
131:6 142:15
**operations** 13:13
13:21,24 20:25
70:18 168:5
**operative** 321:15
**opinion** 17:5
267:18 315:4
**opportunities**
51:13 114:19

**opposed** 108:22
143:11 179:22
**opt** 221:24
**opted** 286:4
**oral** 5:23 26:11
126:7
**orange** 276:5,12
276:20
**order** 58:24
59:19 65:16,17
66:21 67:9,18,21
68:9 102:15
123:18 200:2
201:6 218:18
246:11 266:16
269:9 273:22
275:25 276:22
278:4 280:4
287:25 294:2,14
294:17,23
297:13,15,16,17
297:19,21,22
298:4,4,13 304:6
304:13,22 306:9
306:14 307:15
308:12 329:7,8
**ordered** 69:3
276:5
**ordering** 332:20
**orders** 12:7 59:2
60:9 63:22
90:13 244:6
267:22 270:20
270:23 271:19
281:10 292:9
293:5,9 295:21
296:19,20 307:9
307:11 329:6,17

**ordinary** 245:12
**org** 78:21 79:10
79:22 84:3,25
85:10
**organization**
13:9 82:19
112:22 113:24
131:7
**organizations**
14:11 245:9
**organized**
225:19 273:21
**organizer** 237:7
**orientation**
240:14,22
**orienting** 240:2
**original** 297:12
298:12 332:22
**originally** 270:5
**osha** 94:9
**outbreak** 245:8
**outcome** 218:12
335:15
**outline** 57:9
**outmatch** 144:23
**outside** 114:20
213:6,7 307:5
**overall** 30:6,10
31:12
**overlap** 111:11
**overnight**
297:19
**oversaw** 74:5
**oversee** 18:12
19:8,19 56:8
70:12 106:24
184:6 235:4

**overseeing** 168:3
**oversees** 56:4
70:13,17 72:2
86:14 90:5
106:10,16
112:15 308:20
**oversight** 14:9
15:10 21:10
71:13 75:18,21
77:13
**overview** 32:22

**p**

**p.c.** 2:9
**p.m.** 176:21,21
333:9
**page** 5:17 39:14
39:16,19 40:12
40:17,21 80:21
81:16 82:3,3,4
82:23 83:4,19,25
84:8,8,12,20,24
85:7 93:23,25
127:12 129:3
132:21,24 135:4
135:23,25 136:2
140:21 141:19
141:20,20
146:19 147:3,3,7
147:9,22 196:21
198:2,3 201:7,7
205:20,21,22
209:15 227:22
227:22 228:2,15
228:21 234:8
242:4 273:24,24
273:24 274:17
275:16,16,20

277:10,11 278:2
278:11,12,21
279:23 284:23
285:7,8 304:4,5
304:18 305:3
308:11,12 334:3
334:8,20 336:6
**pages** 79:2,3,13
133:24 134:6
146:15,15 328:2
**pandemic** 46:23
244:15,18
**paragraph** 97:22
195:12,17
196:22 198:3
201:9,14 205:23
207:9 252:21
253:3 278:25
**park** 245:10,15
245:24
**part** 18:25 19:21
25:8 30:16
36:12 37:23
41:25 56:15
62:2,4,4 64:23
66:24,24,25 67:4
67:7,25 68:6
74:15,20 79:5,7
80:12,14 81:3
82:14 86:10
97:7 107:10,15
117:25 138:6
174:5,9 195:12
198:19 203:19
235:7 236:2,6
244:8 270:17
**partially** 121:15

**participants**
136:8
**participate**
44:13 45:6,17
51:5
**participated**
44:21
**participates** 11:3
**particular** 61:18
62:23 66:10
75:23 103:13
193:10 201:19
265:16
**parties** 3:5 4:4
200:2,25 335:13
**parts** 61:22
275:25 276:5,22
278:4 311:15
**party** 8:18 315:4
**pasquarello** 1:6
9:21 15:6,24
17:8 21:17 22:3
24:2,20 30:8
35:25 45:16,24
73:25 114:4,7,18
115:21 118:20
119:5 120:16,24
124:21 125:16
126:8,13 137:6
139:10 144:8
150:15 153:12
161:7 163:24
164:16,21 165:6
166:17,21
168:11 169:24
169:25 170:16
170:17 172:21
173:7,10 175:16

178:10,20 179:7
179:9 187:4,14
188:10 189:3
198:20 199:3,7
199:16,20,23
200:15,22
201:22,25 202:7
202:10,20,22
203:3 205:6,19
207:25 208:3
209:8 211:13
212:2 214:2,5
215:2,9 216:20
216:24 220:20
224:13 232:22
233:3 234:11
235:6 240:23
241:2 244:16
246:23 247:4
248:4 249:8,17
249:25 251:24
253:2 258:10,13
263:21 284:14
285:10 296:12
303:23 308:15
309:17 311:4
317:19 321:3
323:16 325:2
328:12 336:3
**pasquarello's**
14:18,22 21:22
24:19 72:24
81:12 122:12
155:12 174:5
177:6,16,21
186:15 190:6,15
210:5 212:22
215:17 217:3

256:11 296:6
321:24
**pass** 223:2
233:13
**passed** 154:18
154:19
**passes** 223:4
**passing** 103:23
**pat** 233:10
309:16 311:4
313:14
**path** 116:13
184:16 289:16
**patty** 313:20
314:7,11
**pay** 322:7,9,10
**penalties** 6:11
**pending** 7:4,12
**people** 11:8,10
27:23 28:4,15
32:6 40:5 43:14
43:19,23,24 45:4
48:14 49:4 72:9
72:21,23 73:7
86:16 93:5
99:20 102:8
106:23 143:20
143:21 170:4
171:15 174:3
180:13,15
185:24 186:4
192:24 193:4,6
197:16 220:10
225:5 230:19
237:12,15,23
246:4 290:17
292:5,5 296:10
300:25 308:13

308:14,14,16,17
309:21
**percent** 63:6
92:10 143:4
**perception** 29:9
**perez** 41:9
101:17,20
104:18 110:22
111:7 217:14,19
229:20 231:9
**perform** 26:16
115:14,16
116:12 126:11
191:24 198:14
305:8 323:18
326:13
**performance**
16:5,10 23:5,7
24:19,21 25:2,19
25:24 26:20
27:5,13,13,17,19
28:25 29:10,21
29:24 30:2,3,5,6
30:9,10,17,21
31:10,12,12,24
32:9,11,15,23
33:2,8,11 65:3
104:25 107:22
119:11,13
122:12 123:21
124:23 125:24
130:16,19
150:15 151:13
153:19 155:15
160:24 163:18
163:21 164:23
165:16,25 210:6
212:11,23

215:18 217:3
219:18 220:11
220:16,18
248:16 249:18
252:10 265:11
284:22 285:7,9
285:14,15 286:3
286:5,18 287:15
287:17
**performed** 60:15
62:17 64:3,11
122:18 160:25
179:22 191:25
270:5
**performing**
116:23 117:9
118:14,18 220:9
250:8
**period** 16:2
25:15 32:3
40:22 135:14
137:18 153:23
156:2,13 169:10
170:25 171:7,8
171:11,13
180:12 182:12
184:20 220:17
264:14 265:24
284:4 295:8
300:7
**periods** 239:13
**perjury** 6:11
**permanent**
294:13
**permits** 168:6
**persaud** 87:6
**person** 23:19
24:4,12 49:14,17

49:20 50:5
52:20,24,25
53:15 61:24
75:7 93:6 95:9
101:17 140:11
140:14 141:6
143:17,18
171:12 180:18
193:10 203:5,8
203:12 205:5
254:6,10,11,11
292:2 314:2
330:19 331:18
**personal** 9:14
114:17
**personalities**
145:18
**personality**
145:8
**personally** 51:21
109:3 171:17
237:16 291:7
295:15 300:22
**personnel** 146:7
195:25 228:4
**persons** 143:16
**perspective**
104:24
**perusing** 46:11
79:18
**phase** 274:6,7
275:25
**phone** 24:6
54:22 55:3,6
**phonetic** 5:7,7,8
23:14
**physical** 299:9

**physically** 90:22
299:8 302:6
**piece** 61:12
170:17 302:7
308:21
**pieces** 103:23
**pinpoint** 184:24
188:14
**pip** 30:9 160:18
165:6,8,12 233:6
251:3 296:24
317:11
**place** 1:19 4:3
148:7 213:4
214:14 243:20
257:14 259:6,11
270:22 292:19
295:25 296:5
302:3 313:7
315:11
**placed** 313:4
**places** 24:25
25:17 226:24
**plaintiff** 1:7 2:4
4:13 9:20,21
14:11
**plaintiff's** 34:18
36:17 37:9
38:25 78:18
91:19 126:19
134:16 146:3
194:20 227:16
233:25 251:19
273:2 303:15
312:9 334:8
**plan** 29:21,25
30:3,17,22 31:6
31:10,16,24

32:10 120:4
150:16 151:14
153:20 155:16
158:4 159:10,13
160:24 161:15
164:23 165:17
166:2,6 189:7
235:23,25 236:3
236:7,9,11,16
237:5 284:22
285:7,9,15,16,21
285:23,24,25
286:5,18 287:17
304:9 310:15
311:15 312:25
317:2
**planned** 290:18
**plans** 274:18
285:19
**plant** 69:20 70:3
70:16,16,17,22
71:2,3,3,16
73:23 178:8,15
179:22 180:6,25
182:23 184:23
186:6,10
**plants** 70:13
**platform** 63:17
63:19 69:5
173:22
**play** 117:25
**please** 4:21,24
6:15,25 7:5 9:23
38:9 77:17
124:15 127:9
129:21 133:13
187:25 188:6
228:16 265:2

273:23 332:12
333:4
**plenty** 286:23
288:5 296:18
**plugged** 61:10
**plumber** 192:5
192:14 194:6,7,9
**plumber's**
195:24
**plumbers** 196:5
196:25 197:5,7,9
197:11,17,20,23
198:23 199:3,7
199:10,12,19
**plumbing** 60:21
71:12,15,18 72:7
89:19 194:2,5,10
197:24 198:9,12
199:15 200:4
**plus** 97:12 305:9
**pm** 304:20 306:5
**pms** 61:13
306:22
**po** 67:6,9
**point** 26:9 35:14
78:25 80:3,18
81:9 82:11 83:9
83:16 84:4 85:4
85:14 96:2
116:3 118:21
129:11 138:21
140:14,15,24
143:6,14 149:14
149:18 159:23
166:4 169:21
170:9 177:6
178:7 199:10
203:3 204:13

209:9 210:7,8
211:6 214:19
248:15 249:24
250:20 255:15
255:24 264:19
270:20 271:10
271:13 274:19
274:20 279:2
315:19 321:23
326:4,5 329:22
330:4
**points** 271:11
**policies** 240:25
241:4,9,15,22,23
241:24
**policy** 219:5
241:18,19,20
327:18,22
**poor** 218:12
219:17 220:11
220:16,17
271:18 301:25
**portrayal** 80:2
81:19,23
**position** 111:13
112:14 113:5,19
113:20 114:12
114:15,25 115:3
115:5 116:4,5,7
116:8,14 117:5
127:20 128:15
128:17 131:24
132:4 142:3
153:12 163:4
165:21 219:12
220:23 221:4,20
225:21 226:2,13
226:16,17,19

227:3 228:17
253:21 279:5,12
290:22
**positions** 13:15
20:3 39:12 40:6
40:13,15,18 41:5
43:16 132:13
137:13,14,16
138:23,24 139:6
139:13 140:22
140:23 141:15
141:21 225:5
**possessed** 147:8
**possible** 33:18
33:25 44:16
121:19 131:2
206:16 207:5
208:16 322:4,5
324:10,15
**post** 217:5 221:9
**posted** 40:4,15
41:5 42:5,7
43:25 217:13,15
218:4 220:23
221:3,4,6,17,18
221:20,22 222:3
223:12
**posting** 217:9,12
218:2 219:24
220:5,21 221:24
**postings** 43:6
222:5
**potential** 40:19
**potentially** 36:6
75:15
**practical** 154:20
**pre** 307:18

**predated**  249:16
**predates**  226:22
**predecessor**
  163:11,12
**predecessors**
  101:22 140:9
**preferred**  94:16
  94:19,20 95:11
  96:23 97:3,14,21
  98:6 100:2
  108:21 229:25
**preliminary**
  9:19
**premium**  260:4
**premiums**  260:8
  260:9,15 261:9
  261:11
**prep**  8:25
**preparation**  9:3
**prepare**  8:23
  63:3
**prepared**  198:17
  198:18 199:21
**presence**  54:18
**present**  62:8
  85:19 247:22
  261:20 299:11
**presented**  62:5
  78:22 98:10
  129:6 161:10
  241:21 277:7,24
**presents**  90:12
**president**  100:14
**presume**  130:2,6
  291:13,15
  313:22
**preventative**
  57:22 59:5,7,17

59:17,23,25 60:4
  60:10 62:12
  286:11 287:3
  300:10 304:6
  305:21
**preventive**
  288:19 304:23
**previous**  33:21
  60:7 73:15
  82:10 144:20
  167:19 182:3
  188:3 207:17
  212:4 218:10
  226:8 254:23
  261:18 274:16
  275:15 288:9,24
  308:2 318:20
**previously**  73:16
  99:17 115:2
  117:6 128:6
  207:14 210:9
  214:24 241:5
  253:23 255:6,9
  257:20 258:24
  262:25 283:23
  285:22
**price**  67:5
  325:13 332:2
**primarily**  145:3
  168:2 170:8
**primary**  75:7
**printed**  80:6
**prior**  13:23 32:5
  69:24 81:12
  85:15 113:5
  152:24 158:11
  158:12 159:13
  163:4 172:24

177:20 184:18
  206:5 208:21
  209:2 212:2
  236:13,15 249:8
  255:18 256:18
  256:22 257:5,6
  257:24 258:2
  260:17 289:12
  298:22 311:25
  322:6
**prioritization**
  218:20
**prioritize**  121:4
**priority**  149:21
  183:19,21
**probably**  26:6
  34:8 49:17
  83:10 104:8
  168:24 170:17
  188:16 202:16
  202:17,18
  204:23 211:5
  215:12 217:7,7
  244:14 259:12
  259:21 268:9
  284:14 299:17
  300:24 306:25
  323:9
**problem**  64:16
  65:19 104:21,23
  104:25 105:10
  105:12,20
  123:19 157:10
  157:15
**problematic**
  64:17,25 65:10
**problems**  74:6
  164:17

**procedure**  1:23
  221:12 242:3
  255:11 256:3,6
  256:10,15,21,25
  257:2,5,14,22,23
  258:3 259:2,5,11
  261:3 263:11
  265:19 266:15
  270:21 271:7,10
  271:12 292:12
  292:18,18
**procedures**
  240:19,25 241:9
  241:15 242:7
  255:25
**proceed**  314:14
**process**  36:13
  65:18 67:8
  75:16 103:19
  105:18 110:23
  155:3 160:12
  240:7,9 256:5
  269:8 271:22
  272:3 281:3
  302:3,11,14
  307:6 325:14,15
  326:12
**produce**  98:14
  109:21
**produced**  25:14
  26:22 33:11
  78:21 80:24
  84:22 100:6
  109:8,9,10,19
  126:23 139:3,3
  150:9,10 152:9
  165:13,14
  213:17 257:2

285:25
**produces** 71:5
162:2
**product** 37:20
**production**
165:12 220:22
**program** 10:25
11:4,4,22,25
12:6,10,14,18,19
12:22 44:7,10
47:7,25 48:4
58:8,10,14,20
60:16 61:15
90:6 145:3
175:6,8 177:13
177:15,15,22
179:11 182:5
183:17 184:22
185:7 186:21
240:10 326:22
327:6
**programs** 72:3
172:23 240:8
**progress** 215:23
268:12 269:12
271:19
**progressive**
22:22 23:5,24
29:10,12 32:8
123:17 164:22
165:7 249:6
252:5,15,17
265:11 283:21
285:11 303:22
303:25 304:14
304:16 310:5,11
310:16 311:17
312:25

**project** 201:19
202:6,12,23
203:13,17,20
204:11,15,16
205:11 266:2
268:3 270:13
274:11,14 275:5
275:8 280:7,17
281:4,19 283:13
283:22
**projects** 283:16
323:9
**promote** 220:10
**promoted** 21:2,4
21:6,8
**proof** 67:21
**proper** 284:18
**properly** 76:6
276:20,21,23
293:17
**proposal** 324:21
325:17,21 326:6
328:13 329:9
**proposed** 120:4
**proposing**
141:25
**prospect** 211:24
**prospective**
145:14
**prospects** 140:25
141:11,15
**prove** 266:17
**proven** 211:21
**provide** 16:13
32:22 49:24
50:11,25 99:12
99:25 119:5,17
121:3,8 122:21

123:6,16,17,20
135:13 210:23
213:25 216:16
218:18 246:14
280:23 326:24
**provided** 32:21
32:25 33:4
35:21,22,23
36:21 39:11
48:13,15,16,18
48:19,21,22 49:2
49:10 50:6
57:25 79:21
121:5 123:20,24
124:21 127:5
159:20 173:20
207:14 213:16
216:14,15,17
273:14 274:24
281:17 315:12
**provider** 253:9
275:11
**provides** 42:12
56:10
**providing** 77:10
91:9
**proving** 68:16
270:25
**public** 1:21 3:14
4:17 333:18
335:4 336:24
**pull** 272:19
295:8,16
**pulls** 41:11
**pump** 174:12
180:10 184:13
185:22 186:21
188:22 196:18

253:10 256:7
259:7 304:20
**pumps** 174:25
175:4,11 177:5
177:23 178:12
179:6 180:20
181:21 182:25
183:13 188:13
189:24 190:10
190:22 191:2,3,4
191:22 192:4,14
194:3 200:14
**purchase** 67:9
329:6,8,17
331:23,25
**purchased**
320:22 321:2
**purchases**
328:10 330:8,10
330:12,18
**purchasing**
327:17,18 328:8
328:14 329:2,12
330:25
**purposes** 82:21
**pursuant** 1:22
**purview** 70:8
183:15 189:15
**put** 22:23 37:3
45:19 116:5
138:3 150:14
156:17 158:3
159:10,12
161:14 180:6
256:3,6 265:6,9
270:22 298:20
316:25 317:10
332:16 333:2

**putting** 31:3
257:14 287:12
296:22
**pyro** 174:14,15
174:16
**pyrosignal**
174:15,17
191:15,16 195:3
199:14 200:10
200:13,18 203:7
203:12 207:23
208:14

**q**

**qualifications**
93:24 99:15,22
**qualified** 117:20
172:19 173:3
223:5
**qualities** 166:11
166:12
**quarter** 306:8
**quarterlies**
305:9,14
**quarterly** 61:14
305:2,18,25
306:7,13,18
**queens** 15:16
18:15,25 19:4,15
20:10 21:11
54:3 162:24
165:21
**quest** 327:21
**question** 3:10
6:15,17,21 7:4,5
7:5,10,11,12,24
9:22 38:8,12,20
59:21 81:8

94:25 96:14
98:2 113:11
123:17 124:5,10
124:12 125:15
126:12 131:22
139:5,8 142:12
145:9 151:9
161:4 172:10,10
172:25 179:15
181:14 182:11
183:4 184:8,10
187:23 188:4
191:19 199:2
209:17 227:4
230:10,21
244:25 247:20
247:23,24
254:22 263:3
281:16 284:5
297:4 324:7
326:8
**questioning**
172:13
**questions** 5:19
6:7 7:22 9:19
49:5 123:15
124:6 145:10
198:25 242:21
309:13 325:23
326:21 332:16
**queue** 307:9
309:7
**quick** 92:23
**quicker** 207:5
**quickly** 133:8
161:16 207:5
248:10 251:2
284:21 285:5

312:3
**quite** 35:13
38:20 57:8
104:6 105:18
139:20 163:7
171:23 203:25
**quote** 274:8,25

**r**

**r** 4:15
**raise** 132:12
**ran** 36:19
**range** 130:12,12
332:2
**ranking** 203:4
205:5
**rate** 175:5
**reach** 96:15
217:12 231:8
286:7 327:7,14
**reached** 208:21
208:24 209:2
**read** 35:12,14,15
38:13 92:23
94:18 97:18
124:12,19 134:8
167:17,19 188:3
188:7 191:19,20
204:4 287:10
312:15 317:24
318:18,20
322:18,19
325:22
**reading** 38:12
97:8 187:23
202:24 204:18
**reads** 195:20

**ready** 134:22,25
303:17
**real** 18:22 72:8
289:21
**realized** 189:6
284:17
**really** 56:16
70:23 71:3
75:17 94:24
95:12 116:10
121:5 133:8
138:19 139:7
169:25 170:20
269:3 292:17
**reason** 8:8,15
34:24 42:4,6
51:4,8 122:4
198:13 220:3
300:19 304:19
316:25 319:20
336:6
**reasons** 45:7
**reassign** 301:17
**reassigned** 301:4
**reassigning**
301:2
**recall** 15:23
23:13,16 26:13
26:17,17,19
45:23 46:6
100:20 101:15
120:22 142:7,10
149:19 158:10
162:7 163:7,13
166:24 168:20
168:23 169:9
178:3 186:18,20
189:25 195:15

195:21 201:22
203:21 204:4,5
205:16 206:9,12
208:16 215:16
224:11 248:14
248:23 249:3
258:19,22 269:6
282:20 309:14
310:25 311:3,19
323:16,20
324:25
**recanted** 317:25
**receive** 12:13
33:14 109:4
132:18 236:25
280:22
**received** 10:16
34:8 68:5 82:25
83:21 84:10
132:12 160:18
206:4 209:4
223:3 236:23
237:11 257:20
276:15 280:15
280:20 282:23
285:22 288:10
288:25 296:11
**receiving** 218:13
285:20
**recess** 78:14
133:14 176:20
251:10 303:7
**recognize** 273:17
**recognized**
311:14
**recognizes**
192:12

**recollect** 198:21
**recollection**
129:19,22 159:6
166:3 184:15
**recommend**
176:4 314:16
**recommendation**
258:25 259:17
259:19,22
327:13
**recommendati...**
99:25
**recommended**
261:3 327:7
**recommending**
257:21
**record** 4:22,25
5:24 43:5,8,24
134:18 146:21
176:17,19,23
226:25 227:3
228:4 251:17
266:18,20,23
313:2 314:21
315:5 329:21
332:17 335:10
**recorded** 107:4
148:8,20
**recording** 91:8
**records** 12:12
43:9,10,11 62:12
63:11 146:7
**recruiter** 141:4
217:15 221:15
222:21,24,25
**recruiting** 20:9
39:13 142:2

**rectify** 123:18
**recycled** 320:24
322:24,25 323:6
**red** 276:6,13,22
**redo** 271:20
**refer** 26:16 54:7
71:2 242:3
**reference** 196:9
197:11 297:22
**references** 275:8
275:10,12
**referring** 9:20
9:23 11:9 21:13
25:14 53:22
56:14,16 70:6
141:3 171:8,14
196:4 197:6,9
235:22,23
238:16 244:20
276:12,14
283:17
**refers** 97:21
196:13
**reflected** 210:15
**reflects** 33:2
**refresh** 309:19
312:3,17
**regard** 286:14
**regarding** 17:7
17:13,18 18:3,8
28:11 87:13
124:22 145:14
198:16 268:15
325:17
**regardless**
235:16
**region** 110:23

**regional** 13:12
13:21,23 14:2,21
83:15 100:13
101:16,18
104:18
**regular** 82:22
119:8 125:3,23
126:3 280:15
292:20
**regularly** 17:3
161:22 214:6
293:2
**regulatory** 48:2
206:22 288:8,14
288:18,24
289:25 316:2,22
**reimburse** 154:5
**reimbursement**
154:9
**reissued** 153:22
**relate** 88:18
**related** 22:25
23:6,21 26:20
27:5,12,17 29:13
33:7,10 36:20
39:25 43:15
63:22 67:3 74:5
97:10,14 99:13
122:3 123:9
138:18 139:4
144:9 146:8
172:6 188:17
196:17,19,20
217:2 228:11,17
232:23 245:14
247:24 249:4
265:15 268:12
269:15 274:10

275:4,6,7 280:6
280:13 293:3
298:3 310:15
311:21,22 313:5
317:13 318:6
323:22 325:3
335:13
**relating** 64:24
**relationships**
145:19
**relatively** 145:2
**remain** 106:13
**remainder** 209:7
209:14
**remaining** 197:2
274:21 278:5
**remember** 18:6
22:15,18,19,25
35:19,24 36:3
72:23 124:13
137:20 169:13
170:13,18 182:9
183:22,23 184:2
185:12 186:25
187:3,5 189:11
189:12,13,16
190:5 204:20
213:10 224:7,16
254:3,16 262:6
269:14 283:11
309:20 310:3,4
310:17 311:11
311:11,12,22
313:9,21 324:16
324:18,23
**remind** 11:16
63:16

**remote** 50:4 53:3
**remotely** 4:4
54:13
**removed** 88:7
259:16,19,21
264:20
**renders** 66:2
**renew** 105:7
232:5
**renewed** 229:14
231:6
**renovated**
323:10
**repair** 56:17,25
67:5,18 68:13
75:15 77:9
90:20 91:5
175:10 207:4
270:13 280:16
293:4 298:18
**repaired** 91:13
107:4 175:23
267:5 276:6
**repairs** 58:12
65:13 74:12
90:7,12 107:6
174:12,24
175:18,19,25
176:4 206:5,15
266:3,10,12,24
267:9 268:12,16
268:18,25
269:12,18,23
270:18 271:4
272:4 281:11
300:8
**repeat** 26:25
38:8 40:9 43:2

45:14 55:25
59:21 64:7
102:23 106:6
113:11 122:9
123:2 127:9
129:21 131:17
158:19 179:19
191:10 229:2,12
243:7 247:13
257:18 265:2
268:21 283:4
319:3
**repeatedly** 48:7
**repeating** 182:16
**repetitive** 216:2
290:4
**rephrase** 6:16
64:8,22
**replace** 114:7,23
276:24 325:10
**replaced** 101:5
**replacing** 169:7
210:19,21
**report** 52:15,17
55:18 68:5
72:10,14,17
86:22 87:3
89:20 110:18
115:5 118:9
128:16 131:3,9
138:11,14,17
145:4 154:7,11
154:12 192:25
193:22 194:8,9
194:13 197:20
215:5 218:13
251:23 257:20
258:13,14

259:17 260:25
262:3 266:4,6
267:2,4 268:17
274:7,22 276:15
282:22,24,25
295:8,16 302:21
**reported** 17:14
68:12 72:24
113:17 115:6
128:7 201:23
207:24 261:21
262:8 263:2
277:22 302:25
**reporter** 1:21
4:2,5,20 5:20
6:6 7:14 17:21
17:25 26:24
40:8,11 42:25
45:13 55:24
102:22,25 106:5
122:8,25 124:14
127:8 129:20
131:16 133:6,12
158:18 167:12
167:15,20
187:24 188:5
191:9,13 208:22
228:25 229:11
243:5 247:12
254:13 257:17
264:25 268:20
283:3,6 284:24
318:11,13,16,21
319:2 332:25
**reporting** 15:18
16:24 66:14
73:5,14,15,16,19
127:23 128:22

131:25 143:3
192:19 299:24
**reports**  16:6,11
16:19 28:21
30:15,18,25
31:19,25 36:20
55:15,17,20
56:17,17,24,25
57:12,20 58:10
58:11 63:20
67:24 73:8,9,12
86:23 87:4
89:21 120:13
128:15 138:13
194:14 264:2,5
267:15 282:14
282:15 320:11
**represent**  82:10
**representation**
80:17 237:13
238:17
**representative**
233:11
**reprimanded**
207:20
**request**  37:7
57:2,12 58:23
62:12,18 103:20
104:9 105:20
155:9 156:17
157:8 160:17
232:21 233:4
320:19 324:22
325:9 329:8
330:22
**requested**  33:5,7
37:11 38:13
58:25 62:9

109:17 124:19
150:8 155:6,7
156:22 157:2
188:7 191:20
213:18 232:5,8
232:24 241:22
287:6 322:19
324:17 325:2
**requesting**  104:4
207:8 318:8
323:17 325:18
325:18
**requests**  36:17
37:10,16 57:5,6
58:9 63:9
156:15 168:7
326:10 330:24
332:18 334:19
**require**  95:6
156:23 230:14
230:21 270:21
293:7 294:13
**required**  16:15
31:5 57:24 59:5
59:14,18 62:16
87:25 88:11
91:5,7 94:12,22
95:11 98:16
100:24 105:8
107:3,25 108:5
108:22 109:24
122:19 150:16
150:20 230:2,3
235:7 265:9
266:16 287:9
298:14 304:7,9
317:4 331:9,11
331:13

**requirement**
95:15,24 106:22
138:14 175:4
229:21 230:24
237:4 241:3
264:15,16,20
265:7
**requirements**
11:2 12:3 14:6
47:25 57:9 94:8
94:18 97:17
98:8,19 100:3,4
145:21 223:6
247:7,18 289:12
**requires**  54:18
207:6 284:19
289:7 299:9
**requisition**
225:21
**requisitions**  43:6
329:5
**reread**  269:19
**rereading**  284:2
**rescheduled**
197:3 206:6
**reserved**  3:10
**resident**  14:2,21
83:14
**resign**  249:25
**resigned**  135:15
135:20 137:22
152:8
**resolve**  75:8
180:16
**resolved**  165:19
211:8 276:3
**resources**  93:3
96:15 98:17,18

98:22 99:2
252:3
**respect**  16:18,23
18:24 64:23
71:22 72:19
144:7 292:25
**respective**  3:4
**respects**  123:8
**respond**  30:23
301:16
**responding**
301:15
**response**  6:2
36:8 37:15
39:17 241:24
302:9
**responses**  5:23
5:24
**responsibilities**
14:5,9,24 15:5
48:5 55:22
71:22 74:3
88:13 90:3 93:7
99:14 106:9
107:10,16
167:25 170:3
174:6,10 217:20
234:23 235:8
248:5 253:6
291:21,23 316:3
**responsibility**
28:19 59:11,12
60:23 97:11
110:25 180:5
186:7,14 187:14
188:11 189:4,23
190:6,15 200:25
201:24 203:6

211:23 222:25
235:14 244:9
294:19 300:20
309:4
**responsible** 15:8
15:9 16:4 30:14
30:23 31:4 45:8
66:13,15 69:25
74:10 76:3,4
90:6 91:2,4,5,7
91:14 100:12
110:19 141:7
168:2 199:8
238:25 239:11
239:15,17,20,22
240:4,23 241:25
242:2,12,15
243:13 244:16
263:12,16 290:7
290:10,14 291:5
299:12 308:10
308:24 309:5
315:17,23 316:8
**responsing**
301:15
**responsive** 36:16
37:9
**rest** 101:11
**restarted** 12:23
**restate** 124:10
124:17 131:22
139:19 156:4
254:22
**restates** 124:16
**result** 91:10
218:14 244:18
263:10 285:23
289:9 315:11

**resulted** 218:12
**resume** 146:16
146:23,25 223:2
**retake** 157:3,4
**retest** 105:7
**retract** 14:19
**retrained** 271:15
272:13
**return** 180:7
**revealing** 8:21
**review** 9:2 24:21
24:23 32:10
39:12 57:11,20
158:7 159:20,24
160:21 206:22
212:14 260:7
284:11,13
290:18 294:19
300:25 302:9
313:16,24
332:19
**reviewed** 25:24
25:24,25 103:5
120:5,22 157:25
158:2 213:22
252:2 258:12
264:16 270:21
271:8 282:12
288:10,25
297:23 298:16
314:25
**reviewing** 57:19
240:24 299:20
**reviews** 24:19
56:9 66:11
107:22 130:16
**revise** 332:19

**revision** 241:8
256:18,20,21,24
**revisions** 326:5
**richard** 16:2
**rid** 323:14
**right** 37:25 46:4
48:25 69:14
79:14 81:4
82:16 83:5
85:17 89:13,18
104:11 108:8,24
112:6,8 118:10
128:9 131:11
142:12 146:12
150:3 159:12
165:2 176:22
180:21 195:18
205:7 209:16,23
219:9 222:15
233:17 267:17
267:21,25 273:6
279:25 286:25
288:21 293:7
302:19 304:25
309:11 317:16
325:7
**risk** 244:3
260:13,14,15,17
260:18,21,25
261:10,12,13,22
**roach** 5:7,8
**road** 5:2
**robert** 15:25
48:18,19 49:13
49:14,23,24
284:14
**roche** 1:9,16 4:8
4:23 5:6 6:1 7:1

7:14 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
33:18 34:1,7
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1,15
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1

| | | | |
|---|---|---|---|
| 112:1 113:1 | 188:1 189:1 | 263:1 264:1 | **roche's** 188:3 |
| 114:1 115:1 | 190:1 191:1 | 265:1,2 266:1 | **roesh** 5:6 |
| 116:1 117:1 | 192:1 193:1 | 267:1 268:1 | **role** 21:8 62:3 |
| 118:1 119:1 | 194:1 195:1 | 269:1 270:1 | 74:3 83:11,16 |
| 120:1 121:1 | 196:1 197:1 | 271:1 272:1 | 86:15 90:17 |
| 122:1 123:1 | 198:1 199:1 | 273:1 274:1 | 92:8,17,22 99:14 |
| 124:1,16 125:1 | 200:1 201:1 | 275:1 276:1 | 99:15 108:2,18 |
| 126:1 127:1,23 | 202:1 203:1 | 277:1 278:1 | 111:22 112:5,20 |
| 128:1 129:1,5 | 204:1 205:1 | 279:1 280:1 | 113:10,12 |
| 130:1 131:1 | 206:1,4 207:1 | 281:1 282:1 | 115:20 116:17 |
| 132:1 133:1 | 208:1 209:1 | 283:1 284:1,25 | 116:21,22 117:8 |
| 134:1 135:1 | 210:1 211:1 | 285:1 286:1 | 117:13,17,20 |
| 136:1,8 137:1 | 212:1 213:1 | 287:1 288:1 | 118:3,3,6 120:12 |
| 138:1 139:1 | 214:1 215:1 | 289:1 290:1 | 122:17,19 128:5 |
| 140:1 141:1 | 216:1 217:1 | 291:1 292:1 | 129:6 130:8,16 |
| 142:1 143:1 | 218:1 219:1 | 293:1 294:1 | 130:18,20 132:8 |
| 144:1 145:1 | 220:1 221:1 | 295:1 296:1 | 132:23 142:15 |
| 146:1 147:1 | 222:1 223:1 | 297:1 298:1 | 145:11 148:23 |
| 148:1 149:1 | 224:1 225:1 | 299:1 300:1 | 163:18 167:10 |
| 150:1 151:1 | 226:1 227:1 | 301:1 302:1 | 169:19 171:22 |
| 152:1 153:1 | 228:1 229:1 | 303:1,9 304:1 | 175:22 180:24 |
| 154:1 155:1 | 230:1 231:1 | 305:1 306:1 | 186:23 202:3 |
| 156:1 157:1 | 232:1 233:1,19 | 307:1 308:1 | 204:6 216:8,8 |
| 158:1,19 159:1 | 234:1 235:1 | 309:1 310:1 | 217:17,20,25 |
| 160:1 161:1 | 236:1 237:1 | 311:1 312:1 | 219:4,7 222:16 |
| 162:1 163:1 | 238:1 239:1 | 313:1 314:1 | 223:10 253:24 |
| 164:1 165:1 | 240:1 241:1 | 315:1 316:1 | 262:2,14 263:23 |
| 166:1 167:1 | 242:1 243:1 | 317:1 318:1 | 290:21 302:5,17 |
| 168:1 169:1 | 244:1 245:1 | 319:1 320:1 | **roles** 111:9 |
| 170:1 171:1 | 246:1 247:1 | 321:1 322:1 | 112:17 170:2 |
| 172:1 173:1 | 248:1 249:1 | 323:1 324:1 | **rolling** 15:14 |
| 174:1 175:1 | 250:1 251:1,11 | 325:1 326:1 | **rome** 16:2 18:4 |
| 176:1 177:1 | 251:21 252:1 | 327:1 328:1 | 171:22 172:5 |
| 178:1 179:1 | 253:1 254:1 | 329:1 330:1 | 173:5 174:20 |
| 180:1 181:1 | 255:1 256:1 | 331:1 332:1,17 | 320:4,6 |
| 182:1,20 183:1 | 257:1 258:1 | 332:23 333:1,13 | **ron** 73:2 167:4 |
| 184:1 185:1 | 259:1 260:1 | 334:5 336:5,20 | 169:6,15 170:12 |
| 186:1 187:1 | 261:1 262:1 | | 171:9 194:14 |

222:11 239:24
242:20 256:16
257:8
**room** 12:25
119:8 233:11
286:23
**ross** 48:18 49:13
49:14,22,23,23
49:24
**rotation** 250:15
**routinely** 306:21
**rule** 253:4
**rules** 1:22
**run** 10:25 11:25
**rush** 134:25
**ryan** 15:25 17:18
73:8,10,11,13,14
74:2 115:6
117:15,16 128:7
128:22 130:13
130:15 131:9,25
238:2 319:22

**s**

**s** 94:9,9,9 147:24
147:24,24,24
150:21,22,22,22
229:6 334:7
336:6
**safe** 294:21
**safety** 10:12,24
15:10 21:25
27:21 28:4 30:6
30:10,13 31:13
52:8 56:5,8
57:14 60:21
67:3,16,16,20
68:21 75:19

82:6 85:21 86:5
86:11,21 87:2,6
87:11 88:23
89:4 90:4,5,11
90:12,19,21
91:12 92:3 93:8
93:15 94:12,23
95:2,9 96:18
98:20 99:3,5
102:4 103:18
105:24 108:3
112:4,5,19 113:2
113:6,9,13 114:9
114:20 115:20
116:7,16,21,23
117:8,10 118:6
118:14 131:23
138:25 139:13
139:17,22
140:11 142:23
143:23,25 144:6
144:13,15 149:7
162:23 163:6,8
163:19 167:11
167:23,24 168:3
168:8,18 169:8
171:13,25 172:6
172:20 175:8
177:9,10,24
178:5,16,18,24
178:25 179:4,23
179:25 180:7,10
180:11,17,22
184:4,5,19,23
185:13,18,21
186:2,4,24
189:15 190:2,4
190:16,18,21

191:3 200:22
203:5 205:4,5,8
210:2 211:10,12
217:6,23 224:14
224:19 226:20
227:2 234:6,25
237:13 238:18
239:2,10,14,18
240:5,19,24
242:8,13 243:15
243:16 244:7,10
244:17,19 245:2
245:4,19 246:3,8
246:18,23 247:2
247:9,16 248:16
253:13 254:11
263:15,16 264:8
264:10 286:12
287:2 288:22
290:6,8 292:9,10
293:8,10,22
294:4,4,17,18,20
297:17,24
299:10,21
300:18 301:12
301:19 302:2,18
302:20,21,24
307:23,24
308:14,16
315:18
**salaried** 290:22
**salaries** 36:20
**salary** 112:14
129:24 130:3,8
130:14 132:7,17
**satisfied** 160:16
274:23

**saw** 152:13
214:15,18
260:18 261:14
261:20 313:21
**saying** 30:11,12
31:8,15 34:11
62:25 100:20
123:14 128:11
128:11,13 153:2
153:5 171:15
174:16 178:21
186:19 202:6,9
208:8 247:4
280:25 282:5
286:17 318:2
331:22
**says** 81:17 83:14
93:24 94:3,7,8
94:10 97:8,16
127:17 128:10
129:4 136:7
137:12,13
138:22 140:22
140:22 141:22
147:16 153:25
154:17 196:9
197:12 198:4,5,7
201:10,14 206:2
207:10 228:15
229:4,8 231:21
232:3 260:12
269:5 270:3
273:25 274:5,18
274:20 275:21
275:21 276:2
277:14,15 278:3
279:2 280:2
288:7 292:8

293:15 304:19
304:20,25
307:22,22 308:5
**schedule**   51:20
53:5,8 207:13
232:17 233:14
250:17
**scheduled**   51:11
65:14 195:22
207:16,22
208:14 263:14
278:7
**schedules**   51:22
174:19
**scheduling**   67:7
91:11 156:21
171:21 199:8
223:19 232:11
233:9
**scheme**   276:17
**school**   21:3
73:21 74:7,10,15
74:21,24 75:6,6
77:3,12 308:19
**scope**   199:23
201:3
**score**   260:9,13
260:14,15,17,18
260:22 261:22
**scratch**   237:20
**screen**   33:20
34:16,20,22,25
35:2,5,8,9
**screening**   223:4
**scroll**   83:18,25
84:8,12,20,24
85:7,10 127:12
129:3 133:20

134:3 135:22
140:20,21
141:18 146:18
147:2,21 205:20
227:22 228:20
273:23 274:16
275:14 277:10
277:25 278:20
279:23 304:3
**scrutinize**   62:24
**sealing**   3:5
**search**   36:15
37:8
**searches**   36:23
**seasoned**   143:16
143:25
**second**   37:18
39:14,16,19
40:16,21 93:22
196:21 236:15
265:10,13 272:4
273:23 274:19
274:20 285:8
303:22 304:3,5
304:13,16
306:25 308:11
308:12
**section**   252:23
276:9 278:3
**security**   240:19
**see**   34:22,24,25
39:15,18 40:25
79:2 82:24
83:12,12 84:2,7
84:19 94:3
103:2 127:15,24
127:25 135:23
136:5,9,12,18

146:5,8,13,14
147:6,25 148:3
150:2 195:5,11
195:15 196:2,9
196:15,22 198:4
201:9,10,14
205:23 206:7,13
207:9,18,19
221:10 225:6,9
225:11,22 226:7
226:11,24,25
228:18,21,23
229:4,8 231:3,20
231:24 250:19
260:16 273:5,24
274:4,17 275:2
275:13,18,19
276:9 277:13
278:9,15,21,25
279:9 284:3
289:22 295:9
299:4,8 301:14
303:3 304:17
307:20 327:8,14
**seeing**   148:12
149:16 269:6
**seen**   35:9 39:4
80:8 110:4,6
121:13 144:24
144:25 145:4
150:6 152:11
153:16 228:10
250:18 260:20
**select**   232:19
**seliger**   2:6 4:13
5:5 33:13,17
34:20 35:5
37:21 38:11

76:21 77:15,19
77:24 78:3,10,13
80:23 109:14
124:11 133:7,11
134:10,18
145:24 150:7,13
165:11 172:13
176:14,22
181:10,15
182:14,19 184:9
187:22 188:2,8
191:18 194:16
209:16 213:15
220:19 225:15
227:5,12 230:12
233:21 250:24
251:6,9,16
272:23 279:16
303:2,6,12
311:23 312:6
329:25 332:14
334:4
**send**   120:3
150:11 207:7
213:21 238:10
258:6 298:13
306:16 328:2
**sending**   312:6
**sends**   42:15
306:21
**senior**   11:6
13:11,19 14:14
21:6,8 69:14,19
237:25 262:20
262:21 263:6
302:5 331:20
**sense**   6:18 7:7
66:3 134:4

**[sense - sinai]** Page 52

245:2
**sent** 35:20 38:19
  103:4 120:2
  194:4,6 208:8,9
  219:21 220:4,20
  251:13 258:8,14
  318:7
**sentence** 97:22
  195:12,14,15,19
  196:4,12
**sentences** 27:8
**separate** 14:4,6
  71:15,17 240:6
  240:14 305:15
**separately**
  212:21
**september**
  137:25 195:23
  210:10
**served** 332:22
**serves** 177:11
**service** 144:23
  145:6 253:11
  256:8 297:14
**services** 19:8,10
  275:10
**servicing** 307:16
**session** 284:11
  284:13
**set** 57:3 135:7
  161:8 255:11
  290:16 295:19
  296:2 302:10,13
  309:9 335:8,18
**setting** 12:25
**seven** 42:22
  52:12 54:9
  70:15 78:6 82:3

147:7 205:21
  330:6
**seventeen**
  226:10
**severe** 286:7
**severity** 77:6
**shaffer** 48:21
  52:3 57:14 86:7
  86:9 166:9
  178:5 212:9,21
  213:5,22 214:4
  215:17 216:24
  223:14 272:17
  284:15
**shaffer's** 52:5
  62:3
**shape** 271:18
**share** 33:19
  34:15,20 35:5,8
  35:9 313:25
**shared** 320:7
**sharpe** 2:12 4:11
  34:4
**shawn** 2:12
  33:14 77:16
  311:23
**sheet** 83:5 336:2
**shift** 66:13
**shooter** 99:3
**shop** 60:21 279:6
  307:15,22,22,24
  308:25
**short** 171:6,7
  250:22
**shortcomings**
  118:16
**shorthand** 1:20

**shortly** 35:17
  92:18 114:3
  152:7,8 163:14
  163:14 168:24
  255:10 271:4
**shoulders**
  301:20
**show** 59:8 60:2
  69:2 200:19,20
  221:23 222:4
  225:10 267:13
  268:23 276:17
  281:12,17
  295:17 309:7
  313:14,19
**showed** 78:23
  250:19 281:2,6
  281:22 313:20
**showing** 40:3,18
  64:3 68:15
  226:16 266:19
  267:3,5 271:19
**shown** 56:18,20
  289:6
**shows** 59:16
  82:5 202:11
  232:20 276:19
**shut** 197:18
  207:12
**shutdown** 168:7
  326:10
**shutdowns**
  326:14
**sic** 12:9 45:19
  233:10 275:24
  278:6 301:15
  317:25

**sick** 290:13
  291:4
**side** 14:7 208:6
**sign** 47:6,10 92:6
  108:10 234:13
  234:17,20
**signator** 130:25
**signature** 234:9
  335:21
**signed** 3:13,15
  47:12 93:2
  109:4,7,15,15,17
**significant** 77:11
  181:5
**signing** 45:8
  214:22
**similar** 147:22
  164:6 289:17
  291:12 315:5
**simple** 157:13
  294:10
**simplified** 58:7
**simplistically**
  281:9
**simply** 203:22
**sinai** 13:5,10
  14:13 15:15,16
  18:14,15,17,25
  19:4,12,14,20,25
  20:10 21:10,13
  37:6 53:23 54:2
  54:3,4,6,8 55:14
  56:5 70:6,18,21
  71:23 72:20
  74:16 81:20
  85:20 86:11
  87:23 90:10
  106:2 115:3

Veritext Legal Solutions
www.veritext.com
212-267-6868      516-608-2400

117:6 162:24
163:5,8,18
165:21 168:4,18
197:10,11,20
198:12 210:2
225:23 226:12
240:16 242:14
253:18 260:6
320:17,22
322:24 327:17
328:13,25
329:12 330:25
**sincerely** 129:4
**single** 55:8 61:3
61:6 209:15
**sir** 17:22 26:25
40:9 43:2 45:14
55:24 102:23
106:6 122:9
123:2 127:8
129:21 191:10
208:23 229:2,12
243:6 247:13
254:14 257:18
268:21 283:4
319:3
**sit** 138:14
**site** 19:6 44:8
51:11 67:6
69:25 70:5,18
103:20 104:5
154:20 166:15
197:4 198:5,8
201:11,15
207:12 223:25
232:8,10,12,23
258:23

**sites** 42:21 53:20
53:21,23
**situation** 120:22
**six** 15:22 20:15
51:10 52:12
135:25 185:2
215:15,24
**skills** 30:7
115:14 145:17
145:19
**skip** 82:2
**slack** 250:12
**slight** 132:12
**small** 39:15
**smaller** 166:14
166:23 323:14
330:10,12,18
**snapshot** 80:5
82:5
**soft** 145:19
**software** 43:13
47:23 130:23
**solutions** 274:6
275:12 276:16
277:20 280:3
336:2
**somebody** 144:5
170:15 200:22
207:6 210:23
211:9 218:17
248:11 263:22
301:17 302:12
314:9
**somebody's**
313:4
**soon** 59:18 104:9
189:6 224:5
329:24

**sorry** 6:5 11:17
17:21 18:6 19:9
22:13 36:10
40:8,16,20 43:2
43:3 45:5 46:5
47:18 55:24
58:17 64:7 69:7
70:2 73:10
76:18 77:24
80:13 84:17
92:13 93:24
95:18 102:11
107:12 115:16
123:3 127:8
129:20 132:10
132:21,23 133:7
134:11 136:11
137:9 159:2,3,22
164:12,15,15
165:5 174:15
177:18 179:18
187:11 190:12
191:10,18 196:7
208:22 209:12
213:2 218:8
225:15 226:7
227:10,11 230:5
230:7,10,12
234:15 237:21
242:10 243:6
248:13,19
249:13 254:13
259:18 260:8
262:15 264:25
265:11 272:21
273:9 278:10,12
280:19,21 283:6
284:24 285:8

305:6 317:8
318:17 319:2
322:17
**sort** 104:23
146:21 193:18
228:4
**sound** 6:6 84:17
107:12 112:6,8
182:20
**sounds** 74:25
162:8 272:2
**sources** 41:14
**southern** 1:3
**space** 75:7 299:5
**spaced** 209:15
**speak** 24:6 42:10
55:2,2,6 95:13
**speaking** 69:13
317:12
**special** 87:25
**specific** 29:13
50:14,19 57:5
61:7 103:13
126:9 137:3
142:10 181:17
183:9 188:14
206:12 213:2,3,7
216:25 238:15
240:6 241:19
242:22 245:14
245:18 249:12
249:19 252:14
252:18 253:7,25
255:8 257:16,19
260:23 281:13
289:10 304:5
305:22 307:12
308:5,7,21

313:17 324:18
326:8
**specifically**   7:23
26:20 27:5
41:14 52:14
62:24 104:16
111:20 119:14
137:19 170:19
174:15 201:2,3
205:16 211:10
212:12 224:15
224:20 256:17
264:11 309:18
316:4 317:13
331:5
**specifics**   22:18
46:6 48:9 88:6
149:19 169:13
189:11 310:3,18
311:12,19
**specified**   57:7
221:16
**specifies**   221:12
**specify**   48:9
239:7 244:19
249:14
**specifying**
164:10,14,16
**speed**   138:12
**spelling**   119:22
**spending**   212:13
**spent**   196:25
**spoke**   189:3
232:22 279:22
**spots**   51:13
**spouse**   36:7
**spreadsheet**
80:13,15 82:14

84:3 225:3
**sprinkler**   196:14
297:14 304:20
307:17,19
**sprinklers**
177:11
**square**   15:11
74:7
**squarely**   190:20
**staff**   66:25 72:15
80:2,17 81:20,23
84:14 85:3
102:12 139:9
140:2 143:14,15
168:4 169:15
197:10 242:14
275:23 286:13
294:11 300:18
301:19
**staffed**   171:7
**staffing**   16:20
137:23 139:12
**stagnated**
215:25
**stakeholders**
76:7
**stamp**   84:9,20
126:22 135:24
146:20
**stamped**   68:11
79:5 91:25 94:2
132:9 146:6
147:3,9 194:17
198:4 201:8
205:21 227:23
233:23 275:20
278:13,22
281:12 304:18

**stand**   29:5
**standard**   62:15
62:17 235:19
315:9,9
**standards**   62:16
62:21
**standby**   134:7
**standpoint**   12:2
**stands**   293:22
**start**   6:23 10:3
11:5 20:19
81:12 92:17
124:6 129:8,17
133:25 147:10
151:15 238:21
**started**   10:18
20:3,23,25 46:13
46:23 47:4,7
104:9 111:10,15
111:18 151:22
163:14 168:23
174:16 184:2
189:7 210:4
215:22 244:14
271:3 329:20
**starting**   79:19
172:17 305:3,13
**starts**   34:20
40:25 147:6
196:22 205:23
284:23
**stat**   23:14
**state**   1:21 4:21
4:24 68:16
335:5
**stated**   108:9
123:23 124:13
157:12 283:12

**statement**   183:5
186:19,19
287:19 314:12
**statements**
216:23
**states**   1:2 128:14
132:7 208:6
**stating**   203:2
284:2 324:24
**status**   110:14
151:5,12 268:16
268:18 276:17
**stay**   231:12
291:3
**step**   180:15
328:6,6
**steve**   193:25
**stipulate**   4:4,10
4:12
**stipulated**   3:3,8
3:12
**stipulates**   4:14
**stipulations**   1:23
3:2
**stop**   35:7 306:2
**stops**   35:5
263:21
**storage**   323:5
**story**   208:7
**streamline**
326:12
**strike**   33:9 44:4
58:16 105:11
125:14 126:6
142:20 206:17
209:17 249:22
286:8 310:25

strong   211:23
study   10:7
stuff   298:25
subcontractor
   191:15
subject   6:10
   11:7 93:12
   248:24 283:20
submissions
   328:25
submit   61:15
   155:8 324:21
   325:16 328:13
submitted   37:23
   101:16 154:6,10
   156:16 279:7
   331:17
subordinate
   123:4,7 290:9
subordinates
   110:20 315:21
   316:6
subscribed
   333:15 336:21
substantial
   246:16
successful
   212:18 216:8
successfully
   211:19 255:20
sufficient   232:24
   267:12,12 281:7
   282:10 291:2
   314:11
sufficiently
   160:16 266:18
suggest   166:21
   182:13 327:3

suggested
   165:23
suggestion   142:5
   166:14
suite   2:5
suited   116:2
super   167:11
supervise   95:6
supervising
   15:20 230:19
supervisor   21:20
   89:16 112:3,9,10
   112:13,19
   117:12 118:19
   163:6 167:23,24
   199:13,15 200:5
   222:14 301:11
   301:13 306:21
   307:6
supervisors
   72:13
supplied   204:11
supplies   330:10
supply   71:10
   93:14 195:24
   274:25 323:3
supplying   204:8
support   29:5
   122:22 123:9
   164:25 213:25
   214:5
supporter
   171:19
supposed   10:25
   126:10 177:16
   235:3 256:4
suppression   90:8
   106:12 190:16

191:6 192:6,8,9
   192:15,24 193:3
sure   5:16 6:22
   6:25 7:20 9:23
   12:8 31:7 32:3
   38:10,20,21 42:9
   48:24 50:10
   54:7 58:7,13
   59:22 63:18
   73:2 75:12
   76:21 77:19
   78:13 79:21
   82:9 83:3 86:2
   87:19 92:14
   94:13 102:18
   108:12 110:20
   111:2 112:24
   127:10 130:11
   133:2,11 134:9
   137:17 139:20
   142:6,12 149:10
   157:16 159:17
   165:9 167:22
   179:20 199:2
   203:25 205:14
   225:14 229:17
   230:20 231:9,11
   235:5 238:12
   243:8 251:9
   254:23 261:25
   263:23 264:2,11
   269:3,21 273:10
   273:12 280:12
   282:6 300:20
   301:6,9 302:9
   303:5 305:20
   312:5 315:23
   319:9

surprised   139:14
   183:11 206:13
   300:2
survey   64:16
   65:4 145:8
surveyor   62:9
   63:9
sustainable
   302:11
swear   4:5
switch   162:15
switched   182:9
sworn   3:15 4:16
   6:6 333:15
   335:8 336:21
synopsis   328:5
system   18:18
   19:2 43:13 52:7
   56:6 65:21
   70:15 111:7
   130:23 177:11
   180:9 190:17
   253:15 255:4
   269:11,14
   280:16 294:4
   295:3,6 297:20
   298:13 305:16
   305:23 306:16
   306:19,20
   307:18,19 308:4
   308:5 327:17
   328:14 329:2,7
   329:13 330:8,11
   330:18,22,25
systems   12:4
   47:23 54:4
   71:24 72:7,7
   90:8,19,21 91:3

106:12 142:14
144:6,11 173:10
173:13 196:14
197:3 198:12

**t**

**t** 185:19 334:7
**tab** 82:18
**table** 82:19
112:22 113:24
131:7
**tabs** 82:20
**tagged** 298:12
**take** 4:3 59:19
76:19,22 77:15
78:15 79:12
83:16 85:11
104:8 136:23
138:2 141:8
153:17 176:13
176:15 188:11
209:6 216:7
217:8 236:10
248:11 250:22
252:20 289:13
291:20,22
298:22 300:19
303:2 322:14
**taken** 1:20 78:14
133:14 154:19
176:20 186:15
251:10 253:10
253:10 256:7
303:7
**takes** 144:10
**talk** 7:9 9:8 12:8
29:19 164:2

**talked** 125:23
128:7 161:22
**talking** 44:7 49:4
69:15 85:22
118:23,24 119:3
137:23 158:14
158:20 173:13
176:25 188:21
197:12,13,15
279:15 295:12
311:3 328:19
**target** 304:8
**task** 59:8 60:15
63:23 107:17
168:10 189:14
201:6 304:7,24
305:2,4,15 306:4
314:8 318:9
**tasks** 31:2 57:11
57:23 58:21
59:6 60:10,12
61:2 115:11
121:5 170:6
174:8 286:11
287:3 300:11
305:19,25 306:7
306:18 315:22
315:23,25 316:2
**taught** 11:21
**teach** 10:22
**teaches** 11:25
12:3
**team** 64:12
88:14 239:23
291:24
**teamdoc** 47:24
58:9

**teamdocs** 12:9
12:10,14,16,20
56:14,15 57:20
58:6 63:15,16,18
63:25 64:10
66:5 67:22
283:9 284:11
288:11,16 289:2
290:2 309:25
314:19 316:6,15
**teamops** 12:4,5,6
47:24 49:15
57:21 58:5,8,14
58:19,20 59:16
59:24 61:9,9
62:4 63:11,22
65:21 66:16
68:24 69:2,4
265:22 269:9
293:18 295:6
297:3,7 307:8
308:8
**technical** 75:2
133:9 145:17
309:2
**technician** 192:4
192:7,10,18,19
194:4
**technicians**
72:10,15 76:8,12
102:13 191:22
191:23 192:23
197:14,14
**technology**
173:22
**techs** 193:3
**television** 319:11
319:17,20,23,25

320:4,9,12
321:16 322:11
322:15 323:25
324:17
**televisions**
320:24 321:21
322:25,25 323:7
**tell** 6:9 9:23 13:8
31:8 39:8 40:22
40:24 46:11
70:25 81:3
119:9 125:5,16
133:19,21
135:24 141:23
189:10 190:3
199:21 205:15
209:24 218:3,6
219:19 222:21
226:15 234:4
238:20 251:21
252:23 257:11
262:16 265:13
269:10 273:7
293:19 323:24
332:5,6
**telling** 98:25
292:14
**tells** 99:2 173:22
**ten** 82:4 127:13
251:4,6 277:11
278:11
**tend** 223:3
**tent** 245:25
246:4,9,15 247:2
**tenure** 14:18,22
50:21 72:25
73:6 111:11
118:21 122:13

144:9 153:24
168:23 170:21
177:6,21 256:11
262:14,21 296:6
321:5,24 322:5
329:18
**term** 75:2
204:14,16
**terms** 14:7 32:19
32:24 126:11
127:19 330:10
**test** 103:23 104:4
105:21 134:23
153:17 154:18
156:20 157:4
175:4,11 197:2
232:20,25 233:4
233:14,15 271:2
**testified** 4:18
156:8 160:10
**testify** 8:6,9
155:2 177:3
**testifying** 6:12
9:13
**testimony** 38:13
124:19 167:19
182:17 188:7
191:20 318:20
322:19 335:7,10
**testing** 56:17,24
57:9,10 58:10,11
59:15 77:9
106:10,17 107:7
156:11 173:23
174:20,21 177:4
177:22 178:11
179:5 180:19
181:20 182:23

182:24 183:13
183:19,22
184:14 185:22
188:12,17,20,22
189:2,23 190:9
191:24,25
196:10,13,18,24
199:11,24 200:3
206:6,15,20,21
207:4 265:15
**testings** 173:16
**tests** 175:25
195:22 199:9
305:11
**text** 98:3 148:22
**thank** 17:25
40:11 78:12
102:25 133:12
188:8 191:13
251:8 312:16
**thanks** 303:6
**theirs** 138:17
**theory** 326:15
**thing** 9:18 22:24
241:19 269:7
287:10 318:22
**things** 28:2,14
48:12 64:15,25
70:22 76:15
106:25 112:15
119:2 121:8
122:14 169:21
170:5 176:25
216:4 239:12
241:24 242:5
245:10 290:14
324:10

**think** 14:25 20:8
21:18 28:8 31:2
32:17 33:21,24
36:3 42:10 44:7
46:5,7,22 49:21
73:5 80:4 83:14
85:6 94:10
98:11 99:16
100:7 102:3,6
105:6,9,12,17,19
107:6 112:18,25
115:12 116:17
118:17 120:8
121:2,4,5,7,15
121:24 122:2,3
122:14,16
123:13,24
124:24,25
126:12 132:9
144:4 145:3
149:3 157:25
158:22 160:15
166:3 171:5
173:11 177:7
179:3,14 180:23
181:7,17 182:4
183:9 184:17
189:3,19 204:10
205:13 206:14
208:4 211:7
216:6 217:13
218:21 219:16
219:23,25 220:2
220:7 221:16
222:10 223:21
225:10 229:23
230:17 235:20
237:17 239:8

245:16,17
246:15 248:19
248:19 250:7,9
251:12 254:19
255:22,23
264:18 272:5
273:20 277:19
281:24 282:3,5
283:11,23 285:6
286:15 287:11
288:4 301:25
303:9,9 313:24
314:10,13
316:24 318:17
319:19,20
320:10 323:21
327:7,9 330:20
331:12 333:7
**thinking** 75:2
213:4
**third** 2:10 80:21
93:25 199:5
274:19 277:13
282:18 310:5,10
**thirteen** 20:21
**thirty** 21:16
**thomas** 44:25
308:18
**thought** 81:20
81:21 120:5
250:4,8 252:15
314:9 329:23
**thousand** 20:21
**thousands** 61:5
61:6
**three** 13:22 15:2
87:21 136:2
146:19 169:10

179:8 181:7,13
198:9 207:12
278:14 279:23
289:14 305:24
306:14 308:13
308:16 317:2
**thursday** 207:11
**ticked** 317:19
**ticket** 59:13
297:16
**tickets** 61:16
**time** 1:19 3:11
6:24 9:22 12:17
15:6,21,24 16:2
16:12 20:9
24:22 27:10
31:23 32:19
35:13,15 40:14
40:22 50:14
58:4 68:11,14,17
74:4 76:18,19
78:2,9 80:5,18
81:9 82:12
85:15 96:8
104:3 105:3
107:3 111:19
112:2 113:15,17
113:21 114:2
116:15 117:7
121:14 125:13
130:18 131:13
135:14 137:16
137:18 138:5
139:22 140:14
141:5 144:10
148:11,16
149:19,25 151:6
151:13,20

152:10,13
153:20,24
156:13 158:8
164:10 165:3
168:12 169:22
170:11,12,14,25
171:4,7,9,11,14
171:16 172:24
176:13 177:13
178:23 180:12
181:4,21 183:17
185:2,18 186:3
199:5 202:7
204:2,8 208:9
210:10,19,25
221:21 224:8
226:6 232:13
233:16 239:13
241:16 242:23
243:3,10 250:4
250:22,25 251:5
252:6 253:12,16
253:17,21
254:14,21,23
256:12 261:14
262:12,15,23
264:14,24 265:5
265:24 276:5,6
281:12 282:18
284:17 287:20
289:20,22
290:17,25
299:22 300:7,9
302:24 308:16
310:6 315:24
320:6 330:6
333:9

**timeliness**
142:17
**timely** 286:10
295:4 296:23
310:12 311:5
**times** 26:3 27:23
47:23 76:11,12
76:13 161:20
173:17 181:8,13
182:18 183:10
188:16 204:19
204:22 213:9
215:20 239:9
291:17,19
305:23
**timing** 333:2
**title** 13:3,5,6,8
13:25 14:2,5,20
14:25 21:23
52:6,10 69:18,22
69:25 73:18,22
86:19,24,25
87:20 89:15
128:12 193:11
205:9 210:15
217:19 254:20
262:16,18
**titles** 13:4,16
14:10,15,17
20:22 40:2
80:12
**today** 5:19 6:8
6:25 8:6,10,16
9:13 288:6
**told** 99:8 119:12
119:15 120:6
125:8 137:24
143:6 153:16

163:24,25 182:6
182:7 189:9
200:20,20
212:16 217:22
218:5,21 224:2
250:9 260:21
269:4 324:2
325:24 327:5
330:17 332:11
**tools** 145:15
**top** 48:25 79:19
83:14 136:5
137:21 188:18
188:24 205:22
268:4 274:2
283:2,8 304:17
**topics** 235:14
**total** 18:21
**totally** 238:13
**touch** 217:16
240:18
**tough** 215:19
**track** 12:7 58:15
59:25 65:17
104:14,16
229:19 265:20
268:25 269:11
270:22 271:16
326:10
**tracked** 265:21
266:18 326:11
**tracking** 65:9,20
**tracks** 43:14
295:4
**trade** 309:2
**trades** 74:13
75:19,23

**train** 10:22,24
50:23 242:18
**trained** 47:22,24
48:11 216:4
255:16 272:12
272:16 275:23
**training** 10:13
10:15,17,19 11:4
11:17,22 12:4,13
12:20 44:7,10,13
44:17,21 45:9,17
45:19 47:13,16
47:20 48:7,8,10
48:13,15,17,18
48:20,21,23 49:3
49:3,11,15,16,25
50:7,12 51:2,6,9
51:13,15,18,23
66:25 91:9
94:11 159:25
215:3 216:3
239:22,25 240:4
240:17 242:13
242:16,19
246:14 250:12
294:11
**trainings** 49:18
50:4,5 90:14
**transcribing**
5:22
**transcript**
332:18,21 333:7
335:9
**transferred** 32:6
166:22
**transferring**
165:20

**transition** 32:2
80:7 137:19
138:19 165:23
179:24 185:4
**transitioned**
178:8 184:18
190:2
**transitions**
169:11
**trial** 3:11
**tried** 214:7
**trouble** 310:14
**true** 98:20
100:10 148:9
149:5,8 151:18
252:13 300:5
335:9
**trust** 195:14,21
**trusted** 247:15
**truth** 6:10
**truthfully** 8:6,9
**try** 7:17 123:18
166:14 221:9
241:13
**trying** 18:6
59:22 71:21
74:18 225:8
270:2
**tuesday** 206:3
**turned** 27:9 38:4
39:7
**turns** 35:8
**tv** 318:24 319:7
319:14 323:13
323:14,17,20
328:20
**tvs** 320:21 321:4
322:3 323:4,6

**twenty** 271:24
**twice** 145:2
**two** 13:4 14:15
14:17 15:14
18:12,13 19:4
20:21 24:3
44:14,18 47:9
53:2 54:11,14
69:12 73:4,10
78:4 79:20,22
87:18,21,22
103:22 104:8
132:17 133:8
137:13,15
138:22,24 139:5
139:12 140:23
143:15,20
146:15 160:12
185:23 186:4
189:5,20 192:12
197:4,13 198:8
209:2,5 218:10
226:24 237:20
237:22 249:4
252:14,18 253:8
267:15 274:7
280:3,4,10
284:23 285:18
286:6 288:16
289:14 304:15
325:10,10
332:20
**type** 51:9 77:8
145:8 146:7
173:19 192:3
193:7 241:24
282:6,20 289:7
292:3 307:16

308:8
**types** 58:23
64:24 87:14
173:16 175:18
176:4 192:12
242:21 285:19
**typical** 313:25
**typically** 54:15
**typo** 270:7,8
293:21

| u |
|---|

**u** 191:12
**u.s.a.** 127:22
**ultimately** 116:5
139:15 142:19
142:23 143:5,17
164:22 165:19
166:12 175:23
201:24 212:5,17
249:5 263:20
282:14 290:6
302:19 310:18
311:15 315:2,15
**unable** 48:8
237:8
**unaware** 207:15
**uncertain** 233:7
315:16
**uncertainty**
315:2
**uncommon** 17:4
24:16 82:16
137:4 138:16
248:11 289:13
290:17 292:2
300:14,16

**understand**  5:25
6:8,14 8:2 31:7
48:10 57:13
58:14 59:23
64:9 65:12
70:24 71:21
74:19 110:24
118:5 125:21
159:18 175:18
179:3 199:23
202:21 204:12
239:6 270:2
273:10 281:15
305:20 321:15
327:21 330:7
**understanding**
97:20 145:7,18
149:4 154:16
173:16 183:7
267:13 288:13
**understood**  6:18
31:9
**unexpectedly**
291:5
**unfounded**  23:3
**union**  15:16
72:15
**unit**  92:2 94:23
95:3 102:4
**united**  1:2
**unplanned**
290:19
**unprepared**
198:13 199:18
199:20
**unrelated**
225:23 267:25

**upcoming**  59:8,9
60:11 188:17
189:7
**update**  41:18
82:17 242:7
278:18 281:9
**updated**  82:9,22
241:16
**updates**  41:21
240:17 280:15
280:22,24
281:16
**updating**  240:24
**upload**  63:24
67:20 68:25
69:6 289:14
313:8 314:18
316:18
**uploaded**  288:10
288:15 289:2
309:24 311:5
316:23
**uploading**
289:19 310:6
316:5,15 317:14
**upset**  318:7
**urgent**  293:16
295:4,9 296:16
297:7 298:2,7
299:13 300:20
**use**  12:6 89:2
271:12 272:11
276:16 317:19
318:3,5 323:2
326:9 330:11,17
330:21
**useful**  327:3

**users**  58:22 75:6
**uses**  145:5 328:9
**usual**  5:15
**usually**  69:4
92:12,13 176:3
217:14 306:23
**utility**  72:8

**v**

**v**  1:8
**vacancy**  114:21
**vacant**  116:4,5
137:12 140:22
**vacation**  290:13
**vaguely**  262:6
310:2 311:10
**valentine**  22:12
22:14
**valid**  154:3
**valve**  197:17
207:13
**vanwart**  178:6
**various**  41:13
45:7 48:12
53:19 60:17
61:2 74:8,9
78:21 239:9
323:15
**vast**  144:5
**vendor**  56:16,24
57:19 58:10
63:20 66:11
67:5,23 174:16
174:17 192:2
195:2 206:25
209:18 246:10
274:4 275:9,9,24
286:12 329:9

**vendor's**  67:24
**vendors**  64:5,12
76:12 91:10
171:21 203:7
280:11 330:9
**venue**  275:24
**verbal**  5:23 6:2
26:8,10 32:18
36:8 39:17
**verbally**  216:12
**verified**  4:7
**verify**  41:4
**veritext**  336:2
**vice**  100:13
**videoconference**
1:12,19 2:2 4:6
**view**  94:15
**viewing**  299:3
**violated**  253:4
**virtual**  1:16
**visit**  207:22
208:13 259:4
**voice**  7:18
248:14
**voiced**  143:5
218:9
**volume**  235:17
**volunteer**  213:25
**vp**  331:21
**vs**  336:3

**w**

**w**  147:23 150:21
231:3
**waiting**  232:11
274:25 275:24
**waived**  3:7

walking 243:14
want 28:22
  38:14 77:16,20
  78:7,15,25 83:18
  97:4 99:12
  117:2 125:15
  133:25 134:3
  196:8 209:11,13
  225:7 227:8,9
  236:5 242:5
  249:24 265:10
  271:14 272:11
  273:22 284:21
  324:4,8 327:22
  332:16 333:2
wanted 29:4
  96:4 143:7
  150:25 157:7
  176:24 188:10
  207:4 209:25
  238:6 251:2
  252:4,7 323:24
  324:2 326:16
wanting 310:4,8
wants 316:19
warranted
  287:18
watch 106:17,23
  324:2,4,8
water 71:5,6,9
  190:23 191:2
way 58:7,25
  68:13,23 78:22
  82:13 90:25
  91:2 103:19
  120:24 131:6
  138:11 156:15
  181:17 200:16

211:15 217:11
221:16 241:13
245:3,5 246:16
272:6 273:23
289:11 292:20
301:7 305:16
316:13 335:15
wayne 44:25
  308:18
ways 56:7 68:19
  171:20 221:6
  245:17 285:18
  323:15
we've 109:10
  134:19 165:11
  241:5,6 295:19
  329:21
wearing 245:19
week 24:4 39:12
  52:22 53:2
  54:11,25 55:7,8
  212:14 250:15
  250:15 269:25
  270:16 274:7
  280:15 283:25
  284:8 306:24
  333:6
weekly 25:23
  26:15 27:20
  32:12 42:16
  55:7,11 125:3
  135:11 214:10
  214:13,17,19
  215:6 218:7
  273:14
weeks 268:6,9
went 12:17
  47:25 48:3

132:7 157:21
169:11 250:14
261:23 281:7
whatsoever
  238:18
whereof 335:17
white 274:20
whiteboard
  326:11
whiteboards
  325:11
wife 9:12
willing 212:16
wilton 5:2
witness 1:17 4:6
  4:7,15 7:20 9:16
  17:23 38:2
  77:18 124:4
  159:3 191:11
  230:7 285:3
  312:13 330:14
  334:3 335:7,11
  335:17 336:5
witnessed
  262:22
wondering
  172:4,11
word 98:5
  134:24 138:2
  272:12
words 317:19
  318:4,5
work 5:12 12:7
  36:22 37:2,19
  53:18,25 54:2,3
  54:8 58:9,15,21
  58:23,24 59:2,13
  59:19 60:9,17

61:16 63:21,21
63:23 64:3,4,10
65:16 66:21
67:18,21,25 68:9
69:2 76:9,25
77:5,6 87:6,10
88:10,18 90:13
99:8,11,18
106:23 114:21
114:24 116:18
128:6 153:20
161:18 163:10
168:6,17 173:19
174:4 191:5
192:13 193:5,7
193:12 197:5,16
198:9 199:15,16
200:17 204:4,7
205:10 207:21
214:14 244:6
267:22 269:9
270:16,19,23
271:18 281:10
290:25 292:9
293:5,9 294:2,6
294:17,23
295:21 296:18
296:20 297:12
297:15,15,17,19
297:21,22 298:3
298:4,12 300:13
301:13 304:6,12
304:22 306:9,13
306:20 307:9,11
307:13,14
308:12 319:12
319:18 324:5,12
325:4 327:23

332:12
**worked** 21:17
53:4 121:14
163:7 174:23
245:8 321:21
330:20 332:11
**working** 20:19
21:23 53:8
67:23 102:8
103:17 111:10
119:10 169:23
191:22 192:7
200:13 203:12
210:25 212:12
234:13,24
274:11 275:22
276:20,21,23
277:15,19
280:11 298:17
321:4
**workload** 141:8
166:6
**works** 53:2
54:11,13 85:20
89:18 90:15
103:19 191:4
192:4 214:15
305:16
**world** 91:12
241:18
**worth** 79:13
270:16
**worthy** 252:15
**wrapping**
329:23
**write** 16:8,9
24:18 130:15
211:25 254:25

283:20 310:4
324:20
**writes** 107:21
**writing** 16:5
26:18 119:17
253:2 312:20
314:3
**written** 32:24
130:24 154:18
202:19,21
216:23 233:14
254:8 255:2,7
256:11,23
266:14,14 270:3
278:3 292:18
294:22
**wrote** 24:23
26:13,14 155:15
256:15

| **x** |
| --- |

**x** 1:5,11 334:2,7

| **y** |
| --- |

**yeah** 34:4 50:8
77:17,25 78:6
79:15 81:10
85:24 90:23
114:5 135:25
142:6 149:12
159:17 175:13
185:10 194:22
195:16,18
214:21 225:9,16
250:24 262:19
278:14 280:9
295:13 298:9
327:23 329:25
332:8 333:4

**year** 15:13 44:22
69:23 82:10
105:11,15,21
110:12,13
111:17 158:11
159:8,11,25
169:10 184:24
189:16 212:4
250:17 300:9
305:24 306:3
**years** 13:20
44:15,18 47:9
52:12 81:21
97:11,12 104:8
127:6 140:18
144:10 160:12
172:18 209:5
211:20 241:7
**yep** 4:9 65:25
**yesterday** 8:25
**york** 1:3,22 2:5,5
2:11,11 46:19,23
50:3 156:7
192:12 245:7
335:5

| **z** |
| --- |

**z** 153:13 154:14
154:16,22
**zack** 2:12 33:25
**zone** 78:2
**zoom** 1:12,19 2:2
4:6 50:5

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.