UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH PASQUARELLO,

                              Plaintiff,

        -against-

CROTHALL HEALTHCARE, INC. and
MICHAEL ROCHE,

                              Defendants.

Case No. 1:21-cv-08732 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

        Plaintiff Joseph Pasquarello ("Plaintiff") brings this action against Crothall Healthcare,

Inc. ("Crothall") and Michael Roche (together with Crothall, "Defendants"), alleging

(1) discrimination based on his age in violation of the Age Discrimination in Employment Act

("ADEA"), 29 U.S.C. § 621 *et seq.*, the New York State Human Rights Law ("NYSHRL"), N.Y.

Exec. Law § 296, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin.

Code § 8-101, *et seq.*; (2) retaliation in violation of those same statutes; and (3) a violation of the

New York State Equal Pay Act ("NYS EPA"), N.Y. Lab. Law ("NYLL") § 194.  *See* ECF No. 1

("Compl.") ¶¶ 132-170.  Now before the Court is Defendants' motion for summary judgment on

all claims.  *See* ECF No. 44 ("Br."); *see also* ECF No. 58 ("Reply").[1]  Plaintiff opposes that

motion.  *See* ECF No. 54 ("Opp.").[2]  For the reasons set forth below, Defendants' motion is

---

[1] In connection with their motion, Defendants also filed: a Rule 56.1 Statement (ECF No. 43 ("56.1 Statement")); a declaration from Defendant Michael Roche, and accompanying exhibits (ECF No. 45 ("Roche Decl.")); a declaration from Robert Shaffer, and accompanying exhibits (ECF No. 46 ("Shaffer Decl.")); and a declaration from Shawn M. Clark, and accompanying exhibits (ECF No. 47 ("Clark Decl.")).

[2] In connection with his opposition, Plaintiff also filed: a Rule 56.1 Counterstatement (ECF No. 56 ("56.1 Counter")); a declaration from Leah Seliger, and accompanying exhibits (ECF No.

GRANTED in part, the Court declines to exercise supplemental jurisdiction, and this case is dismissed.

## BACKGROUND

The following facts are taken from the evidence submitted in connection with Defendants' summary judgment motion.  Unless otherwise noted, the facts are undisputed or construed in the light most favorable to Plaintiff.

### I.      History of Crothall's Fire Safety Department & Relevant Employees

Defendant Crothall Healthcare, Inc., is a leading healthcare services provider that supports hospital and health systems across the country in specific areas.  56.1 Counter ¶¶ 1-2. Those areas include environmental services, healthcare technology solutions, patient transportation, facilities management, ambulatory services, as well as sterile processing and laundry services.  *Id.* ¶ 3.  Crothall supports the Mount Sinai Health System ("Mount Sinai"), a healthcare network in New York.  *Id.* ¶ 4.  Crothall has provided fire safety management services to Mount Sinai since 2013, when Robert Shaffer largely handled the fire safety responsibilities. *Id.* ¶¶ 6-7.  Since then, more roles have been created in the department.  For instance, the role of Fire Safety Manager entails a host of responsibilities, including maintaining all documentation for fire safety programs, performing "necessary audits to ensure full compliance with the Joint Commission Standards and all governing agencies," participating in hospital management and safety meetings, assisting in mitigation of violations and fines, and other manager responsibilities.  *See id.* ¶ 14.  The role of Fire Safety Supervisor shares the following responsibilities with the Fire Safety Manager:

---

55 ("Seliger Decl.")); and a declaration from Plaintiff, and accompanying exhibits (ECF No. 57 ("Pl. Decl.")).

> [u]nderstanding and implementing Mt. Sinai fire & life safety
> policies, . . . Implementing and managing building fire safety plans,
> . . . Performing ILSM [interim live-saving measures] assessments
> and document preparation, . . . Managing and implementing the hot
> works program, . . . Managing and reviewing above ceiling
> permits[,] . . . Managing fire stopping program, . . . Managing and
> implementing the clear corridor program, . . . Participating in event
> walk-throughs to ensure life safety compliance, . . . Managing and
> reviewing lab inspections and required follow-up for corrective
> work, . . . Managing fire marshal staff . . . .

*Id.* ¶¶ 14-16.  At times, there has also been an employee in the position of Assistant Fire Safety

Director (including Plaintiff), whose duties include overseeing fire alarm and fire suppression

programs, maintenance of those fire alarm and suppression systems, performing ILSM,

performing audits to ensure compliance with joint commission standards, overseeing fire drill

and in-service training, implementing and managing fire safety plans, managing programs for

FDNY compliance, "[m]aintain[ing] public assembly compliance and permitting," and

overseeing other fire stopping programs.  *Id.* ¶¶ 16, 22, 25.

Defendant Michael Roche was hired in September 2013 as an Operations Manager.  *Id.*

¶ 40.  By 2022, he was the Regional Director of Operations for the Mount Sinai Health System.

*See* Roche Decl. ¶ 6.  As Resident Regional Manager, members of the Fire Safety Department

reported to him.  *See* 56.1 Counter ¶ 45.  The parties dispute whether Roche interviews all

candidates for roles in the Fire Safety Department.  *See id.* ¶ 44; Roche Decl. ¶ 9; Pl. Decl. ¶ 55.

## II.   Plaintiff's Employment at Crothall

### A.   Plaintiff's Hiring and Training

Following interviews with Shaffer and Roche, Plaintiff was hired as Assistant Fire Safety

Director in the fall of 2019.  *See* 56.1 Counter ¶¶ 55, 58.  Plaintiff contends that he was also

interviewed by the Senior Vice President of Mount Sinai Health Systems, Pat Lamb, and that

Shaffer ultimately hired Plaintiff on the spot.  Pl. Decl. ¶¶ 5-6.  Roche and Shaffer assert that

Roche made the ultimate decision to hire Plaintiff.  *See* Roche Decl. ¶ 23; Shaffer Decl. ¶ 15.
Plaintiff's background as a firefighter made him suitable for the role, in Shaffer's view.  56.1
Counter ¶ 56.  The parties agree that when Plaintiff started in his role, Matthew Bond, a Fire
Safety Supervisor, and Joseph Jurain, a Fire Safety Manager, directly reported to him.  *Id.* ¶¶ 15,
47, 58.  Plaintiff reported to Roche.  *Id.* ¶ 121.

General training for employees at the Fire Safety Department included a program called
"Foundations" that teaches new employees how the department is run, how the department's
systems work, how the "TeamOps" program to track orders works, and how to use "TeamDocs,"
the program the department uses to store documents and records.  *Id.* ¶¶ 33-38.  During the
COVID-19 pandemic, Foundations training was not held, and Plaintiff received his training
through one-on-one training with members in the department.  *Id.* ¶ 39.  Plaintiff contends that
he did not receive significant training.  *Id.* ¶¶ 138-141.

### B.  Plaintiff's Evidence of Discrimination

Over the course of Plaintiff's employment at Crothall, he argues that he was subject to
discrimination on the basis of his age.  In support of these allegations, he describes the following
incidents:

- Roche formed a "clique" with younger employees, who ate lunch together and
  watched sports together during work hours.  *Id.* ¶¶ 176-179.

- Roche "acted in a condescending manner" towards Plaintiff and Ron Kanterman, a
  Fire Safety Manager, who were both "older employees."  *Id.* ¶¶ 27, 180-181.  Roche
  yelled at Plaintiff, made comments about his lack of engineering knowledge, and
  made comments about his computer skills and cyber-security knowledge, "implying
  that [Plaintiff's] lack of knowledge was due to his age."  *Id.* ¶¶ 182-185.

- In April 2020, in front of others when walking through the hospital, Roche said: "We better take the elevator.  Don't let the old guy walk the stairs."  *Id.* ¶ 186.

- Roche regularly commented on "Fire Safety's" deficiencies with remarks such as, "What do you expect?  It's fire safety."  *Id.* ¶ 187.

- Other employees commented on Plaintiff's age, including by saying to Plaintiff after he had to be taken to the emergency room following smoke inhalation from a fire, "You thought you were still young.  There's a reason they retired you."  *Id.* ¶ 188.  Another employee "joked with Roche" about Plaintiff's use of glasses.  *Id.* ¶ 189.

- Roche ignored Plaintiff's input in favor of younger employees, such as by not providing the Fire Safety Department with a set of elevator keys and ignoring Plaintiff's advice.  *Id.* ¶¶ 191-193.

- Roche ignored Plaintiff's request to have a television in his office, despite allowing others to have them.  *Id.* ¶¶ 195-201.  Plaintiff also asserts that Roche did not permit him to purchase a laptop, falsely contending that "each department was only budgeted for one laptop."  *Id.* ¶¶ 202-204.  Similarly, Roche ignored Plaintiff's requests for a monitor, despite the fact that Plaintiff was supposed to have a budget for one.  *Id.* ¶¶ 206-211.

### C.  October 2020 Performance Review

The parties agree that on October 29, 2020, Plaintiff received a written job performance assessment from Roche.  *Id.* ¶ 69.  That assessment explained that Plaintiff needed to improve his time management skills, and in particular, noted that "he continued to close preventative measures on the last day of the month, and . . . he was failing to complete his interim life-saving measure reviews in a timely manner."  *Id.* ¶ 70.  They also agree that on or around December 9,

2020, Roche began to write up "a counseling" for Plaintiff, but he withdrew it after a discussion with Shaffer. *Id.* ¶¶ 72-73. Shaffer instead agreed to take a more direct role in assisting Plaintiff with his responsibilities "after Roche expressed his displeasure with [Plaintiff's] work product and his intention to write an associate counselling report." *Id.* ¶ 73.

The parties disagree about the circumstances that led to Roche's October 2020 review. Specifically, the parties dispute some of the details surrounding events that took place in late fall 2019 and early 2020 involving "delayed door closers." Plaintiff contends that the hospital "wanted to address the fact that the doors to terminal chute rooms regularly broke because hospital staff jammed the doors to hold them open," and "proposed installing delayed door closers" which would hold the door open automatically. Pl. Decl. ¶ 189. Defendants argue that these types of doors "prevent a door from opening immediately when an individual tries to exit . . . to prevent unauthorized exits or entrances." 56.1 Counter ¶ 61. Notwithstanding this, the parties agree that Roche told Plaintiff around November 26, 2019 to install these doors. *Id.* ¶ 59; Pl. Decl. ¶ 191. In response, Plaintiff says that he told Roche he thought the doors could pose a fire safety hazard, and they engaged in discussions about how to properly keep doors open (without letting staff jam the doors). Pl. Decl. ¶¶ 192-194. Defendants, however, maintain that Roche told Plaintiff to install the delayed doors immediately; this project entailed installation of a fire door that Plaintiff was responsible for maintaining; and Plaintiff failed to install the doors by October 16, 2020, after repeated requests from Roche. 56.1 Counter ¶¶ 62-68. Plaintiff denies this narrative, and maintains that after ongoing discussions about whether to install the delayed doors, he promptly "facilitated the installation of the delayed door closures, which were completed by October or November 2020." Pl. Decl. ¶¶ 193-198. Plaintiff also maintains that

Roche did not bring up this issue as part of the October 2020 review, or any other review.  *Id.*
¶ 200.

After the October 2020 review, Shaffer worked with Plaintiff to improve his
performance, but the parties dispute Shaffer's views about Plaintiff's work during that time.
Defendants contend that Shaffer came to understand that Plaintiff did not know how to use
TeamDocs or TeamOps, that he had his own system, and that Plaintiff "simply did not
understand his role and was not even trying to meet these expectations set for him."  56.1
Counter ¶¶ 74-77.  Plaintiff disputes these assertions, says that he never spoke to Shaffer about
the programs at all, and maintains that Shaffer continued to support him, including by
nominating him for "Leader of the Month" in February 2021.  *Id.* ¶ 77; Pl. Decl. ¶ 109.

### D.  May 2021 Meetings, June 2021 Performance Improvement Plan (PIP), and Complaint to Human Resources

The parties also agree that on May 25, 2021, Roche and Plaintiff met to discuss
Plaintiff's work, and Roche relayed to Plaintiff that he felt that Plaintiff's "job performance
needed substantial improvement and that he was not meeting expectations."  56.1 Counter ¶ 92.
However, the parties disagree as to certain facts leading up to this meeting.

In 2021, Mount Sinai was subject to an audit by the Joint Commission, a nationwide
healthcare accrediting agency.  56.1 Counter ¶ 78; *see* Pl. Decl. ¶ 56.  The Fire Safety
Department had to ensure that it was in compliance with regulations for the audit.  56.1 Counter
¶ 79.  Defendants contend that, prior to the audit, Plaintiff "failed to sufficiently document work
orders including whether improperly working doors were fixed."  *Id.* ¶ 80.  Plaintiff maintains
that he adequately documented fire door deficiencies as agreed-upon by Roche, and created
sufficient work orders for those deficiencies, including Roche on the process.  *See id.* ¶¶ 266-
278; Pl. Decl. ¶¶ 138-146.  The parties also dispute whether the cost of using an outside vendor

for part of the process was an unexpected, or planned, expense.  *See* 56.1 Counter ¶¶ 81-82; Pl. Decl. ¶ 147.  Moreover, Plaintiff maintains that Roche understood Plaintiff's process, and never told Plaintiff to change his method.  56.1 Counter ¶ 278.

Roche and Plaintiff met on May 10, 2021.  *See id.* ¶¶ 90, 215.  According to Defendants, by that day, Plaintiff had "failed to provide notice to Crothall's insurance provider – FM Global Risk Management – of an impairment to a fire pump that services 5 buildings."  *Id.* ¶ 85. Plaintiff, on the other hand, claims that:  a plumbing team did not inform him about work needed on a fire pump; fire marshals are generally in charge of informing the fire department and FM Global; and when FM Global discovered the pump was offline on May 6, 2021, Plaintiff told Roche what had occurred.  *See* Pl. Decl. ¶¶ 148-152.  Plaintiff insists that the fire pump was not discussed at the May 10 meeting, and instead, at that meeting, Plaintiff confronted Roche about how he was being treated.  *See* 56.1 Counter ¶¶ 215-217.  He claims to have told Roche he was being held to a different standard than younger employees, and in response, Roche informed Plaintiff that he "did not see" Plaintiff with the department long term.  *Id.*  Plaintiff also asserts that Roche offered to transfer Plaintiff to Brooklyn, and asked him, "I know you're in your second career.  Why are you still working?"  *Id.* ¶ 220.  While Roche contends that he questioned Plaintiff about his alleged failure to alert FM Global to the fire pump issue at that meeting, *see* Roche Decl. ¶ 52, Plaintiff insists that the disputed incident was not discussed, *see* Pl. Decl. ¶ 152.  Plaintiff states that, on May 10, 2021, he reported the conversation to Crothall's Human Resources ("HR") Manager, Patricia Lizarazo.  56.1 Counter ¶ 222.

Plaintiff thereafter requested another meeting with Roche, and they met on May 25, 2021. *See id.* ¶ 92.  The parties agree that, at the meeting, "[i]t was clear that Roche felt that [Plaintiff's] job performance needed substantial improvement and that he was not meeting

expectations." *Id.*  Plaintiff further contends that, at that meeting, he "asked Roche to clarify what [he] failed to accomplish" and Roche responded that, if "pushed . . . to clarify, he would have to write [Plaintiff] up, and that would expedite the process of [Plaintiff] leaving the department."  Pl. Decl. ¶ 120.  After the meeting, Roche began to draft a written performance improvement plan ("PIP"), and disciplinary counseling.  56.1 Counter ¶ 93.

After that meeting, on May 26, 2021, Plaintiff wrote to HR's manager Lizarazo to inform her that "he believed that Roche was discriminating against him because of his age."  *Id.* ¶ 94. The HR department opened an investigation into Plaintiff's claim, and on June 4, 2021, concluded that Roche had not discriminated against Plaintiff.  *Id.* ¶¶ 95-96.  Roche was then granted permission to move forward with the PIP and counseling, and did so on June 10, 2021. *Id.* ¶¶ 97-98.  The PIP required Plaintiff to meet certain standards, including but not limited to "[t]imely completion and closing of all preventative maintenance tasks completed by a vendor or in house Fire Safety staff" and "[e]nsur[ing] life safety work orders are created for all life safety deficiencies by the next business day per your current procedure."  *Id.* ¶ 99 (listing all standards). Roche and Plaintiff met regularly about this PIP, but the parties dispute how successful Plaintiff was in meeting those standards.  *Id.* ¶ 100.

### E.   July 2021 Counseling and Letter to Human Resources

The parties further agree that, on July 19, 2021, Plaintiff received a second counseling from Roche.  *Id.* ¶ 101.  Once again, however, the parties dispute what led to this counseling.  *Id.*

After Plaintiff was presented with the June 10, 2021 PIP, he argues that Roche informed him that Crothall would be hiring a new Director of Fire Safety – a position that had been vacant – and that Plaintiff would no longer be able to hire people in the department, or make decisions without approval from the new director.  *Id.* ¶¶ 234, 236; Pl. Decl. ¶ 153.  Believing that Roche intended to "push out" Plaintiff, Plaintiff filed another complaint with HR on June 11, 2021,

alleging that the PIP and counseling were in retaliation for his first complaint.  Pl. Decl. ¶ 156.
Plaintiff states that Roche's treatment of Plaintiff worsened after this complaint.  He says that
Roche "embarrassed [him] about the PIP" in front of a group of younger employees.  *Id.* ¶ 158.
Additionally, Plaintiff contends that, around June 14-16, 2021, Roche blamed Plaintiff for an
error made by Roche's staff, and "berated" Plaintiff in front of a vendor.  *Id.* ¶¶ 159-160.  The
stress of this incident, Plaintiff claims, sent him to the emergency room and forced him to miss
several days of work.  *Id.* ¶¶ 160-161.  Plaintiff was further humiliated when Roche hired Bernie
Nunez, a younger man, as the new Director of Fire Safety, and did not promote Plaintiff.  *See id.*
¶¶ 162-163.  After Nunez's hiring, Plaintiff claims that he received a reduction in duties that
effectively demoted him.  *Id.* ¶¶ 164-165.  On July 19, 2021, a day after Nunez's hiring, Roche
issued Plaintiff the second counseling.  56.1 Counter ¶ 101.  Plaintiff says the second counseling
was a total surprise to him, despite meeting with Roche frequently.  Pl. Decl. ¶ 167.

Defendants, on the other hand, contend that this counseling was the result of Plaintiff
"fail[ing] to close a preventative maintenance task promptly and [leaving] other tasks open."
56.1 Counter ¶ 101.  The counseling specifically pointed to one work order that Defendants say
Plaintiff "failed to close out . . . by the required timeframe, and he failed to implement an interim
life safety measure (ILSM) – a process by which the fire safety team identifies the measures
required to be taken if a fire emergency occurs if a particular function, such as a door, failed."
*Id.* ¶ 102.  An ILSM is a "core duty" of the Fire Safety Department.  *Id.* ¶ 105.  Plaintiff responds
that the work order was for an annual test that was not required to be completed by June.  Pl.
Decl. ¶¶ 170-172.  He maintains that Bond was responsible for the work order.  *Id.* ¶ 173.  He
further explains that the ILSMs that were "not closed within 24 hours of certain dates" fell within
his sick leave and vacation, and Kanterman was responsible for closing them.  *Id.* ¶¶ 174-175.

Plaintiff provides other justifications that, in his view, refute the comments made in the July 2021 counseling.  *See id.* ¶¶ 176-182.

Plaintiff wrote another letter to HR after receiving the July 2021 counseling, alleging that the counseling was invalid and retaliatory.  56.1 Counter ¶ 106.  HR opened an investigation, and concluded that Plaintiff had not been subject to retaliation.  *Id.* ¶ 107.

### F.   September 2021 Resignation

Following the July 2021 counseling, the parties agree that Roche drafted another PIP assessment, but Plaintiff contends that it was never approved by HR and presented to him.  *See id.* ¶¶ 108-111; Pl. Decl. ¶ 180 (contending that an error included in September 2021 draft PIP was Nunez's error, and Plaintiff only learned of the draft during this lawsuit).  Nevertheless, Plaintiff claims that, when Roche blamed Plaintiff for a mistake of another employee, Plaintiff "knew that [Roche] was preparing to issue [him] a final PC, and that [he] would likely be terminated."  Pl. Decl. ¶ 186.  He states that from July through September 2021, he was experiencing extreme stress, including physical symptoms, and had been to the hospital twice "in connection with the stress induced by Roche's discriminatory and retaliatory treatment of [him]."  *Id.* ¶ 183.  On September 21, 2021, Plaintiff resigned from Crothall.  56.1 Counter ¶ 113.  Defendants counter they had no intention of firing Plaintiff.  *Id.* ¶ 112.

Nunez was hired as Director of Fire Safety on July 18, 2021.  *Id.* ¶ 30.  He appointed Bond to Plaintiff's role after Plaintiff resigned.  *Id.* ¶ 32.

### III.   Procedural History

Plaintiff initiated this action on October 25, 2021.  *See generally* Compl.  On June 29, 2022, the Court denied Defendants' motion to compel arbitration on the record.  ECF No. 33.  After the parties completed discovery, the Court approved their briefing schedule for summary judgment on August 12, 2022.  ECF No. 38.  On September 16, 2022, the case was reassigned to

the undersigned.  ECF No. 39.  On October 4, 2022, Defendants filed their motion for summary

judgment.  *See* ECF No. 42; *see also* Br.  Plaintiff filed his opposition on November 22, 2022,

*see* Opp., and Defendants filed their reply on December 12, 2022, *see* Reply.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a moving party is entitled to summary

judgment if, on any claim or defense, that party "shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A

"genuine" dispute is one in which "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A

fact is "material" only if it "might affect the outcome of the suit under the governing law . . . ."

*Id*.  Thus, "the substantive law will identify which facts are material."  *Id.*

At summary judgment, the court's task is simply to "discern[] whether there are any

genuine issues of material fact to be tried, not to decid[e] them."  *Gallo v. Prudential Residential

Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  Therefore, "[c]redibility assessments,

choices between conflicting versions of the events, and the weighing of evidence are matters for

the jury, not for the court on a motion for summary judgment."  *Fischl v. Armitage*, 128 F.3d 50,

55 (2d Cir. 1997).  The court is "required to resolve all ambiguities and draw all permissible

factual inferences in favor of the party against whom summary judgment is sought."  *Est. of

Gustafson ex rel. Reginella v. Target Corp.*, 819 F.3d 673, 675 (2d Cir. 2016) (quoting *Stern v.

Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).  "Affidavits submitted in support of

or in opposition to the summary judgment motion must 'be made on personal knowledge, shall

set forth such facts as would be admissible in evidence, and shall show affirmatively that the

affiant is competent to testify to the matters stated therein.'"  *Patterson v. Cnty. of Oneida*, 375

F.3d 206, 219 (2d Cir. 2004) (internal citation omitted); *see also* Fed. R. Civ. P. 56(c)(4).

## DISCUSSION

The Court will analyze Plaintiff's federal claims of age discrimination and retaliation first

and then address his state and city claims.

### I.      Age Discrimination Claim

Plaintiff brings claims under the ADEA, alleging that he was discriminated against due to

his age.  Under the ADEA, an employer must not "discriminat[e] against any individual . . .

because of such individual's age."  29 U.S.C. § 623(a)(1).  Discrimination claims under the

ADEA are analyzed under the *McDonnell Douglas* burden-shifting framework.  *See Carr v.*

*N.Y.C. Transit Auth*., --- F.4th ---, No. 22-792-cv, 2023 WL 5005655, at *3 (2d Cir. Aug. 7,

2023) (applying *McConnell Douglas* framework to ADEA claims).  Under this framework, to

defeat summary judgment, a plaintiff must first establish a *prima facie* case of discrimination, by

showing that: "(1) [he] was within the protected class; (2) [he] was qualified for the position; (3)

[he] was subject to an adverse employment action; and (4) the adverse action occurred under

circumstances giving rise to an inference of discrimination."  *Adams v. Equinox Holdings, Inc.*, -

-- F.Supp.3d ----, No. 19-cv-08461 (JPC), 2023 WL 2561508, at *5 (S.D.N.Y. Mar. 17, 2023)

(internal quotation marks omitted).  "[O]nce a plaintiff produces minimal evidentiary support for

the claim of discriminatory motivation, the burden of production shifts to the employer to

articulate a non-discriminatory reason for the adverse employment action."  *Davis v. New York*

*City Dep't of Educ*., 804 F.3d 231, 235 (2d Cir. 2015); *see also Carr*, 2023 WL 5005655, at *3.

"If the employer does so, then the burden shifts back to the employee to show that the

employer's articulated reason is pretext for discrimination."  *Carr*, 2023 WL 5005655, at *3

(quoting *Truitt v. Salisbury Bank & Tr. Co.*, 52 F.4th 80, 86-87 (2d Cir. 2022)).  A plaintiff can show that the proffered reason is merely a pretext "in the ADEA context 'by presenting facts which taken in [his] favor suffice to show that a triable issue exists as to whether [his] age was a "but for" cause of [his] termination.'"  *Adams*, 2023 WL 2561508, at *5 (quoting *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168 (2d Cir. 2014)).  Even within this framework, the plaintiff bears the "ultimate burden of persuading the court that [he] has been the victim of intentional discrimination."  *Carr*, 2023 WL 5005655, at *3 (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981)).

The Court first considers whether Plaintiff has established a *prima facie* case of discrimination.  Defendants do not dispute that Plaintiff belongs to a protected class or that he was qualified for his position, but rather they argue that Plaintiff has failed to establish that he suffered an adverse employment action under circumstances giving rise to an inference of discrimination.  *See* Br. at 8-10.  The Court agrees.

In order to establish an "adverse employment action," an employee must put forth evidence that he suffered a "materially adverse change in the terms of his employment." *Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 524 (S.D.N.Y. 2015) (internal citation and quotation marks omitted).  That is, the employee must experience "a change in working conditions" that is "more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Id.* (quoting *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 843 (S.D.N.Y. 2013)).  Common examples include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation."  *Id.* (quoting *Bloomberg L.P.*, 967 F. Supp. 2d at 843).  Courts in this Circuit have agreed that

negative evaluations and other discipline are not sufficient, by themselves, to constitute an adverse employment action. *See id.* at 525 (concluding that "[a]bsent some indication that the PIP was an unachievable pretext to facilitate [the plaintiff's] termination at the end of its duration . . . , the mere fact that failure to abide by its terms could lead to termination does not transform the PIP into a materially adverse employment action"); *see also McGrath v. Thomson Reuters*, No. 10-cv-04944 (JSR) (JCF), 2012 WL 2119112, at *11 (S.D.N.Y. Apr. 30, 2012) (collecting cases for the proposition that "[t]he issuance of a performance improvement plan to an employee is simply not an adverse employment action"), *report and recommendation adopted*, No. 10-cv-04944 (JSR) (JCF), 2012 WL 2122325 (S.D.N.Y. June 12, 2012), *aff'd*, 537 F. App'x 1 (2d Cir. 2013).

The PIP and counseling that Plaintiff received in the summer of 2021 are not "materially adverse" employment actions in the discrimination context. The PIP and counseling did not change Plaintiff's responsibilities or his wages. Rather, "the [June 2021] PIP clarified the expectations for [Plaintiff's] position," *Gorman*, 146 F. Supp. 3d at 524-25, by setting forth seven "tasks" for "performance improvement," ECF No. 45-3 ("June 2021 PIP"); *see also* 56.1 Counter ¶¶ 99-100. Those tasks included, but were not limited to, "[t]imely completion and closing of all preventative maintenance tasks completed by a vendor or in house Fire Safety staff" and "[e]nsur[ing] life safety work orders are created for all life safety deficiencies by the next business day per your current procedure." 56.1 Counter ¶ 99 (listing all standards). Plaintiff has not established that these standards are inconsistent with the responsibilities associated with his role as Assistant Fire Safety Director. In fact, the parties agree that the duties of the Assistant Fire Safety Director include overseeing fire alarm and fire suppression programs, maintenance of those fire alarm and suppression systems, performing ILSM, performing audits

to ensure compliance with joint commission standards, overseeing fire drill and in-service training, implementing and managing fire safety plans, managing programs for FDNY compliance, "[m]aintain[ing] public assembly compliance and permitting," and overseeing other fire stopping programs. *Id.* ¶ 20. "A comparison of the [Assistant Fire Safety Director] job description to the Performance [Improvement Tasks] set forth in the PIP indicates that the PIP effected no substantial change to [Plaintiff's] responsibilities, but merely provided a more detailed framework within which he was to perform his work." *Gorman*, 146 F. Supp. 3d at 525. The same is true of the July 2021 counseling report. *Compare* ECF No. 45-4 ("July 2021 PC") *with* 56.1 Counter ¶ 20. Plaintiff has not provided any evidence, absent conjecture, that these standards were "an unachievable pretext to facilitate [his] termination." *Gorman*, 146 F. Supp. 3d at 525. Accordingly, the PIP and counseling are not materially adverse employment actions.[3]

Plaintiff also argues that he was constructively discharged by the hostile work environment at Crothall. *See* Opp. at 24-25. "[C]onstructive discharge requires a showing that 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Gorman*, 146 F. Supp. 3d at 526 (quoting *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983)). "[A] claim of constructive discharge cannot survive a motion for summary judgment based only on the employee's subjective beliefs about his working conditions. Instead, the employee must present some objective evidence of intolerable working conditions." *Bryant v. Greater New Haven*

---

[3] Defendants argue that Crothall's hiring of Nunez as a Fire Safety Director was not an adverse employment action in that it did not effectively demote Plaintiff. *See* Br. at 9-10. Plaintiff does not address this argument in opposition, and therefore any argument that he was effectively demoted was waived. *See Conklin v. U.S. Immigr. & Customs Enf't*, --- F.Supp.3d ---, No. 20-cv-08178 (LTS), 2023 WL 2537665, at *15 (S.D.N.Y. Mar. 16, 2023) ("Generally, an argument not addressed in an opposition to a summary judgment motion is considered waived.").

*Transit Dist.*, 8 F. Supp. 3d 115, 138 (D. Conn. 2014).  The standard is similar, but higher, than

the standard for a hostile work environment claim, such that, "[w]ithout an actionable hostile

environment claim, [a] plaintiff's constructive discharge claim must also fail." *Nakis v. Potter*,

422 F. Supp. 2d 398, 412 (S.D.N.Y. 2006) (internal quotation marks and citation omitted).

Plaintiff argues that Roche's statements and behavior toward Plaintiff – including that

Roche expressed that he did not see Plaintiff in the department long-term and suggested Plaintiff

transfer, the PIP and counseling, and comments by Roche that "embarrassed" Plaintiff –

collectively demonstrate that Roche was looking to push Plaintiff out of the company.  *See* Opp.

at 24-25.  But a constructive discharge is not established merely when an "employee feels that

the quality of his work has been unfairly criticized" or that "the employee's working conditions

were difficult or unpleasant." *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993).

Here, Roche issued a PIP and counseling that "created a roadmap for [Plaintiff] to succeed in his

position, with ongoing guidance and support from [Plaintiff's] supervisors." *Gorman*, 146 F.

Supp. 3d at 526.  Moreover, "[n]othing about the PIP" or counseling "indicates that resignation

was [Plaintiff's] only reasonable option." *Id.*  Nor does the record of undisputed facts permit an

inference that the working conditions were "so intolerable that a reasonable person" in Plaintiff's

position would feel compelled to resign. *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1157 (2d

Cir. 1993).

Plaintiff's conclusory evidence that Roche formed a "clique," "acted in a condescending

manner" towards Plaintiff, and made comments about Plaintiff's knowledge about engineering,

are not only vague, but do not suggest an environment so intolerable that a reasonable person

would be forced to resign.  Plaintiff provides an estimated date (April 2020) for only one specific

comment from Roche; namely, Roche said, "We better take the elevator.  Don't let the old guy

walk the stairs," 56.1 Counter ¶ 186, which occurred more than a year prior to Plaintiff's

departure. *See Rimpel v. AdvantageCare Physicians, P.C.*, 486 F. Supp. 3d 625, 638 (E.D.N.Y.

2020) ("The timing of the remarks tends to minimize rather than amplify their probative value.").

The other comments made by Roche – including "Why are you still working?" – were made in

the context of discussions about Plaintiff's PIP and counseling, both of which involved

procedures to *keep* Plaintiff working.  For these reasons, and because the Court concludes that

Plaintiff has not established a hostile work environment claim, *see infra* at Discussion § II, he

similarly has not met his burden to defeat summary judgment with respect to a constructive

discharge.

Finally, Plaintiff appears to argue that he suffered an adverse employment action because

Nunez was paid more than him.  *See* Opp. at 12-13.  The Court rejects this argument.  To be

sure, "[s]ubjecting an employee to unequal pay can, of course, constitute a materially adverse

employment action."  *LeeHim v. New York City Dep't of Educ.*, No. 17-cv-03838 (PAE), 2017

WL 5634128, at *6 (S.D.N.Y. Nov. 21, 2017).  However, "the key inquiry is whether the

plaintiff has provided adequate comparators who are similarly situated in all material respects,"

and a plaintiff must demonstrate this by showing the "comparators' relevant experience and

length of employment."  *Id.*  The undisputed facts in the record demonstrate that Nunez had a

different job than Plaintiff.  Nunez was hired as the Director of Fire Safety, while Plaintiff was

the Assistant Director of Fire Safety.  56.1 Counter ¶ 30.  Plaintiff has not put forth any facts

about their comparative job responsibilities and duties, or background and experience, from

which the Court could infer that Nunez is an adequate comparator necessary to conclude that

there is a dispute of material fact as to whether Plaintiff was subject to an adverse employment

action via a pay disparity.

Having failed to meet his burden to show that he was subject to an adverse employment action, he has not established a *prima facie* case for discrimination under the ADEA. Therefore, Defendants' motion is granted with respect to that claim.

## II.   Hostile Work Environment Claim

The Court next considers Plaintiff's argument that there are disputed issues of material fact regarding a hostile work environment claim under the ADEA. *See* Opp. at 14-16. As an initial matter, it is unclear that Plaintiff has brought a hostile work environment claim in the Complaint, as none of the causes of action mention a hostile work environment. *See* Compl. ¶¶ 132-170; *Wilkins v. United Parcel Serv., Inc.*, No. 19-cv-08180 (VB), 2022 WL 597431, at *6 n.5 (S.D.N.Y. Feb. 28, 2022) (declining to "construe the complaint as asserting a hostile work environment claim" when "the allegations . . . make no reference to 'hostile work environment'"); *see also Craven v. City of New York*, No. 19-cv-01486 (JMF), 2020 WL 2765694, at *4 n.2 (S.D.N.Y. May 28, 2020) (declining to construe the complaint as asserting a hostile work environment claim even through the plaintiff "makes reference to a hostile work environment" in opposition to the motion to dismiss). Even if such a claim were pleaded, based on the record presented, Defendants are still entitled to summary judgment on the claim.

"To prevail on a federal hostile work environment claim, a plaintiff must show conduct that (1) is objectively severe or pervasive – that is, . . . creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's protected characteristic." *Adams*, 2023 WL 2561508, at *8 (internal quotation marks and citation omitted). In order to establish a hostile work environment under the ADEA, the plaintiff must show that his "workplace [was] permeated with discriminatory intimidation, ridicule, and

insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Gorman*, 146 F. Supp. 3d at 527.  When evaluating this claim, a court ought to "distinguish between merely offensive or boorish conduct and conduct that is sufficiently severe or pervasive as to alter the conditions of employment, considering the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *O'Dell v. Trans World Ent't Corp.*, 153 F. Supp. 2d 378, 386 (S.D.N.Y. 2001)) (internal quotation marks omitted).

Plaintiff points to the following evidence in support of his claim for a hostile work environment: Roche's purportedly ageist comments to Plaintiff, "belittling," permitting younger employees to make ageist comments, refusing to provide him with equipment that was provided to younger employees, refusing to allow Plaintiff to "fully staff" the Fire Safety Department, threatening Plaintiff's job at counseling meetings, issuing a "groundless PIP," and maintaining a "clique" of younger employees.  Opp. at 14.  But Plaintiff's recitation of these facts exaggerates their pervasiveness and severity.  Looking closely at the facts in the record, which the Court construes in the light most favorable to Plaintiff, Plaintiff's evidence constitutes only generalizations, *see* 56.1 Counter ¶¶ 176-179 (describing a "clique"); ¶¶ 180-185 (describing without specificity that Roche "acted in a condescending manner" and made comments "implying [Plaintiff's] lack of knowledge was due to his age"), and isolated remarks from Roche, *see id.* ¶ 186 (describing Roche's April 2020 comment saying they should not "let the old guy walk the stairs"), or from co-workers, *see id.* ¶¶ 188-189 (describing comments by other employees).  As to comments by his co-workers, Plaintiff has failed to "show that a specific basis exists for imputing the conduct that created the hostile environment to the employer."

*Adams*, 2023 WL 2561508, at *8 (quoting *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000)).  Absent more specificity, Plaintiff has also failed to present evidence that Roche's comments were "extraordinarily severe," or that he made comments that were "sufficiently continuous and concerted in order to be deemed pervasive."  *Id.* at *8 (internal quotation marks and citation omitted); *see also Berger-Rothberg v. City of New York*, 803 F. Supp. 2d 155, 164 (E.D.N.Y. 2011) (noting that "[c]asual comments, or accidental or sporadic conversation" are generally insufficient to support a hostile work environment claim).  The remaining conduct to which Plaintiff points does not, even in combination with the comments, "show a workplace permeated with discriminatory intimidation, ridicule and insult."  *Del Franco v. New York City Off-Track Betting Corp.*, 429 F. Supp. 2d 529, 542 (E.D.N.Y. 2006), *aff'd*, 245 F. App'x 42 (2d Cir. 2007) (internal quotation marks and citation omitted); *see* 56.1 Counter ¶¶ 191-193 (describing Roche giving a younger employee a set of keys and not listening to Plaintiff's input); ¶¶ 195-211 (describing Roche not giving Plaintiff his requested television, laptop, or monitor).

For all of these reasons, Plaintiff has failed to put forth sufficient evidence of a hostile work environment under the ADEA, and Defendants are entitled to summary judgment.

## III.    Retaliation Claim

Plaintiff also brings claims under the ADEA alleging that he was retaliated against for complaining that Roche's treatment of him was discriminatory.  The *McDonnell Douglas* burden-shifting framework also applies to claims for retaliation.  *See Carr*, 2023 WL 5005655, at *4.  Under the ADEA and similar federal statutes, "[t]o establish a *prima facie* case of retaliation, a plaintiff must demonstrate that (1) [he] engaged in protected activity, (2) the defendant was aware of that activity, (3) [he] was subjected to a retaliatory action, or a series of retaliatory actions, that were materially adverse, and (4) there was a causal connection between

the protected activity and the materially adverse action or actions." *Carr*, 2023 WL 5005655,

at \*5.  Defendants argue that they are entitled to summary judgment on Plaintiff's retaliation

claim because the purportedly adverse actions – the negative reviews, PIP, and counseling – are

part of a series of actions that began *before* Plaintiff's protected conduct (the complaints to HR),

undermining any causal connection.  *See* Br. at 20-22.  The Court agrees.

  While generally speaking, "[t]he causal connection needed for proof of a retaliation claim

can be established indirectly by showing that the protected activity was closely followed in time

by the adverse action," *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 224 (2d Cir.

2001) (internal quotation marks and citation omitted), where "timing is the only basis for a claim

of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in

any protected activity, an inference of retaliation does not arise," *Chamberlin v. Principi*, 247 F.

App'x 251, 254 (2d Cir. 2007) (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87,

95 (2d Cir. 2001)).  When defendants have articulated some non-discriminatory reason for the

adverse actions, "[t]emporal proximity alone is insufficient to defeat summary judgment at the

pretext stage." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013).  In turn, "a

plaintiff may prove that retaliation was a . . . cause of an adverse employment action by

demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's

proffered legitimate, nonretaliatory reasons for its action." *Id.* at 846.[4]

---

[4] As other courts in this District have observed, "[r]egarding causation, the law is unsettled as to
whether the Supreme Court's decision in *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180
(2009), requires but-for causation only for ADEA claims of disparate treatment, leaving ADEA
retaliation claims to be decided under the more relaxed 'motivating factor' test. *Massaro v. Bd.
of Educ. of City Sch. Dist. of City of New York*, No. 17-cv-08191 (LGS), 2021 WL 184364, at \*5
(S.D.N.Y. Jan. 19, 2021), *aff'd sub nom. Massaro v. N.Y.C. Dep't of Educ.*, No. 21-266-CV,
2022 WL 1788203 (2d Cir. June 2, 2022).  However, the Supreme Court has applied the "but-
for" test in retaliation claims under Title VII, and the Second Circuit and district courts within
the Second Circuit, in non-binding opinions, have largely agreed that the standard is the same

Defendants argue that, even though the PIP and counseling occurred within the same two-month time period that Plaintiff complained to HR, they were the culmination of progressive disciplinary actions, starting with Roche's assessment of Plaintiff in October 2020, where Roche indicated that Plaintiff needed to improve his time management skills, "that he continued to close preventative measures on the last day of the month, and that he was failing to complete his interim life-saving measure reviews in a timely manner." 56.1 Counter ¶ 70. Plaintiff did not complain to HR until at least May 10, 2021. *See id.* ¶ 222 (describing complaint to HR that Roche had been behaving discriminatorily). Plaintiff counters that because no "tangible actions were taken against Plaintiff before he engaged in protected activity," Defendants are not entitled to summary judgment. Opp. at 22.

Plaintiff points to no case law to support a requirement that there be a "tangible act" in order to establish that progressive discipline began before protected activity. Plaintiff merely emphasizes that, unlike in the cases cited by Defendants, here Roche did not actually sign a PIP or counseling in October or December 2020. *See id* at 21-22. Regardless of this, the undisputed evidence shows that Defendants were beginning to critique and discipline Plaintiff long before his May 2021 complaints to HR. The parties agree that on October 29, 2020, Plaintiff received a written job performance assessment from Roche; that assessment explained that Plaintiff needed to improve his time management skills, and in particular, that "he continued to close preventative

---

under the ADEA. *See Weiss v. Quinnipiac Univ.*, No. 20-cv-00375 (JCH), 2021 WL 4193073, at *8 n.6 (D. Conn. Sept. 15, 2021) (providing overview of current law and deciding to apply "but for" standard); *see also Abdelsayed v. NYC Dep't of Educ.*, No. 16-cv-01775 (CBA) (LB), 2019 WL 13271813, at *10 (E.D.N.Y. Mar. 12, 2019) ("Although the Second Circuit has not squarely defined the causation standard for an ADEA retaliation claim, the Court agrees with the weight of authority since *Gross* and *Nassar* recognizing that plaintiffs must demonstrate but-for causation to state an ADEA retaliation claim.") (collecting cases); *see also Wolf v. Time Warner, Inc.*, 548 F. App'x 693, 696 (2d Cir. 2013) (applying "but-for cause" standard in the context of an ADEA retaliation claim).

measures on the last day of the month, and . . . he was failing to complete his interim life-saving measure reviews in a timely manner."  56.1 Counter ¶¶ 69-70.  Importantly, the parties also agree that around December 9, 2020, Roche began to write up "a counseling" for Plaintiff.  *Id.* ¶ 72.  This all occurred before any protected activity by Plaintiff.

To be sure, Roche withdrew the counseling after a discussion with Shaffer, but this is only because Shaffer agreed to take a more direct role in assisting Plaintiff with his responsibilities "after Roche expressed his displeasure with [Plaintiff's] work product and his intention to write an associate counselling report."  *Id.* ¶¶ 72-73.  The fact that Shaffer and Roche took a different step, other than a PIP or counseling, to address what they viewed as deficiencies in Plaintiff's performance does not support Plaintiff's position.  The relevant fact is that Defendants had already identified the deficiencies and were taking steps to improve Plaintiff's work performance prior to any protected activity.  Thus, the continuation of this progressive discipline process demonstrates that it was not undertaken because of any protected activity by Plaintiff that occurred later.  In other words, because those "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."  *Chamberlin*, 247 F. App'x at 254.

For instance, in *Slattery v. Swiss Reinsurance Am. Corp.*, the Second Circuit, affirming the district court, concluded that where "the adverse employment actions were both part, and the ultimate product, of an extensive period of progressive discipline," there was no inference of retaliation.  248 F.3d at 95.  There, the discipline began five months before the plaintiff's alleged protected activity.  *See id.*  Here, Roche began disciplining Plaintiff around seven months before the alleged protected activity.  Under these circumstances, temporal proximity alone is insufficient to raise an inference of retaliation.  *See, e.g.*, *Cousar v. New York-*

*Presbyterian/Queens*, No. 16-cv-01784 (MKB), 2019 WL 4015440, at *16 (E.D.N.Y. Aug. 26, 2019) ("[B]ecause Defendant began disciplining Plaintiff for time and attendance issues in 2012, approximately two years before Plaintiff filed her first complaint of discrimination with HR in June of 2014, Plaintiff cannot rely on temporal proximity alone to establish an inference of retaliation."), *aff'd sub nom. Cousar v. New York-Presbyterian Queens*, 845 F. App'x 34 (2d Cir. 2021); *Domb v. Metro. Life Ins. Co.*, No. 01-cv-10074 (GEL), 2003 WL 21878784, at *9 (S.D.N.Y. Aug. 7, 2003) (granting summary judgment for the defendant and finding no retaliation when the plaintiff was fired the same day as the conclusion of an investigation into her discrimination complaint, and the complaint followed performance warnings to the plaintiff); *Blodgett v. 22 S. St. Operations*, No. 17-cv-00766 (VAB), 2019 WL 2913844, at *7 (D. Conn. July 8, 2019) ("But where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." (internal quotation marks omitted)), *aff'd sub nom. Blodgett v. 22 S. St. Operations, LLC*, 828 F. App'x 1 (2d Cir. 2020).

Even assuming that Plaintiff has made out a *prima facie* case of retaliation, "the evidence would not permit a jury to find that [Defendants'] proffered legitimate, non-discriminatory reason for" issuing the PIP and counseling – "his long subpar performance – was a pretext for retaliation." *Yagudaev v. Credit Agricole Am. Servs., Inc.*, No. 18-cv-00513 (PAE), 2020 WL 583929, at *15 (S.D.N.Y. Feb. 5, 2020). Plaintiff argues that Roche "harassed" Plaintiff by discussing the deadlines set forth in the PIP in front of colleagues. Opp. at 21 (citing 56.1 Counter ¶¶ 280-284). But neither these conclusory assertions, nor any of the other fairly sparse evidence provided by Plaintiff, would permit a reasonable jury to infer that Plaintiff's complaints to HR "catalyzed" his PIP and counseling. *Yagudaev*, 2020 WL 583929, at *15; *Fleming v.*

*MaxMara USA, Inc.*, 371 F. App'x 115, 117 (2d Cir. 2010) ("[Plaintiff's] retaliatory termination claim fails because, even if she can show a prima facie case of retaliation, defendants have put forth a legitimate, non-discriminatory reason for her termination, and [plaintiff] has not responded with facts sufficient to warrant a reasonable jury finding by a preponderance of the evidence that [the reason was pretext for retaliation]."); *Tomizawa v. ADT LLC*, No. 13-cv-6366 (MKB) (LB), 2015 WL 5772106, at *3 (E.D.N.Y. Sept. 29, 2015) ("Plaintiff's sole evidence of pretext, the temporal proximity between Plaintiff's complaints and Defendants' discipline, cannot demonstrate that Defendants' progressive discipline, initiated before Plaintiff's protected activity and supported by Plaintiff's poor performance record, was pretext for retaliation."). Moreover, Plaintiff has not articulated any "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Zann Kwan*, 737 F.3d at 846. Defendants consistently advised Plaintiff that he was not timely performing essential aspects of his job and provided performance plans for improvement. Accordingly, Defendants are entitled to summary judgment with respect to Plaintiff's retaliation claim.

## IV.     Supplemental Jurisdiction

Plaintiff has also asserted claims for discrimination, retaliation, and failure to provide equal pay under New York state and city laws. *See* Compl. ¶¶ 143-170. A district court "may decline to exercise supplemental jurisdiction" where it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Courts consider the "traditional 'values of judicial economy, convenience, fairness, and comity . . . .'" *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Generally, where "all federal-law claims are eliminated before trial, the balance of

the factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Cohill*, 484 U.S. at 350 n.7; *see United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well."); *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 325 (2d Cir. 2021) (concluding that the district court did not abuse its discretion in declining to exercise pendent jurisdiction over the remaining state law claims after the federal claims were dismissed).

This is particularly true in employment cases, where the claims that remain include NYSHRL and NYCHRL claims that are "evaluated under a different legal standard" and "present distinctly state-law questions." *Green v. Gen. Motors*, No. 20-cv-01797 (LJV) (HKS), 2023 WL 3541265, at *8 (W.D.N.Y. May 18, 2023); *see also Ebel v. G/O Media, Inc.*, No. 20-cv-07483 (PAE), 2022 WL 2359245, at *29 (S.D.N.Y. June 30, 2022) (declining to exercise supplemental jurisdiction over NYSHRL and NYCHRL claims after summary judgment); *Fitzgerald v. We Co.*, No. 20-cv-05260 (AT), 2022 WL 952963, at *10 (S.D.N.Y. Mar. 30, 2022) (same). While this case has progressed through summary judgment, "[t]he extensive discovery already taken is likely sufficient to enable Plaintiff['s] [state] claims to be evaluated in state court without any additional discovery, and Plaintiff[] would not be prejudiced by dismissal since New York's C.P.L.R. § 205 allows a plaintiff to recommence a dismissed suit within six months without regard to the statute of limitations." *Vuona v. Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 394 (S.D.N.Y. 2013) (internal quotation marks and citations omitted) (declining to exercise supplemental jurisdiction over state law employment claims after granting summary judgment on federal claims). Therefore, because the Court dismisses Plaintiff's federal claims, *see supra* Discussion §§ I-III, the Court declines to exercise supplemental jurisdiction over Plaintiff's state and city claims.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part.  Counts 1 and 2 are dismissed with prejudice, and all other counts are DISMISSED without prejudice to renewal in state court.

The Clerk of Court is respectfully directed to terminate all pending motions and to CLOSE this case.

Dated: September 5, 2023
        New York, New York

                                        SO ORDERED.


                                        _____
                                        JENNIFER L. ROCHON
                                        United States District Judge